**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (BLS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DECLARATION OF CHRIS CRAMER, CHIEF EXECUTIVE OFFICER,
CHIEF OPERATING OFFICER, AND CHIEF FINANCIAL OFFICER OF
CLAIRE'S HOLDINGS LLC AND CERTAIN OF ITS AFFILIATES, IN SUPPORT
OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Chris Cramer, Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Claire's Holdings LLC (collectively, with its Debtor affiliates, the "Debtors" and, together with the Debtors' non-Debtor affiliates, the "Company" or "Claire's"), hereby declare under penalty of perjury:[2]

1.        Claire's is a global brand powerhouse for self-expression, creating exclusive, curated, and fun fashionable jewelry and accessories.  Claire's is also a go-to establishment for ear piercing, having pierced over 100 million ears since 1978.  Indeed, Claire's ear-piercing services are a renowned "rite of passage" for millions of girls across the world who trust Claire's with their first ear-piercing experience.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343).  The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

[2]    Capitalized terms used but not immediately defined herein have the meanings given to them in other sections herein.

2.      Claire's was highly profitable in the years following emergence from its 2018 prearranged chapter 11 cases.  While the business experienced a temporary slump during the early months of the COVID pandemic, it quickly rebounded, offering a uniquely fun, colorful immersive, experiential, in-person shopping experience during a period marked by uncertainty, loss, and isolation for many individuals and families across the globe.

3.      Claire's carried this momentum into 2021.  In the first half of the fiscal year in 2021, Claire's posted stronger same-store sales, total net sales growth, and EBITDA as compared to both 2019 and 2020.  Claire's also amplified its online store presence, posting increased e-commerce sales.  From this position of financial strength and stability, Claire's filed for an initial public offering on September 29, 2021, to drive further long-term growth in revenue and earnings.

4.      Despite this momentum, Claire's was not immune from the continued trend away from brick and mortar and more recent macroeconomic challenges, including higher interest rates, labor costs and, most recently, tariffs.  While Claire's took many steps over the last few years to address these and other challenges, it was not enough to overcome the obstacles.

5.      In the months leading to the Petition Date, the Debtors launched a dual-track marketing process to solicit bids for (a) all or part of the Debtors' business operations as a going concern or (b) a full chain liquidation either on a fee-for-service or equity basis.  Pursuant to this process, the Debtors contacted over 150 potential buyers, executed approximately 60 confidentiality agreements, and received multiple letters of intent, which the Debtors are continuing to negotiate.  Additionally, the Debtors executed a fee-for-service agency agreement (the "Agency Agreement") with Hilco Merchant Resources, LLC ("Hilco") on July 24, 2025, to liquidate all or a portion of the United States and U.S. territory stores in the event a going-concern transaction is not achievable.

6. The Debtors intend to use the initial days of these chapter 11 cases to convert one or more of the non-binding letters of intent into binding commitments to purchase some or all of the Debtors' assets.  In the meantime, the Debtors intend to immediately commence store closing sales to monetize some or all of their store locations pursuant to the Agency Agreement and in accordance with the terms of the consensual cash collateral order negotiated with the Debtors' ABL Lenders and Priority Term Loan Lenders.  The liquidity generated from the store closing sales will facilitate the administration of these Chapter 11 Cases and maximize the value of the Debtors' estates for the benefit of all stakeholders.  The Debtors maintain the flexibility under the Agency Agreement, subject to the consent of their lenders, to stop the liquidation sales in the event of an actionable going-concern transaction and will continue to make every effort to effectuate such a transaction.

\* \* \*

## BACKGROUND AND QUALIFICATIONS

7. I am the Chief Executive Officer ("CEO"), Chief Operating Officer ("COO"), and Chief Financial Officer ("CFO") of the Company.  I joined the Company as COO and CFO in October 2023, after over 20 years in the retail space.  I was appointed CEO on an interim basis on June 17, 2024, and on a permanent basis on June 6, 2025.  Prior to my tenure with the Company, I worked in a short-term role as president at Parade, Inc., an early-stage lingerie and lifestyle apparel retailer in the spring of 2023.  Before that, I worked as chief operating officer at Bath & Body Works, Inc. from September 2020 to August 2022, having originally joined Bath & Body Works, Inc. (formerly L Brands, Inc.) in 2001.  During my time at Bath & Body Works, I held a variety of other leadership roles within Bath & Body Works corporate and brand management, including executive vice president and general manager for Bath & Body Works Direct (the

e-commerce business unit of Bath & Body Works), executive vice president, merchandise planning & allocation and customer marketing insights, and senior vice president and chief financial officer.  As a part of these roles, I spent significant time preparing public financial reports and developing and implementing the company's e-commerce business.  While I served as chief operating officer of Bath & Body Works, the company generated approximately $7.9 billion in net sales during fiscal year 2021 and approximately $7.6 billion in net sales during fiscal year 2022. During my time at Bath & Body Works, I was one of the core team members leading the company's launch as a public entity in August 2021.  I also led the e-commerce business unit directly, during which time sales increased from approximately $500 million to approximately $2 billion.  I began my career working in systems integration consulting for Accenture (Andersen Consulting), followed by financial management roles with IBM.  I hold a Bachelor of Arts degree from the University of Michigan and a Master of Business Administration degree from the Johnson School at Cornell University.

8.      I am authorized to submit this Declaration on behalf of the Debtors in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases").  As CEO, COO, and CFO, I am generally familiar with the Debtors' business and financial affairs, day-to-day operations, and underlying books and records.  Except as otherwise indicated, all facts set forth in this declaration (this "Declaration") are based on my personal knowledge, my discussions with other members of the Debtors' management team, employees, and advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  Any references to the Bankruptcy Code, the chapter 11 process, and related legal matters herein reflect my understanding of such matters based

on the explanations and advice proposed counsel to the Debtors have provided.  If called to testify, I would testify competently to the facts set forth in this Declaration.

9.      On August 6, 2025 (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Court").  I submit this Declaration (a) to describe the Debtors' business and background, the circumstances that led to the Debtors' chapter 11 filings, and the Debtors' goals in these Chapter 11 Cases, and (b) in support of the Debtors' Petitions and the "first-day" motions and applications that are being filed with the Court concurrently herewith (collectively, the "First Day Pleadings").

10.     The Debtors commenced these Chapter 11 Cases to implement an orderly and value-maximizing monetization of their assets for the benefit of all stakeholders.  To that end, the Debtors seek the relief set forth in the First Day Pleadings to minimize any adverse effects of the commencement of these Chapter 11 Cases on their business.  I have reviewed the Debtors' Petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business during these Chapter 11 Cases and to successfully maximize the value of the Debtors' estates.

11.     To familiarize the Court with the Debtors, their business, the circumstances leading to these Chapter 11 Cases, and the relief the Debtors seek in the First Day Pleadings, this Declaration is organized as follows:

- **Part I** describes the Debtors' business, organizational structure, prepetition performance and challenges, and prepetition indebtedness;

- **Part II** describes the circumstances leading to the commencement of these Chapter 11 Cases;

- **Part III** describes the proposed use of Cash Collateral and anticipated path forward and timeline for the Chapter 11 Cases; and

- **Part IV** provides support for the relief requested in the First Day Pleadings.

## DISCUSSION

## I.    COMPANY BACKGROUND.

12.    Headquartered in Hoffman Estates, Illinois, Claire's is a go-to establishment for ear piercing, having pierced over 100 million ears since 1978.  The cornerstone of Claire's business is to provide tweens, teens, and young girls with a memorable, immersive, experience-driven in-person shopping and ear-piercing experience.

13.    Customers visiting a *Claire's*® store will find colorful and trendy earrings, necklaces, bracelets, purses, hair accessories, fashion accessories, stuffed animals, makeup, perfumes, and licensed merchandise targeted towards girls, tweens, and teens, in addition to ear-piercing services provided in-store through fully-trained staff.  Claire's has a powerful following with the Generation Z and Generation Alpha (colloquially, "Gen Zalpha") audience and a reputation for delivering a differentiated, trendsetting, and diverse assortment of products, many of which are proprietary designs, that help young minds style and define themselves.

14.    The Company has attracted loyal customers for more than 40 years through generational relationships.  As *Claire's*® customers mature through their teenage years into young adulthood, *Icing*® branded stores offer a sophisticated line of jewelry, beauty products, and fashion accessories, as well as ear-piercing services.

15.    The Company operates (a) approximately 2,300 brick-and-mortar stores, consisting of (i) approximately 1,970 *Claire's*® stores located in 17 countries throughout North America and Europe, (ii) approximately 210 *Claire's*® "Store-in-Store" ("SiS") locations inside Walmart stores

in North America, and (iii) approximately 120 *Icing*® stores in North America, and (b) approximately 9,000 Concessions locations throughout North America and Europe. In addition, Claire's franchisees operate approximately 230 franchised stores, primarily located in the Middle East and South Africa.[3]  Globally, the Company employs approximately 13,000 employees.  As of the Petition Date, the Debtors employ approximately 7,000 employees who work in their retail stores, corporate offices, and distribution center, and who are essential to the Debtors' ordinary course business operations.

**A.    The Debtors' Corporate History.**

16.    The Company has been a staple in the retail industry since its inception, providing its customers with opportunities for fun, fashion, and flair.  The Company was founded by Rowland Schaefer in 1961 as a wig retailer by the name of "Fashion Tress Industries."  In 1973, Fashion Tress Industries acquired the Chicago-based Claire's Boutiques, a 25-store jewelry chain that catered to women and teenage girls.  Fashion Tress Industries adopted the Claire's brand following the acquisition, changing its name to "Claire's Stores, Inc.", and shifted its focus to a full line of fashion jewelry and accessories.  The Company began its now iconic ear-piercing business in 1978.

17.    The Company continued to expand its footprint throughout the following two decades, and experienced considerable growth beginning in the late 1990s, expanding from suburban shopping malls to European city centers and beyond.  In furtherance of that goal and to engage with *Claire's*® customers through the next stage of their lives, the Company acquired The Icing in 1996 and Afterthoughts in 1999, which together became *Icing*® as it is known today.

---

[3]    The Company's foreign entities, other than Debtor Claire's (Gibraltar) Holdings Limited, are not debtors in these Chapter 11 Cases.

**B.**      **The Company's Business Operations.**

18.      The Company operates under two distinct brands:  (i) *Claire's*®, the fun fashion destination for jewelry, cosmetics, accessories, and ear piercing primarily targeted to tweens, teens, and young girls and (ii) *Icing*®, the jewelry, accessories, and cosmetics "it" store for young women.

19.      The Company's business is divided into four main business lines:  (i) Brick & Mortar; (ii) Concessions; (iii) E-commerce; and (iv) Franchise.  Geographically, the Company's operations are organized in two divisions:  (i) the North American division, which encompasses the Debtors' operations in the United States (including Puerto Rico) and non-Debtor Claire's Stores Canada Corp.'s Canadian operations; and (ii) the European division, which encompasses the Company's operations in the UK, the Republic of Ireland, and continental Europe. The Company primarily derives its revenue from its world-leading ear-piercing services and merchandise sold in its brick-and-mortar and Concessions retail locations across North America and Europe.

### 1.      The Company's Retail Brands and Licensing.

20.      ***Retail Brands.***      The Company operates *Claire's*® through a combination of sales channels around the world, serving as a global leader  in providing jewelry, fashion accessories, beauty products, and piercing services for kids, tweens, and teens.  The target *Claire's*® customer is primarily girls between the ages of 3 and 18 years old.

21.      The      Company      also      operates approximately 120 *Icing*® stores in North America. *Icing*® caters to a more mature customer base, with  the target *Icing*® customer being an independent, fashion-conscious young woman between the ages of 18 and 35 years old.

22.     The *Icing*® brand bolsters long-term, meaningful relationships with young *Claire's*® customers who mature to become loyal *Icing*® customers.  The differentiation between *Claire's*® and *Icing*® allows the Company to operate multiple store locations within a single mall or in close proximity of each other and to serve a wider demographic.  In the lead up to these Chapter 11 Cases, the Company determined to shift its focus solely to the *Claire's*® brand and, accordingly, intends to commence orderly exits from all *Icing*® locations.

23.     **Licensing.**  The Company both licenses intellectual property from third parties ("In-Licensing") and licenses its own intellectual property to third parties ("Out-Licensing").  The Company's In-Licensing involves licensing the rights to sell certain products branded with the logos and likeness of popular characters and movies, such as The Smurfs™, Disney Stitch©, and Peanuts™, among several others.

24.     The Company's Out-Licensing efforts include licensing its intellectual property to affiliates and franchisees.  In February 2024, the Company partnered with IMG Licensing to extend the Company's global fashion brands through strategic licensing, focusing on categories ranging from apparel, fashion accessories, room décor, and other lifestyle and special occasion products for Gen Alpha, Gen Z, and beyond.

## 2.     The Company's Sales Channels.

25.     **Brick-and-Mortar Operations.**   The Company's revenue is overwhelmingly generated from its in-store sales, with the brick-and-mortar business line earning the Company approximately $75 million in adjusted EBITDA in Fiscal Year 2024.  The Company operates approximately 1,500 store locations in North America (*i.e.*, the United States, U.S. territories, and Canada) as of the Petition Date, including *Claire's*®, *Icing*®, and Walmart SiS locations.  The Company operates an additional approximately 825 Company-run stores outside of North America.  Of the Company's stores, the Debtors operate approximately 1,350 store locations

within the United States and U.S. territories, including *Claire's*®, *Icing*®, and Walmart SiS locations.

26.     The Company leases all of its store locations and offices, including its combined U.S. headquarters and distribution center in Hoffman Estates, Illinois.  The aggregate annual occupancy cost of the Company's current global lease footprint is approximately $250 million, and the aggregate annual occupancy cost with respect to the Debtors' U.S. and U.S. territory lease footprint is approximately $130 million.

27.     Before the Petition Date, the Company's management team and advisors undertook an extensive analysis of the Debtors' existing store footprint to identify stores that are not viable under current lease terms or otherwise underperforming.  Based on this review, the Company determined it is advisable to exit approximately 700 store locations, including all of its *Icing*® locations and 210 Walmart SiS locations, and pursue a value-maximizing transaction for the remaining approximately 800 stores, of which approximately 700 are operated by the Debtors and approximately 100 are operated by a non-Debtor affiliate in Canada.  As of the Petition Date, an actionable going-concern sale has not materialized for these remaining 800 stores, and unless a going-concern purchaser emerges in the immediate near-term, the Debtors intend to exit all of their physical store locations.

28.     ***Concessions.***  The Company sells its merchandise through a "concessions" channel through partnerships with several prominent retailers, including Walmart,[4] Kohls, and CVS (collectively, the "Concessions Partners") to provide Claire's merchandise for sale within the partners' own retail locations (the "Concessions").  The Company's Concessions Partners are generally retailers with store locations benefitting from heavy daily foot traffic, such as

---

[4]     In addition to the Walmart SiS locations, the Company also has a Concession partnership with Walmart.

pharmacies, supermarkets, mass market stores, and other retail locations located outside of the traditional shopping mall format.  By partnering with these retailers, the Company sought to gain access to new sales channels without encroaching on its traditional mall-based operations.

29.     Concessions Partners are paid a commission in connection with the sale of the Company's goods at those locations.  The Company's Concessions business line earned the Company approximately $16 million in adjusted EBITDA in Fiscal Year 2024.

30.     Initially, the Company grew its accounts with Concessions Partners to over 20,000 locations.  Inventory management and systems issues and inventory shrinkage made it difficult for the Company's Concessions business to turn a profit.  Unfortunately, the Concessions business did not yield the expected returns, but instead saddled the Company with a large and complex network of Concessions Partners that required significant labor to manage.  As a result, in 2024 and 2025, the Company significantly scaled back its Concessions business.  The Company currently operates approximately 9,000 Concessions locations worldwide, and has decided, in an exercise of its business judgment, to exit all of its Concessions locations in North America during the course of these Chapter 11 Cases.

31.     ***E-Commerce.***  The Company operates a digital sales platform through which new and existing customers can purchase products directly through the *Claire's*® and *Icing*® websites and mobile application.  The Company's e-commerce business, which includes an integrated distribution channel, lost the Company approximately $9 million in adjusted EBITDA in Fiscal Year 2024.

32.     ***Franchise.***  Finally, the Company franchises approximately 230 stores across Africa, Asia, Europe, Latin America, and the Middle East.  The Company's franchise business line earned the Company approximately $3 million in EBITDA in Fiscal Year 2024.

### 3.    The Company's Merchandising Operations.

33.    The Company's merchandising operations are extensive and require significant working capital and investments to maintain.  Each of the Company's store locations maintains approximately 7,500 different stock keeping units ("SKUs") on average at any given time.  This level of product diversity enables the Company to offer trend-oriented products, which is a critical component of the shopping experience that the Company offers to its customers and differentiates the Company's products from its competitors.

34.    The Company does not own or operate any manufacturing facilities.  Instead, the Company sources merchandise from approximately 250 vendors, a substantial majority of which are located outside of the United States.  Vendors participating in the Company's supply chain are subject to rigorous and ongoing quality-control evaluations.

35.    The Company has an established process for vetting new products and bringing them to market.  First, the Company evaluates trends and concepts and sources samples.  Then, the Company works with its vendors to finalize new designs and product offerings.  Once satisfied with the new product, the Company negotiates purchase agreements and places orders.  Vendors typically take four to six months to manufacture the product after the order is placed.  Completed products ordered by the Company are shipped to the Company's distribution centers (primarily via ocean freight), which typically takes another month.[5]  Finally, products are allocated and distributed to stores for sale to customers.

36.    The Company manages buying operations for approximately 45% of its North American inventory needs through RSI International Ltd. ("RSI"), a non-Debtor subsidiary

---

[5]    The Debtors operate one distribution center in the United States, while non-Debtor affiliates operate a distribution center in each of Hong Kong and the United Kingdom.

organized under the laws of Hong Kong. RSI acts as purchasing and disbursement agent for various Debtor and non-Debtor entities in connection with the Company's global supply chain management practices. Specifically, Debtor CBI Distributing Corp. ("CBI"), and certain non-Debtor procurement entities, are parties to agency agreements with non-Debtor Claire's China Services. Claire's China Services, in turn, outsources the agency services to RSI.

37.     CBI, along with Claire's non-Debtor purchasers, places purchase orders directly with foreign vendors, generally in mainland China. In the first instance, the foreign vendor will issue invoices to RSI and RSI, in turn, invoices the relevant Claire's entity for the aggregate funds attributable to such purchases. On a weekly basis, the Debtor and non-Debtor purchasers pay outstanding invoices from RSI, which in turn remits payment to the applicable vendors. Weekly payments by the Debtors to RSI averaged approximately $1.0 million over the four-month prepetition period.[6] In addition to payment for merchandise sourced by RSI, the Debtors remit approximately $400,000 per month to RSI to cover operating expenses such as payroll, rent, and other business expenses. Although RSI remits payment directly to vendors, RSI solely acts in its capacity as an agent of the relevant Claire's entity and the ultimate liability for goods procured by RSI on behalf of the Debtors are obligations of such Debtors.

**4.     Claire's Strong Performance Through 2022.**

38.     Claire's emerged from its prior prearranged chapter 11 cases in 2018 (the "Prior Cases") with a reorganized balance sheet that eliminated $1.9 billion of funded debt, a right-sized lease portfolio commensurate with the 2018 retail environment, and a business that was poised to

---

[6]     For the avoidance of doubt, by this motion, the Debtors seek the authority, but not direction, to continue their agency arrangement with RSI in order to manage purchases from foreign vendors. The Debtors separately seek relief to honor prepetition amounts due to vendors, if any, pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain (A) Critical Vendors, (B) Foreign Vendors, (C) 503(b)(9) Claimants, and (D) Lien Claimants, (II) Granting Administrative Expense Priority to Outstanding Orders, and (III) Granting Related Relief*, filed contemporaneously herewith.

succeed in a highly competitive retail environment.  The COVID-19 pandemic occurred less than two years after Claire's emerged from the Prior Cases.  State and local governments issued unprecedented "stay at home orders" and other restrictive executive orders that required "non-essential" businesses, including malls, to close during the initial months of the COVID-19 pandemic.  While Claire's experienced a slump in sales during the initial approximately three months of the COVID-19 pandemic, Claire's was well positioned to capitalize on pent-up demand when it reopened the majority of its stores in May 2020, as state and local governments began to ease COVID-19 related restrictions.

39.    Claire's experienced a continued period of growth during the retail-industry wide boom during 2021, and, indicative of Claire's strengthening brand presence, Claire's expanded its "C-Club" loyalty program in the United States from approximately 5.6 million members to over 8 million members.  Claire's also amplified its online store presence, posting increased e-commerce sales.  From this position of financial strength and stability, Claire's filed for an initial public offering on September 29, 2021, to drive further long-term growth in revenue and earnings.[7] Claire's performance continued to increase through the fourth quarter of 2021, culminating in a record-breaking 2021 holiday season for Claire's.

40.    Notwithstanding a strong 2021 across the retail industry, market trends continue to shift away from in-person mall shopping and towards e-commerce.  With Claire's strong financials in hand, Claire's focused on its opportunity to expand and grow its brand identity and business beyond its in-mall brick-and-mortar presence to capture off mall sales revenue.

41.    To that end, Claire's expanded its offerings into off-mall locations, including strip malls and "store-in-store" locations inside Walmart stores, and grew its Concessions business (as

---

[7]    Ultimately, however, Claire's decided to withdraw its IPO application in July 2023.

defined herein) to approximately 20,000 partner locations.  Claire's also amplified its e-commerce platform and in-store aesthetic to strengthen its engagement with its core demographic—individuals in Gen Zalpha who have a strong digital literacy and preference for a sleeker, more modern aesthetic—and emphasized fewer young girls and more teenagers in its advertising materials.  At the same time, Claire's increased prices on many products in an attempt to maintain strong margins.

42.     As further described herein, the Company's strategy to expand the Company's physical locations beyond its core brand identity and business did not comprehensively offset the decline in in-person shopping, the rise of e-commerce across the board, increased costs, first from labor and other inflation, and then from tariffs.

### 5.     Industry-Wide Move Towards E-Commerce.

43.     COVID-19 upended the retail industry and resulted in long-term shifts in consumer behavior.  Customer purchase volumes and mall foot-traffic decreased and demand shifted, as consumers shifted to retailers focused on e-commerce methods of product delivery as the pent-up in-store demand generated by COVID-19 dissipated.

44.     Notwithstanding the uptick in sales on the Company's e-commerce platform as compared to brick-and-mortar retail during the COVID-19 pandemic, the Company's business was not conducive to a large-scale transition to e-commerce for the long-run.  The majority of the Company's customers are young individuals who do not themselves have access to funds, credit cards, or the ability to shop online.  These customers rely on their parents or caretakers to bring them to the Company's stores so that they can see and touch the Company's products.  Accordingly, the Company struggled to create an online website that could compare to the tactile shopping experience that is so vital for its young customers.  The Company is also smaller and offers more specialized products than most e-commerce competitors, and accordingly did not

possess the scale to invest heavily in e-commerce capabilities that could support a broad transition from brick-and-mortar to online retail.  Finally, the Company's ear-piercing services, which are foundational to the Company's business and brand, were not transferable to e-commerce because they can only be provided in-store by trained employees with specialized ear-piercing equipment—not online or at home.

45.    The Company also invested in its Concessions business to showcase and sell its products in the stores of other retailers with heavy foot traffic.  Indeed, the Company grew its Concessions business to more than 20,000 partner locations.  As set forth herein, poor inventory management practices and systems and challenges with inventory shrinkage made it difficult for the Company's Concession business to generate a financial return due to lost sales and customers.  In addition, the Concessions business resulted in a large and complex network of Concessions Partners that required significant labor for the Company to manage and a large working capital investment without generating sufficient sales to offset the expense.

### 6.    Increased Competition.

46.    The piercing market, which Claire's had dominated year over year, also became increasingly more competitive.  Specialty retailers that offered ear-piercing services, like Lovisa, Rowan, and Studs emerged with, in the aggregate, hundreds of locations across the United States, while other retailers, like Ulta and Five Below, introduced in-store ear piercing services.  Other outlets, like tattoo parlors, grew in popularity as a location for piercing services.  At the same time, needle ear piercing increased in popularity as compared to Claire's touch-free piercing single use cartridge system.

47.    Competition mounted across a variety of products in the non-piercing market as well.  Claire's was slow to move into beauty and skincare products, missing out on share of

customer wallet for such products, as competitors such as Lovisa, SHEIN, Five Below, Ulta, and Temu experienced their own rapid growth in this time period.

### 7.    Pricing and Inventory Management and Systems Issues.

48.    The Company pursued several initiatives in an attempt to combat inflationary pressure, increased freight costs, and a period of high interest rates, that increased the Company's costs and lowered the Company's margins.  The Company undertook a price adjustment strategy in 2021 to increase the prices of its merchandise and improve its margins.  This initiative was not received well by the Company's customers who were accustomed to purchasing the Company's merchandise in a certain price range.  The price adjustments did not have the revenue boosting effect that the Company had hoped.  Instead, the Company's prices became less competitive, damaged the Company's value perception with consumers, and led to a decrease in customers and sales.

49.    The Company also focused on stocking its shelves with more "core products" that are usable and wearable year-round, as opposed to trendy or seasonal merchandise.  This, too, did not have the anticipated result on the Company's bottom line, as the Company was left stocked with too many products that did not feel relevant to consumers.  As a result, the Company's sales declined, necessitating heavy discounts to sell excess inventory.

50.    The Company also struggled with poor inventory management practices and systems, which, among other things, led to significant out of stocks and made it difficult for the Company to identify inventory shrinkage (*i.e.*, the loss of merchandise that could not be accounted for through sales as a result of, for example, shoplifting or supplier error).  These issues were compounded by inaccurate demand forecasting, such that the Company did not have in-demand goods in their distributions centers to replenish its stores once inventory shortages were identified, as well as several seasons where the Company struggled to correctly predict style and trend

demands in a market where style and trends are paramount. Ultimately, poor inventory management practices and systems harmed the Company's brick-and-mortar sales and made it difficult for the Company's Concessions business to turn a profit due to lost sales and customers who were disappointed that the Company was not adequately stocked with in-demand inventory.

51.     To address these issues, the Company underwent a multi-year implementation of Blue Yonder's end-to-end supply chain management solutions, focused on allocation tools and demand forecasting. Blue Yonder, however, required significant capital to integrate and presented its own challenges, the majority of which were typical for onboarding a systems adjustment of this type and scale, including demand forecasts not being well-aligned, SKUs not being loaded into Blue Yonder's systems, inaccurate store assumptions, and requisite training of the Blue Yonder team. Each of these foregoing issues were remedied within a 9–12-month period. The Blue Yonder "Go Live" was initiated (*i.e.*, transitioned the systems from the test phase to making them for use) just prior to holiday season 2023. The integration of Blue Yonder led to an initial period of operational disruption, leading to contributing to disappointing 2023 holiday sales. Today, the Blue Yonder system is functioning well and supporting the Company's business.

52.     Over the ensuring years, and as further described herein, the Company took numerous proactive initiatives to address these issues. In July 2023, Claire's revamped its legacy piercing brand  with a new visual identity—"Pierced by Claire's"—to more effectively target its key Gen Zalpha demographic, introducing a new logo and refreshed aesthetic. In connection therewith, Claire's launched its popular "Free Earrings for a Year" promotion. While these initiatives were productive incremental steps to addressing Claire's challenges, Claire's management team identified in 2024

that a comprehensive turnaround plan was prudent to holistically address these challenges, which resulted in certain operational improvements by late 2024 and early 2025—including stabilizing customer decline for the first time in three years.  The full impact of the Company's turnaround efforts, however, could not be realized fast enough as a result of additional macroeconomic headwinds.

### 8.    Tariffs Lead to Higher Costs.

53.    The Company relies heavily on foreign suppliers.  Indeed, between November 2024 and April 2025, the Company purchased approximately 70% of its inventory from suppliers located outside of the United States, including, among others, 56% from mainland China, 8% from Vietnam, and 3% from Thailand.  As a result, the Company has been significantly impacted by the implementation of sweeping tariffs on imported goods in April 2025, which led to higher projected costs and uncertainty in inventory pricing.

54.    Specifically, on April 2, 2025, a cumulative 145% tariff on imported Chinese goods took effect, as did a 46% tariff on imported Vietnamese goods and a 35% tariff on imported Thai goods.  The Company estimated that its cost of goods sold ("COGS") were projected to increase by approximately $30 million (as of June 23, 2025) as a result of increased tariffs, as compared to the baseline tariffs in effect prior to April 2, 2025, despite tariffs declining to approximately 55% for China and 10% for each of Vietnam and Thailand by mid-June 2025.

55.    The Company could not raise prices to comprehensively mitigate the effects of tariffs on the Company's COGS.  As noted above, raising prices in 2021 and 2022 contributed to declining customer base and declining same store sales.  The Company evaluated and engaged in numerous tariff-mitigation initiatives including, among other things, (a) adjusting the Company's promotional calendar to lean less into "buy three get three" sale promotions, (b) testing price increases across the chain, (c) reassessing its inventory receipt plan for the year and holding back

certain orders to identify opportunities to adjust inventory for the latter part of 2025, (d) implementing certain selling, general, and administrative and operating expenditures cuts, and (e) implementing a large reduction in force in March 2025.

56.     Ultimately, the Company saw a significant and unforeseen decline in same store sales, contributing to the need to commence these Chapter 11 Cases.

### 9.     Burdensome Lease Portfolio.

57.     These challenges combined to affect the profitability of the Debtors' stores.  Prior to the Petition Date, the Debtors undertook a review of their 1,350 retail store locations located in the United States and U.S. territories and determined that approximately 700 of their stores (including the Debtors' Walmart SiS portfolio) were unviable under current economic terms. Monthly rent obligations for these stores are approximately $2.6 million per month.

58.     As further described herein, the Go-Forward Business Plan was centered around rationalizing the Company's North American footprint, including by exiting stores with burdensome lease obligations or that are otherwise unviable, and focusing the Company's resources on the remaining approximately 800 stores.

59.     As further described below, the Debtors and their advisors developed a plan to effectuate an orderly and efficient exit from their approximately 700 unviable or less profitable physical store locations in all scenarios, including a going-concern transaction.  Absent a going-concern purchaser emerging in the immediate near-term, the Debtors will continue to liquidate the entirety of their U.S. lease portfolio, through the store closing procedures set forth in the Store Closing Motion, filed contemporaneously herewith.

C.      **Prepetition Initiatives.**

60.     Claire's undertook numerous prepetition initiatives to address its liquidity challenges, create runway to advance its prepetition marketing process, and facilitate a smooth landing into chapter 11, all as further described below.

1.      **Adjusted Management Team.**

61.     The Company responded to the operational and business performance challenges described above by making certain key changes to its management team.  I joined the Company's leadership team in 2023 to fill the vacant roles of both COO and CFO.  Less than one year into my time at Claire's, in June 2024, the preceding CEO resigned.  I was named CEO on an interim basis in June 2024, in addition to my COO and CFO roles.  I was named permanent CEO in June 2025.

62.     I replaced or added several members to the executive team after becoming CEO in June 2024, including the leaders of the Merchandising, Product Design, Planning & Logistics, Marketing, Human Resources, and Strategy functions, as well as the leader of the Concessions business.

2.      **Turnaround Plan.**

63.     The Company began working on efforts to address its challenges, including via a "Same-Store Sales" or "SSS" turnaround, in November 2023.  Beginning in December 2023, the Company engaged McKinsey & Company ("McKinsey") as consultants to assist the Company in developing its turnaround efforts, including identifying areas for improvement, including to inventory management practices and systems, pricing, non-merchandise procurement, vendor terms, key performance indicators, and reporting.

64.     When I assumed the title of CEO in June 2024, I implemented additional structure to the process of developing and implementing a comprehensive turnaround plan focused on improving all areas of the Company's business (the "Turnaround Plan").  The Turnaround Plan

focused on foundational retail pillars, including the Company's product offerings, promotions, and marketing, pricing, and in-store experience.  Specifically, the Turnaround Plan was focused on: (a) strengthening the Company's management team; (b) renewing the Company's focus on "fresh" product offerings and cosmetic and beauty products; (c) improving the in-store experience that Claire's offers its customers, including by conducting customer tests on various floor sets and product launches; (d) implementing pricing adjustments to improve competitiveness; (e) improving inventory management and systems, (f) overhauling the Company's product design and production teams and processes; (g) clearing out inventory build ups; and (h) enhancing the Company's marketing and promotions strategy.

65.    The Company worked to revitalize its product pipeline, including by expanding the Company's beauty and cosmetics assortment, replacing merchandising leaders (as described above), restructuring the design and production processes and teams, and increasing the percentage of "newness" in product offerings.

66.    Further, the Company sought customer feedback on its floor sets and planned product launches (*e.g.*, "back-to-school" designs and product offerings) to engage with its customers and deliver in-store experiences that resonate with customers.  Adjunct to the Company's turnaround plan efforts, the Company also cleared out overstocked inventory to unlock working capital and free up physical space at the Company's stores and distribution centers for new, vibrant product offerings in line with current trends.

67.    In addition to these efforts, the Company also adjusted its pricing to be more competitive with its market peers and developed internal processes to evaluate leading performance indicators with respect to, among other things, gross margin return, product turnover,

customer acquisition and retention, savings from non-merchandise procurement, and sales penetration from new products.

68.     Indeed, over the year preceding the Petition Date, the Company analyzed its retail channels and exited a substantial number of its unviable Concessions locations to focus on core partners, reducing the Company's Concessions footprint from approximately 20,000 locations to approximately 9,000.   The Company renegotiated contracts with the remaining Concessions partners, enabling the Concessions channel to potentially deliver an acceptable financial return.

69.     The Company raised incremental financing in the form of the $50 million Priority Term Loan Facility in September 2024 to fund the Company's turnaround efforts and working capital needs.   The Priority Term Loan Facility was subsequently upsized by an additional $50 million in February 2025.   While Claire's was confident that the Turnaround Plan would position Claire's for future success, implementing a turnaround takes time.   Despite green shoots in the business as a result of the Turnaround Plan, the Company simply ran out of time.

### D.     The Debtors' Prepetition Corporate Structure.

70.     As set forth on the corporate structure chart attached as **<u>Exhibit A</u>**, Debtor Claire's Holdings LLC is the ultimate parent company of the 13 other Debtors in these Chapter 11 Cases, along with 28 non-Debtor affiliates.

71.     The substantial majority of the Company's international operations are undertaken by the direct and indirect subsidiaries of Debtor Claire's (Gibraltar) Holdings Limited ("<u>Gibraltar Holdings</u>"), the holding company for the Company's European division.   Only one of Gibraltar Holdings' subsidiaries, Claire's Intellectual LLC, an obligor on the Debtors' funded debt, is a Debtor in these Chapter 11 Cases.   The Company's Canadian operations are conducted by Claire's Stores Canada Corp., a non-Debtor entity organized under Canadian law.   In Fiscal Year 2024, the

Company's operations outside of the United States accounted for approximately 26% of the Company's total revenue.

      **E.**      **The Debtors' Prepetition Capital Structure.**

      72.      As of the Petition Date, the Debtors have approximately $690.8 million in principal amount of total funded debt obligations. The following table depicts the Debtors' prepetition capital structure.

| Debt Facility | Maturity | Approximate Principal Outstanding |
|---|---|---|
| *Secured Debt* | | |
| **ABL Facility** | September 30, 2027[8] | $63.5 million[9] |
| **Priority Term Loan Facility** | May 15, 2026 | $121.2 million |
| **Existing Term Loan Facility** | December 18, 2026 | $506.2 million |
| | **Total:** | **$690.8 million** |

      1.      **The ABL Facility.**

      73.      The Debtors are party to that certain ABL Credit Agreement, dated as of September 30, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain First Amendment, dated as of May 31, 2024, and that certain Second Amendment, dated as of May 2, 2025, that certain Third Amendment and Limited Waiver, dated as of June 25, 2025, and that certain Fourth Amendment, dated as July 2, 2025, the "ABL Credit Agreement"), by and among Claire's Holdings LLC, as the parent guarantor, Claire's Stores, Inc. and other domestic borrowers party thereto from time to time, Claire's (Gibraltar) Holdings Limited, and U.K. borrowers party thereto from time to time,

---

[8]    If (a) more than $50 million of Existing Term Loan is outstanding and (b) unrestricted cash *plus* excess availability is less than the amount of outstanding Existing Term Loan, then the ABL Facility maturity date occurs 91 days before the Existing Term Loan Facility maturity date.

[9]    The Company also has approximately $5.7 million of undrawn letters of credit issued and outstanding under the ABL Facility supporting workers compensation and general liability insurance, among other obligations.

certain financial institutions party thereto from time to time as lenders, and JPMorgan Chase Bank, N.A. as administrative agent, collateral agent, lender, letter of credit issuer and swingline lender. The ABL Credit Agreement provides for an asset based revolving credit facility with commitments of $150 million (the "ABL Facility," the lenders thereunder, the "ABL Lenders," and the secured parties thereunder, the "ABL Secured Parties"), with borrowings subject to capacity under the U.S. Borrowing Base and U.K. Borrowing Base (as defined in the ABL Credit Agreement). For loans in U.S. dollars, the ABL Facility bears interest at SOFR + 1.25-1.75%.[10] All loans under the ABL Facility mature on September 30, 2027.

74.    The guarantors under the ABL Credit Agreement are, in each case other than with respect to their own borrowing obligations:  Claire's Holdings LLC, the Existing Term Loan Guarantors,[11] the Priority Term Loan Guarantors,[12] Claire's (Gibraltar) Holdings Limited, Claire's European Services Limited, Claire's Accessories UK Ltd, and Claire's European Distribution Limited.  Claire's (Gibraltar) Holdings Limited and the U.K. Borrowers [13] guarantee the borrowings of Claire's (Gibraltar) Holdings Limited and U.K. Borrowers only, in each case other than with respect to their own borrowing obligations.  The ABL Facility is secured by liens on substantially all of the Debtors' assets, including a first-priority lien on, among other things, inventory, accounts, and certain receivables (the "ABL Priority Collateral"), and a second-priority

---

[10]    The ABL Credit Agreement contains 0.10% credit spread adjustment on Term SOFR loans.  The ABL Credit Facility includes a SOFR "floor" (including the credit spread adjustment) of 0.00%.

[11]    The "Existing Term Loan Guarantors" are:  (i) Claire's Holdings LLC; (ii) Claire's Puerto Rico Corp.; (iii) Claire's Boutiques, Inc.; (iv) Claire's Canada Corp.; (v) Claire's Swiss Holdings LLC; (vi) Claire's Swiss Holdings II LLC; (vii) CSI Canada LLC; (viii) CBI Distributing Corp.; (ix) CLSIP Holdings LLC; (x) BMS Distributing Corp.; (xi) CLSIP LLC; and (xii) Claire's Intellectual LLC.

[12]    The "Priority Term Loan Guarantors" are:  (i) all of the Existing Term Loan Guarantors, other than Claire's Boutiques, Inc. (the borrower under the Priority Term Loan Facility); and (ii) Claire's Stores, Inc.

[13]    The "U.K. Borrowers" are:  (i) Claire's European Services Limited; (ii) Claire's Accessories UK Ltd.; and (iii) Claire's European Distribution Limited.

lien on substantially all other assets, including, among other things, intellectual property and certain stock pledges (the "Term Loan Priority Collateral"). As of the Petition Date, $63.5 million in borrowings remain outstanding under the ABL Facility as well as approximately $5.7 million of undrawn letters of credit issued and outstanding under the ABL Facility that support workers compensation and general liability insurance, among other obligations.

### 2. The Term Loan Facilities.

#### (i) *The Priority Term Loan Facility.*

75.     Claire's Boutiques, Inc. is party to that certain Priority Term Loan Credit Agreement, dated as of September 23, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain Amendment No. 1 to Priority Term Loan Credit Agreement, dated as of February 20, 2025, that certain Amendment No. 2 to Priority Term Loan Credit Agreement, dated as of February 27, 2025, that certain Amendment No. 3 to Priority Term Loan Credit Agreement, dated as of May 2, 2025, that certain Amendment No. 4 to Priority Term Loan Credit Agreement and Amendment No. 1 to Guarantee and Collateral Agreement, dated as of June 2, 2025, that certain Amendment No. 5 to Priority Term Loan Credit Agreement and Amendment No. 2 to Guarantee and Collateral Agreement, dated as June 25, 2025, and that certain Amendment No. 6 to Priority Term Loan Credit Agreement, dated as July 1, 2025 the "Priority Term Loan Credit Agreement"), by and among Claire's Holdings LLC, as the parent guarantor, Claire's Boutiques, Inc., as borrower, certain financial institutions party thereto from time to time as lenders, and Ankura Trust Company LLC, as administrative and collateral agent (the "Priority Term Loan Agent"). The obligations under the Priority Term Loan Credit Agreement are guaranteed by the Priority Term Loan Guarantors.

76. The Priority Term Loan Credit Agreement provides for a secured term loan facility (the "Priority Term Loan Facility," the loans thereunder, the "Priority Term Loans," and the lenders thereunder, the "Priority Term Loan Lenders") secured by liens on substantially all of the Debtors' assets, including a first-priority lien on Term Loan Priority Collateral, and a second-priority lien on ABL Priority Collateral, subject to exclusions for certain excluded collateral and limitations on perfection steps as set forth in the Priority Term Loan Credit Agreement. The Priority Term Loan Facility bears interest at SOFR[14] + 7.25%, and such interest is paid in-kind. The Priority Term Loan Facility matures on May 15, 2026. As of the Petition Date, the outstanding principal amount of the Priority Term Loan Facility is approximately $121.2 million.

77. The Company initially entered into the Priority Term Loan Facility in September 2024, borrowing $50 million in an effort to address the Company's working capital needs and provide runway for the Company to refine and implement its Turnaround Plan. While the Priority Term Loan Facility provided the Company with time to formulate and begin to execute on its Turnaround Plan, by the first quarter of 2025, it became clear that the Company would need incremental financing. The Company obtained an additional $50 million in the form of incremental Priority Term Loans pursuant to the Amendment No. 3 to Priority Term Loan Credit Agreement, which was executed on February 27, 2025.

78. As set forth in greater detail herein, the Debtors subsequently raised an incremental $16 million of Priority Term Loans in June 2025. The Debtors continued to reach out to the Term Lenders in June and July 2025 to raise additional incremental Priority Term Loans, but the Term Lenders ultimately elected not to contribute additional capital.

---

[14] The Priority Term Loan Facility includes a SOFR "floor" of 1.00%.

### (ii)    *The Existing Term Loan Facility.*

79.    Claire's Stores, Inc. is party to that certain Term Loan Credit Agreement, dated as of December 18, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of March 17. 2023, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of September 23, 2024, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of February 27, 2025, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of April 28, 2025, and that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of July 1, 2025, the "Existing Term Loan Credit Agreement"), by and among Claire's Holdings LLC, as the parent guarantor, Claire's Stores, Inc., as borrower, certain financial institutions party thereto from time to time as lenders, and Ankura Trust Company, LLC, as administrative and collateral agent.  The Existing Term Loan Credit Agreement provides for a secured term loan facility (the "Existing Term Loan Facility," the lenders thereunder, the "Existing Term Loan Lenders," together with the Priority Term Loan Lenders, the "Term Lenders," and together with the Priority Term Loan Lenders and ABL Lenders, the "Prepetition Secured Lenders").  The Existing Term Loan Facility bears interest at SOFR + 6.50%,[15] with such interest paid in-kind at the option of the Debtors and matures on December 18, 2026.

80.    The Existing Term Loan Credit Agreement is guaranteed by the Existing Term Loan Guarantors.  Like the Priority Term Loan Facility, the Existing Term Loan Facility is secured by liens on substantially all of the Debtors' assets, including a first-priority lien on Term Loan Priority Collateral, and a second-priority lien on ABL Priority Collateral, subject to exclusions for

---

[15]    Lenders under the Existing Term Loan Facility benefit from a 0.10% credit spread adjustment.  The Existing Term Loan Facility includes a SOFR "floor" (including the credit spread adjustment) of 0.00%.

certain excluded collateral and limitations on perfection steps as set forth in the Existing Term Loan Credit Agreement. As of the Petition Date, the outstanding principal amount of the Existing Term Loan Facility is approximately $506.2 million.

### 3. Intercreditor Arrangements.

81. The relationship between the Priority Term Loan Facility and the Existing Term Loan Facility (collectively, the "Term Facilities") is governed by that certain Priority First Lien Intercreditor Agreement, dated as of September 23, 2024, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) between, *inter alios*, Ankura Trust Company, LLC, as the priority first lien administrative agent and Ankura Trust Company, LLC, as the existing credit agreement administrative agent (the "Term Loan Priority Intercreditor Agreement"). Pursuant to the Term Loan Priority Intercreditor Agreement, the Priority Term Loan Facility is senior in right of payment vis-à-vis the Existing Term Loan Facility. The Term Loan Priority Intercreditor Agreement also provides that, notwithstanding the date, time, manner or order of grant, attachment, or perfection of the liens securing the Priority Term Loan Facility and Existing Term Loan Facility, such liens are of equal priority.

82. The relationship between the Term Facilities and the ABL Facility is governed by that certain ABL Intercreditor Agreement, dated as of December 18, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as supplemented by that certain Lien Sharing and Priority Confirmation Joinder, dated as of September 23, 2024, the "ABL Intercreditor Agreement") among, *inter alios*, JPMorgan Chase Bank, N.A., as ABL agent (the "ABL Agent"), and Ankura Trust Company, LLC, as existing administrative agent and priority first lien administrative agent. The ABL Intercreditor Agreement provides that the ABL Facility has a senior lien on ABL Priority Collateral vis-à-vis the Term Facilities and a junior lien on non-ABL Priority Collateral vis-à-vis the Term Facilities,

irrespective of the time, order or method of creation, attachment, or perfection of the liens securing the ABL Facility and Term Facilities.

### 4. Common and Preferred Equity Interests.

83.     The equity of parent Debtor Claire's Holdings LLC ("Claire's Holdings") consists of preferred equity units and common equity units.  As of the Petition Date, approximately 835,200 of Claire's Holdings' Series A preferred units (the "Series A Preferred Units")[16] and 782,658 common units (the "Common Units") were issued and outstanding.[17]  The Series A Preferred Units and Common Units are not listed on a national securities exchange.

## II.    EVENTS LEADING TO THE FILING OF THESE CHAPTER 11 CASES.

### A.    Retention of Advisors.

84.     The Company initially engaged Kirkland & Ellis LLP ("K&E") in April 2025 in connection with the Credit Agreement Amendments, and formally retained K&E on May 9, 2025, as restructuring counsel.  The Company subsequently retained Alvarez & Marsal North America LLC, as financial advisor for its North American operations, on May 2, 2025, Houlihan Lokey ("Houlihan"), as investment banker, on May 13, 2025, and Interpath Ltd ("Interpath"), as financial and operational advisor for its European operations, on May 30, 2025.

85.     The Debtors also retained Omni Agent Solutions, Inc. as claims and noticing agent and as a consulting and administrative services provider on June 20, 2025, and Richards, Layton & Finger, PA as Delaware co-counsel, on July 7, 2025.

---

[16]    As of the Petition Date, of the Series A Preferred Units, approximately 708 are Reduced-Voting Series A Preferred Units.

[17]    As of the Petition Date, of the Common Units, approximately 679 are Reduced-Voting Common Units.

B.     **Credit Agreement Amendments.**

86.     The Debtors engaged with their Prepetition Secured Lenders for months in advance of the Petition Date as the Debtors sought to raise incremental liquidity and secure sufficient time to implement the Turnaround Plan and conduct the prepetition marketing process.  In April 2025, the Debtors approached the ABL Lenders regarding an extension of the June 30, 2025, deadline under the ABL Facility to deliver audited fiscal 2024 annual financials to July 1, 2025, and fiscal 2025 quarter one financials to July 2, 2025.  In consideration for this extension and the runway provided by the same, the Debtors agreed to provide the ABL Lenders with, among other things, additional on-going reporting, including 13-week cash forecasts, weekly variance reports, and weekly borrowing base certificates, additional financial covenants (including a fixed charge coverage ratio), and certain restrictive covenants prohibiting certain liability management transactions that would prime ABL Priority Collateral.  Following weeks of good-faith, arm's-length negotiations, the Company executed an amendment of the ABL Credit Agreement on June 25, 2025.

87.     Simultaneously, the Debtors engaged with the Priority Term Loan Lenders and Existing Term Loan Lenders regarding an extension of the deadline to provide audited financials under the Term Loan Facilities and conversion of cash interest under the Existing Term Loan Facility to be paid-in-kind.  The Priority Term Loan Lenders and Existing Term Loan Lenders each provided an extension of the deadline to deliver audited financials.  Additionally, the Existing Term Lenders agreed to the conversion of cash interest under the Existing Term Loan Facility to be paid-in-kind in consideration for a 5.00% PIK fee payable upon each interest payment date during a PIK election (together with the ABL Credit Agreement amendment described in the preceding paragraph, the "Credit Agreement Amendments").

88.     These amendments provided the Debtors with incremental liquidity and critical breathing room for the Debtors to explore strategic alternatives, including the prepetition marketing process.

### C.     Governance Initiatives.

89.     On May 14, 2025, the Company appointed David Barse and William Transier as independent and disinterested managers (the "Independent Managers") to assist the Claire's Holdings Board [18] in exploring, negotiating, evaluating, and executing potential strategic value-maximizing transactions.    Contemporaneously with the appointment of the Independent Managers, the Claire's Holdings Board formed a special committee consisting solely of the Independent Managers (the "Special Committee") and delegated to it, among other things: (a) the authority to, on behalf of the entire Board and as it deems appropriate or desirable in its discretion, take any action with respect to conflicts matters and (b) without limiting the authority of the Board other than with respect to conflicts matters, the authority to review, discuss, consider, negotiate, approve, and authorize the Company's entry into and consummation of a transaction.

### a)    Investigation.

90.     As of July 23, 2025, the Company, at the sole direction of the Independent Managers, engaged Katten Muchin Rosenman LLP ("Katten") as independent counsel to assist in, among other things, conducting an independent investigation (the "Special Investigation") into any and all potential estate claims and causes of action against various related parties arising from the Company's prepetition transactions.    The Independent Managers, with the assistance of Katten,

---

[18]    On June 1, 2025, Independent Managers were appointed to the boards of the following Debtor entities and were appointed to special committees of such boards:  (i) Claire's Stores, Inc.; (ii) Claire's Puerto Rico Corp.; (iii) CBI Distributing Corp.; (iv) Claire's Boutiques, Inc.; (v) Claire's Canada Corp.; (vi) BMS Distributing Corp.; (vii) CSI Canada LLC; (viii) CLSIP Holdings LLC; (ix) CLSIP LLC; (x) Claire's Swiss Holdings LLC; and (xi) Claire's Swiss Holdings II LLC.

have begun conducting the Special Investigation, which is ongoing as of the Petition Date and will proceed during the Chapter 11 Cases.

### D.    Subsequent Waiver Amendments.

91.    As the deadline approached to deliver financial reporting to the Prepetition Secured Lenders, the Company negotiated and executed amendments to the Priority Term Loan Credit Agreement and Existing Term Loan Credit Agreement on July 1, 2025, waiving, among other things, the requirement to deliver audited fiscal 2024 annual financials, fiscal 2025 quarter one financials and fiscal 2025 quarter two financials.  After the deadline to deliver certain financial reporting pursuant to the ABL Credit Agreement, the Company executed an amendment to the ABL Credit Agreement, on July 2, 2025, that waived defaults for failure to provide such financial reporting and extended the deadline to deliver audited fiscal 2024 annual financials and fiscal 2025 quarter one financials to July 7, 2025, in consideration for, among other things, a pause on borrowing under the ABL Facility.  These amendments provided further flexibility for the Company to continue refining a go-forward business plan and continue its efforts with respect to the prepetition marketing process.

### E.    Imposition of Reserve Notices.

92.    In accordance with the ABL Credit Agreement, on May 28, 2025, the ABL Agent delivered a $5 million reserve notice for upcoming professional fees and other expenses that may arise in the event of a restructuring.  Around the same time, the ABL Agent requested additional field exam reserves, which had a net availability impact of approximately $5 million.   The ABL Agent subsequently delivered an additional $5 million reserve notice on June 7, 2025, also for upcoming professional fees, as well as a notice of default related to failure to execute deposit control accounts in respect of certain accounts.

93.     The ABL Agent further delivered a reserve notice for $12.5 million on June 29, 2025 (the "June 29 Reserve Notice"), stating that it was imposed as a result of the decline in the value of Eligible Inventory in the U.S. Borrowing Base as outlined in the latest inventory appraisal (each as defined in the ABL Credit Agreement).

**F.      Priority Term Loan Capital Raise.**

94.     The Debtors reached out to the Term Lenders in May 2025 to raise incremental Priority Term Loans to fund the business while the Company continued to pursue strategic alternatives.  The Debtors raised approximately $16 million of incremental Priority Term Loans in June 2025, which were funded into an escrow account outside of the Debtors' cash management system.

**G.      Formulation of Go-Forward Business Plan.**

95.     Following execution of the Credit Agreement Amendments, the Debtors, with the assistance of their advisors, developed a go-forward business plan (the "Go-Forward Business Plan") centered on a smaller, more profitable footprint with rationalized overhead cost.  The plan considered three key structural changes to the business:  (i) closure of approximately 700 stores in North America (including the closure of all Walmart SiS and *Icing*® locations) to remove drag on four-wall profitability and reduce operational complexity across the brick-and-mortar channel, (ii) reduction of corporate selling, general, and administrative ("SG&A") expenses driven by targeted assessment of go-forward requirements as well as renegotiated contract savings, and (iii) winddown of the Debtor's North America Concession business due to weak inventory turnover and return on capital.

**H.      Prepetition Marketing Process.**

96.     The Company, with the assistance of Houlihan and Interpath, launched a third-party marketing process on June 2, 2025, to sell some or all of its assets in North America and abroad.

The Go-Forward Business Plan was provided to all marketing process participants that executed NDAs and served as the basis for such parties to evaluate the opportunity to purchase some or all of the Company's assets.  The Company contacted over 150 prospective transaction parties, including a broad range of strategic and financial buyers, and executed confidentiality agreements with approximately 60 parties.  The Debtors received multiple letters of intent prior to the Petition Date and are continuing to engage with all parties regarding a potential stalking horse bid.

97.    The Debtors simultaneously solicited, received, and evaluated partial- and whole-portfolio liquidation equity and fee-for-service bids from two parties (the "Liquidation Bidders," and such bids, the "Liquidation Bids").  The Liquidation Bids contemplated: (a) liquidation of a portion of the Debtors' North American portfolio comprised of approximately 400 standalone stores and 210 SiS locations ("Exited Stores"); (b) liquidation of all of the Debtors' North American portfolio, comprised of approximately 1,260 standalone stores and approximately 210 SiS locations ("Total Portfolio"); and (c) in a going-concern scenario, renegotiation and/or restructuring of lease terms for a portion of a the Debtors' North American portfolio comprised of approximately 800 stores.  The Liquidation Bidders were asked to provide equity and agency bids, as well as an expected timeline for completion, for each of the Exited Stores and Total Portfolio liquidation scenarios.  After several weeks of negotiations, the Debtors determined that Hilco's bid represented the highest or otherwise best Liquidation Bid and executed a fee-for-service agreement with Hilco on July 24, 2025.

## I.    Entry into Forbearance Agreement to Secure Necessary Liquidity Runway.

98.    Following the June 29 Reserve Notice, the Company and the ABL Agent negotiated the terms of a forbearance agreement that would de-risk the ABL lenders in consideration for time and stability to allow the marketing process to proceed on an out-of-court basis.  The Company and the ABL Lenders executed that certain Forbearance and Amendment Agreement

(the "Forbearance Agreement") on July 16, 2025, which provided, among other things, that the ABL Lenders would suspend further reserves and not implement cash dominion in exchange for the Company (i) transferring the incremental Priority Term Loans into a controlled account, (ii) making weekly paydowns of the ABL Facility during the forbearance period, and (iii) complying with the following parallel path Going-Concern Scenario and Liquidation Scenario milestones (as subsequently extended by agreement of the parties).[19]

| Going-Concern Sale Milestones | |
|---|---|
| No later than **August 5, 2025** | Delivery to the ABL Agent of a letter of intent to purchase the Debtors' anticipated go-forward assets as a going concern; *provided* that a binding bid from a credit-worthy party includes certain satisfactory evidence that, among other things, certain obligations under the ABL Facility would be fulfilled. |
| No later than **August 5, 2025** | The Debtors shall commence voluntary chapter 11 cases. |
| By the earlier of (i) **August 31, 2025** *or* (ii) the **date the Debtors request a post-petition borrowing** pursuant to a post-petition financing facility provided by the Participating Lenders (as defined in the Forbearance Agreement) | Delivery to the ABL Agent of a binding bid to purchase the Debtors' anticipated go-forward assets as a going concern, with no financing or diligence contingencies; *provided* that a binding bid from a credit-worthy party includes certain satisfactory evidence that, among other things, certain obligations under the ABL Facility would be fulfilled. |
| Liquidation Scenario Milestones | |
| No later than **July 24, 2025** | Execution of an engagement letter with a liquidating consultant on a "fee for service" basis in connection with a full chain liquidation of the Company. |
| No later than **July 28, 2025** | Company shall order any necessary signage in connection with the Liquidation Scenario. |
| No later than **August 5, 2025** | Delivery to the ABL Agent of a binding bid for the Liquidation Scenario on an equity basis. |
| Week of **August 4, 2025** (if going-concern LOI not delivered to the ABL Agent by July 31, 2025) | Company shall commence the Liquidation Scenario. |

---

[19] This summary of the Forbearance Agreement milestones is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Forbearance Agreement, the Forbearance Agreement shall govern in all respects.

| Liquidation Expense Milestones | |
|---|---|
| No later than **July 28, 2025**, and there is a going-concern LOI | Delivery to the ABL Agent of a list of (i) employees terminated since the effective date of the Forbearance Agreement (the "<u>Effective Date</u>") or identified for termination under the terms of the going-concern LOI and (ii) a list of any leased stores closed since the Effective Date or to be excluded or rejected in connection with such going-concern LOI. |
| No later than **July 28, 2025**, and there is ***not*** a going-concern LOI | Delivery to the ABL Agent of a list of employees identified for termination under the Liquidation Scenario. |

99.     The Forbearance Agreement paved the path for the Debtors to advance their marketing process on a prepetition basis and facilitated an orderly and organized transition into chapter 11, as further described below.

### III.     THE PROPOSED USE OF CASH COLLATERAL, AND PATH FORWARD IN CHAPTER 11.

#### A.     The Proposed Use of Cash Collateral.

100.     The Debtor and the ABL Lenders negotiated in good faith in the lead up to the Petition Date regarding the consensual use of cash collateral (the "<u>Cash Collateral</u>").  Access to Cash Collateral will provide the Debtors with the liquidity necessary to maximize the value of the Debtors' estates for the benefit of all stakeholders through the post-petition store closing and marketing processes.

101.     Specifically, pursuant to the Cash Collateral Motion, the Debtors have agreed to provide the ABL Secured Parties with adequate protection as set forth in the Cash Collateral Motion and the accompanying proposed interim order (the "<u>Interim Cash Collateral Order</u>"). The Debtors' use of Cash Collateral would also be subject to the following milestones.

| Cash Collateral Milestones | |
|---|---|
| Within (3) business days of the Petition Date | The Court shall have entered the Interim Cash Collateral Order in form and substance acceptable to the Directing Cash Collateral Agent (as defined in the Interim Cash Collateral Order) |

| | |
|---|---|
| Within ten 10 days of the Petition Date | The Debtors shall have filed a plan and disclosure statement, in each case in form and substance acceptable to the Directing Cash Collateral Agent |
| Within thirty 30 days of the Petition Date | The Court shall have entered the Final Cash Collateral Order in form and substance acceptable to the Directing Cash Collateral Agent |
| September 5, 2025 | The Debtors shall have delivered a report from each firm providing services in connection with the liquidations of the Collateral commenting on sales performance, and with respect to the going-out-of-business sales of inventory.  In each case, such reports shall be in form and substance reasonably acceptable to the Directing Cash Collateral Agent. |
| September 30, 2025 | The Prepetition ABL Obligations shall have been paid in full and the Prepetition Letters of Credit shall have been cash collateralized in accordance with the Cash Collateral Orders. |

102.    In light of the Debtors' circumstances, I believe that access to the Cash Collateral will give the Debtors the liquidity necessary to ultimately consummate their Chapter 11 Cases, while continuing to operate their business by satisfying payroll obligations, paying suppliers, and satisfying any other payments that are essential for the continued management, operation, and preservation of the Debtors' estates.  For the reasons set forth in this Declaration, I submit that it would be appropriate for the Court to approve the Interim Cash Collateral Order.

**B.    CCAA Proceeding.**

103.    Concurrently with the commencement of these Chapter 11 Cases, the Debtors' non-Debtor affiliate, Claire's Stores Canada Corp., intends to make an application to the Ontario Superior Court of Justice (Commercial List) seeking protection pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA" and the related proceedings, the "CCAA Proceedings").  Claire's Stores Canada Corp. intends to use the breathing space afforded by the CCAA Proceedings to pursue various avenues of restructuring on an expedited basis, failing which Claire's Stores Canada Corp. will conduct an orderly liquidation and wind-down of its operations.  Claire's Stores Canada Corp. funds its own day-to-day

operations, including payroll, rent, and local vendor expenses.  The Debtors do not anticipate the need to transfer funds to Claire's Stores Canada Corp. during these Chapter 11 Cases.

### C.    The Anticipated Path Forward.

104.    As described above, the Debtors filed these Chapter 11 Cases to maximize the value of their estates for the benefit of all stakeholders.  To that end, the Debtors filed, among other motions, the Store Closing Motion to immediately initiate store closing sales at their retail locations.  The Debtors also intend to file a motion seeking approval of customary bidding procedures to govern a sale process for their assets in the coming days.  As of the Petition Date, the Debtors will proceed to liquidate their retail inventory through the store closing sales and subsequently exit their retail store locations.  In parallel, the Debtors will continue to market their assets to consummate one or more value-maximizing transactions.

105.    Whichever path these cases take, it is critical that the Debtors move quickly through these Chapter 11 Cases.  In the coming days, the Debtors intend to file a chapter 11 plan to move expeditiously towards confirmation.  This is particularly salient because the Debtors are funding these cases on Cash Collateral and must operate under the related milestones set forth above.  In my opinion, expeditious confirmation of a chapter 11 plan and consummation of the same is in the best interests of the Debtors, their estates, and their stakeholders.

## IV.    EVIDENTIARY BASIS FOR RELIEF REQUESTED IN THE FIRST DAY PLEADINGS.

106.    Contemporaneously herewith, the Debtors filed a number of First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and ensure that the value of the Debtors' assets is maximized for the benefit of all interested parties.

107.    The First Day Pleadings request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, except to the extent relief is "needed to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

108.    On the Petition Date, the Debtors filed the following First Day Pleadings:

- **Automatic Stay Motion.**  *Motion of Debtors Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief.*

- **Cash Collateral Motion.**  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.*

- **Cash Management Motion.**  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief.*

- **Claims Agent Retention Application.**  *Application of Debtors for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent and (II) Granting Related Relief.*

- **Creditor Matrix Motion.**  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Redact Certain Confidential Information of Customers, (B) Redact Certain Personally Identifiable Information of Individuals, and (C) Serve Certain Parties in Interest by Email, (II) Approving the Form and Manner of Service of the Notice of Commencement, and (III) Granting Related Relief.*

- **Critical Vendors Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain (A) Critical Vendors, (B) Foreign Vendors, (C) 503(b)(9) Claimants, and (D) Lien Claimants, and (II) Granting Related Relief.*

- **Insurance Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance, Surety Coverage, and Letters of Credit Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, Surety Bonds, and Letters of Credit, (C) Continue to Pay Broker Fees, and (D) Honor and Renew Their Premium Financing Agreement, and (II) Granting Related Relief.*

- **Joint Administration Motion.** *Motion of Debtors for Entry of an Order (I) Directing the Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.*

- **NOL Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief.*

- **Store Closing Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, (III) Modifying Customer Programs at the Closing Stores, and (IV) Granting Related Relief.*

- **Taxes Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief.*

- **Utilities Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief.*

- **Wages Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue the Compensation and Benefits Programs, and (II) Granting Related Relief.*

109.    I have reviewed and am familiar with the content of each of the First Day Pleadings and have consulted with the Debtors' advisors to ensure that I understand each First Day Pleading

and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Pleadings are true and accurate and each such factual statement is incorporated herein by reference.

110.    Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Pleadings is necessary to enable the Debtors to transition into chapter 11 with minimal disruption or loss of productivity and value and in the best interest of the Debtors' estates and their stakeholders.  I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Pleadings, the Debtors' business and their estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Pleadings, the Court should grant the relief requested in each of the First Day Pleadings.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  August 6, 2025

/s/ *Christopher T. Cramer*

Name: Christopher T. Cramer

Title:   Chief Executive Officer,
         Chief Operating Officer, and
         Chief   Financial Officer,
         Claire's Holdings LLC

## Exhibit A

**Corporate Structure Chart**



