## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (BLS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date: Sept. 9, 2025 at 2:00 p.m. (ET)** |
|  | ) | **Obj. Deadline: Sept. 3, 2025 at 4:00 p.m. (ET)** |

## MOTION OF DEBTORS FOR
## ENTRY OF AN ORDER (I) AUTHORIZING AND
## APPROVING THE SALE OF GOING-CONCERN ASSETS
## FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
## AND OTHER INTERESTS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:[2]

### Preliminary Statement

1.     As set forth in the First Day Declaration, the Debtors ran a comprehensive, multi-month sale and marketing process to identify a value-maximizing going-concern transaction for Claire's.  The Debtors entered chapter 11 with multiple letters of intent and worked tirelessly

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343).  The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

[2]     A detailed description of the Debtors and their businesses is set forth in the *Declaration of Chris Cramer, Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Claire's Holdings LLC and Certain of its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration").  Capitalized terms used but not defined in this motion shall have the meanings ascribed to them in the First Day Declaration, the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Interim DIP Order"), or the Asset Purchase Agreement, as applicable.

with these counterparties since the Petition Date to convert the letters of intent into binding bids and, ultimately, an asset purchase agreement. ***That effort was a success***.

2.     By this motion, the Debtors seek approval of a going-concern sale transaction with AWS Claire's, LLC (the "Purchaser"), an entity owned by a buyer group led by Ames Watson, LLC ("Ames Watson"), to acquire no less than 795 (and potentially as many as 950) of the Debtors' North American stores as well as the inventory contained therein (the "Sale Transaction"), as more fully described herein and in the asset purchase agreement attached as Exhibit 1 to the Sale Order (the "Asset Purchase Agreement"). Critically, pursuant to the Sale Transaction, the Purchaser has committed to extend employment to substantially all store employees at the acquired stores as well as a significant number of employees at the Debtors' headquarters.

3.     Beginning June 2, 2025, the Debtors' proposed investment banker, Houlihan Lokey ("Houlihan") launched a marking process for the Debtors' assets that included outreach to approximately 160 potential financial and strategic counterparties and execution of over 60 non-disclosure agreements ("NDAs"). The Debtors' management team, Houlihan, and the Debtors' other advisors held numerous discussions with potential purchasers, provided such parties with access to a virtual data room, and responded to information requests to provide such potential purchasers with information necessary to submit indications of interest. The Debtors received three letters of intent ("LOIs") prior to the Petition Date and two LOIs after the Petition Date. Two of the LOIs were for a going concern transaction and the others were primarily for the Debtors' intellectual property assets (the "IP Assets").

4.     On August 6, 2025, the Debtors commenced these chapter 11 cases and sought and obtained relief at the First Day Hearing to immediately begin closing all of their brick-and-mortar

stores.  As set forth in the Store Closing Motion, the Debtors maintained the flexibility to stop the store closings in their business judgment with the consent of the ABL Agent.  On August 16, 2025, the Debtors exercised their right to stop liquidating approximately 950 stores.[3]

5.    The Sale Transaction represents the value-maximizing result in these chapter 11 cases.  The Sale Transaction provides for, among other things, (a) consideration of $104 million (subject to Purchase Price adjustments) in cash *plus* a $36 million Seller Note (subject to Purchase Price adjustments), (b) assumption of certain liabilities, including Cure Costs and certain administrative rent associated with the Assigned Contracts, and (c) continued employment of a significant number of the Debtors' employees.  The Sale Transaction will enable the Debtors to fully pay down the ABL Facility at the closing of the Sale Transaction, cure all assumed and assigned executory contracts and unexpired leases, and fund distributions under the Debtors' chapter 11 plan.  Importantly, the Sale Transaction will preserve thousands of jobs, provide continued business to many of the Debtors' vendors and landlords, and will allow the Claire's brand to remain a prominent retailer for teens, tweens, and young girls around the world.  The Asset Purchase Agreement provides the Debtors with a "fiduciary out" if in the Debtors' business judgment, a superior alternative arises prior to the hearing to approve the Sale Transaction (the "Sale Hearing").  In such a circumstance, the Debtors may pivot to such an alternative to maximize value of their estates for the benefit of all stakeholders.

6.    The Debtors left no stone unturned in their sale and marketing process.  The Sale Transaction is the only viable going-concern transaction available to the Debtors.  Importantly, the Sale Transaction is supported by the Debtors' secured creditors, including the ABL Lenders, the

---

[3]    While the Debtors stopped going out of business sales ("GOB Sales") at approximately 950 stores, the Debtors may elect to resume GOB sales at certain stores following conclusion of the Purchaser's initial designation period.

Lenders holding a majority of the Priority Term Loan (such consenting Lenders and any consenting agents under the Priority Term Loan Credit Agreement, the "Consenting PTL Lenders"), and Lenders holding a majority of the Existing Term Loan (such consenting Lenders and any consenting agents under the Existing Term Loan Credit Agreement, the "Consenting ETL Lenders," and together with the Consenting PTL Lenders, the "Consenting Term Lenders"). Indeed, the Consenting Term Lenders—who, subject to the terms of the Prepetition Priority First Lien Intercreditor Agreement, share a first lien on many of the Debtors' assets, including the Debtors' IP Assets—support the Sale Transaction because it will, among other things, result in the preservation of thousands of jobs and the continuation Debtors' brand, notwithstanding that the DIP Facility provided by the Purchaser in connection with the Sale Transaction primes the PTL Lenders' prepetition liens and adequate protection liens and that the PTL Lenders and ETL Lenders potentially could have received larger recoveries in a standalone sale of the Debtors' IP Assets.

7.     The Debtors agreed to provide the Prepetition Secured Parties with a release in exchange for the value that the Prepetition Secured Parties are providing to the Debtors estates in connection with the Sale Transaction.[4]  The releases provided in the Sale Order are an integral part of the Sale Transaction; absent the releases provided for in the Sale Order, the Prepetition Secured Parties would not have consented to the Sale Transaction, including the DIP Facility provided in connection therewith.[5]  The Settlement is in the best interests of the Debtors' estates because it

---

[4]   Certain of the releases are subject to the completion of the Special Committee's Investigation, which is anticipated to conclude prior to the hearing on this motion scheduled for September 9, 2025.

[5]   For additional information regarding the DIP Facility, see the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, filed contemporaneously herewith.

enables the Debtors to pursue the Sale Transaction, and incur the DIP Financing necessary to fund the Debtors' business operations to bridge to the closing of the Sale Transaction.

8.      The Sale Transaction is a remarkable achievement and should be approved.

## Background

9.      On August 6, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On August 7, 2025, the Court entered an order [Docket No. 79] authorizing the procedural consolidation and the joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  On August 15, 2025, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 154] (the "Committee").  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

## Relief Requested

10.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Sale Order"), (a) approving the Sale Transaction by and between Debtor Claire's Holdings LLC and certain of its subsidiaries listed on the signature pages of the Asset Purchase Agreement (the "Seller"), and AWS Claire's, LLC (the "Purchaser") to acquire certain assets as set forth in the Asset Purchase Agreement (the "Going-Concern Assets"), including: (i) certain leases for retail locations and a distribution center, (ii) all inventory and other tangible personal property and/or improvements to real property associated with the Go-Forward Stores, (iii) the Debtors' IP Assets, and (iv) certain other assets and assumed liabilities; (b) authorizing and approving the Debtors to enter into the Asset Purchase Agreement; (c) authorizing the Debtors to sell the Going-Concern Assets to the Purchaser free and clear of liens, claims, encumbrances,

and other interests pursuant to section 363(f) of the Bankruptcy Code (as defined herein) and the terms set forth in the Asset Purchase Agreement; (d) approving the releases granted in connection therewith; (e) authorizing the assumption and assignment of certain leases of nonresidential real property and other executory contracts in connection therewith; and (f) granting related relief.

11.     In support of this motion, the Debtors submit the (a) *Declaration of David R. Salemi in Support of (1) Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (iii) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (v) Granting Related Relief and (2) Motion of Debtors for Entry of An order (I) Authorizing and Approving the Sale of Going-Concern Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (II) Granting Related Relief* (the "Salemi Declaration"), the (b) *Declaration of Amy Lee in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens And Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Lee Declaration"), and the (c) *Declaration of Elise S. Frejka, CIPP/US, in Support of the Motion of Debtors For Entry of an Order (I) Authorizing and Approving the Sale of Going-Concern Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (II) Granting Related Relief* (the "Frejka Declaration"), each filed contemporaneously herewith.

## Jurisdiction and Venue

12.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated

February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6004(f) and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 6004-1.

### Proposed Sale

15.     As set forth in the Salemi Declaration, prior to and after the Petition Date, the Debtors and the Purchaser engaged in good faith, arms'-length negotiations on a sale transaction for the Going-Concern Assets, the key terms of which are set forth in the Asset Purchase Agreement. *See* Salemi Decl. ¶ 16. The proposed Sale Transaction, if approved, will enable the Debtors to preserve thousands of jobs, repay the Prepetition ABL Facility, and fund the administrative expenses of these chapter 11 cases. *See* Salemi Decl. ¶¶ 11, 12. After running an extensive, months-long marketing process, the Asset Purchase Agreement represents the best and the only viable offer for the Going-Concern Assets. Salemi Decl. ¶ 8. The Debtors believe that the purchase consideration is the best available for the Going-Concern Assets, and the Debtors have not received a higher or otherwise better offer for the Going-Concern Assets. Salemi Decl. ¶ 16.

16.     The Debtors, in consultation with their advisors, believe that the cost and delay of continuing their marketing process for the Going-Concern Assets would outweigh any marginal increase to the sale proceeds, particularly in light of the Debtors' constrained liquidity position and the benefit that the Sale Transaction will provide to the Debtors' estates.  *See* Salemi Decl. ¶ 13. The Debtors, the ABL Secured Parties, the Consenting PTL Lenders, and the Consenting ETL Lenders are aligned that the Sale Transaction is the best transaction available and will maximize value for the benefit of all stakeholders.  *See* Salemi Decl. ¶ 15.  Indeed, each of the Debtors, the ABL Lenders, the holders of a majority of the PTL and ETL, and the Purchaser have made significant concessions to facilitate the Sale Transaction.  *See* Salemi Decl. ¶ 15.  The Purchaser is providing a $22.5 million deposit, which shall be accessed during the cases as debtor in possession financing to fund inventory purchases (the "DIP/Deposit").  The ABL Lenders agreed to reduce the ABL paydown prior to the Closing by approximately $20 million (compared to previously agreed upon paydowns pursuant to the Original Cash Collateral Order), subject to, among other things, (a) the full funding the DIP/Deposit by August 22, 2025, and (b) the Closing of the Sale Transaction and repayment of the ABL Facility by September 26, 2025.   The Consenting Term Lenders agreed to consent to the going-concern Sale Transaction even though they are being primed by the DIP Facility.

17.     The Debtors believe that entering into the Asset Purchase Agreement and consummating the Sale Transaction is fair, reasonable, represents a sound exercise of the Debtors' business judgment, and will maximize value of the Debtors estates for the benefit of all stakeholders.  *See* Salemi Decl. ¶ 12.  As described above, the Asset Purchase Agreement includes a standard "fiduciary out" provision to ensure the Debtors are free to pursue alternative value-maximizing transactions, should any arise.  Salemi Decl. ¶ 14.

## Summary of Key Sale Terms

18.     The following is a summary of the material terms of the Asset Purchase Agreement

and Sale Order, as applicable:[6]

| Provision | Summary Description |
|---|---|
| **Seller** | Claire's Holdings LLC, a Delaware limited liability company, and certain of its subsidiaries and subsidiaries thereof as indicated on the signature pages of the Asset Purchase Agreement.<br><br>Asset Purchase Agreement, Preamble. |
| **Purchaser** | AWS Claire's, LLC, a Delaware limited liability company.<br><br>Asset Purchase Agreement, Preamble. |
| **Going-Concern Assets** | All of the properties, rights, interests, and other assets primarily related to the Business held by the Seller as of the closing of the Sale Transaction, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by the Seller after the execution of the Asset Purchase Agreement and prior to closing, but not any assets excluded by the Asset Purchase Agreement.<br><br>Asset Purchase Agreement § 1.1. |
| **Proposed Purchase Price** | The consideration to be paid to the Seller with respect to the Sale Transaction shall consist of:<br><br>The payment of $104,000,000 (the "Base Cash Purchase Price"), plus certain other amounts and surpluses and less certain shortfalls (collectively and together with the Base Cash Purchase Price, the "Cash Purchase Price"), plus liabilities assumed under the Asset Purchase Agreement (the "Assumed Liabilities"), and that certain seller note in an aggregate principal amount of $36,000,000 (the "Seller Note").<br><br>Asset Purchase Agreement §§ 11.1, Preamble. |
| **Sale Not to Insider**<br><br>**Local Bankr. R. 6004-1(b)(iv)(A)** | The Purchaser is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.  Local Bankr. R. 6004-1(b)(iv)(A). |
| **Releases**<br><br>**Local Bankr. R. 6004-1(b)(iv)(C)** | In consideration and exchange for the valuable consideration being given by each of the ABL Secured Parties, the Consenting PTL Lenders, and the Consenting ETL Lenders (collectively, the "Consenting Prepetition Secured Parties") in connection with the Sale Transaction, upon entry of the Sale Order, each of the Consenting Prepetition Secured Parties and their respective related parties shall be deemed released and discharged by each and all of the Debtors, the Debtors' estates, any party |

---

[6]   This summary is provided for the convenience of the Court and parties in interest and describes, generally, the terms contained in the Asset Purchase Agreement. To the extent there is any conflict between this summary and the Asset Purchase Agreement, the Asset Purchase Agreement shall govern in all respects.

| | |
|---|---|
| | acting on behalf of the Debtors or their estates, and the Purchaser, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Debtors' estates, and the Purchaser, as more fully described in paragraph 43 of the Sale Order.<br><br>Sale Order ¶ 43. |
| **Private Sale / No Competitive Bidding**<br><br>**Local Bankr. R. 6004-1(b)(iv)(D)** | The Going-Concern Assets will be sold via private sale.  There will not be an auction. |
| **Closing and Other Deadlines**<br><br>**Local Bankr. R. 6004-1(b)(iv)(E)** | The Closing will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022 at 10:00 a.m. Eastern Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing.<br><br>Asset Purchase Agreement § 2.3.<br><br>Furthermore, the Debtors seek a waiver of the 14-day stay consistent with Local Rule 6004-1(b)(iv)(O).<br><br>Sale Order ¶ 53. |
| **Good Faith Deposit**<br><br>**Local Bankr. R. 6004-1(b)(iv)(F)** | Prior to the Agreement Date, Purchaser has made an earnest money deposit of $7,500,000 (the "Initial Deposit") with Citibank, N.A., together with its permitted successors and assigns (the "Escrow Agent"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the Financing Orders. Purchaser shall make an additional earnest money deposit of $15,000,000 on or prior to 5:00 pm Eastern Time on August 22, 2025 (the "Second Deposit", and together with the Initial Deposit collectively, the "Deposit") with the Escrow Agent by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the Financing Orders and Purchaser's failure to fund the Second Deposit in accordance with this Section 2.2(a) shall be deemed a material breach of this Agreement by the Purchaser that is not subject to cure. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser.<br><br>Asset Purchase Agreement § 2.2(a). |
| **Tax Exemption**<br><br>**Local Bankr. R. 6004-1(b)(iv)(I)** | None Sought. |

| Requested Findings as to Successor Liabilities<br><br>Sale Order ¶¶ 17-21, 47<br><br>Local Bankr. R. 6004-1(b)(iv)(L) | The Sale Order shall find that the Purchaser is not a successor to any Seller and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code.<br><br>Asset Purchase Agreement § 5.3. |
|---|---|
| Sale Free and Clear<br><br>Sale Order ¶¶ 9, 10, 23<br><br>Local Bankr. R. 6004-1(b)(iv)(M) | Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances.<br><br>Asset Purchase Agreement § 1.1. |

### **Proposed Settlement**

19.     The Sale Transaction represents a remarkable result for the Debtors' estates, including the preservation of thousands of jobs and hundreds of vendor relationships and a significant reduction of administrative and general unsecured claims assertable against the Debtors' estates.  To facilitate this result, the Prepetition Secured Parties have provided the Debtors with significant concessions: the ABL Lenders have accepted greater risk with respect to their recovery in the form of a delayed ABL pay down as compared to the pay down contemplated under the Original Cash Collateral Order, and Consenting Term Lenders have agreed to be primed by the DIP Facility and forgo a standalone sale of the IP Assets on a non-going concern basis.  All of these concessions were given for the benefit of the Debtors' estates as a whole to preserve the going concern.

20.     In exchange for these concessions, the Debtors propose to release the Prepetition Secured Parties from any and all claims, causes of action, or demands of any nature held by the Debtors (the "Settlement").[7]  The Settlement will allow the Debtors to consummate the Sale

---

[7]     As set forth above, certain of the releases are subject to the completion of the Special Committee's Investigation,

Transaction, preserve the Debtors' business as a going-concern, and, importantly, save thousands of jobs.  The Settlement should be approved.

## **Basis for Relief**

I.      **The Sale Transaction Is a Sound Exercise of the Debtors' Business Judgment, Is Appropriate Pursuant to Bankruptcy Rule 6004(f), and Should Be Approved.**

21.      Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In determining whether to authorize the use, sale, or lease of property of the estates under section 363 of the Bankruptcy Code, "courts require the debtor to show that a sound business purpose justifies such actions."  *The Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *see*, *e.g.*, *In re ICL Holding Co., Inc.*, 802 F.3d 547, 551 (3d Cir. 2015); *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983).  In considering whether a sound business purpose exists, courts generally approve a debtor's exercise of business judgment "unless it is the product of bad faith, whim, or caprice."  *In re Phila. Newspapers, LLC*, 424 B.R. 178, 182 (Bankr. E.D. Pa. 2010).  The "sound business purpose" test requires a debtor to establish that: "(1) a sound business purpose [for the sale] exists; (2) the [total consideration] is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith." *In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  The Debtors submit that the Sale Transaction satisfies each of these elements.

---

which is anticipated to conclude prior to the hearing on this motion scheduled for September 9, 2025.

22.     Once a debtor articulates a valid business justification, then the burden of rebutting the "strong presumption . . . that the agreement at issue was negotiated in good faith and in the best interests of the estate" falls to parties opposing the transaction.  *In re Filene's Basement*, No. 11-13511 (KJC), 2014 WL 1713416; *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

23.     Moreover, Bankruptcy Rule 6004(f)(1) authorizes a debtor to sell estate property outside of the ordinary course of its business by private sale or public auction.  *See* Fed. R. Bankr. P. 6004(f)(1).  Courts generally afford debtors in possession broad discretion in determining the manner in which estate property is sold.  *See*, *e.g.*, *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998).   Private sales by a debtor outside of the ordinary course of business are appropriate where the debtor demonstrates that the sale is permissible pursuant to section 363 of the Bankruptcy Code.  *See In re Stephens Indus., Inc.*, 789 F.2d 386, 390 (6th Cir. 1986) (holding a debtor may sell property via private sale "when a sound business purpose dictates such action); *In re Schipper*, 933 F.2d 513 (7th Cir. 1991) (approving private real estate sale by debtor when purchase price was the same as independent appraisal); *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction."); *In re Blue Coal Corp.*, 67 B.R. 798 (Bankr. M.D. Penn. 1986) (permitting the private sale of certain of the debtor's assets); *In re Paper Corp. of Am.*, 138 F.Supp. 29 (S.D.N.Y. 1956) (holding that the trustee's inability to sell the property after "many months . . . was sufficient to warrant the private sale."); *see also In re Blue Coal Corp.*, 168 B.R. 553, 564 (M.D. Penn. 1994) ("[A] larger measure of discretion is available to the court in considering whether a private bid should be approved or confirmed.").

24.     Selling the Going-Concern Assets by private sale is in the best interests of the Debtors' estates and should be approved.  ***First***, the Debtors believe that the Purchaser is the only party interested in and capable of in acquiring the Debtors' business as a going concern.  Salemi Decl. ¶ 10.  The Debtors, with the assistance of Houlihan, have been marking their assets as a going concern since June 2, 2025.  While the Debtors received one other going concern bid, it was for significantly fewer stores, would provide continued employment for far fewer people, and would result in far less value (including cash consideration) for the estates.  Accordingly, the Debtors believe that continuing to market the Going-Concern Assets on a postpetition basis will not yield a better result.  *See* Salemi Decl. ¶ 13.  As set forth herein, however, the Debtors bargained for a "fiduciary out" in the Asset Purchase Agreement and will evaluate any and all alternative proposals to maximize the value of these estates, if any should arise prior to the Sale Hearing. Salemi Decl. ¶ 14.

25.     ***Second***, the Debtors' liquidity is precarious, necessitating an expedited timeline between signing the Asset Purchase Agreement and the Closing.  *See* Lee Decl. ¶ 7–8.  To bridge between signing of the Asset Purchase Agreement and the Closing, the Purchaser is providing necessary liquidity to support the business in the form of a $22.5 million debtor in possession financing facility, the proceeds of which will be used to fund inventory purchases, *See* Lee Decl.  ¶ 7, and the ABL Lenders agreed to reduced previously agreed upon paydowns to provide the Company with ongoing access to critically needed liquidity.

26.     ***Third***, the Sale Transaction contemplates substantial consideration—$104 million (subject to Purchase Price adjustments) plus an amount equal to the aggregate Cure Costs of all Assigned Contracts—the assumption of certain liabilities, which will maximize the value of the Debtors' estates for the benefit of all stakeholders, and the Seller Note.  *See* Salemi Decl. ¶ 11.

The consideration will allow the Debtors to fund the administration of these chapter 11 cases, pay down the ABL Facility and fund distributions under the Debtors' chapter 11 plan. Salemi Decl. ¶ 12.

27. And *fourth*, the Prepetition Secured Parties support the Sale Transaction, which includes the sale of a meaningful portion such parties' collateral. As described above, the Prepetition Secured Parties providing significant concessions to facilitate the Sale Transaction and preserve thousands of jobs, even in the face of incremental risk to their own recoveries.

28. Courts in this district have authorized private sales pursuant to section 363 of the Bankruptcy Code. *See, e.g.*, *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 29, 2024); (authorizing a private sale of certain of the debtors' assets without bidding procedures or an auction); *In re Armstrong Flooring, Inc.*, No. 22-10426 (MFW) (Bankr. D. Del. Mar. 27, 2023) (same); *In re Indep. Pet Partners Holdings, LLC*, No. 23-10153 (LSS) (Bankr. D. Del. Feb. 24, 2023); *In re Boy Scouts of Am.*, No. 20-10343 (LSS) (Bankr. D. Del. Apr. 22, 2022) (same); *In re RTI Holding Co., LLC*, No. 20-12456 (JTD) (Bankr. D. Del. Feb. 1, 2021) (same).

## II. The Sale Free and Clear of Liens and Other Interests Is Authorized by Section 363(f) of the Bankruptcy Code.

29. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

    b.    applicable non-bankruptcy law permits sale of such property free and clear of such interests;

    c.    such entity consents;

    d.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    e.    such interest is in bona fide dispute; or

    f.    such entity could be compelled, in a legal or

> equitable proceeding, to accept a money satisfaction
> of such interest.

11 U.S.C. § 363(f).

30.     Because these requirements are listed in the disjunctive, the Debtors only need to satisfy one of the five requirements to permit the Property to be sold "free and clear" of liens and interests.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) (holding that section 363(f) is written in the disjunctive).  The Debtors submit that each lien or interest in the Going-Concern Assets (other than any assumed liability or permitted encumbrance) satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code.

31.     Specifically, the ABL Lenders and the Consenting Term Lenders, whose collateral is the subject to the Sale Transaction, do not object to the proposed Sale Transaction (and indeed support the transaction), satisfying section 363(f)(2).  To the extent any other party has a prepetition security interest in and liens upon the Going-Concern Assets, these creditors can be compelled to accept a monetary satisfaction of their interests or are adequately protected by having their claims that constitute interests in the Going-Concern Assets, if any, attach to the proceeds of the Sale Transaction with the same priority that existed immediately prior to the closing.  Thus, section 363(f)(5) of the Bankruptcy Code is satisfied and any existing interests in the Going-Concern Assets will be adequately protected through attachment to the proceeds of the sale.  *See In re Katy Indus.*, No. 17-11101 (KJC), 2017 WL 5434578, at *5 (Bankr. D. Del. 2017) (finding that holders of liens against property sold free and clear of all liens are "adequately protected by having their Encumbrances, if any, attach to the cash proceeds of the Sale attributable to the Purchased Assets in which such holder alleges an Encumbrance"); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately

protected if his interest is assertable against the proceeds of the disposition."). Accordingly, the Debtors request that the Going-Concern Assets be transferred to the Purchaser free and clear of liens, claims, and encumbrances, with any such liens, claims, and encumbrances attaching to the net sale proceeds realized from the applicable private sale.

### III.    The Purchaser Is a Good-Faith Purchaser and Is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code.

32.    Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith[.]" 11 U.S.C. § 363(m). Although good faith is not specifically defined in the Bankruptcy Code, one court has stated that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings . . . A purchaser's good faith is lost by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (internal quotations omitted). Within the Third Circuit, a good faith purchaser is one who purchases assets for value and in good faith. "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

33.    The Asset Purchase Agreement and Sale Transaction contemplated herein are the product of good-faith, arm's-length negotiations. *See* Salemi Decl. ¶¶ 16, 20. There is no indication of fraud or any improper insider dealing. Moreover, the Purchaser is not an insider of,

or otherwise affiliated with, the Debtors.  Further, the consideration to be received by the Debtors for the Going-Concern Assets is fair and reasonable as determined by a thorough marketing process, and the Debtors are not aware of any other actionable competing going-concern offers. Salemi Decl. ¶ 8.  Accordingly, the Debtors request that the Court enter an order entitling the Purchaser to the full protections of section 363(m) of the Bankruptcy Code.

## IV.    The Assumption or Assignment of the Non-Real Property Contracts and Real Property Leases Should Be Approved.

34.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assume and assign its executory contracts, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  *See* 11 U.S.C. § 365.  A debtor's decision to assume or reject an executory contract must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Grp. of Institutional Invs. v. Chi., Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *In re Spirit Holding Co., Inc.*, 166 B.R. 371, 378 (Bankr. E.D. Mo. 1994) (providing that the standard for approving the assumption of an executory contract is to determine if the debtor "exercise[d] wise business judgment").

35.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate

whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.   This section is focused on "balancing twin concerns:  preventing substantial economic detriment to the nondebtor contracting party and permitting the bankruptcy estate's realization of the intrinsic value of its assets." *In re Fleming Cos., Inc.*, 499 F.3d 300, 305–06 (3d Cir. 2007) (citations omitted).

36.    To facilitate and effectuate the Sale Transaction, the Debtors are seeking authority to assume certain executory contracts (the "Non-Real Property Contracts") and non-residential unexpired real property leases (the "Real Property Leases," and together with the Non-Real Property Contracts, the "Assigned Contracts") and assign them to the Purchaser or its designees in accordance with the terms of the Asset Purchase Agreement.  The Sale Order provides that, as of and conditioned on the occurrence of the Closing, the applicable Seller shall assume and assign or cause to be assigned to the Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court (the "Assumed and Assigned Contract Notice").  The Assumed and Assigned Contract Notice shall also set forth the Seller's good faith estimate of the Cure Cost (as defined in the Asset Purchase Agreement) under each of the Assigned Contracts.  At the Closing, pursuant to the Sale Order, the Seller shall assume and assign to the Purchaser (the consideration for which is included in the Purchase Price), and the Purchaser shall accept and assume, all Assigned Contracts that may be assigned by the Seller to the Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code.

37.     The Asset Purchase Agreement further provides that in the event that as of the Closing there are any Contracts (including Real Property Leases for Go-Forward Stores) for which the Purchaser desires additional time to decide whether to include such on Schedule 1.1(a) (Acquired Executory Contracts)  or Schedule 1.1(f) (Acquired Leased Real Property) of the Asset Purchase Agreement, as applicable, the Purchaser may, in its discretion, require the Seller to keep in place such Contract(s) (at Purchaser's sole cost and expense) and, notwithstanding anything to the contrary herein, in no event shall any such Contract(s) be deemed to be an Excluded Contract unless the Purchaser has not elected for such Contract to be an Assigned Contract within the earlier of (x) the effective date of the Plan and (y) sixty (60) days following the Closing.[8]

38.     The Debtors will serve the Assumed and Assigned Contract Notice via first class mail on all non-Debtor counterparties to the Assigned Contracts upon the filing of the cure notice (the "Cure Notice").  Objections, if any, to the proposed assumption and assignment of any Assigned Contract or to the Cure Cost proposed with respect thereto must: (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules, and any other orders of the Court, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Cost, the correct Cure Cost alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served so as to be actually received by the Debtors and the Purchaser on or before the deadline specified in the Cure Notice.  Any objection to the Cure Cost that remains unresolved as of the Sale Hearing shall be heard at the Sale Hearing or such later hearing if the objection is not resolved and the Debtors and the Purchaser determine that an adjournment is appropriate.  Any party who fails to timely file an objection to its scheduled Cure Cost listed on

---

[8]     Asset Purchase Agreement § 1.5(b)(ii).

the Assumed and Assigned Contract Notice or to the assumption and assignment of a Assigned Contract (i) shall be forever barred, estopped, and enjoined from objecting thereto, including (a) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults against the Debtors, their estates, or the Purchaser and (b) asserting that the Purchaser has not provided adequate assurance of future performance; (ii) shall be deemed to consent (a) to the sale of the Going-Concern Assets as approved by the Sale Order and (b) the assumption and assignment of the Assigned Contracts; and (iii) shall be forever barred and estopped from asserting or claiming against the Debtors or the assignee of the relevant Assigned Contract that any conditions to assumption and assignment of such Assigned Contract must be satisfied (pursuant to section 365(b)(1) of the Bankruptcy Code or otherwise).

39.     Here, the Court should approve the Debtors' decision to assume the Assigned Contracts and assign them to the Purchaser or its designee in connection with the Sale Transaction as a sound exercise of the Debtors' business judgment.  The Assigned Contracts are necessary to run the Debtors' businesses and, as such, they are essential to inducing the highest or otherwise best offer for the Going-Concern Assets.  Further, it is unlikely that any purchaser would want to purchase the Going-Concern Assets unless a significant number of the contracts and the real property leases needed for the go-forward business were included in the transaction.  Indeed, the assumption and assignment of the Assigned Contracts is integral to, and inextricably integrated in, the Sale Transaction.

40.     Additionally, any counterparties to the Assigned Contracts will receive notice of the assumption and assignment of the applicable Assigned Contracts, including the name or an appropriate description of the Assigned Contract.  Such notice will include a good faith estimate of Cure Costs, thereby giving such counterparties thereto an appropriate opportunity to object.

Accordingly, the Debtors submit that the assumption of the Assigned Contracts and their assignment to the Purchaser or its designees should be approved as an exercise of their business judgment.

41.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Purchaser or its designee has agreed to cure of all defaults associated with, or that are required to properly assume, the Assigned Contracts.  If the Debtors are unable to consensually resolve disputes over the Cure Costs or other defaults prior to the Sale Hearing, the Debtors will continue to work with the parties to resolve any outstanding issues, and if the applicable parties are unable to consensually resolve cure disputes, such disputes may be resolved at a later date.

42.     Similarly, the Debtors submit that the requirement of section 365(b) of the Bankruptcy Code to provide contract counterparties with adequate assurance of future performance is also satisfied under the facts and circumstances.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982); *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001) (same).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective

assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

43.     Here, Ames Watson is a private holding company with extensive experience in the retail industry, making them a natural fit to lead the buyer group in the Sale Transaction. Accordingly, the Purchaser and the Debtors will provide adequate assurance to the affected counterparties to the Assigned Contracts.

**V.      The Settlement Is Fair, Reasonable, and in the Best Interest of the Debtors' Estates, Is a Sound Exercise of the Debtors' Business Judgment, and Should Be Approved.**

   **A.      Approval of the Settlement is Warranted Pursuant to Bankruptcy Rule 9019.**

44.     Under Bankruptcy Rule 9019(a), "[o]n the [debtor in possession's] motion and after notice and a hearing, the court may approve a compromise or settlement."   Bankruptcy Rule 9019(a).   "To minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy."   *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)).   "Compromises are a normal part of the process of reorganization."   *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

45.     Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after notice and a hearing, approve a compromise or settlement.   *See Martin*, 91 F.3d at 393.   A court need not hold a full evidentiary hearing or even a "mini-trial" before a compromise can be approved.   *See In re Decade, S.A.C., LLC*, No. 18-1880 (MN), 2020 WL 564903, at *5 (D. Del. Feb. 5, 2020) ("Although the Goodwins may have meritorious arguments to the contrary, the Bankruptcy Court was not required to hold a mini-trial on each aspect of the parties' disputed claims against one another.").   Nor must a court determine that the settlement is the "best possible compromise"; rather, a court must simply be convinced that the settlement "falls above the lowest point in the

range of reasonableness." *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010) ("The court need not decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." (citations omitted)).

46.     The Third Circuit considers four criteria to determine whether a settlement should be approved:  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of creditors.  *See In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) (listing factors (quoting *Martin*, 91 F.3d at 393 (same)).  In addition to the above factors, the Court must determine whether the proposed settlement is fair and equitable and in the best interests of the estate.  *See Anderson*, 390 U.S. at 424 ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle.").  When determining the best interests of the estate, the Court must balance the value to the estate of accepting the settlement against the claims that are being compromised.  *See Martin*, 91 F.3d at 393 ("This particular process of bankruptcy court approval requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal.").

47.     The Settlement satisfies the *Martin* factors and should be approved.  **First**, the Settlement resolves legal issues and claims among the Debtors and the Prepetition Secured Parties, the probability of success of which is highly speculative.  The benefit to the Debtors' estates of the Settlement outweighs the millions of dollars that would be spent on litigating various potential claims and a contested Sale Transaction, the result of which is unlikely to put the Debtors and their

estates in a better place than the Settlement affords.  Accordingly, the probability of success factor weighs heavily in favor of the Settlement.

48.    ***Second***, the Settlement obviates the need for contested litigation among the Debtors and the Prepetition Secured Parties and assures that the Debtors achieve the most value maximizing result in these chapter 11 cases pursuant to the Sale Transaction.

49.    ***Third***, any issues that are likely to arise in the course of litigation are likely to be complex, multi-party issues, and which would magnify the duration and complexity of these cases and severely strain the resources available to the Debtors.

50.    And ***fourth***, the settlement is undoubtedly in the paramount interest of the Debtors estates.   The Settlement enables the Debtors to consummate the Sale Transaction, which contemplates (a) cash consideration of $104 million (subject to Purchase Price adjustments) *plus* a $36 million Seller Note (subject to Purchase Price adjustments), (b) assumption of certain liabilities, including Cure Costs and certain administrative costs associated with the Assigned Contracts, and (c) continued employment of a significant number of the Debtors' employees.

51.    The terms set forth in the Settlement are reasonable and in the best interests of the Debtors, their estates, and creditors and other parties in these chapter 11 cases.  The Settlement, and the Debtors' decision to enter into it, and paves the way for the Debtors to close the Sale Transaction in an expedient, cost-effective manner.  The compromise embodied in the Settlement is the product of good-faith and arm's-length negotiations between the Debtors and the Prepetition Secured Parties and should be approved.

52.    Accordingly, the Debtors respectfully submit that the *Martin* factors are met, the Settlement Agreement falls well within the lowest "range of reasonableness," and, therefore, the Settlement Agreement should be approved pursuant to Bankruptcy Rule 9019.

53.     Courts routinely approve 9019 settlements between chapter 11 debtors and their secured and unsecured creditors. *See In re Coram Healthcare Corp.*, 315 B.R. 321, 331 (Bankr. D. Del. 2004) (approving 9019 settlement between Debtors and unsecured creditors); *In re Age Refining, Inc.*, 801 F.3d 530, 545 (5th Cir. 2015) (approving 9019 settlement between secured lender and debtors); *In re Royal Alice Props., LLC*, 637 B.R. 465, 486 (Bankr. E.D. La. 2021) (same). Accordingly, the Settlement is fair, reasonable, in the best interest of the Debtors' estates, and should be approved.

**B.      The Settlement Should Be Approved Pursuant to Section 105 and 363 of the Bankruptcy Code.**

54.     In connection with Bankruptcy Rule 9019(a), courts also look to sections 105(a) and 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Weatherly Oil & Gas, LLC*, No. 19-31087 (Bankr. D. Del. Aug. 15, 2019) [Docket No. 584] (authorizing and approving settlement between debtor and its equity sponsor under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019); *In re Lilis Energy, Inc.*, No. 20-33274 (Bankr. S.D. Tex. Oct. 22, 2020) [Docket No. 529] (authorizing and approving settlement amongst debtors and equity holder under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019).

55.     Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. 11 U.S.C. §363(b)(1). A debtor may use property of the estate outside the ordinary course of business under this provision if there is a sound business purpose for doing so. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."). In the context of Bankruptcy Rule 9019, "although approval of a settlement rests in the Court's sound discretion, the debtor's

business judgment should not be ignored." *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009) (citations omitted).

56.    Further, under section 105(a) of the Bankruptcy Code, bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the [Bankruptcy Code]."  11 U.S.C. §105(a).

57.    The Settlement is a sound exercise of the Debtors' business judgment.  As discussed above, the Sale Transaction would not be feasible without the concessions provided by the Prepetition Secured Parties.  The Debtors request that the Court authorize the Debtors' entry into the Settlement as a proper exercise of the Debtors' business judgment.

### Waiver of Bankruptcy Rule 6004(h)

58.    To implement the foregoing successfully, the Debtors seek a waiver of the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) for the reasons set forth herein.

### Notice

59.    The Debtors will provide notice of this motion to the following parties or their respective counsel, as applicable:  (a)  the U.S. Trustee; (b) the Priority Term Loan Agent; (c) the Existing Term Loan Agent; (d) the Agent under the ABL Facility; (e) the Committee; (f) the United States Attorney for the District of Delaware; (g) the Internal Revenue Service; (h) the state attorneys general for states in which the Debtors conduct business; (i) all parties who have expressed a written interest in some or all of the Going-Concern Assets, if any; (j) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Going-Concern Assets; (k) the Purchaser; (l) the counterparties to the Assigned Contracts; and (m) any party that is entitled to notice

pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  In light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request entry of the Sale Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  August 20, 2025
Wilmington, Delaware

*/s/ Zachary I. Shapiro*
**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Clint M. Carlisle (No. 7313)
Colin A. Meehan (No. 7237)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          defranceschi@rlf.com
                heath@rlf.com
                shapiro@rlf.com
                carlisle@rlf.com
                meehan@rlf.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                allyson.smith@kirkland.com

- and -

Alexandra F. Schwarzman, P.C. (admitted *pro hac vice*)
Robert A. Jacobson (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          alexandra.schwarzman@kirkland.com
                rob.jacobson@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*