## Exhibit A

**Proposed Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. __** |

## ORDER (I) AUTHORIZING AND
## APPROVING THE SALE OF GOING-CONCERN ASSETS
## FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
## AND OTHER INTERESTS AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of an order (this "Sale Order"): (a) approving the Sale Transaction by and between Debtor Claire's Holdings LLC and certain of its subsidiaries listed on the signature pages of the Asset Purchase Agreement (the "Seller"), and AWS Claire's, LLC (the "Purchaser") to acquire certain assets as set forth in the Asset Purchase Agreement (the "Going-Concern Assets"), including: (i) certain leases for retail

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343). The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Interim DIP Order (as defined herein), or Asset Purchase Agreement.

locations and a distribution center, (ii) all inventory and other tangible personal property and/or improvements to real property associated with the Go-Forward Stores, (iii) the Debtors' IP Assets, and (iv) certain other assets and assumed liabilities;[3] (b) authorizing and approving the Debtors to enter into the Asset Purchase Agreement; (c) authorizing the Debtors to sell the Going-Concern Assets to the Purchaser free and clear of liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code (as defined herein) and the terms set forth in the Asset Purchase Agreement; (d) approving the releases granted in connection therewith; (e) authorizing the assumption and assignment of certain leases of nonresidential real property and other executory contracts in connection therewith; and (f) granting related relief; and upon the Salemi Declaration and the Frejka Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court

---

[3]  Any references in this Sale Order to specific assets being acquired or liabilities being assumed by the Purchaser pursuant to the Asset Purchase Agreement, including the term "Going-Concern Assets" or those terms and phrases used in subparagraphs (a)(i)-(iv) of this paragraph are for reference only and any and all assets to be acquired or liabilities to be assumed by the Purchaser are set forth in totality in the Asset Purchase Agreement. Notwithstanding anything to the contrary in this Sale Order, to the extent of any inconsistency between this Sale Order and the Asset Purchase Agreement with respect to assets being acquired or liabilities being assumed by the Purchaser, the Asset Purchase Agreement shall control in all respects.

having reviewed the Motion and having heard the statements in support of the relief requested therein, if any, at a hearing before this Court (the "Sale Hearing"), and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor; it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT:[4]**

## I.    Notice.

A.    As evidenced by certificates filed with the Court [Docket No. [●]], proper, adequate, and sufficient notice of, and a reasonable opportunity to object or to be heard regarding, (i) the Motion, (ii) the entry of this Sale Order, and (iii) the transactions contemplated under the Asset Purchase Agreement, including the assumption, assignment and/or transfer of the Assigned Contracts, have been provided to all parties entitled thereto.  Such notice constitutes good and sufficient notice of, and a reasonable opportunity to object or be heard regarding, the Motion and the entry of this Sale Order under Bankruptcy Code §§102(1), 363, and 365 and Bankruptcy Rules 2002 (including, without limitation, 2002(i)), 6004, and 6006 and Local Rule 2002-1(b).  No other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Motion or the entry of this Sale Order need be given to any entity.

## II.    Disclosures.

B.    The disclosures made by the Debtors in the Motion and related documents filed with the Court concerning the Sale Transaction are sufficient under the circumstances.

---

[4] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

### III.     Sale in Best Interests of the Debtors' Estates.

C.      The Debtors' determination that the sale of the Going-Concern Assets through a private sale on the terms and conditions set forth in the Asset Purchase Agreement is in the best interests of the Debtors' estates constitutes a valid and sound exercise of the Debtors' business judgment.  The total consideration provided by the Purchaser for the Going-Concern Assets represents not only a fair and reasonable offer to purchase the Going-Concern Assets, but also the highest or otherwise best offer received by the Debtors for such Going-Concern Assets.  No other entity or group of entities has presented any actionable offer, let alone one that is higher or otherwise better to the Debtors to purchase the Going-Concern Assets for greater economic value to the Debtors' estates than the Purchaser.  The transactions contemplated under the Asset Purchase Agreement, including the total consideration to be realized by the Debtors thereunder, (i) are the highest or otherwise best offer received by the Debtors for the Going-Concern Assets by the Debtors and (ii) are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.  The Debtors, in consultation with their advisors, believe that no further marketing of the Going-Concern Assets would produce a result greater or more favorable than that presented by the Asset Purchase Agreement.

### IV.     Good Faith.

D.      The sales process engaged in by the Debtors and the Purchaser, and the negotiation of the Sale Transaction and the other transactions contemplated by the Asset Purchase Agreement, were non-collusive, in good faith, and substantively and procedurally fair to all parties in interest. The Purchaser is purchasing the Going-Concern Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.  Neither the Purchaser nor any of its affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or

any of their respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtor, and, therefore, each such person is entitled to the full protections of section 363(m), and otherwise has proceeded in good faith in all respects in connection with these chapter 11 cases in that: (1) the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the applicable Going-Concern Assets; (2) all payments to be made by the Purchaser and other agreements or arrangements entered into, or to be entered into, by the Purchaser in connection with the Sale Transaction and the other transactions contemplated by the Asset Purchase Agreement have been disclosed; (3) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (4) the negotiation and execution of the Asset Purchase Agreement, including the Sale Transaction contemplated thereby, were at arms'-length and in good faith. The evidence presented demonstrated that there was no insider influence or improper conduct by the Purchaser or any of its affiliates in connection with the negotiation of the Sale Transaction with the Debtors. The protections afforded by section 363(m) of the Bankruptcy Code are integral to the Sale Transaction, and the Purchaser would not consummate the Sale Transaction without such protections.

## V.   Highest or Otherwise Best Offer.

E.     The Debtors' marketing process with respect to the Going-Concern Assets, including the Debtors' pre- and postpetition marketing processes with respect to the Going-Concern Assets, afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Going-Concern Assets. The Asset Purchase Agreement constitutes the highest or otherwise best offer for the Going-Concern Assets and there was no other transaction available or presented that would have yielded as favorable a result for

the Debtors' estates. The Debtors' determination that the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment. Approval of the Motion and the Asset Purchase Agreement and the consummation of the Sale Transaction is in the best interests of the Debtors' chapter 11 estates, their creditors, and all parties in interest. The Sale Transaction should be approved.

**VI.    No Collusion.**

F.    The Sale Transaction and the other transactions contemplated by the Asset Purchase Agreement cannot be avoided under section 363(n) of the Bankruptcy Code. None of the Debtors, the Purchaser, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the consummation of the Sale Transaction or the other transactions contemplated by the Asset Purchase Agreement to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

**VII.    Purchaser Not Successor.**

G.    By consummating the Sale Transaction and the other transactions contemplated by the Asset Purchase Agreement, the Purchaser is not a mere continuation of any Debtor or any Debtor's estate, and there is no continuity, no common identity, and no continuity of enterprise between the Purchaser and any Debtor. By consummating the Sale Transaction and the other transactions contemplated by the Asset Purchase Agreement, no Purchaser shall be deemed to be holding itself out as a continuation of the Debtors based on the Sale Transaction, the Asset Purchase Agreement, any subsequent documentation entered into for purposes of consummating such transaction, or this Sale Order. The Purchaser is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Sale Transaction does not amount to a

consolidation, merger, or *de facto* merger of any Purchaser and the Debtors. Neither the Purchaser nor any of its affiliates and their respective successors, assigns, members, partners, principals, and shareholders (or equivalent) shall assume or in any way be responsible for any obligation or liability of any Debtor (or any Affiliates thereof) or any Debtor's estate, except to the extent expressly provided in the Asset Purchase Agreement.

**VIII.    Validity of Transfer.**

H.      The Asset Purchase Agreement was not entered into, and the Sale Transaction is not being consummated for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtors, their estates or their affiliates. All consideration to be provided by the Purchaser in connection with the Sale Transaction has been disclosed. None of the Debtors, the Purchaser, or their respective affiliates, is entering into the Asset Purchase Agreement, or proposing to consummate the Sale Transaction, fraudulently, for the purpose of completing a statutory or common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. None of the Debtors, the Purchaser, or their respective affiliates is entering into the transactions contemplated by the Asset Purchase Agreement fraudulently for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims.

I.      The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), and 363(m) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

J.     The Debtors are the sole and lawful owners of the Going-Concern Assets.  The Going-Concern Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The transfer of each of the Going-Concern Assets to the Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer of the Going-Concern Assets, which transfer vests or will vest the Purchaser with all legal, equitable and beneficial right, title, and interest of the Debtors to the Going-Concern Assets and, except as otherwise specifically and expressly provided herein or in the Asset Purchase Agreement, free and clear of all liens, claims, or other interests, relating to, accruing or arising any time prior to the Closing Date, with the exception of any such liens or claims that are expressly assumed by the Purchaser pursuant to the Asset Purchase Agreement, including, for the avoidance of doubt, Cure Costs or any other obligations arising under the Assigned Contracts to the extent set forth in the Asset Purchase Agreement or this Sale Order.

K.     Subject to the entry of this Sale Order, each Debtor: (a) has full requisite corporate or other organizational power and authority to execute, deliver, and perform its obligations under the Asset Purchase Agreement and all other documents contemplated thereby, and (b) has taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery, and performance of its obligations under the Agreements and to consummate the Sale Transaction, including as required by their respective organizational documents, and, upon execution thereof, the Asset Purchase Agreement and the related documents were or will be duly and validly executed and delivered by such Debtor and enforceable against such Debtor in accordance with their terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, constituted or will constitute a valid and binding obligation of such Debtor.

L.      No government, regulatory, or other consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, were required for the execution, delivery, and performance by the Debtors of the Agreements or the consummation of the Transaction contemplated thereby.  No consents or approvals of the Debtors, other than those expressly provided for in the Asset Purchase Agreement or this Sale Order, are required for the Debtors to consummate the Transaction.

## IX.    **Binding Agreement.**

M.      The Asset Purchase Agreement is a valid and binding contract between the Seller and the Purchaser and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession, or the District of Columbia.  The Asset Purchase Agreement and the Sale Transaction themselves, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed with respect to any of the Debtors, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.  The terms and provisions of the Asset Purchase Agreement, the other agreements contemplated by the Asset Purchase Agreement, and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors (whether known or unknown), the Purchaser, and each of their respective affiliates, successors, and assigns, and any affected third parties, including, without limitation, all Persons asserting encumbrances (collectively, the "Bound Parties"), notwithstanding any subsequent appointment of any trustee, examiner, or receiver under the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary

under the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, receiver, party, entity, or other fiduciary.  The provisions of this Sale Order and the terms and provisions of each Asset Purchase Agreement and other agreements contemplated by the Asset Purchase Agreement, shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these chapter 11 cases, or converting these chapter 11 cases to cases under chapter 7.  The rights and interests granted pursuant to this Sale Order, the Asset Purchase Agreement, and each other agreement contemplated by the Asset Purchase Agreement shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to perform under the Asset Purchase Agreement, each other agreement contemplated by the Asset Purchase Agreement, and this Sale Order without the need for further order of the Court.

**X.    Free and Clear Sale.**

N.    The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Going-Concern Assets free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), liabilities, interests, rights, and encumbrances, and all other matters of any kind or nature whatsoever, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or

unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor or transferee liability or theories of liability related to acting in concert or active participation with the Debtors or related theories (all of the foregoing collectively being referred to in this Sale Order as "Interests") in the Going-Concern Assets, unless otherwise set forth in this Sale Order.

O.      The Debtors may sell the Going-Concern Assets free and clear of all Interests (except to the extent set forth in the Asset Purchase Agreement) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Those holders of Interests who did not object or who withdrew their objections to the Motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2).  Those holders of Interests who did object, fall within one or more of the other subsections of Bankruptcy Code section 363(f), including that such holders of Interests are adequately protected by having their claims that constitute interests in the Going-Concern Assets, if any, attach to the proceeds of the sale of the applicable Going-Concern Assets, with the same validity, force, and effect that such liens or claims had prior to the Sale Transaction, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.  If the Sale Transaction was not free and clear of all Interests, or if any Purchaser would, or in the future could, be liable for any of such Interests (except to the extent set forth in the Asset Purchase Agreement), such Purchaser would not have entered into and consummated the Sale Transaction, thus adversely affecting the Debtors and their estates and

creditors.  In addition, the sale of the Going-Concern Assets other than pursuant to a transfer that is free and clear of all Interests (except to the extent set forth in the Asset Purchase Agreement) would be of substantially less benefit to the Debtors' estates.  The total consideration to be provided under the Sale Transaction reflects the Purchaser's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the applicable Going-Concern Assets free and clear of all Interests (except to the extent set forth in the Asset Purchase Agreement).

P.    Solely by reason of entering into the Asset Purchase Agreement and closing the sale of the Going-Concern Assets, neither the Purchaser nor any of its affiliates are a continuation of the Debtors or their estates, there is no continuity or common identity between the Purchaser, any of its affiliates, and any of the Debtors, and there is no continuity of enterprise between the Purchaser, any of its affiliates, and any of the Debtors.  Solely by reasons of entering into the Asset Purchase Agreement and closing on the sale of the Going-Concern Assets, neither the Purchaser nor any of its affiliates are holding themselves out to the public as a continuation of any of the Debtors.  Neither the Purchaser nor any of its affiliates are a successor to any of the Debtors or their estates and none of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assigned Contracts amounts to a consolidation, merger, or *de facto* merger of the Purchaser or any of its affiliates with or into any of the Debtors.

## XI.    Application of Proceeds.

Q.    On August [●], 2025, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate*

*Protection to Certain Prepetition Secured Parties, and (III) Granting Related Relief* [Docket No. [●]] (the "Interim DIP Order").  Pursuant to the Interim DIP Order, the Going-Concern Assets constitute Prepetition Collateral and are subject to the Adequate Protection Liens and Prepetition Liens (in each case, as such terms are defined in the Interim DIP Order).  For the avoidance of doubt, the sale of the Going-Concern Assets is free and clear of such Adequate Protection Liens and Prepetition Liens.  Upon the closing of the Sale Transactions, notwithstanding anything to the contrary herein or in the Interim DIP Order, the Debtors shall repay in full in cash all of the obligations outstanding under the Prepetition ABL Credit Agreement, including by cash collateralizing all Letters of Credit outstanding thereunder in accordance with the procedures set forth in the Prepetition ABL Credit Agreement and the Interim DIP Order (the "ABL Repayment"). The ABL Repayment is an integral term of the Sale Transaction and the ABL Repayment constitutes adequate protection of the interests of the ABL Secured Parties in their collateral, which is being sold pursuant to the Sale Transaction. Absent the ABL Repayment the Prepetition ABL Secured Parties would not have consented to the Sale Transaction and the Debtors would not have been able to provide adequate protection of the Prepetition ABL Secured Parties' claims to their collateral. All parties in interest reserve any right they may have to object to, or otherwise contest, the appropriate allocation of sale proceeds, including as to the allocation of sale proceeds among the Debtors.

## XII.    Cure Costs and Adequate Assurance of Future Performance.

R.     The Assumed and Assigned Contract Notice filed separately is reasonably calculated to provide all non-Debtor counterparties to the Assigned Contracts with proper notice of the potential assumption and assignment of their Assigned Contract and the proposed Cure Costs relating thereto.

S.     The assumption and assignment of the Assigned Contracts listed in the Asset Purchase Agreement and set forth on **Exhibit 2** to this Sale Order pursuant to the terms of this Sale Order is integral to the Transaction, does not constitute unfair discrimination, and is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.  Subject to the terms and conditions of the Asset Purchase Agreement and this Sale Order, the Purchaser shall:  (a) to the extent necessary and in accordance with its obligations under the Purchase Agreement, cure or provide adequate assurance of cure, of any default existing prior to the date of such assumption and assignment with respect to the Assigned Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (b) to the extent necessary, provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date of assumption and assignment with respect to the Assigned Contracts, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code.  The obligation of the Purchaser to pay Cure Costs in accordance with the terms of the Asset Purchase Agreement and to perform the obligations under the Assigned Contracts shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  The Debtors have demonstrated that assuming and assigning the Assigned Contracts in connection with the Sale Transaction is an exercise of their sound business judgment, and that such assumption and assignment is in the best interests of the Debtors' estates, for the reasons set forth in the Motion and on the record at the Sale Hearing, including, without limitation, because the assumption and assignment of the Assigned Contracts in connection with the Transaction will maintain the ongoing business of the

Debtors, limit the losses of counterparties to Assigned Contracts, and maximize the distribution to creditors of the Debtors.

## XIII.    Carve Out Reserves.

T.    Sound business justifications also exist for the funding of the Carve Out (as defined in and provided for in paragraph 10 of the Interim DIP Order) at the closing of the sale in accordance with this Sale Order and the Interim DIP Order by the use of the proceeds of the sale of the Going-Concern Assets into the Carve-Out Reserves (as defined in the Interim DIP Order) to be held in trust for the benefit of the parties entitled to the Carve Out as set forth in the Interim DIP Order.

## XIV.    The Settlement

U.    The Settlement is a good faith compromise and settlement of all disputes, controversies, claims, and causes of action among the parties thereto.  The Special Committee has diligently reviewed and approved the Settlement and the releases contained therein.

V.    The Settlement is the product of arm's-length, good faith negotiations and represents a fair and reasonable compromise among the parties.  The Settlement is reasonable, fair, equitable, appropriate, and in the best interests of the Debtors and their estates, and entry into the Settlement reflects a sound exercise of the Debtors' business judgment.

W.    The proposed Settlement satisfies the factors set forth in *Protective Comm. For Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968), *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996), and their progeny.

X.    This Court has the authority to approve the Settlement pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

**XV.    Protection of Consumer Privacy.**

Y.    As contemplated in the Asset Purchase Agreement, and subject to the terms of this Sale Order, the sale to the Purchaser under the Asset Purchase Agreement of any personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code) satisfies the requirements of section 363(b)(1)(A) of the Bankruptcy Code.

**XVI.    Compelling Circumstances for an Immediate Sale.**

Z.    Good and sufficient reasons for approval of the Asset Purchase Agreement and the Sale Transaction have been articulated.  The relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.  The Debtors have demonstrated both (a) good, sufficient, and sound business purposes and justifications for approving the Asset Purchase Agreement, and (b) compelling circumstances for the Sale Transaction outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a chapter 11 plan, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to maximize the value of the Debtors' estates and the Sale Transaction will provide the means for the Debtors to maximize distributions to creditors.  Such business reasons include, but are not limited to, the facts that: (i) the Sale Transaction constitutes the highest or otherwise best offer for the Going-Concern Assets; and (ii) the Sale Transaction on the terms set forth herein and in the Asset Purchase Agreement is supported by a substantial majority of the Debtors' Prepetition Secured Lenders.

**XVII.    Sale Transaction Not a Sub Rosa Plan.**

AA.    The sale and assignment of the Purchased Assets outside of a chapter 11 plan pursuant to the Agreements neither impermissibly restructures the rights of the Debtors' creditors

nor impermissibly dictates the terms of a liquidating plan for the Debtors.  The Sale Transaction

does not constitute a *sub rosa* chapter 11 plan.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

    **I.**    **General Provisions.**

    1.    The relief requested in the Motion is granted and approved, and the Sale Transaction

contemplated thereby is authorized and approved as set forth in this Sale Order.

    2.    All objections to the Motion or the relief requested therein that have not been

withdrawn or otherwise resolved are overruled on the merits and denied with prejudice; *provided*

that objections to assignment that are unresolved as of the date of this Sale Order shall be

considered at a later date in connection with any proposed assumption or assignment of such

applicable Assigned Contract.  All persons and entities with actual or constructive notice of the

relief sought in the Motion and set forth in this Sale Order that failed to timely object thereto are

deemed to consent to such relief, including for purposes of section 363(f)(2) of the Bankruptcy

Code.

    3.    Notice of the Motion and Sale Hearing was adequate, appropriate, fair and equitable

under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code

and Bankruptcy Rules 2002, 6004, and 6006.

    **II.**    **Approval of the Asset Purchase Agreement.**

    4.    The Asset Purchase Agreement and all other ancillary documents, including,

without limitation, each other document contemplated by the Asset Purchase Agreement or

necessary or appropriate to complete the transactions provided for in the Asset Purchase

Agreement, and all of the terms and conditions thereof, and the Sale Transaction and related

transactions contemplated therewith, are hereby approved in all respects, pursuant to section

105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.  The failure specifically to include any particular terms of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Transaction be authorized and approved in its entirety.

5.    Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the sale of the Going-Concern Assets to the Purchaser pursuant to and substantially in accordance with the terms and conditions of the Asset Purchase Agreement, (b) enter into all other agreements contemplated by the Asset Purchase Agreement and consummate all other transactions contemplated by the Asset Purchase Agreement, (c) close the Sale Transaction as contemplated in the Asset Purchase Agreement and this Sale Order, and (d) execute and deliver, perform under, consummate, and implement the Asset Purchase Agreement, together with all additional instruments and ancillary documents that may be reasonably necessary or desirable to implement the sale, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement, the Asset Purchase Agreement, and such other documentation.

6.    The Debtors and the Purchaser are hereby authorized to take any and all actions as may be necessary and desirable to implement the Sale Transaction, and any actions taken by the Debtor or the Purchaser necessary and desirable to implement the Sale Transaction prior to the date of this Sale Order, are hereby approved and ratified.

7.    The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in the Debtors, all holders of any claims against any Debtor, any holders of claims against

or on some or all of the Going-Concern Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser, any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of these chapter 11 cases or upon a conversion to chapter 7 of the Bankruptcy Code of any of the Debtors' cases, and any filing agents, filing officers, title agents, recording agencies, secretaries of state, and other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Going-Concern Assets.  The terms and provisions of the Asset Purchase Agreement, each other agreement contemplated by the Asset Purchase Agreement, and this Sale Order shall inure to the benefit of the Debtors, their estates and their creditors, the Purchaser and its Affiliates, and any other affected third parties, including all persons asserting any claims in the Going-Concern Assets to be sold pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.  This Sale Order shall survive any dismissal or conversion of any of these chapter 11 cases or any dismissal of any subsequent chapter 7 cases.

8.    The sale of the Going-Concern Assets to the Purchaser under the Asset Purchase Agreement constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and laws of all applicable jurisdictions, including, without limitation, the laws of each jurisdiction in which the Going-Concern Assets are located, and the sale of the Going-Concern Assets to the Purchaser may not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories, whether under the Bankruptcy Code or the laws of

the United States, any state, territory, possession thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

### III.    Transfer of the Going-Concern Assets

9.    Pursuant to section 105(a), 363, and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Going-Concern Assets, including but not limited to the Assigned Contracts, to the Purchaser in accordance with the terms of the Asset Purchase Agreement and this Sale Order and such transfer of the Going-Concern Assets shall constitute a legal, valid, binding, and effective transfer and shall vest the Purchaser with title to the Going-Concern Assets and, shall be free and clear of all Interests, with all such Interests to attach to the proceeds of the sale of the applicable Going-Concern Assets in the order of priority of such Interests, with the same validity, force, and effect which such Interests had prior to the Sale Transaction, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto. All persons or entities, presently or on or after the Closing Date, in possession of some or all of the Going-Concern Assets are directed to surrender possession of the Going-Concern Assets to the Purchaser or its designee on the Closing Date or at such time thereafter as the Purchaser may request.

10.    Those holders of Interests who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction are deemed to have consented to the Sale Transaction being free and clear of their claims pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Interests who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such claims pursuant to section 363(f)(5) of the Bankruptcy Code, or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their claims that constitute interests in the

Going-Concern Assets, if any, attach to the proceeds of the Sale Transaction with the same priority that existed immediately prior to the closing.

11.     All persons and entities who may or do hold Interests in the Going-Concern Assets arising under or out of, in connection with, or in any way relating to the Debtors, the Going-Concern Assets owed by the Debtors, the operation or ownership of the Going-Concern Assets by the Debtors prior to the Closing Date, or the transfer of such Going-Concern Assets to the Purchaser hereby are forever barred, estopped, and permanently enjoined from asserting or pursuing such Interests against the Purchaser, its affiliates, successors, assigns, its property or the Going-Concern Assets; *provided that* any liens or encumbrances provided for pursuant to the Seller Note and any claims against the proceeds of the sale of the Going-Concern Assets shall be excluded from the restrictions of this paragraph 11.

12.     Upon the occurrence of the Closing Date and concurrently with the closing, the Debtors shall make the ABL Repayment in accordance with the terms of the Prepetition ABL Documents and the Interim DIP Order. The ABL Repayment shall be final and irrevocable and such payment shall be free and clear of all liens and claims of any kind. The ABL Repayment is hereby approved, and shall not be subject to disgorgement or any other rights or claims of any party.  The ABL Repayment is an integral part of the Sale Transaction and absent the ABL Repayment, the Prepetition ABL Secured Parties would not consent to the Sale Transaction.

13.     Except as otherwise expressly provided in the Asset Purchase Agreement, after the closing of the sale, the Debtors shall have no further liability with respect to the Going-Concern Assets first arising from and after the closing, and any claims, whether administrative or otherwise, relating to or first arising from such Going-Concern Assets after the closing of the sale asserted against the Debtors shall be deemed disallowed.  For the avoidance of doubt, notwithstanding

anything to the contrary contained in this Sale Order, the Purchaser is assuming only the Assumed Liabilities set forth in the Asset Purchase Agreement and shall not be responsible for any other liabilities; *provided* that all rights and claims of the Prepetition Priority Term Loan Secured Parties and the Prepetition Existing Term Loan Secured Parties against the Debtors and their assets (including the proceeds of the Going-Concern Assets), including all rights granted pursuant to the Original Cash Collateral Order, are expressly preserved.

14.     A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the appropriate recorder to act to cancel any of the liens and other encumbrances of record.

15.     Subject to the occurrence of the ABL Repayment, with respect to the Prepetition ABL Obligations, if any person or entity that has filed statements or other documents or agreements evidencing liens on, or interests in, any of the Going-Concern Assets shall not have delivered to the Debtors prior to the closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of liens or interests which the person or entity has or may assert with respect to such Going-Concern Assets, the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to such Going-Concern Assets.

16.     This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be

required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

## IV.    No Successor or Transfer Liability

17.    Upon the Closing Date, except as provided in the Asset Purchase Agreement, the entry of this Sale Order and the Asset Purchase Agreement shall mean that the Purchaser (and any of its affiliates, successors, or assigns), as the result of any action taken in connection with the Asset Purchase Agreement, the consummation of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assigned Contracts, or the transfer or operation of the Going-Concern Assets, shall not be, nor be deemed to: (a) be a legal successor or successor employer to the Debtors, or otherwise be deemed a successor to the Debtors, and shall instead be, and be deemed to be, a new employer with respect to all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have, *de facto*, or otherwise, merged or consolidated with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors, or otherwise be deemed to be acting in concert or active participation with the Debtors, including, in the case of each of (a)-(c), without limitation, (x) within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), the WARN Act (29 U.S.C. §§ 2101 *et seq*.) ("WARN"), Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as

amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq. or (y) in respect of (i) any environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, (ii) any liabilities, penalties, costs, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), (iii) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine or (iv) any consumer protection law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, including, without limitation, any liabilities, penalties, costs, debts, or obligations imposed by the Federal Trade Commission and/or Bureau of Consumer Protection, of or required to be paid by the Debtors.

18.    Without limiting the generality of the foregoing, and except as otherwise provided in the Asset Purchase Agreement and this Sale Order, neither the Purchaser nor any of its affiliates, successors or assigns shall have any responsibility for (a) any liability or other obligation of the Debtors related to the Going-Concern Assets or (b) any claims against the Debtors or any of their predecessors or affiliates.  By virtue of the Purchaser's purchase of the Going-Concern Assets, neither the Purchaser nor any of its affiliates shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or any theory

based on acting in concert or active participation with the Debtors, or based upon any theory of antitrust, environmental (including, but not limited to CERCLA), successor or transferee liability, de facto merger or substantial continuity, labor and employment (including, but not limited to, WARN or COBRA), consumer protection law, or products liability law, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of any settlement or injunction or any liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Going-Concern Assets prior to the Closing Date or such later time as Purchaser is assigned and assumes any Assigned Contract (collectively, with the potential claims set forth in paragraph 18 above, "Successor or Transferee Liability").  The Purchaser would not have acquired the Going-Concern Assets but for the foregoing protections against Successor or Transferee Liability.

19.     None of the Purchaser or its affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Asset Purchase Agreement and the entry into and consummation of the Sale of the Going-Concern Assets, except as expressly provided in the Asset Purchase Agreement and this Sale Order.

20.     Except as set forth in the Asset Purchase Agreement, nothing shall require the Purchaser or any of its affiliates to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, fringe benefit or any trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, pension benefits payable after retirement or other

termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

21.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions that are approved by this Sale Order, including, without limitation, the Asset Purchase Agreement and the Sale Transaction.

**V.     Assumption and Assignment of Assigned Contracts**

22.     The Assumed and Assigned Contract Notice filed separately and the procedures set forth in the Motion for service and objections thereto are approved.

23.     The Debtors are hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, in accordance with the terms of the Asset Purchase Agreement and this Sale Order, the Assigned Contracts free and clear of all liens, claims, and other interests of any kind or nature whatsoever (other than as otherwise specifically and expressly provided herein), and (b) execute and deliver to the Purchaser such documents or other instruments as the Purchaser deems may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

24.     The Cure Costs listed on **Exhibit 2** to this Sale Order are the sole amounts necessary to be paid upon the assumption of the Assigned Contracts under Bankruptcy Code sections 365(b)(1)(A) and (B) and 365(f)(2)(A).  All Cure Costs, if any, shall be paid as set forth in the Asset Purchase Agreement.  Upon the payment of the Cure Costs, if any, the Assigned Contracts shall remain in full force and effect, and no default shall exist under the Assigned Contract nor shall there exist any event or condition which, with the passage of time or giving of notice, or both,

would constitute such a default.  After the payment of the Cure Costs, none of the Debtors or the Purchaser shall have any further liabilities to the counterparties to the Assigned Contracts other than the Purchaser's obligations under the Assigned Contracts that accrue and become due and payable on or after the Closing Date.

25.    **Exhibit 2** to this Sale Order may be modified following the entry of this Sale Order in accordance with the Asset Purchase Agreement.  The Purchaser and the Debtors have identified or will identify all Assigned Contracts by filing a notice on the docket following the Closing.

26.    To the extent any non-Debtor counterparty to an Assigned Contract has failed to timely object to a proposed Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as the Cure Cost listed on **Exhibit 2** to this Sale Order and any such non-Debtor counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time.  The non-Debtor counterparty to an Assigned Contract is forever bound by the applicable Cure Cost and, upon payment of the Cure Cost as provided herein and in the Asset Purchase Agreement, is hereby barred from taking any action against the Purchaser with respect to any claim for cure under the Assigned Contract.

27.    For the avoidance of doubt, (i) the Debtors shall remain liable to the counterparties to all Real Property Leases for (a) all obligations arising thereunder in accordance with section 365(d)(3) of the Bankruptcy Code and the applicable Real Property Lease in each case until the applicable Cure Cost is paid (unless otherwise agreed to by the applicable counterparty) and assignment is effective with respect to the applicable Real Property Lease (or such Real Property Lease is rejected) and (b) any postpetition rent arising under a Real Property Lease for the period from the Petition Date through and including August 31, 2025 (the "Stub Rent"), *provided that* Purchaser shall be liable for Cure Costs (as defined below) attributable to Real Property Leases

assumed and assigned to the Purchaser and any obligations relating to the Non-Acquired Stores arising after Closing that arise under section 365(d)(3) of the Bankruptcy Code, including but not limited to base rent, any percentage rent relating to store proceeds, utilities, common area maintenance charges, and other rents, fees, and costs specified by the applicable Lease (and, together with the Cure Costs attributable to Real Property Leases assumed and assigned to the Purchaser, the "Purchaser Rent Obligations"), and (ii) the Sale Order shall not modify, impair or expand any rights of the counterparties to any Real Property Lease to enforce the terms of any Real Property Lease directly against the Debtors, except with respect to the Purchaser Rent Obligations, in each case until a Cure Cost is paid and assignment is effective with respect to the applicable Real Property Lease (or such Real Property Lease is rejected).

28. With respect to the Assigned Contracts and except as otherwise specifically and expressly provided herein: (a) the Debtors may assume each of the Assigned Contracts in accordance with section 365 of the Bankruptcy Code; (b) the Debtors may assign each of the Assigned Contracts to the Purchaser in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any of the Assigned Contracts that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect solely in connection with the Transaction contemplated pursuant to this Sale Order and the Asset Purchase Agreement and the assumption and assignment of the Assigned Contracts in connection therewith; (c) subject to the Purchaser's payment of Cure Costs (as defined below), all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment

to the Purchaser of each Assigned Contract have been satisfied; (d) the Assigned Contracts shall be transferred and assigned to, and following the date of such assignment remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, and, (e) except as otherwise set forth in this Sale Order, from and after the effective date of any assumption and assignment, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Purchaser pursuant to section 365(k) of the Bankruptcy Code.

29.     Upon the effective date of the assignment of any Assigned Contract, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title and interest of such Assigned Contract.

30.     Except as otherwise specifically and expressly provided in this Sale Order, in accordance with section 5.2 of the Asset Purchase Agreement, all defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to assumption and assignment of the Assigned Contracts, or otherwise required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (collectively, the "Cure Costs"), shall be paid and otherwise cured by the Purchaser excluding, for the avoidance of doubt, Stub Rent.

31.     Upon the Debtors' assignment of the Assigned Contracts to the Purchaser under the provisions of this Sale Order or any additional orders of this Court, and the payment of any Cure Costs by the Purchaser pursuant to the terms hereof or the Asset Purchase Agreement, no default shall exist under any Assigned Contract and no counterparty to any Assigned Contract shall

be permitted to declare a default under such Assigned Contract or to otherwise take action against the Debtors or the Purchaser or their respective assets as a result of any Debtors' financial condition, bankruptcy, or failure to perform any obligation under the relevant Assigned Contract. Each non-Debtor party to an Assigned Contract hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors, the Purchaser, or the property of any of them, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing Date, or, against the Purchaser, any counterclaim, defense, recoupment, setoff, or any other Claim asserted or assertable against the Debtors, except as otherwise specifically and expressly provided in this Sale Order, and (ii) imposing or charging against the Purchaser or their respective affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignments to the Purchaser of the Assigned Contracts. Any provision in any Assigned Contract that purports to declare a breach, default, or termination as a result of a change of control of the Going-Concern Assets is hereby deemed unenforceable solely in connection with the Transaction contemplated pursuant to this Sale Order and the Agreements and the assumption and assignment of the Assigned Contracts in connection therewith under section 365(f) of the Bankruptcy Code.

32.     The Purchaser has demonstrated adequate assurance of future performance under the relevant Assigned Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

33.     On the effective date of the assignment of any Assigned Contracts, the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Contracts effective as of the date of such assignment.

34.     All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser (and shall not charge the Debtors or the Purchaser) for any instruments, applications, consents, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the sale of the Going-Concern Assets.

35.     All timely filed objections to this Sale Order related *solely* to the assumption or assumption and assignment of an Assigned Contract, related Cure Costs, or adequate assurance in connection with an Assigned Contract which have not been resolved between the Debtors, the Purchaser, and the applicable contract counterparty prior to the entry of this Sale Order shall be continued to a future hearing which shall be noticed by the Debtors.  The Purchaser shall have no obligation to pay Cure Costs for such Assigned Contract until the objection is resolved.  Such disputes related *solely* to the assumption or assumption and assignment of an Assigned Contract, related Cure Costs, or adequate assurance shall be adjudicated by the Bankruptcy Court if the Debtors, the Purchaser and the applicable contract counterparty are unable to come to a resolution.

36.     The assignments of each of the Assigned Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

**VI.    Carve Out Reserves and DIP Financing Provisions.**

37.     On the Closing Date (a) the Debtors shall report the amount of the Carve Out (as defined in the Interim DIP Order) as of such date to the Directing Cash Collateral Agent and (b) the Carve Out Reserves shall be funded in accordance with the Interim DIP Order.  The Directing Cash Collateral Agent shall be deemed to have satisfied each of its obligations with respect to the Carve Out and the Carve Out Reserves as set forth in the Interim DIP Order upon the funding of the Carve Out Reserves.  Prior to the Closing Date, the Debtors shall provide good

faith, non-binding estimates to the Directing Cash Collateral Agent regarding the expected amount of the Carve Out Reserves to be funded on the Closing Date.  Except as set forth in this paragraph, nothing in this Sale Order shall impair, modify or otherwise affect the Carve Out.

38.     Upon the occurrence of the Closing Date and the occurrence of the events set forth in paragraphs 37 and 39, all ongoing commitments under the Prepetition ABL Facility (as defined in the Interim DIP Order) shall be deemed terminated and canceled.

39.     Upon the occurrence of the Closing Date, proceeds of the sale of the Going-Concern Assets shall be used to make the ABL Repayment and do all things necessary to cash collateralize the Prepetition Letters of Credit in accordance with the procedures set forth in the Prepetition ABL Credit Agreement and the Interim DIP Order.  Professionals for the Prepetition ABL Agent are authorized to immediately receive and apply any amounts received pursuant to a payoff letter acceptable to the Prepetition ABL Agent (the "ABL Payoff Letter") towards payment of any fees of such professionals.  Any and all amounts paid to professionals for the Prepetition ABL Agent pursuant to the ABL Payoff Letter are hereby approved in full and shall not be subject to avoidance, disgorgement or any similar form of recovery by the Debtors or any other person.

40.     On or after the Closing Date, the Prepetition ABL Agent shall execute and deliver all documents reasonably requested by the Debtors to evidence the release of any mortgages, deeds of trust, liens, pledges, and other security interests on the Purchased Assets.

41.     Upon the occurrence of the Closing Date, the Seller shall transfer and assign all right, title, and obligation that the Seller holds in the Seller Note to the Prepetition Priority Term Loan Agent for the benefit of the Prepetition Priority Term Loan Lenders in accordance with each

Prepetition Priority Term Loan Lender's ratable share of the Prepetition Priority Term Loan Obligations.

**VII.    Approval of the Settlement.**

42.    The terms of the Settlement are approved in all respects.  The Settlement satisfies all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules, including sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

43.    In consideration and exchange for the valuable consideration being given by each of the ABL Secured Parties, the Consenting PTL Lenders, and the Consenting ETL Lenders (collectively, the "Consenting Prepetition Secured Parties") in connection herewith, upon entry of this Sale Order, each of the Consenting Prepetition Secured Parties and their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees shall be deemed released and discharged by each and all of the Debtors, the Debtors' estates, any party acting on behalf of the Debtors or their estates, and the Purchaser, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Debtors' estates, and the Purchaser, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Debtors' estates, their affiliates or the Purchaser (or its successors or assigns) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim against, or interest in, the Debtors or the Purchaser, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the transactions

or events giving rise to these chapter 11 cases, the business or contractual arrangements between any Debtors and the Consenting Prepetition Secured Parties, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Sale Transaction, the Interim DIP Order, the ABL Facility, the Prepetition Priority Term Loan Credit Facility, the Prepetition Existing Term Loan Credit Facility, the Prepetition Credit Documents, the Prepetition Secured Obligations, the chapter 11 cases, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Sale Transaction, the Interim DIP Order, the ABL Facility, the Prepetition Priority Term Loan Credit Facility, the Prepetition Existing Term Loan Credit Facility, the Prepetition Credit Documents, the filing of the chapter 11 cases, this Sale Order, or the distribution of proceeds from the Sale Transaction or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Closing Date; *provided* that any right to enforce this Sale Order is not so released; and *provided further* that notwithstanding anything herein to the contrary, the entry of this Sale Order is without prejudice to, and does not constitute a waiver or release of, any rights or claims of any of the Prepetition Secured Parties under the Prepetition ABL Intercreditor Documents or the Prepetition Priority First Lien Intercreditor Agreement.  For the avoidance of doubt, the Challenge Period (as defined in the Interim DIP Order) shall be deemed to have expired on the Closing Date with respect to each of the Consenting Prepetition Secured Parties.  The releases provided for herein are an integral part of the Sale Transaction; absent the releases provided for herein, the Consenting Prepetition Secured Parties would not have consented to the Sale Transaction and the Debtors did not have an alternate means of providing adequate protection of the Consenting Prepetition Secured Parties' claims to their collateral.

44.     The parties are authorized to take any and all actions necessary to consummate the Settlement.  The stay of section 362 of the Bankruptcy Code is hereby modified to permit the parties to implement the terms and conditions of the Settlement.

**VIII.    Consumer Privacy Provisions.**

45.     The sale of personally identifiable information contemplated in the Asset Purchase Agreement is consistent with the Seller's privacy policies and satisfies the requirements of section 363(b)(1)(A) of the Bankruptcy Code.

46.     The Purchaser shall be bound by and meet the material standards established by the Seller's privacy policies solely with respect to the personally identifiable information transferred to the Purchaser pursuant to the Asset Purchase Agreement; provided, however, that nothing in this Sale Order shall affect, limit, restrict, prohibit or impair any right to amend or replace the Seller's privacy policies on a going forward basis with respect to the personally identifiable information transferred to the Purchaser, in accordance with the terms thereof and applicable law.

**IX.    Other Provisions.**

47.     The Sale Transaction and any other transactions contemplated by the Asset Purchase Agreement and the Asset Purchase Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate any transaction shall not affect the validity of such transaction (including, for the avoidance of doubt, the sale of the Going-Concern Assets free and clear of all liens, claims, and encumbrances (unless such lien, claim, or encumbrance constitutes a Permitted Encumbrance (as that term is defined in the Asset Purchase Agreement))), unless such authorization and consummation of such transaction was stayed pending such appeal.  The Purchaser is a good-faith

purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled

to the full protections of section 363(m) of the Bankruptcy Code. The Purchaser has not colluded

with any potential purchaser or any other parties interested in the Going-Concern Assets, and

therefore the sale of the Going-Concern Assets may not be avoided pursuant to section 363(n) of

the Bankruptcy Code.

48.     Upon the closing of the Sale Transaction, notwithstanding anything to the contrary

herein or in the Interim DIP Order, the DIP Loans shall be automatically credited against the

Purchase Price, and shall be deemed repaid in full and final satisfaction of all liens, claims,

encumbrances, and other interests, and shall be deemed released and discharged by the DIP Lender

in each case on behalf of themselves and their respective successors, assigns, and representatives,

and any and all other entities who may purport to assert any cause of action, directly or

derivatively, by, through, for, or because of the DIP Lender, from any and all claims, obligations,

rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any

derivative claims, asserted or assertable on behalf of any of the DIP Lender.

49.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted

to the extent necessary, without further order of this Court, to (i) allow the Purchaser to deliver

any notice provided for in the Asset Purchase Agreement and any ancillary documents and

(ii) allow the Purchaser to take any and all actions permitted under this Sale Order, the Asset

Purchase Agreement, the other agreements contemplated by the Asset Purchase Agreement, and

any other ancillary documents in accordance with the terms and conditions thereof.

50.     The Debtors, including their respective officers, employees, and agents, are hereby

authorized to execute such documents and do such acts as are necessary or desirable to carry out

the transactions contemplated by the terms and conditions of the Asset Purchase Agreement and

this Sale Order.  The Debtors shall be, and they hereby are, authorized to take all such actions as may be necessary to effectuate the terms of the Asset Purchase Agreement and this Sale Order and the relief granted pursuant to this Sale Order.

51.     From time to time, as and when requested by any party, each party to the Sale Transaction and other agreements contemplated by the Asset Purchase Agreement shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale Transaction and other transactions contemplated by the Asset Purchase Agreement, including such actions as may be necessary to vest, perfect or confirm, of record or otherwise, in the Purchaser its right, title and interest in and to the Going-Concern Assets.

52.     The parties to the Sale Transaction and the other agreements contemplated by the Asset Purchase Agreement may make any non-material modifications, amendments, or supplements to such agreement and to any related agreements, documents, or other instruments in accordance with the terms thereof without further order of this Court.

53.     Notwithstanding the provisions of the Bankruptcy Rules, including Bankruptcy Rules 6004(h), 6006(d), and 7062, or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is waived and shall not apply.  Time is of the essence in closing the Sale Transaction and the other transactions contemplated by the Asset Purchase Agreement, and the Debtors and the Purchaser intend to close the Sale Transaction and the other transactions contemplated by the Asset Purchase Agreement as soon as practicable.

54.     The Court shall retain jurisdiction to interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement entered into for purposes of consummating the Sale Transaction, the other transactions contemplated by the Asset Purchase Agreement, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale of the Going-Concern Assets.

## Exhibit 1

**Asset Purchase Agreement**

**<u>EXECUTION VERSION</u>**
**CONFIDENTIAL**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF AUGUST 18, 2025**

**BY AND AMONG**

**AWS CLAIRE'S, LLC, AS PURCHASER,**

**AND**

**CLAIRE'S HOLDINGS LLC**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

**TABLE OF CONTENTS**

**Page**

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION
    OF ASSUMED LIABILITIES ...............................................................5
    Section 1.1    Purchase and Sale of the Acquired Assets ................................5
    Section 1.2    Excluded Assets ........................................................................7
    Section 1.3    Assumption of Certain Liabilities .............................................9
    Section 1.4    Excluded Liabilities ................................................................10
    Section 1.5    Assumption/Rejection of Certain Contracts ...........................10

ARTICLE II CONSIDERATION; PAYMENT; CLOSING........................................13
    Section 2.1    Consideration; Payment ..........................................................13
    Section 2.2    Deposit; DIP Financing............................................................14
    Section 2.3    Closing .....................................................................................16
    Section 2.4    Closing Deliveries by Sellers..................................................16
    Section 2.5    Closing Deliveries by Purchaser.............................................16
    Section 2.6    Cash Purchase Price.................................................................17
    Section 2.7    Withholding .............................................................................22

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS............................22
    Section 3.1    Organization and Qualification................................................22
    Section 3.2    Authorization of Agreement ....................................................22
    Section 3.3    Conflicts; Consents .................................................................23
    Section 3.4    Equity Interests of Acquired Entities ......................................23
    Section 3.5    Financial Statements ...............................................................24
    Section 3.6    Title to Properties....................................................................24
    Section 3.7    Contracts .................................................................................24
    Section 3.8    No Litigation ...........................................................................25
    Section 3.9    Permits; Compliance with Laws ..............................................26
    Section 3.10   Intellectual Property................................................................26
    Section 3.11   Data Privacy and Security.......................................................27
    Section 3.12   Tax Matters ..............................................................................27
    Section 3.13   Assumed Benefit Plans ...........................................................28
    Section 3.14   Employees................................................................................28
    Section 3.15   Brokers....................................................................................29
    Section 3.16   No Other Representations and Warranties................................29

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER......................30
    Section 4.1    Organization and Qualification................................................30
    Section 4.2    Authorization of Agreement ....................................................30
    Section 4.3    Conflicts; Consents .................................................................30
    Section 4.4    Financing.................................................................................31
    Section 4.5    Brokers....................................................................................31
    Section 4.6    No Litigation ...........................................................................31
    Section 4.7    Investment Representation; Investigation................................31

i

Section 4.8    Certain Arrangements ...................................................................32
Section 4.9    No Foreign Person ......................................................................32
Section 4.10   Solvency......................................................................................32
Section 4.11   WARN Act and Mass Layoffs....................................................32
Section 4.12   No Competitive Assets ................................................................32
Section 4.13   No Additional Representations or Warranties .............................32

ARTICLE V BANKRUPTCY COURT MATTERS ....................................................33
Section 5.1    Bankruptcy Actions ....................................................................33
Section 5.2    Cure Costs ...................................................................................34
Section 5.3    Sale Order ...................................................................................34
Section 5.4    Approval .....................................................................................35

ARTICLE VI COVENANTS AND AGREEMENTS.....................................................35
Section 6.1    Conduct of the Business of Sellers .............................................35
Section 6.2    Access to Information .................................................................38
Section 6.3    Employee Matters .......................................................................39
Section 6.4    Regulatory Approvals .................................................................41
Section 6.5    Antitrust Notification ..................................................................42
Section 6.6    Reasonable Efforts; Cooperation ................................................44
Section 6.7    Further Assurances......................................................................44
Section 6.8    Insurance Matters........................................................................44
Section 6.9    Receipt of Misdirected Assets; Liabilities .................................45
Section 6.10   Acknowledgment by Purchaser ..................................................45
Section 6.11   Directors' and Officers' Indemnification....................................47
Section 6.12   Seller Support Obligations..........................................................48
Section 6.13   EU IP Licenses...........................................................................48
Section 6.14   Updates to Schedules .................................................................48

ARTICLE VII CONDITIONS TO CLOSING ..............................................................49
Section 7.1    Conditions Precedent to the Obligations of Purchaser and Sellers............49
Section 7.2    Conditions Precedent to the Obligations of Purchaser .............49
Section 7.3    Conditions Precedent to the Obligations of Sellers .................50
Section 7.4    Waiver of Conditions.................................................................50

ARTICLE VIII TERMINATION ..................................................................................50
Section 8.1    Termination of Agreement..........................................................50
Section 8.2    Effect of Termination..................................................................51

ARTICLE IX TAXES ...................................................................................................52
Section 9.1    Sales Taxes and Transfer Taxes..................................................52
Section 9.2    Allocation of Purchase Price......................................................53
Section 9.3    Cooperation.................................................................................53
Section 9.4    Preparation of Tax Returns and Payment of Taxes ...................54

ARTICLE X MISCELLANEOUS .................................................................................54
    Section 10.1   Non-Survival of Representations and Warranties and Certain
                  Covenants; Certain Waivers .................................................54
    Section 10.2   Expenses ...............................................................................54
    Section 10.3   Notices ..................................................................................55
    Section 10.4   Binding Effect; Assignment; Designated Purchasers ..............56
    Section 10.5   Amendment and Waiver ........................................................56
    Section 10.6   Third Party Beneficiaries .....................................................56
    Section 10.7   Non-Recourse .......................................................................57
    Section 10.8   Severability ...........................................................................57
    Section 10.9   Construction ..........................................................................57
    Section 10.10  Schedules ..............................................................................57
    Section 10.11  Complete Agreement .............................................................58
    Section 10.12  Specific Performance ............................................................58
    Section 10.13  Jurisdiction and Exclusive Venue..........................................58
    Section 10.14  Governing Law; Waiver of Jury Trial ....................................59
    Section 10.15  No Right of Set-Off ..............................................................60
    Section 10.16  Counterparts and PDF ...........................................................60
    Section 10.17  Publicity ...............................................................................60
    Section 10.18  Bulk Sales Laws....................................................................60
    Section 10.19  Fiduciary Obligations............................................................61
    Section 10.20  Sellers' Representative..........................................................61

ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ..................61
    Section 11.1   Certain Definitions................................................................61
    Section 11.2   Index of Defined Terms .........................................................71
    Section 11.3   Rules of Interpretation ..........................................................73

### INDEX OF EXHIBITS

Exhibit A     Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit B     Form of Intellectual Property Assignment Agreement
Exhibit C     Form of Seller Note
Exhibit D     Accounting Policies
Exhibit E     Illustrative Net Working Capital Calculation

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of August 18, 2025 (the "Agreement Date"), is made by and among AWS Claire's, LLC, a Delaware limited liability company (subject to Section 10.4(b), "Purchaser"), and Claire's Holdings LLC, a Delaware limited liability company (as in existence on the Agreement Date, as a debtor-in-possession, and as a reorganized Debtor, as applicable, "Parent") and the Subsidiaries of Parent that are indicated on the signature pages attached hereto (as updated pursuant to Section 6.14, together with Parent, each a "Seller" and collectively "Sellers"). Purchaser and Sellers are referred to individually as a "Party" and collectively as the "Parties." Capitalized terms used in this Agreement shall have the meanings set forth in this Agreement including Article XI.

WHEREAS, on August 6, 2025, Sellers, together with certain of Sellers' Subsidiaries and Affiliates (other than the Canadian Seller (as defined below)), commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 25-11454 (collectively, the "Bankruptcy Cases");

WHEREAS, on August 6, 2025, Seller Claire's Stores Canada Corp. (the "Canadian Seller") was granted protection under the *Companies' Creditors Arrangement Act*, RSC 1985, c. C-36 (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and the proceedings thereunder, the "Canadian Proceedings");

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by (i) with respect to Acquired Assets and Assumed Liabilities of the Sellers subject to the Bankruptcy Cases, the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and (ii) with respect to Acquired Assets and Assumed Liabilities of the Canadian Seller, the Canadian Court, in accordance with the applicable provisions of the CCAA, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order;

WHEREAS, on or prior to the date hereof, as a material inducement to Parent and the Sellers' willingness to enter into this Agreement and consummate the transactions contemplated hereby, Purchaser, Parent and the Escrow Agent have entered into an escrow agreement (the "Escrow Agreement");

WHEREAS, at the Closing, Purchaser will issue and deliver to Parent that certain Seller Note, substantially in the form attached hereto as Exhibit C (the "Seller Note"), in favor of the Sellers, in an original principal amount equal to $36,000,000 (the "Seller Note Amount"); and

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth in this Agreement, intending to be legally bound, the Parties hereby agree as follows:

# ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

Section 1.1    Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of the properties, rights, interests and other assets primarily related to the Business held by any Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the Agreement Date and prior to the Closing, and further including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

(a)    (i) subject to Section 1.5, the Contracts on Schedule 1.1(a), (ii) all purchase orders or similar instruments related to the Contracts set forth on Schedule 1.1(a), (iii) all Contracts that are leases governing tangible assets otherwise included in the Acquired Assets, (iv) all Contracts constituting a guarantee, indemnity, or similar arrangement pursuant to which Parent or any of its Subsidiaries provides a Seller Support Obligation in respect of any other Assigned Contract or Assumed Liability, but, in all cases, excluding Leases, which are addressed in Section 1.1(f) (collectively, the "Assigned Executory Contracts");

(b)    all Accounts Receivable;

(c)    Subject to Section 1.1(n), all prepaid expenses or deposits (A) made pursuant to any Assigned Contract or purchase order or (B) to the extent arising out of the operation or conduct of the Business unless to the extent related to any Excluded Contracts;

(d)    any cash on hand (whether in a cash register, safe, deposit box) at an Acquired Leased Real Property (the "Store Cash" and such amount, the "Store Cash Amount");

(e)    all Documents (excluding any credit card numbers or related customer payment sources, social security numbers, or other information to the extent prohibited by Law) and any Tax Returns of the Sellers to the extent solely or primarily related to any Acquired Assets, Acquired Entities or any Assumed Liabilities other than any Excluded Tax Return (the "Assumed Tax Returns");

(f)    subject to Section 1.5, the Leased Real Property listed on Schedule 1.1(f) (the "Acquired Leased Real Property" and the Lease governing any Acquired Leased Real Property, an "Acquired Lease" and collectively, the "Acquired Leases", and together with the Assigned Executory Contracts, the "Assigned Contracts"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

(g)    subject to Section 1.2(j), all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property and

any such tangible assets on order to be delivered to any Seller; <u>provided</u> that, with respect to any such tangible asset that is leased to any Seller, the lease agreement covering such leased tangible asset is an Assigned Contract;

(h)     all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case (i) other than with respect to Taxes or Tax matters (including any Tax refunds or Tax attributes) and (ii) to the extent arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller or its Affiliates);

(i)     all credits, deposits, prepaid amounts and other rights to refunds in respect of Taxes that are attributable to (i) any Acquired Asset for any taxable period (or portion thereof) beginning after the Closing Date, (ii) any Acquired Entity or (iii) any Assumed Liability;

(j)     all Equity Interests that any Seller owns in the Persons set forth on <u>Schedule 1.1(j)</u> (the "<u>Transferred Subsidiaries</u>" and, together with the Subsidiaries of any Transferred Subsidiary, the "<u>Acquired Entities</u>") and all amounts owing from any Acquired Entity to any Seller;

(k)     to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations and all pending applications therefor;

(l)     the sponsorship of, and all rights, interests and assets associated with, the Employee Benefit Plans set forth on <u>Schedule 1.1(l)</u> (collectively, the "<u>Assumed Benefit Plans</u>");

(m)     all Intellectual Property owned by Sellers, all rights to collect royalties and proceeds in connection with such Intellectual Property with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world (collectively, the "<u>Acquired Intellectual Property</u>");

(n)     all (i) subject to <u>Section 1.2(j)</u>, Inventory and supplies of Sellers located in any Acquired Leased Real Property or Go-Forward Store in North America, (ii) prepaid inventory or in-transit inventory ordered and paid for by any Seller for any Acquired Leased Real Property or Go-Forward Store prior to Closing (including customs and freight charges to the extent paid by Sellers prior to Closing), regardless whether such inventory has arrived at an Acquired Leased Real Property or Go-Forward Store as of the Closing Date and (iii) inventory on consignment or related to the Seller's Consumer Products Group; and

(o)     all goodwill, payment intangibles and general intangible assets and rights of Sellers.

6

Section 1.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to any assets of the Seller other than the Acquired Assets, including the following properties, rights, interests and other assets of Sellers (collectively, the "Excluded Assets"): Sellers hereby acknowledge and agree that no Asset of any Acquired Entity shall be an Excluded Asset and that all Assets of any Acquired Entity as of the Closing shall continue to be the Assets of such Acquired Entity following the Closing.

(a)    except as set forth in Section 1.1(c), (d) and (n)(ii), and excluding those of any Acquired Entities, all Cash and Cash Equivalents of Sellers, all bank accounts, and all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, except to the extent made pursuant to any Assigned Contract or Lease for any Go-Forward Store, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)    subject to Section 1.5, all rights and interests in any Contracts of Sellers other than the Assigned Contracts, including the Contracts set forth on Schedule 1.2(b) (collectively, the "Excluded Contracts"); provided, that Leases for Go-Forward Stores which are not Assigned Contracts as of the Closing shall not constitute Excluded Contracts until such time as Purchaser timely notifies Sellers that such Go-Forward Store Lease will not be an Assigned Contract in accordance with Section 1.5(b)(ii);

(c)    (i) all Documents (including information stored on the computer systems, data networks or servers of any Seller) (A) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, (B) that are financial accounting Documents, minute books, Organizational Documents, stock certificates or other Equity Interests instrument, stock registers and such other books and records of any Seller pertaining to the ownership, organization or existence of such Seller, Tax Returns and records (and any related work papers), corporate seal, checkbooks, and canceled checks, (C) that any Seller is required by Law to retain, or (iv) that are governed under applicable data privacy Laws that prohibit the transfer or sale of Personal Information and (ii) all Tax Returns, Tax records and Tax work papers of the Sellers other than Assumed Tax Returns; provided that Purchaser shall have the right to make copies of any reasonably relevant portions of such Documents or Tax Returns (other than Excluded Tax Returns) to the extent not prohibited by applicable Law;

(d)    all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the Transactions, or the Bankruptcy Case, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of any Seller or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (iii) all privileged materials, documents and records of any Seller or any of its Affiliates, including any privileged materials, documents and records that are in the possession of any Acquired Entity (and including for the avoidance of doubt, any other privileged materials, documents and records that are prepared or received by Seller or any of its Affiliates or on their

behalf in any other circumstance), (iv) copies of the documents, materials and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, (v) confidentiality agreements with prospective purchasers of any of Sellers' businesses or assets, and (vi) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Case;

(e)　　all current and prior insurance policies or Employee Benefit Plans of any Seller or its Affiliates, in each case, that are not Assumed Benefit Plans, including all director and officer insurance policies, and all rights and benefits of any nature of Sellers or its Affiliates with respect to such insurance policies or Employee Benefit Plans, including all insurance recoveries under such insurance policies or Employee Benefit Plans and rights to assert claims with respect to any such insurance recoveries;

(f)　　all Equity Interests of any Seller or any of their respective Subsidiaries, other than Equity Interests issued by any Acquired Entity;

(g)　　(i) all preference or avoidance claims or Actions arising under the Bankruptcy Code or applicable Law, (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller or its Affiliates, in each case, arising out of or relating to events occurring on or prior to the Closing Date, and (iii) all claims that any Seller or any of its Affiliates may have against any Person to the extent related to any other Excluded Assets or any Excluded Liabilities;

(h)　　Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price, or any agreement, certificate, instrument, or other document executed and delivered between any Seller or its Affiliates, on the one hand, and Purchaser or any member of the Purchaser Group, on the other hand, in connection with the Transactions, or any other agreement between any Seller or its Affiliates, on the one hand, and Purchaser or any member of the Purchaser Group, on the other hand, entered into on or after the Agreement Date;

(i)　　all credits, deposits, prepaid amounts and other rights to refunds in respect of Taxes that are attributable to (i) any Acquired Asset in any Tax period ending on or prior to the Closing Date (unless such Taxes are Assumed Liabilities), (ii) any Excluded Asset or (iii) any Excluded Liability;

(j)　　every asset of Sellers or their Affiliates that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the Agreement Date until the Closing Date (i) in the Ordinary Course, (ii) as authorized by the Bankruptcy Court, or (iii) as otherwise permitted by the terms of this Agreement;

(k)　　except with respect to Assigned Contracts, all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to Leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date;

(l)      all claims or other amounts owing from any Sellers or any of their respective Affiliates (other than the Acquired Entities);

(m)      the credit card reserves of the Sellers; and

(n)      all items set forth on Schedule 1.2(n).

Section 1.3    Assumption of Certain Liabilities. On the terms and subject to the conditions set forth in this Agreement, in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Purchase Price and delivery of the Seller Note in accordance with Section 2.1, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms, and Sellers (or with respect to Taxes, if applicable, Sellers' applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)      all Liabilities and obligations of any Seller under the Assigned Contracts related to and arising from and after the Closing, including any accrued but unpaid Liabilities that are not due prior to the Closing;

(b)      all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code and/or any equivalents under the CCAA in connection with the assumption and assignment of the Assigned Contracts ("Cure Costs");

(c)      all Liabilities (including all government charges or fees) related to or arising out of the Purchaser's conduct of the Business or the ownership or operation of the Acquired Assets on or after the Closing Date;

(d)      all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under the express terms of this Agreement;

(e)      all Liabilities for (i) Taxes imposed on or with respect to the Acquired Assets (including the Acquired Entities) and the Assumed Liabilities for any taxable period (or portion thereof) beginning after the Closing Date and (ii) Sales Taxes and Transfer Taxes allocated to Purchaser pursuant to Section 9.1;

(f)      the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with the Assumed Benefit Plans and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in 26 C.F.R. § 54.4980B-9;

(g)      all Liabilities up to a cap of $5,900,000 arising under Section 503(b)(9) of the Bankruptcy Code;

(h)      all (i) Liabilities relating to Purchaser's employment of the Transferred Employees and all Liabilities and obligations assumed by Purchaser under Section 6.3, including

all Liabilities associated with any termination of employment of any Transferred Employee after the Closing; and (ii) for the avoidance of doubt, all Liabilities of any kind or nature whatsoever, whenever arising, relating to the Acquired Entity Employees;

        (i)     all Liabilities related to the Acquired Leased Real Property and the Acquired Leases, including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

        (j)     any Liabilities owing to any Acquired Entity;

        (k)     all Liabilities related to gift cards, store credits, customer loyalty programs, and gift certificates, validly issued by the Sellers within the one-year period prior to the Closing that are outstanding and redeemable in North America; and

        (l)     all Liabilities in respect of freight and duty for any Inventory purchased by Sellers as contemplated by Section 6.1(a).

        Section 1.4    Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge, or in any other manner be liable or responsible for any Liabilities of any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities, including any Liabilities of any Seller in respect of such Seller's European operations, that are not Assumed Liabilities being referred to collectively as the "Excluded Liabilities"). For avoidance of doubt, the Excluded Liabilities shall include (a) all Liabilities relating to Sellers' employment of the Business Employees and qualified COBRA beneficiaries (including payroll, benefits and COBRA) up to the Closing, including all Liabilities associated with any termination of employment of any Business Employee on or prior to the Closing, (b) all Liabilities for Taxes imposed on or with respect to the Business, the Acquired Assets (including the Acquired Entities) and the Assumed Liabilities for any taxable period (or portion thereof) beginning prior to and ending on the Closing Date, and all Liabilities for Taxes imposed on or with respect to the Excluded Assets and Excluded Liabilities and (c) all Liabilities in respect of Stub Rent. Purchaser hereby acknowledges and agrees that no Liability of any Acquired Entity shall be an Excluded Liability and that all Liabilities of any Acquired Entity as of the Closing shall continue to be the Liabilities of such Acquired Entity following the Closing.

        Section 1.5    Assumption/Rejection of Certain Contracts.

        (a)     Assumption and Assignment of Executory Contracts. Sellers shall provide timely and proper written notice of a proposed Sale Order to all parties to any executory Contracts or unexpired Leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Assigned Contracts to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code and/or its equivalents under the CCAA to the extent that such Contracts or Leases are Assigned Contracts at Closing. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable

Sellers shall assume and assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the Cure Cost under each of the Assigned Contracts. At the Closing, pursuant to the Sale Order, and the Assignment and Assumption Agreement, Sellers shall assume and assign to Purchaser (the consideration for which is included in the Purchase Price), and Purchaser shall accept and assume all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code and/or its equivalents under the CCAA. At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respect terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to Section 365 of the Bankruptcy Code and/or its equivalents under the CCAA.

       (b)      <u>Go-Forward Stores; Excluding or Adding Assigned Contracts</u>.

       (i)      Within seven (7) days following the date hereof, Purchaser shall provide notice to Sellers identifying the retail stores operated by the Sellers in North America that Purchaser is not interested in acquiring (such stores, the "<u>Phase I Closing Stores</u>"). Notwithstanding anything to the contrary herein, Sellers shall be permitted, from and after receipt of the foregoing notice, to conduct liquidation and "going out of business" sales at the Phase I Closing Stores; <u>provided</u> that, in no event shall any Inventory, located in the Sellers' distribution center(s) or not otherwise located in the Phase I Closing Stores be delivered to any of the Phase I Closing Stores.

       (ii)      Subject to <u>Section 1.5(b)(iii)</u>, Purchaser shall have the right to notify Sellers in writing of any Assigned Contract covered in clause (i) or (v) of <u>Section 1.1(a)</u> or <u>Section 1.1(f)</u> that it does not wish to assume or any Contract to which any Seller is a party that Purchaser wishes to add as an Assigned Contract, in either case, following the date hereof and at least two Business Days prior to Closing, and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by the applicable Seller to sell and assign to Purchaser and accepted and assumed by Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing. In the event that as of the Closing there are any Contracts (including Leases for Go-Forward Stores) for which Purchaser desires additional time to decide whether to include such on <u>Schedule 1.1(a)</u> or <u>(f)</u>, as applicable, Purchaser may, in its discretion, require Sellers to keep in place such Contract(s) (at Purchaser's sole cost and expense) and, notwithstanding anything to the contrary herein, in no event shall any such Contract(s) be deemed to be an Excluded Contract unless Purchaser has not elected for such Contract to

be an Assigned Contract within the earlier of (x) the effective date of the Plan and (y) sixty (60) days following the Closing (such date, the "Rejection Deadline Date").

(iii)    On or prior to September 15, 2025, Purchaser shall provide notice of the Leases for the Go-Forward Stores that (A) Purchaser will seek to assume as of the Closing Date (the "Acquired Stores") and (B) Purchaser does not seek to assume as of Closing but for which the Purchaser requests the Debtors not reject effective as of Closing (the "Non-Acquired Stores"). Purchaser shall be responsible for any obligations relating to the Non-Acquired Stores arising after Closing that arise under section 365(d)(3) of the Bankruptcy Code and/or its equivalents under the CCAA, including but not limited to base rent, any percentage rent relating to store proceeds, utilities, common area maintenance charges, and other rents, fees, and costs specified by the applicable Lease (the "Non-Acquired Stores Obligations"). The Debtors may in their sole discretion reject the applicable Leases for (1) any Go-Forward Stores that are not Acquired Stores and (2) if Purchaser has not timely paid to Parent the Non-Acquired Store Obligations with respect to any Non-Acquired Store within 3 Business Days' following Parent's request for payment for such Non-Acquired Store Obligations, such Non-Acquired Stores.

(c)    Non-Assignment.

(i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or its Affiliates in accordance with this Section 1.5 or terminated by a Seller, its Affiliates or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract and is not continued or otherwise extended upon assumption.

(ii)    Notwithstanding anything to the contrary in this Agreement, if (A) an Acquired Asset requires a Consent or Governmental Authorization in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, (B) no Order of the Bankruptcy Court or the Canadian Court, including the Sale Order, is then in effect that precludes satisfaction of such requirement, and (C) such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser, such asset shall not be transferred to, or received by, Purchaser until either (Y) such an Order is in effect or (Z) such Consent or Governmental Authorization has been obtained.

(iii)    If any Acquired Asset is deemed not to be assigned pursuant to Section 1.5(c)(ii), the Closing shall nonetheless take place subject to the terms and conditions set forth in this Agreement and, thereafter, through the earliest of (W) such time as such Consent or Governmental Authorization is obtained, (X) such an Order is in effect, (Y) six (6) months following the Closing, and (Z) the closing of the Bankruptcy Cases or the Canadian Proceedings or dissolution of the applicable Seller(s), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization or Order as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to

12

any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon the effectiveness of such Order or satisfying any requisite Consent or Governmental Authorization requirement after the Closing, the applicable Seller shall transfer to Purchaser and Purchaser shall accept such Seller's right, title and interest in and to such Acquired Asset in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code and the CCAA.

(iv)    Notwithstanding anything in this Agreement to the contrary, (A) the provisions of this Section 1.5(c)(iv) shall not apply to any Consent or Governmental Authorization required under any Foreign Competition Laws, which Consent or Governmental Authorization shall be governed by Section 6.4 and (B) no Seller will be obligated to pay any consideration to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

Section 2.1    Consideration; Payment.

(a)    The aggregate consideration to be paid by Purchaser for the purchase of the Acquired Assets shall be the Purchase Price.

(b)    At the Closing, Purchaser shall deliver, or cause to be delivered, to Parent (for further distribution to the Sellers) an aggregate amount equal to the Cash Purchase Price less the Holdback Amount and the DIP Balance plus an amount equal to the Aggregate Partial September Rent for the Acquired Stores (collectively, the "Closing Date Payment").

(c)    Within one (1) Business Day of the effectiveness of Parent's rejection of or Purchaser's assumption and assignment of any Lease for a Go-Forward Store that is not an Acquired Store pursuant to Section 1.5(b), Purchaser shall reimburse the applicable Seller for the Aggregate Partial September Rent for such Lease for a Go-Forward Store that is not an Acquired Store by wire transfer of immediately available funds to such bank account as shall be designated in writing by Parent.

(d)    The Closing Date Payment and any payment required to be made pursuant to any other provision of this Agreement shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made, and such designation shall be made at least two (2) Business Days prior to the date such payment is to be made.

(e)    A portion of the Cash Purchase Price equal to $4,000,000 (the "Retained Holdback Amount) shall be retained by the Purchaser at Closing until the Purchaser Price is finally

13

determined in accordance with Section 2.6. If as a result thereof, (i) the Sellers owe additional funds to Purchaser, Purchaser shall be permitted to retain from the Retained Holdback Amount a sum equal to such amounts owed and pay the remaining amount of the Retained Holdback Amount to Sellers in cash in immediately available funds to such account(s) as may be designated by Purchaser or (ii) the Sellers do not owe additional funds to Purchaser, the Purchaser shall pay the 100% of the Retained Holdback Amount to Sellers in cash in immediately available funds to such account(s) as may be designated by Parent.

(f)    A portion of the Cash Purchase Price equal to $4,000,000 (the "Deposited Holdback Amount", and together with the Retained Holdback Amount, the "Holdback Amount") deposited with the Escrow Agent at Closing until the Cash Purchase Price is finally determined in accordance with Section 2.6. If as a result thereof, (i) the Sellers owe additional funds to Purchaser and the amount owed to Purchaser exceeds the Retained Holdback Amount Purchaser and Parent shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds  (x) a sum equal to such amounts owed in excess of the Retained Holdback Amount to such account(s) as may be designated by Purchaser and (y)any remaining portion of the Deposited Holdback Amount (together with any and all investment interest thereon, if any) to such account(s) as may be designated by Parent, or (ii) the Sellers do not owe additional funds to Purchaser, Purchaser and Parent shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the Deposited Holdback Amount (together with any and all investment interest thereon, if any) to such account(s) as may be designated by Parent.

Section 2.2    Deposit; DIP Financing.

(a)    Prior to the Agreement Date, Purchaser has made an earnest money deposit of $7,500,000 (the "Initial Deposit") with Citibank, N.A., together with its permitted successors and assigns (the "Escrow Agent"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the Financing Orders. Purchaser shall make an additional earnest money deposit of $15,000,000 on or prior to 5:00 pm Eastern Time on August 22, 2025 (the "Second Deposit", and together with the Initial Deposit collectively, the "Deposit") with the Escrow Agent by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the Financing Orders and Purchaser's failure to fund the Second Deposit in accordance with this Section 2.2(a) shall be deemed a material breach of this Agreement by the Purchaser that is not subject to cure. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser.

(b)    During the period beginning on the date of the Financing Orders and ending on the Closing, Parent (on behalf of the Sellers) shall have the right to use all, or a portion, of the Deposit as a DIP Facility (as defined the Financing Orders) in accordance with the Financing Orders, which shall be in a form acceptable to each of Purchaser and Parent, including (i) to fund the purchase of Inventory for the Business (including (a) any Inventory in transit but for which Seller has not yet obtained title or possession and (b) actual freight and duty invoices associated with such Inventory) upon notification of such intended purchases to Purchaser, (ii) to fund certain critical vendor payments, and (iii) to the extent any amounts under the DIP Facility Amount remain

14

following the funding of clauses (i) and (ii), to pay vendor claims under section 503b9 of the Bankruptcy Code, in each case, subject to written approval (email being sufficient) from the Purchaser (such approval not to be unreasonably withheld, conditioned or delayed). With respect to prong (i), any purchase order proposed by Parent must be accompanied by supporting information with respect to the Inventory subject to such proposed purchase order, which provides the following: historical sales (if applicable, to the extent such information exists), margins, current inventory position on hand and how such purchase fits into the merchandising open to buy) and, if Purchaser declines to approve Parent's proposed purchase order, Purchaser shall provide an alternative proposal of similar amount for such purchase order to Parent within five (5) Business Days of such notification from Parent. Within one (1) Business Day of such approval or alternative proposal from Purchaser, the applicable Parties shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds for the applicable purchase amount to the account(s) as may be designated by Purchaser. In the event that the Purchaser withholds its approval for the applicable proposed purchase order and does not provide an alternative proposal of similar amount to such unapproved purchase order, the Minimum Core Inventory Threshold shall be decreased dollar-for-dollar by the amount of Inventory proposed to be purchased pursuant to the purchase order; provided, that notwithstanding the foregoing, there shall be no decrease to the Minimum Core Inventory Threshold if the Purchaser withholds its approval for the applicable proposed purchase order because Sellers have not provided the required supporting information.

(c)    If, prior to the Closing, this Agreement has been terminated other than by Seller pursuant to Section 8.1(d) or (f), then the remaining Deposit, together with all received investment income, if any, shall be returned to Purchaser after such termination and within two (2) Business Days of such termination, the applicable Parties shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the remaining Deposit (together with any and all investment interest thereon, if any) to such account(s) as may be designated by Purchaser.

(d)    If, prior to the Closing, this Agreement has been terminated by Seller pursuant to Section 8.1(d) or (f), then Sellers shall retain the remaining Deposit together with all received investment income, if any and, within two (2) Business Days of such termination, the applicable Parties shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the remaining Deposit (together with any and all investment interest thereon, if any) to such account(s) as may be designated by Parent.

(e)    Sellers' right to retain the remaining Deposit, as set forth in Section 2.2(d), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(f)    If the Closing occurs, at the Closing the applicable Parties shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the Deposit (together with any and all investment interest thereon, if any) to such account(s) as may be designated by Parent.

Section 2.3    Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Cash Purchase Price, the Seller Note and the assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022 at 10:00 a.m. Eastern Time) on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to as the "Closing Date."

Section 2.4    Closing Deliveries by Sellers. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by the applicable Sellers;

(b)    a short-form Intellectual Property assignment agreement substantially in the form of Exhibit B (the "IP Assignment Agreement"), duly executed by the applicable Sellers;

(c)    instruments of transfer of the Equity Interests of the Transferred Subsidiaries, in customary form, duly executed by the applicable Sellers;

(d)    an Internal Revenue Service ("IRS") Form W-9 or IRS Form W-8, as applicable, executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes; provided that the failure to deliver such form shall not be deemed a breach of any condition or covenant in this Agreement and Purchaser's sole remedy for the failure to provide any such form shall be to from the consideration otherwise payable to Sellers in accordance with Section 2.7;

(e)    the Seller Note, duly executed by Parent;

(f)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Parent certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(g)    to the extent the ABL Credit Agreement (as defined in the Seller Note) is entered into at Closing, the Intercreditor Agreement (as defined in the Seller Note), duly executed by the applicable subsidiaries of Parent.

Section 2.5    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a)    the Closing Date Payment;

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

16

(c)     the IP Assignment Agreement, duly executed by Purchaser;

(d)     the Seller Note, duly executed by Purchaser; and

(e)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Section 7.3(a) and 7.3(b) have been satisfied.

Section 2.6     Cash Purchase Price.

(a)     At least three (3) Business Days before the Closing, Parent shall prepare and deliver to Purchaser a written statement (the "Closing Statement") setting forth in reasonable detail its good faith estimate of (i) Core Inventory Amount, as of the Determination Time (the "Estimated Core Inventory Amount") and corresponding Estimated Core Inventory Shortfall or Estimated Core Inventory Surplus, as applicable, (ii) the A/R Amount as of the Determination Time (the "Estimated A/R Amount") and corresponding Estimated A/R Shortfall (if any), and (iii) the Store Cash Amount as of the Determination Time (the "Estimated Store Cash Amount") and corresponding Estimated Store Cash Shortfall or Estimated Store Cash Surplus, as applicable, and (iv) based upon the immediately preceding clauses (i), (ii) and (iii), the resulting Estimated Cash Purchase Price and Estimated Seller Note Credit. Parent will prepare the Closing Statement and all items included therein consistent with this Agreement (including the definitions herein) and the Accounting Policies, which statement shall be substantially in the form of Exhibit E attached hereto. During the period after the delivery of the Closing Statement and prior to the Closing Date, Purchaser shall have an opportunity to review the Closing Statement and Parent shall provide Purchaser and its Representatives reasonable access during normal business hours to all properties, books and records relating thereto and the officers and other employees and advisors of the Sellers and their Affiliates, in each case, to the extent reasonably necessary to assist Purchaser and its Representatives in their review of the Closing Statement; provided, that such access shall be in a manner that does not interfere with the normal business operations of the Sellers and their Subsidiaries. Parent shall in good faith consider any questions or comments received from Purchaser regarding the Closing Statement; provided, that, to the extent that Purchaser and Parent disagrees as to any one or more items, then with respect to such item, the amount of such item set forth in the Closing Statement sent by Parent shall be used for purposes of calculating the Estimated Cash Purchase Price and Estimated Seller Note Credit; provided, however, that, Purchaser's acceptance of the Estimated Cash Purchase Price and Estimated Seller Note Credit as proposed by Parent (or as otherwise agreed by Purchaser and Parent pursuant to this Section 2.6(a)) will not be deemed to waive or otherwise impair any rights of Purchaser relating to its preparation of the Post-Closing Statement and the adjustments to the Estimated Cash Purchase Price, the Estimated Seller Note Credit, the Cash Purchase Price or the Seller Note Credit pursuant to this Agreement, or waive, limit or otherwise modify any of its rights or remedies under this Agreement. Notwithstanding the foregoing, the Parties agree that in the event the Estimated A/R Amount is less than the A/R Peg, the first $1,000,000 of such difference shall be satisfied by way of a dollar-for-dollar Seller Note Credit, to be applied by Purchaser to the cash payments first owing under the Seller Note, and any remaining portion of such difference shall result in a reduction to the Estimated Cash Purchase Price.

(b)    Subsequent to the Closing and subject to this <u>Section 2.6</u> (as applicable), the Estimated Cash Purchase Price and/or Seller Note Credit shall be <u>increased</u> (if the Net Adjustment Amount is positive) or <u>decreased</u> (if the Net Adjustment Amount is negative) by the absolute value of the Net Adjustment Amount (which may be negative or positive). "<u>Net Adjustment Amount</u>" means an amount equal to the net result of (i) the amount by which the Final Core Inventory Amount exceeds the Estimated Core Inventory Amount (if any), less (ii) the amount by which the Estimated Core Inventory Amount exceeds the Final Core Inventory Amount (if any), plus (iii) solely in the event the Final A/R Amount is equal to or less than the A/R Peg, the amount by which the Final A/R Amount exceeds the Estimated A/R Amount (if any) (the "<u>A/R Increase</u>"), less (iv) the amount by which the Estimated A/R Amount exceeds the Final A/R Amount (if any) (the "<u>A/R Decrease</u>"), plus (v) the amount by which the Final Store Cash Amount exceeds the Estimated Store Cash Amount (if any), less (vi) the amount by which the Estimated Store Cash Amount exceeds the Final Store Cash Amount (if any). Notwithstanding the foregoing, the Parties agree that, solely with respect to any Net Adjustment Amount resulting from an A/R Decrease, (A) the first $1,000,000 of such A/R Decrease (inclusive of any difference based on the amount by which the Estimated A/R Amount is less than the A/R Peg) shall be satisfied by way of a dollar-for-dollar adjustment to the Estimated Seller Note Credit, to be applied by Purchaser to the cash payments first owing under the Seller Note and (B) to the extent the Estimated A/R Amount was less than the A/R Peg and it is thereafter determined that there is an A/R Increase as part of the Net Adjustment Amount, (i) a portion of any such A/R Increase in an amount up to the portion of cash reduction included in the Estimated Cash Purchase Price due to the Estimated A/R Shortfall shall be paid to Sellers and (ii) the Estimated Seller Note Credit shall be decreased by an amount equal to the remaining portion of such A/R Increase. By way of example, if the Estimated A/R Amount was $8,500,000 and, as such, the Estimated Seller Note Credit was $1,000,000 and there was a $500,000 cash reduction included in the Estimated Cash Purchase Price, and thereafter it is determined that the Final A/R Amount is $9,500,000 and there is a $1,000,000 A/R Increase as part of the Net Adjustment Amount, the first $500,000 of such A/R Increase shall be paid to Sellers and the Estimated Seller Note Credit shall be reduced by $500,000.

(c)    As soon as reasonably practicable, but no later than ten (10) Business Days after the Closing Date, Purchaser shall (i) prepare a statement of the calculation of (A) the Core Inventory Amount as of the Determination Time (the "<u>Final Core Inventory Amount</u>"), (B) the A/R Amount as of the Determination Time (the "<u>Final A/R Amount</u>"), (C) the Store Cash Amount as of the Determination Time (the "<u>Final Store Cash Amount</u>"), and (D) based upon the immediately preceding clauses (A), (B) and (C) (and taking into account the Net Adjustment Amount, including the limitation set forth in the proviso in the first sentence of <u>Section 2.6(b)</u>), the resulting Cash Purchase Price and Seller Note Credit (as applicable) as if (and solely for this purpose) such Core Inventory Amount is the Final Core Inventory Amount, such A/R Amount is the Final A/R Amount and such Store Cash Amount is the Final Store Cash Amount (the "<u>Post-Closing Statement</u>"), and (ii) deliver the Post-Closing Statement to Parent. The Post-Closing Statement shall be prepared in good faith consistent with this Agreement (including the definitions herein) and the Accounting Policies, which statement shall be substantially in the form of <u>Exhibit E</u> attached hereto (in the case of the Core Inventory Amount, A/R Amount and Store Cash Amount). The Parties agree that (1) in determining the Final Core Inventory Amount, the Final Store Cash Amount and the Final A/R Amount, and the related adjustment contemplated by this <u>Section 2.6(c)</u>, no Party will be permitted to introduce judgments, accounting methods, policies, principles, practices, procedures, assumptions, conventions, categorizations, definitions,

techniques (including in respect of management's exercise of judgment), classifications or estimation methodologies different than those set forth in the Accounting Policies, and (2) the Post-Closing Statement shall not include any purchase accounting or other adjustment arising out of the consummation of the Transactions and shall not be impacted by any changes requested by Purchaser between the Closing and the delivery of the Post-Closing Statement. Without the prior consent of Parent pursuant to this Section 2.6, Purchaser shall not have the right to modify the Post-Closing Statement or any items or amounts set forth therein after Purchaser delivers the Post-Closing Statement to Parent. If Purchaser does not deliver the Post-Closing Statement to Parent within ten (10) Business Days after the Closing Date, Parent (acting in its sole discretion) may elect by written notice to Purchaser to deem the Closing Statement as the Final Post-Closing Statement that is final, binding and non-appealable by the Parties.

(d)    In connection with the review of the Post-Closing Statement by Parent, Purchaser shall provide Parent and its Representatives with reasonable access to the books and records, personnel and facilities of the Business (in each case upon reasonable advance notice in writing and during normal business hours in a manner that does not unreasonably interfere with the Business). Furthermore, Parent shall have the right to review the work papers of Purchaser underlying or utilized in preparing the Post-Closing Statement and the calculation of the Cash Purchase Price set forth therein; provided, however, that the independent accountants of the Business, if any, shall not be obligated to make any such work papers available to Parent unless and until Parent has signed a customary confidentiality agreement relating to such access to such work papers in form and substance reasonably acceptable to such independent accountants.

(e)    Within ten (10) Business Days after its receipt of the Post-Closing Statement, Parent shall inform Purchaser in writing either (i) that the Post-Closing Statement is acceptable or (ii) of any objection to the Post-Closing Statement, setting forth in reasonable detail the basis for such objection and the specific adjustment to amounts, determinations and calculations set forth on the Post-Closing Statement that Parent believes should be made, including specific dollar amounts of adjustments necessary (an "Objection Notice"). If an Objection Notice is timely delivered within such ten (10) Business Days period, Purchaser and Parent shall negotiate in good faith to resolve each dispute raised therein (each, a "Disputed Item"). Any amounts that are not a Disputed Item on the Objection Notice shall be final, conclusive, binding and non-appealable on the Parties. If Purchaser and Parent, notwithstanding such good faith efforts, fail to resolve any Disputed Item within five (5) days after Parent timely delivers an Objection Notice or such longer period of time as the Parties may mutually agree in writing, then Purchaser and Parent shall jointly engage the Accounting Firm to resolve only any remaining Disputed Items as soon as practicable thereafter (but in any event, within ten (10) days after engagement of the Accounting Firm or such longer period as the Accounting Firm may reasonably require), which resolution must be in writing and set forth in reasonable detail the basis therefor; provided, that, all negotiations and discussions between Purchaser and Parent regarding the matters specified on the Objection Notice shall (unless otherwise agreed to in writing by Purchaser and Parent) be governed by Rule 408 of the U.S. Federal Rules of Evidence and any comparable applicable state rule of evidence. The amounts, determinations and calculations (or any component thereof) contained in the Post-Closing Statement shall become final, conclusive, binding and non-appealable on the Parties at the following times:

(i)      in the event that Parent has informed Purchaser in writing that the Post-Closing Statement is acceptable pursuant to this <u>Section 2.6(e)</u>, the date on which Parent so informs Purchaser (in which case such amounts, determinations and calculations (or any component thereof) shall be as set forth in the Post-Closing Statement delivered or deemed to be delivered pursuant to <u>Section 2.6(c)</u>);

(ii)     in the event that Parent does not deliver an Objection Notice to Purchaser pursuant to this <u>Section 2.6(e)</u> within ten (10) Business Days after receipt of the Post-Closing Statement, on the next Business Day following the expiration of such period (in which case such amounts, determinations and calculations (or any component thereof) shall be as set forth in the Post-Closing Statement delivered pursuant to <u>Section 2.6(c)</u>);

(iii)    in the event that Parent has delivered an Objection Notice to Purchaser pursuant to this <u>Section 2.6(e)</u>, the date of an agreement in writing by Purchaser and Parent that such amounts, determinations and calculations (or any component thereof) that are the subject of such Objection Notice, together with any modifications thereto agreed to by Purchaser and Parent, are final, conclusive, binding and non-appealable (in which case such amounts, determinations and calculations (or any component thereof) shall be as agreed upon by Purchaser and Parent); and

(iv)    in the event that Purchaser and Parent engage the Accounting Firm to resolve any remaining Disputed Items pursuant to this <u>Section 2.6(e)</u>, the date on which the Accounting Firm issues its written resolution of such Disputed Items (in which case such amounts, determinations and calculations (or any component thereof) shall be as resolved by the Accounting Firm pursuant to this <u>Section 2.6(e)</u> with respect to all Disputed Items submitted to the Accounting Firm, and shall otherwise be as set forth in the Post-Closing Statement delivered pursuant to <u>Section 2.6(c)</u>, together with any modifications thereto agreed to by Purchaser and Parent).

(f)      At such time determined in accordance with this <u>Section 2.6</u>, the Post-Closing Statement as so agreed (or deemed agreed) or determined shall be the "<u>Final Post-Closing Statement</u>" for purposes of this Agreement, and shall be final, conclusive, binding and non-appealable (absent fraud, willful misrepresentation or mathematical or manifest error and such determination may be entered and enforced in accordance with <u>Section 10.12</u>) on the Parties and shall be used for the adjustment of the Purchase Price, if any, pursuant to <u>Section 2.6(i)</u>. The statements of (i) Core Inventory Amount as of the Determination Time set forth in the Final Post-Closing Statement shall be the "<u>Final Core Inventory Amount</u>" for purposes of this Agreement, (ii) A/R Amount set forth in the Final Post-Closing Statement shall be the "<u>Final A/R Amount</u>" for purposes of this Agreement and (iii) the Store Cash Amount as of the Determination Time set forth in the Final Post-Closing Statement shall be the "<u>Final Store Cash Amount</u>" for purposes of the Agreement.

(g)      In resolving any Disputed Item, the Accounting Firm (i) shall act as an expert and not as an arbitrator, (ii) shall be bound by the provisions of this <u>Section 2.6(g)</u>, (iii) shall not assign a value to any Disputed Item greater than the greatest value claimed for such Disputed Item or less than the smallest value for such Disputed Item claimed by either Purchaser in the Post-Closing Statement or Parent in the Objection Notice, (iv) shall limit its determination to each

unresolved Disputed Item, (v) shall make its determination based solely on presentations by Purchaser and Parent which are in accordance with the guidelines and procedures set forth in this Agreement and not on the basis of independent review; provided, that, the Accounting Firm may make reasonable requests for additional information from Purchaser and Parent, (vi) may not consider for any purpose, any settlement discussions or settlement offer(s) made by or on behalf of either Purchaser or Parent unless otherwise agreed in writing by Purchaser and Parent, and (vii) shall have exclusive jurisdiction over any disputes arising out of or relating to the calculation of, and any adjustments to, the Purchase Price; provided, that upon the determination of the Accounting Firm, such determination may be entered and enforced in any court of competent jurisdiction in accordance with Section 10.12.

(h)     For purposes of complying with this Section 2.6, Purchaser and Parent shall furnish to each other and to the Accounting Firm such work papers and other documents and information relating to the Disputed Items as the Accounting Firm may require and that are available to the Party (or its independent public accountants) from whom such documents or information are requested. The Accounting Firm shall deliver its determination of the Disputed Items to Purchaser and Parent in writing, together with a reasonable basis for its determination of each Disputed Item. In no event shall either Party engage in *ex parte* communications with the Accounting Firm with respect to any Disputed Item until the Accounting Firm issues its final determination of the Disputed Items. The fees and expenses of the Accounting Firm incurred pursuant to this Section 2.6 shall be allocated between Purchaser and Parent in inverse proportion to their success on the unresolved Disputed Items, i.e., (i) Purchaser shall be responsible for that portion of the fees and expenses multiplied by a fraction, the numerator of which is the aggregate Dollar value of the Disputed Items submitted to the Accounting Firm that are resolved against Purchaser (as finally determined by the Accounting Firm) and the denominator of which is the total Dollar value of the Disputed Items so submitted and (ii) Parent shall be responsible for the remaining amount of fees and expenses. In the event of any dispute regarding such allocation, the Accounting Firm shall determine the allocation of its fees and expenses as between Purchaser and Parent in accordance with such allocation methodology, such determination to be final and binding on both Purchaser and Parent. Except as otherwise set forth in Section 2.6(b) and this Section 2.6(h), the fees and expenses of Parent and its Representatives incurred in connection with the Post-Closing Statement and any Disputed Items shall be borne by Parent, and the fees and expenses of Purchaser and its Representatives incurred in connection with the Post-Closing Statement and any Disputed Items shall be borne by Purchaser.

(i)     If the Cash Purchase Price (as finally determined in the Final Post-Closing Statement): (A) is less than the Estimated Cash Purchase Price, then within three (3) Business Days after the Cash Purchase Price is finally determined in the Final Post-Closing Statement, Parent shall repay to Purchaser an amount equal to the difference between the Cash Purchase Price and the Estimated Cash Purchase Price by way of offset against the Holdback Amount; provided, that, if the amount owed by Parent is greater than the Holdback Amount, the Parent shall pay the difference to Purchaser, by wire transfer of immediately available funds to the bank accounts designated by Purchaser in writing; or (B) exceeds the Estimated Cash Purchase Price, then within three (3) Business Days after the Cash Purchase Price is finally determined in the Final Post-Closing Statement, Purchaser shall pay (or Purchaser shall cause to be paid) to Parent (on behalf of Sellers) an amount equal to the difference (if any) between the Cash Purchase Price and the Estimated Cash Purchase Price by wire transfer of immediately available funds to the bank

accounts designated by Parent in writing. The amounts in this <u>Section 2.6(i)</u> shall be exclusive of any fees and expenses owed to the Accounting Firm by any Party pursuant to <u>Section 2.6(h)</u>. If the Net Adjustment Amount is deemed to be zero ($0), the Estimated Cash Purchase Price is the Cash Purchase Price.

This <u>Section 2.6</u> shall be the sole and exclusive remedy of the Parties with respect to the determination of the Cash Purchase Price; <u>provided</u>, <u>however</u>, that in no event shall Purchaser or Parent be entitled to any duplicative recovery as a result of the rights and remedies afforded in this Agreement and the Transaction Agreements.

Section 2.7   <u>Withholding</u>. Notwithstanding anything in this Agreement to the contrary, Purchaser, Sellers, and any other Person required to make a payment with respect to the transactions contemplated by this Agreement shall be entitled to deduct and withhold from such payment such amounts as Purchaser, Sellers, or any other Person is required to deduct and withhold under applicable Tax Law; <u>provided</u> that Purchaser shall use commercially reasonable efforts to notify Sellers of any anticipated deduction or withholding at least five (5) Business Days prior to making the applicable payment. The Parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such deduction or withholding to the maximum extent permitted by applicable Law. To the extent that amounts are so deducted and withheld and paid over to the appropriate Governmental Body, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court or (ii) set forth in the Schedules delivered by Sellers concurrently herewith and subject to <u>Section 10.11</u>, Sellers represent and warrant to Purchaser as of the Agreement Date as follows.

Section 3.1   <u>Organization and Qualification</u>. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the Laws of the jurisdiction of its incorporation or formation, except where the failure to be so incorporated, organized, existing or in good standing would not reasonably be expected to prevent or materially adversely affect the ability of any Seller to consummate the Transactions.

Section 3.2   <u>Authorization of Agreement</u>. The execution, delivery, and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, subject to requisite Bankruptcy Court approvals being granted, have been duly authorized by all requisite corporate action, limited liability company action, or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery, and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals being granted, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due

authorization, execution and delivery of the Transaction Agreements by the other parties to such Transaction Agreements, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

Section 3.3    Conflicts; Consents.    Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) the notices, authorizations, approvals, Orders, Permits or Consents set forth on Schedule 3.3 are made, given, or obtained (as applicable), (c) the requirements of any applicable antitrust, competition, foreign direct investment or "FDI", or merger control Laws promulgated by any Governmental Body ("Foreign Competition Laws") are complied with, and (d) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, and the consummation by Sellers of the Transactions and the performance or compliance by Sellers with any of the terms or provisions of the Transaction Agreements, do not and will not (i) conflict with or violate any provision of any Seller's Organizational Documents, (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract, (iii) violate any Law or Order applicable to Sellers, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Assets, except, in the case of clauses (ii) through (iv), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.4    Equity Interests of Acquired Entities.

(a)    The authorized and outstanding Equity Interests of each of the Acquired Entities are as set forth on Schedule 3.4(a). All of the Equity Interests of the Acquired Entities have been duly authorized, validly issued, fully paid and are non-assessable (where such concepts are legally recognized in the jurisdictions of organization of such Acquired Entities). Except as set forth on Schedule 3.4(a), there are no Contracts, commitments, understandings, arrangements, or other obligations by which any of the Acquired Entities is bound to issue, deliver or sell, or cause to be issued, delivered or sold, Equity Interests, or that otherwise give any Person the right to receive any benefits or rights similar to any rights enjoyed by or accruing to the holders of shares of Equity Interests of any Acquired Entity (including any rights to receive any payment in respect, or based on the price or value, of such Equity Interests).

(b)    None of Sellers or the Acquired Entities is a party to any shareholders' agreement, voting trust agreement, registration rights agreement or other similar agreement or understanding relating to any Equity Interests or any other agreement relating to the disposition, voting, or dividends with respect to any Equity Interests. Except as set forth on Schedule 3.4(a), Sellers own all of the outstanding Equity Interests of the Acquired Entities, free and clear of all Encumbrances (other than Permitted Encumbrances).

23

(c)      Except as set forth on Schedule 3.4(c), there are no other corporations, limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which the Acquired Entities own as of the Agreement Date, of record or beneficially, any Equity Interests or any right (contingent or otherwise) to acquire any Equity Interests.

Section 3.5      Financial Statements. Attached to Schedule 3.5 are the (i) audited consolidated financial statements of Sellers as of February 3, 2024 (the "Audited Financial Statements") and (ii) the unaudited consolidated balance sheets of Sellers, as of and for the nine month period ended November 2, 2024 (the "Balance Sheet" and collectively with the Audited Financial Statements, the "Financial Statements"). The Financial Statements were prepared in accordance with GAAP, except as noted therein, and subject, in the case of the Balance Statements, to the absence of explanatory footnote disclosures, other presentation items, and normal recurring year-end adjustments (none of which are not material, individually or in the aggregate, to the Business).

Section 3.6      Title to Properties.

(a)      As of immediately prior to Closing, one or more of Sellers or the Acquired Entities have, or will have, good and valid title to all of the Acquired Assets, free and clear of any and all free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)      As of immediately prior to Closing, one or more of Sellers or the Acquired Entities has a good and valid leasehold interest to the Acquired Leased Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances).

(c)      Except as set forth on Schedule 3.6(c) (and subject to entry of the Sale Order), with respect to each Acquired Lease (i) such Acquired Lease is legal, valid, binding, enforceable and in full force and effect; (ii) neither Sellers nor any of the Acquired Entities have currently subleased, licensed or otherwise granted any Person the right to use or occupy such Acquired Leased Real Property or any portion of such Acquired Leased Real Property; and (iii) none of the Acquired Leases, or any interest in any Acquired Lease, is collaterally assigned or subject to a security interest (except for Permitted Encumbrances).

Section 3.7      Contracts.

(a)      Schedule 3.7(a) sets forth a list of each Material Contract, as of the Agreement Date. For purposes of this Agreement, "Material Contract" means any Contract to which any Sellers or Acquired Entity, excluding the Employee Benefit Plans and any Leases, is party that is material to the Business including and Contract that:

(i)      relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement with a third party (in each case, other than Contracts entered into in the Ordinary Course and Organizational Documents of any Seller or Acquired Entity);

(ii)      relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $1,000,000 (in each case, excluding acquisitions or dispositions,

24

supplies, merchandise, Inventory, products, Equipment, properties or other assets in the Ordinary Course, or of supplies, Inventory, merchandise, products, Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the Business);

(iii)    contains any provision (A) limiting, in any material respect, the right of Sellers or the Acquired Entities to engage in any business, make use of any Acquired Intellectual Property that is material to Sellers or the Acquired Entities, compete with any Person, or operate anywhere in the world, (B) granting any exclusivity right to any third party, or (C) containing a "most favored nation" provision in favor of any third party, in each case of clauses (A) through (C), other than (1) a Contract that can be terminated on 90 days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (2) Contracts entered into in the Ordinary Course granting exclusive rights to any Seller's or any Acquired Entity's services or containing "most favored nation" provisions with respect to certain of Seller's and the Acquired Entity's products or (3) any provision in any license agreements for Intellectual Property limiting Seller's and the Acquired Entity's use of such Intellectual Property to specified fields of use or specified territories; and

(iv)    is a commitment or agreement to enter into any of the foregoing.

(b)    Subject to requisite Bankruptcy Court and/or Canadian Court approvals, and assumption by the applicable Purchaser of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Cases or the Canadian Proceedings, (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, or (iii) as set forth in Schedule 3.7(b), (A) each Material Contract is valid and binding on the Seller or Acquired Entity that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, except as such enforceability may be limited by the Enforceability Exceptions, (B) the applicable Seller or Acquired Entity, and, to the Knowledge of Sellers, any other party thereto, have performed all material obligations required to be performed by it under each Material Contract, (C) Sellers or Acquired Entities have received no written notice of the existence of any breach or default on the part of any Sellers and the Acquired Entities under any Material Contract, (D) there are no events or conditions that constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller or Acquired Entity, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) to the Knowledge of Sellers, Sellers and the Acquired Entities have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of clauses (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.8    No Litigation. Except as set forth on Schedule 3.8, there are no Actions pending or, to the Knowledge of Sellers, threatened against any of Sellers or the Acquired Entities that would reasonably be expected to (a) adversely affect any Seller's performance of its obligations under this Agreement or the consummation of the Transactions or (b) be material to the Acquired Assets and Assumed Liabilities, taken as a whole.

Section 3.9    Permits; Compliance with Laws. (i) Each Seller and Acquired Entity is, and has been since January 1, 2024, in compliance in all material respects with all Laws and applicable Orders, and (ii) Sellers and the Acquired Entities hold all licenses, franchises, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of the Business as currently conducted, in each case, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (collectively, "Permits"). Each Seller and Acquired Entity and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2024, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder.

Section 3.10    Intellectual Property.

(a)    Except as would not reasonably be expected to be material to the Business, taken as a whole, Sellers and the Acquired Entities own all of the rights, title and interest in and to the Acquired Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Acquired Intellectual Property is subsisting, valid and enforceable.

(b)    Except as would not reasonably be expected to be material to the Business, taken as a whole, (i) Sellers and the Acquired Entities own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the Business as currently conducted by Sellers and the Acquired Entities free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Sellers and the Acquired Entities have taken commercially reasonable steps to maintain the confidentiality of all material non-public Acquired Intellectual Property; provided that nothing in this Section 3.10(b) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.10(d).

(c)    Except as would not reasonably be expected to be material to the Business, taken as a whole, no Actions are pending or, to the Knowledge of Sellers, threatened against any Seller or Acquired Entity in a writing received by a Seller or Acquired Entity, and since January 1, 2024, Sellers and the Acquired Entities have not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by any Seller or Acquired Entity of any Intellectual Property owned by any such Seller or Acquired Entity or (ii) alleging that any Seller or Acquired Entity with respect to the Business is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(d)    Except as would not reasonably be expected to be material to the Business, taken as a whole, to the Knowledge of Sellers, since January 1, 2024, (i) no Person has infringed, misappropriated or otherwise violated the rights of Sellers or the Acquired Entities with respect to any Intellectual Property that is owned by Sellers or the Acquired Entities and (ii) the operation of the Business by Sellers and the Acquired Entities has not violated, misappropriated or infringed the Intellectual Property of any other Person.

26

(e)    The consummation of the Transactions will not result in the grant of any right or license to any third party of any Intellectual Property that is owned by any Seller or Acquired Entity and is material to the Acquired Assets, the Assumed Liabilities, and the Business, taken as a whole.

Section 3.11    Data Privacy and Security.

(a)    Except as would not reasonably be expected to be material to the Business, taken as a whole, each Seller and Acquired Entity are, and since January 1, 2024, have been, in compliance with all applicable data privacy Laws.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2024, there has been no unauthorized intrusions into the information technology systems owned by any Seller or Acquired Entity or breaches of security in which Personal Information in the possession of any Seller or Acquired Entity was exfiltrated without authorization, in each case, that would reasonably require Sellers to notify a Governmental Body under any applicable Law.

Section 3.12    Tax Matters.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    All Tax Returns required to be filed with respect to the Acquired Assets or the Acquired Entities have been timely filed (taking into account any valid extensions of time within which to file) and all such Tax Returns are complete and accurate.

(b)    All Taxes with respect to the Acquired Assets or the Acquired Entities that are due and payable have been timely paid or have been adequately reserved for in accordance with GAAP, except to the extent the nonpayment thereof is permitted or required by the Bankruptcy Code.

(c)    There are no currently pending or threatened Actions with respect to Taxes or Tax Returns of or with respect to any Acquired Entity, Acquired Asset, or Assumed Liability.

(d)    There are no Encumbrances for Taxes on any of the Acquired Assets or the assets of the Acquired Entities other than Permitted Encumbrances.

(e)    None of Sellers or the Acquired Entities has waived any statute of limitations in respect of Taxes with respect to the Acquired Assets or the Acquired Entities or agreed to any extension of time with respect to an assessment or deficiency for Taxes with respect to the Acquired Assets or the Acquired Entities (other than customary extensions of time for filing Tax Returns), in each case, which waiver or extension would have effect after the Closing.

(f)    Neither Sellers nor any Acquired Entity has participated in any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(2).

Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.12 and Section 3.13 (insofar as they relate to Taxes) shall constitute the sole representations and warranties in this Agreement with respect to Taxes and no representation or

warranty set forth in this <u>Section 3.12</u> shall apply, directly or indirectly, with respect to any Seller Combined Tax Return. No representation or warranty is made with respect to the validity of any Tax position or the amount or availability of any Tax attribute in any Tax period (or portion thereof) following the Closing.

Section 3.13    <u>Assumed Benefit Plans</u>.

(a)    With respect to each material Assumed Benefit Plan, Sellers shall make available to Purchaser copies, within thirty (30) days after the date hereof (to the extent applicable) of the current plan document or a written description of the material terms of such Assumed Benefit Plan, other than any document that any Seller is prohibited from making available to Purchaser as the result of applicable Law relating to the safeguarding of data privacy.

(b)    There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Assumed Benefit Plan that would reasonably be expected to result in any material Liability to Purchaser and no material audit or other proceeding by a Governmental Body is pending, or to the Knowledge of Sellers, threatened with respect to such Assumed Benefit Plan. The Assumed Benefit Plans comply in form and in operation in all material respects with their terms and applicable Laws, except as would not reasonably be expected to be material to the Acquired Assets, the Assumed Liabilities, and the Business, taken as a whole.

(c)    None of Sellers or the Acquired Entities maintains, contributes to, or has any Liability with respect to any (i) pension plan that is subject to Title IV of ERISA or Section 412 of the Tax Code or (ii) "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(d)    The consummation of the Transactions is not reasonably expected to (i) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any Business Employee under any Assumed Benefit Plan, (ii) cause a Seller or Acquired Entity to transfer or set aside any assets to fund any benefits under any Assumed Benefit Plan or (iii) result in any "disqualified individual" with respect to any Seller or Acquired Entity receiving any "excess parachute payment" (as each such term is defined in Section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by, or at the direction of, Purchaser or any of its Affiliates.

Section 3.14    <u>Employees</u>.

(a)    None of Sellers or the Acquired Entities is party to any collective bargaining agreements or similar labor-related Contracts with any labor union representing any Business Employees. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) there is no written demand from any labor union seeking recognition as the exclusive bargaining representative of any Business Employees by any Seller or Acquired Entity and (ii) there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by any Business Employees.

(b)    Sellers are in compliance with all applicable Laws respecting employment practices and labor, including those related to wages and hours, collective bargaining,

28

unemployment insurance, workers' compensation, immigration, harassment and discrimination, disability rights and benefits, affirmative action, and employee layoffs except where the failure to be in compliance would not reasonably be expected to result in a Material Adverse Effect.

(c)     There is no Action pending or, to the Knowledge of Sellers, threatened in writing against any Seller or any Acquired Entity alleging a violation of any applicable labor or employment Law brought by any Business Employee before any Governmental Body, except for such Actions (or threatened Actions) that, if adversely determined, would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 3.15   Brokers. Except for Houlihan Lokey (the "FA"), the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Sellers.

Section 3.16   No Other Representations and Warranties. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE SCHEDULES), NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND PURCHASER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE ACQUIRED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY ACQUIRED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE SCHEDULES), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE ACQUIRED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE ACQUIRED ASSETS BY PURCHASER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO PURCHASER OR ITS AFFILIATES OR ADVISORS (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR ADVISOR OF ANY SELLER OR ANY OF THEIR AFFILIATES). THE DISCLOSURE OF ANY MATTER OR ITEM IN THE SCHEDULES SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED OR IS MATERIAL OR THAT SUCH MATTER WOULD RESULT IN A MATERIAL ADVERSE EFFECT. PURCHASER HAS PERFORMED AN

INDEPENDENT INVESTIGATION, ANALYSIS, AND EVALUATION OF THE ACQUIRED ASSETS. THE PROVISIONS OF THIS <u>SECTION 3.15</u> SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as of the Agreement Date as follows.

Section 4.1    <u>Organization and Qualification</u>. Purchaser is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or used by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to prevent or adversely affect the ability of Purchaser to consummate the Transactions.

Section 4.2    <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and the Transaction Agreements and to perform its obligations hereof and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. This Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery of this Agreement by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

Section 4.3    <u>Conflicts; Consents</u>.

(a)    Assuming that (i) the Sale Order, and all other requisite Bankruptcy Court approvals are obtained, (ii) the notices, authorizations, approvals, Orders, permits or Consents set forth on <u>Schedule 4.3(a)</u> are made, given or obtained (as applicable), and (iii)  neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions of this Agreement, will (A) conflict with or violate any provision of Purchaser's Organizational Documents, (B) violate any Law or applicable Order, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or

provisions of any loan or credit agreement or other material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (A) through (D), as would not, individually or in the aggregate, reasonably be expected to prevent or adversely affect the ability of Purchaser to consummate the Transactions.

(b)     Except as set forth on Schedule 1.1(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or Consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such Consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair the ability of Purchaser to consummate the Transactions.

Section 4.4     Financing. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with Transactions and does not know of any circumstance or condition that could reasonably be expected to prevent or substantially delay the availability of such funds or otherwise impair such capability at the Closing and such other dates that such obligations and transactions are required to be satisfied pursuant to the terms hereof. Purchaser affirms that it is not a condition to Closing or to any of its obligations under this Agreement that Purchaser obtains financing for the Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

Section 4.5     Brokers. There is no investment banker, broker, finder, or other intermediary that has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

Section 4.6     No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will or would reasonably be expected to adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

Section 4.7     Investment Representation; Investigation. Purchaser is acquiring the Equity Interests of the Acquired Entities for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities Laws. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser is knowledgeable about the industries in which the Acquired Entities operate and is capable of evaluating the merits and risks of the Transactions and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded full access to the books and records, facilities and personnel of the Acquired Entities for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of

the Acquired Entities and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

Section 4.8    Certain Arrangements. As of the Agreement Date, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of directors (or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such Transactions.

Section 4.9    No Foreign Person. As of Closing, Purchaser will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950 or its implementing regulations.

Section 4.10    Solvency. Purchaser is, and immediately after giving effect to the Transactions each of Purchaser and the Acquired Entities shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser or any of the Acquired Entities. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 4.11    WARN Act and Mass Layoffs. Purchaser does not currently plan or contemplate any plant closings, reduction in force, terminations of employees, or similar personnel actions impacting Transferred Employees that would trigger obligations under the WARN Act or similar Laws.

Section 4.12    No Competitive Assets. Neither Purchaser nor any of its "associates" or "affiliates" (each as defined in 16 CFR 801.1(d)) hold five percent (5%) or more of the economic interest, voting securities or non-corporate interests (as "hold," "voting securities" and "non-corporate interest" are defined under 16 CFR 801) of any entity that competes with any of Sellers or the Acquired Entities to the extent that any such holdings would reasonably be expected to prevent or materially delay the expiration or termination of the waiting period under applicable Foreign Competition Laws in connection with the Transactions.

Section 4.13    No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, Sellers acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

## ARTICLE V
## BANKRUPTCY COURT MATTERS

Section 5.1    <u>Bankruptcy Actions</u>.

(a)    Within two (2) Business Days following the Agreement Date, Sellers shall file a notice with the Bankruptcy Court attaching the proposed form of Sale Order approving the execution, delivery, and performance of this Agreement by Sellers (including payment of the Expense Reimbursement pursuant to <u>Section 8.2(b)</u> or Breakup Fee pursuant to <u>Section 8.2(c)</u>), other than the performance of those obligations to be performed at or after the Closing, which Sale order shall be in form and substance acceptable to Purchaser. The foregoing notice shall be served in accordance with the Sale Order. Purchaser will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order.

(b)    As soon as reasonably practicable following the Agreement Date, Sellers shall file a notice with the Canadian Court attaching the proposed form of Sale Order approving the execution, delivery, and performance of this Agreement by Sellers (including payment of the Expense Reimbursement pursuant to <u>Section 8.2(b)</u> or Breakup Fee pursuant to <u>Section 8.2(c)</u>), other than the performance of those obligations to be performed at or after the Closing, which Sale order shall be in form and substance acceptable to Purchaser. The foregoing notice shall be served in accordance with the Sale Order. Purchaser will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Canadian Court approval of the Sale Order.

(c)    Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Sale Order. Sellers may modify the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Monitor appointed in the Canadian Proceedings, the Bankruptcy Court or Canadian Court, any creditor or committee representing a group of creditors in the Bankruptcy Case or the Canadian Proceedings, or any other party in interest, with such modifications being acceptable to Purchaser in its commercially reasonable discretion.

(d)    From the Agreement Date until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, the Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court and the Canadian Court of the Sale Order.

(e)    Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's and the Canadian Court's entry of the Sale Order and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and/o the Canadian Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court and/or the Canadian Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, as well as

demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(f)     Parent (on behalf of the Sellers) and Purchaser shall (i) appear formally or informally in the Bankruptcy Court and/or the Canadian Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Sellers from the Bankruptcy Court and/or the Canadian Court with respect to the Transactions.

(g)     If Purchaser is not the prevailing party at the conclusion of the Sale Hearing (as defined in the Sale Motion) (such prevailing party, the "Successful Bidder"), then, unless this Agreement is validly terminated by Purchaser pursuant to Section 8.1(h) (and without limiting such termination right), Purchaser may in its discretion agree to serve as a back-up bidder in its sole discretion.

(h)     This Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court and Canadian Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice to the creditors of Sellers and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Sale Hearing.

(i)     Purchaser shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code and/or its equivalents under the CCAA for the Assigned Contracts. Purchaser will take all actions reasonably required to assist in obtaining a Bankruptcy Court and/or Canadian Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and/or Canadian Court and making Purchaser's Advisors available to testify before the Bankruptcy Court and/or Canadian Court.

(j)     Nothing in this Section 5.1 shall prevent Sellers from modifying the Sale Order as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

Section 5.2     Cure Costs. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code and/or its equivalents under the CCAA and this Agreement.

Section 5.3     Sale Order. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance

by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth in this Agreement and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor Law, *de facto* merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, and (f) find that Purchaser shall have no Liability for any Excluded Liability. Sellers shall seek substantially equivalent approvals and findings, as necessary and appropriate, pursuant to the Sale Order in the Canadian Proceedings.

Section 5.4    Approval. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court and/or the Canadian Court (including entry of the Sale Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court or the Canadian Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court, the Canadian Court, or its stakeholders.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

Section 6.1    Conduct of the Business of Sellers.

(a)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) due to any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, the Canadian Court or the CCAA, or Sellers' debtor-in-possession financing, use of cash collateral, the DIP Term Sheet (as defined in the Financing Orders) or any DIP Budget (as defined in the Financing Orders), as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement or the Financing Orders, (iv) to the extent related to an Excluded Asset or an Excluded Liability, (v) as set forth on Schedule 6.1, during the period from the Agreement Date until the Closing, unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), (A) Sellers shall use their commercially reasonable efforts to carry on the Business in the Ordinary Course and to cause the Acquired Entities to carry on the Business in the Ordinary Course, in each case except as would not reasonably be expected to be material to the Acquired Assets, the Assumed Liabilities, and the Business and (B) subject to Section 2.2(b), Sellers shall use its reasonable best efforts to acquire $24,100,000 of new Core Inventory  in accordance with Sellers' forecast inventory purchasing plan; provided, that upon Purchaser's written consent, Sellers may allocate a portion of the foregoing commitment to pay vendor claims under Section 503(b)(9) of the Bankruptcy Code, in each case, taken as a whole; provided that no action by any Seller or Acquired Entity with respect

to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) due to any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, the Canadian Court or the CCAA, or Sellers' debtor-in-possession financing or use of cash collateral, the DIP Term Sheet or any DIP Budget, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement or the Financing Orders, (iv) to the extent related to an Excluded Asset or an Excluded Liability, or (v) as set forth on Schedule 6.1, during the period from the Agreement Date until the Closing, unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Sellers shall not, and shall cause the Acquired Entities not to, take any of the following actions:

(i)     other than transactions solely among Sellers and the Acquired Entities or pursuant to the terms of any Employee Benefit Plan, (A) issue, sell, encumber or grant any Equity Interests of the Acquired Entities; (B) redeem, purchase, or otherwise acquire any of the outstanding Equity Interests of the Acquired Entities, (C) establish a record date for, declare, set aside for payment or pay any dividend on, or make any other distribution in respect of, any Equity Interests of the Acquired Entities, or (D) split, combine, subdivide or reclassify any Equity Interests of the Acquired Entities;

(ii)     (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Sellers or the Acquired Entities, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except (1) for intercompany Indebtedness among Sellers and their Affiliates, (2) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (3) for Indebtedness incurred under arrangements that are not secured by the Acquired Assets and that the Acquired Entities are not responsible for (whether as borrowers or guarantors), (4) for Indebtedness incurred under existing arrangements (including in respect of letters of credit), and (5) for Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the Agreement Date or permitted to be incurred, assumed or otherwise entered into under this Agreement, in each case of this clause (A), other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements other than in the Ordinary Course or (C) make any loans, capital contributions or advances to, or investments in, any Person other than (1) as permitted pursuant to Section 6.1(b)(v) or (2) in the Ordinary Course;

(iii)     sell or lease to any Person, in a single transaction or series of related transactions, any of the Acquired Assets for consideration, individually or in the aggregate, in excess of $25,000, except (A) Ordinary Course dispositions of Inventory and dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the Business, (B) transfers among Sellers and the Acquired Entities, (C) leases or subleases of real property under which a Seller or Acquired Entity is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases,

in each case following prior good faith consultation with Purchaser, and (D) other sales and leases in the Ordinary Course;

(iv)    make or authorize capital expenditures, including for property, plant and Equipment, except for those (A) in connection with the repair or replacement of (x) facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (y) assets that are necessary to operate the Business in the Ordinary Course, (B) otherwise in an aggregate amount for all such capital expenditures made pursuant to this clause (B) not to exceed $25,000 in the aggregate or (C) in accordance with the business plan or capital expenditure budget made available to Purchaser;

(v)    except as permitted under Section 6.1(b)(iv), and except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any material properties, assets, securities or business (including by merger), except in the Ordinary Course (which shall include acquisitions of Inventory in the Ordinary Course with respect to the Go-Forward Stores);

(vi)    except (A) in the Ordinary Course or (B) as permitted or required pursuant to the terms of any Employee Benefit Plan, (1) grant to any Business Employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) hire any employee whose base salary exceeds $50,000 per annum, (3) establish, adopt, enter into, materially amend or terminate any material Assumed Benefit Plan or (4) take any action to accelerate any rights or benefits of any Business Employee under any Assumed Benefit Plan; provided that the foregoing shall not restrict any Seller from (x) entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) in a manner consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions or (y) taking any action or establishing any Employee Benefit Plan or other compensation or benefit plan that is not targeted at Business Employees or that will not result in Purchaser bearing Liability therefor after the Closing;

(vii)    make any material changes in financial accounting methods, principles or practices materially affecting the consolidated assets, Assumed Liabilities or results of operations of Sellers and the Acquired Entities, except insofar as may be required (A) by GAAP (or any interpretation of GAAP), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

(viii)    grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets other than to secure Indebtedness and other obligations that are in existence at the Agreement Date (and required to be so secured by their terms);

(ix)    settle any pending or threatened Action against any Seller or Acquired Entity that would result in an Assumed Liability in an amount in excess of $25,000;

(x)    sell or license to any Person, in a single transaction or series of related transactions, any of the material Acquired Intellectual Property, except for non-exclusive licenses granted in the Ordinary Course or the expiration of registered Intellectual Property at the end of its statutory term;

(xi)    subject to Section 2.2(b) and Section 6.1(a), (A) purchase any new Inventory, (B) conduct liquidation sales of any goods on consignment or any Core Inventory, (C) replenish any Inventory in any Phase I Closing Stores or (D) replenish Inventory in any Go-Forward Stores other than Ordinary Course replenishments of Inventory on hand as of the Agreement Date; or

(xii)    commit or agree to take any of the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Business (or the other business of Sellers and their Affiliates) prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

Section 6.2    Access to Information.

(a)    From the Agreement Date until the Closing, Sellers will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours (and in accordance with the reasonable procedures established by Sellers) to the books and records of Sellers and the Acquired Entities to the extent required in order to consummate the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of any Seller or Acquired Entity, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the Transactions and such books and records, (iii) all requests for access will be directed to the FA or such other Person(s) as the FA may designate in writing from time to time, (iv) Sellers and the Acquired Entities are not obligated to disclose, and may redact or remove, any information that is not related to the Business, and (v) nothing in this Agreement will require Sellers or any Acquired Entity to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller or any Acquired Entity if the Transactions are not consummated, (B) would require any Seller or the Acquired Entities to disclose any information regarding the Affiliates of any Seller (other than any Seller or Acquired Entity), (C) would reasonably be expected to adversely affect any legal privilege, (D) would be in violation of applicable Laws (including the Foreign Competition Laws) or the provisions of any agreement to which any Seller or Acquired Entity is bound or (E) would violate any fiduciary duty. Nothing in this Agreement will permit Purchaser or its Advisors to conduct any sampling or testing of environmental media or any other invasive investigation or assessment at any Acquired Leased

Real Property other property of the Acquired Entities, including of the type commonly known as a Phase II environmental site assessment.

(b)    The information provided pursuant to this <u>Section 6.2</u> will be used solely for the purpose of consummating the Transactions and will be governed by the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary in the Confidentiality Agreement. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers and their Affiliates make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)    For a period of three (3) years following the Closing Date (or, if later, through the closing of the Bankruptcy Cases and dissolution of Sellers and their controlled Affiliates), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, and other documents (but excluding any books and records with respect to Taxes or Tax matters, which shall be governed by <u>Section 9.3</u>) (for the purpose of examining and copying) relating to the Acquired Assets, the Acquired Entities, the Excluded Assets, the Assumed Liabilities, or the Excluded Liabilities, with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to Advisors, offices and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Sellers, Purchaser will not, during such period, destroy, alter, or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records that Purchaser may intend to destroy, alter, or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate Documents or information related to preparation of Tax Returns, reconciliation of claims in the Bankruptcy Case and other Liabilities, and processing of insurance/benefit claims).

(d)    Purchaser will not and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the Closing with respect to any Seller, the Business, or the Transactions, without the prior written consent of such Seller for each such contact.

Section 6.3    <u>Employee Matters</u>.

(a)    At or prior to Closing, Purchaser shall, in its discretion, extend to certain Business Employees employed by Sellers (i) who are not employed by an Acquired Entity; and (ii) whose work either primarily relates to the Acquired Leased Real Property or primarily relates to the revenue channels of the Business (each an "<u>Offer Employee</u>"), a written offer of employment on the terms set forth in this <u>Section 6.3</u> ("<u>Transfer Offer</u>"), and that, if accepted, shall become effective immediately after the Closing. Business Employees who are employed by an Acquired

Entity as of the Closing Date (each an "<u>Acquired Entity Employee</u>") or who accept such Transfer Offers and begin employment with Purchaser or an Affiliate of Purchaser, and Business Employees employed by the Acquired Entities as of the Closing Date, shall be collectively referred to as "<u>Transferred Employees</u>." Purchaser shall notify Sellers in a reasonable timeframe (but in any event within three Business Days of receiving a response from the applicable Offer Employee) with respect to whether each such offer has been accepted or rejected. Nothing in this Agreement shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all Offer Employees employed by Sellers will accept a Transfer Offer, or that any Transferred Employee will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the timely employment by it of each Offer Employee who has accepted a Transfer Offer, and the continuation of employment of all Business Employees employed by the Acquired Entities, on the Closing Date. Effective as of the Closing, each Transferred Employee previously employed by Sellers shall cease to be an employee of each Seller.

(b)     Purchaser shall provide each Transferred Employee, or cause each Transferred Employee to be provided, with a base compensation or wage rate, as applicable, that is no less than that provided to such Transferred Employee as of immediately prior to the Closing. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date (the "<u>Purchaser Plans</u>"), each Transferred Employee shall be credited with his or her years of service with Sellers (and any of its predecessors) before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)     At the Closing, Transferred Employees (and their eligible dependents and beneficiaries) shall cease active participation in the Employee Benefit Plans that are not Assumed Benefit Plans. Further, (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and their covered dependents (unless such exclusions or requirements were applicable under comparable Employee Benefit Plans); and (iii) Purchaser shall use commercially reasonable efforts to cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance, and maximum out-of-pocket requirements applicable to such Transferred Employee and their covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Purchaser shall be solely responsible for paying, providing, and satisfying when due all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims, severance and termination pay, notice, and benefits (including any employer Taxes or other payments related thereto), in each case, to the extent, accruing, incurred or arising as a result of employment or separation from employment with Purchaser on or after the Closing Date with respect to Transferred Employees. For the avoidance of doubt, (i) all Liabilities relating to the employment with, termination of employment with, application for employment with or any other employment or labor-related Liabilities with

respect to current and former employees of any of the Acquired Entities shall continue to be Liabilities of such Acquired Entity and (ii) all Liabilities relating to the employment with, termination of employment with, application for employment with or any other employment or labor-related Liabilities with respect to any Business Employees who do not become Transferred Employees shall be Excluded Liabilities and continue to be Liabilities of the applicable Seller.

(e)    The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing in this Agreement, express or implied, is intended or shall be construed to confer upon or give any Person (including any employees of Sellers or Acquired Entities or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained in this Agreement, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify, or terminate any particular benefit plan, program, agreement, or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(f)    Purchaser will, or will cause its Affiliates to, provide any required notice under the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") and to otherwise comply with the WARN Act with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting Transferred Employees and occurring after the Closing. Purchaser will not, and will cause its Affiliates not to, take any action on or after the Closing Date that would result in an employment loss or layoff for a sufficient number of Transferred Employees in Hawaii, New Jersey, and Illinois, if aggregated with any such conduct on the part of Sellers prior to the Closing Date, would trigger the WARN Act.

(g)    For any Transferred Employees of Sellers who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(h)    At the Closing, Sellers shall provide a list that sets forth the name, site of employment, and employment loss date of any employee who suffered an "employment loss" (including as a result of a furlough or reduction in hours) under the WARN Act within the ninety (90) days immediately preceding the Closing Date.

Section 6.4    Regulatory Approvals.

(a)    Subject to Section 6.5, Sellers will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to Section 6.4(b), and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(a) or Section 6.4(b) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

41

(b)    Subject to <u>Section 6.5</u>, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Sellers in exchanging such information and providing such assistance as Sellers may reasonably request in connection with any filings made by a Seller pursuant to <u>Section 6.4(a)</u>, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(b)</u> or <u>Section 6.4(a)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

Section 6.5    <u>Antitrust Notification</u>.

(a)    Parent (on behalf of the Sellers) and Purchaser will (and will cause their respective Affiliates, if applicable, to), as promptly as practicable make all notifications, filings, registrations or other materials required or necessary under the Foreign Competition Laws or other Laws set forth on <u>Schedule 7.1(a)</u>. Parent (on behalf of the Sellers) and Purchaser shall (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the Foreign Competition Laws or such other Laws, and will respond to any requests made for any supplemental information by any Governmental Body as promptly as practicable. Parent (on behalf of the Sellers) and Purchaser shall not extend any waiting period or enter into any agreement or understanding with any Governmental Body without the prior written consent of the other; <u>provided</u> that such consent shall not be unreasonably withheld, conditioned, or delayed. Purchaser will use all reasonable best efforts to comply as promptly as practicable with any requests made for additional information in connection with such filings. Purchaser will be solely responsible for payment of all filing fees payable in connection with such filings.

(b)    Subject to the immediately following sentence, Parent (on behalf of the Sellers) and Purchaser will use their reasonable best efforts to obtain as promptly as practicable (and in any event prior to the Outside Date) any clearances, waiting period expirations or terminations, non-actions, or other Consents required under state transaction notification or similar Laws, or such Foreign Competition Laws for the Transactions and will keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Body and will comply promptly with any such inquiry or request. Purchaser will take, and will cause its Affiliates to take, any and all steps necessary to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Body or any other Person so as to enable the Parties to expeditiously consummate the Transactions, including (i) opposing at Purchaser's cost and expense any motion or Action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, and exhausting all avenues of appeal, including appealing properly any adverse decision or Order by any Governmental Body, (ii) entering into a consent decree, consent agreement, settlement, or other agreement or arrangement (including any customary ancillary agreements) containing Purchaser's agreement to hold separate, license, sell, transfer, dispose of, or divest (pursuant to such terms as may be required by any Governmental Body) such assets (whether tangible or intangible), rights, properties, products, or businesses of Purchaser and its Affiliates and any Acquired Assets, (iii) agreeing to the termination, modification, or assignment

of existing relationships, joint ventures, Contracts, or obligations of Purchaser and its Affiliates and (iv) agreeing to such limitations on conduct or actions of members of Purchaser and its Affiliates after the Closing as may be required in order to obtain satisfaction of the conditions set forth in Section 7.1(a) prior to the Outside Date, in each case, so as to allow the consummation of the Transactions as soon as practicable and, in any event, prior to the Outside Date.

(c)     Without limiting this Section 6.5(c), the Parties will instruct their respective counsel to cooperate with each other and will use reasonable best efforts to facilitate and expedite obtaining any clearances, waiting period expirations or terminations, non-actions, or other Consents under state transaction notification or similar Laws, or Foreign Competition Laws at the earliest practicable dates and, in any event, prior to the Outside Date. Such reasonable best efforts and cooperation shall include each Party and its respective counsel undertaking to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any communication received by such Person from a Governmental Body in connection with the filings made pursuant to this Section 6.5 and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to any Governmental Body in connection with this Agreement and the Transactions and any developments, meetings or discussions with any Governmental Body in respect such submissions and filings, including with respect to (A) the receipt of any non-action, action, clearance, Consent, approval, waiver, or other authorizations, (B) the expiration or termination of any waiting period, (C) the commencement or proposed or threatened commencement of any investigation, litigation or administrative or judicial Action or proceeding under applicable Laws, including any proceeding initiated by a private party, and (D) the nature and status of any objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. Neither Parent (on behalf of the Sellers) nor Purchaser will participate in any meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry relating to the Transactions without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion, unless prohibited by such Governmental Body. Parent (on behalf of the Sellers) will have the right to review and approve the content of any draft notifications, formal notifications, filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted to any Governmental Body in advance of any such submission. With respect to any non-public information provided by a Party to the other under this Section 6.5, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets.

(d)     Purchaser will not, and will not permit any member of the Purchaser Group or their respective Affiliates to, engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that would reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other

43

authorizations under the Foreign Competition Laws from any Governmental Body necessary to consummate the Transactions, (ii) increase the risk of any Governmental Body entering an Order preventing, delaying, or prohibiting the consummation of the Transactions or (iii) delay the consummation of the Transactions.

Section 6.6    Reasonable Efforts; Cooperation.

(a)    Subject to the other terms of this Agreement, including any provisions with an express different standard regarding actions to be taken in this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and to do, or cause to be done, all things necessary, proper, or advisable to cause the Transactions to be effected as soon as practicable but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations in this Agreement in all cases, taking into account of the Bankruptcy Cases. The "reasonable best efforts" of Sellers will not require any Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy, or condition hereunder.

(b)    The obligations of Sellers pursuant to this Agreement, including this Section 6.6, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code, Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court, and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

Section 6.7    Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary to evidence and effectuate the Transactions in accordance with the terms of this Agreement.

Section 6.8    Insurance Matters. Upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with any Seller or its Affiliates) shall cease to provide any coverage with respect to the Business, the Acquired Assets, and the Assumed Liabilities, and no further coverage shall be available to Purchaser with respect to the Business, the Acquired Assets, or Assumed Liabilities under any such policies. From and after the Closing, Purchaser shall have the right to make claims and to receive proceeds from such claims with respect to any matter solely to the extent related to the Acquired Assets or Assumed Liabilities for periods prior to the Closing, and Sellers shall use reasonable best efforts to seek recovery or allow Purchaser to seek recovery under the applicable occurrence-based insurance policies, and Seller shall cooperate with Purchaser's reasonable requests if it seeks recovery, with respect to such matters and shall remit (or, at Purchaser's request, direct any such insurer to pay directly to Purchaser) any insurance proceeds actually obtained with respect to such

claims (net of Sellers' reasonable and documented out-of-pocket costs and expenses of seeking recovery, to the extent not otherwise paid or reimbursed by Purchaser) to Purchaser or its designee.

Section 6.9    <u>Receipt of Misdirected Assets; Liabilities</u>.

(a)    From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or similar documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or similar documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)    From and after the Closing, if any Seller or any of such Seller's Affiliates is subject to a Liability that should belong to Purchaser or its Affiliates pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller or its Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller or its Affiliates, and such Seller or its Affiliates shall assume and accept such Liability.

(c)    If, on or after the Closing, if Purchaser receive any payments or other funds due to or belonging to the Sellers pursuant to the terms of this Agreement or any Transaction Agreements, including any credit card reserves of the Sellers, then Purchaser shall, within five (5) Business Days after receipt of such funds, forward such funds to Parent. The Parties acknowledge and agree there is no right of offset regarding such payments and a Party may not withhold funds received from third parties for the account of the other Party in the event there is a dispute regarding any other issue under this Agreement or any of the Transaction Agreements.

Section 6.10    <u>Acknowledgment by Purchaser</u>.

(a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the Business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks, and prospects), the Acquired Assets, and the Assumed Liabilities.

(b)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that, in making its determination to execute this Agreement and proceed with the Transactions, Purchaser and the Purchaser Group have relied, are relying, and will rely solely on the Express Representations and have not relied on, are not relying on, and will not rely on any

information, statements, disclosures, documents, projections, forecasts or other material made available or provided by any Person (including in any presentations or other materials prepared by the FA (the "Information Presentation") or in that certain Project Carat datasite administered by Datasite, (the "Dataroom") or elsewhere) to Purchaser or any of its Affiliates or Advisors, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, in all cases, except for the representations and warranties expressly contained in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or the certificate delivered pursuant to Section 2.4(f) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such Express Representations).

(c)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of the Business, or the quality, quantity or condition of any of the Acquired Assets or any assets or Liabilities of the Acquired Entities, are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in clause (ii) in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the Express Representations.

(d)     Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any Seller or any Acquired Entity or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of any Seller's or any Acquired Entity's business (including the Business), operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects, except, in each case, solely to the extent expressly set forth in the Express Representations.

(e)        Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of any Seller or other Seller Parties, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections). Purchaser further acknowledges that neither Parent, Seller nor any Seller Parties make any representations or warranties with respect to the Projections.

(f)        Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.10.

(g)        Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.10 (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the Transactions and that, without these agreements set forth in this Section 6.10, Seller would not enter into this Agreement.

Section 6.11    Directors' and Officers' Indemnification.

(a)        Following the Closing until the sixth (6th) anniversary of the Closing, Purchaser shall (a) cause the Acquired Entities not to amend, repeal, or otherwise modify the Acquired Entities' Organizational Documents as in effect at the Closing, in any manner that would adversely affect the rights of individuals who are or were directors or officers of the Acquired Entities (the "Indemnified Persons") and (b) cause the Acquired Entities to honor and pay, the indemnification, advancement of expenses and exculpation provisions of each of the Acquired Entities' Organizational Documents as in effect at the Closing, in any manner; provided that all rights to indemnification in respect of any Action pending or asserted or any claim made within such period shall continue until the disposition of such Action or resolution of such claim. Purchaser shall not cancel or otherwise reduce coverage under any "tail" insurance policies purchased by the Acquired Entities prior to the Closing; provided that no payments shall be required of the Acquired Entities or the Purchaser Group with respect to such policies after the Closing.

(b)        This Section 6.11 is intended to be for the benefit of each of the Indemnified Persons and may be enforced by any such Indemnified Person as if such Indemnified Person were a party to this Agreement. The obligations of Purchaser under this Section 6.11 will not be terminated or modified in such a manner as to adversely affect any Person to whom this Section 6.11 applies without the consent of such affected Person.

47

Section 6.12    <u>Seller Support Obligations</u>

(a)    Parent and its Affiliates may have entered into various arrangements (a) in which guarantees, letters of credit, sureties, bonds, or similar arrangements were issued by Parent or its Affiliates and (b) in which Parent or its Affiliates are the primary obligors on other Contracts, in any such case to support or facilitate the Business. The arrangements entered into by Parent and its Affiliates referred to in the foregoing clauses (a) and (b) that are set forth in <u>Schedule 6.12(a)</u> are referred to as the "<u>Seller Support Obligations</u>". The Seller Support Obligations are not intended to continue after the Closing.

(b)    Purchaser shall use its reasonable best efforts to obtain replacements for the Seller Support Obligations (which shall include the full and unconditional release of Parent and its Affiliates) that will be in effect at the Closing or, in the case of Seller Support Obligations described in clause (b) of <u>Section 6.12(a)</u> above, will use its commercially reasonable efforts to arrange for itself or one of its Subsidiaries to be substituted as the primary obligor as of the Closing through an assumption, accession, acknowledgement, or similar agreement (which shall include the full and unconditional release of Parent and its Affiliates) with the beneficiary of the applicable Seller Support Obligation.

(c)    Whether or not Purchaser is able to satisfy the terms of <u>Section 6.12(b)</u>, (i) the obligations of Purchaser in <u>Section 6.12(b)</u> shall continue following the Closing until such terms have been satisfied and (ii) Purchaser shall indemnify Sellers and their respective Affiliates and each of their respective officers, directors, employees, agents and representatives from and against any and all Liabilities incurred by any of them relating to the Seller Support Obligations. With respect to any Seller Support Obligation, Purchaser's reasonable best efforts shall include, if requested, the execution and delivery by Purchaser, or by an Affiliate of Purchaser acceptable to the beneficiary of such Seller Support Obligation, of a replacement guarantee that is substantially in the form of such Seller Support Obligation. All costs and expenses incurred in connection with providing the release or substitution of the Seller Support Obligations shall be borne by Purchaser.

Section 6.13    <u>EU IP Licenses</u>. Prior to Closing, upon request by Seller or by any acquirer of all or a portion of the Sellers' business in the European Union or in the United Kingdom (each, an "<u>EU Acquirer</u>"), Purchaser shall (and shall cause its Affiliates to) negotiate in good faith and enter into a license or similar grant of rights to such EU Acquirer(s) on commercially reasonable terms for the use of the Acquired Intellectual Property in the European Union or in the United Kingdom, including in connection with any business or operations that are similar to the Business; <u>provided</u> that in no event shall Sellers enter into any such license or similar grant of rights prior to Closing without Purchaser's consent.

Section 6.14    <u>Updates to Schedules</u>. Following the date hereof and no less than one (1) Business Days prior to the Closing, Parent may, upon Purchaser's request, deliver to Purchaser: (a) updated Schedules reflecting updates and changes to the lists of the Assigned Contracts, the Excluded Contracts, the Acquired Entities (including any corresponding updates to <u>Schedule 3.4</u>), the Assumed Benefit Plans being transferred or rejected arising as a result of the conduct of the Business in the Ordinary Course consistent with past practice during the period from the Agreement Date until the Closing and (b) updated list of the Sellers, resulting from the changes of the lists of the Assigned Contracts, the Excluded Contracts, the Acquired Entities (including any

corresponding updates to Schedule 3.4) or the Assumed Benefit Plans. Such updates to the Schedules shall be incorporated for all purposes herein.

Section 6.15    Stub Rent. Following the date hereof until (a) the effective date of assumption of the applicable Lease for an Acquired Store by Purchaser or its affiliates or (b) the effective date of rejection of such Lease by the Debtors, as applicable), Purchaser shall use commercially reasonable efforts to cause the applicable landlord of such Lease to waive or, to the extent such Stub Rent is not waived, reduce or settle for a lower amount, the Stub Rent.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    Conditions Precedent to the Obligations of Purchaser and Sellers. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) at the Closing, of each of the following conditions:

(a)    reserved;

(b)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated, or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is still in effect; and

(c)    the Bankruptcy Court and the Canadian Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, vacated, or modified without Purchaser's consent.

Section 7.2    Conditions Precedent to the Obligations of Purchaser. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser), at the Closing, of each of the following conditions:

(a)    the representations and warranties made by Sellers in Article III shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except that (A) representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect;

(b)    Sellers shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by Sellers under this Agreement on or prior to Closing;

(c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4; and

(d)    Subject to Purchaser's compliance with Section 2.2(b), the Acquired Assets are delivered with a minimum balance of $63,600,000 for the Core Inventory (as adjusted pursuant to Section 2.2(b), the "Minimum Core Inventory Threshold").

49

Section 7.3    <u>Conditions Precedent to the Obligations of Sellers</u>. The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), at the Closing, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)    Purchaser shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.5</u>.

Section 7.4    <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

## ARTICLE VIII
## TERMINATION

Section 8.1    <u>Termination of Agreement</u>. This Agreement may be terminated at any time prior to the Closing only in accordance with this <u>Section 8.1</u>:

(a)    by the mutual written consent of Sellers and Purchaser;

(b)    by written notice of either Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding, and non-appealable; <u>provided</u> that no Party may terminate this Agreement under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before September 30, 2025 (the "<u>Outside Date</u>"); <u>provided</u> that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement; <u>provided</u> <u>further</u> that Sellers may extend the Outside Date up to an additional 30 days to the extent necessary to satisfy the conditions set forth in <u>Section 7.1</u> so long as <u>Section 7.2(d)</u> and the other conditions in <u>Article VII</u> (other than conditions that by their

nature are to be satisfied at the Closing) have been satisfied or waived as of each of the initial Outside Date and the extended Outside Date;

(d)     by written notice from Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser, then Sellers may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date that is the earlier of (A) two Business Days prior to the Outside Date and (B) 10 days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Sellers at any time that Sellers are in material breach of, any covenant, representation, or warranty in this Agreement;

(e)     by written notice from Purchaser to Sellers, if (a) the Bankruptcy Court has not approved and entered the Sale Order prior to 11:59 p.m. (Eastern Time) on September 30, 2025 (unless further extended upon mutual agreement by Purchaser and Sellers in writing (email to counsel being sufficient)), or (b) following entry of the Sale Order if such Sale Order is not a Final Order (unless such Final Order requirement is waived by Purchaser and Sellers in their respective discretion) within fourteen (14) days of entry of the Sale Order; provided, that the right to terminate this Agreement under this Section 8.1(e) shall not be available to Purchaser if Purchaser failed to fulfill any material obligation under this Agreement and such failure is the cause of, or resulted in, such stay, reversal, modification, amendment or vacation;

(f)     by written notice from Sellers to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

(g)     by written notice from Sellers to Purchaser, if any Seller or the board of directors, board of managers, or similar governing body of any Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; or

(h)     by written notice of either Purchaser or Sellers, if (i) the Sellers enter into an Alternative Transactions with any Person other than Purchaser or the Successful Bidder, (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder, or (iii) Sellers consummate an Alternative Transaction with the Successful Bidder.

Section 8.2     Effect of Termination.

(a)     In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall become null and void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that Section 2.2, Section 6.2(b), this Section 8.2, and Article X shall survive any such termination. Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be

entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

(b)      Subject in all cases to the Sale Order and Financing Orders:

(i)      if this Agreement is terminated pursuant to Section 8.1(e), then Seller will pay, or cause to be paid, to Purchaser by wire transfer of immediately available funds within five (5) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, which amount will shall not exceed $500,000 ("Expense Reimbursement").

(ii)      In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation of this Agreement, if this Agreement is terminated pursuant to Section 8.1(h), Sellers shall pay, or cause to be paid, to Purchaser (x) a break-up fee in an amount equal to 2% of the Base Cash Purchase Price (the "Breakup Fee"); provided that the Breakup Fee shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an Alternative Transaction, to an account designated by Purchaser in writing to Sellers and (y) the Deposit, in accordance with the terms and conditions of Section 2.2(c).

(c)      The agreements contained in this Section 8.2 are an integral part of this Agreement. The Expense Reimbursement, the Breakup Fee, are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such Expense Reimbursement, Breakup Fee, or refund of Deposit, as applicable, is payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement, which amount would otherwise be impossible to calculate with precision.

(d)      Subject in all cases to Section 10.12, prior to the Closing, in the event of any breach by Seller of this Agreement, the sole and exclusive remedy of Purchaser shall be to terminate this Agreement in accordance with Section 8.1 and, if applicable, to receive the and Expense Reimbursement or the Breakup Fee, as applicable, in accordance with Section 8.2(b) and Section 8.2(c). Subject to approval by the Bankruptcy Court and entry of the Sale Order, the claim of Purchaser in respect of the Expense Reimbursement, the Breakup Fee or refund of Deposit, is and constitutes an allowed administrative expense claim against Seller under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case.

## ARTICLE IX
## TAXES

Section 9.1      Sales Taxes and Transfer Taxes. Any sales, use, goods and services, or similar Taxes attributable to the transfer of the Acquired Assets, the Assumed Liabilities and the Acquired Entities under this Agreement and not exempted under the Sale Order (the "Sales Taxes") and any real or personal property, transfer, conveyance, deed, recording charge, value added, fixed asset, documentary stamp, other similar Taxes attributable to the transfer of the Acquired Assets,

the Assumed Liabilities and the Acquired Entities under this Agreement and not exempted under the Sale Order (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to such Sales Taxes and Transfer Taxes.

Section 9.2    Allocation of Purchase Price. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) (a) between the Acquired Assets (other than the Acquired Entities), on the one hand, and each of the Acquired Entities, on the other hand, and (b) among the Acquired Assets (other than the Acquired Entities) in accordance with the methodology set forth in Schedule 9.2 (the "Allocation Methodology"). As soon as commercially practicable, but no later than 60 days following the final determination of the Cash Purchase Price in accordance with the provisions of Section 2.6, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) between the Acquired Assets, on the one hand, and each of the Acquired Entities, on the other hand, and among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation") for Sellers' review, comment, and consent (such consent not to be unreasonably withheld, conditioned or delayed). If Sellers deliver a written objection within 30 days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within 30 days of Purchaser's receipt of Sellers' objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Sellers shall resolve such dispute, with the costs of such resolution to be allocated by such accounting firm between Purchaser and Sellers based upon the percentage of the aggregate contested amount submitted to such accounting firm that is ultimately awarded to Purchaser, on the one hand, or Sellers on the other hand, such that Purchaser bears a percentage of such costs and expenses equal to the percentage of the contested amount awarded to Sellers and Sellers bears a percentage of such costs and expenses equal to the percentage of the contested amount awarded to Purchaser. The Allocation, as delivered by Purchaser, if Sellers do not timely deliver a written objection, as modified by the agreement between Purchaser and Sellers, or as determined by such accounting firm shall be final and binding on the Parties. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and shall not take any Tax-related action inconsistent with such Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code.

Section 9.3    Cooperation. Purchaser and Sellers shall use commercially reasonable efforts to cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of any Tax Returns and the conduct of any Action with respect to Taxes. Following the Closing, the Purchaser shall retain all Assumed Tax Returns for the applicable statute of limitations (including any extension thereof) and in abidance with any record retention agreements entered into with any taxing authority. Notwithstanding anything to the contrary in this Agreement, Sellers shall not be obligated to provide or disclose to any Person any Excluded Tax Returns (including any Seller Combined Tax Return).

Section 9.4    Preparation of Tax Returns and Payment of Taxes.

(a)    Except as otherwise provided by Section 9.1, Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets and any Acquired Entity for any Tax period ending on or prior to the Closing Date (and Purchaser shall reasonably cooperate with Sellers in causing such Tax Returns to be filed) and (ii) all income Tax Returns of Sellers (including any Seller Combined Tax Return).

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets or any Acquired Entity for any Tax period ending after the Closing Date.

(c)    Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, take or initiate any voluntary discussion, examination or Contract with a taxing authority (including any voluntary disclosure agreement or similar process), or otherwise take any Tax position that has the effect of increasing any Tax that is payable or otherwise borne by Sellers or their Affiliates. Notwithstanding anything to the contrary, Purchaser shall not, and shall cause its Affiliates not to, make any election under Sections 338 or 336 of the Tax Code with respect to the Acquired Entities.

## ARTICLE X
## MISCELLANEOUS

Section 10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) set forth in this Agreement or in any other Transaction Agreement, will terminate effective immediately as of the Closing such that no claim for breach of, and no claim for detrimental reliance or other right or remedy (whether in contract, in tort, at law, or in equity) with respect to, any such representation, warranty, covenant, or agreement may be brought after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, only to the extent such covenant or agreement contemplates performance after the Closing, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five years following the Closing Date. Purchaser and Parent (on behalf of the Sellers) acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this Section 10.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five years and (b) are an integral part of the Transactions and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement.

Section 10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided in this Agreement, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other Transaction Agreements, the performance of this Agreement and the other Transaction Agreements, and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses. However, (a) all fees and expenses in connection with any filing or submission that is necessary under any Foreign Competition Laws will be allocated pursuant to Section 6.4, (b) all

Sales Taxes and Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (c) all Cure Costs will be allocated pursuant to <u>Section 5.2</u>.

Section 10.3    <u>Notices</u>. Except as otherwise expressly provided in this Agreement, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation of such transmittal), if delivered by 5:00 P.M. Central Time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

<u>Notices to Purchaser:</u>

c/o Ames Watson, LLC
6100 Merriweather Drive, Suite 550
Columbia, MD 21044
Attention:    Lawrence Berger
Email:    lberger@ameswatson.com

with a copy to (which shall not constitute notice):

Paul Hastings LLP
2050 M Street, NW
Washington, DC 20036
Attention:    Alan Noskow
Email:    alannoskow@paulhastings.com

<u>Notices to Sellers:</u>

Claire's Holdings LLC
2400 West Central Road
Hoffman Estates, IL 60192
Attention:    Brendan McKeough
Email:    Brendan.McKeough@Claires.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Shawn O'Hargan, P.C.
    Keli Huang
Email:    sohargan@kirkland.com
    keli.huang@kirkland.com

Section 10.4    Binding Effect; Assignment; Designated Purchasers.

(a)    This Agreement shall be binding upon Purchaser and, subject to the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that, without limiting Section 10.4(b) below, neither this Agreement nor any of the rights or obligations in this Agreement may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void.

(b)    Prior to the Closing, Purchaser shall be entitled to designate, by written notice to Sellers no later than two (2) Business Days prior to the Closing Date, one or more Affiliates to (i) purchase the Acquired Assets and pay the corresponding Purchase Price amount, (ii) assume Assumed Liabilities, or (iii) take title directly to any Acquired Asset (any such Affiliate that shall be designated in accordance with this clause, a "Designated Purchaser"), and, to the extent of any such designation, this Agreement shall be binding upon each of such Affiliates, their successors and permitted assigns, which shall be treated as Purchaser to such extent; provided that Purchaser shall remain primarily liable until the transfer to any such Designated Purchaser and the satisfaction by such Designated Purchaser of any related obligations or other Liabilities in this Agreement. If such designation will, or would reasonably be expected to, (x) result in any Seller incurring any incremental unreimbursed fees, costs, Taxes or expenses (other than immaterial attorneys' fees), (y) result in notifications or other information required to be filed under any foreign investment Laws or (z) delay the receipt of any Consent, clearance, approval or authorization of or from any Governmental Body required to be obtained by Purchaser, Sellers or any of their respective Affiliates to consummate the Transactions, then such assignment shall be void ab initio. At or after the Closing, Purchaser may assign its rights (but not its obligations) under this Agreement to any of the financing sources of Purchaser to the extent necessary for purposes of creating a security interest therein or otherwise assigning as collateral in respect of any such financing, provided that, in each case of the foregoing, no assignment shall relieve the assigning party of any of its obligations hereunder.

Section 10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Party against which enforcement of such waiver is sought. No waiver of any provision in this Agreement or of any breach or default of any provision in this Agreement will extend to or affect in any way any other provision or prior or subsequent breach or default.

Section 10.6    Third Party Beneficiaries. Except as otherwise expressly provided in this Agreement, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of Section 6.11, the Indemnified Persons, (ii) for purposes of Section 10.7 the Non-Recourse Persons, and (iii) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

Section 10.7 __Non-Recourse__. This Agreement may be enforced against, and any Agreement Dispute may be brought against, only the Persons that are expressly named as Parties and not against any other Persons. Except to the extent named as a Party, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party (each, a "__Non-Recourse Person__") will have any Liability (whether in contract, tort, equity, or otherwise) for any of the representations, warranties, covenants, agreements, or other obligations or Liabilities of any of the Parties or for any Agreement Dispute and (ii) in no event shall any Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions or omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons and the Non-Recourse Persons are intended third party beneficiaries of this __Section 10.7__ and shall be entitled to enforce this __Section 10.7__ as if a party directly hereto.

Section 10.8 __Severability__. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

Section 10.9 __Construction__. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions of this Agreement.

Section 10.10 __Schedules__. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement. However, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules, or the Exhibits does not imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, or Exhibits in any Agreement Dispute as to whether any obligation, item, or matter not set forth or included in this Agreement, the Schedules, or Exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument,

plan, arrangement, or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item, and such terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, the Schedules, and the Exhibits is disclosed solely for purposes of this Agreement, and no information contained in this Agreement, the Schedules, or the Exhibits will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

Section 10.11 <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and the other Transaction Agreements, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements and documents among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the other Transaction Agreements will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions of this Agreement or the intent of the Parties, and will be deemed joint work product of the Parties.

Section 10.12 <u>Specific Performance</u>. Irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it under this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance, or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which the Parties are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement. Any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any Action, in each case in accordance with <u>Section 10.12</u>, to enforce specifically the performance of the terms and provisions of this Agreement by any other Party, the Outside Date will automatically be extended (i) for the period during which such Action is pending, plus ten Business Days or (ii) by such other time period established by the court presiding over such Action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller.

Section 10.13 <u>Jurisdiction and Exclusive Venue</u>. Any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any

Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement, the negotiation, execution, or performance of this Agreement, or the Transactions and any questions concerning the construction, interpretation, validity, and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "Chosen Courts"). Each of the Parties irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. No Party will commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. Venue would be proper in any of the Chosen Courts, and each Party hereby irrevocably waives any objection that any Chosen Court is an improper or inconvenient forum for any Agreement Dispute. Each of the Parties irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

Section 10.14   Governing Law; Waiver of Jury Trial.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)     ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. ANY AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.14(B).

Section 10.15 <u>No Right of Set-Off</u>. Purchaser, on its own behalf and on behalf of the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

Section 10.16 <u>Counterparts and PDF</u>. This Agreement and any other Transaction Agreements, and any amendments to any Transaction Agreements, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party to such Transaction Agreement, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF, DocuSign, or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version of such Contract delivered in person. Minor variations in the form of the signature page to this Agreement or any Transaction Agreement, including footers from earlier versions of any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party to any Transaction Agreement, each other party to such Transaction Agreement will re-execute original forms of such Transaction Agreement and deliver them to all other parties. No party to any such Transaction Agreement will raise the use of a .PDF, DocuSign, or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF, DocuSign, or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

Section 10.17 <u>Publicity</u>. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party (which approval will not be unreasonably conditioned, withheld, or delayed), (i) unless in the reasonable judgment of the applicable disclosing Party, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; <u>provided</u> that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the contents of such release; or (ii) <u>provided</u> that each Party or its Affiliates may make customary disclosures in connection with marketing purposes and financial disclosures to (x) any current or prospective investors of such Party or its Affiliates and (y) their lenders, banks and Advisors who have a reasonable need to receive such information. However, a copy of this Agreement will be filed with the Bankruptcy Court.

Section 10.18 <u>Bulk Sales Laws</u>. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets (including any Encumbrances claims arising out of any "bulk sales," "bulk transfers," or similar Laws), except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with any "bulk sales," "bulk transfers," or similar Laws in respect of the Transactions.

Section 10.19  <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of their respective managers, officers, directors, partners, or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

Section 10.20  <u>Sellers' Representative</u>. Parent has the power and authority to unilaterally act on behalf of all or any Seller for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents, and determinations on behalf of Sellers, including to make any waiver of any condition or agree to any amendment to this Agreement. No Party shall have any right to object, dissent, protest, or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Parent on behalf of Sellers.

**ARTICLE XI**
**ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**

Section 11.1  <u>Certain Definitions</u>.

"<u>A/R Amount</u>" means the Accounts Receivable (net of gift card receivables, "tax receivables" (as set forth on <u>Exhibit E</u>) and "other miscellaneous receivables" (as set forth on <u>Exhibit E</u>)) of the Sellers as of the Determination Time.

"<u>A/R Peg</u>" means $10,000,000.

"<u>A/R Shortfall</u>" means the amount by which the A/R Peg exceeds the Final A/R Amount.

"<u>Accounting Firm</u>" means a nationally recognized independent accounting firm mutually acceptable to Purchaser and Parent.

"<u>Accounting Policies</u>" has the meaning set forth on <u>Exhibit D</u>.

"<u>Accounts Receivable</u>" means accounts receivable (net of credit card reserves), notes receivable, negotiable instruments and chattel paper owing from Persons to the Sellers to the extent related to the Business (other than Sellers and their Affiliates), together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto.

"<u>Action</u>" means any action, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative, or appellate proceeding) or prosecution, of any kind whatsoever, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted, or heard by or before any Governmental Body.

"<u>Advisors</u>" means, with respect to any Person as of any relevant time, any directors, managers, officers, employees, investment bankers, financial advisors,

61

accountants, agents, attorneys, consultants, agents or other representatives of such Person.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs, and policies of such Person, whether through ownership of voting securities, by Contract, or otherwise. For the avoidance of doubt, the Acquired Entities will be Affiliates of Sellers until Closing and Affiliates of Purchaser after Closing.

"Aggregate Partial September Rent" means any Liabilities for the Leases for the Go-Forward Stores, including but not limited to base rent, any percentage rent relating to store proceeds, utilities, common area maintenance charges, and other rents, fees, and costs specified by each such applicable Lease (if Closing has occurred on or prior to September 15, 2025, for the period from September 16 to September 30, 2025 and, if Closing has not occurred by September 16, 2025, for the period from September 16, 2025 to the effective date of assumption of such Lease by Purchaser or its affiliates or the effective date of rejection of such Lease by the Debtors), provided that if (w) all of the conditions in Section 7.1 are satisfied (or waived) on or by September 15, 2025; (x) one or more conditions in Section 7.2 (excluding Section 7.2(d)) are not satisfied (or waived) on by September 15, 2025, (y) an initial draft of the Intercreditor Agreement has been provided to Parent on or prior to 10:00 am Eastern Time at least five (5) Business Days prior to September 15, 2025 and (z) the Closing has not occurred on or prior to September 15, 2025, Sellers shall be responsible for a portion of the Aggregate Partial September Rent determined as follows: (1) the number of days after September 15, 2025 that the Closing Date occurs (capped at 15) *multiplied* by (2) the Pro Rata September Rent.

"Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires (i) beneficial ownership of a majority of the Equity Interests of Sellers or (ii) a material portion of the Acquired Assets, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization, or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Sellers' estates (or a plan in the Bankruptcy Case approving a liquidation or wind-down) shall not be an Alternative Transaction.

"Base Cash Purchase Price" means $104,000,000.

"Business" means the business and operations of Sellers and their Subsidiaries as of the Closing that are related to their North America operations.

"<u>Business Day</u>" means any day other than a Saturday, Sunday, or other day on which banks in New York City, New York are authorized or required by Law to be closed.

"<u>Business Employee</u>" means each (i) employee of any of Sellers and (ii) employee of any Acquired Entity.

"<u>Cash and Cash Equivalents</u>" means all cash (including checks and deposits in transit, demand deposits, money markets, or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"<u>Cash Purchase Price</u>" means the Estimated Cash Purchase Price, as adjusted in accordance with Section 2.6.

"<u>Confidentiality Agreement</u>" means that certain letter agreement, dated as of June 9, 2025, by and between Parent and Ames Watson, LLC.

"<u>Consent</u>" means any approval, consent, ratification, permission, waiver, or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"<u>Contract</u>" means any written contract, indenture, note, bond, lease, sublease, mortgage, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than an invoice, purchase order, service order, or sales order.

"<u>Core Inventory</u>" means (i) all Inventory on hand at any Acquired Leased Real Property or any Go-Forward Store, (ii) all Inventory in transit to any Acquired Leased Real Property or any Go-Forward Store plus the amount of customs and freight charges to the extent paid by Sellers prior to Closing for such Inventory, (iii) the amount of any Eligible Prepaid Inventory, and (iv) the amount of any cash payments approved by Purchaser in writing to any vendor with a claim under Section 503(b)(9) of the Bankruptcy Code.

"<u>Core Inventory Amount</u>" means the amount of Core Inventory as of the Determination Time.

"<u>Core Inventory Peg</u>" means $82,600,000.

"<u>Core Inventory Shortfall</u>" means the amount by which the Inventory Peg exceeds the Final Core Inventory Amount.

"<u>Core Inventory Surplus</u>" means the amount by which the Final Core Inventory Amount exceeds the Inventory Peg.

63

"<u>Debtors</u>" means, collectively, the debtors-in-possession under the Bankruptcy Cases.

"<u>Determination Time</u>" means 11:59 PM Eastern time on the date immediately preceding the Closing Date.

"<u>DIP Balance</u>" means all amounts due and owing under the DIP Financing as of the Closing, including outstanding principal, accrued interest and fees.

"<u>Documents</u>" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, ledgers, journals, customer lists, regulatory filings, plans, research materials, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form; <u>provided</u> that Documents shall exclude any Tax Returns, Tax records or Tax work papers.

"<u>Eligible Prepaid Inventory</u>" means the amount of any prepayments for Inventory designated for the Acquired Leased Real Property or Go-Forward Stores, to the extent such prepayments are acknowledged by the vendor in writing as being prepaid and available for future application against purchase orders, plus the amount of customs and freight charges to the extent paid by Sellers prior to Closing for such Inventory.

"<u>Employee Benefit Plan</u>" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement, or (v) bonus, incentive, retention, stay, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe, or any other compensation or benefit plan, program, policy, Contract, agreement, or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers or the Acquired Entities or to which any Seller or Acquired Entity is obligated to contribute or with respect to which any Seller or Acquired Entity has any Liability.

"<u>Encumbrance</u>" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interest, hypothecation, easement, right of way, encroachment, conditional sale or other title retention agreement and other similar imposition, imperfections or defects of title, or restrictions on transfer or use.

"Equipment" means equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles, and other fixed assets.

"Equity Interests" means, with respect to a Person, any (a) membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or stock or equity appreciation rights, "phantom" stock rights, stock-based performance units, or other similar rights) or other ownership interests of such Person, or (b) any securities (including debt securities or other indebtedness), options, warrants, rights to subscribe to, purchase rights, calls or commitments relating to the issuance, purchase, or sale or repurchase of or exercisable or exchangeable for or convertible into, or other rights to acquire any of the items in clause (a) of such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Estimated A/R Shortfall" means the amount by which the A/R Peg exceeds the Estimated A/R Amount.

"Estimated Cash Purchase Price" means an amount equal to (a) the Base Cash Purchase Price, plus (b) Estimated Store Cash Surplus (if any), (c) less Estimated Store Cash Shortfall (if any), less (d) the Estimated Core Inventory Shortfall (if any), plus (e) the Estimated Core Inventory Surplus (if any), less (f) the portion of the Estimated A/R Shortfall in excess of $1,000,000; provided, that in any and all events, the Base Cash Purchase Price is inclusive of the Deposit and the DIP Balance.

"Estimated Core Inventory Shortfall" means the amount by which the Inventory Peg exceeds the Estimated Core Inventory Amount.

"Estimated Core Inventory Surplus" means the amount by which the Estimated Core Inventory Amount exceeds the Inventory Peg.

"Estimated Seller Note Credit" means an amount equal to the Estimated A/R Shortfall, not to exceed $1,000,000.

"Estimated Store Cash Shortfall" means the amount by which the Store Cash Peg exceeds the Estimated Store Cash Amount.

"Estimated Store Cash Surplus" means the amount by which the Estimated Store Cash Amount exceeds the Store Cash Peg.

"Excluded Tax Returns" means Tax Returns (or any portion of any Tax Return) of the Sellers related to (i) Taxes that are not solely or primarily related to any Acquired Entity, Acquired Asset or Assumed Liability or (ii) any consolidated, combined, affiliated or unitary group for Tax purposes that includes Seller or any of its Affiliates.

"Final Order" shall mean an Order or judgment of the Bankruptcy Court entered by the clerk of the Bankruptcy Court or such other court on the docket in the Bankruptcy Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the applicable Bankruptcy Court, or other court of competent jurisdiction shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or a similar rule of such other court of competent jurisdiction; provided, that, with respect to the Bankruptcy Court, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Code, may be (but for the avoidance of doubt has not been) filed relating to such order, shall not cause such order not to be a Final Order.

"Financing Orders" means the interim and final orders approving the DIP Term Sheet.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Go-Forward Store" means each of the retail stores operated by the Sellers in North America that is not a Phase I Closing Store, which shall include a minimum of 795 retail stores operated by the Sellers in North America.

"Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification, or authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, of any nature, whether foreign, federal, state, or local, or any agency, branch, department, commission, official, entity, instrumentality, political subdivision, or authority of any of the foregoing, or any court or arbitrator of competent jurisdiction.

"Hazardous Materials" means any toxic or hazardous material, substance, or waste regulated under any environmental laws due to its dangerous or deleterious properties or characteristics.

"Intellectual Property" means (i) patents, patent applications, and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names, and Internet domain names, together with all associated goodwill; (iii) copyrights; (iv) registrations and applications for any of clauses (i) through (iii); (v) trade secrets; (vi) computer software; (vii) drawings, schematics, and other technical plans; and (viii) all other intellectual property.

"Inventory" means all inventory (including finished goods, supplies, raw materials, work in progress, and spare, replacement, and component parts) maintained or held by, stored by or on behalf of, or in transit to, any of Sellers or the Acquired Entities.

"Knowledge of Sellers", or words of like import, means the actual knowledge, as of the Agreement Date, without independent verification (and not any constructive, imputed or similar concepts of knowledge) of Chris Cramer and Brendan McKeough, none of whom shall have any personal Liability or obligations regarding such knowledge.

"Law" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other law, statute, legislation, constitution, principle of common law, ordinance, code, decree, treaty, convention, rule, regulation, or Order, in each case, issued, enacted, adopted, promulgated, implemented, or otherwise put into effect by or under the authority of any Governmental Body.

"Lease" means all leases, subleases, licenses, concessions, and other agreements (written or oral) pursuant to which any Seller or any Acquired Entity holds any Acquired Leased Real Property.

"Leased Real Property" means all real property leased by Sellers and the Acquired Entities.

"Leasehold Improvements" means all buildings, structures, improvements. and fixtures that are owned by a Seller and located on any Acquired Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Acquired Leased Real Property.

"Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"Material Adverse Effect" means a material adverse effect on the Business, Acquired Assets, and Assumed Liabilities, taken as whole; provided that none of the following (or consequences of the following), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has

been, a Material Adverse Effect: any matter, event, change, development, occurrence, circumstance. or effect (each, an "Effect") in, arising from, or relating to (i) general business or economic conditions; (ii) conditions including tariffs, riots, protests, the engagement in hostilities or the escalation of any hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack or data breach, including upon any military installation, asset, Equipment, or personnel; (iii) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19") or the worsening of any outbreak, or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) the change in price and availability of any Equipment, inventory or supplies necessary to or used in the Business; (v) to financial, banking, or securities markets (including (A) any disruption of any of such markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (vi) changes in GAAP or interpretation of GAAP; (vii) changes in Laws or other binding directives or determinations issued or made by or agreements with or Consents of any Governmental Body (including any such items related to Section 6.5) and any change in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii)(A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Business, Acquired Assets, Assumed Liabilities, and Business Employees, including the impact on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix) any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has actual knowledge as of the Agreement Date; (x) any action required to be taken under any existing Contract to which Sellers or their Subsidiaries is bound; (xi) any seasonal fluctuations in the Business; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xiii) any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing of the Transactions or any breach by Purchaser of this Agreement; (xiv) the matters set forth on the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (xv) (A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this

Agreement or any of the Transactions, (2) the Sale Order or the reorganization or liquidation of Sellers or their Affiliates, (3) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Affiliates in compliance with such Orders. However, any adverse Effect resulting or arising from any matter described in clauses (i) through (v) may be taken into account in determining whether there has been a Material Adverse Effect to the extent, and only to the extent, that such Effect has had a materially disproportionate adverse effect on Sellers relative to similarly situated participants in the industries and geographic areas in which Sellers operate (in which case only such incremental materially disproportionate adverse effect may be taken into account in determining whether there has been a Material Adverse Effect).

"Order" means any order, injunction, judgment, decree, ruling, writ, or award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"Ordinary Course" means the ordinary and usual course of operations of the Business, taken as a whole, subject to deviation, in the reasonable business judgment of the Sellers, on account of the contemplation, commencement and pendency of the Bankruptcy Cases and past practice; provided that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the Ordinary Course. For the avoidance of doubt, each Seller retains the right to pursue any business strategy that in such Seller's reasonable business judgment will maximize the value of the Business, consistent with its obligations under applicable Law.

"Organizational Documents" means, with respect to any Person other than a natural person, the constituent documents or agreements by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or that relate to the internal governance of such Person (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

"Permitted Encumbrances" means (i) Encumbrances for Taxes not yet due and payable, or that are being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments, and similar non-monetary Encumbrances or non-monetary impediments against any of the Acquired Assets, in each case, that do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Acquired Leased Real Property, that do not, individually or in the aggregate, adversely affect the use or occupancy of such Acquired Leased Real Property as it relates to the operation of the Business, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law, (iv) materialmans', mechanics', artisans', shippers', warehousemans', or other similar common law or statutory liens incurred in the

Ordinary Course for amounts not yet due and payable or that are being contested by appropriate proceedings, (v) licenses granted on a non-exclusive basis, (vi) such other Encumbrances or title exceptions that do not, individually or in the aggregate, materially and adversely affect the operation of the Business, (vii) any Encumbrances set forth on Schedule 11.1, and (viii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body, or other entity or group.

"Personal Information" means any data or information (i) that identifies, relates to, describes, is reasonably capable of being associated with, or would reasonably be linked, directly or indirectly, with a particular individual or household or (ii) that is otherwise subject to a Law relating to privacy or security of data or information (including if such data or information constitutes "personal information" or "personal data" or other equivalent term under any such Law).

"Plan" means any chapter 11 plan filed by Parent and/or any of its debtor affiliates in the Bankruptcy Cases.

"Pro Rata September Rent" means a fraction with the numerator as the Aggregate Partial September Rent and the denominator as 15.

"Purchase Price" means the Cash Purchase Price, plus the assumption of the Assumed Liabilities, plus the payment of the Aggregate Partial September Rent, plus the Seller Note.

"Purchaser Group" means Purchaser (including any Designated Purchaser), any Affiliate of Purchaser (or any Designated Purchaser) (including, following the Closing, the Acquired Entities) and each of their respective former, current or future Affiliates, partners, members, Advisors, successors, or permitted assigns.

"Sale Order" means the Order or Orders of the Bankruptcy Court and the Canadian Court (i) approving this Agreement and the terms and conditions of this Agreement, including pursuant to sections 363 and 365 of the Bankruptcy Code and/or equivalents under the CCAA and (ii) approving and authorizing Sellers to consummate the Transactions.

"Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

"Seller Combined Tax Return" means any combined, consolidated, affiliated, or unitary Tax Return that includes a Seller or any of its Affiliates (other than an Acquired Entity), on the one hand, and any Acquired Entity, on the other hand.

"Seller Note Credit" means the Estimated Seller Note Credit, as adjusted in accordance with Section 2.6.

70

"Seller Parties" means each Seller and its former, current, or future Affiliates, partners, members, equityholders, controlling or controlled Persons, managers, Advisors, successors, or permitted assigns.

"Straddle Period" means any taxable period commencing on or before, and ending after the Closing Date.

"Store Cash Peg" means $350,000.

"Stub Rent" means any post-petition rent for any Go-Forward Stores (for the period from the petition date to August 31, 2025).

"Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company, or other entity of which a majority of the total voting power of shares of stock or other Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, trustees, or other governing body of such Person is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association, or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"Tax" or "Taxes" means any federal, state, local, or non-U.S. income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, or estimated tax, in each case, imposed by any Governmental Body, including any interest, penalty or additions to tax with respect thereto.

"Tax Code" means the United States Internal Revenue Code of 1986, as amended.

"Tax Return" means any return, claim for refund, report, statement, or information return relating to Taxes required to be filed with a Governmental Body in connection with the determination, assessment or collection of any Tax, including any schedule or attachment thereto and any amendment thereof.

"Transaction Agreements" means this Agreement and any other agreements, instruments, or documents entered into pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

Section 11.2    Index of Defined Terms.

| | | | |
|---|---|---|---|
| Acquired Assets | 5 | Acquired Entity Employee | 40 |
| Acquired Entities | 6 | Acquired Intellectual Property | 6 |

Acquired Lease ........................................... 5
Acquired Leased Real Property ................ 5
Acquired Leases......................................... 5
Agreement................................................... 4
Agreement Date ......................................... 4
Agreement Dispute ................................... 59
Allocation................................................... 54
Allocation Methodology .......................... 53
Assigned Contracts .................................... 5
Assigned Executory Contracts.................. 5
Assignment and Assumption Agreement.. 15
Assumed Benefit Plans .............................. 6
Assumed Liabilities ................................... 9
Assumed Tax Returns ................................ 5
Audited Financial Statements .................. 23
Bankruptcy Cases....................................... 4
Bankruptcy Code ........................................ 4
Bankruptcy Court....................................... 4
Breakup Fee .............................................. 53
Chosen Courts ........................................... 60
Closing ...................................................... 15
Closing Date.............................................. 15
Closing Date Payment.............................. 13
Closing Statement ..................................... 16
Cure Costs ................................................... 9
Dataroom................................................... 46
Deposit ...................................................... 14
Designated Purchaser............................... 57
Disputed Item ........................................... 18
Effect.......................................................... 67
Enforceability Exceptions ........................ 22
Escrow Agent............................................ 14
Escrow Agreement...................................... 4
EU Acquirer .............................................. 49
Excluded Assets .......................................... 7
Excluded Contracts .................................... 7
Excluded Liabilities ................................. 10
Expense Reimbursement........................... 52
Express Representations ........................... 46
FA .............................................................. 29
Final A/R Amount............................... 18, 20
Final Core Inventory Amount............. 18, 20
Final Post-Closing Statement................... 19
Final Store Cash Amount.................... 18, 20

Financial Statements ................................ 23
Foreign Competition Laws ....................... 22
Holdback Amount...................................... 14
Incremental Deposit.................................. 14
Indebtedness.............................................. 36
Indemnified Persons.................................. 48
Information Presentation........................... 46
Initial Deposit........................................... 14
IP Assignment Agreement ........................ 16
IRS ............................................................. 16
Material Contract ...................................... 24
Minimum Core Inventory Threshold........ 50
Net Adjustment Amount ........................... 17
Non-Acquired Store .................................. 12
Non-Acquired Store Schedule ................. 12
Non-Recourse Person................................ 57
Objection Notice ....................................... 18
Offer Employee......................................... 40
Outside Date.............................................. 51
Parent .......................................................... 4
Parties.......................................................... 4
Party ............................................................ 4
Permits ....................................................... 25
Phase I Closing Stores .............................. 11
Post-Closing Statement ............................ 18
Projections................................................. 47
Purchaser ..................................................... 4
Purchaser Plans ......................................... 40
Rejection Deadline Date ........................... 12
Sales Taxes................................................ 53
Seller ........................................................... 4
Seller Note .................................................. 4
Seller Note Amount .................................... 4
Seller Support Obligations....................... 48
Sellers.......................................................... 4
Store Cash ................................................... 5
Store Cash Amount ..................................... 5
Successful Bidder...................................... 33
Target Store Cash Amount........................ 17
Transfer Offer ........................................... 40
Transfer Taxes .......................................... 53
Transferred Employees ............................. 40
Transferred Subsidiaries ............................ 6
WARN Act................................................. 42

Section 11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any Transaction Agreement.

(a)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule, and Exhibit references in this Agreement are references to Sections, clauses, Schedules and Exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed to this Agreement or referred to in this Agreement are incorporated in and made a part of this Agreement as if set forth in full in this Agreement. Any capitalized terms used but not defined in any Schedule or Exhibit shall be defined as set forth in this Agreement.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation," whether or not such words are actually included. Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)    When calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, such period will end on the next succeeding Business Day.

(e)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined in this Agreement, references to the singular will include references to the plural and vice versa.

(f)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory. "May" is permissive.

(g)    References to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(h)    References to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(i)    Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors, or (iii) made available upon request, including at Sellers' offices.

(j)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(k)    Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section

or Law regardless of how it is numbered or classified; <u>provided</u> that, for the purposes of the representations and warranties set forth in this Agreement, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(l)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(m)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

[*Signature pages follow.*]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

PURCHASER:

**AWS CLAIRE'S, LLC**

By: _____
Name:  Lawrence S. Berger
Title:   Authorized Signatory

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**SELLERS**

**PARENT:**

**CLAIRE'S HOLDINGS LLC**

By: _____

Name:  Chris Cramer
Title:  Chief Executive Officer


**CLAIRE'S STORES, INC.**

By: _____

Name:  Chris Cramer
Title:  Chief Executive Officer


**CLAIRE'S BOUTIQUES, INC.**

By: _____

Name:  Chris Cramer
Title:  Chief Executive Officer


**BMS DISTRIBUTING CORP.**

By: _____

Name:  Chris Cramer
Title:  Chief Executive Officer


**CBI DISTRIBUTING CORP.**

By: _____

Name:  Chris Cramer
Title:  Chief Executive Officer


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**CLAIRE'S CANADA CORP.**

By: _____

Name:  Chris Cramer

Title:  Chief Executive Officer


**CLAIRE'S PUERTO RICO CORP.**

By: _____

Name:  Chris Cramer

Title:  Chief Executive Officer


**CLAIRE'S STORES CANADA CORP.**

By: _____

Name:  Chris Cramer

Title:  Chief Executive Officer


**CLAIRE'S SWISS HOLDINGS LLC**

By: _____

Name:  Chris Cramer

Title:  Chief Executive Officer


**CLSIP LLC**

By: _____

Name:  Chris Cramer

Title:  Chief Executive Officer


**CLSIP HOLDINGS LLC**

By: _____

Name:  Chris Cramer

Title:  Chief Executive Officer

**CSI CANADA LLC**

By: _____

Name:  Chris Cramer
Title:  Chief Executive Officer


**CLAIRE'S INTELLECTUAL LLC**

By: _____

Name:  Chris Cramer
Title:  Chief Executive Officer


**CLAIRE'S SWISS HOLDINGS II LLC**

By: _____

Name:  Chris Cramer
Title:  Chief Executive Officer

**CLAIRE'S GIBRALTAR HOLDINGS LLC**

By: _____

Name:  Chris Cramer

Title:  Chief Executive Officer

**CLAIRE'S (GIBRALTAR) HOLDINGS
LIMITED**

By: _____
Name:  Chris Cramer
Title:  Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

## **EXHIBIT A**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

[*See attached.*]

# **EXHIBIT B**

## **FORM OF IP ASSIGNMENT AGREEMENT**

[*See attached.*]

## **EXHIBIT C**

**FORM OF SELLER NOTE**

[*See attached.*]

# **EXHIBIT D**

## **ACCOUNTING POLICIES**

[*See attached.*]

**<u>EXHIBIT E</u>**

**ILLUSTRATIVE CALCULATION**

[*See attached.*]

## Exhibit 2

**Assigned Contracts**

To Come