IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

DECLARATION OF
ELISE S. FREJKA, CIPP/US, IN
SUPPORT OF THE MOTION OF DEBTORS
FOR ENTRY OF AN ORDER (I) AUTHORIZING AND
APPROVING THE SALE OF GOING-CONCERN ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
AND OTHER INTERESTS AND (II) GRANTING RELATED RELIEF

I, Elise S. Frejka, CIPP/US, make this Declaration pursuant to 28 U.S.C. § 1746:

1. I am a licensed attorney, member at the law firm Frejka PLLC, and special counsel to the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company"). I have been practicing law since 1990, after graduating, *cum laude,* from New York Law School where I was awarded the James P. Kibbey Award for Excellence in Commercial Law. My practice is almost exclusively in the area of bankruptcy and bankruptcy litigation. I am admitted to practice before the courts of the State of New York, the Supreme Court of the United States, the Second and Federal Circuit Courts of Appeal, and the Southern, Eastern, and Northern Districts of New York.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343). The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

2.     Following my judicial clerkship for the Honorable Prudence Carter Beatty, United States Bankruptcy Judge, Southern District of New York (Retired), I spent the next two decades working in the bankruptcy and restructuring departments of major law firms including Kramer Levin Naftalis & Frankel LLP (Special Counsel, 2009–2015), Dechert LLP, as successor to Swidler Berlin Shereff Friedman LLP (Associate, 1999–2009), Togut Segal & Segal LLP (Associate, 1998 – 1999), and Curtis Mallet-Prevost, Colt & Mosle LLP (Associate, 1994–1998). In March 2015, I left big law and founded Frejka PLLC.

3.     I am a Certified Information Privacy Professional (CIPP/US) credentialed by the International Association of Privacy Professionals and have been appointed the consumer privacy ombudsman by the United States Trustee Program in *In re Epic! Creations, Inc.*, No. 24-11161 (BLS) (Bankr. D. Del. June 4, 2024); *In re Oberweis Dairy, Inc.*, No. 24-05385 (DDC) (Bankr. N.D.Il. Apr. 12, 2024); *Unlikely Heroes, Inc.*, No. 23-10057 (RC) (Bankr. N.D. Ca Jan. 20, 2023); *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Aug. 16, 2022); *In re Fred's Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 9, 2019); *In re uBiome, Inc.*, No. 19-11938 (LSS) (Bankr. D. Del. Sept 4, 2019); *In re Insys Therapeutics, Inc.*, No. 19-11292 (JTD) (Bankr. D. Del. June 10, 2019); *In re Ditech Holding Corp.*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Feb. 11, 2019); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2018); *In re Hooper Holmes, Inc.*, No. 18-23302 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2018); *In re Wall Street Languages Ltd.*, No. 18-11581 (SHL) (Bankr. S.D.N.Y. May 24, 2018); *In re Avaago, Inc.*, No. 17-12926 (MKV) (Bankr. S.D.N.Y. Oct. 19, 2017); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Sept. 18, 2017); *In re Bristlecone, Inc.*, No. 17-50472 (BTB) (Bankr. D. Nev. Apr. 18, 2017); *In re Marbles Holdings LLC*, No. 17-03309 (TAB) (Bankr. N.D. Ill. Feb. 3, 2017); *In re The Wet Seal, LLC*, No. 17-10229 (CSS) *(*Bankr. D. Del. Feb. 2, 2017); *In re VoicePulse, Inc.*, No.

16-25075 (MBK) (Bankr. D.N.J. Aug. 5, 2016); *In re SFX Ent., Inc.*, No. 16-10238 (MFW) (Bankr. D. Del. Feb. 1, 2016); *In re The Great Atl. & Pac. Tea Co., Inc.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 19, 2015); and *In re RadioShack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015).  I was special counsel to the debtors and filed a declaration in support of the sale process in *In re New Rite Aid, LLC*, No. 25-14861 (MBK) (Bankr. D.N.J. May 5, 2025) [Docket Nos. 19, 1150]; *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Jan. 15, 2025) [Docket No. 388]; *In re Vyaire Medical Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. June 9, 2024) [Docket No. 403]; *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. June 4, 2023) [Docket No. 68], *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. Apr. 22, 2024) [Docket No. 128], *In re Le Tote, Inc.*, No. 20-33332 (KLP) (Bankr. E.D. Va. Feb. 17, 2020) [Docket No. 27], *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 16, 2023) [Docket No. 34], *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 23, 2023) [Docket No. 29], *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. Feb. 17, 2020) [Docket No. 36], and *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 25, 2019) [Docket No. 107].  In addition, while at Kramer Levin Naftalis & Frankel LLP, I represented the purchaser of the ecommerce business and customer data in *In re Circuit City Stores, Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 11, 2008) and actively participated in the consumer privacy ombudsman process.

4.   I am a member of numerous professional associations, including the International Association of Privacy Professionals, the American Bankruptcy Institute, the International Women's Insolvency & Restructuring Confederation, the Turnaround Management Association, and the National Association of Legal Fee Analysis.  In addition, I have served as a presenter or panelist on consumer privacy issues at numerous conferences and seminars.  Finally, for the past

decade I have been a guest lecturer at New York University School of Continuing and Professional Studies for the Bankruptcy, Workout and Reorganizations class where I lecture on the intersection of privacy and bankruptcy.

5. I submit this declaration (this "Declaration") in support of the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Sale of Going-Concern Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests and (II) Granting Related Relief*, filed contemporaneously herewith (the "Sale Motion" seeking entry of the "Sale Order" substantially in the form attached thereto as Exhibit A).[2] Except as otherwise noted herein, the facts set forth in this Declaration are based upon my personal knowledge and independent investigation, the review of relevant Company policies, website caches of the Debtors' ecommerce sites available on the "waybackmachine" at www.archive.org, other information prepared by me or collected for me by the Debtors' employees, and my conversations with the Debtors' counsel or other advisors.

6. As part of the due diligence process, I personally tested the Company's data processing practices by (a) creating an account at https://www.claires.com/;[3] (b) making purchases[4] and providing my personal information at the following Claires® locations in the Towson Town Center located at 825 Dulaney Valley Road, Towson, Maryland 21204, the Danbury Fair Mall, located at 7 Backus Avenue, Danbury, Connecticut 06810, the Poughkeepsie Galleria, located at 2001 South Road, Poughkeepsie, New York 12601, and at the Claires® located

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Sale Motion, the Sale Order, or the First Day Declaration, as applicable.

[3] As part of the sign-up process, my date of birth was required. Given the target audience of the Company, this is a positive requirement as it avoids inadvertent data collection from children under the age of 13. When I modified my date of birth to 2012, I was not permitted to create an account.

[4] After considerable thought I declined to have an additional ear piercing at Claires, but I do now own a wide array of hair accessories.

at 1385 Broadway, New York, New York 10018; (c) activating a membership in the C-Club rewards program; (d) signing up to receive electronic marketing materials and thereafter modifying my consent to the frequency of communications; (e) opting in to receive SMS messaging[5] to receive personalized marketing alerts and then revoking my consent; (f) meticulously securitizing and interacting with https://www.claires.com/ to understand how the Company's privacy policy (the "Privacy Policy"), attached hereto as **Exhibit A**, is incorporated into the Company's data collection and use from the consumer perspective. This Declaration is intended to provide the Court and other parties-in-interest with an overview of the Company's existing privacy practices and policies.[6]

7. If I were called upon to testify, I could and would competently testify to the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this declaration on behalf of the Debtors.

### The Debtors' Privacy Policy and Data Processing

8. As described in the First Day Declaration, the Company's core business is comprised of four sales channels: (a) brick and mortar operations; (b) consumer products concessions; (c) e-commerce; and (d) franchise locations. The Company operates over 1,500 stores in North America and has a robust online presence at www.claires.com (the "Website"). The collection,[7] use, and sharing of personal information is governed by the Privacy Policy. The

---

[5] The SMS text signup required me to affirmatively opt-in, or consent, to receiving SMS texts when I agreed as part of the C-Club enrollment and I was required to confirm my consent via SMS text with an affirmative "Y" response. Entry of "Stop" to any SMS text will unenroll a consumer from SMS marketing and other SMS messages.

[6] At the Company's direction, I did not conduct a similar examination of the Icing privacy policy.

[7] The Company collects typical personal information to enhance the consumer experience such as name, address, transaction data, "wish lists," and user-generated content like product reviews. However, credit and debit card numbers are not stored or retained by the Company. Instead, all payments are processed by a third-party payment processor.

at 1385 Broadway, New York, New York 10018; (c) activating a membership in the C-Club rewards program; (d) signing up to receive electronic marketing materials and thereafter modifying my consent to the frequency of communications; (e) opting in to receive SMS messaging[5] to receive personalized marketing alerts and then revoking my consent; (f) meticulously securitizing and interacting with https://www.claires.com/ to understand how the Company's privacy policy (the "Privacy Policy"), attached hereto as **Exhibit A**, is incorporated into the Company's data collection and use from the consumer perspective. This Declaration is intended to provide the Court and other parties-in-interest with an overview of the Company's existing privacy practices and policies.[6]

7. If I were called upon to testify, I could and would competently testify to the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this declaration on behalf of the Debtors.

### The Debtors' Privacy Policy and Data Processing

8. As described in the First Day Declaration, the Company's core business is comprised of four sales channels: (a) brick and mortar operations; (b) consumer products concessions; (c) e-commerce; and (d) franchise locations. The Company operates over 1,500 stores in North America and has a robust online presence at www.claires.com (the "Website"). The collection,[7] use, and sharing of personal information is governed by the Privacy Policy. The

---

[5] The SMS text signup required me to affirmatively opt-in, or consent, to receiving SMS texts when I agreed as part of the C-Club enrollment and I was required to confirm my consent via SMS text with an affirmative "Y" response. Entry of "Stop" to any SMS text will unenroll a consumer from SMS marketing and other SMS messages.

[6] At the Company's direction, I did not conduct a similar examination of the Icing privacy policy.

[7] The Company collects typical personal information to enhance the consumer experience such as name, address, transaction data, "wish lists," and user-generated content like product reviews. However, credit and debit card numbers are not stored or retained by the Company. Instead, all payments are processed by a third-party payment processor.

Company has had a privacy policy on the Website since at least November 20, 2001.[8] In the early days of ecommerce and associated privacy policies, updates were not overly common; however, with the increase in the enactment of state privacy laws, the expansion of the types of data collected (*i.e.*, tracking technologies, widgets, cookies, SMS texts, targeted advertising), and the introduction of loyalty programs, it is now common for privacy policies to be routinely updated with the date of the update identified in the body of the privacy policy together with a statement that consumers should look to the privacy policy for updates and changes. These changes typically describe the reason for the data collection, the rights of consumers in certain states with state specific privacy laws, and how to interact with the Company about the collection of a consumer's data.

9. The Company has adopted the now common practice of permitting the transfer of personally identifiable information[9] ("Personally Identifiable Information") to an unaffiliated third-party as part of a larger business transaction. Thus, any consumer who voluntarily provided the Company with Personally Identifiable Information has affirmatively consented, or opted-in,[10]

---

[8] CLAIRES, http://web.archive.org/web/20020604000350/http://www.claires.com/privacy.asp?top=pr&name= (last visited July 25, 2025). This early iteration of the privacy policy made clear that "[i]n the unlikely event that we sell all or part of our business, we will transfer to the new owner the related business assets, which may include our customer information." Likewise, the privacy policy in effect on the Petition Date, dated as of January 2, 2023, expanded and clarified that "[the Company] may share your personal information in the event we sell or transfer all or a portion of our business assets (e.g., further to a merger, reorganization, liquidation, or any other business transaction), including negotiations of such transactions."- CLAIRES, https://www.claires.com/us/privacy-policy.html#7 (last visited July 25, 2025). The Company removed this express language from its Privacy Policy during the prior bankruptcy filing but reinserted the express language regarding a third-party corporate transaction with the adoption of the privacy policy dated November 16, 2020. The absence of this express language is not a basis to prohibit a sale consumer data but may support anonymizing certain consumer information prior to the closing of the Sale.

[9] Section 101(41A) of the Bankruptcy Code defines "personally identifiable information" as an individual's name, residence address, email address, telephone number, social security number, or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual. 11 U.S.C. § 101(41A).

[10] "Opt-in" consent requires affirmative steps by a consumer to allow the collection and/or use of information; "Opt-out" consent requires affirmative steps to prevent the collection and/or use of information.

to the collection and use of Personally Identifiable Information, the transfer of such Personally Identifiable Information as part of a business transaction, and to look to the Company's website(s) to determine whether there has been a change to the Privacy Policy or the Company's use and disclosure of Personally Identifiable Information. As such, if a consumer originally provided the Company with Personally Identifiable Information in 2020, for example, and continued to access the Website and engage in transactions with the Company in 2025, such consumer has been deemed to consent to the current privacy policy which permits the sale of Personally Identifiable Information as part of a corporate transaction. Notwithstanding this consent, the Company currently honors opt-out requests and any request that the Company not sell a consumer's Personally Identifiable Information.

10.    All versions of the Privacy Policy since 2020, have expressly contemplated that Personally Identifiable Information would be shared with third parties as part of a corporate transaction with an unaffiliated third-party:

| Effective Date | Information We Share with Third Parties | Changes to Privacy Policy |
|---|---|---|
| January 2, 2023[11] | We may share your personal information in the event we sell or transfer all or a portion of our business assets (e.g., further to a merger, reorganization, liquidation, or any other business transaction), including negotiations of such transactions. We further reserve the right to sell or transfer any information we obtain through the Site in connection with any joint venture, partnership, merger, or other collaboration with another organization. | We may change this Privacy Policy from time to time. If we make changes, we will notify you by revising the date at the top of this Privacy Policy. |
| September 21, 2021[12] | We may share your personal information in the event we sell or transfer all or a portion of our business assets (e.g., further to a merger, reorganization, liquidation, or any other business transaction), including negotiations of such transactions. We further reserve the right to sell or transfer any information we obtain through the Site in connection with any joint venture, partnership, merger, or other collaboration with another organization. | We may change this Privacy Policy from time to time. If we make changes, we will notify you by revising the date at the top of this Privacy Policy |

---

[11]    CLAIRES, https://www.claires.com/us/privacy-policy.html (last visited July 25, 2015).

[12]    CLAIRES, https://web.archive.org/web/20221115194256/https://www.claires.com/us/privacy-policy.html (last visited June 19, 2025).

| Effective Date | Information We Share with Third Parties | Changes to Privacy Policy |
|---|---|---|
| November 16, 2020[13] | We may share your personal information in the event we sell or transfer all or a portion of our business assets (e.g., further to a merger, reorganization, liquidation, or any other business transaction), including negotiations of such transactions. We further reserve the right to sell or transfer any information we obtain through the Site in connection with any joint venture, partnership, merger, or other collaboration with another organization. | We may change this Privacy Policy from time to time. If we make changes, we will notify you by revising the date at the top of this Privacy Policy |

**Transfer of Personally Identifiable Information is Permissible**

11. Sections 332 and 363(b)(1)(A) of the Bankruptcy Code require the appointment of a consumer privacy ombudsman only when a debtor seeks to sell or transfer Personally Identifiable Information in contravention of the debtor's privacy policy with respect to the transfer of such Personally Identifiable Information. *See* 11 U.S.C. §§ 332, 363(b)(1)(A). However, the mere presence of Personally Identifiable Information in a sale does not mandate appointment of a consumer privacy ombudsman; rather, appointment is only required when the transfer is inconsistent with the existing privacy policy.

12. Based upon my investigation of the facts and circumstances surrounding the Company's collection and processing of Personally Identifiable Information, all consumers[14] who have not opted out have consented to the transfer of their Personally Identifiable Information to third parties as part of a sale. As such, I do not believe the appointment of a consumer privacy ombudsman is necessary or required to effectuate a transfer of the Company's customer data to an

---

[13] CLAIRES, https://web.archive.org/web/20210613173035/https://www.claires.com/us/privacy-policy.html (last visited June 19, 2025).

[14] The Company will need to focus on any limitations imposed on the sale or transfer of Personally Identifiable Information by the California Consumer Privacy Act of 2018 ("CCPA") (CAL. CIV. CODE §§ 1798.100–1798.199) and other state data protection laws once a buyer is identified but this is not a basis to appoint a consumer privacy ombudsman. The Company does not intentionally collect Personally Identifiable Information from residents of the United Kingdom or the European Union and neither the European Union (EU) General Data Protection Regulation (2016/679) or the UK Data Protection Act of 2018 are implicated. Moreover, the Company does not intentionally collect personal information in a manner that is not permitted by the U.S. Children's Privacy Protection Act ("COPPA") (15 U.S.C. 6501 *et seq*.) and removes such data to the extent required by COPPA.

unaffiliated third-party provided that the Company complies with its Privacy Policy, anonymizes certain data, where appropriate, consistent with applicable best practices and regulatory guidance before transfer, and complies with state data protection laws regarding any such transfer.[15]  This interpretation is consistent with the underlying policy of Section 332 of the Bankruptcy Code, which is to safeguard consumer expectations and prevent unexpected transfers of data—not to interfere with transactions expressly contemplated by a clear and public-facing privacy policy.

[*Remainder of page intentionally left blank.*]

---

[15] In my professional opinion, the role of a consumer privacy ombudsman is not to ensure compliance with state privacy laws or a Company's own privacy law as such the appointment of a consumer privacy ombudsman is only required if the privacy policy in effort on the Petition Date prohibits a transfer of Personally Identifiable Information in contravention of that privacy policy.  *See* 11 U.S.C. § 363(b)(1)(A).  Here, such a transaction would have been permitted without an ombudsman immediately prior to the Petition Date and is not required here.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  August 20, 2025                    */s/  Elise S. Frejka*
                                                                                Name: Elise S. Frejka