**LEASE AGREEMENT BETWEEN
CLAIRE'S BOUTIQUES, INC.
AND
WEST ACRES DEVELOPMENT, LLP**

WEST ACRES DEVELOPMENT, LLP
P. O. BOX 9978
FARGO, ND 58106-9978

07/10/01

# TABLE OF CONTENTS

ARTICLE 1. BASIC TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE 2. ADDITIONAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE 3. DEMISED PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 3.1.  Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 3.2.  Common Area Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 3.3.  Building Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 3.4.  Right to Relocate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 3.5.  Acceptance of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 3.6.  Landlord's Access to Premises . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 3.7.  Quiet Enjoyment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE 4. TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 4.1.  Commencement Date and Term . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 4.2.  Lease Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 4.3.  Verification of Term - Floor Area - Rent . . . . . . . . . . . . . . . . 5
    Section 4.4.  Failure of Tenant to Open . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE 5. FIXED MINIMUM RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE 6. PERCENTAGE RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 6.1.  Payment of Percentage Rent . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 6.2.  Gross Sales Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 6.3.  Sales Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 6.4.  Sales Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 6.5.  Examination and Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE 7. COMMON AREAS AND COMMON AREA COSTS . . . . . . . . . . . . . . 9
    Section 7.1.  Common Areas Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 7.2.  Control of All Common Areas . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 7.3.  Non-Exclusive Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 7.4.  Modification of Common Areas . . . . . . . . . . . . . . . . . . . . . . 10
    Section 7.5.  Apportionment of Common Area Cost . . . . . . . . . . . . . . . . . 10
    Section 7.6.  Common Area Cost Defined . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 7.7.  Payment of Common Area Charges . . . . . . . . . . . . . . . . . . . 12

ARTICLE 8. TAXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Section 8.1.  Real Property Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Section 8.2.  Personal Property Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE 9. UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 9.1.  Provision of Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 9.2.  Payment for Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Section 9.3.  Landlord Supplied Utilities . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Section 9.4.  Interruption in Utility Service . . . . . . . . . . . . . . . . . . . . . . . 17

ARTICLE 10. USE AND OPERATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Section 10.1. Use of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Section 10.2. Operation of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Section 10.3. Open Hours . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Section 10.4. Liquidation Sales. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 10.5. Waste or Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 10.6. Governmental Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 10.7. Storage, Office, Non-Selling Space . . . . . . . . . . . . . . . . . . . . . . 18

ARTICLE 11. IMPROVEMENTS AND ALTERATIONS TO PREMISES . . . . . . . . 18
    Section 11.1. Tenant's Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 11.2. Landlord's Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 11.3. Alterations and Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 11.4. Security for Tenant's Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Section 11.5. Mechanic's Lien . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Section 11.6. Ownership of Improvements and Fixtures . . . . . . . . . . . . . . . . . . 21
    Section 11.7. Signs - Displays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Section 11.8. Access to Roof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Section 11.9. Adjacent Excavation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARTICLE 12. INSURANCE AND INDEMNITY . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Section 12.1. Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Section 12.2. Construction Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Section 12.3. Tenant's Liability Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Section 12.4. Tenant's Property Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Section 12.5. Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Section 12.6. Mutual Waiver of Subrogation . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Section 12.7. Waiver of Claims Against Landlord. . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE 13. DAMAGE AND DESTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Section 13.1. Landlord's Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Section 13.2. Option to Terminate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Section 13.3. Landlord's Reconstruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Section 13.4. Tenant's Reconstruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Section 13.5. Insurance Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Section 13.6. Tenant's Obligations - Rent Adjustment . . . . . . . . . . . . . . . . . . . 26

ARTICLE 14. REPAIRS AND MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Section 14.1. Landlord's Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Section 14.2. Tenant's Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    Section 14.3. Plate Glass . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    Section 14.4. Renovation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ARTICLE 15. CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    Section 15.1. Continuation of Lease. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    Section 15.2. Rental Obligation after Taking . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    Section 15.3. Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    Section 15.4. Right to Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Section 15.5. Condemnation of Less than a Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE 16. HAZARDOUS MATERIALS
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Section 16.1. Hazardous Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Section 16.2. Compliance with Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Section 16.3. Environmental Audit and Removal . . . . . . . . . . . . . . . . . . . . . . . 30
Section 16.4. Landlord's Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Section 16.5. Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ARTICLE 17. DEFAULT AND REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Section 17.1. Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Section 17.2. Remedies for Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
Section 17.3. Recovery of Rent and Damages . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Section 17.4. Interest on Amount Overdue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Section 17.5. Legal Expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Section 17.6. Bankruptcy of Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Section 17.7. Waiver of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Section 17.8. Option to Cure Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Section 17.9. Accord and Satisfaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Section 17.10.       Remedies Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ARTICLE 18. SURRENDER OF PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Section 18.1. Tenant's Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Section 18.2. Landlord's Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Section 18.3. Damages for Failure to Surrender Premises . . . . . . . . . . . . . . . . . 39
Section 18.4. Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Section 18.5. Removal and Storage of Tenant's Property . . . . . . . . . . . . . . . . . 39

ARTICLE 19. MERCHANTS ASSOCIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Section 19.1. Merchants Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Section 19.2. Daily Sales Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ARTICLE 20. TRANSFER AND ASSIGNMENT . . . . . . . . . . . . . . . . . . . . . . . . . 40
Section 20.1. Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Section 20.2. Change of Ownership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Section 20.3. Landlord's Consent to Assignment. . . . . . . . . . . . . . . . . . . . . . . . 41
Section 20.4. Assignment or Transfer by Landlord. . . . . . . . . . . . . . . . . . . . . . . 42

ARTICLE 21. OTHER TENANT OBLIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . 43
Section 21.1. Rules and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
Section 21.2. Competition - Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
Section 21.3. Name Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ARTICLE 22. PROTECTION OF LENDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Section 22.1. Estoppel Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Section 22.2. Attornment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Section 22.3. Subordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ARTICLE 23.  SECURITY DEPOSIT ..................................... 45

ARTICLE 24.  OTHER PROVISIONS ..................................... 45
     Section 24.1. Additional Rents ....................................... 45
     Section 24.2. Excuse for Non-Performance ............................ 45
     Section 24.3. Successors ............................................ 46
     Section 24.4. Consent and Approval .................................. 46
     Section 24.5. Entire Agreement ...................................... 46
     Section 24.6. Net Lease............................................. 47
     Section 24.7. No Partnership Relation ................................ 47
     Section 24.8. Notices .............................................. 47
     Section 24.9. Captions ............................................. 47
     Section 24.10.Submission of Lease Form .............................. 47
     Section 24.11.Rent Restrictions ..................................... 48
     Section 24.12.Brokerage ............................................ 48
     Section 24.13.Severability .......................................... 48
     Section 24.14.Survival of Obligations ................................ 48
     Section 24.15.No Option ............................................ 48
     Section 24.16.Recording ............................................ 48

# L E A S E

THIS LEASE, made on the _17th_ day of ___July___, 2001 (the "Effective Date") by and between WEST ACRES DEVELOPMENT, LLP, a Limited Liability Partnership, whose address is Box 9978, Fargo, North Dakota 58106-9978, herein called "Landlord," and Claire's Boutiques, Inc., d/b/a Claire's, Claire's Accessories, or Claire's Boutiques, herein called "Tenant."

## WITNESSETH:

## ARTICLE 1. BASIC TERMS

The following are the Basic Terms referred to in this Lease:

**Section 1.1.**    **Lease:** This Lease agreement.

**Section 1.2.**    **Landlord:**   West Acres Development, LLP, a limited liability partnership, whose address is specified above, and whose phone number for facsimile transmissions is 701.282.2229.

**Section 1.3.**    **Tenant:** Claire's Boutiques, Inc., d/b/a Claire's, Claire's Accessories, or Claire's Boutiques, whose address is 2400 West Central Road, Hoffman Estates, IL 60195, and whose phone number for facsimile transmissions is 847.765.4618.

**Section 1.4.**    **Shopping Center:**  The West Acres Regional Shopping Center, and parking areas, driveways, walkways, and service courts adjacent thereto, located on Blocks 1, 2, 3, and 5 through 8, inclusive, West Acres Third Addition to the City of Fargo (exclusive of those portions of Block 3 no longer a part thereof pursuant to the Replat of Part of Block 3 of West Acres Third Addition) and Blocks B through D, inclusive, of the Replat of Part of Block 3 of West Acres Third Addition to the City of Fargo, Cass County State of North Dakota, and all buildings and improvements thereon, as they may be increased, decreased or modified by Landlord from time to time as authorized in this Lease. A current Site Plan of the Shopping Center, covering the land described above and adjacent properties is attached hereto as Exhibit 1.

**Section 1.5.**    **Premises:** Space 306 f.k.a. B-11 in the West Acres Shopping Center, the approximate location of which is identified on Exhibit 2, and which contains an area of approximately 973 square feet of floor area.

**Section 1.6.**    **Use of Premises:** The permitted use of Premises referred to in Section 10.1, shall be for the following and for no other purpose:

The display and sale, at retail, of such items as are normally sold in Claire's Boutiques, Inc.'s prototype Claire's stores, including, without

limitation, fashion accessories, jewelry, hair goods, handbags and sunglasses; teen home and gift accessories; cosmetics, fragrances, bath and body products; novelties, trend-driven and holiday promotional items; and Tenant shall be permitted to perform ear piercing the Premises.

Section 1.7.     **Term:** The term of this Lease shall commence on the Commencement Date referred to in Section 1.8 and, unless sooner terminated as provided in this Lease, the term of this Lease will continue through the 30th day of June, 2011.

Section 1.8.     **Commencement Date:** July 1, 2001.

Section 1.9.     **Fixed Minimum Rent:** Fixed minimum rent, payable under Article 5, shall be:

(a)     $5,675.83 per month from the Commencement Date through the third (3rd) Lease Year, inclusive.

(b)     $6,081.25 per month from the fourth (4th) through the seventh (7th) Lease Year, inclusive.

(c)     $6,486.67 per month from the eighth (8th) through the tenth (10th) Lease Year, inclusive.

Section 1.10.    **Percentage Rent:** The percentage rent rate under Section 6.1, shall be eight percent (8%) of gross sales, as defined in Section 6.2.

Section 1.11.    **Tenant Improvements:** Tenant shall be required to complete the improvements, if any, specified in Exhibit 3. Tenant's improvements shall be completed no later than November 1, 2001.

Section 1.12.    **Merchants Association:** Tenant shall be obligated to pay annual dues to the Merchants Association under Article 19 set forth below: $2.03 per square foot.

Section 1.13.    **Landlord Improvements:** Landlord shall be required to make those improvements, if any, to the Premises specified in Exhibit 4.

Section 1.14.    **Security Deposit:** Tenant's security deposit under Article 23 shall be waived.

Section 1.15.    **Name:** Tenant shall, in accordance with the terms of Section 21.3, operate under the name: Claire's Accessories, Claire's or Claire's Boutiques.

Section 1.16.    **Guarantors:** This Lease shall be guaranteed by Waived

**Section 1.17.**      **Brokers:** The name of any brokers listed under Section 24.12, and the responsibility for commissions payable to such brokers is as follows:

None

**Section 1.18.**      **Exhibits:** The exhibits listed in this Section and attached or referenced in this Lease are incorporated in and made a part of this Lease:

Exhibit 1 -    Site plan of the Shopping Center.

Exhibit 2 -    Floor plan of Shopping Center showing the approximate location of the Premises.

Exhibit 3 -    Description of Tenant's Improvements.

Exhibit 4 -    Description of Landlord's Improvements.

Exhibit 5 -    Rules and Regulations.

Exhibit 6 -    Verification of Term - Floor Area

References contained in this Article 1 to other provisions of this Lease are for convenience and are not intended to be an exhaustive listing of all of the Articles where the basic terms may be relevant. Each basic term defined in Article 1 of this Lease shall be construed to incorporate all of the terms of the substantive provisions of this Lease which contain references to the basic terms. In the event of any conflict between any of the basic terms defined in Article 1 with any other provision of this Lease, the latter shall control. The listing of any monetary amounts set forth in Article 1 is not intended to be an exhaustive list of all of Tenant's financial obligations to Landlord under this Lease.

## ARTICLE 2. ADDITIONAL PROVISIONS

None

## ARTICLE 3. DEMISED PREMISES

**Section 3.1. Premises.** In consideration of the mutual covenants, conditions and agreements included in this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, that certain space in the Shopping Center, described in Section 1.5 (the "Premises") together with those appurtenances specifically granted to Tenant in this Lease, but reserving to Landlord the use of the exterior walls (other than store fronts), the roof, and the right to install, maintain, use, repair, and replace, pipes, ducts, conduits, and wires leading through the Premises and which serve the Premises or other parts of the Shopping Center, at locations which will not materially interfere with Tenant's use of the Premises. Tenant's rights under this Lease are subject and subordinate to all liens, encumbrances, easements,

restrictions, ground leases, and any rights of way and other interests of record, zoning laws and regulations affecting or governing the Premises.

**Section 3.2.  Common Area Use.**  The use and occupation by the Tenant of the Premises shall include the non-exclusive use, in common with others entitled thereto, of the Common Areas defined in Section 7.1, the present boundaries of which are depicted on attached Exhibits 1 and 2.  Tenant's use of the Common Areas shall be subject to the limitations and restrictions set forth in this Lease, including without limitation those set forth in Article 7 and this Article 3, and further subject to reasonable rules and regulations for the use of Common Areas as adopted from time to time by Landlord.

**Section 3.3.  Building Changes.**  Landlord hereby reserves the absolute right, at any time and from time to time, to make alterations or additions to, and to build basements or additional stories on the buildings comprising the Shopping Center, including without limitation, the building in which the Premises is contained, to build adjoining the same. Landlord also reserves the right to construct other buildings or improvements in the Shopping Center from time to time and to make alterations thereof or additions thereto and to build basements or additional stories on any such building or buildings and to build adjoining same.  Where practicable and when doing so will not materially increase the cost thereof in Landlord's commercially reasonable judgment, Landlord shall use reasonable efforts to exercise its rights hereunder in a manner so as to minimize disruption to the operation of Tenant's business from the Premises.

**Section 3.4.  Right to Relocate.**  The purpose of the site plan attached hereto as Exhibit 1 and the floor plan attached as Exhibit 2 is to show the approximate location of the Premises in the Shopping Center.  Landlord reserves the right at any time to add to and relocate the various buildings, automobile parking areas, access roads, utility facilities, walk ways and other Common Areas and facilities shown on said site plan.  The relative location of the Premises in the Shopping Center will be maintained as much as reasonably possible.

Notwithstanding the foregoing, Landlord may, only once during the lease term (but in no event during the last Three (3) years of the term), relocate Tenant to another location in the Shopping Center, provided the following conditions are satisfied:

(a)  Tenant is given at least One Hundred and Eighty (180) days notice of the proposed relocation;

(b)  The relocated space is comparable in size (no less than 95% and no more than 105% of the size of the original space), location in relation to anchor stores and mall entrances, access and pedestrian traffic;

(c)  Landlord assumes all costs related to the move, including, without limitation, the construction of improvements to the new space in accordance with Tenant's plants and specifications, which shall be substantially similar to Tenant's then current design, layout and finish.

(d)  Tenant shall not be required to move from the current location until the new space is ready for operation.  In the event that it is necessary for Tenant to

move prior to the completion of the new space, temporary space will be provided to Tenant at no charge, and rent and all other charges shall wholly abate during the time in which Tenant is closed.

**Section 3.5.   Acceptance of Premises.**   TENANT ACKNOWLEDGES THAT TENANT HAS EXAMINED THE PREMISES AND THAT IT IS IN THE CONDITION CALLED FOR BY THIS LEASE AND THAT LANDLORD HAS PERFORMED ALL OF LANDLORD'S WORK WITH RESPECT THERETO, EXCEPT FOR ANY ITEMS LISTED IN SECTION 1.13 AS TO WHICH TENANT SHALL HAVE GIVEN WRITTEN NOTICE TO LANDLORD PRIOR TO EXECUTION OF THIS LEASE.   TENANT AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS LEASE, THE PREMISES AND ANY IMPROVEMENTS OR PERSONAL PROPERTY LEASED, TRANSFERRED OR SOLD UNDER OR IN CONNECTION WITH THIS LEASE ARE LEASED, TRANSFERRED OR SOLD, AS IS, WITH ALL FAULTS AND WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES INCLUDING WARRANTIES OF MERCHANTABILITY.

**Section 3.6.   Landlord's Access to Premises.**   Landlord or its agents shall have the right to enter the Premises at all reasonable times to, upon reasonable prior notice to Tenant and while accompanied by Tenant (but neither shall be required in the case of emergency), examine the same, to show them to prospective purchasers or lessees of the building, and to make such repairs, alterations, improvements or additions in the Premises or the building of which it is a part as may be necessary, and Landlord shall be allowed to take all material into and upon the Premises that may be required therefor without the same constituting an eviction of Tenant in whole or in part, and rent shall in no wise abate while said repairs, alterations, improvements, or additions are being made, by reason of loss or interruption of business of Tenant because of the performance of any such work. Nothing in this Section 3.6 shall be deemed or construed to impose upon Landlord any independent obligation, responsibility or liability whatsoever, for the care, supervision or repair of the building or of the Premises, beyond those otherwise herein specifically provided.

During the three months prior to the expiration of this Lease Landlord may show the Premises to prospective tenants and place upon the Premises the usual notices "To Let" or "For Rent" which notices Tenant shall permit to remain thereon without molestation.  If during the last month of the term Tenant shall have removed all or substantially all of its property therefrom, Landlord may immediately enter and alter, renovate or redecorate the Premises without elimination or abatement of rent or other compensation and such action shall have no effect upon this Lease.

**Section 3.7.   Quiet Enjoyment.**   Upon payment by the Tenant of the rents herein provided, and upon the observance and performance of all the covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Premises for the term of this Lease without hindrance or interruption by Landlord or any other person lawfully claiming by, through or under Landlord, subject, nevertheless, to the other terms and conditions of this Lease, and to all mortgages and underlying leases of record to which this Lease is, or may be or become subject or subordinate.

## ARTICLE 4.  TERM

**Section 4.1.  Commencement Date and Term.**  This Lease shall begin and be of full force and effect as to both Landlord and Tenant as of the Effective Date.  The term of this Lease and Tenant's obligation to pay rent hereunder shall commence on the Commencement Date set forth in Section 1.8, and, unless sooner terminated as permitted by this Lease or by law, shall end at midnight on the date specified in Section 1.7.

**Section 4.2.  Lease Year.**  The term "Lease Year" means each consecutive period of twelve (12) full calendar months during the term of this Lease commencing on the Commencement Date, if that date shall occur on the first day of a calendar month; if not, then the first Lease Year shall commence upon the first day of the first calendar month following the Commencement Date.  Each succeeding Lease Year shall commence upon the anniversary date of the first Lease Year.  The last Lease Year shall end on the date this Lease terminates and may be less than twelve months.

**Section 4.3.  Verification of Term - Floor Area - Rent.**  When the Commencement Date has been determined, Landlord and Tenant shall execute and deliver a statement, in duplicate, specifying the Commencement Date, the actual number of square feet of floor area in the Premises, and, the fixed minimum rent payable under this Lease, which completed statement shall be attached to and constitute a part of this Lease, as Exhibit 6.  In determining the floor area of the Premises and all other areas in the Shopping Center which are available from time to time for the exclusive use and occupancy by a tenant of Landlord: i) measurements from outside walls and store fronts shall be made from the exterior of the wall or store front; ii) measurements from walls adjacent to other leasable areas of the Shopping Center shall be made from the mid-point of the wall; iii) each two square feet of basement space shall be counted as one square foot of floor area; iv) if any portion of mezzanine or upper floor space is used for displaying or selling merchandise, each two square feet of the floor area of the entire mezzanine or upper floor space shall be counted as one square foot of floor area, otherwise the entire area of mezzanine or upper floor space will be excluded from floor area.  Failure of Landlord and Tenant to execute Exhibit 6 shall not affect either party's obligations under this Lease.

**Section 4.4.  Failure of Tenant to Open.**  Unless prevented by causes beyond Tenant's reasonable control, if Tenant fails to take possession and to open the Premises for business fully fixtured, stocked and staffed on the Commencement Date, then Landlord shall have, in addition to any and all remedies herein provided or otherwise provided by law, the right, at its option, to collect not only the fixed minimum rent herein provided, but an additional rent of one and one-half per cent (1½%) of the monthly fixed minimum rent per day for each and every day that Tenant shall fail to commence to do business as herein required.  The additional rent shall be deemed to be in lieu of any percentage rent that might have been earned during the period of Tenant's failure to open and shall be payable on the first day of each succeeding calendar month.

## ARTICLE 5. FIXED MINIMUM RENT

Tenant covenants and agrees to pay Landlord at its office or at such other place designated by Landlord, without any prior demand therefor and without any deduction or set-off whatsoever, an annual fixed minimum rent for the Premises in the amount set forth in Article 1, Section 1.9.  The fixed minimum rent shall be payable in advance in equal monthly

installments on the first day of each and every calendar month during the term of this Lease. If the Commencement Date shall occur on a day other than the first day of a calendar month, Tenant shall pay as fixed minimum rent on the Commencement Date a sum equal one-twelfth of the annual fixed minimum rent payable for the first Lease Year times a fraction, the numerator of which is the number of the days in such month on or after the Commencement Date of this Lease, and the denominator of which is the total number of days in such month. If this Lease terminates other than at the end of any Lease Year, fixed minimum rent for the period between the end of the last full Lease Year to the date of termination shall continue at the rate provided in the last Lease Year.

## ARTICLE 6. PERCENTAGE RENT

**Section 6.1.  Payment of Percentage Rent.**  In addition to fixed minimum rent, Tenant agrees to pay Landlord during each Lease Year during the entire term of this Lease at Landlord's designated office, without prior demand therefor, and without any deduction or set-off whatsoever, percentage rent equal to the amount, if any, by which the percentage rent rate set forth in Article 1, Section 1.10, times Tenant's "gross sales", as hereafter defined, shall exceed the fixed minimum rent payable for such Lease Year.

Percentage rent shall be paid monthly in arrears on or before the 20th day after the end of each month during the term of this Lease and within 60 days following the expiration or earlier termination of this Lease.  The amount of such payment, if any, shall be the amount by which the above percentage of Tenant's cumulative gross sales transacted for the entire Lease Year through the end of the most recent month, exceeds the sum of all the fixed minimum rent paid by Tenant, plus any percentage rent previously paid by Tenant for the same period.  Upon receipt by Landlord of each annual statement of Tenant's gross sales as provided hereafter, the amount of percentage rent for the preceding Lease Year shall be determined.  If Tenant's monthly payments for percentage rent are less than Tenant's liability for percentage rent, Tenant shall pay the difference to Landlord within 15 days after billing. If Tenant's monthly payments for percentage rent are in excess of Tenant's liability for percentage rent for the applicable Lease Year, Landlord may, at Landlord's election, either apply such excess to future rents or other obligations Tenant may owe to Landlord, or refund the balance to Tenant.  For the purpose of computing percentage rent payable with respect to the first Lease Year, the gross sales during the first fractional month, if any, of the term shall be included with the gross sales of the first full calendar month.

For the purpose of computing Percentage Rent payments for any partial Lease Year of less than twelve (12) full calendar months occurring at the end of the Lease term, Tenant shall pay a sum equivalent to the product obtained by multiplying (i) Tenant's Gross Sales for the last twelve (12) full calendar months of the Term times (*) eight percent (8%) minus (-) the fixed minimum rent payable by Tenant for such twelve (12) month period, by (ii) a fraction, the numerator of which shall be the number of days in the partial Lease Year and the denominator of which shall be three hundred sixty five (365).  If the termination date is a day other than the last day of a month, the fixed minimum rent and any other charges shall be prorated on the basis of the ratio of the number of days from the first day of the month through the termination date.

**Section 6.2.   Gross Sales Defined.** The term "gross sales", as used in this Lease, means the actual full price charged for all merchandise sold, leased or licensed in, on or from the Premises, and the actual charges for services performed in, on, or from the Premises, whether by Tenant or by Tenant's lessees, concessionaires, and licensees, and whether for cash or on credit, and without reserve or deduction for inability or failure to collect (including all lay-away, credit, and finance, interest and service charges charged in connection with sales or other dealings from the Premises), even though such sales or services are ordered by telephone, mail, telegraph or otherwise. The full price charged for each sale, lease or license of goods made on the Premises shall be included regardless of whether: i) the transaction was made by Tenant, Tenant's sublessee, concessionaire or licensee as a consignee, trustee or agent for a third party; or ii) another party is entitled to retain all or a portion of the price payable for the transaction as its own property. Notwithstanding the foregoing, the following shall be excluded from gross sales: (a) the selling price of all merchandise returned by customers which were purchased from the Premises and accepted for full credit, or the amount of discounts and allowances made thereon; (b) refunds and credits for exchanged or returned merchandise; (c) sales, luxury or excise taxes collected by Tenant from customers, imposed by and paid over to federal, state or local governmental authority, levied in whole or in part upon the basis of retail sales made in, on or from the premises; (d) gift certificates until redeemed; (e) insurance proceeds received with respect to inventory or other goods damaged or destroyed; (f) receipts from coin telephones except to the extent of commissions received therefrom; (g) sales of trade fixtures or store equipment, which are neither stocked for sale or trade nor sold in the ordinary course of Tenant's business, after use thereof on the Premises; (h) exchanges or transfers of merchandise between stores and/or warehouses of Tenant where such exchange is made solely for the convenient operation of Tenant's business and not to avoid liability for percentage rent; (i) parcel post and delivery charges; (j) sales to employees at discount to the extent such sales do not exceed two percent (2%) of the Gross Sales during any Lease Year and are at no profit to Tenant; (k) receipts from vending machines or pay telephones located in non-sales areas for the exclusive use of Tenant's employees, so long as such vending machines are operated at no profit to Tenant; (l) losses on bad debts arising from sales consummated by a non-sufficient fund check or uncollectible credit charge at or from the Premises to the extent such sales are charged off by Tenant in accordance with sound business and accounting practices and that (i) such exclusion shall be made in the Lease Year in which such sales are charged off, (ii) such exclusion shall not exceed two percent (2%) of Gross Sales for any Lease Year, and (iii) if such sale so charged off shall later be collected during the term of this Lease, they shall be included in Gross Sales for the Lease Year in which they are collected; and (m) sales to jobbers at or below cost for purposes of liquidating inventory but not for resale at the Premises.

**Section 6.3.   Sales Records.** For the purpose of ascertaining the amount payable as percentage rent, Tenant agrees to prepare, keep, and make available at its principal accounting office in Miami, Florida, or other location approved in writing by Landlord, for a period of not less than three years following the end of each Lease Year, adequate records which shall show Tenant's Gross Sales, inventories and receipts of merchandise at the Premises, and daily receipts from all sales and other transactions on or from the Premises by Tenant and any others conducting any business upon or from the Premises. Tenant shall record at the time of sale, in the presence of the customer, all receipts from sales or other transactions, whether for cash or credit, in a cash register or in cash registers having a

cumulative total which shall be sealed in a manner approved by Landlord, or having such other features as shall be approved by Landlord. Tenant further agrees to retain and make available for at least three years following the end of each Lease Year the gross income, sales and occupation tax returns and all pertinent original sales records bearing upon or relating to the Premises. Pertinent original sales records shall include, but are not limited to: (a) serially numbered sales slips; (b) records of all mail and telephone orders at and to the Premises; (c) settlement report sheets of transactions with sub-tenants, concessionaires and licensees; (d) records showing that merchandise returned by customers was purchased at the Premises by such customers; (e) records of merchandise taken out on approval; (f) other such sales records, if any, which would normally be examined by an independent certified public accountant pursuant to accepted auditing standards in performing an audit of Tenant's sales; (g) daily bank deposits and reconciliations of such records with sales; and (h) the records specified in (a) to (h) above of sub-tenants, assignees, concessionaires, or licensees.

**Section 6.4.   Sales Statements.** Within 20 days after the end of each calendar month during the term of this Lease, Tenant shall furnish to Landlord a statement, signed and verified by Tenant or an authorized officer, of Tenant's gross sales transacted during such month; and within 60 days after the end of each Lease Year and the end of the term of this Lease, Tenant shall furnish to Landlord an annual statement of gross sales transacted during the preceding Lease Year or to the date of termination, whichever is applicable. The statement shall contain the certification of an officer of Tenant that the gross sales shown on the annual statement conform with and are computed in compliance with the definition thereof contained in the Section 6.2 of this Lease.

**Section 6.5.   Examination and Audit.** Tenant agrees that acceptance by Landlord of payments of percentage rent shall be without prejudice to Landlord's right of reasonable access to Tenant's accounting system to examine Tenant's books and records as necessary in order to verify or establish the true amount of gross sales made by Tenant and others in and from the Premises. Tenant also agrees that Landlord, at its option, may cause, at any reasonable time upon not less than ten (10) days prior written notice not more than one time per Lease Year (except as follow-up to an ongoing audit) a complete audit at Tenant's principal accounting office in Miami, Florida to be made of Tenant's books and other records relating to reported gross sales for the period covered by any statement issued by Tenant as above set forth, and received by Landlord within the current and three preceding Lease Years. If any audit shall correctly disclose a liability for percentage rent to the extent of three percent (3%) or more in excess of the percentage rents theretofore computed and paid by Tenant for such period, Tenant shall promptly pay Landlord the reasonable cost of the audit in addition to the deficiency in percentage rent, which deficiency shall be payable in any event. So long as Tenant is not then overdue on any sums owed under this Lease, Landlord shall promptly refund to Tenant any overpayment established by such audit.

## ARTICLE 7.  COMMON AREAS AND COMMON AREA COSTS

**Section 7.1.   Common Areas Defined.** The parking areas, streets, fire corridors, driveways, walkways, curbs, gutters, drainage areas, landscaped areas, access roads, retaining walls, truck serviceways or tunnels, loading docks, pedestrian malls, (enclosed or open), courts, stairs, escalators, elevators, ramps and sidewalks, comfort and first aid stations, customer service areas, washrooms, management offices, utility rooms, community hall or auditorium,

bus stops, and parcel pick-up stations, and the like, designated by Landlord for common use or benefit of tenants, occupants and other patrons of the Shopping Center and their employees, agents, servants, customers and other invitees. Common Areas may be located either within the Shopping Center or on land adjacent to the Shopping Center which is made available for the common use or benefit of tenants of the Shopping Center.

**Section 7.2.  Control of All Common Areas.**  All Common Areas and other common facilities provided by Landlord are for the general use or benefit, in common with other tenants, their officers, agents, employees, customers, and invitees and shall be subject to the exclusive control and management of Landlord, and Landlord shall have the right from time to time to promulgate and enforce reasonable rules and regulations, as it may deem appropriate, with respect to all Common Areas which shall apply equally and without discrimination to all tenants and permitees.  Landlord shall have the right to construct, maintain and operate lighting facilities on all said areas and improvements; to police the same; to change the area, level, location and arrangement of parking areas and other Common Area facilities; to build multi-story or underground parking facilities; to restrict parking by tenants, their officers, agents and employees to employee parking areas; to enforce parking charges (by operation of meters or otherwise), with appropriate provisions for free parking ticket validating by tenants; to construct, remove, and modify utility lines within the Common Areas; to grant easements through Common Areas; to close all or any portion of said areas or facilities to such extent as may, in the opinion of Landlord's counsel, be legally sufficient to prevent a dedication thereof or the accrual of any rights to any person or the public therein; to grant occupants of adjacent properties and others access easements to Common Areas and the right to use all Common Areas; to close temporarily all or any portion of the parking areas or common facilities, to regulate non-customer parking; to allow concessions, kiosks, mall shows and displays (provided the same do not substantially interfere with the access to the Premises) and to do and perform such other acts in and to said areas and improvements as in the use of good business judgment, Landlord shall determine to be advisable with a view to the improvement of the convenience and use thereof by tenants, their officers, agents, employees, invitees, and customers.  Landlord will operate and maintain the common facilities referred to above in such manner as it, in its sole discretion, shall determine and shall have full right and authority to employ and discharge all personnel with respect thereto.

**Section 7.3.  Non-Exclusive Use.**  Tenant's right to use all Common Areas is a non-exclusive right, in common with Landlord, all other tenants in the Shopping Center, and all other to whom Landlord may through easements, operating agreements, leases, or agreement, authorize to use the Common Areas.

**Section 7.4.  Modification of Common Areas.**  Landlord reserves the absolute right to designate additional land or improvements as Common Areas, withdraw land or improvements from Common Areas, to sell or lease areas formerly designated as Common Areas, to change the boundaries of Common Areas, and to construct, modify and remove buildings or other improvements on Common Areas.  If the area of such Common Areas is diminished, Landlord shall not be subject to any liability nor shall Tenant be entitled to any compensation or abatement of rent, nor shall such diminution of such areas be deemed constructive or actual eviction.  Landlord agrees, however, to provide within the limits of the

Shopping Center, parking area or areas in a sufficient amount to meet all applicable governmental laws, codes and regulations.

**Section 7.5.  Apportionment of Common Area Cost.** Tenant shall pay to Landlord as additional rent, in addition to the fixed minimum, percentage, and all other rents specified in this Lease, "Tenant's Share" of Common Area Costs, as that term is defined in Section 7.6. "Tenant's Share" shall be determined by taking the total of all Common Area Costs reduced by the contribution to Common Area Costs, if any, made by stores or other occupants of: i) buildings with a floor area greater than 50,000 square feet; ii) buildings on land outside the Shopping Center subject to an easement or operating agreement with Landlord; and iii) any freestanding buildings in or adjacent to the Shopping Center which do not contain an entrance on the enclosed mall located within the Shopping Center (hereinafter i), ii), and iii) above collectively the "Major Stores"), multiplied by a fraction, the numerator of which is the floor area of the Premises and the denominator of which is the total average leased floor area of the entire Shopping Center for the applicable period, exclusive of the floor area of the Major Stores, but in no event less than eighty percent (80%) of the gross leaseable area of the Shopping Center, exclusive of the floor area of the Major Stores.

**Section 7.6.  Common Area Cost Defined.** As used herein, "Common Area Costs" means all costs and expenses of every kind and nature as may be paid or incurred by Landlord in operating, managing, equipping, lighting, repairing, replacing, cleaning and maintaining the Common Areas and facilities specifically including, without limitation, the total costs and expenses paid or incurred in cleaning, planting, watering, fertilizing, replanting and maintaining the exterior and interior landscaping; the cost of all Landlord's insurance on the improvements comprising the Common Areas, including, but not limited to, fire and extended coverage insurance, public liability and property damage insurance with all endorsements, automobile parking lot liability insurance, sign insurance, worker's compensation insurance and any other insurance carried by Landlord for the Common Areas; personal property and real estate taxes and assessments on the land and improvements comprising the Common Areas, including the cost of negotiating or contesting such taxes, as well as taxes in lieu thereof; all maintenance and repairs; exterior repainting; rental and maintenance of signs and equipment; cost of acquisition, maintenance, and modification of mall directories; any public utility or governmental charges, surcharges or costs levied, assessed or imposed on Landlord, or incurred by Landlord, pursuant to, or in compliance with laws, statutes, regulations, codes and ordinances promulgated by any governmental or quasi-governmental authority; lighting; acquisition, operation, maintenance of emergency electrical generating equipment serving the Shopping Center; sanitary and pest control; removal of snow and ice, soil, silt, ash, dust, trash, rubbish, garbage and other refuse; heating, ventilating, air conditioning of enclosed mall(s) and other interior Common Areas; maintenance, repair and replacement of mechanical equipment including automatic door openers, light fixtures (including replacement of fixtures and bulbs), heating, ventilating, air conditioning equipment, fire, sprinkler, public address and security systems; repair, replacement, maintenance and cleaning of any enclosed mall structures including floor, ceiling, roof skylights and windows; painting and decorating; pest control; repair, maintenance, and replacement of the parking areas, whether ground level, subsurface or elevated, including repaving and restriping of the paved areas; traffic consultants; repair, maintenance, and replacement of roofs; the costs for the repair and replacement of equipment for the maintenance or operation of Common Areas, on-site water and irrigation lines,

electrical lines, utility lines, sanitary sewer lines and storm sewer lines; all electrical, water, sewer or other utility charges for service to the Common Areas; independent audit by a certified public accountant of Common Area charges; fidelity bonds for personnel; the cost of personnel to implement such services, including the directing of parking and security personnel and traffic consultants; wages and salaries (including employee benefits) of the mall manager and all other personnel necessary to implement the operation, maintenance and repairs of the Shopping Center (excluding the cost of Landlord's home office and marketing director); the cost incurred in the repair, cleanup, removal, disposal, abatement and/or detoxification of Hazardous Materials (as defined in Section 16.1) from, in, or about the Common Areas, whether voluntary or mandated; sales and use taxes on materials, equipment, supplies and services; fees for required licenses and permits; fire, security and police protection; public toilets; reasonable depreciation of and all rental charges for all warehouse and storage space, office space, customer service areas and all machinery and equipment which are allocable to the maintenance and operation of the Common Areas; supplies, tools, materials and labor; and other costs and fees necessary or beneficial in Landlord's judgment for the maintenance and operation of the Common Areas. In addition, there shall be included in Common Area Costs a charge equal to fifteen percent (15%) of the total of all such Common Area Costs to cover Landlord's administrative overhead. Landlord shall be authorized to amortize the costs of repairs, replacements and improvements made to Common Areas, with interest at a rate not to exceed 3% more than the prime rate reported by the Wall Street Journal at any time within two months of the completion of the repair, replacement or improvement, over the useful life of the repair, replacement or improvement, or such shorter time as may be selected by Landlord. Charges for the costs incurred and the repair, clean-up, removal, disposal, abatement, and/or detoxification of Hazardous Materials from, in, or about the Common Areas of the Shopping Center, plus amortized capital improvements, will not exceed ten percent (10%) of the Common Area Costs for a calendar year, provided any such items exceeding such ten percent (10%) may be carried over into succeeding years.

Notwithstanding anything to the contrary contained herein, the following shall be excluded from Common Area Costs: (a) any and all costs related to the acquisition of additional land for use by the Shopping Center, including costs related to construction of improvements on that land, unless such improvements constitute or are located wholly within Common Areas; (b) alterations attributable solely to particular tenants of the Shopping Center; (c) interest and any increase in the rate of interest payable by Landlord with respect to liens it has granted or assumed on the Shopping Center and/or the land on which the Shopping Center is located; (d) interest or amortization of any financing by Landlord; (e) depreciation on the original cost of constructing the Shopping Center; (f) legal and other professional fees incurred by Landlord in connection with the execution of leases and the expenses of enforcing any such leases; (g) except as otherwise provided with respect to new or supplemental real-estate-type taxes, income, excess profits or franchise taxes or other such taxes imposed on or measured by the income of Landlord from the operation of Shopping Center; (h) the cost of any items for which Landlord is actually reimbursed by condemnation proceeds or insurance carried or required by this Lease to be carried and/or not so carried, to the extent the Landlord would have been reimbursed thereunder; (i) the amount of rent or other charges payable under and pursuant to any ground lease pertaining to the land on which the Shopping Center is located, unless and only to the extent such rent pertains to Common Areas; (j) a reasonably allocated share of the cost of employees who are not located entirely on-site and who provide services

for the Shopping Center and other shopping centers managed by affiliates of Landlord attributable to such other shopping centers; (k) any cost stated in Common Area Costs representing an amount paid to a Landlord-related corporation or entity which is in excess of the amount which would be paid in absence of such relationship; and (l) the cost of any repairs, alterations, additions, changes, replacements and other items which under generally accepted accounting principles are properly classified as capital expenditures except the portion thereof Landlord is authorized to amortize as provided above.

In no event shall there be any duplication of charges to Tenant, regardless of their classification as Common Area Maintenance Charges or otherwise.

Notwithstanding anything in this Lease to the contrary, Landlord's administrative charge based upon a percentage of the Common Area Costs shall not apply to real estate taxes and assessments to tenants' premises (as opposed to Common Areas) and utilities that are billed to Tenant from a utility provider other than Landlord.

**Section 7.7.  Payment of Common Area Charges.** Commencing on the Commencement Date and thereafter during the term of this Lease Tenant shall pay to Landlord, as additional rent, Tenant's share of Common Area Costs in monthly installments on the first day of each month, in advance, in an amount estimated by Landlord from time to time.  From time to time, but no less often than once each calendar year, Landlord shall furnish Tenant a statement in reasonable detail of the actual Common Area Costs paid or incurred by Landlord during such period, prepared in accordance with sound accounting principles.  Tenant shall pay within 20 days after billing the deficiency, if any, between Tenant's Share of actual Common Area Costs and the amounts paid by Tenant, and in the event of any overpayment by Tenant, Landlord shall credit the overpayment to Tenant's future rental obligations under this Lease (or refund same to Tenant if there are no future rental obligations) to the end that Landlord shall receive the entire amount of Tenant's Share of such Common Area Costs for such period and no more.

Tenant shall have the right, at Tenant's sole cost, to audit Landlord's records of Common Area Costs provided that all of the following criteria are met:

   a.    Tenant's auditor shall make an appointment with Landlord's audit supervisor. Landlord and Tenant shall reasonably cooperate to arrange a mutually acceptable time within thirty (30) days from Tenant's request; notwithstanding the foregoing, Landlord shall not be required to accommodate Tenant's auditors if other tenants have scheduled audits prior to Tenant's request on the date proposed by Tenant and such audit shall not be scheduled for the period of January 1 through April 15 of any year.

   b.    Before conducting any audit, Tenant must pay the full amount of Common Area Costs billed and must not be in default of any other Lease provisions beyond applicable notice and cure periods.

   c.    Tenant may review only those records of Landlord that are specifically related to Common Area Costs.  Without limiting the foregoing, Tenant may not

review any other leases or anchor agreements, or Landlord's tax returns or financial statements.

d.    In conducting an audit, Tenant must utilize an independent certified public accountant experienced in auditing shopping center records.

e.    The audit shall be conducted at Landlord's general administration office.

f.    Upon receipt thereof, Tenant will deliver to Landlord a copy of the audit report and all accompanying data.

g.    Tenant will keep confidential all information obtained and the results of any audits conducted hereunder. Notwithstanding the foregoing, Tenant shall be permitted to furnish the foregoing information to its attorneys, accountants and auditors to the extent necessary to perform their respective services for Tenant on the condition that such service providers also keep such items confidential, except as may be disclosed in any court proceedings.

h.    The audit shall be conducted in accordance with generally accepted rules of auditing practices.

i.    Tenant may not conduct an audit more often than once each calendar year. Tenant may audit records with respect to each Lease Year only one time. No audit shall cover a period of time in excess of the three (3) Lease Years immediately preceding the audit. Any audit shall take place within three (3) years of the end of particular Lease Year being audited by Tenant or Tenant's right to audit such Lease Year shall be deemed to have lapsed.

j.    In the event that Tenant, after having reasonable opportunity to examine the Common Area Cost records, shall disagree with Landlord's determination, then Landlord and Tenant shall attempt to adjust such disagreement, and if they are unable to do so, Landlord and Tenant shall designate an independent certified public accountant who shall not have worked for, or been employed by, Landlord or Tenant (the "Arbiter") whose determination shall be binding upon the parties. The parties shall share equally the cost of the Arbitrator, but shall otherwise pay their own costs associated with the audit.

## ARTICLE 8. TAXES

**Section 8.1.  Real Property Taxes.**  Tenant shall pay as additional rent, Tenant's Share of all real property taxes (including extraordinary and special assessments) and including any taxes in lieu thereof which may be levied or assessed by any lawful authority against the land and buildings which make up the Shopping Center (exclusive of Common Areas charged by Landlord as a Common Area Cost), and any tax, fee or excise on rents, the floor area of the Premises, on the act of entering into this Lease, or on the occupancy of the Tenant, or any other tax, fee or excise, however described, on account of the rent reserved hereunder or the business of the renting space in the Shopping Center now or hereinafter levied on or assessed

against the Landlord. The term "real property taxes" shall not include any franchise, estate, inheritance, succession, capital levy, net income or excess profits taxes imposed upon Landlord. In the event that any other tax, fee or excise, however described, is levied or assessed as a substitute, in whole or part, for or as an addition to, any real property taxes, such tax, fee or excise shall in any event for the purpose of this Lease be considered a real property tax regardless of how denominated or from the source from which it is collected. The term "real property taxes" shall also include all expenses reasonably incurred by Landlord in seeking reduction by the taxing authorities of real property taxes applicable to the Shopping Center. Tenant shall be entitled to its prorata share of any reduction actually determined by the taxing authority and the Landlord.

"Tenant's Share" of the real property taxes shall be determined by taking the total of all real property taxes assessed against the Shopping Center, exclusive of real property taxes allocable to Common Areas and charged by Landlord as a Common Area Cost, reduced by contributions made to Landlord and real property tax payments made to the taxing authorities by Major Stores, as defined in Section 7.5, multiplied by a fraction, the numerator of which is the floor area of the Premises and the denominator of which is the total average leased floor area of the entire Shopping Center, for the applicable period, exclusive of the floor area of the Major Stores, but in no event less than eighty percent (80%) of the gross leaseable floor area of the Shopping Center, exclusive of the floor area of the Major Stores.

Commencing on the Commencement Date and thereafter for the term of this Lease, Tenant shall pay to Landlord, as additional rent, Tenant's Share the real property taxes on the first day of each month during the term of this Lease in an amount equal to one-twelfth (1/12) of Tenant's Share of the annual taxes reasonably estimated by Landlord to be due or to become owing for such annual period. Following Landlord's receipt of the applicable tax bill, Landlord shall notify Tenant of any additional amount owing over and above the amounts paid by Tenant, and Tenant shall pay such additional amount to Landlord within twenty days thereafter. In the event Tenant's monthly tax payments exceed Tenant's Share of real property taxes, such excess shall be credited against Tenant's future tax obligations, or refunded if there are no future tax obligations. In the event Landlord is required under any mortgage covering the Shopping Center to escrow taxes, Landlord may, but shall not be obligated to, use the amount required to be so escrowed as a basis for the estimate of monthly installments due from Tenant hereunder and apply the amounts paid by Tenant hereunder to such escrow account.

A copy of a tax bill or assessment submitted by Landlord to Tenant shall at all times be conclusive evidence of the amount of taxes assessed or levied upon the property to which such bill relates. In the event any such tax bill does not allocate taxes due and attributable to the Common Areas of the building(s) which comprise the Shopping Center from the leasable areas of said building(s), Landlord may allocate the taxes between such areas on a rational basis, including, but not limited, to a pro rata allocation based on square foot area of each as it bears to the entire area of the building(s). For the years in which this Lease commences and terminates, Tenant's liability for its portion of the taxes for such calendar years shall be subject to a pro rata adjustment based on the number of days in such calendar years during which the term of this Lease is in effect.

**Section 8.2.  Personal Property Taxes.** Tenant shall at all times be responsible for and pay, before delinquency, all taxes levied, assessed or unpaid upon any leasehold interest, any right of occupancy or use, any investment of Tenant in the Premises, or any personal property of any kind owned, installed, or used by the Tenant, including Tenant's leasehold improvements or taxes on Tenant's right to occupy or use the Premises.

## ARTICLE 9.  UTILITIES

**Section 9.1.  Provision of Utilities.**  To the extent described in Landlord's design criteria as it exists at the Effective Date, Landlord shall bring to the Premises at points reasonably determined by Landlord sanitary sewer, water, gas, telephone systems, and steam, hot water or other heating media. Electric service will be brought by Landlord to a meter room serving the Premises and conduit will be extended from the meter room to the Premises. Tenant will be responsible for installing and maintaining all utilities within or immediately adjacent to and exclusively serving the Premises including, without limitation: i) all plumbing fixtures and equipment, including toilet, janitorial and drinking fountain facilities, drainage, vent, hot and cold water piping, water meters and equipment necessary to heat and chill water; ii) electrical power and lighting system; iii) telephone system; iv) heating apparatus systems utilizing the heat media provided to the Premises by Landlord; v) ventilating and air conditioning equipment.  Tenant shall, at Tenant's expense, make any changes or modifications required as a result of changes in heating media or other utilities supplied to and exclusively serving the Premises.

**Section 9.2.  Payment for Utilities.**  Tenant shall be solely responsible for and shall promptly pay all charges for heat, water, hot or chilled water, steam, gas, electricity, sewer, waste removal and any other utility used or consumed, in or about the Premises during the term of this Lease which are billed to Tenant by any supplier.  If the cost for any utilities serving the Premises are billed to Landlord, Tenant agrees to pay Landlord, as additional rent, within twenty (20) days after submission of a statement, Landlord's cost for such utilities as may be reasonably allocated by Landlord to the Premises.  Waste disposal may be allocated by Landlord on the basis of number of dumpsters used by Tenant or such other reasonable basis related to tenants' needs and usage.  Landlord's costs for utilities which are not billed directly to Tenant shall include all costs paid and incurred by Landlord in supplying the utility, including, but not limited to:  i) amounts paid or payable by Landlord to any third party for the provision of the utility service; ii) Landlord's costs, if any, of maintenance, including routine service of the utility; iii) Landlord's administrative costs in providing personnel to provide for utilities and to monitor and account for utility charges, not to exceed 15% of the utility charge to Tenant.  In no event shall the utilities cost to Tenant exceed the cost Tenant would have been charged had it contracted directly for such utility with the independent local utility provider.

**Section 9.3.  Landlord Supplied Utilities.**  Should Landlord elect to supply any utility to the Premises, or arrange for the supply through any contractor or supplier of any such utility, Tenant agrees to purchase and pay to Landlord, as additional rent, for Tenant's usage as additional rent, a charge based at rates established by Landlord.  Payment shall be due not later than the tenth day after the rendering of a bill therefor by Landlord.  Landlord's charges for Landlord supplied utilities shall not exceed an amount which, when added to any other charges payable Tenant for the same utility over a calendar year, will exceed those which

would be charged if the utilities were supplied to Tenant by the municipality or utility corporation which would otherwise supply such utilities during the same period. Landlord may at any time, upon thirty (30) days written notice, elect to terminate any utility service provided by Landlord. In such event, Landlord's sole obligation shall be to permit a local utility or similar agency to use Landlord's lines and conduits to the Premises for use for the furnishing of the discontinued service. In the event Tenant fails to pay for services provided by Landlord within thirty (30) days after written notice to Tenant, Landlord may, in addition to all other available remedies, cut off and discontinue such service without liability to Tenant. No such termination shall be construed by Tenant or any other party as an eviction of Tenant or termination of this Lease.

If Landlord installs an off-peak generator or other equipment which entitles Tenant to reduction in the rate it is required to pay to a public utility for utility services provided to the Premises, Landlord shall be entitled to charge Tenant a utility service fee to reimburse Landlord for all loss, cost and expense incurred by Landlord as a result of its acquisition and operation of the equipment, including, but not limited to, the cost of acquiring and installing the equipment, interest paid to finance acquisition of the equipment, maintenance and repair of the equipment and fuel, and administrative charges at a rate not to exceed 15% of the described costs and expenses. For each Calendar Year, the charge assessed by Landlord under this paragraph shall not exceed the amount Tenant would have paid to the public utility had Landlord not installed the equipment or service. The fee may be charged by Landlord directly to Tenant, or through the public utility company serving the shopping center. This provision shall be in addition to and not in lieu of Section 9.3 of the Lease.

**Section 9.4.   Interruption in Utility Service.** Landlord shall not be liable for damages or otherwise if the furnishing by Landlord or by any other supplier of any utility service to the Premises shall be interrupted or impaired by fire, accident, riot, strike, Act of God, the making of necessary repairs or improvements, or by any causes beyond Landlord's control, and no such interruption or impairment shall entitle Tenant to terminate this Lease or stop making any rental or other payment to Landlord.

Notwithstanding the foregoing, if such interruption results from Landlord's negligence or willful misconduct and causes Tenant, in the exercise of its commercially reasonable judgment, to close the Premises for more than two full consecutive business days, then commencing with the third such fully closed day, fixed minimum rent, but not percentage rent or additional rent, shall abate until services are restored to the point where, in the exercise of Tenant's commercially reasonable judgment, closure is no longer required.

## ARTICLE 10.  USE AND OPERATION

**Section 10.1.        Use of Premises.** Tenant shall occupy and use the Premises solely for the purpose of conducting the business authorized under Article 1, Section 1.6. and under the name authorized by Article 1, Section 1.15. Tenant shall not use, permit, or suffer the use of the Premises for any other business or purpose, and shall not conduct catalogue sales in or from the Premises except of merchandise which Tenant is permitted to sell "over the counter" in or at the Premises pursuant to Section 1.6. Tenant covenants and agrees that it will complete Tenant's improvements set forth in Section 1.11 and open its business in the Premises to the public fully fixtured, staffed and stocked not later than the Commencement

Date and shall thereafter conduct its business therein, for the purpose authorized under Article 1, Section 1.6 and under the name authorized under Article 1, Section 1.15, continuously and uninterruptedly, during the entire term of this Lease.

**Section 10.2.**     **Operation of Business.** Tenant covenants and agrees that the Premises shall not be abandoned or left vacant.   Tenant further covenants and agrees that it will operate its business on the Premises during the entire term of this Lease with due diligence and efficiency so as to produce all of the gross sales which may be produced by such manner of operation, unless prevented from doing so by causes beyond Tenant's control. Subject to inability by reason of strikes or labor disputes, Tenant shall carry at all times in the Premises a stock of merchandise of such size, character and quality as shall be reasonably designed to produce the maximum return to Landlord and Tenant.  No damage to, vacancy of, or failure to open for business by any other store or stores in the Shopping Center, including department stores, shall excuse the Tenant from opening for business in the manner and during the hours required hereunder or paying any rentals required herein.  Landlord shall have the absolute right to effect such other tenancies in the Shopping Center as landlord, in the exercise of its sole business judgment, shall determine to best promote the interests of the Shopping Center.  Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or number of tenants shall during the term of this Lease occupy any space in the Shopping Center.

**Section 10.3.**     **Open Hours.**  Tenant shall conduct its business and will keep the Premises open for business to the public between 10:00 a.m and 9:00 p.m Monday through Saturday, and Noon and 6:00 p.m. on Sundays, except when excused under Section 24.2, or on holidays or other times when the Shopping Center is closed by Landlord.  In addition, Tenant shall be open and remain open for business to the public during such additional hours which Landlord shall establish from time to time with the consent of either: i) tenants occupying a majority of non-department store floor area of the Shopping Center; or ii) any two or more department stores. Nothing contained in this provision shall be construed to require Tenant to open during any period Tenant may not be compelled to open under then applicable law.

**Section 10.4.**     **Liquidation Sales.** No auction, fire, liquidation, going-out-of-business or bankruptcy sales may be conducted in the Premises without the previous written consent of Landlord.

**Section 10.5.**     **Waste or Nuisance.** Tenant shall not commit or allow to be committed any waste upon the Premises or any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant in the building in which the Premises may be located, or in the Shopping Center, or which may disturb the quiet enjoyment of any person within five hundred feet of the boundaries of the Shopping Center.  Tenant shall not perform any acts or carry on any practices which may injure the building of which the Premises form a part.

**Section 10.6.**     **Governmental Regulations.**  Tenant shall, at Tenant's sole cost and expense, comply with and faithfully observe all of the rules, regulations, ordinances, laws and requirements of county, municipal, state, federal and other applicable governmental authorities, present or future, which affect the occupancy or use of, or carrying on of Tenant's

business in the Premises, including the making of such modifications to the Premises as may be required thereby.

**Section 10.7.**       **Storage, Office, Non-Selling Space.** Tenant agrees to warehouse, store or stock in the Premises only such goods, wares and merchandise as Tenant intends to offer for sale at retail at, in, from or upon the Premises within a reasonable time after receipt. This shall not preclude occasional emergency transfers of merchandise to other stores of Tenant, if any, not located in the Shopping Center. Tenant shall use for office, clerical, storage, or other non-selling purposes only such space in the Premises as is reasonably required for Tenant's business. Landlord shall have the right at all reasonable times to enter the Premises in order to verify the amount of space devoted to non-selling purposes, and if it appears to Landlord that the amount of such space is excessive, it shall promptly notify Tenant in writing. If Tenant shall fail or neglect, within thirty days after such notice, to reduce such non-selling space to an amount reasonable and adequate for Tenant's business operations, Landlord may, at its option treat such failure as an event of default constituting a breach by Tenant of this Lease agreement.

## ARTICLE 11. IMPROVEMENTS AND ALTERATIONS TO PREMISES

**Section 11.1.**       **Tenant's Improvements.** Tenant agrees to make, at Tenant's expense, those improvements to the Premises specified in Article 1, Section 1.11. Tenant's improvements shall be completed by the time specified in Article 1, Section 1.11. Tenant shall submit to Landlord for approval, within 15 days from the date of this Lease, plans and specifications covering Tenant's work prepared by a licensed architect or engineer, at Tenant's expense, which plans shall be in strict conformity with the design criteria established by Landlord for the Shopping Center, from time to time, which design criteria is incorporated into this Lease as if it were a part hereof. Tenant's plans and specifications shall include detailed specifications of the work to be performed in the Premises, clearly outlining the store front in detail, including types of materials and colors, including samples thereof, and all remodeling work to the interior of the Premises. Landlord shall promptly notify Tenant of any objections to the plans, and Tenant shall make such necessary revisions and resubmit the same to the Landlord within ten days after notice. Failure to submit or resubmit plans shall be deemed a default under this Lease. There shall be no deviations from or changes in the plans without the prior written consent of Landlord. Tenant shall be responsible for obtaining approval of appropriate governmental agencies and Tenant shall obtain all permits and pay all fees necessary to complete Tenant's work on the Premises. Tenant shall enter into construction contracts for Tenant's work with licensed bondable general contractors or contractor. Promptly after receipt of all approvals and permits, Tenant shall cause said contractors to commence Tenant's work and prosecute the same diligently to completion in a good and workmanlike manner, all in strict conformance with approved plans and in compliance with all federal, state and local laws, ordinances, rules, regulations, and permits relating thereto. Tenant's improvements shall be done in a manner which does not interfere with other Tenants of the Shopping Center, and in accordance with applicable laws, regulations, ordinances and requirements of governmental authorities and board of fire underwriters having jurisdiction. Tenant shall obtain the insurance required by Section 12.2 in connection with any improvements made by Tenant or on Tenant's behalf to the Premises. Any work on the Premises, except the items specifically delineated in Section 11.2 as Landlord's work, shall be Tenant's work and be performed by Tenant at its own cost and

expense. Any equipment or work, other than those items specifically described as Landlord's work in said Section 11.2, which Landlord installs or constructs in Premises at Tenant's request or on Tenant's behalf, shall be paid for by Tenant within fifteen days after receipt of a bill therefor, at cost plus fifteen percent for overhead and supervision.

**Section 11.2.**    **Landlord's Improvements**.  Landlord agrees, at its expense, to make those improvements, if any, specified in Article 1, Section 1.13.  Other than any such improvements, Landlord shall have no obligation to make any improvements or modifications to the Premises or for the benefit of the Premises.

**Section 11.3.**    **Alterations and Improvements**.  Without first obtaining Landlord's written approval and consent Tenant shall not make, cause to be made, or contract for any alterations, additions, or improvements to the Premises, or to install therein any trade fixture, exterior sign, floor covering, interior or exterior lighting, plumbing fixtures, heating and air conditioning equipment, shades or awnings, or make any changes to the store front, or other structural changes or additions to the Premises or mechanical systems serving the Premises. At the time Tenant requests Landlord's consent for any such improvement, alteration, or addition, Tenant shall deliver to Landlord Tenant's drawings and specifications for the proposed work, together with all other documentation required by Landlord's then current design criteria.  All work undertaken must be in accordance with Landlord's design criteria in effect at the time the improvement or modification is made.

Notwithstanding anything to the contrary in this Lease, without first obtaining Landlord's prior written consent or approval, Tenant may make interior, nonstructural and non-roof-related alterations, provided (a) such alterations neither require any structural alteration nor impose any greater load on any structural portion of the Premises or the Shopping Center; (b) such alterations are in accordance with Tenant's originally approved plans and are in conformance with Landlord's most current design criteria; (c) the cost of such alteration shall not exceed $10,000 per Lease Year; (d) Tenant provides Landlord at least ten (10) days prior written notice of its intention to commence the alteration; (e) such alteration shall be undertaken in full conformity of other provisions of this Lease (excluding the need for Landlord's consent); and (f) Tenant shall indemnify and hold Landlord harmless from and against all claims, actions, liability, damage and expense (including reasonable attorney's fees) arising out of or in any way related to any such work by Tenant, its agent, employees or contractors.

**Section 11.4.**    **Security for Tenant's Work**.  At Landlord's request, Tenant shall, prior to the commencement of any work or improvements on the Premises, obtain or cause its contractor to obtain payment and performance bonds covering the faithful performance of any contract for the construction of improvements on the Premises and the acquisition of equipment to be installed in the Premises, and the payment of all obligations arising thereunder.  Such bonds shall be for the mutual benefit of both Landlord and Tenant and shall be issued in the names of both Landlord and Tenant as obligees and beneficiaries. Tenant shall submit evidence satisfactory to Landlord that such bonds have been issued. So long as Tenant is not in default under this Lease, the covenants of Section 11.4 shall be inoperative.

**Section 11.5.**      **Mechanic's Lien.** Tenant shall do all things reasonably necessary to prevent the filing of any mechanic's or other liens or encumbrances against the Shopping Center, or any part thereof, or upon any interest of Landlord or any mortgagee in any part of the Shopping Center, by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone in possession of the Premises or any part thereof through Tenant. Tenant agrees to promptly pay all sums of money in respect of any labor, services, materials, supplies, or equipment furnished or alleged to have been furnished to Tenant in, at or about the Premises or furnished to Tenant's agents, employees, contractors or subcontractors, which may be secured by any mechanic's, materialmen, supplier's, or other type of lien against the Premises, or any interest therein. In the event of the receipt of any notice of intention to claim such a lien, a demand for payment, or a mechanic's lien statement, Tenant shall immediately notify Landlord thereof, and shall either: (a) cause the same to be discharged of record with twenty (20) days thereafter; or (b) if in good faith Tenant determines that such lien should be contested, Tenant shall furnish such security as may be necessary and required to (i) prevent any foreclosure proceeding against the Shopping Center, or any portion thereof during the pendency of the contest, and (ii) cause the title insurance company or companies insuring Landlord's or Landlord's mortgagees' interest in the Shopping Center, to remove such lien as a matter affecting title of the entire Shopping Center. Failure of Tenant to discharge the lien in the manner required hereunder shall constitute a default under this Lease and, in addition to any other remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same of record by paying the amount claimed to be due, and the amount so paid by Landlord and all costs and expenses incurred by Landlord therewith, including reasonable attorney's fees, shall be due and payable by Tenant to Landlord.

**Section 11.6.**      **Ownership of Improvements and Fixtures.**   All alterations, installations, additions and improvements made upon or for the benefit of the Premises by either party shall, unless Landlord otherwise elects (by giving notice thereof to Tenant not less than thirty days prior to the expiration or other termination of this Lease), become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the expiration or sooner termination of this Lease. Movable furniture, trade fixtures and other personal property not affixed to the Premises which is acquired by Tenant at its expense shall remain its property and may be removed at any time, provided Tenant promptly repairs any damage caused by such removal.

**Section 11.7.**      **Signs - Displays.** Tenant will not place or suffer to be placed or maintained anywhere in the Shopping Center or on any exterior door, wall or window of the Premises any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place or maintain any decoration, lettering or advertising matter on the glass of any window or door of the Premises without first obtaining Landlord's written approval and consent. Prior to the Commencement Date Tenant shall, at its expense, install all signs required by and in compliance with Landlord's design criteria. Signs shall be harmonious to the general exterior architectural treatment of the buildings in the Shopping Center and must comply with the design criteria specified by Landlord. Tenant further agrees to maintain such sign, awning, canopy, decoration, lettering, advertising matter or other thing as may be approved in good condition and repair at all times.   Tenant shall install and maintain at all times displays of merchandise in the display windows (if any) on the Premises. Displays shall be harmonious with the requirements of a first-class shopping

center, and be in accordance with reasonable standards which may be adopted by Landlord from time to time for tenants of the Shopping Center. Tenant shall keep the display windows (if any) and signs in the Premises well lighted at all times when the Shopping Center is open to the public.

Tenant may install displays and signs within the Premises, including without limitation ear piercing signs, as are customarily found in other stores operated by Tenant under the same trade name permitted hereunder, so long as such signs generally conform with Landlord's sign criteria.

**Section 11.8.**      **Access to Roof.** Landlord shall have the exclusive right to use any and all or part of the roof of the Premises and the roof of the Shopping Center and any additions thereto. Neither Tenant, Tenant's agents, employees, or independent contractors, shall be permitted to go upon, use, alter, or work in any way upon any part of the roof of the Shopping Center without the express written consent of Landlord. Tenant shall be fully responsible to Landlord for any damages to the roof occasioned by the acts of its agents, employees, or independent contractors resulting from their use of the roof of the Shopping Center.

**Section 11.9.**      **Adjacent Excavation.** If any excavation or other building alteration or construction shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, or construction, license to enter upon the Premises for the purpose of doing such work as Landlord shall deem necessary to preserve the wall or the building of which the Premises form a part from injury or damage and to support the same by proper foundations, without any claim for damages or indemnification against Landlord or diminution or abatement of rent.

## ARTICLE 12.  INSURANCE AND INDEMNITY

**Section 12.1.**      **Insurance.** Tenant agrees to pay to Landlord as additional rent its share of premiums incurred by Landlord for property (fire and special extended coverage), rental value, and other insurance on the buildings and improvements comprising the Shopping Center with all their endorsements, which are payable for each calendar year with respect to the buildings and improvements comprising the Shopping Center, exclusive of insurance allocable to exterior or interior Common Areas which are charged by Landlord as a Common Area Cost. Tenant's share shall be determined by multiplying the total of such insurance premiums payable for any calendar year, less any reimbursement for such insurance made to Landlord by Major Stores, as defined in Section 7.5., times a fraction, the numerator of which is the floor area of the Premises, and the denominator of which is the total average leased floor area of the entire Shopping Center, for the applicable period, exclusive of the floor area of the Major Stores, but in no event less than eighty percent (80%) of the gross leaseable area of the Shopping Center, exclusive of the floor area of the Major Stores.

Commencing on the Commencement Date and thereafter during the term of this Lease, Tenant shall pay to Landlord, as additional rent, Tenant's share of insurance premiums on the first day of each month during the term of this Lease in an amount equal to one-twelfth (1/12) of the annual insurance premiums reasonably estimated by Landlord to be Tenant's

portion due or to become owing for each calendar year during this Lease. Following the end of each calendar year, Landlord shall notify Tenant relative to any additional amount owing, over and above the amounts paid by Tenant, and Tenant shall pay such additional amount to Landlord within twenty days thereafter. In the event Tenant's monthly insurance payments exceed Tenant's share of Landlord's insurance, such excess shall be credited against Tenant's future obligations under this Lease. The insurance bill, submitted by the Landlord's insurance carrier, shall be conclusive evidence of the amount of premiums required to be paid. For the years in which this Lease commences and terminates, Tenant's liability for its share of the insurance for such year shall be subject to a pro rata adjustment based on the number of days in said calendar year during which this Lease is in effect.

Tenant also agrees that it will not keep, use, sell, or offer for sale in or upon the Premises any article which may be prohibited by the standard form of fire insurance policy. Tenant agrees to pay to Landlord on demand any increase in insurance premiums over and above the premium charged for the standard form of fire insurance policy which is attributable to the type of merchandise sold by Tenant, or from its activities carried on in the Premises whether or not the Landlord has consented to the same.

**Section 12.2.**     **Construction Insurance.**     At all times during the making of any improvements or other construction on the Premises by Tenant, or on Tenant's behalf, Tenant shall have and maintain in full force builder's risk insurance (completed value form, if available) and Workers Compensation insurance to the extent required by law. Prior to the commencement of any such work, Tenant shall provide Landlord a certificate of such insurance evidencing compliance with this Section 12.2.

**Section 12.3.**     **Tenant's Liability Insurance.**     Tenant shall, during the entire period of its occupancy of the Premises, including the entire term of this Lease and any occupancy of Tenant prior to the Commencement Date, procure and keep in full force and effect, at its own cost, a policy of public liability insurance and property damage insurance with respect to the Premises and the business operated by Tenant and any of its subtenants, with a combined single limit of no less than $1,000,000.00, including independent contractor's coverage. The insurance policy shall name Landlord, and any person, firms or corporations, if any, designated by Landlord, as a named insured, and shall contain a clause that the insurer will not cancel or change the insurance without first giving the Landlord at least thirty days prior written notice.     In addition, Tenant shall pay when due to the state worker's compensation fund all amounts required by law to be paid by Tenant, and in the event state law requires the procurement of worker's compensation insurance or similar insurance, Tenant shall keep in full force and effect a policy affording full statutory coverage at the statutory limits. All insurance shall be in a responsible company qualified to do business in North Dakota and reasonably approved by Landlord, and a certificate of insurance shall be delivered to Landlord. Not more frequently than once each three years if, in the good faith opinion of Landlord's lender or Landlord's insurance agent, the amount of public liability and property damage insurance required hereunder is not adequate, Tenant shall increase its insurance coverage to the amount reasonably requested or required by either Landlord's lender or Landlord's insurance agent.

Notwithstanding anything contained in this Lease to the contrary, and so long as Claire's Boutiques, Inc. is Tenant under this Lease and maintains a net worth of at least Twenty

Million Dollars ($20,000,000), Tenant may, in lieu of carrying fire and extended coverage insurance, boiler and machinery insurance and plate glass insurance, self-insure said items. Tenant expressly waives all right of recovery against Landlord, its partners, officers, agents, contractors, affiliates, employees and the like for damage otherwise coverable by the insurances required of Tenant hereunder. If Tenant elects to self-insure, any reference in this Lease to obligations imposed on Tenant's insurance company shall apply to Tenant.

**Section 12.4.**     **Tenant's Property Insurance.**  Tenant agrees that during the entire term of this Lease and the entire period of its occupancy of the Premises, it will procure and keep in full force and effect, at its own cost, fire and extended coverage insurance, including vandalism and malicious mischief and sprinkler leakage, to cover all of Tenant's leasehold improvements, stock in trade, fixtures, furniture, furnishings, equipment, signs, and all other property which Tenant is obligated to repair, rebuild or replace under Section 13.4 following any damage to or destruction of the Premises, which are located in, on, or about the Premises to the extent of at least equal to their full replacement cost.  Tenant shall provide Landlord with certificates of such insurance evidencing such coverage is in full force and effect throughout the term of this Lease.   Tenant may insure its heating, ventilating and air conditioning system for mechanical failures.

**Section 12.5.**     **Indemnification.**  Tenant covenants and agrees to indemnify, defend and save Landlord harmless from and against any and all injury, loss, claims, actions, damages, liability, costs and expense including reasonable attorney's fees resulting from loss of life, personal or bodily injury, damage to property, or litigation arising from or out of any occurrence in, upon or at the Premises or the occupancy or use by Tenant of the Premises, or occasioned anywhere, wholly or in part, by any act, neglect, or omission of Tenant, its agents, contractors, employees, servants, lessees or concessionaires.   Tenant shall be obligated to indemnify Landlord under this Section 12.5 even if Landlord's negligence contributes to the loss, unless Landlord's negligence is greater than the combined negligence of Tenant and Tenant's sublessees, and that of their respective contractors, agents and employees. All of Tenant's public liability and property insurance policies shall contain a contractual liability endorsement insuring the performance by Tenant of the indemnity agreement set forth in this Section 12.5 as to liability for injury to or death of persons and injury or damage to property.

**Section 12.6.**     **Mutual Waiver of Subrogation.**  Landlord and Tenant each hereby release and waive any and all rights of recovery from each other and their respective officers, employees, agents and representatives for loss of or damages to their respective property or the property of others under their respective control, arising from any cause insured under any policy of fire and extended coverage insurance carried by such party to the extent such loss or damage is recoverable under such policy (an "Insured Loss") and without regard to the negligence of the other party that may have contributed to the loss or damage.  Tenant further agrees to release all other occupants of the Shopping Center under lease or operating agreement with Landlord, their officers, employees, agents and representatives from any and all rights of recovery from such other parties for loss of or damages to Tenant's property or the property of others under Tenant's control, arising from any Insured Loss, under any policy of insurance carried by Tenant, provided that such party has a similar waiver in its lease.  Under no circumstances shall Landlord be obligated to obtain similar provisions in agreements with other occupants of the Shopping Center or incur any liability for the failure

to procure or insure that other stores have similar provisions in their leases or operating agreements with Landlord.

**Section 12.7.**     **Waiver of Claims Against Landlord.**     Landlord, its agents and employees shall not be liable for, and Tenant waives all of claims for, loss or damage to Tenant's business (including, without limitation, loss of sales or other revenue and additional labor and expense) or damage to person or property sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence directly or primarily in or upon the Premises or the building of which it is a part, or any other area of the Shopping Center, including, but not limited to, claims for damage resulting from fire; any equipment, machinery or appurtenances becoming out of repair; injury done or occasioned by wind; any defect in or failure of plumbing, heating, ventilating or air conditioning equipment, electric wiring or installation thereof, gas, water, and steam pipes, stairs, porches, railings or walks; broken glass; the backing up, overflowing or leaking of any sewer pipe or downspout; the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about such building or the Premises; the escape of steam or hot water; water, snow or ice being upon or coming through the roof, skylight, trapdoor, stairs, doorways, show windows, walks or any other place upon or near such building or the Premises or otherwise; the falling of any fixture, plaster, tile or stucco; and any act, omission or negligence of other tenants, licensees or of any other persons in or occupants of said building or of adjoining or contiguous buildings or of owners or occupants of adjacent or contiguous property of the Shopping Center. To the extent Tenant desires to be compensated for such claims, Tenant shall obtain insurance to cover losses to its property and business. This waiver shall not apply to any such loss resulting from Landlord's failure to make a reasonable effort to repair a defect Landlord is obligated to repair under this Lease, within a reasonable time after Landlord receives written notice from Tenant specifying the existence of the defect. Tenant shall give prompt notice to Landlord or its agent in case of fire, accident, casualty, or other untoward incident in the Premises or in the building of which the Premises are a part, and of any defects therein or in any fixtures or equipment.

## ARTICLE 13. DAMAGE AND DESTRUCTION

**Section 13.1.**     **Landlord's Obligation.** If the Premises is partially or totally destroyed or damaged by fire or other insured casualty so as to become partially or totally untenantable, Landlord shall  repair and rebuild the same as required by Section 13.3, except that Landlord shall have no obligation to repair and rebuild if: i) Landlord is unable to obtain all necessary permits and approvals therefor, including, without limitation, permits and approvals required from any agency or body administering environmental laws, rules or regulations; ii) Landlord terminates this Lease as authorized by Section 13.2); or iii) Tenant is in default under this Lease.

**Section 13.2.**     **Option to Terminate.** If (a) the Shopping Center, or the Premises, or the building in which the Premises are located, shall be destroyed or damaged by fire or other insured casualty to the extent of 25% or more of the cost of replacement thereof under the coverage of Landlord's insurance (notwithstanding that the Premises may be unaffected by such fire or other occurrence), or (b) if the Premises shall be partially or totally destroyed during the last three years of the term of this Lease, or (c) if the Shopping Center, the Premises or the building of which it is a part shall be partially or totally destroyed by a cause

01lease.4.wpd                              - 25 -

or casualty other than one covered by Landlord's insurance, or (d) if Landlord's mortgagee shall require that the insurance proceeds be applied against the principal balance of Landlord's mortgage, then in such event, Landlord, may, if it so elects, rebuild the Premises, or it may give notice terminating this Lease as of a date not later than sixty (60) days after such damage or destruction. If Landlord elects to restore, repair or rebuild the Premises, Landlord shall, within sixty days after such damage or destruction, give Tenant notice of its intention to restore, repair or rebuild the Premises and then shall proceed with reasonable speed to make the repairs to or to rebuild the Premises. Unless Landlord elects to terminate this Lease, this Lease shall remain in full force and effect, provided, however, that Tenant shall have the right to terminate this Lease, upon not less than sixty days written notice to Landlord, if Landlord shall not have commenced to restore/rebuild within nine months after the fire or other casualty or if Landlord shall not have restored, repaired or rebuilt the Premises suitable for Tenant's use and occupancy within two years after the fire or other casualty (excluding time lost because of strikes, material shortages, Acts of God, or other causes beyond Landlord's control.)

**Section 13.3.** **Landlord's Reconstruction.** If Landlord shall elect or be obligated to repair or rebuild the Premises because of any damage or destruction, Landlord shall reconstruct the shell of the Premises to substantially the condition as it existed prior to the damage or destruction, provided that Landlord shall not be required to make any repairs to the extent such repairs are not fully covered by the insurance proceeds attributable to the Premises actually received by Landlord under insurance policies carried by Landlord pursuant to the provisions of Section 12.1, and subject to Tenant's obligation under Section 13.4. For the purposes of this provision, the shell of the Premises shall include the structural framing material, roof, unfinished concrete floor slab, side walls and a rear wall with exposed masonry or exposed studs extending from the floor slab to roof deck. Landlord shall make sanitary sewer, storm sewer, water and electrical service available to the Premises to the extent provided prior to the damage or destruction. All work to be performed by Landlord shall be done in such manner that upon completion thereof, that portion of the Premises repaired or rebuilt shall contain substantially the same amount of floor area as immediately prior to the damage or destruction. Tenant agrees to cooperate and assist Landlord in the restoration and reconstruction of the Premises.

**Section 13.4.** **Tenant's Reconstruction.** If Landlord does not elect to terminate this Lease as provided in Section 13.2, Tenant shall, at its own cost and expense promptly and diligently commence to fully repair, replace and restore those portions of the Premises Landlord is not required to repair under Section 13.3, including, but without limitation, all walls, partitions, doors, floor coverings, painting and decorating, store front, plumbing and electrical systems and fixtures, telephone, heating, ventilating and cooling facilities, signs and other leasehold improvements (whether or not constructed by tenant), trade fixtures, furnishings, equipment, merchandise, signs and other personal property to a condition equal to, or better than, that existing prior to its damage or destruction. All construction shall be in accordance with plans and specifications approved by Landlord which satisfy Landlord's then current design criteria.

**Section 13.5.** **Insurance Proceeds.** All proceeds payable from Landlord's insurance policies with respect to the Premises shall belong to and shall be payable to Landlord. If Landlord does not elect to terminate this Lease, as provided in Section 13.2, Landlord shall,

subject to the rights of Landlord's mortgagee, disburse and apply so much of any insurance recovery as shall be necessary to pay and reimburse Landlord for the costs incurred by Landlord with respect to Landlord's restoration work referred to in Section 13.3.

**Section 13.6.**     **Tenant's Obligations - Rent Adjustment.** Should the Premises be rendered totally or partially untenantable as a result of any fire or other insured casualty, a just and proportionate part of the fixed minimum rent, but not of percentage and additional rents, shall be abated until the earlier of: i) sixty (60) days after completion by Landlord of the restoration work Landlord is required to perform under Section 13.3, or ii) Tenant's reopening of the Premises for normal business following such fire or other casualty, or iii) the date the Premises would have been open for normal business had Tenant promptly and diligently proceeded to complete its reconstruction under Section 13.4; or iv) in the event Landlord terminates this Lease, until the date of termination.  If fixed minimum rent is abated, percentage rent shall be computed upon the basis of the fixed minimum rent as abated.   Tenant shall continue the operation of its business to the extent reasonably practicable from the standpoint of good business during any period of reconstruction or repair of the Premises.  In no event shall Landlord be liable for interruption to the business of Tenant or for damage to or repair, reconstruction or restoration of any items belonging to Tenant or within the Premises.

## ARTICLE 14.  REPAIRS AND  MAINTENANCE

**Section 14.1.**     **Landlord's Obligation.**  Landlord shall, within a reasonable period after receipt of written notice from Tenant, make or cause to be made necessary structural repairs to the exterior foundations and exterior walls of the Premises (but excluding the exterior of, and the frames surrounding all windows, doors, plate glass, storefronts and signs) and shall keep or cause to be kept in good order, condition and repair the exterior walls, foundations and roofs of the buildings constituting the Shopping Center, and utility lines not exclusively serving the Premises except for reasonable wear and tear.

**Section 14.2.**     **Tenant's Obligation.**  Tenant shall, at its expense, keep, replace and maintain the Premises (including maintenance of storefronts, exterior entrances and signs, all glass, and show window moldings) and all partitions, doors, store fronts, fixtures, equipment and appurtenances thereof (including lighting, heating and plumbing fixtures, escalators, elevators, interior walls, interior surfaces of exterior walls, and any air handling equipment or air conditioning system) in clean, neat and good order, condition and repair (including reasonably periodic painting and decorating), damage by unavoidable casualty excepted, If Landlord is required to make repairs to said structural portions by reason of Tenant's, its agents' or employees' acts or omission to act, or if Tenant refuses or neglects to repair, maintain or replace property as required hereunder to the reasonable satisfaction of Landlord after ten days written notice, then Landlord may make such repairs or modifications without liability to Tenant for any loss or damage that may accrue to Tenant's merchandise, fixtures, or other property or to Tenant's business by reason thereof, and upon completion thereof and presentation of bill therefor, Tenant shall pay Landlord, as additional rent, at the time the next fixed minimum rent payment is due, the Landlord's cost and expense for making such repairs, plus 15% for overhead and  supervision.  Landlord and Landlord's

agents shall be entitled at any reasonable time to enter, inspect and examine the Premises for the purpose of verifying Tenant's compliance with this Section 14.2.

**Section 14.3.**        **Plate Glass.** Tenant agrees to replace all plate glass and all other glass, if and when broken on said Premises. However, Tenant shall not be liable for plate glass if destroyed through negligence of the Landlord or its agents or servants and the Tenant shall have the right of insuring the plate glass if it so desires.

**Section 14.4.**        **Renovation.** Intentionally omitted.

### ARTICLE 15.  CONDEMNATION

**Section 15.1.**        **Continuation of Lease.** If title to the whole of the Premises shall be conveyed or condemned by right of eminent domain for any public or quasi-public use, then this Lease shall cease and terminate as of the date that possession is taken by the condemning authority. If less than all of the area of the Premises shall be so taken under eminent domain, the term of this Lease shall cease only with respect to the part so taken or conveyed, as of the day possession shall be taken by such authority; provided, however, that if the area taken amounts to more than 25% of the floor area of the Premises, either party shall have the right to terminate this Lease upon notice in writing within 30 days after such taking of possession. If more than 50% of the floor area of the building in which the Premises are located shall be so condemned or conveyed, whether or not any portion of the Premises shall be taken or conveyed, or if more than 25% of the total floor area in the Shopping Center shall be so condemned or conveyed, or if so much of the parking areas and Common Area facilities shall be so taken or conveyed that a reasonable number of parking spaces and sufficient other Common Area facilities, necessary, in Landlord's judgment, for the continued effective operation of the Shopping Center shall not be available for use by tenants and patrons of the Shopping Center, or if required by Landlord's mortgagee, or if Landlord's mortgage requires the condemnation award to be applied to Landlord's loan, then, in any such event, Landlord may, by notice in writing to Tenant delivered on or before the day of surrendering possession to the condemning authority, terminate this Lease, and rent and all other charges shall be paid or refunded as of the date of termination. Tenant shall have no claim against Landlord for the bonus value of any unexpired portion of the term of this Lease.

**Section 15.2.**        **Rental Obligation after Taking.** In the event this lease should terminate by reason of any taking or conveyance as aforesaid of the Premises, the building of which it is a part, the Shopping Center, the parking areas and Common Area facilities, or any portion thereof, Tenant shall pay rent to the day when possession shall be taken by such authority, with an appropriate refund by Landlord of such rent and all other charges as may have been paid in advance for a period subsequent to such date. If this Lease shall continue in effect as to any portion of the Premises not so taken or conveyed, the fixed minimum rent (but not the percentage rent) shall be reduced to a fair and equitable amount based on the floor area of the Premises remaining after such taking (or conveyance) as compared to the floor area in the Premises prior to such taking, and all additional rents shall thereafter be computed on the basis of such remaining floor area. The computation of percentage rent shall be based upon the revised fixed minimum rent as hereby reduced.

**Section 15.3.**          **Restoration.** If this Lease shall continue, Landlord shall, subject to the limitations set forth below, make all necessary repairs or alterations so as to constitute the portion of the remaining building a complete architectural unit, and the remaining Premises a complete merchandising unit. Landlord shall also restore or replace the parking areas and other common facilities as nearly as practicable to the area and condition they were in prior to any such taking. There shall be no abatement of rent during such repairs and restoration except to the extent otherwise provided above. Landlord's obligation under this Section 15.3 shall be limited to an equitable portion of the condemnation award paid to Landlord and not applied by Landlord's mortgagee to the reduction of debt.

**Section 15.4.**          **Right to Award.** All compensation awarded or paid for any taking or conveyance, as aforesaid, whether for the whole or a part of the Premises or otherwise, shall be the property of Landlord, whether such compensation shall be awarded as compensation for diminution in the value of the leasehold or of the fee, and Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to any and all such compensation. Tenant shall have the right to claim and recover from the condemning authority, but not from Landlord, (except to the extent that any compensatory items of Tenant's damages are specifically included in Landlord's condemnation award), such compensation as may be separately awarded or recoverable by Tenant in Tenant's own right on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in repairing, restoring or removing Tenant's merchandise, furniture, and trade fixtures, as well as for the unamortized cost (amortized on a straight line basis over the term of this Lease) of Tenant's leasehold improvements to the extent Landlord has not contributed to the cost thereof.

**Section 15.5.**          **Condemnation of Less than a Fee.** In the event of a condemnation of a leasehold interest in all or a portion of the Premises without the condemnation of the fee simple title also, this Lease shall not terminate and such condemnation shall not excuse Tenant from full performance of all of its covenants hereunder, but Tenant in such event shall be entitled to present or pursue against the condemning authority its claim and to receive all compensation or damages sustained by it by reason of such condemnation, and Landlord's right to recover compensation or damages shall be limited to compensation for and damages, if any, to its reversionary interest; it being understood, however, that during such time as Tenant shall be out of possession of the Premises by reason of such condemnation, this Lease shall not be subject to forfeiture for failure to observe and perform those covenants not calling for the payment of money. In the event the condemning authority shall fail to keep the Premises in the state of repair required hereunder, or to perform any other covenant not calling for the payment of money, Tenant shall have ninety days after the restoration of possession to it within which to carry out its obligations under such covenant or covenants. During such time as Tenant shall be out of possession of the Premises by reason of such leasehold condemnation, Tenant shall pay to Landlord, in lieu of the minimum and percentage rents provided for hereunder, and in addition to any other payments required of Tenant hereunder, an annual rent equal to the average annual minimum and percentage rents paid by Tenant for the period from the commencement of the term until the condemning authority shall take possession, or during the preceding three full calendar years, whichever period is shorter. At any time after such condemnation proceedings are commenced, Tenant agrees, upon request of Landlord, to assign to Landlord all compensation and damages payable by the condemnor to Tenant, to be held without liability for interest thereon as

security for the full performance of Tenant's covenants hereunder, such compensation and damages received pursuant to said assignment to be applied first to the payment of rents and all other sums from time to time payable by Tenant pursuant to the terms of this Lease as such sums fall due, and the remainder, if any, to be payable to Tenant at the end of the term hereof or on restoration of possession to Tenant, whichever shall first occur, it being understood and agreed that such assignment shall not relieve Tenant of any of its obligations under this Lease with respect to such rents and other sums except as the same shall be actually received by Landlord.

## ARTICLE 16. HAZARDOUS MATERIALS

**Section 16.1.**        **Hazardous Materials.** Tenant covenants and agrees that Tenant shall at all times from and after delivery of possession of the Premises to Tenant, be responsible and liable for, and be in complete and strict compliance with, all "Governmental" laws, ordinances, rules and regulations relating to "Environmental Protection", "Environmental Matters" and "Industrial Hygiene" (as such terms are hereinafter defined) arising, directly or indirectly, out of the use of "Hazardous Materials" in, on, under or about the Premises or the Shopping Center by Tenant, its agents, servants, employees, licensees, contractors, subtenants and concessionaires. The term "Governmental" as used herein shall include, without limitation, federal, state, and local governments, and political subdivisions and regulatory agencies of federal, state, and local governments.    The term "Hazardous Materials" as used herein shall include, without limitation, whether now or subsequently listed in any Governmental listing or publication defining hazardous materials, substances defined as: 'hazardous substances', 'hazardous materials', or 'toxic substances' in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq.; and any subsequent amendments thereto, or replacement statutes thereof and ordinances, rules and regulations adopted and publications promulgated pursuant to said laws.    The terms "Environmental Protection", "Environmental Matters" and "Industrial Hygiene" as used herein shall include, without limitation, any matter which affects the environment or which may affect the environment, the use of sophisticated electrical and/or mechanical equipment, chemical, electrical, radiological or nuclear processes, radiation, sonar and sound equipment, use of lasers, and laboratory analysis and materials. Tenant shall be deemed to be (1) the person in control, (2) an operator of the Premises and (3) the person in charge with respect to the Premises for purposes of reporting requirements under the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended. Tenant agrees (i) that should it or its agents, servants, employees, licensees, contractors, subtenants or concessionaires know of the release or threatened release of any Hazardous Materials, in, on, under or about the Premises, including, without limitation, the release or threatened release of any Hazardous Materials in connection with Tenant's work, or in connection with any alterations, replacements, installations, improvements and/or additions made by Tenant to the Premises or any part thereof during the term of this Lease, that they will promptly notify Landlord of such release or threatened release, and (ii) that it will provide all warnings of exposure to Hazardous Materials in, on, under or about the Premises, as required by law, including, but not limited to, all laws hereinabove referred to in this Section 16.1, as the same may be amended from time to time,

all ordinances, rules and regulations adopted and publications promulgated thereunder, and all future laws or case decisions to the same effect.

**Section 16.2.**    **Compliance with Laws.**    Tenant further covenants and agrees, at its sole cost and expense, to procure, maintain in effect, and comply with all conditions of any and all permits, licenses, and approvals issued by governmental agencies for Tenant's use of Hazardous Materials in, on, under or about the Premises. Tenant shall prior to any use of the Premises affecting Environmental Protection, Environmental Matters and Industrial Hygiene or involving the use of Hazardous Materials, in, on, under or about the Premises, notify Landlord in writing of the intended use of such Hazardous Materials and promptly provide Landlord evidence of compliance with all Governmental laws, ordinances, rules and regulations pertaining to such use. Tenant shall in all respects handle, treat, deal with and manage any and all Hazardous Materials in, on, under or about the Premises in strict conformity with all applicable Governmental laws, ordinances, rules and regulations relating to Hazardous Materials, Environmental Protection and Industrial Hygiene.

**Section 16.3.**    **Environmental Audit and Removal.**    Landlord shall have the right, upon written notice to Tenant ("Landlord's Notice"), at any time and from time to time during the term of this Lease, including, without limitation, (i) prior to the expiration or earlier termination of the term of this Lease, or (ii) in conjunction with a proposed assignment of this Lease or a proposed sublease of all or a part of the Premises requested by Tenant pursuant to the provisions of this Lease (in which event, Tenant's satisfaction of its obligations under this Section 16.3 shall be a condition precedent to Landlord's consent to any such proposed assignment or sublease), to require Tenant, at its sole cost and expense, to cause an environmental audit and survey (the "Survey") to be made of the Premises, not later than thirty (30) days following Landlord's Notice, by an environmental consulting firm (the "Consulting Firm") approved and/or designated by Landlord to determine whether the Premises contains any Hazardous Materials. Tenant shall, upon completion of such Survey, promptly furnish to Landlord a copy of such Survey prepared by the Consulting Firm. In the event said Survey shall disclose the presence of Hazardous Materials in, on, under or about the Premises, and if Landlord determines, based upon the original approved plans for Tenant's Work, or on the basis of any subsequent plans and specifications submitted to Landlord pursuant to the terms of this Lease, or on the basis of other information and data available to Landlord, that the existence of said Hazardous Materials arose out of or is in any way connected with the construction, use, manufacture, storage, sale, release or disposal of Hazardous Materials or products containing Hazardous Materials by Tenant, its agents, servants, employees, licensees, contractors, subtenants or concessionaires during the period of Tenant's occupancy of the Premises (the "Tenant Installed Hazardous Materials"), (i) Tenant shall, at its sole cost and expense, cause all of said Tenant Installed Hazardous Materials to be removed from in, on, under or about the Premises and transported from the Shopping Center for use, storage or disposal in compliance with all applicable laws by a hazardous materials abatement contractor (the "Abatement Contractor") licensed in the state in which the Shopping Center is located and approved by Landlord. In the event such removal and disposal of the Tenant Installed Hazardous Materials is performed by Tenant after the expiration or earlier termination of the term of this Lease, Tenant shall be deemed to be occupying the Premises as a licensee at a monthly charge in an amount equal to average rent for the last twelve months of the term of this Lease, which sum shall be charged to Tenant by Landlord until the date Landlord receives certification from the Abatement

Contractor that all Tenant Installed Hazardous Materials have been removed from in, on, under or about the Premises and transported from the Shopping Center for use, storage or disposal, or (ii) Landlord may, at its sole option upon written notice to Tenant, cause all of said Tenant Installed Hazardous Materials to be removed from in, on, under or about the Premises and transported from the Shopping Center for use, storage or disposal, in compliance with all applicable laws, by a hazardous materials abatement contractor selected by Landlord, in which event, the costs and expenses of such removal and disposal, as reasonably estimated by Landlord, shall be paid to Landlord by Tenant, as additional rent, within ten (10) days after receipt of an invoice therefor. In the event Tenant fails to timely perform its obligations under this Section 16.3, Landlord shall have the right (but shall not be obligated) to perform Tenant's obligations under this Section 16.3, in which event, Tenant shall pay to Landlord, as additional rent, promptly, upon demand, the costs and expenses thereof; provided, however, in the event Landlord performs Tenant's obligations hereunder after the expiration or earlier termination of the term of this Lease, Tenant shall pay to Landlord, in addition to the foregoing costs and expenses, a monthly charge in an amount equal to the monthly charge determined pursuant to the provisions of this Section 16.3 from the date of expiration or earlier termination of the term of this Lease until the date Landlord has completed Tenant's obligations under this Section 16.3. Landlord and Tenant agree that the foregoing monthly charge represents a reasonable estimate of the financial losses suffered by Landlord by Tenant's failure to timely perform its obligations under this Section 16.3.

**Section 16.4.** **Landlord's Approval.** Tenant shall not take any remedial action in response to the presence of Hazardous Materials in, on, under or about the Premises, nor enter into any settlement agreement, consent decree or other compromise in respect to any Claims [as such term is hereinafter defined in Section 16.5 relating to Hazardous Materials in any way connected with the Premises], without first notifying Landlord of Tenant's intention to do so and affording Landlord ample opportunity to appear, intervene or otherwise appropriately assert Landlord's interest with respect thereto.

**Section 16.5.** **Indemnity.** Without limiting anything contained in this Article 16, Tenant shall indemnify and hold Landlord harmless from and against any and all claims, demands, losses, liabilities, penalties, damages, costs and expenses, including without limitation, attorneys' fees and costs (collectively "Claims"), arising out of or in any way connected with the use, manufacture, storage, sale, release or disposal of Hazardous Materials or products containing Hazardous Materials by Tenant, its agents, servants, employees, licensees, contractors, subtenants or concessionaires in, on, under or about the Premises during the period of its occupancy of the Premises including, without limitation; (i) any Claim by a federal, state or local Governmental agency or a private citizen arising out of or in any way connected with the environmental condition of the Premises; (ii) any Claim by any successor tenant, its agents, servants, employees, licensees, contractors, subtenants or concessionaires, arising out of or in any way connected with the environmental condition of the Premises; and (iii) the cost of any required or necessary repair, cleanup or detoxification and the preparation of any closure or other required plans in connection therewith. The indemnity obligations of Tenant under this Section 16.5 shall survive the expiration or earlier termination of the term of this Lease.

Notwithstanding anything in this Lease to the contrary, Tenant's indemnity and remediation obligations in this Article 16 extend only to Hazardous Materials brought on the Shopping

Center by Tenant or Tenant's agents, servants, employees, licensees, contractors, subtenants, concessionaires or the like.

## ARTICLE 17. DEFAULT AND REMEDIES

**Section 17.1.**         **Events of Default.** Any one or more of the following occurrences shall constitute an event of default under this Lease by Tenant:

(a)     The failure of the Tenant to pay any fixed minimum rental, percentage rental, or additional rental of any kind or nature due hereunder within ten (10) days after the same shall be due;

(b)     The intentional or fraudulent falsification by the Tenant or an agent of the Tenant of any report required to be furnished to the Landlord pursuant to the terms of this Lease, or the repeated or intentional failure to document or record sales made on or from the Premises;

(c)     The bankruptcy or insolvency of the Tenant or any guarantor of this Lease, or the filing of any debtor proceedings, including petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or any portion of Tenant's or any such guarantor's property, or the making or assignment for the benefit of creditors, or the petitioning or entering into an arrangement by the Tenant or any guarantor of this Lease;

(d)     The failure of Tenant to complete Tenant's improvements required under Section 11.1.

(e)     The vacation or abandonment by the Tenant of the Premises for a period of five (5) days, unless caused by Landlord's election to relocate Tenant to an alternate Premises;

(f)     The taking by any party of this Lease by writ of execution or similar process;

(g)     The failure of the Tenant to keep or perform any of the terms, conditions, covenants or agreements of this Lease covenanted and agreed to be observed or performed by Tenant, not otherwise specified as a default or event of default, for more than 30 days after written notice of such default or violation shall have been given to Tenant, provided that if the default be of such a nature that it cannot be reasonably cured within said thirty day period, and Tenant shall in good faith have promptly commenced the curing of such default within such period, then Tenant shall be deemed not in default hereunder if it shall diligently proceed to cure such default within the grace period expressly allowed by Landlord in writing.

**Section 17.2.**         **Remedies for Default.** In the event of the occurrence of an event of default, as defined in Section 17.1, in addition to all other rights and remedies available to Landlord under this Lease or under law, Landlord shall have the following remedies:

**17.2.1.**         At any time following an event of default, Landlord may, at Landlord's option, elect to terminate this Lease by written notice to Tenant specifying Landlord's intention to terminate this Lease, which notice may, but need not be, included in a notice of

01lease.4.wpd                                    - 33 -                        July 10, 2001 (3:46PM)

intention to evict or pleading in an eviction action. Notice of termination shall be served in the manner specified in Section 24.8, or any manner authorized for service of any pleading or notice of intention to evict. Following service of the notice of termination, Tenant shall have the right to reinstate this Lease by paying to Landlord all fixed minimum rent, percentage rent, additional rentals, late charges and all other fees and charges payable under this Lease and curing all other events of default under this Lease, by no later than 11:59 p.m of the fifth business day following either: i) personal delivery of notice of termination to Tenant's manager or assistant manager; ii) service of the notice of termination to Tenant by facsimile, iii) the expiration of one full day after mailing of notice of termination; or iv) such later day as specified by Landlord in the notice of termination.   For the purpose of this provision, a "business day" shall be each Monday through Friday, inclusive, other than any federally recognized banking holiday for New Years, Christmas, Memorial Day, Independence Day, Labor Day or Thanksgiving. Landlord shall be under no obligation to reinstate this Lease if Tenant fails to cure all events of default within the time and in the manner required herein.

Unless Tenant reinstates this Lease in the time and in the manner provided above, termination of this Lease will be effective, without further notice and without the necessity of any legal suit or action, upon the expiration of the period Tenant is allowed to reinstate this Lease. Delivery of Landlord's notice of termination under this provision is intended to satisfy any common law requirements relating to service of notice of default or demand for payment of rents prior to terminating a lease, and no further notice to quit, vacate, demand or legal process shall be necessary to terminate this Lease, whether or not any additional notice may be required by law as a condition to obtaining a judicial order evicting Tenant from the Premises.

Following the effective time of termination, Tenant shall have no further interest in the Premises or in this Lease, or any right to rents or profits generated by Landlord from the Premises and, subject to Landlord's right to recover damages under Subsection 17.3.2, Tenant shall not be liable to Landlord for fixed minimum rent, percentage rent, or additional rents which first accrue after the effective date of termination. Rents and other charges paid to Landlord for the post-termination use or occupancy of all or any portion of the Premises shall not reduce Tenant's obligations to pay all rents and other charges which accrued prior to the effective date of termination. No attempt by Tenant to cure defaults under this Lease following expiration of the time to cure defaults shall be valid. Landlord's acceptance of rent following expiration of the period of curing a default shall not, unless otherwise agreed by Landlord in writing, constitute reinstatement of this Lease, and any post-termination rental payments received or recovered by Landlord shall be applied by Landlord to satisfy Tenant's obligations under this Lease, without affecting the termination of this Lease.

     **17.2.2.**        At any time following an event of default, Landlord, shall, at its option, have the immediate right to re-enter the Premises, with only so much legal process as may be required under the applicable laws, and without terminating the Lease. Should Landlord elect to re-enter, it may take such steps as it deems necessary to secure the Premises and to exclude Tenant and its agents and employees therefrom; make such alterations and repairs as may be necessary in order to relet the Premises; and relet the Premises or any part thereof, on behalf of Tenant, for such term or terms (which may be for a term extending beyond the term of this Lease) and at such rental and upon such other terms and conditions as Landlord,

in its sole discretion, may deem advisable. Notwithstanding re-entry by Landlord, and until termination of this Lease, Tenant's obligations under this Lease shall remain in full force and effect and, unless Landlord has agreed to lease or otherwise convey all or any portion of the Premises, Tenant shall have the right to reinstate this Lease and retake possession of the Premises by curing all events of default and paying all late charges and legal fees due under this Lease. Any rents collected by Landlord following re-entry shall be applied as provided in Section 17.3.3. To the extent that for any month after re-entry, but prior to termination, Landlord receives net rents, as defined below, in excess of Tenant's rental obligation for such month, the excess shall be held by Landlord as security for Tenant's future obligations to Landlord under this Lease, and upon satisfaction of those obligations, shall be applied to the reduction of Tenant's past due obligations to Landlord.

Following re-entry, Landlord shall have no obligation to relet the Premises or otherwise mitigate Tenant's damages. In the event, notwithstanding this provision, any court were to impose on Landlord the obligation to mitigate Tenant's damages subsequent to re-entry, Landlord shall not be required to give preference to releting the Premises over any other vacancies in the Shopping Center, and Landlord may condition the releting of the Premises on, among other reasonable conditions, any one or more of the following: i) the payment of a fair market rate of rent for the Premises, whether or not that rate is in excess of the amounts reserved to Landlord under this Lease; ii) the compliance by the prospective tenant with the use clause and all other material covenants and agreements in this Lease (except those which cannot legally be performed by anyone other than Tenant); iii) the making of repairs and improvements to the Premises necessary to place it in first-class condition; iv) the provision of a security deposit or guaranty; or v) the satisfaction of all requirements Landlord could impose as a condition to approving Tenant's assignment of the Lease to any other party under Sections 17.6 or 20.1 of this Lease. Re-entry by Landlord solely for the purpose of securing the Premises and without any effort by Landlord to relet the Premises after Tenant's abandonment or vacation of the Premises, shall not impose any obligation on Landlord to mitigate damages.

      **17.2.3.**      In the event of the occurrence of an event of default, Landlord shall have a lien on all of Tenant's trade fixtures, and all other of Tenant's personal property located on the Premises to secure the payment of all rents due from Tenant to Landlord under this Lease and all other loss and damage suffered by Landlord as the result of Tenant's default. Following an event of default, Landlord may, with or without terminating this Lease or re-entering the Premises, take possession of such fixtures and personal property, and, in its sole discretion, sell the same at any public or private sale without notice to Tenant and apply the proceeds thereof first to the costs of such sale, including reasonable attorney's fees, and second, to all rentals and other charges due from Tenant to Landlord under this Lease. Any balance remaining after satisfying all amounts due and owing from Tenant to Landlord under this Lease, shall, within a reasonable time, be paid to the Tenant at its address set forth herein.

      **17.2.4.**      Following the occurrence of an event of default, Landlord may apply all or any portion of the security deposit to the reduction of Tenant's obligations to Landlord under this Lease, as authorized under Article 23 of this Lease.

**17.2.5.**        Following the occurrence of an event of default, Landlord shall be entitled to bring an action to enforce any bond, guaranty, or other collateral agreements, with or without bringing any prior action against Tenant.

**Section 17.3.**        **Recovery of Rent and Damages.** In addition to all other rights and remedies of Landlord provided by law and under this Lease, following an event of default, Landlord shall have the right to recover from Tenant, Tenant's successors and assigns, and any co-obligor, surety or guarantor, or other party legally responsible for Tenant's obligations under this Lease, all or any portion of Tenant's obligations under this Lease in the following amounts:

**17.3.1.**        Fixed minimum rent, percentage rent, additional rents, and late charges, reasonable legal fees, and all other charges owing by Tenant to Landlord under this Lease prior to the effective date of termination or re-entry; plus,

**17.3.2.**        Damages subsequent to termination of the Lease equal the excess of all fixed minimum rent, percentage rent (computed under subsection 17.3.6), and additional rents reserved under this Lease reduced to present value to the date of the termination, over the rental value of the Premises for the remaining term of this Lease; plus,

**17.3.3.**        For any period subsequent to re-entry but prior to termination of this Lease, fixed minimum rent, percentage rent (computed under subsection 17.3.6), additional rents, late charges, legal fees and other charges reserved under this Lease, as defined below, accrued as of the date of judgment, less the net rentals received by Landlord from the releting of all or any portion of the Premises, after deducting Landlord's costs of releting the Premises, including without limitation, reasonable leasing commissions, reasonable brokerage fees, costs of repairs, improvements or modifications made to the Premises, reasonable legal fees, and other costs incurred by Landlord in releting the Premises; plus,

**17.3.4.**        All direct and consequential damages, cost, expense, or loss suffered by Landlord as a proximate result of the breach by Tenant of any provision of this Lease for which Landlord is not fully compensated under subsection 17.3.1. plus,

**17.3.5.**        Interest on all rents and damages at the rate provided in Section 17.4.

**17.3.6.**        For the purpose of determining the Tenant's obligation to pay percentage rent following termination of this Lease, re-entry by Landlord, or any failure of Tenant to remain continuously open for business in the manner required by the open hours clause of this Lease, percentage rent shall be determined on the basis of Tenant's average gross sales from either: i) the Commencement Date to the date Tenant's gross sales were last reported to Landlord prior to the date of termination, re-entry or failure to open (the "Final Reporting Date"); ii) the three full calendar years preceding the Final Reporting Date, whichever period is shorter. Present value of future rents under subsection 17.3.2 shall be computed on the basis of an interest rate of six percent (6%) per annum. Tenant's liability for additional rents (exclusive of percentage rent) subsequent to termination of this Lease, shall be determined by multiplying the monthly additional rent in effect at the date of termination, times the number of months remaining in the term of this Lease, without any reduction for present

value, it being agreed that inflationary increases in such costs for future years fully negate the need for present value reductions.

**Section 17.4.** **Interest on Amount Overdue.** If any installment of fixed minimum rent, percentage rent, or additional rents, or any other amounts due hereunder from Tenant to Landlord shall not be received by Landlord within ten (10) days after the amount is due, Tenant shall pay the Landlord interest on the unpaid balance overdue at a rate equal to the maximum amount permitted to be charged by the Landlord to the Tenant under North Dakota law, or one and one-half percent (1½%) per month on the overdue balance, whichever is less, plus any reasonable attorney's fees and other costs of collection as provided in this Lease. The charging or acceptance of such interest by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of its other rights and remedies granted hereunder.

**Section 17.5.** **Legal Expense.** If any case, suit or proceeding shall be brought by Landlord for recovery of possession of the Premises, or recovery of any rents or any other amount due under this Lease, or otherwise by a party as the result of the breach by the other party of any other obligation under this Lease, and if such a breach shall be established, the breaching party shall be required to pay to the non-breaching party all expenses incurred as a result thereof, including reasonable attorney's fees.

**Section 17.6.** **Bankruptcy of Tenant.** It is understood and agreed that this is a Lease of real property in a Shopping Center as such a Lease is described in Section 365(b)(3) of the Bankruptcy Code, or corresponding future provision. Upon the filing of a petition by or against Tenant under the Bankruptcy Code, Tenant, as debtor and as debtor in possession, and any trustee who may be appointed agree as follows: (a) to perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by order of the United States Bankruptcy Court; and (b) to pay monthly in advance on the first day of each month as reasonable compensation for use and occupancy of the Premises an amount equal to all fixed minimum rent and all additional rents and other charges otherwise due pursuant to this Lease and to pay percentage rent monthly at the percentage set forth in this Lease on all sales during such month, less fixed minimum rent actually paid in such month; payment of all such percentage rent to be made by the 15th of the succeeding month; and (c) to reject or assume this Lease within sixty (60) days of the filing of such petition under Chapter 7 of the Bankruptcy Code or within one hundred twenty (120) days (or such shorter term as Landlord, in its sole discretion, may deem reasonable so long as notice of such period is given) of the filing of a petition under any other Chapter; and (d) to give Landlord at least forty-five (45) days prior written notice of any proceeding relating to any assumption of this Lease; and (e) to give Landlord at least thirty (30) days prior written notice of any abandonment of the Premises; any such abandonment to be deemed a rejection of this Lease; and (f) to do all other things of benefit to Landlord otherwise required under the Bankruptcy Code; and (g) to be deemed to have rejected this Lease in the event of the failure to comply with any of the above; and (h) to have consented to the entry of an order by an appropriate United States Bankruptcy Court providing all of the above, waiving notice and hearing of the entry of same.

No default of this Lease by Tenant, either prior to or subsequent to the filing of such petition, shall be deemed to have been waived unless expressly done so in writing by Landlord.

Included within and in addition to any other conditions or obligations imposed upon Tenant or its successor in the event of assumption and/or assignment are the following: (1) the cure of any monetary defaults and the reimbursement of pecuniary loss within not more than thirty (30) days of assumption and/or assignment; and (2) the deposit of an additional sum equal to three (3) months' rent to be held as a security deposit under the terms of this Lease; and (3) the use of the Premises as set forth in the Use of Premises, Operation of Business, Open Hours and all other sections of this Lease; (4) that the quality, quantity and/or lines of merchandise of any goods or services required to be offered for sale shall be unchanged; and (5) the reorganized debtor or assignee of such debtor in possession or of Tenant's trustee demonstrates in writing that it has sufficient background, including, but not limited to, substantial retailing experience in shopping centers of comparable size and financial ability to operate a retail establishment out of the Premises in the manner contemplated in this Lease and meet all other reasonable criteria of Landlord as did Tenant upon execution of this Lease; and (6) the prior written consent of any mortgagee to which this Lease has been assigned as collateral security; and (7) the Premises, at all times, remains a single store and no physical changes of any kind may be made to the Premises unless in compliance with the applicable provision of this Lease.

**Section 17.7.** **Waiver of Default.** The waiver by either party of any breach of any term, covenant or condition herein contained or the doing of any matter or payment of any sum by Landlord not required of Landlord by the terms hereof shall not be deemed to be a waiver or amendment of that term, covenant or condition or of any subsequent breach of the same or any other term, covenant or condition herein. The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any existing or preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord's knowledge of such preceding or existing breach at the time of acceptance of such rent. No covenant, term or condition of this Lease shall be deemed to have been waived by a party, unless such waiver be in writing signed by such party.

**Section 17.8.** **Option to Cure Default.** Landlord may, at its option, elect to cure at any time, without notice, (except as otherwise provided), any default by Tenant under this Lease; and whenever Landlord so elects, and if not otherwise expressly provided for in this Lease, all costs and expenses incurred by Landlord in curing a default, including, without limitation, reasonable attorney's fees, together with interest on the amount of costs and expenses so incurred at the rate of eighteen per cent (18%) per annum or the highest legal rate provided by law to be charged to Tenant, whichever is lower, shall be paid by Tenant to Landlord on demand, and shall be recoverable as additional rent.

**Section 17.9.** **Accord and Satisfaction.** No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

**Section 17.10.**    **Remedies Cumulative.** All remedies provided by Landlord under this Lease are intended to be cumulative, and any one or more may be exercised by Landlord, at its option. The exercise by Landlord of any remedy reserved to Landlord under this Lease or provided by law is not intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be in addition to every other remedy now or hereafter existing at law, in equity or by statute.

## ARTICLE 18.  SURRENDER OF PREMISES

**Section 18.1.**    **Tenant's Obligations.** At the expiration of Tenant's right to possession of the Premises, whether by expiration of the term of this Lease, surrender of the Premises by Tenant, or as a consequence of the occurrence of an event of default, Tenant shall surrender the Premises in as good condition and order as they were when Tenant took possession, ordinary wear and tear and damage by unavoidable casualty excepted, and shall return all keys for the Premises to Landlord and shall inform Landlord of all combinations on locks, safes and vaults, if any, in the Premises. Tenant shall, at its expense, remove all its trade fixtures, furniture, signs, and any alterations or improvements made by Tenant as to which Landlord shall have made the election as provided in Section 11.6, before surrendering the Premises and shall repair any damage to the Premises caused thereby. After termination of this Lease, Tenant shall not use for any purposes the name or any trademark or service mark, if any, associated with the Shopping Center.

**Section 18.2.**    **Landlord's Election.** In the event that Tenant fails to comply with the requirements of Section 18.1, Landlord shall be entitled to remove Tenant's property and remove and restore the Premises to the condition required by Section 18.1. Any trade fixtures and other personal property remaining on the Premises may be disposed of by Landlord in accordance with Section 18.5. Tenant shall be required to pay Landlord, as additional rent, the reasonable costs and expenses incurred by Landlord in removing Tenant's improvements, repairing and restoring the Premises caused by Tenant's failure to comply with Section 18.1, plus an administrative fee of fifteen percent (15%).

**Section 18.3.**    **Damages for Failure to Surrender Premises.** In the event that Tenant fails to surrender the Premises to Landlord at the time and in the manner required by Section 18.1, in addition to amounts payable under Section 18.2, Tenant shall pay Landlord the amount of rents due under this Lease, or the rental value of the Premises for such period, whichever is greater, plus Landlord's damages suffered as a consequence of the breach, including, without limitation, loss of rents and any amounts paid as the result of the entry of a judgment or in settlement of any claim asserted against Landlord caused by Tenant's breach of this Article 18. Any party to whom Landlord may lease, license or otherwise convey the Premises following termination of this Lease, is an intended beneficiary of Section 18.1 and shall be entitled to bring a direct action against Tenant to recover any damages it may suffer as a consequence of Tenant's breach of this Article 18.

**Section 18.4.**    **Holding Over.**    Any holding over after the expiration of the term of this Lease, with the consent of the Landlord shall, unless otherwise agreed by the parties in writing, be construed to be a tenancy from month to month at one and one-quarter times the minimum rent herein specified for the period immediately

preceding the termination date (prorated on a monthly basis) and shall otherwise be on the terms and conditions herein specified, so far as applicable.

**Section 18.5.**          **Removal and Storage of Tenant's Property.** Following re-entry or termination of this Lease, Landlord may remove all persons and property from the Premises, and any property removed by Landlord may, in Landlord's sole discretion, be stored in a public warehouse or other location determined by Landlord at Tenant's expense. Upon five days' written notice to Tenant, all such property may be sold, leased, or otherwise transferred at Tenant's cost and for the account of the Tenant, all without service of notice or resort to legal process and without being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned thereby, and without such re-entry working a forfeiture of the rents due and to be paid or of the covenants, agreements, and conditions to be kept and performed by Tenant for the full term of this Lease. If Landlord, in its discretion, determines that the sale of any item or items of Tenant's property is not commercially viable, such property may be disposed of by Landlord in any manner it sees fit, including disposing of the property as waste. All costs and expenses incurred by Landlord with respect to Tenant's property left on the Premises shall be reimbursed and paid by Tenant. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the term of this Lease. The proceeds received by Landlord from the sale of any such property shall be applied by Landlord first to the costs of sale, storage, repair, improvement transportation and removal of all of Tenant's property left on the Premises, and then past due obligations of Tenant to Landlord under this Lease.

## ARTICLE 19.  MERCHANTS ASSOCIATION

**Section 19.1.  Merchants Association.** Tenant agrees, for the express benefit of Landlord and the West Acres Shopping Center Merchants Association, Inc., (or successor) a nonprofit corporation, or its successor, (the "Association") to join and maintain active membership and good standing in said Association during the entire term of this Lease, to comply with the provisions of the Association, and to cooperate in all the activities of the Association. During the term of this Lease, Tenant agrees to pay, as additional rent, on a monthly basis during the full term of this Lease one-twelfth of the rate as set forth in Section 1.12.  Each Tenant member of the Association shall have one vote and Landlord shall also have one vote in the operation of the Association.  If Tenant's Association dues are established under Section 1.12 at a rate other than the rate established by the Association from time to time, Tenant shall not vote on any proposed change in Association dues, unless Tenant has agreed in writing to pay dues at the rate established by the Association or the rate established under Section 1.12, whichever is greater.  Landlord, as sponsor, agrees to pay the Association for the continuing promotion of the Shopping Center an amount equal to twenty-five percent of aggregate monthly dues payable by the members.  Nothing in the bylaws or regulations of the Association shall be in conflict with the provisions of this Lease, including any reasonable rules and regulations promulgated by Landlord pursuant to provisions of this Lease, or in any way shall affect the Landlord's rights.

**Section 19.2.  Daily Sales Reporting.** Intentionally omitted.

## ARTICLE 20.  TRANSFER AND ASSIGNMENT

**Section 20.1.        Assignment and Subletting.** Tenant acknowledges and agrees that Tenant's agreement to operate its business in the Premises for the purposes specified in Section 1.6 and under the name specified in Section 1.15 continuously and uninterruptedly during the entire term of this Lease as provided in Article 10 was a primary inducement and precondition to Landlord's agreement to lease the Premises to Tenant.  Accordingly, Tenant shall not voluntarily or by operation of law, assign, sublet, license, franchise, transfer, mortgage, or otherwise encumber all or any part of the Premises or Tenant's interest in this Lease (collectively for the purpose of this Article 20 a "Transfer"), without the prior written consent of the Landlord, which consent shall not be unreasonably withheld.  Any attempted or purported Transfer without Landlord's written consent shall be null and void, have no force or effect, and confer no rights upon any third party.  Notwithstanding any assignment or subletting, the Tenant shall remain fully liable to Landlord under this Lease and shall not be released from the performance of any of its terms, covenants and conditions.

**Section 20.2.        Change of Ownership.** If Tenant is a corporation, partnership, business trust, or other form of business association at any time during the term of this Lease, and there exists any transfer by sale, assignment, bequest, inheritance, operation of law or other disposition so as to result in the loss of or a change in the voting control of Tenant by the person or persons owing a majority of the voting control prior to such transfer, such change shall be considered a Transfer of this Lease under Section 20.1 and any such transfer without the written consent of Landlord shall constitute an event of default under this Lease.  The provisions of this Section 20.2 shall not apply to a corporation whose entire outstanding

voting stock is listed on a national securities exchange or to a corporation if at least eighty (80) percent of the entire outstanding voting stock is owned by another corporation whose entire outstanding voting stock is listed on a national securities exchange. A "national securities exchange", as referred to herein, shall have the same meaning as defined in the Securities Exchange Act of 1934, as amended.

**Section 20.3.        Landlord's Consent to Assignment.** Should Tenant desire to enter into a Transfer of this Lease, Tenant shall give Landlord at least thirty (30) days prior written notice, which notice shall include: i) the full particulars of the proposed Transfer, including its effective date, terms and conditions, and copies of any agreements, offers, draft agreements, subleases, letters of commitment or intent, and other documents pertaining to such proposed Transfer; and ii) a description of the identity, net worth and previous retail business experience of the proposed transferee, including, without limitation, copies of the proposed transferee's latest income, balance sheet and cash flow statements in audited form, if available, and certified as accurate by the proposed transferee; and iii) any further information relevant to the proposed Transfer which Landlord shall have requested within fifteen (15) business days after receipt of Tenant's notice. With respect to any such proposed Transfer, Landlord, in exercising its right of reasonable consent, shall be entitled to take into account any fact or factor which Landlord deems relevant to such decision. Landlord and Tenant agree, by way of example, and without limitation, it shall not be unreasonable for Landlord to withhold its consent to a proposed Transfer of this Lease if, in Landlord's business judgment, any one or more of the following conditions or situations exist or may exist: i) if the financial strength of the proposed assignee or sublessee (sometimes a "Transferee"), including the adequacy of its working capital, is insufficient to pay all expenses anticipated in connection with its business ii) if the proposed Transferee's use of the Premises conflicts with the permitted use set forth in Section 10.1 or any other provision of this Lease; iii) if the proposed Transferee has not had successful retail experience in operating the business to be operated on the Premises in other shopping centers of like character and quality; iv) if the quality and nature of the merchandise and/or services offered for sale by the proposed transferee in any other locations which it has, is less than the quality of merchandise and retail services which Tenant has offered for sale; v) if the type of services and merchandise which the proposed Transferee proposes to sell in the Premises will have an adverse effect upon the tenant mix in the Shopping Center or the portion of the Shopping Center in which the Premises is located, including without limitation, duplication of services and merchandise offered by tenants and the compatibility of the services and merchandise which the Transferee proposes to sell in the Premises with the services and merchandise offered for sale by tenants in the Shopping Center; vi) if, in Landlord's good faith judgment, the size or configuration of the Premises is inappropriate for Transferee's business; vii) if the transfer will result in the diminution or potential diminution of percentage rents below amounts paid by Tenant or which were reasonably anticipated by Landlord on the Effective Date; (viii) if the quality of the store appearance resulting from any remodeling or renovation to be conducted by the proposed Transferee is not compatible with that of other stores in the portion of the Shopping Center in which the Premises is located; ix) if the store being operated in the Premises is, and the store to be operated by the Transferee will not be a "destination store" (i.e., a store which draws patrons to the Shopping Center specifically to shop at such store); (x) if the current net worth of the proposed Transferee is less than the greater of Tenant's net worth as of the date of this Lease or Tenant's net worth at the date of Tenant's request for Landlord's consent to such Transfer; (xi) if the proposed Transfer would

breach any covenant of Landlord with respect to radius, location, use or exclusivity in any other lease, financing agreement or other agreement relating to the Shopping Center; xii) if Tenant fails to pay any fees or satisfy any other requirements imposed by Section 24.4 of this Lease; xiii) if the requirements of the proposed Transferee for services furnished by Landlord are greater than Tenant's and/or (xiv) if the annual amount anticipated to be expended by the proposed Transferee in advertising its business at the Shopping Center and/or if the annual amount customarily expended by the proposed Transferee in advertising its other locations is less than the annual amount expended by Tenant in advertising its business at the Shopping Center. In addition, Landlord shall be entitled to be satisfied that each and every covenant, condition or obligation imposed upon Tenant by this Lease and each and every right, remedy or benefit afforded Landlord by this Lease would not be impaired or diminished by such transfer. Tenant shall not have the right or power to request or enter into a Transfer (a) with any occupant of the Shopping Center or any prospective tenant with whom Landlord is contemporaneously negotiating for any premises within or adjacent to the Shopping Center, or (b) when there exists any default by Tenant in the performance or observance of any of the terms, covenants and conditions of this Lease or if there exists any such event which, with the passage of time and/or the giving of notice would constitute a default under this Lease, or (c) unless Tenant has furnished to Landlord all of the information and documentation required and/or requested to be furnished to Landlord pursuant to the provisions of this Lease as a condition to approving any such transfer. The requirements of this Section 20.3 are intended to be in addition to those contained in Section 24.4. If any portion of this Section 20.3 is construed to conflict with Section 24.4, this Section shall control.

Notwithstanding anything contained in this Lease to the contrary, Tenant shall have the right to assign this Lease to a parent or wholly-owned subsidiary without Landlord's consent, provided: (i) such assignee continues to operate the business conducted in the Premises in the same manner as Tenant and pursuant to all of the provisions of this Lease; (ii) such assignee corporation shall assume in writing all of Tenant's obligations hereunder; and (iii) Tenant continues to remain liable for the performance of all terms, conditions and covenants of this Lease, including but not limited to, payment of rent and other sums due under this Lease.

Tenant may assign this Lease without Landlord's prior written consent when such assignment is in connection with a merger or consolidation or the sale of all or substantially all of the assets or stock of Tenant to another corporation, provided that such assignee shall assume all of Tenant's obligations hereunder in writing, and in the case of a sale, Tenant continues to remain liable for the performance of all terms, conditions and covenants of this Lease, including but not limited to, payment of rent and other sums due under this Lease.

**Section 20.4.** **Assignment or Transfer by Landlord.** In the event of the bona fide sale or other transfer of Landlord's interest in the Shopping Center, the Landlord herein named (and in case of any subsequent transfers, the then grantor or transferor) shall have no further liability and obligations of Landlord hereunder, except any that may have accrued prior to the sale and transfer, provided any prepaid rent and the Security Deposit, if any, is transferred or credited to such purchaser, assignee or transferee. Notwithstanding anything to the contrary contained in this Lease, it is specifically understood and agreed that there shall be absolutely no personal liability on the part any partner, stockholder, officer, director

or trustee of Landlord or any successor in interest of Landlord, with respect to any of the terms, covenants and conditions of this Lease, and that Tenant shall look solely to the estate and interest of Landlord (or such successor in interest of Landlord) in the Shopping Center for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord or by such successor in interest of any of the terms, covenants and conditions of this Lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever. No judgment against Landlord may be satisfied other than from Landlord's interest in the Shopping Center.

## ARTICLE 21.  OTHER TENANT OBLIGATIONS

**Section 21.1.**      **Rules and Regulations.** Landlord reserves the right to promulgate such reasonable and non-discriminatory rules and regulations relating to the Premises, Common Areas and facilities and the Shopping Center, and any part or parts thereof, as Landlord may deem appropriate and for the best interests of the tenants. Tenant agrees to abide by such rules, which shall be uniformly applied, and to cooperate in their observance. Landlord shall also have the authority to establish in the rules and regulations reasonable fines and penalties for repeated or habitual violations of the rules and regulations applicable to tenants of the Shopping Center. The rules and regulations, and any amendments or additions that may be made from time to time, shall be effective and become binding upon Tenant upon delivery of a copy of them to Tenant. Tenant shall be responsible for compliance by its employees, agents and contractors with all rules and regulations adopted by Landlord. Attached as Exhibit 5 is a copy of the regulations in effect as of the date hereof.

**Section 21.2.**      **Competition - Advertising.** It is understood and agreed that percentage rent is material consideration of this Lease. Accordingly, in order to achieve maximum sales volume, Tenant covenants and agrees that from and after the Effective Date through the end of the term of this Lease, neither Tenant, or any individual or general partner of Tenant, or any stockholder holding more than thirty (30) percent interest in the Tenant, or any parent, subsidiary, or affiliate of Tenant, shall not directly or indirectly own, operate, manage, or have any other interest in the profits of any store of business with the same trade name to that conducted from the Premises within a radius of one (1) mile from the outside boundary of the Shopping Center. This provision shall not, however, prohibit Tenant from continuing to operate in its present locations any existing stores operated by it prior to the Effective Date of this Lease, regardless of trade name changes. Stores operated under a different trade name from the Premises, stores operated as discount or outlet stores, regardless of trade name, or stores acquired by Tenant in a transaction involving at least five stores shall not result in any violation of this Section 21.2. If Tenant shall at any time operate any other store with a similar trade name in the trade area served by the Shopping Center, Tenant agrees that all advertising in respect of such other store will feature Tenant's store in the Shopping Center as prominently as such other store, and that all sales and promotions available at such other store shall also be available at Tenant's store in the Shopping Center. In the event Tenant breaches this provision, in addition to other remedies available to Landlord, Landlord may, at its option, for as long as such other store or business is owned, operated, or managed in violation of the provisions of this Section 21.2, include fifty percent (50%) of the sales of such other store or business in the "gross sales" transacted from the Premises for the purpose of computing percentage rent due under this Lease. In such event, Tenant shall furnish

Landlord statements of Tenant's gross sales from such other store or business in the manner required under Section 6.4.

**Section 21.3.**     <u>Name Change.</u>  Tenant agrees not to change the advertised name of the business operated in the Premises without the written consent of Landlord.

## ARTICLE 22. PROTECTION OF LENDERS

**Section 22.1.**     <u>Estoppel Certificate.</u>  Landlord and Tenant each agree that they will, at any time and from time to time, within ten (10) business days following written notice by the other party hereto specifying that it is given pursuant to this provision, execute, acknowledge and deliver to the party who gave such notice a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified, and stating the modifications), and the dates to which the rent and any other payments due hereunder from Tenant have been paid in advance, if any, and stating whether or not, to the best of knowledge of the signer of such certificate, the other party is in default in performance of any covenant, agreement or condition contained in this Lease, and, if so, specifying each such default of which the signer may have knowledge.

The failure of either party to execute, acknowledge and deliver to the other a statement in accordance with the foregoing provisions within the twenty (20) day period shall constitute an acknowledgment by the party given such notice, which may be relied on by any person holding or proposing to acquire an interest in the Shopping Center or the Premises or this Lease from or through the other party, that this Lease is unmodified and in full force and effect and that the rent has been duly and fully paid to and including the respective due dates immediately preceding the date of such notice and shall constitute, as to any person entitled as aforesaid to rely upon such statements, a waiver of any default which may exist prior to the date of such notice.

**Section 22.2.**     <u>Attornment.</u>  Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of power of sale under, any mortgage or deed of trust made by Landlord covering the Premises, attorn in writing to the mortgagee or purchaser at such foreclosure sale and recognize such purchaser as Landlord under this Lease, provided such mortgagee or purchase provides the same written non-disturbance assurances set out in the second paragraph of Section 22.3.

**Section 22.3.**     <u>Subordination.</u>  This Lease and all of Tenant's rights hereunder shall be subject and subordinate to any and all ground leases or underlying leases or subleases that include the Premises, including, without limitation, a sale leaseback lease or leaseback leases to which Landlord is or may become a party as a tenant or a subtenant, and to the lien of all mortgages, in all amounts and all advances thereon, which may now or hereafter become a lien on the Premises, and to all renewals, replacements, modifications, consolidations and extensions thereof; provided, however, Tenant agrees that any such lessor or mortgagee may elect to have this Lease be made superior to any such ground or underlying lease or the lien of its mortgage, and in the event of such election and upon notification by Landlord or such lessor or mortgagee to Tenant to that effect, this Lease shall be deemed superior to said ground or underlying lease or to the lien of any such mortgage, whether or not this Lease is

recorded or whether this Lease is recorded prior or subsequent to the date of recording of said ground or underlying lease or mortgage. This Lease shall also be subordinate and subject to the provisions of any easements and operating agreements affecting the Shopping Center. Tenant agrees to provide any such mortgagee or lessor whose name and address has been provided to Tenant with written notice of any default by Landlord under this Lease. The curing of any Landlord default by such mortgagee or lessor shall be treated as curing and performance by Landlord.

Upon request of Landlord, Tenant will within twenty (20) days thereafter execute an agreement confirming that this Lease and Tenant's rights thereunder are subordinate to the lien or interest of any mortgage, trust deed, ground or other underlying lease or other instrument resulting from any other method of financing or refinancing (including any sale and leaseback) now or hereafter in force against the Shopping Center or the land or buildings of which the Premises are a part or against any buildings hereafter placed upon the land of which the Premises are a part, and to all advances made or hereafter to be made upon the security thereof, provided, however, that such mortgagee or lessor will agree that, in the event any action is taken to foreclose the lien of the mortgage or terminate any ground lease, this Lease and all rights of the Tenant under its terms to use and quiet possession of the Premises, including, but not limited to, easements, appurtenances and Common Areas and facilities in the Shopping Center, shall not be disturbed and shall continue in full force and effect so long as Tenant shall faithfully discharge each and every obligation on its part to be kept and performed under the terms of this Lease.

## ARTICLE 23.  SECURITY DEPOSIT

Intentionally omitted.

## ARTICLE 24.  OTHER PROVISIONS

**Section 24.1.**       **Additional Rents**.  In addition to fixed minimum rent, percentage rent and additional rents, Tenant agrees that all other sums of money or charges required to be paid by Tenant under the provisions of this Lease, shall be deemed to be and shall become additional rent, whether or not the same be designated as such, and shall be included in the term "rent" wherever used in this Lease.  If such amounts are not paid by Tenant at the time provided in this Lease, they shall nevertheless be collectible from Tenant as additional rent with the next installment of rent thereafter falling due hereunder, but nothing herein contained shall be deemed to suspend or delay the payment of any sum at the time it becomes due and payable hereunder, or limit any other remedy of the Landlord.

**Section 24.2.**       **Excuse for Non-Performance**.  Anything in this Lease to the contrary notwithstanding, if performance of any act or obligation is prevented or delayed by Act of God, war, labor disputes, fire, windstorm, explosion, collapse of structure, riot, government regulation, delays by government bodies or any other cause or causes beyond the reasonable control of Landlord or Tenant (except those unlisted causes relating to the financial status of Landlord or Tenant or general economic conditions), the time for the performance of the act or obligation will be extended for the period that such act or performance is delayed or prevented by any such cause.  This provision shall not operate to excuse Tenant from prompt

payment of fixed minimum rent, percentage rent, additional rent or any other payments required by the terms of this Lease.

**Section 24.3.**      **Successors.** All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the respective heirs, executors, administrators, successors, and assigns of the said parties; and if there shall be more than one tenant, they shall all be bound jointly and severally by the terms, covenants, conditions and agreements herein. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing as hereinbefore provided.

**Section 24.4.**      **Consent and Approval.** Whenever under this Lease the consent or approval of either party hereto is required by the other party, such consent or approval shall not be unreasonably withheld or delayed. In each instance where Tenant requests Landlord's consent, Tenant shall provide Landlord with such information and documentation as Landlord may reasonably require. Tenant agrees to pay to Landlord a reasonable charge established by Landlord to reimburse Landlord for its costs incurred as a result of Tenant's request for Landlord's consent or approval of any matter, such costs to include, without limitation, Landlord's administrative time, legal fees, phone, mail, copy charges, and architect and engineer's fees. Landlord may, at its option, request prepayment of the charge prior to undertaking any review of each request for consent made by Tenant, condition its consent on the payment of such fees, or bill Tenant for such charges as additional rent. Said fees shall be payable notwithstanding Landlord's denial of consent, or Tenant's failure to complete the transaction for which consent is requested.   Landlord's charge for its own internal expenses under this provision shall not exceed $250.  In addition, without advance written notice to Tenant, Landlord will not be authorized to charge any expenses Landlord incurs in connection with each request for Landlord's consent for outside consultants, including without limitation, legal, accounting, architectural or engineering, which are in excess of $500.  All charges shall be reasonable in light of the nature, time involved to evaluate and outside assistance reasonably necessary to evaluate the matter for which consent has been requested. Landlord agrees that no charge will be assessed for the review of Tenant's plans for the initial build-out of Tenant's store.

Landlord's consent or approval of any matter requested by or on behalf of Tenant shall not constitute a representation by Landlord that the matter approved is in compliance with any federal, state or local law, any applicable code or standard or that the matter requested is suitable for or in the best interest of Tenant or Tenant's business. Tenant shall remain solely responsible for the legality, propriety and fitness of any matter for which Tenant seeks Landlord's consent, including, but without limitation, its compliance with all laws, regulations, and codes.

**Section 24.5.**      **Entire Agreement.** This Lease and the exhibits now or hereafter attached (as provided herein) and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises or matters related thereto, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change

or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

**Section 24.6.**     **Net Lease.** Except as otherwise provided in Article 13 and Article 15, it is intended that the rent provided for herein shall be an absolute net return to Landlord for the term of this Lease without any abatement or offset whatsoever and Tenant's use and occupancy of the Premises shall be free of any expenses or charges whatsoever to Landlord with respect to the Premises, including, but not limited to, all insurance premiums, all utility charges, all taxes and other similar assessments, all restoration, repairs and maintenance, and all other costs of, and with respect to, the Premises.

**Section 24.7.**     **No Partnership Relation.** Landlord is not intended to be in any way or for any purpose a partner of Tenant in the conduct of its business, or otherwise, or joint adventurer, or a member of a joint enterprise with Tenant.  The provisions of this Lease relating to the percentage rent payable hereunder are included solely for the purpose of providing a method whereby the rent is to be measured and ascertained.

**Section 24.8.**     **Notices.** Any notice, demand, request or other instrument required to be given under this Lease shall be delivered in person to a director, partner, officer, or local manager or assistant manager, or sent by United States certified mail, postage prepaid, return receipt requested or by nationally recognized overnight courier, and addressed:  (a) if to Landlord, at Landlord's address specified in Article 1 or at such other address as it may designate by written notice, and (b) if to Tenant, at the address specified in Article 1, or such other address as Tenant shall designate by written notice. In addition to the foregoing, either party may send any such notice, demand, request or other instrument by facsimile transmission sent to the other party at the facsimile number specified in Article 1, or such other number as either party may designate to the other in writing.  Unless otherwise specifically provided in this Lease, all notices will be effective on: i) the date they are personally delivered to the other party or refused; ii) two days after the date they are deposited in the mails; iii) the date they are sent by facsimile, whichever is first.

**Section 24.9.**     **Captions.** The captions used as headings for the various subject matters appearing in this Lease are used only as a matter of convenience to help find subject matters and are not to be construed as part of the Lease provisions nor in determining the intent of the parties to this Lease.

**Section 24.10.**     **Submission of Lease Form.** The submission of this Lease or any part hereof to Tenant or Tenant's attorneys or agents for examination does not constitute a reservation of, or an option for the lease of the Premises. This Lease shall be come effective only upon: i) execution hereof by both Landlord and Tenant; ii) the receipt of fully executed counterparts hereby by both Landlord and Tenant; iii) the satisfaction of any other conditions precedent to this Lease which may be specified herein; and iv) the execution of any guaranty of Tenant's obligations required in connection with this Lease and the delivery of the same to Landlord. If Tenant is or will be a corporation, the persons or person executing this Lease on behalf of Tenant hereby represent(s) and warrant(s) that Tenant is a corporation duly incorporated in North Dakota or, if Tenant is a foreign corporation, Tenant is a corporation in good standing under the laws of the state of its incorporation and is duly authorized to do business in North Dakota, and that the person(s) executing and delivering this Lease on

behalf of Tenant is or are an officer or are officers of the Tenant, fully authorized by all required corporate action to execute this Lease and deliver the same to Landlord. Upon request of Landlord, Tenant shall deliver to Landlord reasonable instruments reasonably satisfactory to Landlord evidencing compliance with the foregoing provisions of this Section 24.10. In the event Tenant is a partnership, the persons executing this Lease on behalf of Tenant hereby represent and warrant that Tenant is duly organized and validly existing and is qualified to do business in North Dakota and such persons are duly authorized to execute and deliver this Lease on behalf of the partnership.

**Section 24.11.**    **Rent Restrictions.**  In the event rentals (or any portion thereof), or any other charge payable by Tenant to Landlord or others under this Lease is declared or deemed to be uncollectible or is not or may not be collectible, all or in part, by virtue of any federal, state or local law, regulation or order, or any Presidential order in the nature of a wage-price-rent freeze or otherwise, then Landlord may, by written notice to Tenant, terminate this Lease at any time prior to the Commencement Date.

**Section 24.12.**    **Brokerage.**  Each of the parties represents and warrants that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, except as listed in Section 1.17, and each of the parties agrees to indemnify the other against, and hold it harmless from, all liabilities arising from any such claim (including, without limitation, the cost of attorney's fees in connection therewith).

**Section 24.13.**    **Severability.**  If any term, covenant or condition of this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to person or circumstances other than those in respect to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**Section 24.14.**    **Survival of Obligations.**  Tenant expressly agrees that all provisions of this Lease which contemplate performance by Tenant after the expiration of the term or the earlier termination of this Lease, shall survive the expiration or earlier termination of this Lease.

**Section 24.15.**    **No Option.**  The submission of this Lease for examination does not constitute a reservation of or option for the Premises and this Lease becomes effective as a Lease only upon execution and delivery thereof by Landlord and Tenant.

**Section 24.16.**    **Recording.**  Tenant shall not record this Lease without the written consent of Landlord.

IN WITNESS WHEREOF, Landlord and Tenant have signed this Lease as of the day and year first above written.

WEST ACRES DEVELOPMENT, LLP
A LIMITED LIABILITY PARTNERSHIP

By:  Schlossman Family Limited
         Partnership, a partner

By: _____
     William A. Schlossman, Jr.
     Its:  General Partner

TENANT

By _____
     Its: Senior Vice President


**SHARON LEVI**
**SENIOR VICE PRESIDENT-REAL ESTATE**



WEST ACRES SECOND ADDITION

# REPLAT OF PART OF BLOCK 3
## OF WEST ACRES THIRD ADDITION
to the city of Fargo



## EXHIBIT 3

### DESCRIPTION OF TENANT'S IMPROVEMENTS

Tenant improvements as defined in Article 1, Section 1.1, which Tenant is required to complete pursuant to Section 11.1 of the Lease, consists of the following:

Tenant shall be required to do a complete remodel of the Premises.  This includes complete demolition of existing premises and includes storefront, ceilings, interior walls, HVAC, mechanical, and electrical in compliance with Landlord's Design Criteria.

**EXHIBIT 4**
**LANDLORD'S IMPROVEMENTS**

Landlord improvements, as defined in Section 1.12 of the Lease shall consist of the following:

None

In accordance with Section 11.2, Landlord shall not be required to make any improvements other than those specified herein.

# EXHIBIT 5

**RULES AND REGULATIONS**
**WEST ACRES SHOPPING CENTER**
**Rules and Regulations**
**July 10, 2001**

1.      All loading and unloading of goods shall be done only at such times, in the areas, and through the entrances, designated for such purposes by Landlord.

2.      The delivery or shipping of merchandise, supplies and fixtures to and from the Premises shall be subject to such rules and regulations as in the judgment of Landlord are necessary for the proper operation of the Premises or Shopping Center.

3.      All garbage and refuse shall be kept in the kind of container specified by Landlord, and shall be placed outside of the Premises prepared for collection in the manner and at the times and places specified by Landlord. If Landlord shall provide or designate a service for picking up or recycling refuse and garbage, Tenant shall use same. Tenant shall pay Landlord a reasonable charge to reimburse Landlord for all additional costs incurred as a consequence of Tenant's failure to properly sort and deposit its refuse in designated containers.

4.      No radio or television or other similar device shall be installed without first obtaining in each instance Landlord's consent in writing. No aerial shall be erected on the roof or exterior walls of the premises. or on the grounds, without in each instance, the written consent of Landlord. Any aerial so installed without such written consent shall be subject to removal at any time without notice and at Tenant's expense.

5.      No loud speakers, televisions, phonographs, radios or other devices shall be used in a manner so as to be heard or seen outside of the premises without the prior written consent of Landlord.

6.      If the Premises is equipped with heating facilities separate from those in the remainder of the Shopping Center, Tenant shall keep the Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

7.      The outside areas immediately adjoining the premises shall be kept clean and free from snow, ice, dirt and rubbish by Tenant to the satisfaction of Landlord, and Tenant shall not place or permit any obstructions or merchandise in such areas.

8.      Tenant and its employees shall park their cars only in areas specifically designated for that purpose from time to time by Landlord. Tenant shall furnish Landlord with automobile license numbers assigned to Tenant's car and the cars of its employees, within five days after taking possession of the premises and shall thereafter notify Landlord of any changes within five days after they occur. Tenant agrees to cause its employees to park only in the areas designated for employee parking, and if, after a prior notice of violation, Tenant or its employees fail to park their cars in the designated areas, then at Landlord's election: i) such cars may be removed therefrom by Landlord or its agents and stored elsewhere at Tenant's expense and without liability of Landlord for such removal; ii)      Landlord may place a device which temporarily disables the offending vehicle and charge Tenant; and iii) Landlord may assess Tenant a fine of up to $25, which amount shall be paid as additional rent.

9.      The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant, who shall, or whose employees, agents or invitees shall have caused it.

10.      Tenant shall use at Tenant's cost such pest extermination contractor as Landlord may direct and at such intervals as Landlord may require.

11.    Tenant shall not burn any trash or garbage of any kind in or about the leased premises, the Shopping Center, or within one mile of the outside property lines of the Shopping Center.

12.    Tenant and its employees and agents shall not solicit business in the parking or other Common Areas, nor shall Tenant distribute any handbills or other advertising matter on automobiles parked in the parking area or in other Common Areas.

13.    No flammable or combustible material shall be kept in, on or about the leased premises except as may be permitted to be kept in such locations and containers as specified by Landlord from time to time in accordance with the recommendations or regulations of Landlord's insurance carrier, underwriter or appropriate governmental authority.

14.    These rules and regulations are adopted to set forth in writing the present rules and regulations of Landlord relating to the Shopping Center.  Landlord reserves the right to amend, add to or delete any policy, or repeal these rules and regulations and to adopt new policies at any time.

EXHIBIT 6

VERIFICATION OF TERM - FLOOR AREA
WEST ACRES SHOPPING CENTER

This form is completed by the parties hereto pursuant to the requirements of the Lease dated July 17, 2001, between West Acres Development, LLP and **Claire's Boutiques, Inc.**

(1)   The Commencement Date of the Lease defined in Section 1.8 of the Lease is as follows:

July 1, 2001

(2)   The date Tenant's first Lease Year begins is:

July 1, 2001

(3)   The floor area of the Premises is 973 square feet.

(4)   Fixed minimum rent under the lease shall be on the following schedule:

$5,675.83 per month from the Commencement Date through the Third (3rd) Lease Year, inclusive; $6,081.25 per month from the Fourth (4th) through the Seventh (7th) Lease Year, inclusive; and $6,486.67 per month from the Eighth (8th) through the Tenth (10th) Lease Year, inclusive.

Tenant reacknowledges and affirms that it has examined the Premises in full and that the same is in the condition required under the terms of the Lease between the parties, and that Tenant waives all claims against Landlord concerning the condition of the Premises and the personal property, if any, transferred by Landlord in connection with the Lease, and in accordance with its terms.

This Exhibit 6 is attached to and constitutes a part of the above-described Lease.

AGREED:

_____
Sharon M. Levi, Sr. Vice President

CLAIRE'S BOUTIQUES, INC.

WEST ACRES DEVELOPMENT, LLP
A LIMITED LIABILITY PARTNERSHIP

By:  Schlossman Family Limited
Partnership, a partner

By:  _____
William A. Schlossman, Jr.
Its:  General Partner



3902 13th Ave. S.W.
Box 9978
Fargo, ND 58106-9978
www.westacres.com

701.282.2222
Fax: 701.282.2229

September 6, 2001

Kathy Nelson
Claire's Boutiques, Inc.
240 West Central Road
Hoffman Estates, IL 60195

Dear Kathy:

This letter agreement outlines the conditions under which you agree to occupy Space 330
at West Acres Shopping Center during your remodel.

1.  Tenant shall occupy 900 square feet of Space 330 from September 4, 2001 to October 11,
    2001 during their remodel of their leased Premises (Space 306). The temporary
    occupancy of Space 330 shall be subject to the terms and conditions of the current Lease
    dated July 17, 2001, except as provided below.

2.  Minimum and additional rents due under this agreement shall be those rents due under
    our current Lease agreement for Space 306. In addition, Tenant shall also pay $640.85
    per month for common area maintenance, heat, electricity, taxes, insurance and waste on
    900 square feet of Space 330, payable within fifteen (15) days of vacating the Premises.
    This shall not be subject to year-end adjustment.

3.  Tenant agrees to vacate Space 330 by October 11, 2001. Failure to vacate Space 330 by
    October 11, 2001 shall result in a penalty of $15,000.00 $1,500.00
    $15,000 per item with claims dated 9/13

Please indicate your acceptance of this agreement by countersigning and returning the duplicate
to me. Feel free to call if you have questions.

Claire's Boutiques, Inc., d.b.a.
Claire's, Claire's Accessories, or
Claire's Boutiques
Tenant

_____
9-13-01
(DATE)

WEST ACRES DEVELOPMENT, LLP
Landlord

_____
9/7/01
(DATE)

## FIRST AMENDMENT TO LEASE

This First Amendment to Lease is dated as of the ⟨25th⟩ day of ⟨July⟩ 2006, between **West Acres Development, LLP, a Limited Liability Partnership** ("Landlord") and Claire's Boutiques, Inc., d/b/a/ Claire's, Claire's Accessories or Claire's Boutiques, a Delaware Corporation ("Tenant").

### RECITALS

A.     Landlord and Tenant entered into a Lease dated July 17, 2001 (the "Lease") for certain space, containing approximately 973 square feet within the West Acres Shopping Center known as Space 306 (the "Premises").

B.     The parties wish to extend the term of the Lease, and otherwise amend the Lease, as hereafter provided.

C.     All terms used in this Amendment, and not otherwise defined herein, shall have the same meaning ascribed to them in the Lease.

### AGREEMENTS

In consideration of the Recitals and the following mutual agreements contained herein and for other good and valuable consideration, as of the Expansion Commencement Date (as hereinafter defined), the parties agree as follows:

1.  **Premises**. Section 1.5 on page 1 of the Lease is hereby amended by deleting the phrase "approximately 973 square feet" and replacing it with the phrase "approximately 1,462 square feet."

2.  **Use**. Section 1.6 on page 2 and 3 shall be amended by deleting it in its entirety and replacing the clause with the following: "The display and sale, at retail, of such items as are normally sold in Claire's Boutiques, Inc.'s prototype Claire's stores, including, without limitation, fashion accessories, jewelry, hair goods, handbags and sunglasses; teen home and gift accessories; specialty apparel items, cosmetics, fragrances, bath and body products; novelties, trend-driven and holiday promotional items; and Tenant shall be permitted to perform ear piercing the Premises."

3.  **Term.** Section 1.7 on page 2 of the Lease is hereby amended by deleting the phrase "the 30th day of June, 2011" and replacing it with the phrase "January 31, 2016."

4.  **Commencement Date**. Section 1.8 is hereby amended by adding the following paragraph: The Expansion Commencement Date shall be the earlier of (i) the date Tenant opens for business in the expanded Premises; or (ii) sixty (60) days following the date Landlord tenders possession of the expansion area to Tenant. In no event shall Tenant be required to accept possession of the expansion area prior to September 1, 2006.

5. **Fixed Minimum Rent.** Section 1.9 on page 2 of the Lease is hereby amended by deleting it in its entirety and replacing it with the following:

   a. Approximately $9,137.50 per month (approximately $109,650.00 per annum based on $75.00 per square foot) from the Expansion Commencement Date through January 31, 2007.

   b. After the Expansion Commencement Date, rent for each succeeding year shall be determined by increasing the previous minimum annual amount by two percent (2%) per annum, commencing February 1, 2007 and continuing each successive February 1 thereafter throughout the Term.

6. **Tenant Improvements**. Section 1.11 on page 2 is hereby amended by deleting the entire last sentence and replacing it with: "Tenant's improvements shall be completed no later than the Expansion Commencement Date." Notwithstanding anything to the contrary contained in the Lease, any exhibits attached thereto, any design criteria provided to Tenant, or any construction rules provided to Tenant or its contractors, Landlord agrees that Tenant shall not be required to pay any so-called "chargebacks" in connection with Tenant's improvements including any plan review and/or coordination fees, nor shall Tenant or its contractors be required to provide construction security deposits or payment or performance bonds."

7. **Merchants Association.** Section 1.12 on page 2 is hereby amended by deleting the phrase "$2.03 per square foot" and replacing it with the phrase "$1.68 per square foot)."

8. **Article 2.** Article 2 on page 3 shall be amended to include the following: Tenant must pay to Landlord 100% of the relocation costs of Shirt Shop from the adjacent space in the Shopping Center, not to exceed $30,000.00. Landlord will provide Tenant with copies of invoices substantiating the actual cost of the relocation. Payment will be due within 30 days after the Expansion Commencement Date, unless Landlord fails to provide reasonable documentation supporting the charge.

9. **Allocation of Costs.** Food Court Operating Costs, as defined below, will be allocated solely to Food Court Tenants. Landlord and Tenant acknowledge and agree that the Food Court Common Area, as defined below, like other courts and amenities in the Shopping Center, is intended to benefit all tenants in the Shopping Center by, among other matters, attracting customers to the Shopping Center, providing a place of rest, comfort and nourishment, and increasing the duration customers remain in the mall. Accordingly, expenses related to the general maintenance, upkeep, and operation of the Food Court Common Areas which are or may be incurred in connection with other mall or court areas are generally

allocated under Article 7 of the Lease as a Common Area Costs.    Both parties further acknowledge and agree that certain costs may not fall precisely within the definitions of Food Court Operating Costs or Common Area Costs as provided under this Lease.    In such circumstances it may be necessary for Landlord to exercise discretion in allocating expenses between Food Court Operating Costs and Common Area Costs.    All allocations made by Landlord to determine Common Area Costs, Food Court Operating Costs, and allocations between Food Court Operating Costs and Common Area Costs will be conclusive and be binding on Tenant, unless Tenant can establish, by a preponderance of the evidence, that Landlord's charges or allocations are (i) contrary to the express provisions of this Lease; or (ii) arbitrary and unreasonable.  Landlord warrants that the Food Court operating costs shall not duplicate other expenses recovered by Landlord from Tenant as Common Area Costs or any other charge under this Lease.    The following definitions apply to this provision:

    a.   Food Court Operating Costs.  All costs and expenses of every kind and nature which may be paid or incurred by Landlord relating to the distribution, consumption, and clean-up and disposal of food, plates, containers, packaging materials, utensils and other items provided by Food Court Tenants for use of their customers, including without limitation, removal and disposal of refuse and debris from the Food Court Common Areas; costs of cleaning, repairing, maintaining and replacing refuse containers and tables and chairs primarily used for the consumption and disposal of food in the Food Court Common Areas; costs of removing refuse and debris from, and routine spot cleaning of,  the floor in the Food Court Common Areas (exclusive of the daily washing and any polishing of the floor surface); costs of acquiring, repairing, maintaining and replacing equipment intended to be used by Landlord solely to clean and maintain the Food Court Common Areas, or provided by Landlord for use by customers of Food Court tenants  which are reasonably allocated by Landlord to Food Court Operating Costs, including without limitation, any dishwashing equipment; costs of maintaining, repairing and replacing the smoke evacuation system serving Food Court Tenants; costs of repair, redecorating, renovation and replacement of those portions of the store front demising piers not facing the interior of any tenant space; and the wages, salaries, compensation and benefits paid to employees, agents or contractors used for any of the foregoing purposes to the extent reasonably allocated by Landlord to Food Court Operating Costs.  In addition, there shall be included in Food Court Operating Costs a charge equal to fifteen percent (15%) of the total of all such Food Court Operating Costs to cover Landlord's administrative overhead.  If any capital item chargeable to Food Court Operating Costs exceeds 5% of annual Food Court Operating Costs in any one year, Landlord shall be authorized to amortize and charge such cost, with interest at a rate not to exceed 3% above the prime rate reported by the Wall Street Journal at any time within two months of the such cost is paid by Landlord, over the useful life of the item acquired as determined

by Landlord in Landlord's reasonable discretion. Food Court Operating Costs shall not include general maintenance and operating expenses of the Food Court structure and improvements, including without limitation, real estate taxes and insurance premiums, heating, air conditioning and ventilation costs, costs of lighting the Food Court Common Area, costs of daily washing and any polishing, repairing or replacing the floor and flooring materials in the Food Court Common Area; costs of repairing, redecorating and replacing the ceiling, roof, walls, windows or columns located in the Food Court Common Areas (exclusive of the demising piers); costs of maintaining, repairing, replacing or operating display cases, art, artifacts, fireplace, plants and vegetation, and other amenities located in the Food Court Common Area (exclusive of routine cleaning of such items allocated to Food Court Operating Expense by Landlord) painting or decorating expense.

b.   Food Court Tenants.  "Food Court Tenants" are those tenants occupying leaseable space in the Food Court, exclusive of kiosks and carts, and exclusive of not more than two tenants occupying space in the Food Court whose business is not primarily the sale of food or beverages from the premises.

c.   Food Court. The space designated on Exhibit 1 as the Food Court including the Food Court Common Area.

d.   Food Court Common Area.  The Food Court, exclusive of the leaseable areas designated by Landlord for the exclusive use and occupancy by Food Court tenants.

10. **Tenant Remodel.** Section 11.1 on page 19 is hereby amended by deleting the phrase "15 days" from the date of this Lease from the fourth  (4th) line and inserting in its place "60 days, from the date of this First Amendment to Lease." Section 11.1 on page 19 is hereby amended by adding the following at the end of that section: "Tenant shall complete a major remodel of the Premises by the Expansion Commencement Date in compliance with Landlord's Design Criteria provided Tenant has received a fully executed Amendment."

11. **Temporary Location.**  Tenant may, at its election, occupy a kiosk at a location selected by Landlord during the period of construction of its improvements, but no later than October 31, 2006.  Should Tenant elect to do so, it must notify Landlord prior to August 1, 2006 and return to Landlord an executed Kiosk Lease in the Form attached as Exhibit 7.  If Tenant does not elect to occupy a kiosk space, Tenant's fixed minimum rent, but not additional rents will abate for the period of time Tenant is unable to be open for business at the Premises as a consequence of construction of Tenant's improvements, not to exceed 60 days.

12. **Section 3.4 Right to Relocate**. Section 3.4 Right to Relocate is hereby amended by deleting said Section in its entirety.

13. **Section 21.2 Competition.**   Section 21.2 Competition is hereby amended by deleting said Section in its entirety.

14. **Exhibit 2.**  Exhibit 2 shall be replaced with the attached Exhibit 2.

15. **Exhibit 6.**   Exhibit 6 shall be executed upon Tenant's opening in expanded Premises.

16. **Effect/Further Amendments.** The Lease, except as expressly hereby amended, remains unmodified and in full force and effect. The Lease shall not be further amended except by a writing signed by the parties.

Claire's Boutiques, Inc.
d/b/a/ Claire's, Claire's Accessories,
or Claire's Boutiques
a Delaware Corporation
By:_____
_____COLLEEN COLLINS_____
Its:  ___SENIOR VICE PRESIDENT_____

WEST ACRES DEVELOPMENT, LLP
By SCHLOSSMAN FAMILY LIMITED
PARTNERSHIP, a partner
By:_____
William A. Schlossman, Jr., General Partner



**EXHIBIT 6**

VERIFICATION OF TERM - FLOOR AREA
WEST ACRES SHOPPING CENTER

This form is completed by the parties hereto pursuant to the requirements of the First Amendment to Lease dated July 25, 2006, between West Acres Development, LLP and Claire's Boutiques, Inc., d/b/a/ Claire's, Claire's Accessories or Claire's Boutiques, a Delaware Corporation ("Tenant").

(1)  The Commencement Date defined in Section 4 of the First Amendment to Lease is as follows: November 1, 2006

(2)  The date Tenant's Lease Year begins is:   July 1st

(3)  The floor area of the Premises is 1,462  square feet.

Tenant reacknowledges and affirms that it has examined the Premises in full and that the same is in the condition required under the terms of the Lease between the parties, and that Tenant waives all claims against Landlord concerning the condition of the Premises and the personal property, if any, transferred by Landlord in connection with the Lease, and in accordance with its terms.

This Exhibit 6 is attached to and constitutes a part of the above-described Amendment and Lease.

Claire's Boutiques, Inc.
d/b/a/ Claire's, Claire's Accessories,
or Claire's Boutiques
a Delaware Corporation
By:_____

_____
Its: _____

WEST ACRES DEVELOPMENT, LLP
By SCHLOSSMAN FAMILY LIMITED
PARTNERSHIP, a partner
By:_____
William A. Schlossman, Jr., General Partner

## EXHIBIT 7
### SPECIALTY CART LICENSE AGREEMENT

This Specialty Cart License Agreement ("Agreement") is made as of this ___ day of July, 2006, by and between West Acres Development, LLP, a North Dakota limited liability partnership, whose address is P.O. Box 9978, Fargo, North Dakota 58106-9978 ("West Acres") and whose address is , hereinafter ("Licensee")

### RECITALS

WHEREAS, West Acres is the owner and operator of the West Acres Shopping Center (the "Shopping Center") located in Fargo, North Dakota

WHEREAS, Licensee desires the right and license to use and occupy a retail sales cart owned by West Acres to be located in the mall of the Shopping Center and used and occupied by Licensee in accordance with the terms and conditions of this Agreement.

Now, therefore, the parties agree as follows:

1.  **Basic Terms.** The following basic terms shall apply to this agreement:

    1.1.  *Agreement:* This Specialty Cart License Agreement, together with any written extensions or renewals thereof.

    1.2.  *Cart:*  The retail sales cart provided by West Acres in substantially the form depicted on Schedule 1 attached hereto.

    1.3.  *Cart Location:* The location in the West Acres Shopping Center in Fargo, North Dakota identified on the floor plan attached as Schedule 2, or such other location as may be designated by West Acres in accordance with the terms of this Agreement.

    1.4.  *Commencement Date:* The earlier of: (a) the date Licensee first opens for business in the Shopping Center; or (b) _____ .

    1.5.  *Termination Date:* , or such earlier date as this Agreement may be terminated in accordance with its terms or applicable law.

    1.6.  *Permitted Use:* The permitted use of the Cart referred to in Section 3 shall be for the following, and no other use: _____.

    1.7.  *Security Deposit:* Licensee's security deposit under Section 7 shall be $_____.

    1.8.  *Base Fee:* The Base Fee payable under Section 5 shall be $ per month from the Commencement Date through the Termination Date. The Base Fee includes and covers Licensee's share of common area maintenance, Merchant's Association, and any other fees, as is more fully set forth in Section 5.

    1.9.  *Royalty Fee Rate:* The Royalty Fee Rate payable under Section 6 shall be _____ of gross sales as defined in Section 1.11.

    1.10.  *Monthly Breakpoint:* The Monthly Breakpoint under Section 6 is _____ .

    1.11.  *Gross Sales:* The term "gross sales", as used in this Agreement, means the actual full price charged for all merchandise sold, leased or licensed in, on or from the Cart, and the actual charges for services performed in, on, or from the Cart whether for cash or on credit, and without reserve

or deduction for inability or failure to collect (including all lay-away, credit, and finance, interest and service charges charged in connection with sales or other dealings from the Cart), even though such sales or services are ordered by telephone, mail, telegraph or otherwise. The following shall be excluded from gross sales: (a) the selling price of all merchandise returned by customers which were purchased from the Cart and accepted for full credit, or the amount of discounts and allowances made thereon; (b) refunds and credits for exchanged or returned merchandise; (c) sales, luxury or excise taxes collected by Licensee from customers, imposed by and paid over to federal, state or local governmental authority, levied in whole or in part upon the basis of retail sales made in, on or from the Cart; (d) gift certificates until redeemed; (e) insurance proceeds received with respect to inventory or other goods damaged or destroyed; (f) sales of trade fixtures or store equipment after use thereof on the Cart; (g) transfers of merchandise between stores of Licensee, provided no transfer is made to avoid liability for royalty fees; (h) parcel post and delivery charges.

2.      **License.**  West Acres grants to Licensee the right and license to use and occupy the Cart in the West Acres Mall beginning on the Commencement Date and ending on the Termination Date. Licensee agrees to use and occupy the Cart at the Cart Location in accordance with the terms, covenants, and agreements contained in this Agreement. Landlord reserves the absolute right, at any time, to relocate on a temporary or permanent basis, Licensee's Cart to another location within the enclosed mall area of the Shopping Center. If Licensee disapproves of any relocation of the Cart by Landlord to a new Cart Location (other than a temporary relocation for a period of no more than 25% of the Term), Licensee may terminate this Agreement within 3 business days following receipt of Landlord's notice designating the new Cart Location. If Tenant fails to terminate this Agreement within the applicable period, Licensee shall move its inventory, merchandise and supplies to the new Cart Location, at its expense.

3.      **Permitted Use.**  Licensee shall occupy and use the Cart solely for the Permitted Use as defined in Section 1.6, and for no other purpose. Licensee shall not use, permit or allow the Cart to be used for any other business or purpose, and shall not conduct any catalog sales in or from the Cart, nor sell any merchandise which Licensee is not permitted to sell under this provision.

4.      **Term.**  The Term of this Agreement shall commence on the Commencement Date and will expire on the Termination Date unless sooner terminated as provided herein. Licensee will operate its business upon the Cart throughout the Term. Licensee agrees that Licensee's rights under this Agreement may be terminated, with or without cause, upon three days written notice from West Acres in West Acres's sole and absolute discretion and without cause.

5.      **Base Fee.**  Licensee shall pay to West Acres each month during the Term, in advance on or before the first day of each calendar month during the Term of this Agreement, the Base Fee set forth in Section 1.8 , without any deduction or set-off whatsoever. In the event the Term covers less than a full calendar month, the Base Fee (together with any other charges due on a monthly basis) shall be determined by multiplying such Base Fee and\or the other charges due by a fraction, the numerator of which is the number of days in such calendar month which fall within the Term and the denominator of which is the total number of days in such calendar month. The Base Fee for the first month of the Term shall be due upon execution of this Agreement.

6.      **Royalty Fee.**  Within 5 days after the end of each calendar month during the term of this Agreement, Licensee shall furnish to West Acres a statement of Licensee's Gross Sales transacted during such month, signed and verified by Licensee or an authorized officer. The statement shall contain the certification of an officer of Licensee that the Gross Sales shown on the statement conform with and are computed in compliance with the definition in this Agreement. If Licensee's Gross Sales for any month exceed the Monthly Breakpoint, then Licensee shall pay West Acres at the time the applicable monthly statement is due, a royalty equal to the product obtained by multiplying the Royalty Fee Rate times the amount by which Licensee's Gross Sales for the applicable month exceeds the Monthly Breakpoint.

For the purpose of ascertaining the amount payable as Royalties, Licensee agrees to prepare, keep, and make available at Licensee's main business office, or other location approved in writing by West Acres adequate records which shall show inventories and receipts of merchandise at the Cart, and daily receipts from all sales and other transactions on or from the Cart by Licensee and any others conducting any business upon or from the Cart. Licensee further agrees to retain and make available for at least three years following the end of a the Term: (a) serially numbered sales slips; (b) records of all mail and telephone orders at and to the Cart; (c) settlement report sheets of transactions with sub-Licensees, concessionaires and licensees; (d) records showing that merchandise returned by customers was purchased at the Cart by such customers; (e) records of merchandise taken out on approval; (f) other such sales records, if any, which would normally be examined by an independent certified public accountant pursuant to accepted auditing standards in performing an audit of Licensee's sales; (g) daily bank deposits and reconciliations of such records with sales.

Licensee agrees that acceptance by West Acres of payments of fees, including royalty fees, shall be without prejudice to West Acres's right of reasonable access to Licensee's accounting system to examine Licensee's books and records as necessary in order to verify or establish the true amount of gross sales made by Licensee and others in and from the Cart. Licensee also agrees that West Acres, at its option, may cause, at any reasonable time upon not less than forty-eight hours prior written notice, a complete audit to be made of Licensee's books and other records relating to reported gross sales for the period covered by any statement issued by Licensee as above set forth. If any audit shall correctly disclose a liability for Royalty Fees to the extent of two percent (2%) or more in excess of the royalties theretofore computed and paid by Licensee for such period, Licensee shall promptly pay West Acres the reasonable cost of the audit in addition to the deficiency in Royalty Fees, which deficiency shall be payable in any event.

7.      **Deposit**. On or before the Commencement Date, Licensee shall deposit with West Acres a Security Deposit for full performance of all Licensee's obligations under the Agreement in the amount of _____ ($_____). Under no circumstances whatsoever shall the Security Deposit be deemed to constitute payment of any portion of Base Fees, Royalty Fees, or any other sum due to West Acres. In the event or cancellation by Licensee prior to the Commencement Date or expiration date, West Acres shall retain the Security Deposit. This deposit shall not be in lieu of West Acres's other remedies under this Agreement or at law, and acceptance by West Acres of such charge shall not preclude West Acres from seeking any other available remedy.

8.      **Exchanges and Refund Policy**. Licensee shall be required to exchange or refund to the customer all merchandise returned with receipt within (30) days from the purchase date. Licensee shall not limit the return of merchandise to exchanges or merchant credits, and "Exchanges Only " or similar signs are not permitted. In the event Licensee violates any provisions of the exchange/refund policy, West Acres shall be entitled to utilize Licensee's security deposit, without notice to Licensee to remedy any such violations, and Licensee shall immediately replenish the security deposit to its original amount.

9.      **Merchandise Display.** Licensee acknowledges that the visual appeal of its mall and all carts and kiosks located therein is a significant and legitimate concern to West Acres, and that the manner and methods used by Licensee to display its merchandise has a substantial impact on the appearance of the mall areas in the Shopping Center. Accordingly, Licensee agrees, as a condition to entering into this Agreement, to hire a merchandise display designer approved by Landlord to prepare a merchandise display plan for Licensee's Cart. Fourteen (14) days prior to the Commencement Date, Licensee will submit said merchandise display plan to Landlord for its approval. Licensee shall throughout the term display its merchandise and maintain the Cart in accordance with the merchandise display plan approved by Landlord.

10.     **Signs**. Licensee will not place or suffer to be placed or maintained anywhere in or on the Cart or anywhere else in the Shopping Center any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place or maintain any decoration, lettering or advertising matter on the Cart without first obtaining Landlord's written approval and consent. Prior to the Commencement Date Tenant shall, at its expense, submit a sign plan for Landlord's approval. Following approval, Licensee's signs must be installed and  maintained in accordance with the

approved plans. All signs, lettering and advertising matter located on the Cart must be designed, installed and, at all times during the Term, maintained in compliance with Landlord's design criteria. All approved signs,decorations,lettering, advertising matter or other thing as may be approved shall be maintained by Licensee, at License's sole cost and expense, in good condition and repair at all times.

11.     **Maintenance of Cart and Cart Location**.  Licensee shall, at its sole cost and expense, keep the Cart and all equipment, lighting, fixtures and glass therein in a first-class, clean and wholesome condition, in good order and repair.  Licensee shall not modify or make any changes or alterations to the Cart without Landlord's express written consent.  Licensee shall maintain the Cart Location and the area within a radius of twenty feet from the Cart Location free and clear of litter and debris, noises, odors or nuisances and in compliance with all governmental, health and police regulations.  Licensee agrees to dispose of litter and debris only in receptacles designated by West Acres.  If Licensee refuses or neglects to make repairs or perform maintenance as required hereby, West Acres shall have the right (without notice in emergency situations and upon reasonable notice in other situations), but not the obligation, to make such repairs or perform such maintenance and to bill Licensee for the reasonable costs thereof, which costs shall be immediately payable by Licensee to West Acres as additional fees.

12.     **Utilities.**  West Acres will supply electrical conduit and wiring necessary to provide  electrical service and phone service to the Cart Location.  West Acres will pay for monthly electrical service. Licensee shall be responsible for all costs of telephonic and data communications from the Cart.  Unless otherwise agreed, no water or sewer will be available to Licensee at the Cart Location.

13.     **Compliance with Laws.**  Licensee shall, at its sole cost and expense, comply with all laws, ordinances, orders, rules and regulations (state, federal, municipal or any other agency having or claiming jurisdiction) related to the use, occupancy or condition of the Cart.  All business licenses and other applicable permits and licenses shall be secured and paid for by Licensee.

14.     **Manner of Operation.**  At all times, Licensee shall conduct its activities in a tasteful manner in accordance with West Acres's rules and regulations for the Shopping Center as described in Section 17 of this Agreement and in a manner that will compliment the aesthetics of the Cart and the Shopping Center.

15.     **Insurance.**  Licensee, at its sole cost and expense, shall obtain and keep in full force and effect during the Term a policy or comprehensive general liability and special form (all-risk) insurance, including without limitation broad form property damage liability and personal injury liability coverage, insuring West Acres and Licensee against any liability arising out of the use or occupancy of the Cart and all areas appurtenant thereto.  Said insurance shall at all times be in an amount of not less than Three Million Dollars ($3,000,000.00) combined each occurrence in the aggregate for personal and bodily injury and property damage.  All such insurance shall specifically insure the performance by Licensee of the indemnity agreement as to liability for injury to or death of persons and injury or damage to property contained in Section 16 of this Agreement.  Said policy shall also name as additional insureds West Acres, the Shopping Center's management company and the Shopping Center's Merchants' Association and all other entities requested by West Acres.  Licensee shall also obtain and keep in full force and effect during the term of this Agreement, Workers' Compensation insurance as required by the laws of the State in which the Shopping Center is located.  A certificate evidencing the coverage required under this Section 15 shall be delivered to West Acres not less than fifteen (15) days prior to Licensee entering upon the Shopping Center.  Such certificate shall contain a provision that West Acres and Licensee shall be given a minimum of ten (10) days written notice by the insurer prior to cancellation, termination or material change in such insurance.

16.     **Indemnity.**  Licensee shall indemnify, defend and hold West Acres harmless from and against any and all loss, cost, damage, injury or expense arising out of or in any way related to claims of injury to or death of persons, or damage to property, occurring or resulting directly or indirectly from the use or occupancy of the Cart or activities of Licensee in or about the Cart or Shopping Center, except to the extent such claims arise solely from the gross negligence of West

Acres; such indemnity shall include, without limitation, the obligation to provide all costs of defense against such claims.

17.    **Rules and Regulations**. Licensee agrees to comply with (and cause its employees, contractors, and agents, to comply with the rules and regulations for the operators of Carts within the Shopping Center as may be established by West Acres at any time and from time to time during the Term, and to pay all reasonable and generally applicable fines and penalties as may be assessed thereunder. The current rules and regulations applicable to Licensee are attached as Schedule 3. Rules and regulations are subject to change by West Acres at any time upon notice to Licensee.

18.    **Hours of Operation**. Licensee shall be open for business at the Cart during all regular Shopping Center hours, and at such other hours as a majority of the other businesses operating at the Shopping Center are open. Accordingly, with respect to any day during the Term that Licensee shall fail to be open for all the hours provided for above, Licensee shall pay a charge of Fifty Dollars ($50.00) which shall become immediately due and payable, within 3 days of written notice of default. Such charge shall not be in lieu of West Acres's other remedies under this Agreement or at law, and acceptance by West Acres of such charge shall not preclude West Acres from seeking any other available remedy.

19.    **Mechanics' Liens**. Licensee agrees not to permit or cause any mechanic's lien to be filed against the Shopping Center by reason of any work, labor, services or material performed at or furnished to Licensee, or to anyone holding the Cart through or under the Licensee. Nothing in this Agreement shall be construed as a consent on the part of the West Acres to subject the West Acres's estate in the Shopping Center to any mechanic's lien or liability under the mechanic's lien laws in the state in which the Shopping Center is located.

West Acres's other remedies under this Agreement or at law, and acceptance by West Acres of such charges shall not preclude West Acres from seeking any other remedy available.

20.    **Assignment.** This Agreement and the rights granted hereunder, are personal to Licensee and are non-assignable and non-transferable by Licensee. Any attempted assignment or other transfer of this Agreement, or sublease of any rights hereunder, by Licensee (collectively, "assign " and/or an "assignment ") shall be null and void, have no effect and confer no rights upon any third party. Subject to the foregoing, the terms and conditions of this Agreement shall be binding upon and inure to the benefit of West Acres and Licensee and their respective successors, assigns, heirs, administrators, executors and representatives.

21.    **Default.** The occurrence of any of the following shall constitute an event of default on the part of Licensee:

i.    Any failure by Licensee to pay any sums due hereunder if such failure continues for a period of time in excess of three (3) days after notice from West Acres to Licensee (which notice shall be in lieu of, and not in addition to, any notice required by law).

ii.    Any failure by Licensee to perform any other of the terms, conditions or covenants of this Agreement to be observed or performed by Licensee if such failure continues for a period of time in excess of 3 days after notice from West Acres to Licensee (which notice shall be in lieu of, and no in addition to, any notice required by law);

iii.    If (1) Licensee should institute any proceedings under the Bankruptcy Act, as such now exists or under any amendments, re-enactments, or replacements thereof that may hereinafter be enacted, or under any other act relating to the subject of insolvency or bankruptcy, whether in such proceeding Licensee seeks to be adjudicated a bankrupt, or to be discharged of its debts or to effect a plan of liquidation, composition or reorganization; or (2) any involuntary proceedings should be filed against Licensee under any such bankruptcy laws; or (3) Licensee should become insolvent or be adjudicated a bankrupt in any court of competent jurisdiction, or a receiver or trustee should be appointed of Licensee's property or Licensee should make

assignment for the benefit of creditors; or (4) there should occur the attachment, execution, or other judicial seizure of substantially all of Licensee's assets located at the Cart, or if a writ of attachment is executed on this Agreement; or (5) this Agreement, or any interest therein or to the Cart, should otherwise by operation of law dissolve or pass to any person or persons other than Licensee;

    iv.     Licensee's abandonment of the Cart, in which case the remainder of Fees for the term of this Agreement are immediately due and payable; or

    v.     Licensee's attempt to "assign" this Agreement or any of Licensee's rights hereunder contrary to Section 20 of this Agreement.

If an event of default occurs, then West Acres, in addition to any other rights or remedies it may have at law or in equity or under this Agreement, shall have the immediate right to unilaterally terminate this Agreement and to remove all persons and property from the Cart and Cart Location (such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Licensees), all without service of notice or report to legal process and without being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned thereby.

22.    **Termination.**  Upon the expiration or earlier termination of this Agreement for any reason whatsoever, Licensee shall leave the Cart and Cart Location in a neat and broom clean condition, free of debris and in as good condition as when the Cart and Cart Location was originally delivered to Licensee, ordinary wear and tear and casualty damage excepted, and shall promptly remove all personal property placed on the Cart or Cart Location by or on behalf of Licensee. Licensee hereby authorizes and irrevocably appoints West Acres as its true and lawful attorney-in-fact to remove all such personal property upon Licensee's failure to remove all personal property from the Shopping Center after the expiration or earlier termination of this Agreement. Licensee hereby waives any and all loss or damage thereto arising from the exercise of this power, and covenants to indemnify and hold harmless West Acres from and against any costs, claims, liens, damages or attorney fees, costs and disbursements arising from such removal.

23.    **Entire Agreement.**  This Agreement contains the entire agreement of the parties. Any representations or modifications concerning this instrument shall be of no force and effect, excepting a subsequent modification in writing signed by the party to be charged.

24.    **Notices.**  All notices required hereunder shall be in writing and may be delivered by personal service to the other party (in which case such notice shall be deemed delivered as of the day of such delivery), or sent postage prepaid by certified mail, return receipt requested (in which case such notice shall be deemed delivered as of the third day after the date of such mailing), to the address set forth below each party's signature block.

25.    **Severability.**  If any term or provision of this Agreement or any portion of a term or provision hereof or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each term and provision of this Agreement and each portion thereof shall be valid and be enforced to the fullest extent permitted by law.

26.    **Captions and Terms.**  The captions and section numbers appearing in the Agreement are for convenience only and are not a part of the Agreement and do not in any way limit, amplify, define, construe or describe the scope or intent of the terms and provisions of this Agreement, nor in any way affect this Agreement.

27. **Hazardous Materials.** Licensee shall at all times in all respects comply with all federal, state and local laws, ordinances and regulations relating to industrial hygiene, environmental protection or the use, analysis, generation, manufacture, storage, presence, disposal or transportation of petroleum products or by-products, or hazardous or toxic substances, materials or waste which is or becomes regulated by any local, state or federal agency (collectively, "Hazardous Materials"). Licensee shall not cause or permit any Hazardous Materials to be brought upon, kept or used in or about the Premises without the prior written consent of West Acres, which consent may be withheld in West Acres's sole and absolute discretion.

28. **Waste/Trash Removal**. Without limiting the generality of the foregoing paragraph, in the event waste and/or trash removal for the Cart and Cart Location is separately provided to the Cart and Cart Location, Licensee shall be solely responsible for contracting for such separately provided service and shall pay all costs directly to the service provider.

29. **Time of the Essence; Nonwaiver**. Time is of the essence of each and every provision of this Agreement. The waiver by West Acres in any instance of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition in any other instance and shall not be deemed a waiver of West Acres's rights and remedies with respect to any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of Base Fee, Royalty Fee or any other sum hereunder by West Acres shall not be deemed to be a waiver of any preceding default by Licensee of any term, covenant or condition of this Agreement regardless of West Acres's knowledge of such preceding default at the time of the acceptance of such sum.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written. It is understood that all terms and conditions of this Agreement are confidential.

WEST ACRES DEVELOPMENT, LLP

By _____
　　　Jim Ross
　　　Leasing Manager

West Acres Development, LLP
P.O. Box 9978
Fargo, ND  58106-9978

LICENSEE:

By

Its

July 28, 2006 (11:14AM)

SCHEDULE 1





## SECOND AMENDMENT TO LEASE

This Second Amendment to Lease is dated as of the ~~12th~~ day of ~~February~~ , 20~~19~~ between **West Acres Development, LLP,** a Limited Liability Partnership ("Landlord") and **Claire's Boutiques, Inc.,** d/b/a/ Claire's, Claire's Accessories or Claire's Boutiques, a Colorado corporation, formerly a Delaware Corporation ("Tenant").

### RECITALS

A.      Landlord and Tenant entered into a Lease dated July 17, 2001, as amended by the First Amendment to Lease dated July 25, 2006, (together the "Lease") for certain space, containing approximately 1,462 square feet within the West Acres Shopping Center known as Space 306 (the "Premises").

B.      The parties wish to extend the term of the Lease, and otherwise amend the Lease, as hereafter provided.

C.      All terms used in this Amendment, and not otherwise defined herein, shall have the same meaning ascribed to them in the Lease.

### AGREEMENTS

In consideration of the Recitals and the following mutual agreements contained herein and for other good and valuable consideration, as of the Effective Date (as hereinafter defined), the parties agree as follows:

1.  **Term.** Section 1.7 on page 2 of the Lease is hereby amended by deleting the phrase "January 31, 2016" and replacing it with the phrase "January 31, 2017."

2.  **Effective Date**.  Effective date of this Second Amendment to Lease shall be February 1, 2016 (the "Effective Date").

3.  **Fixed Minimum Rent**. Section 1.9 on page 2 of the Lease is hereby amended by deleting it in its entirety and replacing it with the following:

    a.  $11,138.56  per month from the Effective Date through January 31, 2017.

4.  **Merchant Association.**  Article 19 on page 41 of the Lease shall be amended by deleting Section 19.1 in its entirety and replacing it with the following: **Section 19.1. Merchant's Association**. "Tenant agrees, for the express benefit of Landlord and the West Acres Shopping Center Merchants Association, Inc., a nonprofit corporation, or its successor, (the "Association") to join and maintain active membership and good standing in said Association during the entire term of this Lease, provided that Tenant's sole obligation shall be to make the payment set forth herein.  During the term of this Lease, Tenant agrees to pay, as Additional

1

Rent, on a monthly basis during the full term of this Lease one-twelfth of all fees, dues and assessments in the amount set forth in Section 1.12. Each Tenant member of the Association shall have one vote and Landlord shall also have one vote in the operation of the Association, provided that Tenant may not vote on any proposed change in Association for any other tenant's or members of the Association whose Association fees (unlike Tenant's) are established by vote of the Association. Landlord, as sponsor, agrees to pay the Association for the continuing promotion of the Shopping Center an amount equal to twenty-five percent of aggregate monthly dues payable by the members.  Nothing in the bylaws or regulations of the Association shall be in conflict with the provisions of this Lease, including any reasonable rules and regulations promulgated by Landlord pursuant to provisions of this Lease, or in any way shall affect the Landlord's rights. Landlord will have the right at any time during the Term to establish a marketing, promotional or media fund (a "Media Fund"). Following Landlord's election to establish a Media Fund, Tenant agrees to pay Landlord on or before the first day of each month, as additional rent, the Media Fund charge specified by Landlord on no less than 30 days notice to Tenant.  In no event (i) may the Media Fund charge payable by Tenant for any month exceed the total Merchant Association dues payable under this provision for such month; and (ii) should the Merchant's Association continue in effect, Tenant will not be required to pay Merchant's Association dues for any month in excess of the total Merchant's Association dues payable under this provision, reduced by Tenant's Media Fund contribution for the month."

5. **Effect/Further Amendments**. The Lease, except as expressly hereby amended, remains unmodified and in full force and effect. The Lease shall not be further amended except by a writing signed by the parties.

Claire's Boutiques, Inc.
d/b/a/ Claire's, Claire's Accessories,
or Claire's Boutiques
a Colorado Corporation
By: _____
　　J. Per Brodin
Its: Executive Vice President and
　　　Chief Financial Officer

WEST ACRES DEVELOPMENT, LLP
A Limited Limited Liability Partnership

By: _____
　　G. Bradley Schlossman
Its: CEO

2

## THIRD AMENDMENT TO LEASE

This Third Amendment to Lease ("Amendment") is dated as of the 25th day of _April_, 2017 between **West Acres Development, LLP,** a North Dakota limited liability partnership ("Landlord") and **Claire's Boutiques, Inc.,** d/b/a/ Claire's, Claire's Accessories or Claire's Boutique, a Colorado corporation, formerly a Delaware corporation ("Tenant").

### RECITALS

A.      Landlord and Tenant entered into a Lease Agreement dated July 17, 2001, as amended by First Amendment to Lease dated July 25, 2006 and by Second Amendment to Lese dated February 12, 2016 (together, the "Lease") for certain space known as Space 306 containing approximately 1,462 square feet of floor area (the "Premises") within the West Acres Shopping Center located in Fargo, North Dakota (as further described in the Lease, the "Shopping Center").

B.      The parties wish to extend the term of the Lease, and otherwise amend the Lease, as hereafter provided.

C.      All terms used in this Amendment, and not otherwise defined herein, shall have the same meaning ascribed to them in the Lease.

### AGREEMENTS

In consideration of the Recitals and the following mutual agreements contained herein and for other good and valuable consideration, as of the Effective Date (as hereinafter defined), the parties agree as follows:

1.   **Effective Date**.  The effective date of this Amendment shall be February 1, 2017 (the "Effective Date").

2.   **Term.** Section 1.7 of the Lease is hereby amended by deleting the phrase "January 31, 2017" and replacing it with the phrase "January 31, 2027."

3.   **Fixed Minimum Rent**. Section 1.9 of the Lease is hereby amended by deleting it in its entirety and replacing it with the following:

   A.  $11,330.50   per month ($93.00 per square foot of floor area in the Premises per annum) from the Effective Date through January 31, 2018,
   B.  Commencing February 1, 2018 and each February 1st thereafter throughout the term of the Lease, annual Fixed Minimum Rent shall increase over the previous year's annual Fixed Minimum Rent amount by two percent (2%) per annum.

1

4. **Tenant Improvements**. Section 1.11 of the Lease is hereby amended by deleting it in its entirety and replacing it with the following: "Tenant shall be required to complete the following improvements ("Tenant Improvements") in accordance with Landlord's Design Criteria:  interior remodel of the Premises, re-clad the storefront and add new signage, all in accordance with Tenant's plans and specifications. Tenant Improvements are to be completed no later than October 31, 2017." Notwithstanding anything to the contrary in the Lease, any exhibits attached thereto, any design criteria provided to Tenant or its contractors, or any construction rules provided to Tenant or its contractors, Landlord agrees that Tenant shall not be required to pay any so-called "chargebacks" in connection with Tenant Improvements including any plan review and/or coordination fees, nor shall Tenant or its contractors be required to provide construction security deposits or payment or perfomrmance bonds.

5. **Merchant Association.**  Article 19 of the Lease shall be amended by deleting Section 19.1 in its entirety and replacing it with the following: **Section 19.1. Merchant's Association**. "Tenant agrees, for the express benefit of Landlord and the West Acres Shopping Center Merchants Association, Inc., a nonprofit corporation, or its successor, (the "Association") to join and maintain active membership and good standing in said Association during the entire term of this Lease, provided that Tenant's sole obligation shall be to make the payment set forth herein.  During the term of this Lease, Tenant agrees to pay $205.17, as Additional Rent, on a monthly basis during the full term of this Lease.  Each Tenant member of the Association shall have one vote and Landlord shall also have one vote in the operation of the Association, provided that Tenant may not vote on any proposed change in Association for any other tenant's or members of the Association whose Association fees (unlike Tenant's) are established by vote of the Association.  Landlord, as sponsor, agrees to pay the Association for the continuing promotion of the Shopping Center an amount equal to twenty-five percent of aggregate monthly dues payable by the members.  Nothing in the bylaws or regulations of the Association shall be in conflict with the provisions of this Lease, including any reasonable rules and regulations promulgated by Landlord pursuant to provisions of this Lease, or in any way shall affect the Landlord's rights. Landlord will have the right at any time during the term to establish a marketing, promotional or media fund (a "Media Fund").  Following Landlord's election to establish a Media Fund, Tenant agrees to pay Landlord on or before the first day of each month, as additional rent, the Media Fund charge specified by Landlord on no less than 30 days notice to Tenant.  In no event (i) may the Media Fund charge payable by Tenant for any month exceed the total Merchant Association dues payable under this provision for such month; and (ii) should the Merchant's Association continue in effect, Tenant will not be required to pay Merchant's Association dues for any month in excess of the total Merchant's Association dues payable under this provision, reduced by Tenant's Media Fund contribution for the month."

2

6. **Effect/Further Amendments**. The Lease, except as expressly hereby amended, remains unmodified and in full force and effect. The Lease shall not be further amended except by a writing signed by the parties.

Claire's Boutiques, Inc.
d/b/a/ Claire's, Claire's Accessories,
or Claire's Boutique
a Colorado corporation
By: _____
     Scott E. Huckins
Its:   Executive Vice President and
       Chief Financial Officer

WEST ACRES DEVELOPMENT, LLP
a North Dakota limited liability partnership

By: _____
     G. Bradley Schlossman
Its:   CEO

3

EXECUTION VERSION

## FOURTH AMENDMENT TO LEASE AGREEMENT

THIS FOURTH AMENDMENT TO LEASE AGREEMENT (this "Amendment") is dated the _____ day of June, 2018, by and between CLAIRE'S BOUTIQUES, INC., a Colorado corporation (the "Tenant"), and WEST ACRES DEVELOPMENT, LLP (the "Landlord"). Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Original Lease.

## RECITALS

WHEREAS, Landlord is the current holder of the interest of the landlord or lessor under that certain Lease Agreement between Landlord and Tenant dated July 10, 2001, as modified by that certain First Amendment to Lease dated as of July 25, 2006, as modified by that certain Second Amendment to Lease dated February 12, 2016, and as modified by that certain Third Amendment to Lease dated April 25, 2017 (as amended, the "Original Lease" and as further amended hereby, the "Lease"), and Tenant is the current holder of the interest of the tenant or lessee under the Original Lease; and

WHEREAS, Tenant and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on March 19, 2018 (the "Filing Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

Accordingly, for good and valuable consideration, which the parties acknowledge receiving, the Landlord and Tenant agree as follows, notwithstanding anything in the Lease to the contrary:

## AGREEMENTS

1.    Effective Date. This Amendment is (i) executed and delivered by the Landlord and Tenant as of the date first above written (the "Execution Date"), (ii) binding on Landlord as of the Execution Date and (iii) binding on Tenant upon the entry of an order of the Bankruptcy Court authorizing the assumption of the Original Lease as amended by this Amendment for the applicable Debtors pursuant to section 365 of the Bankruptcy Code (the "Final Order Effective Date"). Upon the Final Order Effective Date, this Amendment shall be fully binding on Landlord and Tenant and for all purposes shall amend the Lease retroactively as of June 1, 2018 (the "Effective Date").

2.    Prepetition Rent. For the period prior to the Filing Date (the "Prepetition Period"), Tenant shall pay upon assumption of the Lease or as soon as practicable thereafter, all rent due under the Original Lease. Landlord will have all lawful remedies under the Lease with respect to Tenant defaults arising subsequent to the Filing Date to the extent permitted by applicable law, including the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

3.    Term. Notwithstanding anything in the Original Lease to the contrary, the current term of the Lease shall expire on January 31, 2027. Any extension or renewal rights and option periods of Tenant under the Original Leases available as of the date hereof shall remain in full

force and effect and shall not be affected or impaired by this Amendment except as set forth below, and shall not have been terminated by the commencement by the Tenant for bankruptcy in the Bankruptcy Court or any defaults of Tenant which are waived hereby, provided the effective date thereof, and the period of time in which the Tenant must give advance notice to exercise such rights, shall be adjusted as necessary to accommodate the adjustment to the expiration date of the current term of such Original Lease made herein. Notwithstanding the foregoing, Tenant shall have the one-time right to terminate the Lease on May 31, 2023, provided Tenant shall deliver notice to Landlord of its intention thereof at least one hundred fifty (150) days prior to such termination date. Upon any such termination, the Lease shall be terminated and neither Landlord nor Tenant shall have any further rights, obligations or liabilities under the Lease, except those which explicitly survive termination thereof.

4.      Acknowledgement of No Assumption.  The parties acknowledge that assumption of the Original Lease, as modified by this Amendment, only shall be effective upon entry of an order of the Bankruptcy Court authorizing such assumption pursuant to section 365 of the Bankruptcy Code and neither Tenant's nor Landlord's execution of this Amendment absent entry of such order shall constitute or be deemed to constitute an assumption of the Original Lease or this Amendment.

5.      Extension of Time to Assume/Reject Lease. Landlord hereby provides its written consent (as that term is used by section 365(d)(4)(B)(ii) of the Bankruptcy Code) to the extension of Tenant's time to assume or reject the Lease to the later of the effective date of a chapter 11 plan confirmed in the Chapter 11 Cases or such other date as may be selected by Tenant in its sole discretion.

6.      Waiver of Default.   Notwithstanding anything in the Original Lease to the contrary, Landlord waives any default or event of default arising out of the filing by the Tenant for bankruptcy in the Bankruptcy Court and the failure to pay Prepetition Rent, if applicable hereunder.  Landlord agrees that no such default or event of default shall be deemed to have caused or cause the loss of any options or rights of Tenant under the Original Lease the exercise by Tenant of which may be contingent upon no prior defaults by Tenant, such as, rights to renew or extend the term of the Original Lease, rights to expand or reduce any Premises, rights of termination, rights for tenant improvement allowance for any Premises, rights of first offer or rights of first refusal.

7.      No Brokers.  Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims, costs, expenses or liabilities, including reasonable attorneys' fees, for commissions or other compensation claimed by any broker or agent with regard to this Amendment as a result of any dealings with Tenant or claiming by or through Tenant.  Landlord shall indemnify, defend and hold Tenant harmless from and against any and all claims, costs, expenses or liabilities, including reasonable attorneys' fees, for commissions or other compensation claims by any broker or agent with regard to this Amendment as a result of any dealings with Landlord or claiming by or through Landlord.

8.      Miscellaneous.

(a)     As amended hereby, the Original Lease shall continue in full force and effect and is in all respects ratified and confirmed by Landlord and Tenant as amended hereby.

(b)     This Amendment sets forth all covenants, agreements and understandings between Landlord and Tenant with respect to the subject matter hereof, and there are no other covenants, conditions or understandings, whether written or oral, between the parties hereto except as set forth in this Amendment.

(c)     The terms of this Amendment shall control over any conflicts between the terms of the Original Lease and the terms of this Amendment.

(d)     Each party hereto warrants and represents to the other party that (i) it is a duly organized and existing legal entity, in good standing in its respective states; (ii) it has full right and authority to execute, deliver and perform this Amendment; and (iii) the person executing this Amendment is authorized to do so.

(e)     This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(f)     Landlord acknowledges that Tenant may file this Amendment with the Bankruptcy Court.

(g)     Landlord shall use commercially reasonable efforts to obtain the consent of any lender or third party to the extent necessary or advisable; provided, however, this Amendment will remain in full force and effect regardless of whether such consent is obtained.

(h)     This Amendment may be executed in multiple counterparts, each of which shall be fully effective as an original, which together shall constitute one (1) instrument.

(i)     The interpretation, validity and enforcement of this Amendment shall be governed by and construed under the law of the State in which the Premises which is the subject matter of such Original Lease is located, except to the extent superseded by the Bankruptcy Code.

(j)     This Amendment constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations (whether written or oral) by or between the parties to the extent they relate in any way to the subject matter hereof.

(k)     In case at any time after the date hereof any further action is necessary to carry out the purposes of this Amendment, each of the parties will, at the requesting party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments as the other parties may reasonably request) to properly evidence the agreement of the parties herein.

(l)    This Amendment or any counterpart may be executed and delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

(m)    If any action is brought by any of the parties against another, then the prevailing party shall be entitled to recover from the other party court costs and reasonable attorneys' fees and costs actually incurred.

(n)    This Amendment may be amended, discharged or terminated, or any of its provisions waived, only by a written instrument executed by the parties hereto.

[SIGNATURES ON PAGE FOLLOWING]

Each Landlord and Tenant have executed and delivered this Amendment to be effective as of the Effective Date.

**LANDLORD:**

WEST ACRES DEVELOPMENT, LLP

By: _____

Name: _____

Title: _____

**TENANT:**

CLAIRE'S BOUTIQUES, INC.

By: _____

Name: _____

Title: _____

SCOTT E. HUCKINS
EXECUTIVE VICE PRESIDENT
CHIEF FINANCIAL OFFICER