## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CLAIRE'S HOLDINGS LLC, *et al.,* | Case No. 25-11454 (BLS) |
| Debtors. | **Ref. Dkt. Nos. 4, 8, 80, and 81**<br>**Hearing Date: September 9, 2025, at 2:00 (ET)** |

### OBJECTION TO ENTRY OF FINAL ORDERS GRANTING WAGE MOTION AND CRITICAL VENDOR MOTION

Exegistics Resource Solutions, LLC ("Exegistics"), by and through its attorneys, brings this objection (the "Objection") to the entry of final orders granting the *Motion (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue the Compensation and Benefits Programs, and (II) Granting Related Relief* [Dkt. 4] (the "Wage Motion") and the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain (A) Critical Vendors, (B) Foreign Vendors, (C) 503(B)(9) Claimants, and (D) Lien Claimants, and (II) Granting Related Relief* [Dkt. 8] (the "Critical Vendor Motion") filed by the debtors (collectively, the "Debtors") in the above-captioned jointly administered chapter 11 cases, and requests that this court (the "Court") compel payment of Exegistics' prepetition claim pursuant to the Wage Motion (or Critical Vendor Motion) based on Debtors' statements on which Exegistics reasonably relied. In further support of this Objection, Exegistics respectfully states as follows:

### OBJECTION

1.  On March 29, 2021, Exegistics and debtor Claire's Stores, Inc. entered into a *Master Services Agreement* (the "MSA") to provide temporary workers to the Debtors at their

Hoffman Estates warehouse location.  A copy of the MSA is attached as **Exhibit 1**.  Paragraph 3(d) provided, *inter alia*, that:

> . . . In the event Client voluntarily files a Chapter 11 bankruptcy petition . . . , Client shall, as soon as practicable, seek entry of an order from the U.S. Bankruptcy Court . . . in form and substance acceptable to Vendor, (a) assuming this Agreement pursuant to 11 U.S.C § 365; or (b) naming Vendor as a "critical vendor" and authorizing payment of any unpaid prepetition amounts owing to Vendor in accordance with 11 U.S.C. §§ 105 and/or 363. . .

Exhibit 1 at ¶ 3(d).  The MSA is governed by Illinois law.  *Id.* at ¶ 14(d).

2.      On August 6, 2025, the Debtor filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.[1]  As of the Petition Date and through the date of this Objection, Exegistics provides 117 part-time warehouse to the Debtors.

3.      On August 8, 2025, Exegistics' counsel contacted Debtors' counsel, pursuant to the MSA, and sought Exegistics' designation as a critical vendor.  A copy of the correspondence is attached as **Exhibit 2**.  On August 12, 2025, the Debtors replied as follows:

> The part-time warehouse workers have been classified as Independent Contractors under the Wages motions as opposed to the Critical Vendors motion. Pursuant to the Wages motion, the Debtors are authorized, but not directed, to pay all outstanding prepetition amounts on account of the Independent Contractors on a postpetition basis in the ordinary course of business and consistent with past practice. Can you please provide backup for what you believe is owed prepetition so that we can review and reconcile any discrepancies?

Exhibit 2 (emphasis added).

4.      On August 13, 2025, Exegistics replied with the A/R detail report and invoices for the prepetition claim totaling $644,735.36.  Attached as **Exhibit 3** is the correspondence providing the prepetition amount.  That same day, Debtor responded "Thanks, we will review and let you know of any issues."  Exhibit 3.

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in the Wage Motion and/or Critical Vendor Motion.

5.      On August 15, 2025, Exegistics followed up with Debtors on confirmation of the amount but not whether the prepetition wages would be paid.  Attached as **Exhibit 4** is the follow up correspondence.  Debtors never responded with any issues.

6.      Exegistics continued to provide part-time warehouse workers to the Debtors.

7.      On August 28, 2025, having not yet received payment on the prepetition claim, Exegistics again followed up on the claim.  Attached as **Exhibit 5** is the August 28, 2025 e-mail. The next day, Debtor asserted the proposed sale of assets for payment of the claim instead of the Wages Motion or Critical Vendor Motion.  *Id.*

8.      Exegistics relied on Debtors' statements that (i) the part-time warehouse workers have been classified as Independent Contractors under the Wages motions as opposed to the Critical Vendors motion (Exhibit 2); (ii) please provide backup for what you believe is owed prepetition so that we can review and reconcile any discrepancies (*Id.*); and (iii) we will review and let you know of any issues.  Exegistics had no obligation to continue to provide workers to the Debtors.  However, it relied on Debtors' statements that it would receive payment on the prepetition claim pursuant to the Wage Motion (instead of being a critical vendor).

9.      Exegistics requests the Court require the Debtors to pay its prepetition claim based on its reliance on the statements set forth above. *See  Fluor Enters., Inc. v. Orion Ref. Corp. (In re Orion Ref. Corp.),* 372 B.R. 688, 699 (Bankr. D. Del. 2007) (detrimental reliance on promise to pay under critical vendor order was established by non-debtor contract party's performance under executory contract and its forbearance from exercising other options such as filing a motion to compel assumption or rejection); *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 534-24 (Ill. 2009) (identifying elements of promissory estoppel claim under Illinois law).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should sustain Exegistics' Objection and require payment of Exegistics' prepetition claim in the amount of $644,735.36.

Dated: September 2, 2025                              CLARK HILL PLC

                                                     */s/ Kevin H. Morse*
                                                     Kevin H. Morse (admitted *pro hac vice*)
                                                     IL Bar No. 6297244
                                                     130 E. Randolph Street, Suite 3900
                                                     Chicago, IL 60601
                                                     Telephone: (312) 965-5556
                                                     kmorse@clarkhill.com

                                                     - and -

                                                     Karen M. Grivner (Bar No.4372)
                                                     824 N. Market St., Suite 710
                                                     Wilmington, DE 19801
                                                     Telephone: (302) 250-4750
                                                     kgrivner@clarkhill.com

                                                     *Counsel for Exegistics Resource Solutions, LLC*

283484027.v1

4

**Exhibit 1**
**MSA**

## MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT (this "Agreement") is made as of the date listed on the signature page below (the "Effective Date"), by and between the vendor listed on the signature page below ("Vendor") and the Claire's entity listed on the signature page below ("Client"). Client and Vendor are individually referred to as a "Party" and collectively as the "Parties".

In consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **Services.** During the Term (as defined below), and if mutually agreed to in writing, Vendor may provide services to Client ("Services") described in one or more written statements of work executed by both Parties (each, a "SOW"). This Agreement requires Client to deal exclusively with Vendor for the defined Services in the MSA and SOW during the Term. This Agreement shall control over any conflicting provisions of a SOW, unless otherwise stated in such SOW. This Agreement does not impose on Client any obligation to deal exclusively with Vendor for services similar to the Services. Vendor is not obligated to undertake, and Client is not obligated to purchase or pay for, any Services unless this Agreement and a SOW for such Services is

executed and delivered by both Parties.

2.      **Term.** This Agreement shall commence as of the Effective Date and continue, unless otherwise terminated earlier pursuant to the terms hereof, until the later of: (i) the third anniversary of the Effective Date; or (ii) the expiration or termination of, or completion of all Services pursuant to, any outstanding SOW (the "Term").

3.      **Payment Terms; Invoicing.**

(a)      Fees. In consideration for and subject to Vendor's full performance of the obligations as described herein and in the relevant SOW, Client shall pay to Vendor the fees set forth in the SOW. Client is not obligated to pay for Services not rendered due to any termination of this Agreement or any SOW as provided herein. The parties acknowledge that not every specific task, function, or other service has been, or could be, specifically identified in a Statement of Work and accordingly that for Statements of Work, or portions thereof, designated as fixed price or milestone basis pricing, the scope of the Services to be provided within such fixed or milestone based price includes the performance of all other services that are (i) consistent with, and reasonably inferable to be within the scope described in the Statement of Work or (ii) ancillary to, incidental to, or necessary for, the performance of any part of the Services and functions described in such Statement of Work.

(b)      Expenses. Client will pay only those expenses of Vendor that are expressly set forth in a SOW and only if all such expenses are: (i) reasonable and incurred in accordance with a budget which has been pre-approved by Client's project manager and approved in writing by Vendor; (ii) itemized on the relevant invoice together with appropriate receipts providing sufficient backup for such expenses; and (iii) if travel expenses, pre-approved in writing by Client. Unless otherwise specified in a SOW, all approved expenses and pass through charges shall be reimbursed at cost as actually incurred, without mark up by Vendor.

(c)      Invoicing. Vendor shall provide Client with invoices describing any fees due for Services. Such invoices shall indicate the nature of the work performed, the total amount due, the rate for such work and any expenses that are to be paid by Client as set forth in Section 3(b) above.

Client must approve or reject time submitted by Vendor personnel for each work week no later than 10:00 AM on the following Tuesday, at which time all non-rejected time submitted for approval will be considered approved-in-full and will be sent for payroll processing. Invoices will be delivered electronically on a weekly basis and are payable within 30 days of the invoice date. Per applicable state laws, the invoice

1

may include appropriate taxes, which Client agrees to pay. In the event Client's account is in default, ERS will be entitled to recover its costs of collection, including reasonable attorneys' fees.

(d)    Invoicing Disputes. Client shall notify Vendor of any invoice dispute by email or in writing. The Parties shall work in good faith to resolve any invoicing disputes as quickly as reasonably possible. The non-payment of any disputed items shall not constitute a breach under this Agreement. Client shall pay all amounts due that are not in dispute within the time frame specified above. Any invoice disputes must be submitted in writing to Vendor within six months of the date of invoice that is being disputed, after which time Client will be barred from raising such disputes. In the event Client voluntarily files a Chapter 11 bankruptcy petition (or becomes subject to an involuntary bankruptcy petition), Client shall, as soon as practicable, seek entry of an order from the U.S. Bankruptcy Court having jurisdiction over Client's bankruptcy case(s), in form and substance acceptable to Vendor, (a) assuming this Agreement pursuant to 11 U.S.C. § 365; or (b) naming Vendor as a "critical vendor" and authorizing payment of any unpaid pre-petition amounts owing to Vendor in accordance with 11 U.S.C. §§ 105 and/or 363. Client acknowledges that its failure to timely procure either such order shall automatically serve as grounds for Vendor to compel immediate rejection of this Agreement. Client acknowledges that Vendor is relying on this provision as an inducement to enter into this Agreement, and provide further services to Client from and after the Effective Date.

(e)    Taxes. Vendor shall be responsible for the withholding or payment, as required by law, of all federal, state and local taxes (including without limitation, all employment, income, sales, use, services and other taxes) imposed on Vendor or its employees or permitted subcontractors because of the performance of Services hereunder. Furthermore, Vendor shall comply with all federal and state benefits laws applicable to Vendor or its employees, including without limitation, making deductions and contributions to social security, disability and unemployment tax. Each Party shall be responsible for the payment of other taxes, if any, legally imposed upon it resulting from, arising out of or relating to this Agreement. Vendor agrees to reasonably cooperate with Client in order to minimize any such tax obligations.

4.    **Confidential Information and Protection of Data.**

Each party acknowledges it will have access to the other party's confidential information ("Confidential Information") including information about operations, sales, costs, financial condition, plans, practices, strategies, customers, pricing, technology and products. Any point of sale reports or other information Client provides to Vendor about Client's direct customers or their customers/end users, including their respective purchases, sales and forecasts, also will constitute Confidential Information of Client. Each party will keep strictly confidential, will not use in any way detrimental to the other or for any purpose other than in connection with this Agreement, and will not disclose to any third party any Confidential Information, regardless of its form or media (whether obtained in writing, verbally, by electronic or other data transmission or through on-site visits, before or after the date any Services are provided). Each party may, however, disclose Confidential Information to those of its employees, contractors, subcontractors, or agents "Representatives" who need to know such Confidential Information in connection with its performance, provided that the disclosing party directs and obligates such Representatives to treat the Confidential Information confidentially and remains responsible for any improper use or disclosure of the Confidential Information by its Representatives. A party may disclose Confidential Information if and only to the extent required by any law or court or governmental order, provided that such party first gives prompt notice to and cooperates with the other party in seeking to protect the confidentiality of such Confidential Information. These obligations will not apply to any portions of the Confidential Information that a party can demonstrate (a) is or becomes generally available to the public through no action or omission by such party or any of its Representatives, or (b) is or becomes available to such party on a non-confidential basis from a source, other than the other party or its Representatives, which is not prohibited from disclosing the Confidential Information by any contractual, legal or fiduciary obligation. Notwithstanding anything herein to the contrary, Client may disclose Vendor's Confidential Information to its Representatives. Notwithstanding anything herein to the contrary, under the Federal Defend Trade Secrets Act of 2016, an individual may not be held criminally or civilly liable under any

2

Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order. Nothing herein is intended or should be construed, to affect the immunities created by the Defend Trade Secrets act of 2016.

(b)     Publicity. Except as expressly provided for herein or in any SOW, Vendor shall not advertise, market, disclose or otherwise make known to others without prior approval of Client (other than Vendor's employees and permitted subcontractors who are performing Vendor's obligations under this Agreement) any information relating to any terms of this Agreement, the existence of this Agreement, or the existence of a relationship with Client, including mentioning or implying the name of Client, or any of its Affiliates or personnel, without the prior written consent of Client, which may be withheld in Client's sole discretion.

(c)     Personal Information. To the extent Vendor receives, maintains, processes or otherwise has access to Personal Information (as defined in Exhibit B attached hereto) in connection with the Services, Vendor shall comply with Exhibit B.

5.     **Vendor Representations.** Vendor represents and warrants that:  (a) it has full power to enter into this Agreement, to carry out its obligations hereunder and to grant all other rights granted herein to Client; (b) it (and its employees and permitted subcontractors used to provide Services and deliver any Deliverables (as defined below) shall operate in compliance with all applicable federal, state and local laws, statutes, codes, ordinances and regulations, and that it is properly registered to do business or licensed in all jurisdictions in which it will provide Services and deliver the Deliverables; (c) it has the requisite skill, experience and resources to perform all Services and deliver the Deliverables; (d) the Services and Deliverables shall be performed in a timely and professional manner consistent with industry standards, exercising due skill and care; (e) the Services and Deliverables shall comply with all applicable federal, state and/or local laws and regulations, including but not limited to, federal and state laws governing advertising and marketing, including the Federal Trade Commission Act, 15 U.S.C. § 41 et seq.; the CAN-SPAM Act, 15 U.S.C. § 7701 et seq., and corresponding rules, 16 C.F.R. Part 316; and state laws governing unfair and deceptive acts and practices; and (f) the Deliverables shall materially conform to any relevant specifications in the applicable SOW or other written documentation. Unless otherwise specified in a SOW, Vendor shall promptly correct any Services or Deliverables not in compliance with this warranty by either re-performing such nonconforming Services or repairing or recreating any nonconforming Deliverables, in each case at no cost to Client, within 30 days of receiving notice of such nonconformity, or by refunding to Client any amounts paid for such nonconforming Services or Deliverables. If Client has separately purchased software or hardware maintenance services from Vendor relating to underlying software or hardware products to which a customized software or hardware Deliverables provided by Vendor hereunder relates, Vendor shall repair under the applicable maintenance plan any errors or non-conformance to that Deliverables after the warranty period expires.

6.     **Ownership.**

(a)     Ownership of Deliverables. Except as otherwise expressly set forth below or in a SOW, all right, title, and interest in and to any Deliverables shall be exclusively owned by Client, including without limitation, all rights under any applicable copyrights, patents, trade secrets, and other intellectual property rights. Vendor hereby assigns to Client all right, title, and interest in and to all such Deliverables (other than Vendor Property as defined below), including without limitation, all rights under any applicable copyrights, patents, trade secrets, and other intellectual property rights. From time to time upon Client's request, Vendor and its personnel shall confirm such assignments by execution and delivery of such written instruments as

3

Client may request. As used herein, "<u>Deliverables</u>" means all deliverables and other work product: (i) provided to Client or its Affiliates under this Agreement or any SOW; or (ii) designed, created, produced, invented, or conceived of by Vendor or its designees (or jointly by Vendor and Client) in the performance of the Services.

(b)    <u>Vendor Ownership</u>. Notwithstanding the foregoing, Vendor shall retain all ownership rights to its trademarks and to any commercially available products of Vendor developed independently of this Agreement that are provided to Client ("<u>Vendor Property</u>").

(c)    <u>Vendor Know-How</u>. Notwithstanding Client's ownership of the Deliverables (other than Vendor Property), Vendor shall be free to use in other engagements its general skills, know-how, and expertise, whether pre-existing or gained under this Agreement, so long as it acquires and applies such information without disclosure of any Confidential Information of Client. Vendor shall not in any event provide the specific Deliverables provided to Client to any third party without Client's prior written consent, which may be withheld in Client's sole discretion. In addition, this Agreement does not grant Vendor any licenses under any of Client's patents, trade secrets or copyrights.

**7.    <u>Indemnification</u>.**

(a)    <u>Indemnification</u>. Each Party (an "<u>Indemnifying Party</u>") shall defend at its own expense the other Party and its Affiliates (as defined in Section 14(b) below) and their respective directors, officers, employees and agents (collectively, the "<u>Indemnified Party</u>") from and against any and all third party claims, demands, suits or actions (collectively, a "<u>Third Party Claim</u>") resulting from, arising out of or relating to the Indemnifying Party's (including its employees and anyone acting on its behalf) alleged or actual: (i) acts or omissions, willful misconduct or fraud in connection with this Agreement; (ii) breach of this Agreement; (iii) violation of any statute, law, ordinance or regulation; and (iv) disputes between the Indemnifying Party and any of its subcontractors, employees, or agents, partners, or joint venturers. Vendor, as the Indemnifying Party, shall defend at its own expense Client and its Affiliates and their respective directors, officers, employees and agents, as the Indemnified Party, from and against any Third Party Claim resulting from, arising out of or relating to any allegation that the Services or Deliverables infringe any patent, copyright, trademark, trade secret or other intellectual property or other rights of a third party. With respect to each Third Party Claim that is indemnifiable under this section ("<u>Indemnifiable Claim</u>"), the Indemnifying Party shall indemnify and hold harmless the Indemnified Party from and against any and all losses, including without limitation damages, judgments, awards, expenses, reasonable attorneys' fees, and costs, that are awarded by a court, administrative agency, governmental authority, or arbitrator or that are payable to the third party pursuant to a settlement made by the Indemnifying Party or otherwise.

(b)    <u>Rights Upon Potential Impaired Use</u>. If Client's continued use of any Deliverable becomes or is threatened to become the subject of an Indemnifiable Claim, then at Client's request and option, Vendor shall at Vendor's expense either (i) obtain for Client the right to continue using the Deliverable, in a form that is acceptable to Client in its sole discretion; (ii) replace or modify the Deliverable so that it is no longer subject to such Indemnifiable Claim, and continues to perform in a functionally equivalent manner in compliance with any existing specifications.

(c)    <u>Procedures</u>. The Indemnified Party shall give the Indemnifying Party prompt notice of any Third Party Claim for which the Indemnified Party seeks defense and indemnity under this section (a "<u>Notice</u>"). The Indemnified Party's failure to provide or delay in providing a Notice shall not diminish the Indemnifying Party's defense and indemnity obligations hereunder unless and only to the extent that the Indemnifying Party is materially and adversely affected by such failure or delay to give such Notice. The Indemnifying Party shall inform the Indemnified Party promptly following of receipt of a Notice as to whether it will defend and indemnify the Third Party Claim(s) set forth in the Notice. If the Indemnifying Party denies, limits, or conditions the defense or indemnity of the Third Party Claim(s) set forth in the Notice, it shall provide with its response to the Notice a detailed explanation of the basis for such denial, limitation, or condition. The Parties agree that any dispute between them as to whether a Third Party Claim is

4

indemnifiable under this section shall be resolved in accordance with the dispute resolution procedure set forth in Section 14(d) below, or as otherwise agreed to in writing by the Parties. The Indemnifying Party shall control the defense of any Indemnifiable Claim; provided that any settlement by the Indemnifying Party must be approved by the Indemnified Party, with such approval not to be unreasonably withheld or delayed (except that any settlement requiring the Indemnified Party to make any admission of liability, pay any amount, or be subject to any injunctive or continuing obligation shall be subject to the Indemnified Party's approval in its sole discretion). The Indemnified Party shall reasonably cooperate (at the Indemnifying Party's request and expense) with the Indemnifying Party in the defense of such Indemnifiable Claim. The Indemnified Party also has the right to retain separate counsel at its own expense in connection with such Indemnifiable Claim; provided that if the Indemnifying Party has been advised by the written opinion of counsel to either Party that the use of the same counsel to represent both Parties would present a conflict of interest, then the Indemnified Party may select its own counsel and all fees, costs, and expenses of the defense shall be borne by the Indemnifying Party.

**8.** **Limitation of Liability.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, MULTIPLE, OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION, LOST PROFITS, EVEN IF ADVISED OF THE POSSIBILITY THEREOF. THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY TO: (1) BREACHES OF EITHER PARTY'S CONFIDENTIALITY OR PUBLICITY OBLIGATIONS OR (2) AMOUNTS PAYABLE BY A PARTY PURSUANT TO ITS INDEMNIFICATION OBLIGATIONS HEREUNDER, BUT SHALL APPLY IN ALL OTHER INSTANCES REGARDLESS OF THE CAUSE OF ACTION UNDER WHICH SUCH DAMAGES ARE SOUGHT.

**9.** **Termination.**

(a) **For Breach.** If a Party breaches this Agreement or any SOW (including any document that this Agreement references as being attached or incorporated herein by reference), the other Party has the right to terminate this Agreement or such SOW by providing 90 days written notice of termination, due to a failure in any mutually agreed upon KPI mutually agreed to in writing, if the breach has not been cured within 60 days following receipt of notice of the breach (or if the breach is not capable of being cured). If the breach is not cured within 60 days, the Party will provide a 90 day notice of termination. Such other Party is not obligated to pay for any time or resources required to cure any breach. A breach of one SOW entitles the other Party to terminate the affected SOW, but not the entire Agreement, except as provided in the following sentence. If Vendor commits more than two breaches of its duties or obligations under this Agreement or any SOWs with respect to which a breach notice was sent (whether subsequently cured or not), Client may terminate this Agreement or any or all SOWs upon notice.

(b) **Termination by Client.** In addition to any other termination rights, Client has the right in its discretion to terminate this Agreement or any SOW, for any reason or for no reason, upon 180 days prior notice to Vendor.

(c) **Effect of Termination; Transition Period.** Upon termination or other expiration of this Agreement, Vendor shall deliver to Client all Deliverables (whether complete or incomplete) under any SOW and return all Client Materials held by Vendor for purposes of performance of this Agreement. In addition, at Client's request, Vendor shall provide to Client or its designee commercially reasonable transition assistance. Unless otherwise agreed in writing, all terms and conditions of this Agreement shall apply during the transition period.

(d) **Survival.** The following provisions shall survive any expiration or termination of this Agreement: Section 3 (Payment Terms & Invoicing), Section 4 (Confidential Information and Protection of Data), Section 5 (Vendor Representations), Section 6 (Ownership), Section 7 (Indemnification), Section 8

5

(Limitation of Liability), subsections 9(c) (Effect of Termination; Transition Period) and (d) (Survival), Section 10 (Insurance) (until expiration or termination of all SOWs), Section 11 (Independent Contractor), Section 12 (Vendor Personnel), Section 13 (Force Majeure), and Section 14 (General Terms).

**10.** __Insurance.__ Prior to the start of any Services, Vendor shall at its own expense procure and maintain during the Term of the Agreement, the minimum insurance set forth on Exhibit A (the "Required Minimum Insurance"). The Required Minimum Insurance shall: (i) be carried with responsible insurance companies rated A-VIII or better by A.M. Best (or its foreign equivalent) and coverage shall respond in the state or country in which the Services are rendered; (ii) provide primary coverage and not call upon any other insurance procured by other parties for defense, payment or contribution; (iii) waive insurer(s) subrogation rights against Client; (iv) name Claire's Holdings LLC and its Affiliates as additional insureds, as their interests may appear (ATIMA); and (v) be provided on an occurrence rather than a claims made basis; however if any Required Minimum Insurance is available only on a claims-made basis, then the dates of coverage (including the retroactive date) and the time period within which any claim can be filed shall continue during the Term and for a period of three years thereafter, and Vendor shall not permit any gaps in coverage to occur. Notwithstanding the minimum limits of coverage of the Required Minimum Insurance, additional insured status shall be for the full limits of Vendor's insurance coverage, including but not limited to, any excess insurance coverage purchased by the Vendor. Vendor shall comply with all warranties, declarations and conditions contained in each policy evidencing the Required Minimum Insurance. With the exception of Vendor's insurer(s) 10-day notice for non-payment of premium, Vendor (or its insurer representative) shall provide at least 30 days prior notice to Client upon any termination, non-renewal, cancellation, or material change in coverage or deductible amounts of the Required Minimum Insurance. Prior to commencement of the Services and upon policy renewal, Vendor shall deliver to Client certificates of insurance and any required endorsements made out by the applicable insurer(s) (or their authorized agents) evidencing the Required Minimum Insurance and any material policy amendments thereto. If Vendor fails to procure or maintain the Required Minimum Insurance, Client shall have the right, but not the obligation, to effect such insurance at Vendor's expense, and Vendor agrees to indemnify and hold harmless Client against all liability and loss in connection with Vendor's failure to comply with the provisions of this Section. The Required Minimum Insurance in no manner relieves or releases Vendor, its agents, subcontractors, and invitees from, or limits their liability as to, any and all obligations assumed or risks indemnified against in this Agreement.

**11.** __Independent Contractor.__ Each of the Parties is an independent contractor and shall not be considered to be an agent, distributor or representative of the other. Neither Party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other. All personnel supplied or used by Vendor shall be deemed employees, agents or subcontractors of Vendor and shall not be considered employees, agents or subcontractors of Client for any purpose whatsoever. Vendor shall assign only Vendor personnel or permitted subcontractors who are legally eligible to work in the location in which Services are to be performed by those personnel or permitted subcontractors. Vendor assumes full responsibility for the actions of all such personnel and permitted subcontractors while performing Services and for the payment of their compensation (including, if applicable, withholding of income taxes and the payment and withholding of social security and other applicable taxes), workers' compensation, disability benefits and the like to the extent applicable. Vendor shall defend, indemnify and hold harmless Client against all liability and loss in connection with, and shall assume full responsibility for, payment of all federal, state and local taxes or contributions imposed or required under unemployment insurance, social security and income tax laws and all other laws applicable to Vendor or its employees or permitted subcontractors engaged in performance of this Agreement.

**12.** __Vendor Personnel.__

      (a)    On-Site Services. Vendor shall cause its employees and permitted subcontractors who are on Client's premises to behave professionally and appropriately and comply with any written guidelines of Client which are provided to Vendor. Client may immediately remove any Vendor personnel for noncompliance with such standards, and request the replacement of any Vendor personnel that Client

6

reasonably determines is not satisfactorily performing the Services (including without limitation, for reasons of interpersonal skills) and Vendor shall use commercially reasonable efforts to comply with such request. Any equipment or personal property brought onto Client's premises shall be at Vendor's sole risk, and Client is not responsible for any loss or damage resulting to such equipment or personal property.

(b)     Subcontractors. Without limiting Section 12(a) above, any use by Vendor of any subcontractors shall be subject to the following:     (i) Vendor shall provide notice specifying the subcontractor's name and company (where applicable) prior to such subcontractor performing any Services and Client reserves the right to exclude any such subcontractor from performing Services (Client's approval to be in writing or by email); (ii) each approved subcontractor shall be bound by written obligations that are at least as protective of Client's business, Client's Confidential Information and any other materials provided by Client as the terms of this Agreement; and (iii) Vendor shall remain fully responsible to Client for the complete performance of all Services and shall be liable for any subcontractor's noncompliance 'with any terms of this Agreement.

**13.     Force Majeure.** Neither Party shall be liable for any delays or other non-performance resulting from circumstances or causes beyond its reasonable control that are not due to the negligence or misconduct of the Party claiming relief under this Section, including without limitation, fire or other casualty, act of God, war, terrorism, or other violence, any law, order or requirement of any governmental agency or authority or other causes beyond the reasonable control of such Party; provided that such Party has informed the other Party of such force majeure event promptly upon the occurrence thereof (including a reasonable estimate of the additional time required for performance to the extent determinable) and such Party uses reasonable commercial efforts to effect the required performance as soon as reasonably practicable. If either Party's rights have been impaired or intentions unfulfilled due to a force majeure event affecting the other Party, the Parties shall negotiate in good faith an appropriate remedy.

**14.     General Terms.**

(a)     Time of the Essence. Time is of the essence with respect to any Services to be performed or Deliverables to be delivered hereunder.

(b)     Client's Affiliates. The rights granted to Client hereunder shall extend to all Client's Affiliates. "Affiliate" means any person or entity that now or hereafter directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a Party. The term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise, in each case as such terms are interpreted under Rule 12b-2 of the Securities Exchange Act of 1934, as amended.

(c)     Assignment. This Agreement shall inure to the benefit of, and shall be binding upon, the Parties and their respective heirs, permitted successors and permitted assigns. Neither Party shall assign this Agreement or any rights hereunder or, except as expressly permitted in this Agreement, delegate any obligations hereunder to any third party without the other Party's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned. Any change in control of Vendor is deemed to be an assignment hereunder. Notwithstanding the foregoing, either Party may, without consent, assign this Agreement or rights hereunder or delegate obligations to any Affiliate or to any entity which has acquired all or substantially all of its assets or business, whether by merger or acquisition; provided that (i) any such assignment or delegation to an Affiliate or acquirer is conditioned upon the assignee's assumption of all obligations and liabilities of the assignor under this Agreement and (ii) Vendor shall not assign or delegate to any Affiliate or acquirer that is a competitor of Client without Client's prior written consent (which may be withheld in its sole discretion). Either Party shall have the right in its discretion to terminate this Agreement immediately in addition to all other available remedies if there is any assignment or delegation in violation of the foregoing.

7

(d)     Disputes; Governing Law, Venue. Any disputes between the Parties relating to this Agreement shall initially be referred jointly to each Party's respective internal representative, as designated by each Party. If such designated representatives are unable to resolve the dispute within five business days after referral of the matter to them, the Parties shall submit the dispute to a senior executive from each Party for resolution. If such executives are unable to resolve the dispute within 10 business days after referral of the matter to them, the Parties shall then submit the dispute to each Party's general counsel for resolution, who shall use good faith efforts to resolve the matter to the mutual satisfaction of the Parties within 30 days. This Agreement shall be governed by the laws of the State of Illinois, irrespective of Illinois' choice-of-law principles, and all claims relating to or arising out of this contract, or the breach thereof, whether sounding in contract, tort or otherwise, shall likewise be governed by the laws of the State of Illinois, excluding Illinois' choice-of-law principles. Claims must be brought in the federal or state courts situated within boundaries of the U.S. District Court for the Northern District of Illinois.

(e)     Severability. If any provision of this Agreement is found to be invalid or unenforceable to any extent, then the invalid portion shall be deemed conformed to the minimum requirements of law to the extent possible. In addition, all other provisions of this Agreement shall not be affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

(f)     Waiver. No waiver of any provision of this Agreement shall be valid unless in writing signed by the Party to be charged. No waiver with respect to any provision on one occasion shall be deemed a waiver of such provision on any other occasion.

(g)     Amendment. Any modification or amendment of this Agreement (including without limitation, any SOW) must be in writing and signed by both Parties.

(h)     Entire Agreement and Non-Reliance; Interpretation. This Agreement, any SOW, and any other document that this Agreement references as being attached hereto or incorporated herein by reference, sets forth the entire agreement and understanding between the Parties with respect to the subject matter hereof, and supersedes any other agreements, discussions, proposals, representations or warranties, whether written or oral between the Parties with respect to the subject matter hereof. For the avoidance of doubt, any terms and conditions contained in any purchase or sales order, confirmation, acceptance or other purchasing or sale instruments/documents that are inconsistent, different or in addition to any provision of this Agreement, shall be null and void and superseded in their entirety by the terms and conditions of this Agreement. Each Party acknowledges and agrees that:  (i) in deciding whether or not to enter into this Agreement or provide the Services, rights and obligations herein, it did so without reliance upon any oral or written representations made to it by the other Party, its employees or agents that are not included in this Agreement and hereby waives any claims of reliance upon any such oral or written representations that are not expressly set forth in this Agreement; and (ii) this Agreement has been the subject of active and complete negotiations, and this Agreement should not be construed in favor of or against any Party based on such Party's or its advisors' participation in the preparation of this Agreement. Any indemnity described in this Agreement (including all Exhibits) shall be governed by the terms of Section 7 above.

(i)     Remedies. Except as expressly provided in this Agreement, a Party's exercise of any right or remedy under this Agreement or under applicable law is not exclusive and shall not preclude such Party from exercising any other right or remedy that may be available to it. If either Party seeks monetary damages from the other Party, and a final judgment is entered entirely in favor of the Party defending the monetary damages claim, then the Party who brought such monetary claim shall reimburse the defending Party for its reasonable attorney's fees and costs paid defending that claim. Otherwise, each Party shall bear its own fees and expenses unless otherwise provided by statute.

(j)     Third Party Beneficiaries. This Agreement is for the sole benefit of the Parties and is not intended to, and shall not be construed to, create any right or confer any benefit on or against any third party, except as expressly provided in this Agreement. Notwithstanding the foregoing, Client's Affiliates are third party beneficiaries of this Agreement.

(k)     <u>Effectiveness of Agreement</u>. The preparation, revision or delivery of this document for examination and discussion is not an offer to enter into any agreement and is merely a part of the negotiations between the Parties. Neither Party shall have any obligation or liability to the other whatsoever at law or in equity (including without limitation, any claims for detrimental reliance or promissory estoppel) relating to the subject matter hereof unless and until such time as both Parties shall have executed and delivered this Agreement.

(l)     <u>Notices</u>. All notices or demands required or permitted pursuant to this Agreement shall be in writing and shall be sent:  (i) by courier or in person with signed receipt; (ii) by nationally recognized overnight delivery service, prepaid, with signature required; or (iii) by fax if promptly confirmed by copy sent pursuant to any of the foregoing methods, and in each case shall be sent to the other Party at its address set forth below or to such other addresses as either Party may designate from time to time by notice to the other Party in accordance with this Section. Notices shall be deemed received upon actual receipt or refusal of delivery.

(m)     <u>Counterparts; Signatures</u>. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, and all of which shall be deemed one and the same instrument. The Parties' faxed, scanned or authenticated electronic or digital signatures shall be effective to bind them to this Agreement, any SOW or any amendment thereof.

(n)     <u>Non-Solicitation</u>. For one (1) year from the later of (i) the Effective Date, or (ii) the date this Agreement is fully executed by both Parties (such period is referred to as the "<u>Restricted Period</u>"), both Parties agree not to directly or indirectly solicit for employment, any of the other Party's employees who were directly involved with negotiating the terms of this Agreement (including any SOW or order document entered into hereunder).

(o)     <u>Gifts and Entertainment Policy</u>. Client prohibits its employees from accepting incentives, compensation or gifts from any vendor, including without limitation, cash, free products, tickets, travel, gifts, or gratuities (except where the employee has received written authorization from his or her manager). Vendor agrees not to provide any such items to Client's employees or their family members in violation of this prohibition. In addition to any other legal remedies available to Client, Client may immediately terminate this Agreement (including any SOW or order document entered into hereunder) with notice to Vendor in the event Vendor violates this prohibition. Vendor agrees to provide Client with any information reasonably requested by Client to verify Vendor's compliance with this clause.

*[Signature Page Follows]*

9

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

Effective Date: <u>March 29, 2021</u>

**Vendor: Exegictics Resource Solutions, LLC**

By: _____

Name: _____JOHN RHILE_____

Title: __VP FINANCE_____

Notice Address:

8755 HIGGINS RD SUITE 1000
CHICAGO IL 60631

**Client: Claire's Stores, Inc.**

By: _____

Name: _Stuart Brown_____

Title: _Director_____

Notice Address:

Claire's Stores, Inc.
2400 West Central Road
Hoffman Estates, IL 60192
Attn: SVP, CFO, EU
with a copy to:  General Counsel

10

**Exhibit 2**
**August 12, 2025 E-mail**

**Morse, Kevin H.**

| | |
|---|---|
| **From:** | Steinfeld, Eric <eric.steinfeld@kirkland.com> |
| **Sent:** | Tuesday, August 12, 2025 4:02 PM |
| **To:** | Morse, Kevin H. |
| **Cc:** | Chiaghana, Kenny; Smith, Allyson B.; Jacobson, Rob; Freedman, Max M. |
| **Subject:** | RE: Claire's Holdings - Exegistics, Inc. |

> EXTERNAL EMAIL: The sender (eric.steinfeld@kirkland.com) is external to Clark Hill. Exercise caution with links, attachments, or replies if this message is unexpected.

Hi Kevin,

The part-time warehouse workers have been classified as Independent Contractors under the Wages motions as opposed to the Critical Vendors motion. Pursuant to the Wages motion, the Debtors are authorized, but not directed, to pay all outstanding prepetition amounts on account of the Independent Contractors on a postpetition basis in the ordinary course of business and consistent with past practice.  Can you please provide backup for what you believe is owed prepetition so that we can review and reconcile any discrepancies?

Thanks,

**Eric Steinfeld**

**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza, Chicago, IL 60654
**T** +1 312 862 4362  **M** +1 312 307 1536
**F** +1 312 862 2200

eric.steinfeld@kirkland.com

---

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Friday, August 8, 2025 4:29 PM
**To:** Schwarzman, Alexandra <alexandra.schwarzman@kirkland.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>
**Subject:** Claire's Holdings - Exegistics, Inc.

Alexandra:

We represent Exegistics, Inc. in Claire's latest chapter 11 filing.  Exegistics provides 117 part-time warehouse workers for Claire's and was designated a critical vendor in the 2018 chapter 11 case.  Please confirm that Exegistics will receive the same designation in the current chapter 11 case.

Additionally, given the expected wind-down and termination of all Claire's workers, please let me know whether Claire's has undertaken or provided any WARN notice to its warehouse workers.

Thank you.

**Kevin H. Morse**
Attorney at Law
**Clark Hill**

1

**Exhibit 3**
**August 13, 2025 E-mail**

## Morse, Kevin H.

| | |
|---|---|
| **From:** | Steinfeld, Eric <eric.steinfeld@kirkland.com> |
| **Sent:** | Wednesday, August 13, 2025 1:32 PM |
| **To:** | Morse, Kevin H. |
| **Cc:** | Chiaghana, Kenny; Smith, Allyson B.; Jacobson, Rob; Freedman, Max M. |
| **Subject:** | RE: Claire's Holdings - Exegistics, Inc. |

> EXTERNAL EMAIL: The sender (eric.steinfeld@kirkland.com) is external to Clark Hill. Exercise caution with links, attachments, or replies if this message is unexpected.

Thanks, we will review and let you know of any issues.

**Eric Steinfeld**

**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza, Chicago, IL 60654
**T** +1 312 862 4362  **M** +1 312 307 1536
**F** +1 312 862 2200

eric.steinfeld@kirkland.com

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Wednesday, August 13, 2025 1:27 PM
**To:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

Eric:

Attached find the A/R detail report and invoices for Exegistics' prepetition claim.

Let me know if you have any questions or issues opening any of the attached documents.  Thank you.

**Kevin H. Morse**
Attorney at Law
**Clark Hill**
130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office) | +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

**From:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Sent:** Tuesday, August 12, 2025 4:02 PM
**To:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

> EXTERNAL EMAIL: The sender (eric.steinfeld@kirkland.com) is external to Clark Hill. Exercise caution with links, attachments, or replies if this message is unexpected.

Hi Kevin,

The part-time warehouse workers have been classified as Independent Contractors under the Wages motions as opposed to the Critical Vendors motion. Pursuant to the Wages motion, the Debtors are authorized, but not directed, to pay all outstanding prepetition amounts on account of the Independent Contractors on a postpetition basis in the ordinary course of business and consistent with past practice. Can you please provide backup for what you believe is owed prepetition so that we can review and reconcile any discrepancies?

Thanks,

**Eric Steinfeld**

**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza, Chicago, IL 60654
**T** +1 312 862 4362  **M** +1 312 307 1536
**F** +1 312 862 2200

eric.steinfeld@kirkland.com

---

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Friday, August 8, 2025 4:29 PM
**To:** Schwarzman, Alexandra <alexandra.schwarzman@kirkland.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>
**Subject:** Claire's Holdings - Exegistics, Inc.

Alexandra:

We represent Exegistics, Inc. in Claire's latest chapter 11 filing. Exegistics provides 117 part-time warehouse workers for Claire's and was designated a critical vendor in the 2018 chapter 11 case. Please confirm that Exegistics will receive the same designation in the current chapter 11 case.

Additionally, given the expected wind-down and termination of all Claire's workers, please let me know whether Claire's has undertaken or provided any WARN notice to its warehouse workers.

Thank you.

**Kevin H. Morse**
Attorney at Law
**Clark Hill**
130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office) | +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please

notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

**Exhibit 4**
**August 15, 2025 E-mail**

## Morse, Kevin H.

| | |
|---|---|
| **From:** | Morse, Kevin H. |
| **Sent:** | Friday, August 15, 2025 2:25 PM |
| **To:** | Steinfeld, Eric |
| **Cc:** | Chiaghana, Kenny; Smith, Allyson B.; Jacobson, Rob; Freedman, Max M. |
| **Subject:** | RE: Claire's Holdings - Exegistics, Inc. |

Eric—just following up on this for confirmation of outstanding wages.  Thanks again.

**Kevin H. Morse**
Attorney at Law
**Clark Hill**
130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office) | +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

---

**From:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Sent:** Wednesday, August 13, 2025 1:32 PM
**To:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

> EXTERNAL EMAIL: The sender (eric.steinfeld@kirkland.com) is external to Clark Hill. Exercise caution with links, attachments, or replies if this message is unexpected.

Thanks, we will review and let you know of any issues.

**Eric Steinfeld**

**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza, Chicago, IL 60654
**T** +1 312 862 4362  **M** +1 312 307 1536
**F** +1 312 862 2200

eric.steinfeld@kirkland.com

---

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Wednesday, August 13, 2025 1:27 PM
**To:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

Eric:

Attached find the A/R detail report and invoices for Exegistics' prepetition claim.

Let me know if you have any questions or issues opening any of the attached documents.  Thank you.

**Kevin H. Morse**

1

Attorney at Law
**Clark Hill**
130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office) | +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

---

**From:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Sent:** Tuesday, August 12, 2025 4:02 PM
**To:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

> EXTERNAL EMAIL: The sender (eric.steinfeld@kirkland.com) is external to Clark Hill. Exercise caution with links, attachments, or replies if this message is unexpected.

Hi Kevin,

The part-time warehouse workers have been classified as Independent Contractors under the Wages motions as opposed to the Critical Vendors motion. Pursuant to the Wages motion, the Debtors are authorized, but not directed, to pay all outstanding prepetition amounts on account of the Independent Contractors on a postpetition basis in the ordinary course of business and consistent with past practice.  Can you please provide backup for what you believe is owed prepetition so that we can review and reconcile any discrepancies?

Thanks,

**Eric Steinfeld**

---

**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza, Chicago, IL 60654
**T** +1 312 862 4362  **M** +1 312 307 1536
**F** +1 312 862 2200

---

eric.steinfeld@kirkland.com

---

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Friday, August 8, 2025 4:29 PM
**To:** Schwarzman, Alexandra <alexandra.schwarzman@kirkland.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>
**Subject:** Claire's Holdings - Exegistics, Inc.

Alexandra:

We represent Exegistics, Inc. in Claire's latest chapter 11 filing.  Exegistics provides 117 part-time warehouse workers for Claire's and was designated a critical vendor in the 2018 chapter 11 case.  Please confirm that Exegistics will receive the same designation in the current chapter 11 case.

Additionally, given the expected wind-down and termination of all Claire's workers, please let me know whether Claire's has undertaken or provided any WARN notice to its warehouse workers.

Thank you.

2

**Kevin H. Morse**
Attorney at Law
**Clark Hill**
130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office) | +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

**Exhibit 5**
**August 29, 2025 E-mail**

## Morse, Kevin H.

| | |
|---|---|
| **From:** | Steinfeld, Eric <eric.steinfeld@kirkland.com> |
| **Sent:** | Friday, August 29, 2025 7:14 PM |
| **To:** | Morse, Kevin H. |
| **Cc:** | Chiaghana, Kenny; Smith, Allyson B.; Jacobson, Rob; Freedman, Max M.; Groth, Jim |
| **Subject:** | RE: Claire's Holdings - Exegistics, Inc. |

> EXTERNAL EMAIL: The sender (eric.steinfeld@kirkland.com) is external to Clark Hill. Exercise caution with links, attachments, or replies if this message is unexpected.

Hi Kevin,

Apologies for missing your call.  As previously discussed, the Debtors recently filed a motion to sell Claire's business as a going concern. Ultimately, assumption/assignment decisions with respect to the go-forward business will be up to the purchaser. The best contact for the purchaser is Sean McCabe (smccabe@ameswatson.com). Please keep us copied when you reach out.

Thanks,

**Eric Steinfeld**

**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza, Chicago, IL 60654
**T** +1 312 862 4362  **M** +1 312 307 1536
**F** +1 312 862 2200

eric.steinfeld@kirkland.com

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Thursday, August 28, 2025 4:14 PM
**To:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>; Groth, Jim <jgroth@ClarkHill.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

Eric—

The agreement between Claire's and Exegistics requires Claire's to immediately assume the contract or treat Exegistics as a "critical vendor." ¶ 3(d).  We relied on your statement that the "part-time warehouse workers have been classified as Independent Contractors under the Wages motions" and did not push for treatment as a critical vendor or assumption.  At this stage, given the outstanding A/R, we cannot wait any further and incur greater delay.

Let me know ASAP if Exegistics will be paid under the Wages' motion as you asserted or we will seek to enforce the contract in Court.

Thank you.

**Kevin H. Morse**
Attorney at Law
**Clark Hill**

1

130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office) | +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

---

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Friday, August 22, 2025 2:42 PM
**To:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

Eric:

My client cannot continue to float the A/R for "coming weeks" – we will need payment ASAP.  Let me know what the debtors can do to ensure operations continue at the warehouse.

Thank you.

**Kevin H. Morse**
Attorney at Law
**Clark Hill**
130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office) | +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

---

**From:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Sent:** Friday, August 22, 2025 2:29 PM
**To:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

> EXTERNAL EMAIL: The sender (eric.steinfeld@kirkland.com) is external to Clark Hill. Exercise caution with links, attachments, or replies if this message is unexpected.

Hi Kevin,

Sorry I missed your call. As you may know, the Debtors entered into an APA with a buyer group led by Ames Watson and filed a motion to sell certain of its assets relating to its go-forward business operations on August 19, 2025. As such, the Debtors are in active discussions with the purchaser regarding go-forward contracts, including that governing Exegistics' prepetition claim. We are hoping to have a better understanding of which contracts Ames Watson plans to assume in the coming weeks.

Thanks,

**Eric Steinfeld**

**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza, Chicago, IL 60654
**T** +1 312 862 4362  **M** +1 312 307 1536
**F** +1 312 862 2200

eric.steinfeld@kirkland.com

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Tuesday, August 19, 2025 5:02 PM
**To:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

Eric—any word?

**Kevin H. Morse**
Attorney at Law
**Clark Hill**
130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office) | +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

---

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Friday, August 15, 2025 2:25 PM
**To:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

Eric—just following up on this for confirmation of outstanding wages.  Thanks again.

**Kevin H. Morse**
Attorney at Law
**Clark Hill**
130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office) | +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

---

**From:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Sent:** Wednesday, August 13, 2025 1:32 PM
**To:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

> EXTERNAL EMAIL: The sender (eric.steinfeld@kirkland.com) is external to Clark Hill. Exercise caution with links, attachments, or replies if this message is unexpected.

Thanks, we will review and let you know of any issues.

**Eric Steinfeld**

**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza, Chicago, IL 60654
**T** +1 312 862 4362  **M** +1 312 307 1536
**F** +1 312 862 2200

eric.steinfeld@kirkland.com

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Wednesday, August 13, 2025 1:27 PM
**To:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

Eric:

Attached find the A/R detail report and invoices for Exegistics' prepetition claim.

Let me know if you have any questions or issues opening any of the attached documents.  Thank you.

**Kevin H. Morse**
Attorney at Law
**Clark Hill**
130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office)  |  +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

**From:** Steinfeld, Eric <eric.steinfeld@kirkland.com>
**Sent:** Tuesday, August 12, 2025 4:02 PM
**To:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>; Smith, Allyson B. <allyson.smith@kirkland.com>; Jacobson, Rob <rob.jacobson@kirkland.com>; Freedman, Max M. <max.freedman@kirkland.com>
**Subject:** RE: Claire's Holdings - Exegistics, Inc.

EXTERNAL EMAIL: The sender (eric.steinfeld@kirkland.com) is external to Clark Hill. Exercise caution with links, attachments, or replies if this message is unexpected.

Hi Kevin,

The part-time warehouse workers have been classified as Independent Contractors under the Wages motions as opposed to the Critical Vendors motion. Pursuant to the Wages motion, the Debtors are authorized, but not directed, to pay all outstanding prepetition amounts on account of the Independent Contractors on a postpetition basis in the ordinary course of business and consistent with past practice.  Can you please provide backup for what you believe is owed prepetition so that we can review and reconcile any discrepancies?

Thanks,

**Eric Steinfeld**

**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza, Chicago, IL 60654
**T** +1 312 862 4362  **M** +1 312 307 1536
**F** +1 312 862 2200

eric.steinfeld@kirkland.com

**From:** Morse, Kevin H. <kmorse@ClarkHill.com>
**Sent:** Friday, August 8, 2025 4:29 PM
**To:** Schwarzman, Alexandra <alexandra.schwarzman@kirkland.com>

**Cc:** Chiaghana, Kenny <kchiaghana@clarkhill.com>
**Subject:** Claire's Holdings - Exegistics, Inc.

Alexandra:

We represent Exegistics, Inc. in Claire's latest chapter 11 filing.  Exegistics provides 117 part-time warehouse workers for Claire's and was designated a critical vendor in the 2018 chapter 11 case.  Please confirm that Exegistics will receive the same designation in the current chapter 11 case.

Additionally, given the expected wind-down and termination of all Claire's workers, please let me know whether Claire's has undertaken or provided any WARN notice to its warehouse workers.

Thank you.

**Kevin H. Morse**
Attorney at Law
**Clark Hill**
130 E. Randolph Street, Suite 3900, Chicago, IL 60601
+1 312.985.5556 (office) | +1 312.517.7593 (fax)
kmorse@clarkhill.com | www.clarkhill.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.