**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | Case No. 25-11454 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Related to Docket No. 429** |

## MAD RIVER DEVELOPMENT, LLC'S LIMITED OBJECTION TO DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN OF CLAIRE'S HOLDINGS LLC AND ITS DEBTOR AFFILIATES

Mad River Development, LLC (the "Landlord"), by and through its undersigned counsel, hereby files this limited objection and reservation of rights (the "Limited Objection") to the above-captioned debtors' (the "Debtors") *First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates* [D.I. 429] (as amended, the "Plan"). In support of this Limited Objection, Landlord respectfully states as follows:

## I.    BACKGROUND

### General

1.    On August 6, 2025, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Petition Date").

2.    The Debtors' cases are being jointly administered under Case No. 25-11454 (BLS) pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1. *See Order (I) Directing the Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [D.I. 79] (the "Joint

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343). The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

Administration Order").

**The Lease**

3.      Claire's Boutiques, Inc. (hereafter, "Debtor") and Landlord are parties to that certain unexpired Commercial Lease, dated July 19, 2023, with Debtor as Tenant and Mad River Development, LLC as Landlord (the "River Front Center Lease") for the lease of approximately 1,383 square feet of space located at 358 Route 3 West, Unit C-3, Clifton, New Jersey 07014 (the "Premises"). *See* a true and correct copy of the Lease is attached hereto as **Exhibit A**.

4.      The River Front Center Lease was for a term of one hundred and twenty (120) months, commencing on November 1, 2023 (the "Commencement Date") and expiring on October 31, 2033 (the "Expiration Date").

5.      The Debtors remain in possession of their property and continue to operate their businesses and manage their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code.

6.      The River Front Center Lease is an unexpired lease of nonresidential real property pursuant to 11 U.S.C. Section 365.

7.      On October 7, 2025, the Debtors field the *Notice of Filing of Plan Supplement* [D.I. 618] (the "Plan Supplement") which contemplates the deadline for filing objections to the Plan as October 14, 2024.

8.      The Plan Supplement at Exhibit A states that "[p]ursuant to Article V.A. of the Plan…each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty…other than those that (1) are specifically described in the Plan as to be assumed, or assumed and assigned…in connection with Confirmation

of the Plan, or are identified on the Assumed and Assigned Executory Contracts and Unexpired

Leases Schedule...".  Schedule A; however, notes that the schedule of assumed and assigned

Executory Contracts and Unexpired Leases are "**To Be Filed**."

## II.    OBJECTION, RESERVATION OF RIGHTS AND JOINDER

9.    Landlord timely objects to the Plan insofar as it allows Debtors to assume and/or

reject the River Front Center Lease without paying the full amount of rent and other expenses

currently owed by Debtors.

10.    This Court should require Debtors to pay the full amount of rent due under the terms

of the River Front Center Lease. Section 365(d)(3) of the Bankruptcy Code says:

> The trustee shall timely perform all the obligations of the debtor . . . arising from
> and after the order for relief under any unexpired lease of nonresidential real
> property, until such lease is assumed or rejected, notwithstanding section 503(b)(1)
> of this title.

11 U.S.C. § 365(d)(3).

11.    Upon information and belief, the total amount of rent due to date (including both

pre-petition and post-petition rent) is not less than **$26,279.67**.

12.    In addition to the timely payment of rent, Landlord is also entitled to seek the

reimbursement of reasonable attorneys' fees, costs, and expenses incurred in the enforcement of

its contractual rights under the Lease. *See* Lease, at ¶ 24(d). *Travelers Cas. & Su. Co. of Am. V.*

*Pacific Gas and El. Co.*, 127 S. Ct. 1199, 1203 (2007) (finding that a party is entitled to the

reimbursement of attorneys' fees when an "enforceable contract allowing attorneys' fees" exits);

*see also In re: Crown Books Corp.*, 269 B.R. 12 (Bankr. D. De. 2001) (permitting lessors to be

compensated for their legal fees which were reasonably incurred in the commencement of legal

proceedings to enforce their rights under certain leases).

13.    This Court should order Debtors to immediately remit these amounts of post-

petition rent, plus any additional accrued interest, late charges and attorneys' fees, and all other amounts due under the River Front Center Lease as they come due under the provisions of the Lease.

14.    Landlord reserves all rights it now has under the River Front Center Lease as provided in the River Front Center Lease and applicable law including but not limited to all rights under the Bankruptcy Code and Section 365 of the Bankruptcy Code.

15.    The Landlord reserves any and all rights to supplement or amend this Objection and expressly reserves the right to object to any additional relief sought by the Debtors in connection with the Lease.

16.    Landlord joins in all objections to rejection notices filed by other landlords, to the extent that such objections are consistent with this Objection.

17.    To the extent that rent, attorney's fees or other charges continue to accrue either before or after a potential assignment, or Landlord suffers other pecuniary losses under its Lease, Landlord reserves its right to amend its cure amounts for such amounts or for any other reason.

18.    Landlord reserves all rights to contest the rejection and/or assumption and assignment of its Lease.

WHEREFORE, Landlord respectfully requests that this Court (i) order payment of all undisputed cure amounts, with an escrow established that is sufficient to pay any remaining disputed cure amounts, when resolved by the parties or this Court; (ii) order payment of all post-petition rent; and (iii) grant Landlord such other and further relief as may be just and proper.

Dated:  October 13, 2025

**REGER RIZZO & DARNALL LLP**

*/s/ Louis J. Rizzo, Jr., Esquire*
Louis J. Rizzo, Jr., Esquire (#3374)
Brandywine Plaza West
1521 Concord Pike, Suite 305
Wilmington, DE 19803
(302) 477-7100
*Attorney for Creditor, Mad River Development, LLC*



# Exhibit "A"

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

Store #6764

# AGREEMENT OF LEASE

| | |
|---|---|
| **LANDLORD:** | MAD RIVER DEVELOPMENT, LLC<br>a New Jersey limited liability company |
| **TENANT:** | CLAIRE'S BOUTIQUES, INC.,<br>a Michigan corporation |
| **DATE OF LEASE:** | July 19, 2023 |
| **PREMISES:** | RIVER FRONT CENTER<br>CLIFTON, NEW JERSEY |

**Neither the submission of this Lease for examination, nor any negotiations or discussions with respect to same, shall constitute a reservation of or option for the Premises, nor shall same establish any relationship between the parties or an agreement to enter into a relationship, and this Lease shall only become effective upon execution and delivery thereof by Landlord and Tenant. Until such execution and delivery, either party may terminate negotiations and discussions without cause and without any liability one to the other.**

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

## TABLE OF CONTENTS

### TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Basic Provisions | |
| 2. | Premises | |
| 3. | Completion of the Premises | |
| 4. | Term | |
| 5. | Rent | |
| 6. | Renewal Term | |
| 7. | Tax Payments | |
| 8. | Insurance Payments | |
| 9. | Common Area Maintenance Payments | |
| 10. | Permitted Use; Operating at the Premises | |
| 11. | Control of Common Areas | |
| 12. | Alterations | |
| 13. | Signs, Awnings and Canopies | |
| 14. | Repairs and Maintenance | |
| 15. | Insurance and Indemnity | |
| 16. | Utilities; Trash Disposal | |
| 17. | Advertising | |
| 18. | Assignment, Mortgaging and Subletting | |
| 19. | Access | |
| 20. | Tenant's Property | |
| 21. | Casualty Damage | |
| 22. | Eminent Domain | |
| 23. | Events of Default | |
| 24. | Landlord's Remedies | |
| 25. | Curing Tenant's Defaults | |
| 26. | Subordination and Attornment | |
| 27. | Surrender | |
| 28. | Quiet Enjoyment | |
| 29. | Intentionally Deleted | |
| 30. | Hazardous Substances | |
| 31. | Miscellaneous | |
| 32. | Additional Provisions | |

EXHIBITS

| EXHIBIT A-1 | Shopping Center Site Plan Showing Premises |
|---|---|
| EXHIBIT A-2 | Metes and Bounds Description of Shopping Center |
| EXHIBIT A-3 | Shopping Center Permitted Exceptions |
| EXHIBIT B | Landlord's Work |
| EXHIBIT C | Tenant's Work and Timeframe for Submission of Plans and Specifications |
| EXHIBIT D | Prohibited Uses |
| EXHIBIT E | Intentionally deleted |
| EXHIBIT F | Rules and Regulations |
| EXHIBIT G | Exclusives |
| EXHIBIT H-1 | Sign Criteria |
| EXHIBIT H-2 | Permitted Signs |
| EXHIBIT I | Insurance |
| EXHIBIT J | Five Below Waiver |

DocuSign Envelope ID: 380A9286-5066-44F9-B137-A5F5B01B5768

## AGREEMENT OF LEASE – RIVER FRONT CENTER

I.    Basic Provisions.

This Paragraph I is an integral part of this Lease and all of the terms hereof are incorporated into this Lease in all respects.  In addition to the other terms which are defined in this Lease, the following capitalized terms, whenever used in this Lease, shall have the meanings set forth in this Paragraph, and only such meanings, unless such meanings are expressly contradicted, limited or expanded elsewhere herein:

| | | |
|---|---|---|
| (a) | Date of Lease: | July 19, 2023 ("Effective Date") |
| (b) | Landlord: | MAD RIVER DEVELOPMENT, LLC |
| (c) | Address of Landlord: | 240 Paramus Road, Suite 1<br>Ridgewood, New Jersey 07450 |
| | With a copy to: | Newman, Simpson & Cohen LLP<br>Court Plaza North<br>25 Main Street, 6th Floor<br>Hackensack, New Jersey 07601<br>Attention: Susan Marra, Esq. |
| (d) | Tenant: | CLAIRE'S BOUTIQUES, INC. |
| (e) | Address of Tenant: | 2400 W. Central Road<br>Hoffman Estates, IL 60192<br>Attention: Real Estate Dept. |
| | With a copy to: | Claire's Boutiques, Inc.<br>Three SW 129th Avenue<br>Pembroke Pines, FL 33027<br>Attention: Rent Department<br><br>and<br><br>real estate@claires.com |
| (f) | Tenant Information | Tenant's Trade Name: Claire's or Claire's Boutiques<br>Tenant's NAICS Number:<br>Tenant's EIN: 36-2025307 |
| (g) | Premises: | Unit: C-3<br>358 Route 3 West<br>Clifton, NJ 07014<br>Approximate leasable square feet: 1,383<br>as defined in Paragraph 2(a). |
| (h) | Commencement Date: | Shall be the later of: (a) the date on which the Lease is fully executed; (b) the date on which Landlord delivers physical possession of the Premises to Tenant with Landlord's Work Substantially Completed; and (c) August 7, 2023 (the "Delivery Date"). Landlord anticipates that it intends to deliver the Premises to Tenant on August 7, 2023 (the "Anticipated Delivery Date"). Notwithstanding any provision in this Lease to the contrary, in the event that the Rent Commencement Date   would occur during the period between November 15 and January 15 (the "Black Out Period"), the Term of this Lease shall not commence, nor |

DocuSign Envelope ID: 380A9286-5066-44F9-B137-A5F5B01B5768

shall Tenant be required to initially open for business, until the following February 1, unless Tenant, at its option, elects to initially open for business during the Black Out Period. Should the Delivery Date fail to occur within 60 days after the Anticipated Delivery Date, Tenant may, at is option, (i) terminate this Lease by written notice to Landlord any time before the Delivery Date, or (ii) Tenant may take two (2) days of full Basic Rent credit for each day the Delivery Date is delayed beyond the Anticipated Delivery Date.

(i)  Rent Commencement Date:   Determined in accordance with the provisions of Paragraph 5(a)(i)

(j)  Expiration Date:   The last day in the month in which the tenth (10th) anniversary of the Rent Commencement Date occurs.

(k)  Basic Rent:   For the period commencing on the Rent Commencement Date and continuing through and including the last day of the twelfth (12th) full calendar month following the Rent Commencement Date Basic Rent shall be $62.00 psf. Commencing on the first day of the thirteenth (13th) full calendar month following the Rent Commencement Date, and annually thereafter through the Expiration Date [and continuing through any Renewal Term], Basic Rent shall be increased by three percent (3%) per annum.

(l)  Renewal Terms:   Two (2) successive terms of five (5) years each

(m)  Renewal Term Basic Rent:   Payable as set forth in Paragraph 1(k)

(n)  Initial Estimated Expense Share:   1.21%  Landlord represents that the square footage of the Shopping Center on the Effective Date is approximately 114,509 square feet.

(o)  Initial Estimated Tax Payment: $7.54 per square foot per square foot for 2023 calendar year.

(p)  Initial Estimated Common Area Maintenance Payment: $3.87 per square foot per square foot for 2023 calendar year.

(q)  Initial Estimated Insurance Payment: $1.05 per square foot for 2023 calendar year.

(r)  Intentionally Deleted.

(s)  Additional Rent: As defined in Paragraph 5(a)(ii).

(t)  Broker: DL Rosen & Company ("DLR") and AZ Retail Consulting LLC

(u)  Common Area Maintenance Payment: Determined in accordance with the provisions of Paragraph 9(d).

(v)  Common Areas: All areas, improvements, space, equipment and special services in or at the Shopping Center provided by Landlord for the common or joint use and benefit of tenants of the Shopping Center, including Tenant, and their officers, employees, agents, servants, customers and other invitees, including without limitation all parking areas, access roads, driveways, entrances and exits, retaining walls, landscaped areas, truck serviceways or tunnels, loading docks, pedestrian malls, courts, stairs, ramps and sidewalks, exterior stairs, comfort and first aid stations, washrooms and parcel pickup stations, onsite and offsite signs identifying or advertising the Shopping Center, and maintenance buildings and/or areas.

DocuSign Envelope ID: 380A5286-5066-44F9-B137-A5F5B01B5786

(w)    Environment:  Environment shall mean soil, surface waters, ground waters, land, stream, sediments, surface or subsurface strata and ambient air.

(x)    Environmental Complaint: As defined in Paragraph 30(e).

(y)    Environmental Law: Environmental Law shall mean all legal requirements relating to the protection of human health or the Environment, including, without limitation: (i) all legal requirements relating to the reporting, licensing, permitting, investigation or remediation of emissions, discharges, releases, or threatened releases of Hazardous Substances into the Environment or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances and (ii) all legal requirements pertaining to the protection of the health and safety of employees or the public.

(z)    Event of Default: As defined in Paragraph 23(a).

(aa)    Intentionally deleted.

(bb)    Intentionally deleted.

(cc)    Hazardous Discharge:  As defined in Paragraph 30(e).

(dd)    Hazardous Substance:  Hazardous Substance shall mean any substance, gas, material, chemical or pollutant which is or may be regulated by or defined as or included in the definition of "Hazardous Substances", "Toxic Substances", "Hazardous Waste", "Hazardous Materials", or words of similar import under any Environmental Law, including, without limitation, petroleum, radon gas, lead paint, asbestos, and polychlorinated biphenyls.

(ee)    Intentionally deleted.

(ff)    Insurance Costs:  As defined in Paragraph 8(a).

(gg)    Insurance Payment:  Determined in accordance with the provisions of Paragraph 8(b).

(hh)    Insurance Requirements: All requirements of any insurance policy covering or applicable to any part of the Shopping Center or the Premises or the use thereof, all requirements of the issuer of any such policy, and all orders, rules, regulations, recommendations and other requirements of the Association of Fire Underwriters, Factory Mutual Insurance Companies, the Insurance Services Organization, and any other body exercising the same or similar functions and having jurisdiction or cognizance of any part of the Shopping Center or the Premises.

(ii)    Landlord's Work:  As defined in Paragraph 3(a) and as described in Exhibit B.

(jj)    Legal Requirements:  All laws, statutes and ordinances (including building codes and zoning regulations and ordinances)  and the orders, rules, regulations, directives and requirements of all Federal, State, county and city departments, bureaus, boards, agencies, offices, commissions and other subdivisions thereof, or of any official thereof, or of any other governmental, public or quasipublic authority, whether now or hereafter in force, which may be applicable to the Shopping Center or the Premises, or any part thereof, and all requirements, obligations and conditions of all instruments of record affecting the Shopping Center.

(kk)    Operating Costs:  As defined in Paragraph 9(a).

(ll)    Permitted Use: Tenant may use the Premises for the business of the retail display and sale of such items as are normally sold in Tenant's Claire's stores as of the date of this Lease, including without limitation, (i) fashion accessories, jewelry, hair goods, handbags and sunglasses; teen home and gift items; specialty apparel items, cosmetics, fragrances, bath and body products; and cell phone cases

DocuSign Envelope ID: 380A9288-5088-44F9-B137-A5F5B01B5768

and related cell phone accessories, and (ii) limited to items contained in this Permitted Use provision, trend driven items which are items that surge in popularity through customer reaction for a limited duration of time, and novelties and holiday promotional items. Notwithstanding the foregoing, in the event Verizon objects to the sale of cell phone cases and related cell phone accessories, Tenant shall cease the sale of such items upon five (5) days' written notice to Tenant. The sales area of no one (1) category of products shall exceed twelve (12%) percent of the leasable square feet of the Premises. As part of Tenant's primary use, Tenant shall also be permitted to perform ear piercing in the Premises. Landlord agrees and represents and warrants that the Tenant's Permitted Use will not violate any agreement to which the Shopping Center or Landlord is bound, including exclusives granted to other tenants of the Shopping Center set forth in this Lease as Exhibit G and that no variance, exemption or other deviation or exception to the local zoning ordinance shall be required. Tenant, and any assignee or sublessee, shall not conduct its business so as to violate any of the Shopping Center exclusives granted by Landlord to other tenants in the Shopping Center as set forth more fully in Exhibit G; provided, however, that (i) the parties acknowledge that the sale of cell phone cases and related cell phone accessories may violate Verizon's exclusive set forth in Exhibit G and in the event of Verizon's objection to the sale of such items by Tenant, Tenant shall cease such sales after receipt of written notice from Landlord in accordance with the provisions of this Paragraph and (ii) any restrictions imposed on Tenant due to the restriction set forth in Exhibit G in favor of Five Below shall be modified as set forth in that certain waiver provided to Tenant by Five Below and attached hereto as Exhibit J.

    (mm)  Rent:  As defined in Paragraph 5(a).

    (nn)  Rules and Regulations: As defined in Paragraph 10(p).

    (oo)  Shopping Center:  the land and improvements located in the City of Clifton, County of Passaic and commonly known as River Front Center, as more particularly shown on the plan annexed hereto as Exhibit A-1, as described by metes and bounds on Exhibit A-2 and subject to the permitted exceptions on Exhibit A-3, all exhibits made a part hereof.

    (pp)  Substantially Completed: Landlord's Work shall be deemed "substantially completed" notwithstanding the fact that (i) minor or insubstantial details of construction, mechanical adjustment or decoration remain to be performed or (ii) portions of Landlord's Work have not been completed because under good construction scheduling practice such work should be done after completion of still uncompleted finishing or other work to be done by or on behalf of Tenant.

    (qq)  Taxes: As defined in Paragraph 7(a).

    (rr)  Tax Payment: Determined in accordance with the provisions of Paragraph 7(c).

    (ss)  Tenant's Work: Tenant's Work shall be all work (except Landlord's Work) of whatever nature that is necessary, in Tenant's reasonable opinion, to complete the Premises and open the Premises for business to the public, including without limitation, the work described in Exhibit C annexed hereto and made a part hereof.

    (tt)  Term: As defined in Paragraphs 4(a) and 6(f).

2.   <u>Premises</u>

    (a)    Landlord hereby demises and leases to Tenant and Tenant hereby rents and hires from Landlord, those certain premises (the "Premises") consisting of a portion of the Shopping Center, which Premises are substantially as shown by crosshatching on Exhibit A-1 annexed hereto, together with a revocable license to use, in common with others, the Common Areas, as the same may be designated from time to time by Landlord, subject, however, to the terms and conditions of this Lease and to reasonable rules and regulations for the use thereof as prescribed from time to time by Landlord.

    (b)    Except for the Premises, which Landlord may not change, and except as otherwise set forth in this Lease, including, but not limited to, Section 32(c), Landlord reserves the right to change the number and location of buildings, building dimensions, the number of floors in any of the buildings, store

DocuSign Envelope ID: 380A9286-5089-44F9-B137-A5F5B01B5766

dimensions, Common Areas, and the identity and type of other stores and tenancies comprising the Shopping Center, provided , that the visibility of Premises and Tenant's signage, reasonable access to the Premises and the parking facilities as shown on Exhibit A-1 shall not be materially adversely affected.

(c)    Landlord reserves to itself the use of the roof, exterior walls (other than the store front) and the area above and below the Premises together with the right to install, maintain, use, repair, and replace pipes, ducts, conduits, wires and structural elements leading through the Premises and which serve other parts of the Shopping Center provided that same shall not interfere with or materially adversely affect Tenant's operations at the Premises.

3.    Completion of the Premises.

(a)    Prior to the Commencement Date, Landlord shall Substantially Complete the Landlord's Work, as set forth on Exhibit B ("Landlord's Work") at its sole cost and expense.  Tenant shall pay to Landlord any expense incurred by Landlord as a result of work  requested by Tenant in addition to Landlord's Work.

(b)    Tenant agrees that subsequent to the Commencement Date it shall, at its sole cost and expense, complete Tenant's Work. Tenant has submitted its set of plans and specifications, (the "Plans") and Landlord has approved same. Any contractor conducting work at the Premises must produce a certificate of insurance naming Landlord as additional insured and an additional insured endorsement to the insurance policy and, upon request by Landlord, a copy of the policy with respect to the work and Tenant shall be required to comply with the provisions of Paragraph 15(b) regarding insurance. All construction and repair materials and all construction and repair personnel shall use the rear entry of the Premises. No material deviation from the Plans, once submitted to and approved by Landlord, shall be made by Tenant without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency, and Tenant shall be solely responsible for such plans and specifications. Tenant shall cooperate with Landlord in coordinating completion of Tenant's Work with Landlord's Work to assure mutual access and to prevent interference with or damage to the work Landlord and Tenant are performing. Landlord shall have the right to post and maintain on the Premises any notice of non-responsibility provided by law. Upon completion of any construction, including construction of Tenant's Work, Tenant shall provide Landlord with a field marked copy of the Plans depicting any material deviations therefrom. Notwithstanding anything in this Lease, any exhibits thereto, any tenant handbook or design criteria for the Shopping Center, Tenant shall not be required to pay or reimburse Landlord for any work performed by Landlord at Tenant's expense (commonly referred to as "Construction Chargebacks") and Landlord hereby waives all Construction Chargebacks, including any plan review or coordination fees. Tenant's contractors shall not be required to furnish a construction deposit and/or payment or performance bonds with respect to Tenant's Work.

4.    Term.

(a)    The term of this Lease (the "Term") shall commence on the Commencement Date and expire on the Expiration Date, unless sooner terminated pursuant to this Lease.

(b)    When the Commencement Date shall have been determined, Landlord and Tenant shall, upon the request of either of them, execute and deliver a statement prepared by Landlord setting forth the Commencement Date.  Any failure of Landlord or Tenant to execute such statement shall not affect the determination of the Commencement Date.  Landlord and Tenant further agree that at the request of either, they will execute and deliver a confirmatory agreement acknowledging that Tenant has accepted possession of the Premises and that this Lease is operative.

5.    Rent.

(a)    Tenant shall pay to Landlord during the Term, in lawful money of the United States, without any prior demand therefor and without any offsets or deductions whatsoever, the following sums (collectively, "Rent"):

(i)    commencing on the Rent Commencement Date (as defined below), payment of fixed rent ("Basic Rent") shall commence on the earlier of: (1) one hundred and twenty (120) days after

DocuSign Envelope ID: 380A8286-5086-44F9-B137-A5F5B01B5766

the later of (i) the date on which Landlord delivers possession of the Premises to Tenant with Landlord's Work substantially complete or (ii) the date on which Tenant obtains its Approvals (defined in Section 10(n)), and (2) the date Tenant opens for business to the public in the Premises (the "Rent Commencement Date"), and shall be paid at the at the rate or rates per annum specified in Paragraphs 1(k) and 1(m) hereof; and

        (ii)    at the times provided for in this Lease, additional rent ("Additional Rent") consisting of all other sums of money as shall become due from and be payable by Tenant hereunder (for default in the payment of which Landlord shall have the same remedies as for a default in the payment of Basic Rent).

    (b)    Intentionally deleted.

    (c)    In the event that the date that Tenant is required to commence payment of Basic Rent or Additional Rent shall occur on a day other than the first day of a calendar month, the monthly installment of such Basic Rent or Additional Rent payment for the unexpired portion of the month in which the rent payment obligation occurs shall be prorated on the basis of the actual number of days in such month. In the event the Expiration Date shall occur on a day other than the last day of a calendar month, then the amount of the monthly installment of the Basic Rent and Additional Rent, for the last month or portion thereof in which the Expiration Date occurs shall be prorated on the basis of the actual number of days in such month, and any excess prepaid Basic Rent and Additional Rent shall be refunded by Landlord to Tenant on the Expiration Date.

    (d)    If Tenant shall fail to pay any rents, charges or other sums within ten (10) days after the same become due payable, Tenant shall pay to Landlord as Additional Rent a late charge in the amount of five percent (5%) of the amount not paid on time. If Tenant shall fail to pay any rent, charges or other sums within thirty (30) days of when same shall have first become due, such unpaid amounts shall bear interest at the per annum rate of ten percent (10%) in excess of the rate from time to time announced by Citibank, N.A. as its "prime rate", calculated on the basis of actual days elapsed, based on a three hundred sixty (360) day year, from the due date of such rents, charges or other sums to the date of payment; provided, however, that such interest shall never exceed the maximum legal rate from time to time permitted by applicable law. The provisions herein for Additional Rent shall not be construed to extend the date for payment of any sums required to be paid by Tenant hereunder or to relieve Tenant of its obligation to pay all such sums at the time or times herein stipulated.

    (e)    If any of the Rent payable under the terms of this Lease shall be or become uncollectible, reduced or required to be refunded because of any applicable law, ordinance, order, rule, requirement or regulation, Tenant shall enter into such agreement(s) and take such other steps (without additional expense to Tenant) as Landlord may request and as may be legally permissible to permit Landlord to collect the maximum rents which from time to time during the continuance of such legal rent restriction may be legally permissible (and not in excess of the amounts reserved therefor under this Lease). Upon the termination of such legal rent restriction, (i) the Rent shall become and thereafter be payable in accordance with the amounts reserved herein for the periods following such termination and (ii) Tenant shall pay to Landlord, to the maximum extent legally permissible, an amount equal to (1) the Rent which would have been paid pursuant to this Lease but for such legal rent restriction less (2) the Rent paid by Tenant during the period such legal rent restriction was in effect.

6.    <u>Renewal Term</u>.

    (a)    Provided Tenant shall not then be in default under this Lease beyond any notice and cure periods at the time of exercise, Tenant shall have the right, at its option, to renew this Lease for two (2) successive renewal terms of five (5) years each, the first renewal term to commence on the day following the Expiration Date and the second renewal term to commence on the day following the expiration of the first renewal term.

    (b)    Tenant shall exercise each renewal option by giving to Landlord written notice of such election to renew not later than one (1) year nor more than two (2) years prior to the Expiration Date or the date of expiration of the previous renewal term, as the case may be, and upon the giving of such notice this Lease thereupon shall be deemed renewed for such renewal term with the same force and effect as if such renewal term had been originally included in the Term.

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5786

(c)    Tenant may not exercise its option to renew for a renewal term unless its option for each preceding renewal term has theretofore been properly exercised.

(d)    All the terms, provisions, agreements, covenants and conditions of this Lease shall continue in full force and effect during each renewal term except that the number of remaining renewal terms permitted hereunder shall be reduced by one upon the expiration of each renewal term for which Tenant has exercised its option.

(e)    Any termination, cancellation or surrender of this Lease during the Term shall terminate any right of renewal hereunder and any renewal term.

(f)    As used herein, "Term" shall include the renewal term of this Lease if this Lease is renewed pursuant to the provisions of this Paragraph 6.

7.    Tax Payments.

(a)    For purposes of this Lease, the term "Taxes" shall mean all real estate taxes, assessments (special or otherwise), ad valorem charges, front foot benefit charges, water and sewer rents, rates and charges (other than charges which are based on consumption and are paid directly by tenants or included in Operating Costs), city and county taxes, minor privilege permits and any other governmental liens, impositions or charges of a similar or dissimilar nature, whether general, special, ordinary, extraordinary, foreseen or unforeseen, and any payments in lieu of such charges, which may be levied, assessed or imposed on or with respect to all or any part of the Shopping Center by any taxing authority, whether or not the same constitutes one or more tax lots. If, however, by law, any assessment may be divided and paid in installments, then, for the purposes of this Paragraph: (i) such assessment shall be deemed to have been so divided; (ii) such assessment shall be deemed payable in the maximum number of installments permitted by law; and (iii) there shall be deemed included in taxes for each calendar year the installment(s) of such assessment becoming payable during such calendar year, together with interest payable during such calendar year on such installments(s) and on all installments thereafter becoming due as provided by law, all as if such assessment had been so divided. If at any time during the Term the methods of taxation prevailing at the date hereof shall be altered so that in lieu of or as a substitute for the whole or any part of the Taxes now levied, assessed or imposed on all or any part of the Shopping Center, there shall be levied, assessed or imposed (1) a tax, assessment, levy, imposition or charge based on the rents received therefrom whether or not wholly or partially as a capital levy or otherwise, or (2) a tax, assessment, levy, imposition, or charge measured by or based in whole or in part upon all or any part of the Shopping Center and imposed on Landlord, or (3) a license fee measured by the rent payable by Tenant to Landlord, or (4) any other tax, levy, imposition, charge or license fee however described or imposed, then all such taxes, assessments, levies, impositions, charges or license fees or the part thereof so measured or based, shall be deemed to be Taxes. In no event, however, shall Tenant be required to pay Landlord's income taxes unless such income tax is in lieu of or partial substitution for Taxes. The benefit of any discount for any early payment or prepayment of Taxes shall  be subtracted from Taxes. Taxes shall not include income, excess profits or franchise taxes or other such taxes imposed on or measured by the income of Landlord from the operation of the Shopping Center or any interest or late fees assessed due to late payment by Landlord.  Landlord shall timely pay all Taxes as and when due.

(b)    In the event new ground floor leaseable area is constructed after the Commencement Date, Landlord shall have the option of adjusting the Expense Share to reflect the inclusion of assessments and other charges attributable to the new ground floor leaseable area, or of excluding same from the calculation of the Tax Payment.  In the event that such new area is not separately assessed, the portion of the real estate taxes, assessments and other charges attributable to such new area shall be determined by Landlord, in its reasonable judgment.  Landlord may also exclude from the calculation of the Tax Payment any real estate taxes, assessments and other charges attributable to existing ground floor leasable area in the Shopping Center, which, at any time, is separately assessed and paid by the tenant of such premises.

(c)    Commencing on the date that is fourteen (14) days after the later of the (i) Commencement Date, and (ii) date Tenant receives the Approvals (hereafter defined) (the "Additional Rent Date") and thereafter until the Expiration Date, Tenant shall pay to Landlord, as Additional Rent for each calendar

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5788

year falling wholly or partially within the Term, an amount (the "Tax Payment") equal to the product of Taxes for such calendar year and the Expense Share, payable in monthly installments as set forth below.

(d)    For the period, if any, between the Additional Rent Date and the last day of the calendar year in which the Additional Rent Date occurs, Tenant shall pay to Landlord on account of the Tax Payment, a monthly amount equal to the Initial Estimated Tax Payment, as set forth in Paragraph 1(o) hereof, on the first day of each month (provided that if the Additional Rent Date is other than the first day of a calendar month, the payment for the month in which the Additional Rent Date occurs shall be appropriately prorated). With respect to each calendar year commencing after the calendar year in which the Additional Rent Date occurs, Landlord may furnish to Tenant an estimate of amounts that will be payable by Tenant pursuant to Paragraph 7(c) hereof for such year, and upon receipt of such estimate Tenant will thereafter pay to Landlord, on the first day of each month during such year, on account of the Tax Payment, an amount equal to one-twelfth (1/12) of such estimate. Landlord may revise such estimate from time to time. Until such estimate has been furnished to Tenant, Tenant shall pay to Landlord, on account of the Tax Payment, on the first day of each month during such year, an amount equal to the amount payable by Tenant pursuant to Paragraph 7(c) for the previous calendar year divided by the number of months contained in the Term during such previous calendar year. Within ninety (90) days after the end of each calendar year including the year in which the Additional Rent Date occurs, Landlord shall furnish Tenant with a reconciliation statement setting forth the amounts payable by Tenant for such year pursuant to Paragraph 7(c) hereof and the amounts paid by Tenant on account thereof pursuant to this Paragraph 7(d). Any additional amounts payable by Tenant pursuant to such statement shall be payable within thirty (30) days after receipt of such statement, and the amount of any overpayment by Tenant shall be refunded by Landlord within thirty (30) days after Tenant's receipt of such statement, failing which Tenant may offset such amount against Rent.

(e)    Any Additional Rent payable by Tenant pursuant to this Paragraph 7 shall be collectible by Landlord in the same manner as Basic Rent.

(f)    If the Additional Rent Date or Expiration Date shall occur on a date other than January 1 or December 31, respectively, any Additional Rent under this Paragraph 7 for the calendar year in which the Additional Rent Date or Expiration Date shall occur, as the case may be, shall be appropriately prorated. In no event shall Basic Rent ever be reduced by operation of this Paragraph 7. The rights and obligations of Landlord and Tenant under the provisions of this Paragraph 7 with respect to any Additional Rent shall survive the Expiration Date or any sooner termination of the Term.

(g)    If the lessor under any ground or underlying lease of or the holder of any mortgage of the Shopping Center, or portion thereof, shall require any tax escrow deposits, in advance of the due date, then Tenant shall deposit with Landlord, in advance, an amount equal to the Expense Share of such deposits.

(h)    Tenant agrees to pay prior to delinquency any and all taxes and assessments levied, assessed or imposed during the Term upon or against (i) all furniture, fixtures, signs and equipment and any other personal property installed or located within the Premises; (ii) all alterations, additions, betterments or improvements of whatsoever kind or nature made by or on behalf of Tenant to the Premises, including any Tenant's Work or work to be performed by Tenant, as the same may be separately levied, taxed and assessed against or imposed directly upon Tenant by the tax authorities; and (iii) the rentals payable hereunder by Tenant to Landlord (other than Landlord's Federal, State and local income taxes thereon).

(i)    Should any governmental authority require that a tax, other than the Taxes above mentioned, be paid by Tenant, but collected by Landlord, for and on behalf of said governmental authority, and from time to time forwarded by Landlord to said governmental authority, the same shall be paid by Tenant to Landlord payable in advance.

(j)    Only Landlord shall have the right to contest the validity or amount of any Taxes by appropriate proceedings. Landlord, in its sole judgment, may settle any such proceedings. In the event Landlord receives any refund of such Taxes, Landlord shall credit such proportion of such refund as shall be allocable to payments of the Tax Payment actually made by Tenant (less costs, expenses and reasonable attorneys' and appraisers' fees) against the next succeeding payments of the Tax Payment due from Tenant, or during the last year of the term, Landlord will refund such net refund to Tenant within

DocuSign Envelope ID: 380A9286-5096-44F9-B137-A5F5B01B5766

sixty (60) days following the Expiration Date provided Tenant is not then in default of any of its obligations under this Lease. Tenant agrees that it shall be bound by Landlord's judgment as to whether or not to contest the validity or amount of any Taxes, and Tenant agrees that it shall not at any time contest the validity or amount of any Taxes.

     (k)     With respect to any Taxes for which Tenant is responsible hereunder, the official tax bill shall be conclusive evidence of the amount of Taxes levied, assessed, or imposed, as well as of the items taxed. A copy of such tax bill shall, upon request of Tenant, be submitted by Landlord to Tenant.

8.     Insurance Payments.

     (a)     Landlord shall carry, or cause to be carried, commercial general liability insurance on the Common Areas of the Shopping Center and special form insurance insuring the improvements located on Landlord's property within the Shopping Center (excluding Tenant's merchandise, signs, goods, trade fixtures, furnishings, equipment, furniture, personal property and Tenant's Work, if any) and such other insurance as Landlord deems appropriate, in its sole discretion, in such amounts as Landlord shall determine, but in no event less than the amount required by Landlord's mortgagee, if any. For the purposes of this Lease, the term "Insurance Costs" shall mean the cost of such commercial liability and special form insurance and other insurance maintained by prudent landlords of similar commercial properties.

     (b)     Commencing on the Additional Rent Date and thereafter until the Expiration Date, Tenant shall pay to Landlord, as Additional Rent for each calendar year falling wholly or partially within the Term, an amount (the "Insurance Payment") equal to the greater of (i) an amount equal to twelve (12) times the Initial Estimated Insurance Payment or (ii) the product of the Insurance Costs for such calendar year and the Expense Share, payable in monthly installments as set forth below.

     (c)     For the period, if any, between the Additional Rent Date and the last day of the calendar year in which the Additional Rent Date occurs, Tenant shall pay to Landlord on account of the Insurance Payment, a monthly amount equal to the Initial Estimated Insurance Payment, as set forth in Paragraph 1(q) hereof, on the first day of each month (provided that if the Additional Rent Date is other than the first day of a calendar month, the payment for the month in which the Additional Rent Date occurs shall be appropriately prorated). With respect to each calendar year commencing after the calendar year in which the Additional Rent Date occurs, Landlord may furnish to Tenant an estimate of amounts that will be payable by Tenant pursuant to Paragraph 8(b) hereof for such year, and upon receipt of such estimate Tenant will thereafter pay to Landlord, on the first day of each month during such year, on account of the Insurance Payment, an amount equal to one-twelfth (1/12) of such estimate. Landlord may revise such estimate from time to time. Until such estimate has been furnished to Tenant, Tenant shall pay to Landlord, on account of the Insurance Payment, on the first day of each month during such year, an amount equal to the amount payable by Tenant pursuant to Paragraph 8(b) for the previous calendar year divided by the number of months contained in the Term during such previous calendar year. Within ninety (90) days after the end of each calendar year including the year in which the Rent Commencement Date occurs, Landlord shall furnish Tenant with a reconciliation statement setting forth the amounts payable by Tenant for such year pursuant to Paragraph 8(b) hereof and the amounts paid by Tenant on account thereof pursuant to this Paragraph 8(c). Any additional amounts payable by Tenant pursuant to such statement shall be payable within fifteen (15) days after receipt of such statement, and the amount of any overpayment by Tenant shall be refunded by Landlord within thirty (30) days after Tenant's receipt of such statement, failing which Tenant may offset such amount against Rent.

     (d)     Any Additional Rent payable by Tenant pursuant to this Paragraph 8 shall be collectible by Landlord in the same manner as Basic Rent.

     (e)     If the Additional Rent Date or Expiration Date shall occur on a date other than January 1 or December 31, respectively, any Additional Rent under this Paragraph 8 for the calendar year in which the Additional Rent Date or Expiration Date shall occur, as the case may be, shall be appropriately prorated. In no event shall Basic Rent ever be reduced by operation of this Paragraph 8. The rights and obligations of Landlord and Tenant under the provisions of this Paragraph 8 with respect to any Additional Rent shall survive the Expiration Date or any sooner termination of the Term.

     (f)     Notwithstanding anything contained herein to the contrary, should Landlord's mortgagee

DocuSign Envelope ID: 390A9289-5086-44F9-B137-A5F5B01B5766

require at any time the maintenance of an escrow reserve for the insurance obligations of Tenant or for any other obligation of Tenant under this Lease, Tenant shall promptly pay to Landlord its proportionate share of said escrow the required amount as the same may be periodically adjusted.

9.    Common Area Maintenance Payments.

(a)    For purposes of this Lease, the term "Operating Costs" shall mean the total cost and expense incurred in operating, managing, equipping, lighting, repairing, replacing and maintaining the Shopping Center, including without limitation, gardening and landscaping, storm drainage systems and other utility systems, sprinkler systems, fire protection, security and security alarm systems and equipment, traffic control equipment, heating and air conditioning, repairs, line painting, lighting, sanitary control, removal of ice and snow, trash, rubbish, garbage and other refuse, depreciation on or rentals of machinery and equipment used in such maintenance, the cost of personnel to implement such services, to direct parking and to police the Common Areas, and ten percent (10%) of all of the foregoing costs to cover Landlord's administrative and overhead costs.

(b)    There shall be excluded from Operating Costs (i) debt service under any mortgage of the Shopping Center; (ii) rental payments under any ground or underlying lease of the Shopping Center; (iii) Taxes; (iv) Insurance Costs, (v) any expenses not related to the operation of the Shopping Center such as off-site offices or shared equipment unless such is a pro-rated between the Shopping Center and other properties sharing in the expense; (vi) the initial costs of equipment properly chargeable to the capital account consisting of items of real estate in nature and the original costs of constructing the Common Areas; (vii) intentionally deleted; (viii) expenses for which the Landlord is or will be reimbursed by another source (excluding tenant reimbursement for Operating Costs), including repair or replacement of any item covered by warranty; (ix) costs incurred to benefit (or as a result of) a specific tenant or items and services selectively supplied to any specific tenant; (x) expenses for the defense of the Landlord's title to the Premises or the Center; (xi) structural repairs and replacements; (xii) depreciation and amortization of the Center, financing costs, including interest and principal amortization of debts; (xiii) charitable or political contributions; (xiv) costs of improving or renovating space for a tenant or space vacated by a tenant; (xv) any amounts expended by Landlord as environmental response costs for removal, enclosure, encapsulation, clean-up, remediation or other activities regarding Landlord's compliance with federal, state, municipal or local hazardous waste and environmental laws, regulations or ordinances; (xvi) costs to correct original defects in the design, construction or equipment of or latent defects in the Premises or the Shopping Center; (xvii) expenses paid directly by Tenant for any reason (such as excessive utility use); (xviii) any repair, rebuilding or other work necessitated by condemnation, fire, windstorm or other insured casualty or hazard; (xix) any other amounts as a result of Landlord's or another tenant's violation of its lease or failure to comply with any governmental regulations and rules or any court order, decree or judgment; (xx) leasing commissions, advertising expenses and other costs incurred in leasing or procuring new tenants; (xxi) attorneys' fees, accounting fees and expenditures incurred in connection with negotiations, disputes and claims of other tenants or occupants of the Center or with other third parties except as specifically provided in the Lease; (xxii) cost of the initial stock of tools and equipment for operation, repair and maintenance of the Shopping Center; (xxiii) amounts billed (directly or indirectly) for salaries, wages, benefits, overhead, administrative and/or management fees, office expenses, rent and office supplies; (xxiv) expenses related to valet parking operations associated with the Shopping Center; (xxv) income, excess profits or franchise taxes or other such taxes imposed on or measured by the income of Landlord from the operation of the Shopping Center; (xxvi) any advertising for the Shopping Center or promotional expenses and objects of art; (xxvii) any costs representing an amount paid to an entity related to landlord which is in excess of the amount which would have been paid in the absence of such relationship.

(c)    The costs of operating, managing, equipping, securing, lighting, repairing, replacing and maintaining the Shopping Center shall be included in Operating Costs for the calendar year in which such cost is incurred by Landlord except that capital improvements or capital replacements to the Premises and/or Shopping Center shall be amortized over the useful life of such improvement/replacement as reasonably determined in accordance with generally accepted accounting principles (unless another timeframe is set forth herein below).

(i)    The cost of replacing (but not repairing) any roof shall be amortized over a seven year period, and one-seventh (1/7) of said cost shall be included in Operating Costs for each of seven consecutive calendar years, commencing with the calendar year in which such cost is incurred by

DocuSign Envelope ID: 380A9288-8086-44F9-B137-A5F5B01B5766

Landlord. In the event any roof or a portion of any roof shall be maintained or replaced by a tenant at the Shopping Center or by Landlord at such tenant's cost, such roof expense(s) shall be excluded from the operating costs and the expense(s) for maintenance and replacement of the balance of the roof(s) shall be shared proportionately by the balance of the tenants;

(ii)    The cost of replacing (but not repairing) the asphalt surface of the common parking area shall be amortized over a seven year period, and one-seventh (1/7) of said cost shall be included in Operating Costs for each of seven consecutive calendar years, commencing with the calendar year in which such cost is incurred by Landlord; and

(iii)    The cost of reconstruction and replacement of the facade of the Shopping Center shall be amortized over a fifteen year period, and one-fifteenth (1/15) of said cost shall be included in Operating Costs for each of fifteen consecutive calendar years, commencing with the calendar year in which such cost is incurred by Landlord.

(d)    Commencing on the Additional Rent Date, Tenant shall pay to Landlord, as Additional Rent for each calendar year falling wholly or partially within the Term, an amount (the "Common Area Maintenance Payment") equal to the greater of (i) an amount equal to twelve (12) times the Initial Estimated Common Area Maintenance Payment or (ii) the product of the Operating Costs for such calendar year and the Expense Share. Notwithstanding the foregoing, Tenant's proportionate share of certain items of the CAM Expense are different as calculated based on the tenants sharing the expense and the said tenants' Proportionate Shares. At present, Tenant's proportionate share is 1.58% for trash and compactor rental; 2.19% for cardboard recycling; and 2.19% fire alarm and fire line). Landlord shall have the option of adjusting Tenant's Proportionate Share, and to charge Tenant a different proportionate share of certain CAM Expense items based on the tenants sharing in the expense.

(e)    For the period, if any, between the Additional Rent Date and the last day of the calendar year in which the Additional Rent Date occurs, Tenant shall pay to Landlord on account of the Common Area Maintenance Payment, a monthly amount equal to the Initial Estimated Common Area Maintenance Payment, as set forth in Paragraph 1(u) hereof, on the first day of each month (provided that if the Additional Rent Date is other than the first day of a calendar month, the payment for the month in which the Additional Rent Date occurs shall be appropriately prorated). With respect to each calendar year commencing after the calendar year in which the Additional Rent Date occurs, Landlord may furnish to Tenant an estimate of amounts that will be payable by Tenant pursuant to Paragraph 9(d) hereof for such year, and upon receipt of such estimate Tenant will thereafter pay to Landlord, on the first day of each month during such year, on account of the Common Area Maintenance Payment, an amount equal to one-twelfth (1/12) of such estimate. Landlord may revise such estimate from time to time. Until such estimate has been furnished to Tenant, Tenant shall pay to Landlord, on account of the Common Area Maintenance Payment, on the first day of each month during such year, an amount equal to the amount payable by Tenant pursuant to Paragraph 9(d) for the previous calendar year divided by the number of months contained in the Term during such previous calendar year. Within ninety (90) days after the end of each calendar year including the year in which the Additional Rent Date occurs, Landlord shall furnish Tenant with a reconciliation statement setting forth the amounts payable by Tenant for such year pursuant to Paragraph 9(d) hereof and the amounts paid by Tenant on account thereof pursuant to this Paragraph 9(e). Any additional amounts payable by Tenant pursuant to such statement shall be payable within thirty (30) days after receipt of such statement, and the amount of any overpayment by Tenant shall be refunded by Landlord within 30 days after Tenant's receipt of such statement, failing which Tenant may offset such amount against Rent.

(f)    Any Additional Rent payable by Tenant pursuant to this Paragraph 9 shall be collectible by Landlord in the same manner as Basic Rent.

(g)    If the Additional Rent Date or Expiration Date shall occur on a date other than January 1 or December 31, respectively, any Additional Rent under this Paragraph 9 for the calendar year in which the Additional Rent Date or Expiration Date shall occur, as the case may be, shall be appropriately prorated. In no event shall Basic Rent ever be reduced by operation of this Paragraph 9. The rights and obligations of Landlord and Tenant under the provisions of this Paragraph 9 with respect to any Additional Rent shall survive the Expiration Date or any sooner termination of the Term.

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

(h)    If at any time during the Term, Landlord constructs new improvements as part of the Shopping Center resulting in an increase in ground floor leasable area of more than ten percent (10%) over the ground floor leasable area of the Shopping Center as of the date of this Lease, then, from and after the date of issuance of a certificate of occupancy covering such new improvements, the Expense Share, for purposes of Paragraphs 7, 8 and 9 only, shall be adjusted to a percentage equal to the product of the Expense Share (as set forth in Paragraph 1(n) hereof) and a fraction, the numerator of which is the net rentable area of all ground floor space in the Shopping Center as of the date of this Lease and the denominator of which is the net rentable area of all ground floor space in the Shopping Center including such new improvements. Any Additional Rent under Paragraphs 7, 8 and 9 for the calendar year in which the certificate of occupancy for such new improvements has been obtained shall, if such new improvements require an adjustment to the Expense Share pursuant to this Paragraph 9(h), be appropriately prorated.

(i)    If at any time during the Term, a tenant or tenants at the Shopping Center pay any element of Operating Costs directly to the provider thereof, such amount shall not be included in Operating Costs and Landlord shall with respect to that element of Operating Costs and this Paragraph 9 only, adjust Tenant's Expense Share of such Operating Costs accordingly. In that event, Tenant's Expense Share of such Operating Costs shall be a fraction, the numerator of which is the net leasable square footage of the Premises and the denominator of which is the net leasable area of all tenants in the Shopping Center who have not directly paid such element of Operating Costs. Notwithstanding the foregoing, Tenant shall have no right at any time to pay any element of Operating Costs directly to the provider thereof without Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion.

10.    Permitted Use; Operating at the Premises.

(a) When operating in the Premises, Tenant shall use the Premises for the Permitted Use, as set forth in Paragraph 1(ll) hereof, and shall conduct and operate Tenant's business at the Premises under Tenant's Trade Name, as defined in Paragraph 1(f) hereof. Tenant will not use or permit, or suffer the use of the Premises for any other business or purpose, including but not limited to those prohibited uses set forth on Exhibit D attached hereto and made a part hereof. Tenant shall not sell, display or solicit sales in the Common Areas. Tenant shall not use or permit the use of any vending machines or public telephones (except for employee only use) on, at or about the Premises without the prior written consent of Landlord.    Tenant shall not commit waste, perform any acts or carry on any practice which may injure the Shopping Center or be a nuisance or menace to other tenants in the Shopping Center;

(b)    Tenant has no obligation to open its business or operate in the Premises during the Term provided that it continues to pay the Basic Rent and Additional Rent due under this Lease and otherwise complies with the provisions of this Lease. Should Tenant open its business in the Premises, Tenant may (i) close the Premises for business to the public for stocktaking, change of inventory, remodeling and/or making repairs, and (ii) modify its operating hours as reasonably necessary to accommodate its employees due to illness within the store staff and their families caused by COVID-19 or similar pandemic incidents and to comply with restrictions imposed by governmental regulations arising from COVID- 19. . If Tenant shall cease to conduct business at the Leased Premises for a consecutive period in excess of one hundred and eighty (180) days (a "Going Dark Event"), Landlord shall have the right, but not the obligation, at any time thereafter before Tenant re-opens for business in the Premises, to terminate this Lease on written notice to Tenant whereupon this Lease shall terminate upon the thirtieth (30th) day after the date on which Tenant receives Landlord's termination notice (the "Recapture Date") as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the terms of this Lease. All Basic Rent and Additional Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date. During such time as it elects to conduct business operations at the Premises, it shall do so in accordance with the terms and conditions as set forth in this Lease. Tenant shall comply with all Lease provisions and operate at the Premises during the Term (if and when Tenant chooses to operate) with sound business practice, due diligence and efficiency so as to produce the maximum gross receipts which may be produced by such manner of operation. Tenant shall provide, install and at all times maintain in the Premises all suitable furniture, fixtures, equipment and other personal property necessary for the conduct

DocuSign Envelope ID: 380A8288-5088-44F9-B137-A5F5B01B5766

of Tenant's business therein in a businesslike manner, shall carry at when operating in the Premises a stock of merchandise of such size, character and quality as shall be reasonably designed to produce the maximum return to Tenant in Tenant's opinion, and shall staff the Premises at all times with sufficient sales personnel to serve its customers. Tenant shall conduct its business in the Premises during the regular customary days and hours for such type of business as Tenant deems desirable.

(c)     Tenant shall warehouse, store and/or stock in the Premises only such goods, wares and merchandise as Tenant intends to offer for sale at retail at, in, from or upon the Premises. This shall not preclude occasional emergency transfers of merchandise to other stores of Tenant, if any, not located in the Shopping Center. Tenant shall use for office, clerical or other non-selling purposes only such space in the Premises as is from time to time reasonably required for Tenant's business in the Premises. No overnight lodging shall be permitted on the Premises. No secondhand, public or private auction, fire, distress, or bankruptcy sales or any other sale which would indicate to the public that Tenant is bankrupt, is going out of business, or has lost its lease, may be conducted in the Premises without prior written consent of Landlord.

(d)     Tenant shall not permit any business to be operated in or from the Premises by any concessionaire or licensee without the prior written consent of Landlord.

(e)     Tenant shall cause all deliveries to be made to the rear of the Premises.

(f)     Tenant will not, without the Landlord's prior written consent, store, place or maintain any merchandise or rubbish containers or other articles in any vestibule or entry of the Premises or on the sidewalks adjacent thereto or elsewhere outside the Premises.

(g)     Tenant will not use or permit the use of any apparatus, or sound reproduction or transmission, or any musical instrument, in such manner that the sound so reproduced shall be audible beyond the confines of the Premises, and will not use any other advertising medium, including without limitation flashing lights or search lights, which may be seen, heard or experienced outside of the Premises.

(h)     Tenant will not cause or permit objectionable odors to emanate or be dispelled from the Premises.

(i)     Tenant will not solicit business, distribute handbills or other advertising matter or hold demonstrations in the parking areas or other Common Areas.

(j)     Tenant will not permit the parking of delivery vehicles so as to interfere with the use of any driveway, walk, parking area, or other Common Areas.

(k)     Tenant will not use the plumbing facilities for any other purpose than that for which they are constructed and will not permit any foreign substance of any kind to be thrown therein and the expense of repairing any breakage, stoppage, seepage or damage, whether occurring on or off the Premises, resulting from a violation of this provision by Tenant or Tenant's employees, agents or invitees shall be borne by Tenant. All grease traps and other plumbing traps shall be kept clean and operable by Tenant at Tenant's own cost and expense.

(l)     Tenant will not permit any shopping carts to be used at the Premises.

(m)     Tenant will not place or cause or permit to be placed within the Premises pay telephones, vending machines (except those solely for the use of Tenant's employees) or amusement devices of any kind without the prior written consent of Landlord.

(n)     Tenant, at its sole cost and expense, shall comply with all Legal Requirements and all Insurance Requirements relating to or affecting the Premises. Tenant shall procure all final, non-appealable permits, licenses and approvals necessary for the Permitted Use, its other leasehold improvements in the Premises and its signs which shall comply with the attached Sign Criteria and the sign ordinance of the City of Clifton (collectively, the "Approvals"). Tenant shall promptly and diligently apply for and use its diligent efforts to obtain the Approvals. Tenant shall provide Landlord with a copy of its applications for Approvals at the time it submits the applications to the City of Clifton. If Tenant

DocuSign Envelope ID: 380A9288-5086-44F9-B137-A5F5B01B5766

has not obtained the Approvals by September 12, 2023, Tenant shall notify Landlord and if Tenant has been using diligent efforts to obtain the Approvals, Landlord shall provide Tenant with an additional thirty (30) days to obtain the Approvals. If Tenant is unable to procure the Approvals within said additional thirty (30) day period, Landlord shall have the right to terminate this Lease or to attempt to obtain the Approvals within an additional thirty (30) day period. If Landlord attempts to obtain the Approvals and is unable to do so within said thirty (30) day period, thereafter, either party may terminate this Lease upon written notice to the other.

(o)     Tenant shall not place a load upon any floor that exceeds either the floor load per square foot that such floor was designed to carry or exceeds that which is allowed by any Legal Requirement.

(p)     Tenant and its employees, agents, invitees, and licensees shall faithfully observe and strictly comply with, and shall not permit violation of, any reasonable rules and regulations concerning the Shopping Center as Landlord may from time to time make and communicate to Tenant in writing ("Rules and Regulations"). A copy of the current Rules and Regulations is attached hereto and made a part hereof as Exhibit F. In the case of any conflict or inconsistency between the provisions of this Lease and any Rules and Regulations, the provisions of this Lease shall control. Landlord shall take reasonable actions to enforce the Rules or Regulations against other tenants, provided, however, that Landlord's failure to effectuate compliance shall be without liability of Landlord to Tenant.

(q)     Tenant, and any assignee or sublessee, shall not conduct its business so as to violate any of the Shopping Center exclusives granted by Landlord to other tenants in the Shopping Center as set forth more fully in Exhibit G; provided, however, that the parties acknowledge that the sale of cell phone cases and related cell phone accessories may violate Verizon's exclusive set forth in Exhibit G and in the event of Verizon's objection to the sale of such items by Tenant, Tenant shall cease such sales after receipt of written notice from Landlord, and, (ii) any restrictions imposed on Tenant due to the restriction set forth in Exhibit G in favor of Five Below shall be modified as set forth in that certain waiver provided to Tenant by Five Below and attached hereto as Exhibit J. From time to time Landlord shall provide Tenant with an amended or supplemental Exhibit G with respect to additional exclusives granted in the Shopping Center after the date of this Lease. Tenant shall be subject to such future exclusives as applicable to items not included in Tenant's Permitted Use clause; provided, however, that Tenant shall be allowed to sell any such items on an incidental basis wherein not more than 5% of the total square footage of the Premises will be used for the sale of such item.

(r)     Tenant shall not install or permit to be installed by any other party any structure or equipment which would cause any interference (above de minimus interference) with any satellite, radio, telecommunications or television reception or transmission installed anywhere in the Shopping Center or be visible from street level. In the event of a default of this provision after any applicable notice and cure periods have expired, Landlord shall be entitled to all remedies set forth in this Lease, including but not limited to injunctive relief.

(s)     Tenant shall not make any roof penetration without Landlord's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed provided Tenant complies with the provisions of the Lease. If Landlord consents to any roof penetrations by Tenant to complete Tenant's Work, to install equipment or for any other reason, Tenant shall (i) obtain Landlord's prior approval of its plans for the installation of such equipment, (ii) so as not to violate or invalidate any roof warranties maintained by Landlord, use a contractor approved by Landlord for all roof penetrations, (iii) maintain the area where roof penetrations are made while Tenant's equipment is present, and (iv) repair any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon. Any and all necessary repair, maintenance or modifications to the roof necessary as a result of any roof penetrations made by Tenant or its contractors shall be made at Tenant's sole cost by Landlord's designated contractor. If consented to by Landlord, any satellite dish or other permitted structure shall remain below the parapet and all installations and equipment shall not be visible from Route 3. Any contractor must produce a written contract with respect to the work and Tenant shall be required to comply with the provisions of Paragraph 15(b) regarding insurance. In the event of a default of this provision after any applicable notice and cure periods have expired, Landlord shall be entitled to all remedies set forth in this Lease, including but not limited to injunctive relief.

(t)     Tenant shall not cook at the Premises without the prior written approval of Landlord, which approval may be withheld in Landlord's sole discretion.

DocuSign Envelope ID: 380A9286-5089-44F9-B137-A5F5B01B5766

11.    Control of Common Areas.

(a)    Subject to any limitations set forth in other provisions of this Lease, including, but not limited to, Section 32(c), all Common Areas shall at all times be subject to the exclusive control and management of Landlord, and Landlord shall have the right from time to time to establish, modify and enforce reasonable rules and regulations with respect to all Common Areas.  Tenant agrees to abide by and conform with such reasonable rules and regulations; to endeavor to cause its invitees, suppliers, officers, agents, employees and independent contractors to so abide and conform.  Landlord shall have the right to construct, maintain and operate lighting facilities in and on all Common Areas; to police the same; from time to time to change the area, level, location and arrangement of parking areas and other facilities located in the Common Areas; to reasonably restrict parking by tenants, their officers, agents and employees to employee parking areas; to grant parking exclusives; to enforce parking charges (by operation of meters or otherwise), with appropriate provisions for free parking ticket validating by Tenants; to grant tenants exclusive trash dumpster or compactor areas; to close all or any portion of the Common Areas to such extent as may, in the reasonable opinion of Landlord's counsel, be legally sufficient to prevent a dedication thereof or the accrual of any rights to any person or the public therein; to close temporarily all or any portion of the parking areas or parking facilities; to discourage non-customer parking; and to do and perform such other acts in and to the Common Areas as, in the use of good business judgment, Landlord shall determine to be advisable with a view to the improvement of the convenience and use thereof by tenants, their officers, agents, employees and customers.  Landlord will operate and maintain the Common Areas in such manner as Landlord, in its sole discretion, shall determine from time to time. Without limiting the scope of such discretion, Landlord shall have the full right and authority to employ all personnel and to make all rules and regulations pertaining to and necessary for the proper operation and maintenance of the Common Areas.  Notwithstanding anything set forth above or elsewhere in this Lease, Landlord covenants that during the Term, the Shopping Center will remain a retail shopping center which may contain retail establishments, providers of services and entertainment, restaurants, banks and other financial institutions, and other businesses common in similar shopping centers.

(b)    All Common Areas not within the Premises, which Tenant may be permitted to use and occupy, are to be used and occupied in accordance with this Lease, and if the amount of the Common Areas be diminished, except as otherwise set forth in this Lease, Landlord shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of Rent, nor shall such diminution of the Common Areas be deemed a constructive or actual eviction.

12.    Alterations.

(a)    Tenant shall make no improvements, alterations, changes or additions to the Premises which involve structural changes to the Premises or the Shopping Center or which affect the mechanical, plumbing, electrical or other utility systems outside of the Premises  without Landlord's consent which may be withheld in its sole discretion. Any other improvements, alterations, changes or additions, other than cosmetic alterations or improvements which may be made without the need for Landlord's consent ("Cosmetic Improvements"), shall be made only with the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed. Tenant shall procure all permits, licenses and approvals necessary for any improvements, alterations, changes or additions. Except for Cosmetic Improvements, before proceeding with any such improvement, alterations, changes or additions, including Tenant's initial construction, Tenant shall submit to Landlord detailed plans and specifications therefor, drawn by a registered architect and/or licensed engineer, setting forth and describing the proposed work in such detail as Landlord may reasonably require.  No material deviation from the final set of plans and specifications, once submitted to and approved by Landlord, shall be made by Tenant without Landlord's prior written consent.  Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency, and Tenant shall be solely responsible for such plans and specifications.  At least ten (10) days before the commencement of any demolition, construction, installation, repair, alteration, change or addition on the Premises, Tenant shall notify Landlord of Tenant's intention to commence such work.  Landlord shall have the right to post and maintain on the Premises any notice of non-responsibility provided by law. Upon completion of any construction, Tenant shall provide Landlord with a field marked copy of the plans  indicating any material deviation from such plans.

DocuSign Envelope ID: 380A9266-5086-44F9-B137-A5F5B01B5766

(b)    All fixtures installed in and affixed to the Premises during the Term shall not be removed without Landlord's consent and shall remain a part of the Premises. On the Expiration Date or date of earlier termination of this Lease all affixed improvements, alterations, changes and additions, including but not limited to all fixtures installed in and affixed to the Premises during the Term, shall become the property of Landlord and shall be surrendered with the Premises, provided, however, that Tenant shall remove all of its trade fixtures and repair any damage as a result of their removal.

(c)    Any removal of Tenant's personal property from the Shopping Center shall be accomplished in a manner which will minimize any damage or injury to the Premises and the Shopping Center and any such damage or injury shall be promptly repaired by Tenant at its sole cost and expense. If any personal property of Tenant is not removed by Tenant prior to the Expiration Date or date of sooner termination of this Lease, Landlord shall give Tenant written notice in accordance with the provisions of Paragraph 31(n). If same is not removed by Tenant within ten (10) business days after the date Tenant receives such notice, the personal property shall, at Landlord's option, either become the property of Landlord or shall be disposed of, retained by or stored by Landlord at Tenant's risk and expense.

(d)    No approval of plans or specifications by Landlord or consent by Landlord allowing Tenant to make improvements, alterations, changes or additions to the Premises shall in any way be deemed to be an agreement by Landlord that the contemplated work complies with any Legal Requirements or Insurance Requirements or the certificate of occupancy for the Premises or the Shopping Center, or deemed to be a waiver by Landlord of any of the provisions of this Lease. Notice is hereby given that neither Landlord, Landlord's agents, the lessor under any underlying lease of the Shopping Center, or portion thereof, or the holder of any mortgage on the Shopping Center, or portion thereof, shall be liable for any labor or materials furnished or to be furnished to Tenant upon credit, and that no mechanic's or other liens for such labor or materials shall attach to or affect any estate or interest of Landlord or any other such party in and to the Premises or the Shopping Center.

13.    Signs, Awnings and Canopies.

(a)    Tenant shall install and maintain (at Tenant's expense) a sign on the outside facade above the show windows, and shall maintain a canopy or awning to be supplied by Tenant (at Tenant's expense), in good condition and repair at all times. Notwithstanding the foregoing, Tenant has the option to use the existing awning. Landlord reserves the right to approve and to specify the design, type and construction of any sign. Tenant shall comply with Landlord's signage criteria set forth in Exhibit H-1 attached hereto and applicable law.. Landlord hereby approves the dimensions, color, content and design of Tenant's proposed signage as set forth in Exhibit H-2. Landlord acknowledges and agrees that Exhibit H-2 depicts Tenant's prototypical signage and Landlord hereby approves Tenant's site-specific signage so long as same is substantially similar to that shown on Exhibit H-2 and in compliance with all applicable laws, codes and ordinances.

(b)    Except as provided in Paragraph 13(a) hereof, and professionally designed, prepared and produced interior merchandise displays and professionally designed, prepared and produced interior window signs customarily used in Tenant's store locations advertising special sales within the subject premises or temporary signs (exclusive of contractor signs), Tenant will not place or suffer to be placed or maintained on any exterior door, wall or window of the Premises any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place or maintain any exterior lighting, plumbing fixture or protruding object or any decoration, lettering or advertising matter on the glass of any window or door of the Premises.

14.    Repairs and Maintenance.

(a)    Landlord shall keep and maintain the building systems serving the Premises but located outside of the Premises, the foundation, structure, floor slab, exterior walls and roof (including the membrane) of the building in which the Premises are located and the Common Areas in good working order, repair and condition, except that Landlord shall not be called upon to make any such repairs occasioned by the act or neglect of Tenant, its agents, employees, invitees, licensees or contractors. Landlord shall not be called upon to make any other improvements or repairs of any kind upon the Premises. In addition, during the Term, Landlord shall, at Landlord's sole cost and expense (a) make all repairs, replacements, alterations, additions or improvements to the Shopping Center that are required by any present or future requirement of law and that are not the responsibility of Tenant under this Lease, and (b) comply with

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5768

the laws, orders and regulations of all governmental authorities, as well as insurance carriers and underwriters, that are applicable to the Shopping Center, including, without limitation, the Americans with Disabilities Act of 1990, as amended from time to time, and any other code that addresses substantially similar issues as such Act. Notwithstanding the foregoing, Landlord shall in no event be responsible for making any such repairs, replacements, alterations, additions or improvements to the Premises or comply if related to the Premises if required due to Tenant's specific use at or of the Premises (and not to all tenants regardless of the nature of their use or occupancy) and any such repairs, replacements, alterations, additions or improvements or compliance shall Tenant's responsibility.

(b)    Except as provided in Paragraph 14(a) hereof, Tenant shall keep and maintain in good order, condition and repair (including any such replacement and restoration as is required for that purpose) the Premises and every part thereof and any and all appurtenances thereto wherever located provided such appurtenances serve only the Premises, including, without limitation, the exterior and interior portion of all doors, door checks, windows, plate glass, store front, all plumbing and sewage facilities within and exclusively serving the Premises, including free flow up to the main sewer line, fixtures, heating and air conditioning and electrical systems exclusively serving the Premises, sprinkler system, walls, floors and ceilings located within the Premises and any Tenant's Work and other work performed by Tenant pursuant to this Paragraph 14 hereof.

(c)    Landlord represents that heating and air conditioning is provided to the Premises via a roof top unit exclusively serving the Premises (the "RTU"). Tenant shall be responsible, at its sole cost and expense, for keeping the RTU in good order and repair and replacing the same as and when necessary, provided, however that Landlord shall warrant all major parts of the RTU for a period of one (1) year after the Rent Commencement Date. Any replacement shall, upon installation, become the property of Landlord.

(d)    Tenant will keep all exterior and interior store front surfaces clean and will maintain the rest of the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests.

(e)    Tenant will not permit accumulations of any debris, refuse and garbage, but will remove the same and keep the same in odorproof, ratproof containers within the interior of the Premises, shielded from the view of the general public, until removed, and will not burn any refuse but will cause all such refuse to be removed by such person or companies, including Landlord, as may be designated in writing by Landlord, and will pay all charges therefor, which shall in all events be reasonable; provided, however, that Landlord may decline to designate any such person or company in which event all such refuse shall be removed at Tenant's expense by such person or company as Tenant, subject to Landlord's prior written approval, shall select.

(f)    Tenant will, at its sole cost and expense, supply, maintain, repair and replace any fire extinguishers or other fire prevention equipment and safety equipment (including sprinkler systems and installation of approved hoods and ducts if a restaurant use is a Permitted Use or if Landlord permits cooking pursuant to Paragraph 10(a)) required by any Legal or Insurance Requirements, or otherwise recommended or required by any insurance carrier insuring the Shopping Center or any portion thereof.

15.    Insurance and Indemnity.

(a) Tenant shall at all times during the Term, keep in full force and effect, at its expense the following insurance coverages, at a minimum, with the limits and requirements as listed on Exhibit I:

(i)    commercial general liability insurance (including contractual liability coverage), for property damage, personal injury and bodily injury (including wrongful death), occurring in or about the Premises, insuring on an occurrence basis and naming Landlord and any person, firm or entity designated by Landlord as additional insured and Tenant's insurance shall be primary and noncontributory with any other insurance that may or may not be applicable to any subject claim;

(ii)    "Causes of Loss-Special Form" (or its equivalent) property insurance covering Tenant's leasehold improvements, trade fixtures, equipment and personal property installed or placed in the Premises by Tenant, naming Landlord and any person, firm or entity designated by Landlord as additional loss payees, as their interests may appear;

DocuSign Envelope ID: 380A8286-6086-44F9-B137-A5F5B01B5766

        (iii)    "worker's compensation and employer's liability insurance with no less than the minimum limits required by law or one million ($1,000,000.00), whichever is greater;

        (iv)    business interruption insurance in an amount sufficient to cover of expenses (including but not limited to all Basic Rent and Addition Rent due under this Lease) and payroll for a period of (twenty-four (24) months;

        (v)    if Tenant serves, sells and/or distributes liquor on the Premises, liquor law legal liability insurance with limits of not less than $3,000,000 each common cause; and

        (vi)    automobile liability insurance owned (if any), non-owned and hired autos.

    (b)    Tenant shall require any contractor of Tenant performing work on the Premises to take out and keep in force, at no expense to Landlord the following insurance coverages with the limits and requirements as listed in Exhibit I, with Landlord and Tenant to be named as additional insured on the general liability insurance policy and shall provide proof thereof to Landlord evidenced by both a certificate of insurance and an additional insured endorsement to the insurance policy naming Landlord and Tenant.

        (i)    commercial general liability insurance, including contractor's liability coverage (which shall name Landlord as an additional insured), contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, to afford protection to the limit of not less than the limits and requirements as listed on Exhibit I;

        (ii)    worker's compensation and employer's liability or similar insurance in form and amounts required by law, or one million ($1,000,000.00) dollars, whichever is greater; and

        (iii)    automobile liability insurance owned, (if any), non-owned and hired autos.

    (c)    The company or companies writing any insurance which Tenant, Tenant's contractor's or Landlord is required to take out and maintain or cause to be taken out or maintained pursuant to Paragraphs 15 (a) or (b), shall be with a company or companies licensed and admitted to do business in the state in which the Premises are located approved by Landlord and shall have a general policyholder's rating of not less than "A-" and a financial rating of not less than Class VII as rated in the most current available "A.M. Best Key Rating Guide. The policies of Tenant and it contractor's shall be primary and noncontributory with any other insurance that may or may not be applicable to any subject claim. The insurance requirements contained in this Paragraph 15 are independent of Tenant's waiver, indemnification and other obligations under this Lease and shall not be construed or interpreted in any way to restrict, limit or modify those obligations. Landlord shall be an additional insured on Tenant's and Tenant's contractor's liability policies as their respective interests appears. Each such policy of Tenant or self-insurance program shall contain a waiver of subrogation provision in favor of Landlord and shall also contain a provision by which the insurer agrees that such policy shall not be canceled except after thirty (30) days' written notice to the additional insured. A certificate of each such policy together with a copy of the specific additional insured endorsement (which may be provided by a blanket additional insured endorsement) shall be deposited with Landlord. The policies shall name Landlord, any person, firms or corporations designated by Landlord in writing as additional insureds, and Tenant as insured, and shall contain a clause that the insurer will not cancel or change the insurance without first giving the Landlord thirty (30) prior written notice. If Tenant fails to secure and maintain insurance policies complying with the provisions of this Paragraph 15, Landlord may, but shall not be required to, secure and maintain such insurance policies and Tenant shall pay the cost thereof to Landlord, as Additional Rent, upon demand.

    (d)    Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by the standard form of fire insurance policy. Tenant agrees to pay any increase in premiums for property and loss of rents insurance that may be charged during the Term on the amount of such insurance which may be carried by Landlord on the Premises or the Shopping Center, resulting from Tenant's use or manner of use of the Premises or from the type of merchandise sold by Tenant in the Premises, whether or not Landlord has consented to the same. In determining whether

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5786

increased premiums are the result of Tenant's use of the Premises, a schedule, issued by the organization establishing the insurance rate for the Premises, showing the various components of such rate, shall be conclusive evidence of the several items and charges which make up the fire insurance rate on the Premises.

(e)    In the event Tenant's occupancy causes any increase of premium for the property, boiler and/or casualty rates on the Premises or Shopping Center or any part thereof above the rate of the least hazardous type of occupancy legally permitted in the Premises, Tenant shall pay the additional premium on the fire, boiler and/or casualty insurance policies by reason thereof. Tenant also shall pay, in such event, any additional premium on the rent insurance policy that may be carried by the Landlord for its protection against rent loss through casualty. Bills for such additional premiums shall be rendered by Landlord to Tenant at such times as Landlord may elect, and shall be due from, and payable by, Tenant when rendered, and the amount thereof shall be deemed to be, and be paid as Additional Rent.

(f)    Tenant will indemnify Landlord and save it harmless from and against any and all claims, actions, damages, liability and expense in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence (i) in, upon or at the Premises, except if due to the Landlord's sole negligence or that of its agents, contractors or employees, or (ii) the occupancy or use by Tenant of the Premises and Common Areas or any part thereof, or occasioned wholly or in part by any negligent act or omission of Tenant, its agents, contractors, employees, servants, lessees or concessionaires. If Landlord shall be made a party to any litigation commenced by or against Tenant, then Tenant shall protect and hold Landlord harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by Landlord in connection with such litigation. Tenant shall also pay all costs, expenses and reasonable attorney's fees that may be incurred or paid by Landlord in enforcing the covenants and agreements in this Lease. Landlord will indemnify Tenant and save it harmless from and against any and all claims, actions, damages, liability and expense in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in, upon or at the Common Areas, except if due, in whole or part, to Tenant's negligence or misconduct or that of its agents, contractors or employees. If Tenant shall be made a party to any litigation commenced by or against Landlord, then Landlord shall protect and hold Tenant harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by Tenant in connection with such litigation unless caused in whole or part by Tenant's negligence. If not excepted by the negligence of Tenant , Landlord shall also pay all costs, expenses and reasonable attorney's fees that may be incurred or paid by Tenant in enforcing the covenants and agreements in this Lease.

(g)    Tenant shall, at its expense, replace any and all plate and other glass in the Premises damaged or broken from any cause except for the sole negligence of Landlord or its agents, employees or contractors. Tenant shall insure, at its expense, all plate and other glass in the Premises and name Landlord as additional insured.

(h)    Insurance required under Paragraph 15(a)(i) of this Lease may be provided by Tenant under a "blanket" or "umbrella" policy or policies covering all of Tenant's store locations, provided that such policies otherwise comply with the provisions of this Lease, specifically Exhibit I, and specify the coverage and amounts thereof with respect to the Premises. Notwithstanding anything to the contrary contained herein, Tenant's insurance required under Paragraphs 15(a)(ii), 15(a)(iv), and 15(g) of this Lease, and specifically Exhibit I, may be provided by Tenant under a plan of self-insurance, provided that Tenant or its parent, Claire's Store, Inc., maintains, during the period of such self-insurance, a net worth of at least Twenty Million Dollars ($20,000,000.00) ("Self-Insurance Threshold"). In addition, Tenant shall be permitted to maintain a deductible as a part of any insurance policy carried by Tenant in compliance with this Lease, and, provided Tenant's net worth meets or exceeds the Self-Insurance Threshold, such deductible shall be permitted in any amount reasonably determined by Tenant and Tenant's insurer. However, in the event such deductible shall be in excess of twenty five thousand dollars ($25,000.00) for property insurance and five thousand dollars ($5,000.00) for any other policy, such deductible shall remain the responsibility of Tenant. The provisions of this Paragraph 15(h) shall apply only to Claire's Boutiques, Inc., a Michigan corporation or any Permitted Transferee as defined in Paragraph 18(g)(1), (2) or (3) of this Lease, and provided the Self-Insurance Threshold is met. Any portion of any risk for which Tenant is self-insured shall be deemed to be an insured risk under this Lease, and Landlord and its beneficiaries, agents and employees shall be afforded no less insurance protection as if such portion was not self-insured and any waiver of subrogation shall apply in the same way as if Tenant was insured.

DocuSign Envelope ID: 380A9266-5086-44F9-B137-A5F5B01B5766

16.    Utilities; Trash Disposal.

(a)    Commencing on the Delivery Date, Tenant shall be solely responsible for and promptly pay all charges for heat, water, gas, electricity or any other utility used or consumed in the Premises. Currently all utilities serving the Premises are individually metered.  In no event shall Landlord be liable for an interruption or failure in the supply of any such utilities to the Premises.

(b) Tenant shall  have joint access with other tenants to a trash collection "dumpster" bin in the area shown on Exhibit A-1. Commencing on the  Additional Rent Date, Tenant shall pay, as Additional Rent, its proportionate share in accordance with the provisions of Paragraph 9(d) of this Lease for all charges for trash removal from the Premises and maintenance of the trash collection "dumpster" bin.

17.    Advertising.

(a)    Unless such change is consistent with a majority of its stores in New Jersey. Tenant agrees not to change Tenant's Trade Name, as set forth in Paragraph 1(f) hereof, in connection with the business conducted in the Premises, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    Tenant, at its sole expense, agrees to refer to the Shopping Center by the name set forth in Paragraph 1(oo) hereof in designating the location of the Premises in all newspaper or other advertising, stationery, other printed material and all other references to location; to include the address and identity of its business activity in the Premises in all advertisements made by Tenant in which the address and identity of any other business activity of like character conducted by Tenant within the city or trade area in which the Shopping Center is located shall be mentioned; and to use, in such advertising, only the Tenant's Trade Name, as set forth in Paragraph 1(f) hereof.

18.    Assignment. Mortgaging and Subletting.

(a)    Tenant shall not mortgage, pledge or encumber this Lease or all or any part of the Premises in any manner by reason of any act or omission on the part of Tenant, without the prior written consent of Landlord in each instance, which consent Landlord shall be entitled to withhold in its sole discretion. Tenant shall not  (i) assign or otherwise transfer this Lease or the term and estate hereby granted, or (ii) sublet all or any part of the Premises or allow the same to be used or occupied by others or in violation of Paragraph 10 hereof,  without the prior written consent of Landlord in each instance, which consent shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, Landlord may withhold its consent to an assignment or subletting if:

(i)    the proposed assignee's or subtenant's occupancy will cause a density of traffic or make demands on utilities, services, maintenance or facilities in excess of those related to Tenant's occupancy;

(ii)    the proposed assignee or subtenant is a tenant of and is vacating premises in any building owned by Landlord or any affiliate or constituent of Landlord;

(iii)    the proposed assignee or subtenant is a party with which Landlord is then in the course of negotiations, or during the immediately preceding six-month period was in negotiations for the leasing of space in any building owned by Landlord or any affiliate or constituent of Landlord within one-half (1/2) mile of the Shopping Center;

(iv)    the proposed assignee's or subtenant's financial condition is not reasonably adequate to meet its obligations undertaken in such assignment or sublease; or

(v)    if a use by the proposed assignee or sublessee is in violation of any provision of this Lease beyond any applicable grace or cure period.

(b)    If this Lease be assigned, whether or not in violation of the terms of this Lease, Landlord may collect rent from the assignee. If the Premises or any part thereof be sublet or be used or occupied by anybody other than Tenant, whether or not in violation of this Lease, Landlord may, after default by

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

Tenant and expiration of Tenant's time to cure such default, if any, collect rent from the subtenant or occupant. In either event, Landlord may apply the net amount collected to the rent herein reserved. The consent by Landlord to an assignment, transfer, encumbering or subletting pursuant to any provision of this Lease shall not in any way be considered to relieve Tenant from obtaining the express prior consent of Landlord to any other or further assignment, transfer, encumbering or subletting. Neither any assignment of this Lease nor any subletting, occupancy or use of the Premises or any part thereof by any person other than Tenant, nor any collection of rent by Landlord from any person other than Tenant, nor any application of any such rent as provided in this Paragraph 18 shall, under any circumstances be deemed a waiver of any of the provisions of Paragraph 18(a) hereof, or relieve, impair, release or discharge Tenant of its obligations fully to perform the terms of this Lease on Tenant's part to be performed and Tenant shall remain fully and primarily liable therefor.

(c)     Any assignment or subletting, if consented to or permitted under this Lease, shall be further subject to and conditioned upon the following: (i) at the time of any proposed subletting or assignment, Tenant shall not be in default under any of the terms, provisions or conditions of this Lease beyond any applicable notice and cure periods; (ii) the sublessee or assignee shall occupy only the Premises and conduct its business in accordance with the Permitted Use unless another use is approved by Landlord in Landlord's sole discretion; (iii) except for any Permitted Transfer as defined in subsection (g) below, if the rents charges or other sums required to be paid by such sublessee or assignee exceed the rents, charges or other sums reserved hereunder, then Tenant shall pay to Landlord monthly one half of the amount of such excess, which shall be deemed Additional Rent; (iv) prior to occupancy, Tenant and its assignee or sublessee shall execute, acknowledge and deliver to Landlord a fully executed counterpart of a written assignment of lease or sublease, as the case may be (consented to by any guarantor of this Lease), by the terms of which: (x) in case of an assignment, Tenant will assign to such assignee Tenant's entire interest in this Lease, together with any security deposit, and all prepaid rents hereunder, and the assignee will accept said assignment and assume and agree to perform as the obligation of such assignee directly to and for the benefit of Landlord and enforceable by Landlord, all of the terms, covenants and conditions of this Lease on Tenant's part to be performed; or (y) in case of a subletting, the sublease in all respects will be subject and subordinate to all of the terms, covenants and conditions of this Lease and the sublessee thereunder will agree to be bound by and to perform all of the terms, covenants and conditions of this Lease on Tenant's part to be performed, except the payment of rents, charges and other sums reserved hereunder, which Tenant shall continue to be obligated to pay and shall pay to Landlord; (v) notwithstanding any such assignment or subletting under the terms of this Paragraph 18, both Tenant and any guarantor will acknowledge that, notwithstanding any such assignment or subletting and the consent of Landlord thereto, neither Tenant nor said guarantor, if any, is released or discharged from any liability whatsoever under this Lease and both shall continue liable with the same force and effect as though no assignment or sublease had been made; and (vi) Tenant shall reimburse Landlord for Landlord's actual out of pocket administrative costs, overhead and attorneys' fees in connection with proposed assignment or subletting in a sum not less than Two Thousand Five Hundred Dollars ($2,500.00).

(d)     Except for a Permitted Transfer, if Tenant, or any guarantor of this Lease, is a corporation, limited liability company or partnership, and if at any time during the Term the person or persons who, on the date of this Lease, owns or own a majority of such corporation's voting shares or such limited liability company's membership interest or partnership's partnership interest, as the case may be, ceases or cease to own a majority of such shares (whether such transfer occurs at one time or at intervals so that, in the aggregate, such a transfer shall have occurred), or such membership or partnership interest as the case may be (except as the result of transfer by gift or inheritance) or if such guarantor, if any, is dissolved, then (i) Tenant shall give Landlord prior written notice of such event in accordance with Paragraph 18(e) hereof; and (ii) any such event shall be considered to be an assignment prohibited by the provisions of Paragraph 18(a) hereof. This Paragraph 18(d) shall not be applicable to any corporation, all the outstanding voting stock of which is listed on a national securities exchange (as defined in the Securities Exchange Act of 1934, as amended). This Paragraph 18(d) shall not apply to an initial offering of stock to the public provided that Tenant remains liable under this Lease or any transferee has a net worth equal to Tenant's net worth as of the date of this Lease. For the purposes of this Paragraph 18(d), stock ownership shall be determined in accordance with the principles set forth in Section 544 of the Internal Revenue Code of 1954 as the same existed on August 16, 1986, as amended, and the term "voting stock" shall refer to shares of stock regularly entitled to vote for the election of directors of the corporation.

DocuSign Envelope ID: 380A9266-5086-44F9-B137-A5F5B01B5766

(e)     Except for a Permitted Transfer, if Tenant intends to assign this Lease, sublet or part with possession of all or any part of the Premises, or to transfer this Lease in any other manner, in whole or in part or any estate or interest hereunder, then and so often as such event shall occur, Tenant shall give prior written notice to Landlord of such intent, specifying therein the proposed assignee, subtenant or transferee and Landlord shall, within thirty (30) days thereafter, notify Tenant in writing either, that (i) it consents or does not consent in accordance with the provisions and qualifications in this Paragraph 18 or (ii) it elects to terminate this Lease. If Landlord elects to terminate this Lease as aforesaid, Tenant shall notify Landlord in writing within thirty (30) days thereafter of Tenant's intention either to refrain from such assignment, subletting or transfer, or to accept the termination of this Lease.  If Tenant fails to deliver such notice within such period of thirty (30) days, this Lease will thereby be terminated upon the expiration of the said thirty (30) day period.  If Tenant advises Landlord it intends to refrain from such assignment, subletting or transfer, then Landlord's right to terminate this Lease as aforesaid is null and void in such instance.

(f)     Landlord shall have no liability for brokerage commissions arising out of a sublease or assignment by Tenant and Tenant shall and does hereby indemnify Landlord and hold it harmless from any and all liability for brokerage commissions arising out of any such sublease or assignment.

(g)     Notwithstanding anything in this Lease to the contrary, Tenant may, upon prior written notice to, but without the consent of, Landlord, and without payment of Landlord's legal or administrative fees, and without rent increase, assign this Lease or sublet all of the Premises to (each such transferee is a "Permitted Transferee" and each transfer a "Permitted Transfer"): (1) an Affiliate (hereafter defined), provided such Affiliate remains an Affiliate of the Tenant; (2) a corporation formed as a result of a merger of the Tenant with another corporation or other entity; and (3) an acquirer or purchaser of all or substantially all of the assets, stock and/or leases of Tenant's stores operated under the same tradename as the Premises and (4) a fully-trained franchisee, concessionaire or licensee of the Tenant  provided that: (a) such party shall be subject to the terms, covenants and conditions of this Lease; (b) such party shall carry on business under the same trade name and style as the Tenant; and (c) the Tenant maintains direct control and supervision over such party". In the event of an assignment and/or sublet allowed as stated herein, Claire's Boutiques, Inc., a Michigan corporation, shall remain liable pursuant to the terms and conditions of this lease. "Affiliate" shall mean any corporations or other business entities which control, is controlled by, or is under common control with Tenant.

19.     Access.

(a)     Landlord or its representatives, or designees, may enter the Premises at reasonable times and with reasonable written notice to Tenant (except in the case of an emergency when notice shall be reasonable under the circumstances), whether or not during business hours, to inspect the Premises; to enforce any provisions of this Lease; to make or cause to be made such repairs as Landlord may deem necessary or desirable but which are required to be made by Landlord pursuant to the Lease or any necessary repairs in the event of an emergency; to cure defaults of Tenant pursuant to the rights granted Landlord under Paragraph 25 hereof; to repair any utility lines or system or systems servicing other parts of the Shopping Center; to rectify any condition in the Premises adversely affecting other occupants of the Shopping Center; to exhibit the Premises to mortgagees and, during the last year of any Term in the event Tenant fails to renew the Lease, to prospective tenants. Landlord shall use reasonable efforts not to interfere with Tenant's operations in the Premises.  If Tenant, its agents or employees shall not be present or shall not permit an entry into the Premises at any time when such entry shall be permissible, Landlord may use a master key (or master code, card or switch if Tenant's security system is other than conventional locks and keys), or, in the case of an emergency, forcibly enter the Premises.

(b)     If an excavation shall be made upon land adjacent to the Premises, or shall be authorized to be made, upon reasonable advance written notice from Landlord, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the Premises for the purpose of doing such work as Landlord shall deem reasonably necessary to preserve the wall or the building of which the Premises form a part from injury or damage and to support the same by proper foundations provided that in all cases Landlord shall use reasonable efforts not to interfere with Tenant's operations in the Premises.

20.     Tenant's Property.

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

Except if caused by Landlord's sole negligent act or omission or that of its contractors, employees or agents, Landlord shall not be liable for any damage to property of Tenant or of others located in the Premises or in the Shopping Center, nor for the loss of or damage to any property of Tenant or of others by theft or otherwise. Except if caused by Landlord's sole negligent act or omission or that of its contractors, employees or agents, Landlord shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of the Premises or Shopping Center or from the pipes, appliances or plumbing works or from the roof, street or subsurface or from any other place or by dampness or by any other cause of whatsoever nature. Except if caused by Landlord's sole negligent act or omission or that of its contractors, employees or agents, Landlord shall not be liable for any such damage caused by other tenants or persons in the Premises, occupants of adjacent property, of the Shopping Center, or the public, or caused by operations in construction of any private, public or quasi-public work.    Except as provided otherwise in this Lease, all property of Tenant kept or stored on the Premises shall be so kept or stored at the risk of Tenant only and Tenant shall hold Landlord harmless from and hereby waives any claims arising out of damage to the same or damage to Tenant's business, including subrogation claims by Tenant's insurance carrier or any of Tenant's self-insurance plans.

21.    Casualty Damage.

(a)    Tenant shall give immediate notice (by telephone, confirmed in writing) to Landlord of any damage caused to the Premises by fire or other casualty, and if Landlord does not elect to terminate this Lease as provided in Paragraph 21(b) hereof, Landlord shall proceed with reasonable diligence and at its sole cost and expense to repair and restore the Premises (other than any Tenant's Work, any improvements, alterations, changes and additions made by Tenant to the Premises, and any personal property of Tenant) to substantially the same condition as immediately prior to said damage or destruction.

(b)    If the Shopping Center or the Premises shall be destroyed or substantially damaged by a casualty not covered by Landlord's insurance, or if twenty five percent (25%) or more of the Premises is damaged or rendered untenantable by a casualty covered by Landlord's insurance, or if the Premises are not affected but twenty five percent (25%) or more of the Shopping Center, or such portion of the Common Areas as shall render the Premises or the Shopping Center untenantable, is damaged or rendered untenantable, then in any such event Landlord may elect either to terminate this Lease or to proceed to rebuild and repair the Premises or that portion of the Shopping Center so damaged. Landlord shall give written notice to Tenant of such election within ninety (90) days after the occurrence of such casualty, or within thirty (30) days after the adjustment of the insurance settlement, whichever is later. In the event that such notice of termination shall be given, this Lease shall terminate as of the date provided in such notice of termination (whether or not the Term shall have commenced) with the same effect as if that date were the Expiration Date.

(c)    If the Premises are damaged, the Basic Rent and the Additional Rent payable hereunder, shall be abated in proportion to the degree in which Tenant's use of the Premises is impaired during the period of any damage, repair or restoration provided for in this Paragraph 21. Except for such abatement, Tenant shall not be entitled to any compensation or damage for loss in the use of the whole or any part of the Premises and/or any inconvenience or annoyance occasioned by damage, destruction, repair or restoration.

22.    Eminent Domain.

(a)    If the whole or any portion of the Premises shall be acquired or condemned by eminent domain for any public or quasipublic use or purpose, this Lease shall terminate as of the date of the vesting or acquisition of title in the condemning authority with the same effect as if said date were the Expiration Date.

(b)    If the whole or any portion of the Shopping Center (other than the Premises) shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, this Lease shall, at the option of Landlord, terminate as of the date of the vesting or acquisition of title in the condemning authority with the same effect as if said date were the Expiration Date.

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

(c)    Landlord shall give written notice to Tenant of any termination of this Lease pursuant to Paragraph 22(a) or (b) as promptly as reasonable possible, but no later than thirty (30) days after the date Landlord receives written notice of such acquisition or condemnation.

(d)    The proceeds of any condemnation award shall be the property of Landlord, whether such award is compensation for damages to Landlord's or Tenant's interest in the Premises, provided, however, that Landlord shall have no interest in any award made to Tenant for loss of business, relocation expenses, or for the taking of Tenant's personal property if a separate award for such items is made to Tenant. If this Lease is not terminated, Landlord shall apply any condemnation proceeds to any necessary restoration of the Premises.

23.    Events of Default.

(a)    The occurrence of any one or more of the following events and the continuation thereof beyond the applicable grace period herein provided, if any, shall constitute an **"Event of Default"**:

(i)    if Tenant shall default in the payment of (1) Basic Rent and such default shall continue for a period of five (5) days after notice; or (2) any item of Additional Rent and such default shall continue for a period of five (5) days after notice;

(ii)    if Tenant shall default in the observance or performance of any of its covenants or obligations under this Lease (other than the payment of Basic Rent and Additional Rent) and shall not have cured such default within thirty (30) days after Tenant's receipt of written notice from Landlord of such default, or, if such default is of such a nature that it cannot be completely remedied within said thirty (30) days, Tenant shall not (1) have promptly, upon the giving by Landlord of such notice, advised Landlord of Tenant's intention to institute all steps necessary to remedy such situation, (2) promptly institute and thereafter diligently prosecute to completion all steps necessary to remedy the same, and (3) complete such remedy within a reasonable time after the date of the giving of said notice by Landlord and in any event prior to such time as would either subject Landlord or Landlord's agents to prosecution for a crime or cause a default under any lease or mortgage referred to in Paragraph 26 hereof;

(iii)    should Tenant mortgage, assign, sublet or otherwise transfer this Lease or an interest in the Premises in violation of Paragraph 18 hereof;

(iv)    Intentionally deleted.

(v)    if Tenant shall file a voluntary petition in bankruptcy or insolvency, or commence a case under the Federal Bankruptcy Code, or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law (foreign or domestic), or shall make an assignment for the benefit of creditors or shall seek or consent or acquiesce in the appointment of any trustee, receiver or liquidator of Tenant or of all or any part of Tenant's personal property and same shall not be dismissed within thirty (60) days as described in subsection (vi) below;

(vi)    if, within sixty (60) days after the commencement of any proceeding against Tenant, whether by the filing of a petition or otherwise, seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal bankruptcy act or any other present or future applicable federal, state or other statute or law (foreign or domestic), such proceeding shall not have been dismissed, or if, within 60 days after the appointment of any trustee, receiver or liquidator of Tenant or of all or any part of Tenant's personal property, without the consent or acquiescence of Tenant, such appointment shall not have been vacated or otherwise discharged, or if any execution or attachment shall be issued against Tenant or any of Tenant's personal property pursuant to which the Premises, or any part thereof, shall be taken or occupied or attempted to be taken or occupied; or

(b)    If, at any time, (i) Tenant shall be comprised of two or more persons, or (ii) Tenant's obligations under this Lease shall have been guaranteed by any person, or (iii) Tenant's interest in this Lease shall have been assigned, "Tenant", as used in subdivisions (v) and (vi) of Paragraph 23 (a), shall mean any one or more of the persons primarily or secondarily liable for Tenant's obligations under this

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5BD1B5766

Lease. Any monies received by Landlord from or on behalf of Tenant during the pendency of any proceeding of the types referred to in subdivisions (v) and (vi) of Paragraph 23(a) shall be deemed paid as compensation for the use and occupation of the Premises and the acceptance of any such compensation by Landlord shall not be deemed an acceptance of Rent or a waiver on the part of Landlord of any rights under this Lease.

24.    Landlord's Remedies.

(a)    In the case of any Event of Default as hereinabove provided (not cured within the applicable cure period, if any, set forth in the Lease), Landlord shall have the immediate right to reenter the Premises and to dispossess Tenant and all other occupants therefrom and remove and dispose of all property therein or, at Landlord's election, to store such property in a public warehouse or elsewhere at the cost and for the account of Tenant, and without Landlord being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby. Upon the occurrence of any such Event of Default, Landlord shall also have the right, at its option, in addition to and not in limitation of any other right or remedy, to terminate this Lease by giving Tenant ten (10) days' notice of termination and upon the expiration of said ten (10) days, this Lease, and the Term shall cease and terminate as fully and completely as if the date of expiration of such ten (10) day period were the Expiration Date and thereupon, unless Landlord shall have theretofore demanded possession of the Premises, Landlord shall have the immediate right of possession, in the manner aforesaid, and Tenant and all other occupants shall quit and surrender the Premises to Landlord, but Tenant shall remain liable as hereinafter mentioned. However, if Tenant shall default (x) in the payment of any rents, charges or other sums reserved hereunder and any such default shall be repeated for a total of three (3) times in any period of twelve (12) months, or (y) in the performance of any other covenant of this Lease more than four (4) times, in the aggregate, in any period of twelve (12) months then, notwithstanding that such defaults shall have been cured within the period after notice as above provided, any further similar default shall be deemed to be deliberate and Landlord thereafter may serve said ten (10) days' notice of termination without affording Tenant an opportunity to cure such default.

(b)    If by reason of the occurrence of any such Event of Default, the Term shall end before the Expiration Date, or Landlord shall take possession of the Premises, or Tenant shall be ejected, dispossessed, or removed therefrom by summary proceedings or in any other manner, whether or not specifically enumerated in this Lease, or if the Premises become abandoned, Landlord at any time thereafter may, but shall not be obligated to, relet the Premises, or any part or parts thereof, either in the name of Landlord or as agent for Tenant, for a term or terms which may, at Landlord's option, be less than or exceed the period of the remainder of the Term, and at such rent or rentals and upon such other conditions, which may include concessions and free rent periods, as Landlord, in its sole discretion, shall determine. Landlord shall receive the rents from such reletting and shall apply the same first, to the payment of such expenses as Landlord may have incurred in connection with reentering, ejecting, removing, dispossessing, reletting, altering, repairing, redecorating, subdividing or otherwise preparing the Premises for reletting, including brokerage and attorneys' fees and expenses; second, to the payment of any indebtedness other than rents, charges and other sums due hereunder from Tenant to Landlord; and the residue, if any, Landlord shall apply to the fulfillment of the terms, covenants and conditions of Tenant hereunder and Tenant hereby waives all claims to the surplus, if any. Tenant shall be and hereby agrees to be liable for and to pay Landlord any deficiency between the rents, charges and other sums reserved hereunder (conclusively presuming the Additional Rent to be the same as payable for the year immediately preceding such termination or reentry) and the net rentals, as aforesaid, of reletting, if any, for each month of the period which otherwise would have constituted the balance of the Term. Tenant hereby agrees to pay such deficiency in monthly installments on the rent days specified in this Lease, and any suit or proceeding brought to collect the deficiency for any month, either during the Term or after any termination thereof, shall not prejudice or preclude in any way the rights of Landlord to collect the deficiency for any subsequent month by a similar suit or proceeding. Landlord shall in no event be liable in any way whatsoever for the failure to relet the Premises or in the event of such reletting, for failure to collect the rents reserved thereunder. Landlord is hereby authorized and empowered to make such repairs, alterations, decorations, subdivision or other preparations for the reletting of the Premises as Landlord shall deem advisable, without in any way releasing Tenant from any liability hereunder, as aforesaid.

DocuSign Envelope ID: 380A9285-5085-44F9-B137-A5F5B01B5766

(c)     No such reentry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease unless Landlord gives written notice to Tenant of such intention or the termination thereof shall result as a matter of law or be decreed by a court of competent jurisdiction.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous default.

(d)     In the event this Lease is terminated pursuant to the foregoing provisions of this Paragraph 24, Landlord may recover from Tenant all damages it may sustain by reason of Tenant's default, including the cost of recovering the Premises and reasonable attorneys' fees and expenses and, upon so selecting and in lieu of the damages that may be recoverable under Paragraph 24(b) above (measured by the monthly deficiency, if any), shall be entitled to recover from Tenant, as and for liquidated damages, and not as a penalty, an amount equal to the difference between the rents, charges and other sums reserved hereunder for the period which otherwise would have constituted the balance of the Term from the latest of the date of termination of this Lease, the date of reentry or the date through which monthly deficiencies shall have been paid in full (conclusively presuming the Additional Rent, to be the same as payable for the year immediately preceding such termination or reentry) and the rental value of the Premises at the time of such election, for such period, both discounted at the rate of four percent (4%) per annum to present worth, all of which shall immediately be due and payable by Tenant to Landlord.  In determining the rental value of the Premises the rental realized by any reletting, if such reletting be accomplished by Landlord within a reasonable time after the termination of this Lease or within a reasonable time after Landlord regains possession of the Premises, shall be deemed prima facie to be the rental value.  Nothing herein contained, however, shall limit or prejudice the right of Landlord to prove and obtain as liquidated damages by reason of such termination an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amounts referred to in this Paragraph 24(d).

(e)     The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant created hereby Tenant's use or occupancy of the Premises or any claim for injury or damage.

(f)     Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event Tenant shall be evicted or dispossessed from the Premises for any cause, or Landlord reenters the Premises following the occurrence of any Event of Default hereunder, or this Lease is terminated before the Expiration Date.

(g)     In the event of any breach or threatened breach by Tenant of any of the terms and provisions of this Lease, Landlord shall have the right to injunctive relief and declaratory relief as if no other remedies were provided herein for such breach.

(h)     The rights and remedies herein reserved by or granted to Landlord and Tenant are distinct, separate and cumulative, and the exercise of any one of them shall not be deemed to preclude, waive or prejudice Landlord's or Tenant's right to exercise any or all others.  Whether or not specifically enumerated in this Lease, Landlord and Tenant hereby reserve all rights and remedies at law and in equity and nothing contained in this Lease shall be construed as a limitation of any such rights or remedies.

(i)     Landlord and Tenant hereby expressly waive any right to assert a defense based on merger and agree that neither the commencement of any action or proceeding, nor the settlement thereof nor the entry of judgment therein shall bar Landlord or Tenant from bringing any subsequent actions or proceeding, nor the settlement thereof nor the entry of judgment therein shall bar Landlord or Tenant from bringing any subsequent actions or proceedings from time to time.

(j)     Nothing contained in this Paragraph 24 shall be deemed or construed to require Landlord to mitigate its damages or to give the notices herein provided for prior to the commencement of a summary proceeding for nonpayment of rent or a plenary action for the recovery of rent on account of any default in the payment of rent, it being intended that any such notice or notices are for the sole and only purpose of creating a conditional limitation or a condition precedent hereunder pursuant to which this Lease shall terminate and Tenant shall become a holdover tenant.

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

(k)    The words "reenter", "reentry" and "reentered" as used in this Lease shall not be deemed to be restricted to their technical legal meanings.

(l)    In the event Landlord commences any summary proceeding or action for nonpayment of rent, Tenant covenants and agrees that it will not interpose, by consolidation of actions or otherwise, any counterclaim or other claim seeking affirmative relief of whatsoever nature or description in any such proceeding.

25.    Curing Tenant's Defaults. If Tenant shall default in the performance of any term of this Lease on Tenant's part to be performed (provided Landlord shall not exercise such right until there is an Event of Default of Tenant unless earlier action by Landlord is necessary to prevent injury or damage to persons or property, including Landlord's interest in the Shopping Center, as determined by Landlord in good faith), Landlord, without thereby waiving such default, may, but shall not be obligated to, perform the same for the account and at the reasonable expense of Tenant, without notice in case of emergency and upon ten (10) days' prior notice in all other cases. Landlord may enter the Premises at any time to cure any default without thereby incurring any liability to Tenant or anyone claiming through or under Tenant. Bills for any reasonable third party expenses incurred by Landlord in connection with any such performance or involved in collecting or endeavoring to collect rent or enforcing or endeavoring to enforce any rights against Tenant under or in connection with this Lease or pursuant to law, including any cost, expense and disbursement involved in instituting and prosecuting summary proceedings, as well as bills for any property, material, labor or services provided, furnished or rendered, including reasonable attorney's fees and expenses, shall be paid by Tenant as Additional Rent on demand. In the event that Tenant is in arrears in payment of Rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited and Landlord may apply any payments made by Tenant to any items Landlord sees fit, irrespective of and notwithstanding any designation or requests by Tenant as to the items against which any such payments shall be credited.

26.    Subordination and Attornment.

(a)    This Lease is subject and subordinate to all ground or underlying leases and to all mortgages which now affect such leases or the Shopping Center or portion thereof, and to all renewals, modifications, consolidations, replacements and extensions of any such underlying leases and mortgages. The provisions of this Paragraph 26(a) shall be self-operative and no further instruments of subordination shall be required. However, if Landlord requests confirmation of the subordination provided for in this Paragraph 26(a), Tenant shall, without charge therefor, promptly execute and deliver to Landlord any certificate or instrument which Landlord may at any time request in connection therewith. Tenant agrees that this Lease shall be subordinate to any future mortgage or similar instrument on the express condition that Landlord obtains an SNDA in favor of Tenant, on a form reasonably acceptable to Tenant, Landlord and a future lender from any future lender within thirty (30) days after Landlord obtains financing from such lender; provided that if such SNDA is not so delivered, Tenant shall not be required to subordinate its rights under this Lease to such future lender's mortgage until such SNDA is delivered to Tenant.

(b)    The holder of any mortgage referred to in Paragraph 26(a) may elect that this Lease shall have priority over such mortgage and upon notification by such mortgagee to Tenant, this Lease shall be deemed to have priority over such mortgage whether this Lease is dated prior to or subsequent to the date of such mortgage.

(c)    Tenant agrees to give the lessor under any lease or the holder of any mortgage referred to in Paragraph 26(a) hereof a copy, by national overnight courier, of any notice of default served upon Landlord, provided that prior to such notice Tenant has been notified in writing (by way of notice of assignment of rents and leases, or otherwise) of the address of such lessor or mortgagee.

(d)    If, at any time prior to the termination of this Lease, the lessor under any lease or the holder of any mortgage referred to in Paragraph 26(a) (or any person, or such person's successors or assigns, who acquires the interest of Landlord under this Lease through foreclosure action or an assignment in lieu of foreclosure) shall succeed to the rights of Landlord under this Lease through possession or foreclosure or delivery of a new lease or deed or otherwise, Tenant agrees at the election and upon request of any such person, to fully and completely attorn, from time to time, to and recognize such person as Tenant's landlord under this Lease upon the then executory terms of this Lease. Upon

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5768

such attornment this Lease shall continue in full force and effect as a direct lease between Tenant and such successor landlord.

27.    Surrender.

On the Expiration Date or upon the sooner termination of this Lease or upon reentry by Landlord upon the Premises, Tenant shall surrender, vacate and deliver to Landlord the Premises, including all affixed improvements, additions, alterations and replacements thereon,  and personal property installed in or on the Premises by Tenant unless removed by Tenant pursuant to Paragraph 12 hereof, "broom clean" and in good order (but in no better condition than the condition in which the Premises was in on the Delivery Date), condition and repair except for ordinary wear, tear and damage by fire or other insured casualty.  If the Premises are not surrendered upon the Expiration Date or sooner termination of this Lease, unless otherwise agreed in writing by the parties, such occupancy shall not constitute a renewal or extension of the Lease and will automatically constitute and be construed as a holdover tenancy on the same terms and conditions provided herein. If such holdover continues in excess of sixty (60) days, then Basic Rent shall be increased to an amount equal to two hundred percent (200%) of the Basic Rent in effect immediately prior to the expiration of the then current Term and Tenant shall  indemnify Landlord against liability resulting from delay by Tenant in so surrendering the Premises for  any claims made by any succeeding tenant or prospective tenant founded upon such delay.  Tenant's obligations under this Paragraph 27 shall survive the Expiration Date or sooner termination of this Lease.

28.    Quiet Enjoyment.

Tenant, if and so long as it pays the Rent and performs and observes the other terms and covenants to be performed and kept by it as provided in this Lease, shall have the peaceable and quiet possession of the Premises during the Term free of the claims of Landlord or anyone claiming by, through or under Landlord, subject to the terms of this Lease and any lease or mortgage referred to in Paragraph 26(a) hereof.  This covenant shall be construed as a covenant running with the Land and shall not be construed as a personal covenant or obligation of Landlord, except to the extent of Landlord's interest in this Lease and then subject to the terms of Paragraph 31(k) and (l) hereof.

29.    Intentionally Deleted.

30.    Hazardous Substances.

(a)    Except for di minimis amounts of Hazardous Substances used for commercial or cleaning purposes and the waste produced therefrom or as may otherwise be approved in writing by Landlord hereinafter, Tenant will not use the Premises for the generation, use, manufacture, recycling, transportation, treatment, storage, discharge or disposal of any Hazardous Substance or for any use which poses a risk of damage to the environment and will not engage in any activity which could subject Landlord to any liability under any Legal Requirements or Environmental Law.

(b)    Tenant and Landlord will comply with all applicable Environmental Law in effect at any time during the term of this Lease; obtain in its own name any and all environmental permits, registrations, licenses or identification numbers necessary for its operations; and comply with all such permits.

(c)    Tenant will not install any Hazardous Substance storage tank, nor asbestos containing materials nor polychlorinated biphenyl ("PCB") containing equipment at the premises without the advance written permission of Landlord.

(d)    Tenant will take no action which could require Landlord to include in the deed to the property a notice of disposal/release of any Hazardous Substance at the Shopping Center.

(e)    If Tenant receives any notice of the happening of any event involving the use, release, threatened release, spill, discharge or cleanup of any Hazardous Substance on or about the Premises or into the Environment (any such event is hereinafter referred to as a "Hazardous Discharge") or of any complaint, order, citation, or notice with regard to any Hazardous Substance or any Environmental Law affecting Tenant (an "Environmental Complaint") from any person or entity, including the Department of Environmental Protection of New Jersey ("DEP")  and the United States Environmental Protection Agency ("EPA"), then Tenant shall give immediate oral and written notice of same to Landlord and to

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

any mortgagee of all or a portion of the Shopping Center of which Tenant has received notice (collectively, "Landlord's Mortgagee") detailing all relevant facts and circumstances.

(f)        Without limitation of the foregoing, Landlord shall have the right, but not the obligation, to exercise any of its rights as provided in Paragraph 25 of this Lease or to enter onto the Premises or to take such actions as it deems reasonably necessary or advisable to cleanup, remove, resolve or minimize the impact of or otherwise deal with any Hazardous Substance, Hazardous Discharge or Environmental Complaint. If such Hazardous Substance, Hazardous Discharge or Environmental Complaint was caused by Tenant, its agents, contractors or employees, then all reasonable costs and expenses incurred by Landlord in the exercise of any such rights shall be deemed to be Additional Rent hereunder and shall be payable by Tenant to Landlord upon demand; and

(g)        The occurrence of any of the following events shall constitute an Event of Default under this Lease:

(i)        If Landlord receives its first notice of a Hazardous Discharge or an Environmental Complaint on or pertaining to the Premises other than from Tenant which Hazardous Discharge or an Environmental Complaint was caused by Tenant, its agents, contractors or employees, and Landlord does not receive a notice (which may be given in any oral or written form, provided same is followed with all due dispatch by written notice given by overnight mail via nationally recognized courier) of such Hazardous Discharge or Environmental Complaint from the Tenant within three (3) business days of the time Landlord first receives said notice other than from Tenant;

(ii)        If the DEP, EPA or any other local, state or federal agency asserts or creates a first lien upon any or all of the Premises by reason of the occurrence of a Hazardous Discharge or an Environmental Complaint or otherwise which was caused by Tenant, its agents, contractors or employees;

(iii)        If the DEP, EPA or any other local, state or federal agency asserts a claim against the Tenant, the Premises or Landlord for damages or cleanup costs related to a Hazardous Discharge or an Environmental Complaint on or pertaining to the Premises which Hazardous Discharge or an Environmental Complaint was caused by Tenant, its agents, contractors or employees; provided however, such claim shall not constitute a default if, within fifteen (15) days of the occurrence giving rise to the claim:

(1)        Tenant can prove to Landlord's satisfaction that Tenant has commenced and is diligently pursuing either: (x) cure or correction of the event which constitutes the basis for the claim, and continues diligently to pursue such cure or correction to completion, or (y) proceedings for an injunction, restraining order or other appropriate emergent relief preventing such agency or agencies from asserting such claim, which relief is granted within ten (10) days of the occurrence giving rise to the claim and the emergent relief is not thereafter dissolved or reversed on appeal; and

(2)        In either of the foregoing events, Tenant has posted a bond, letter of credit or other security satisfactory in form, substance and amount to Landlord and the agency or entity asserting the claim to secure the proper and complete cure or correction of the event which constitutes the basis for the claim.

(h)        Tenant hereby agrees to defend, indemnify, and hold Landlord and its mortgagee harmless from and against any and all claims, losses, liabilities, damages and expenses (including without limitation, cleanup costs and reasonable attorney's fees arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of any Hazardous Discharge or Environmental Complaint caused by Tenant its agents, contractors or employees. This indemnity shall apply notwithstanding any negligent or other contributory conduct by or on the part of Landlord, its mortgagee or any one or more other parties or third parties.

(i)        (i)        If Tenant's operations on the Premises now or hereafter constitute an "Industrial Establishment" subject to the requirements of the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K6 et seq., and the regulations pertaining thereto, N.J.A.C. 7:26B-1 et seq. ("ISRA"), then prior to the expiration or sooner termination of this Lease and upon any and every condemnation, casualty, assignment or sublease (if permitted), change in ownership or control of Tenant or any other closure,

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

transfer or event by Landlord or Tenant which is subject to the requirements of ISRA, Tenant shall comply with all requirements of ISRA pertaining to an Industrial Establishment closing or transferring operations, at its sole cost and expense, to the satisfaction of the DEP and Landlord. Without limitation of the foregoing, Tenant's obligations shall include (1) the proper filing of the initial notice to the DEP required by N.J.A.C. 7:26B-3.2, (2) the performance to DEP's and Landlord's satisfaction of all air, soil, ground water and surface water sampling and tests required by N.J.A.C. 7:26B-4.1-4.3 and (3) either (x) the filing of a "negative declaration" with DEP under N.J.A.C. 7:26B-5.2 which has been approved by DEP or (y) the performance of a proper and approved cleanup plan to the full satisfaction of DEP and Landlord in accordance with N.J.A.C. 7:26B-5.3. Tenant shall immediately provide Landlord with copies of all correspondence, reports, notices, orders, findings, declarations and other materials pertinent to Tenant's compliance and DEP's requirements under ISRA, as any of same are issued or received by Tenant from time to time;

(ii)    Tenant shall be responsible for any environmental cleanup costs, penalties or damages arising from its use of the Premises due to any Hazardous Discharge or an Environmental Complaint caused by Tenant, its agents, contractors or employees.

(j)    In the event of Tenant's failure to comply in full with this Paragraph 30, Landlord may, at its option, perform any or all of Tenant's obligations as aforesaid and all reasonable costs and expenses incurred by Landlord in exercise of this right shall be deemed to be Additional Rent payable on demand.

(k)    Notwithstanding anything to the contrary in this Lease, Tenant shall not be responsible for any Hazardous Substances existing on or in the Premises prior to the date of possession of the Premises by the Tenant or at any time which were not placed in, on or about the Premises by Tenant, its agents, contractors or employees, and any Hazardous Substances existing on or in the Premises prior to the date of possession of the Premises by the Tenant or at any time which were not placed in, on or about the Premises by Tenant, its agents, contractors or employees  shall be managed, stored, handled and/or disposed of by the Landlord to the extent required by applicable law.

(l) Landlord hereby represents to its best knowledge that (i) there are no violations of any Environmental Law relating to industrial hygiene or to environmental conditions, in, on, under or about the Premises; and (ii) there is no existing condition or environmental conditions of any sort whatsoever in, on, under or about the Premises which could have an adverse effect on the performance by Tenant of its alterations or other activities in the Premises and/or Tenant's business operations from the Premises during the term of this Lease. Landlord hereby agrees to defend, indemnify, and hold Tenant harmless from and against any and all claims, losses, liabilities, damages and expenses (including without limitation, cleanup costs and reasonable attorney's fees arising by reason of any of the aforesaid or any action against Landlord or Tenant under this indemnity) arising directly or indirectly from, out of or by reason of any Hazardous Discharge or Environmental Complaint caused by Landlord its agents, contractors or employees. This indemnity shall apply notwithstanding any negligent or other contributory conduct by or on the part of Tenant or any one or more other parties or third parties.

(m)    This Paragraph 30 shall survive the Expiration Date or sooner termination of the Lease.

31.    Miscellaneous.

(a)    Except for Tenant's express rights to terminate this Lease pursuant to the provisions of the Lease or by law, no agreement to accept a surrender of this Lease shall be valid unless in writing signed by Landlord. The delivery of keys or possession to Landlord or any agent or employee of Landlord shall not operate as a termination of this Lease or surrender of the Premises unless Landlord also accepts the Premises in writing.

(b)    No provision of this Lease shall be deemed to have been waived by Landlord or Tenant unless such waiver be in writing signed by the party making such waiver. The failure of Landlord or Tenant to seek redress for violation of, or to insist upon strict performance of, any covenant or condition of this Lease, shall not be deemed a waiver thereof or prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation.

(c)    The receipt by Landlord of Basic Rent, and/or any items of Additional Rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach. No

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5786

payment by Tenant or receipt by Landlord of a lesser amount than the Basic Rent or Additional Rent herein stipulated shall be deemed to be other than on account of the earliest Basic Rent or Additional Rent reserved hereby which is due and owing at the time such payment is received by Landlord. No endorsement or statement on any check or any letter accompanying any check or payment of any such Rent shall be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right or remedy provided in this Lease.

(d)　　The captions used in this Lease are for convenience only and do not in any way limit or amplify the terms and provisions hereof. Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include each other gender.

(e)　　The Exhibits hereto are hereby incorporated into this Lease.

(f)　　This Lease and all other agreements and instruments signed contemporaneously herewith contain the entire agreement between parties, and no agreement, representation or inducement shall be effective to change, modify or terminate this Lease in whole or in part unless such agreement, representation or inducement is in writing and signed by both parties hereto.

(g)　　Tenant at any time or from time to time at the request of Landlord or at the request of the lessor under any lease or the holder of any lease or mortgage referred to in Paragraph 26(a) hereof, will execute within twenty (20) days of such request, acknowledge and deliver to the party so requesting, a certificate by Tenant certifying:

(i)　　that this Lease has not been modified, changed, altered or amended in any respect and is in full force and effect (or, if there have been modifications, stating the modifications and that the Lease is in full force and effect as modified);

(ii)　　that this Lease is the only Lease between Landlord and Tenant affecting the Premises;

(iii)　　that Tenant has accepted the Premises (or part thereof), is in occupancy of the Premises, or part thereof, and is paying Rent hereunder, for which it is then liable on a current basis;

(iv)　　that there are then existing no credits, offsets or defenses against the enforcement of any provisions of this Lease (or, if so, specifying the same);

(v)　　the dates, if any, to which the Rent or other charges due hereunder have been paid in advance and that there has been no prepayment of Rent other than as provided for in this Lease;

(vi)　　that there are no existing defaults by Landlord or Tenant under this Lease (or, if so, specifying such default);

(vii)　　whether or not Tenant has exercised any renewal options or other options which may be provided in this Lease;

(viii)　　that there are no actions, whether voluntary or otherwise, pending against Tenant under the bankruptcy laws of the United States or any state thereof; and

(ix)　　such further information with respect to the Lease or the Premises as Landlord, or such lessor or mortgagee, may reasonably request.

Any such certificate may be relied upon by any prospective purchaser of the Shopping Center or of the interest of Landlord in any part thereof, by any mortgagee or prospective mortgagee thereof, by any lessor or prospective lessor thereof, by any lessee or prospective lessee thereof, or by any prospective assignee of any mortgage thereof.

In the event Tenant fails to execute, acknowledge and deliver to Landlord a statement in accordance with the provisions of this Paragraph 31(g) within twenty (20) days after request therefor, Landlord shall send a second (2nd) fifteen (15) day notice and Tenant's failure to deliver such statement to Landlord prior to the expiration of such fifteen (15) day period, shall constitute an acknowledgment by Tenant,

DocuSign Envelope ID: 380A9286-5069-44F9-B137-A5F5B01B5766

which may be relied on by any person who would be entitled to rely upon any such statement, that such statement as submitted by Landlord is true and correct. The second notice shall contain a statement that failure to respond shall result in the right to such reliance.

(h)    If any provision of this Lease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Lease shall not be affected thereby.

(i)    The terms, provisions and covenants contained in this Lease shall apply to, inure to the benefit of, and be binding upon the parties hereto and their respective heirs, personal representatives, successors and permitted assigns and shall be covenants running with the land.

(j)    In the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and performed by Landlord, Tenant shall look solely to the estate and property of Landlord in the Shopping Center including the rent and profits therefrom and any insurance or condemnation proceeds, for the collection of any sum of money on a judgment, or for the payment or expenditure of any money under any decree of specific performance, injunctive relief or other equitable relief (or other judicial process) requiring performance by Landlord of any obligation under this Lease. No other property or assets of the Landlord, Landlord's agents, incorporators, shareholders, officers, directors, partners, principals (disclosed or undisclosed) or affiliates shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies.

(k)    The term "Landlord" shall mean only the owner at the time in question of the present Landlord's interest in the Shopping Center and in the event of a sale or transfer of the Shopping Center (by operation of law or otherwise), the transferor shall be and hereby is automatically and entirely released and discharged, from and after the date of such sale or transfer, of all liability in respect of the performance of any of the terms of this Lease on the part of Landlord thereafter to be performed which accrue after the date of such transfer.

(l)    Tenant hereby expressly waives any and all rights granted by or under any present or future laws to redeem Landlord's reversionary interest in the Shopping Center. In addition, in the event of any lawful termination of the Term or any repossession of the Premises by reason of Tenant's default hereunder, Tenant waives (i) any notice of reentry or of the institution of legal proceedings to that end; (ii) any right of redemption, reentry or repossession, and (iii) the benefit of any laws now or hereafter in force exempting property from liability for rent or otherwise. The provisions of this Paragraph shall survive the Expiration Date or sooner termination of this Lease.

(m)    Tenant shall not record this Lease, any amendment to this Lease, or any other memorandum of this Lease without the prior written consent of Landlord and in the event such consent is given, Tenant shall pay all transfer taxes, recording fees and other charges in connection with such recording.

(n)    Except as otherwise expressly set forth herein all notices, requests, demands, approvals or consents required hereunder or by law (collectively, "Notices") shall be in writing and shall be given by mailing the same, certified or registered mail, return receipt requested, postage prepaid, or by recognized overnight courier with receipt acknowledged addressed to Landlord at the Address of Landlord, as set forth in Paragraph 1(c) hereof, and if to Tenant, at the Address of Tenant, as set forth in Paragraph 1(e) hereof if such Notice is given prior to the Commencement Date and thereafter at the Premises. Notices shall be deemed given upon the next day if by recognized overnight carrier or, if mailed, two (2) business days after mailing via certified or registered mail. The persons designated for the receipt of Notices, and the addresses to which Notices may be given or made by either party, may be changed or supplemented by Notice given by such party to the other and notwithstanding the preceding sentence such Notice shall be effective ten (10) days after mailing or delivery.

(o)    This Lease shall be deemed to be made under and shall be construed in accordance with and governed by the internal laws of the State in which the Shopping Center is located, without regard to principles of conflicts of laws.

(p)    Tenant expressly acknowledges that neither Landlord nor Landlord's agents has made or is making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties,

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

representations, promises or statements, except to the extent that the same are expressly set forth in this Lease, and no rights, easements or licenses are or shall be acquired by Tenant by implication or otherwise unless expressly set forth in this Lease. Landlord expressly acknowledges that neither Tenant nor Tenant's agents has made or is making, and Landlord, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease, and no rights, easements or licenses are or shall be acquired by Landlord by implication or otherwise unless expressly set forth in this Lease.

(q)     Landlord and Tenant each warrant that it has not employed nor had any dealings or discussions with any broker or agent in connection with the negotiation or execution of this Lease other than the broker(s), if any, referred to in Paragraph 1(t) hereof. Landlord agrees to pay said broker(s) a commission in accordance with a separate agreement with DLR. Landlord and Tenant each agrees to indemnify the other party and hold it harmless from and against any and all liability for commissions or other compensation or charges and all costs and expenses incurred in defense of the claim if its warranty is breached. In the event of a suit on any such claim, Landlord shall notify and implead Tenant, or Tenant may intervene.

(r)     In any proceeding or controversy associated with or arising out of this Lease or a claimed or actual breach hereof, the prevailing party shall be entitled to recover from the other party as a part of the prevailing party's costs, such party's actual attorneys', appraiser's and other professionals' fees and court costs. The award for legal expenses shall not be computed in accordance with any court schedule, but shall be as necessary to full reimburse all attorneys' and other professionals' fees and other expenses actually incurred in good faith, regardless of the size of the judgment, it being the intention of the parties to fully compensate the prevailing party for all the attorneys' and other professionals' fees and other expenses paid in good faith.

(s)     The terms of this Lease shall bind and benefit the successors and assigns of the parties with the same effect as if mentioned in such instance where a party is named or referred to, except that no violation of the provisions of Paragraph 18 hereof shall operate to vest any right in any successors or assignee of Tenant and that the provisions of this Paragraph shall not be construed as modifying the conditions of limitation contained in Paragraph 18 hereof.

(t)     This Lease may be executed in several counterparts, each of which shall constitute an original instrument and all of which shall together constitute one and the same instrument. The executed signature and acknowledgment (if any) pages may be delivered using portable document format (i.e., pdf) or similar file type and transmitted via facsimile, electronic mail, cloud-based server, e- signature technology or similar electronic means, and, upon receipt, will be deemed originals and binding upon the signatories hereto.

(u)     Tenant represents and warrants to Landlord that Tenant is not a party with whom Landlord is prohibited from doing business pursuant to the regulations of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury, including those parties named on OFAC's Specially Designated Nationals and Blocked Persons List. Tenant is currently in compliance with, and shall at all times during the lease term remain in compliance with, the regulations of OFAC and any other governmental requirement relating thereto. In the event of any violation of this Paragraph, Landlord shall be entitled to immediately terminate this Lease and take such other actions as are permitted or required to be taken under law or in equity. TENANT SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS LANDLORD FROM AND AGAINST ANY AND ALL CLAIMS, DAMAGES, LOSSES, RISKS, LIABILITIES AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COSTS) INCURRED BY LANDLORD ARISING FROM OR RELATED TO ANY BREACH OF THE FOREGOING CERTIFICATIONS. These indemnity obligations shall survive the expiration or earlier termination of this Lease. Landlord represents and warrants to Tenant that Landlord is not a party with whom Tenant is prohibited from doing business pursuant to the regulations of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury, including those parties named on OFAC's Specially Designated Nationals and Blocked Persons List. Landlord is currently in compliance with, and shall at all times during the lease term remain in compliance with, the regulations of OFAC and any other governmental requirement relating thereto. In the event of any violation of this Paragraph, Tenant shall be entitled to immediately terminate this Lease and take such other actions as are permitted or required to be taken under law or in equity. LANDLORD SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS TENANT FROM AND AGAINST ANY AND ALL CLAIMS, DAMAGES,

DocuSign Envelope ID: 380A9268-5086-44F9-B137-A5F5B01B5766

LOSSES, RISKS, LIABILITIES AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COSTS) INCURRED BY TENANT ARISING FROM OR RELATED TO ANY BREACH OF THE FOREGOING CERTIFICATIONS. These indemnity obligations shall survive the expiration or earlier termination of this Lease.

32.  Additional Provisions.

(a) Force Majeure. If either party is delayed, hindered, or prevented from the performance of an obligation under the Lease, including, without limitation, the performance of Landlord's or Tenant's Work in the Premises, due to strikes, lockouts, labor troubles, the inability to procure materials, power failures, restrictive governmental laws or regulations, riots, insurrection, war, epidemic, pandemic or another reason not the fault of the party delayed, but not due to financial inability, the performance shall be excused for the period of delay ("Period of Delay"). Nothing herein will affect Tenant's obligation to pay Rent and Additional Rent. The party claiming the right of delay shall notify the other party, in writing, within ten (10) business days after the occurrence of the cause specifying the nature of the cause and the period of time necessary for performance.

(b) Permitted Closure. Notwithstanding anything contained in this Agreement or the Lease to the contrary, in the event of any local, state, or nationally declared health emergency, including orders, directives, or guidance issued by the U.S. Centers for Disease Control and Prevention ("Health Emergency Order") or epidemic or pandemic (such Health Emergency Order or epidemic or pandemic shall hereinafter collectively be referred to as a "Health Emergency") which occurs after the Commencement Date, and if Tenant is required by such Health Emergency to be closed to the public, then, so long as Tenant is required to be closed in accordance with such Health Emergency, (i) Tenant shall not be deemed to be in default of the Lease due to such closure]; and (ii) Landlord will have no right to pursue any rights and remedies under the Lease including, but not limited to, the right to any damages, late fees, penalties, or interest, whether under the Lease or at law or in equity, or injunctive relief based on Tenant's closure.

(c) Protected Areas/Kiosk Restriction/Landscaping: Landlord shall not erect, construct, nor install or allow to be erected, constructed, or installed any subsequent signage, buildings or other improvements (either permanent or temporary in nature) or make any changes to (i) the "Protected Area" (see attached Exhibit A-1) or (ii) elsewhere in the Shopping Center if same would materially obstruct or materially diminish the parking, signage, visibility of or the access and proximity to the Premises or otherwise materially and adversely interfere with the traversing of vehicular or pedestrian traffic from nearby thoroughfares, intersections, parking areas and the Premises. In addition, Landlord shall not permit any permanent or temporary obstructions within the Protected Area, specifically including temporary promotions, kiosks or mobile vendors (e.g., a hotdog cart), farmers' markets, fairs, Christmas tree sales, carnivals, or similar events. Should Landlord violate the terms of this provision, Tenant shall be entitled to an equitable abatement of Basic Rent for the duration of the interference, provided however, if such Landlord action is necessary to make required repairs or replacements or is required by applicable law, Tenant's right to such abatement of Basic Rent shall not accrue unless and until after such interference continues for more than thirty (30) days. Neither will Landlord allow or install landscaping, signing or decorative elements that block or hinder an unobstructed view of the Tenant's store front signage.

(d) Curing Landlord's Defaults. Should Landlord fail or refuse to perform any of its obligations under this Lease, and shall not cure such default within thirty (30) days after notice thereof from Tenant or, if such default is of such a nature that it cannot be completely remedied within said thirty (30) days and Landlord shall not promptly institute and thereafter diligently prosecute to completion all steps necessary to remedy the same, Tenant upon reasonable notice to Landlord (provided, however, that, in an emergency, Tenant shall be required to give Landlord only such notice as shall be practicable under the circumstances and immediate notice thereafter) may cure any default. In such event, Landlord shall reimburse Tenant for the reasonable cost and expense incurred by Tenant in so doing, within thirty (30) days after Tenant's demand for such reimbursement, which demand shall be accompanied by a reasonably detailed description of all such claimed costs and expenses, failing which, interest shall accrue thereon at the rate of four percent (4%) per annum from the date due until paid, and Tenant may, at its election, offset such owed amounts (together with interest accrued thereon) against subsequent installments of monthly Basic Rent and Additional Rent then

DocuSign Envelope ID: 380A9286-6086-44F9-B137-A5F5B01B5766

becoming due and payable under this Lease.  Landlord's obligation to reimburse Tenant and Tenant's right to so offset shall survive the expiration or earlier termination of this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Lease on the day and year first above written.

**LANDLORD:**

WITNESS:

MAD RIVER DEVELOPMENT, LLC,
a New Jersey limited liability company
By:    SMUGGLERS CAPITAL CORP.,
a New Jersey corporation, its Managing Member

By:
Name: Laury Pensa
Title:   President

**TENANT:**

CLAIRE'S BOUTIQUES, INC.,
a Michigan corporation

By:          Jerald Estime
Name:  Jerald Estime
Title:  Vice President., Real Estate, North America

SK
LEGAL
APPROVAL

DocuSign Envelope ID: 380A9288-5086-44F9-B137-A5F5B01B5766

EXHIBIT A-1                    SHOPPING CENTER SITE PLAN
                                          SHOWING PREMISES



DocuSign Envelope ID: 380A9288-6088-44F9-B137-A5F8B01B5768

EXHIBIT A-2                    METES AND BOUNDS DESCRIPTION
                                              OF SHOPPING CENTER

Beginning at a monument found on the northeasterly line of New Jersey State Highway Route 3, said point being the dividing line between Lot 8 and Lot 7 in Block 72.07 as shown on filed map 1886 and running; thence

1.    Along northeasterly line of New Jersey State Highway Route 3, North 58 degrees 57 minutes 38 second West, 627.92 feet to a point; thence
2.    North 41 degrees 49 minutes 22 seconds East, 185.77 feet to a point; thence
3.    North 25 degrees 45 minutes 52 seconds East, 165.46 feet to a point; thence
4.    South 56 degrees 46 minutes 48 seconds East, 316.73 feet to a point; thence
5.    North 33 degrees 13 minutes 47 second East, 81.56 feet to a point; thence
6.    South 57 degrees 08 minutes 53 second East, 1558.99 feet to a point; thence
7.    North 33 degrees 38 minutes 47 second East, 292.53 feet to a point; thence
8.    North 34 degrees 14 minutes 47 seconds East, 259.06 feet to a point; thence
9.    South 19 degrees 33 minutes 48 seconds West, 42.90 feet to a point; thence
10.   South 11 degrees 19 minutes 22 seconds East, 257.40 feet to a point; thence
11.   South 07 degrees 55 minutes 38 seconds West, 95.70 feet to a point; thence
12.   South 44 degrees 55 minutes 38 seconds West, 145.86 feet to a point; thence
13.   South 09 degrees 51 minutes 22 seconds East, 147.25 feet to a point; thence
14.   South 46 degrees 29 minutes 22 seconds East, 104.28 feet to a point; thence
15.   South 05 degrees 47 minutes 22 seconds East, 106.92 feet to a point; thence
16.   South 33 degrees 52 minutes 38 seconds West 70.00 feet to a point; thence
17.   South 13 degrees 40 minutes 59 seconds East, 235.18 feet to a point on the New Jersey State Highway Route 3; thence
18.   North 58 degrees 57 minutes 38 seconds West, 448.28 feet to a point; thence
19.   North 17 degrees 43 minutes 41 seconds West, 139.90 feet to a point; thence
20.   North 37 degrees 04 minutes 38 seconds West, 97.00 feet to a point; thence
21.   North 58 degrees 57 minutes 38 seconds West, 71.00 feet to a point; thence
22.   South 28 degrees 42 minutes 31 seconds West, 128.47 feet to a point on the northeasterly line of New Jersey State Highway Route 3; thence
23.   Along the same, North 58 degrees 57 minutes 38 seconds West, 1196.84 feet to the point or place of Beginning.

The above description being drawn in accordance with a survey made by Kennon Surveying Services, Inc. dated October 14, 2003, revised November 6, 2003, April 21, 2004 and September 1, 2004.

Excepting there from:

All that certain land and premises, situate, lying and being in the City of Clifton, in the County of Passaic and the State of New Jersey and more particularly described as follows:

Being known and designated as Parcel R19A, as indicated on a map entitled: "NEW JERSEY DEPARTMENT OF TRANSPORTATION, GENERAL PROPERTY PARCEL MAP, ROUTE 3 (1953) SECTION 2, FROM ROUTE TO PASSAIC RIVER, Showing Existing Right Of Way And Parcels To Be Acquired In The City of Clifton, County Of Passaic, January 2002"; and as shown more particularly on a map attached to a deed to the State of New Jersey, Department of Transportation, recorded in Deed Book D1980, Page 278 in the Passaic County Clerk's Office which map is entitled: "NEW JERSEY DEPARTMENT OF TRANSPORTATION, ROUTE 3 (1953) SECTION 2, From Route 46 To Passaic River, Parcels R19A, AER19C, SR19D, AE19E and ER19F, City of Clifton, County of Passaic, February 2005"; and also being construction project ROUTE 3 AT THE PASSAIC RIVER CROSSING.

DocuSign Envelope ID: 360A9286-5086-44F9-B137-A5F5B01B5766

EXHIBIT A-3          SHOPPING CENTER
                     PERMITTED EXCEPTIONS

1.  Rights, public and private, to flow of the Third River and waters of Upper Yantacaw Pond and Yantacaw Pond.

2.  Rights of the State of New Jersey to control access to State Highway Route No. 3.

3.  Sanitary Sewer Easement in Deed Book D33, Page 160.

4.  Slope rights in Deed Book P46, Page 137.

5.  Water System Easements in Deed Book P78, Page 470 and Deed Book L87, Page 179.

6.  Grant of Conservation Restriction/Easement in Deed Book D1170, Page 65.

7.  Grant of Conservation Easement in Deed Book D1178, Page 239.

8.  Developer Agreement in Deed Book D1178, Page 244.

9.  Stream Encroachment Permit in Deed Book D 1336, Page 14.

10. Deed for Easement for water supply in Deed Book D1404, Page 244.

11. Easements to State of New Jersey, DOT in Deed Book D1980, Page 278.

12. Such additional easements and restrictions as may be required by any utility company or governmental or quasi-governmental agency or as permitted under this Lease, provided same do not reduce Tenant's rights or increase Tenant's costs and provided that same do not materially adversely affect Tenant's use of the Premises.

13. Such state of facts as an accurate survey would disclose provided that same do not materially adversely affect Tenant's use of the Premises.

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

EXHIBIT B                    LANDLORD'S WORK

Tenant is accepting the Premises in its "as is" condition. Upon delivery of the Premises to Tenant, the Premises and all systems serving the Premises shall be:

(i)     be free of Hazardous Substances and in compliance with all Environmental Law;
(ii)    be broom clean and free of prior tenant's fixtures and personal property;
(iii)   be structurally sound;
(iv)    code compliant;
(v)     contain separately metered utilities; an electrical panel of 200 amp minimum at 120/208 volts; 1 ton of HVAC per 350 square feet; demising walls extending from floor to roof deck, and an ADA-compliant restroom;
(vi)    contain a water-tight roof; and
(vii)   all building systems serving the Premises shall be in good working order, including, but not limited to, the HVAC system.

DocuSign Envelope ID: 38DA9285-5085-44F9-B137-A5F5B01B5766

EXHIBIT C                    TENANT'S WORK AND TIMEFRAME
                             FOR SUBMISSION OF PLANS AND
                             SPECIFICATIONS


Tenant will construct its prototypical store improvements. Tenant submitted its plans to Landlord on
5/10/23 and Landlord approved Tenant's plans on 5/25/23..

DocuSign Envelope ID: 380A9289-5088-44F9-B137-A5F5B01B5766

EXHIBIT D          PROHIBITED USES

As used in this Lease, the term "Prohibited Uses" shall mean any of the following uses:

A.          As to the Shopping Center, any of the following uses:

(1)      Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse, or for any illegal purpose;

(2)      Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)      Any "second hand" store, "surplus" store or facility for the sale or rental of used goods or any facility selling new or used merchandise as a wholesale operation, liquidation operation, odd lots, lot sales, factory closeouts or imperfect goods, except that GameStop may sell used goods in Building "B" and this provision shall not prohibit retail sale of new odd lot items or so-called "dollar stores" or similar uses;

(4)      Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance with Landlord's consent);

(5)      Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)      Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)      Any central laundry, dry cleaning plant, or laundromat, except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from Anchor "A", or Store "B-3" or Building "C", and not adjacent to Store "B-2";

(8)      Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)      Any bowling alley or skating rink;

(10)    A theater of any kind, auditorium, meeting hall, sporting event, or other entertainment use or any outdoor meetings;

(11)    Any living quarters, sleeping apartments, or lodging rooms;

(12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)    Any mortuary or funeral home;

(14)    Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa, beauty salon, Massage Envy or similar operation, or nail salon which may otherwise be permitted under this Exhibit];

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off- premises consumption, except pursuant to the operation of a sit-down restaurant, with ancillary on premises sale and consumption of alcoholic beverages, where such restaurant is permitted herein. No more than thirty percent (30%) of its space or revenue may be devoted to or derived from the sale of alcoholic beverages and no less than fifty (50%) percent of space or revenue is devoted to or derived from food service;

(17)    Any catering or banquet hall or other place of public assembly;

(18)    Any flea market, amusement, computer game or video arcade, pool or billiard hall, night club, discotheque, or dance hall;

(19)    Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by a tenant incidental to the conduct of its business at the Shopping Center;

(20)    Any gambling facility or operation, including but not limited to off-track or sports betting parlor; table games such as black jack or poker; slot machines; video poker/black- jack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Tenant;

(21)    Any unlawful use;

(22)    Any pawn shop, gun shop, shooting gallery or tattoo parlor;

(23)    Any church or other place of religious worship;

(24)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility;

(25)    Any carnival, amusement park or circus;

(26)    Any medical clinics or medical offices and retail offices providing services commonly found in similar first-class shopping centers in the New York

DocuSign Envelope ID: 38DA9285-5086-44F9-B137-A5F5B01B5788

metropolitan area, sometimes referred to as "quasi-retail" or "service retail" (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are not located in the Stores labeled "B-1" through "B-6" on Exhibit B, and, in the aggregate ten (10%) percent of the leasable square footage of the Shopping Center are not devoted to such uses;

(27)    Any supermarket, except that an upscale, boutique-type food store of the normally operated in the New York metropolitan area (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided, that such store shall not occupy more than 20,000 square feet of floor area, and shall be located in Anchor "D";

(28)    Hotel/motel or residential facility;

(29)    Daycare center;

(30)    Veterinary office, except as may be incidental to a full-line pet and pet supply store operating in at least 15,000 square feet of floor area and located at least 200 feet away from Anchor "A" or Store "B-3" and not immediately adjacent to Stores "B-2", or within 200 feet of "B-3" or "C-1" (except that a full-line pet and pet supply store shall be permitted to be located within Anchor "A"); such tenant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from the Common Areas;

(31)    Children's entertainment or activity facility (such as "Discovery Zone", or "Chuck
(32)    E. Cheese's");

(33)    Karate center, except a first class operation which is not located in the Stores labeled "B-1" through "B-10" or within 100 feet of Store "C-1";

(34)    Movie theater;

(35)    Restaurant serving meals for on- or off-premises consumption except if located as follows: (i) one restaurant in the premises labeled "Pad" (a maximum of 6,000 square feet), (ii) one restaurant in either "B-7" "B-8" or "B-9" (a maximum of 3,400 square feet), (iii) one restaurant located in "B-10" (a maximum of 5,000 square feet), or (iv) Starbucks, Cold Stone and Bensi (or their replacements in Stores "C-2", "C-5" and "C-6" in the maximum aggregate of 7,800 square feet);

(36)    Beauty parlor within two hundred feet of any part of Anchor "A" or Store "B-3" or immediately adjacent to Store "B-2";

(37)    Health spa, sports club, exercise facility or dance studio or similar type business;

(38)    Bailbondsman;

(39)    Psychic, tarot card reading or similar service; or

(40)    Unemployment agency, service or commission.

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

EXHIBIT E    INTENTIONALLY DELETED

DocuSign Envelope ID: 380A9285-5086-44F9-B137-A5F5B01B5766

EXHIBIT F                    RULES AND REGULATIONS

Landlord hereby establishes the following Rules and Regulations for the safety, care and cleanliness of (i) the store area (hereinafter referred to as the "Premises") or any Tenant or Tenants of the Shopping Center (hereinafter referred to as the "Tenant"); (ii) the Common Area and (iii) the Shopping Center in general, for the preservation of good order.

The Tenant agrees as follows:

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

**Deliveries**  (1) All floor areas of the Premises (including vestibules, entrances and air returns) doors, fixtures, windows and plate glass shall be maintained in a clean, safe and good condition. All loading and unloading of goods shall be done only at such times, in the areas, and through the rear entrances, designated for such purposes by Landlord. Where Landlord has made specific provisions for the loading or unloading of trucks for a particular Tenant, that Tenant shall enforce those provisions with all persons or firms making pickups or deliveries. (2) The delivery or shipping of merchandise supplies and fixtures to and from the Premises shall be subject to such Rules and Regulations as in the judgment of the Landlord are necessary for the proper operation of the Premises or Shopping Center. (3) All construction work shall be done utilizing the rear entry of the Premises. All construction and repair materials and all construction and repair personnel shall use the rear entry of the Premises.

**Storage**  No portion of the Premises shall be used for the storage of any merchandise, materials or other properties, other than those reasonably necessary for the operation of the Tenant's business. Landlord may, from time to time, inspect the Premises to insure compliance with the foregoing provisions. All stock must be kept at least 18 inches away from all combustion and away from all vents which would become hot.

**Trash**  All garbage and refuse shall be kept in the kind of container specified by Landlord, and shall be placed where indicated by Landlord prepared for collection in the manner and at the times and places specified by Landlord. These containers shall not be visible to the general public and shall not constitute a health or fire hazard, or a nuisance to any other Tenant. In the event that any Tenant shall fail to remedy such a health or fire hazard, or nuisance, which five (5) days after written notice by Landlord, Landlord may remedy and/or correct such health or fire hazard or nuisance at the expense of the Tenant involved. If Landlord shall provide or designate a service for picking up refuse and garbage, and if Tenant because of Tenant's business requires additional garbage service, Tenant shall use the collector designated by Landlord at Tenant's own cost and expense, provided that the same is at reasonable and competitive rates. Tenant shall not permit any dumping, disposing, incineration or reduction of garbage on the site.

**Roofs**  Except as provided in the Lease, (1) no radio or television or other similar device shall be installed, (2) no aerial shall be erected on the roof or exterior walls of the Premises, or on the grounds, (3) Tenant shall not affix anything to the roof of the Premises and shall not bore any holes or penetrate roof for any purpose whatsoever, without the prior written consent of the Landlord in each instance. Any aerial so installed without such written consent shall be subject to removal without notice at any time. Any approved roof penetrations shall be made by Landlord's contractors or others designated by Landlord.

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

**Temperature** Tenant shall keep the Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

**Displays** Except as provided in the Lease, Tenant shall not place or permit any obstructions or merchandise on the outside areas immediately adjoining the Premises. Neither sidewalks nor walkways shall be used to display, store or place any merchandise, equipment or device, except as provided in the Lease. No public telephone, newsstand, shoeshine stand, refreshment, vending or other coin operated machine shall be installed or placed on the sidewalk or walkway area adjacent to the Premises or on the Common Areas without the Landlord's prior written approval in each instance.

**Plumbing** The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant, who shall, or whose employees, agents, or business invitees, shall have caused it.

**Pest Control** Tenant shall use at Tenant's cost such pest extermination contractor as Landlord may reasonably direct and at such reasonable intervals as Landlord may require, provided Landlord has no interest, direct or indirect, in such contractor.

**Signage, Advertising** (1) Except as provided in Section 13(a) of the Lease, Tenant shall not place or suffer to be placed and maintained on any exterior door, wall or window of the Premises, any sign or advertising matter or other thing of any kind and will not place or maintain any decoration or advertising on the glass of any door or window of the Premises except as permitted by the Lease and the sign criteria.

(2) Landlord shall have the right to prohibit any advertising by Tenant which in Landlord's opinion tends to impair the reputation of the Shopping Center or its desirability for retail operations and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising. Except for professionally prepared signs, and as may otherwise be provided in the Lease, Tenant may not obstruct the windows of the Premises, nor may black out any window without Landlord's prior written consent.

**Shopping Carts**

If a Tenant, with the prior written consent of the Landlord, provides its customers with the use of shopping carts and/or baskets, such Tenant shall be responsible for causing such carts and/or baskets to be stored only in areas designated by Landlord. If such Tenant fails to routinely collect and store said carts as necessary (at least twice on a daily basis), Landlord may, but shall not be required to, assume the responsibility of same and may bill the Tenant involved on as estimated monthly basis for such service.

**Emergency Access**

All of the entrances or exits to the Premises in the Shopping Center have been furnished with a Knox Box to allow Fire Department or Police access in the event of emergencies and Tenant shall provide a key to entrances to the Premises to the applicable department of the City of Clifton for placement in said Knox Boxes. No additional lock or locks shall be placed by Tenant on any door in the Shopping Center, without the prior written consent of the Landlord. Two keys will initially be furnished to Tenant by Landlord without charge; additional keys requested by Tenant shall be paid for by Tenant. Tenants, its agents and employees, shall not have any duplicate keys made and shall not change the lock, without the prior written consent of the Landlord. All means of ingress and egress must be accessible at all times.

DocuSign Envelope ID: 360A9286-5086-44F9-B137-A5F5B01B5766

**Common Areas**

All Tenants and their authorized representatives and invitees shall use any roadway, walkway, or mall (including the enclosed mall, if any) only for the ingress or egress from the stores in the Shopping Center. Use of the Common Areas shall be in an orderly manner in accordance with directional or other signs or guides. Roadways shall not be used at a speed in excess of ten (10) miles per hour and shall not be used for parking or stopping, except for the immediate loading or unloading of passengers or the immediate pickup of bulk material purchases made at the stores. Walkways and malls (if any) shall be used only for pedestrian travel.

**Parking**

(1) All Tenants and their authorized representatives and invitees shall not use the parking areas for anything but parking motor vehicles. All motor vehicles shall be parked in an orderly manner within the painted lines defining the individual parking places. During peak periods or business activity, Landlord may impose any and all controls Landlord deems necessary to operate the parking lot including, but not limited to, the length of time for parking use.

(2) No person shall use any utility area or truck loading area reserved for use in conducting business, except for the specific purpose for which permission to use these areas has been given.

(3) No employee shall use any area for motor vehicle parking except the area specifically designated for employee parking (as shown on Exhibit A-1 hereto) for the particular period of time they are working. No Tenant shall designate an area for employee parking except the area designated in writing by Landlord. Landlord shall provide sufficient lighting to maintain the employee parking area in a well-lit condition.

(4) Upon Landlord's request, Tenant shall furnish Landlord with State automobile license numbers assigned to Tenant's car or cars, and cars of all employees, including vehicle identification information, within five (5) days of opening for business and shall thereafter notify Landlord of any changes within five (5) days after such changes occur.

(5) Except as provided in the Lease, no Tenant, employee of Tenant, or business invitee of Tenant shall perform any automotive repairs or auto body work on any vehicle while such vehicle is parked in the Common Areas of the Shopping Center. All vehicles used by Tenant and its employees must be properly registered and insured in accordance with the laws of the State of New Jersey.

**Cooking System Maintenance**

If the permitted use is a restaurant, all cooking exhaust systems, including but not limited to, the hood, duct and fan must be kept clean to reduce the risk of fire from grease ignition. A licensed service providing this cleaning must be engaged and cleaning provided at least quarterly to the hood, duct and fan as well as to any surface areas that may have grease accumulation. All cooking surfaces must be serviced by an automatic extinguishing system which must be serviced at least semi-annually by a licensed contractor. An automatic fuel shut off must be installed which will shut off the gas at all cooking equipment in the event of a fire which activates the automatic extinguishing system so that a gas fire cannot re-ignite without the protection of the extinguishing agent that would be depleted. Due to normal accumulations of grease in cooking exhaust systems, the hood, duct and fan need to be kept clean to reduce the risk of fire from grease ignition. A licensed service providing this cleaning needs to be engaged and cleaning provided at least quarterly to the hood, duct and fan as well as to any surface areas that may have grease accumulation.

DocuSign Envelope ID: 380A9286-6086-44F9-B137-A5F5B01B5766

**Prohibited Uses:** Without the prior written consent of the Landlord, no Tenant or person shall use any of the Common Areas for:

> (1) Vending, peddling or soliciting orders for sale or distributing of any merchandise, devise, service, periodical, book, pamphlet, or other matter;

> (2) Exhibiting any non-professional sign, placard, banner, notice or other written material;

> (3) Distributing any circular, booklet, handbill, placard, or other material;

> (4) Soliciting membership in any organization, group, or association, or soliciting contributions for any purpose;

> (5) Parading, patrolling, picketing, demonstrating, or engaging in conduct that might interfere with the use of the Common Areas or be detrimental to any of the business establishments in the Shopping Center;

> (6) Using the Common Areas for any purpose when none of the business establishments in the Shopping Center are open for business;

> (7) Discarding any paper, glass, or extraneous matter of any kind, except in designated receptacles;

> (8) Using a sound-making device that is grossly annoying or unpleasant to the general public. No loud speakers, televisions, phonographs, radios or other devices shall be used in a manner so as to be heard or seen outside of the Premises without the prior written consent of the Landlord;

> (9) Damaging or defacing any sign, light standard, or fixture, landscaping material or other improvement or property within the Shopping Center;

> (10) No bicycles, vehicles (except wheelchairs) or animals, except service animals, shall be brought into or kept in or about the Premises;

> (11) The Premises shall not be used for lodging or sleeping purposes;

> (12) Except as provided in Section 13(a) of the Lease, no awnings or other projections shall be attached to the outside walls of the Shopping Center. No curtains, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises, without the prior written consent of the Landlord.

The above listing of specific prohibitions is not intended to be exclusive, but is intended to indicate the manner in which the right to use the Common Areas solely as a means of access and convenience in shopping at the business establishments in the Shopping Center is limited and controlled by Landlord.

Landlord reserves the right, from time to time, to amend or supplement the foregoing Rules and Regulations, and to adopt and promulgate additional Rules and Regulations applicable to the Premises in accordance with the Lease. Notice of such Rules and Regulations and amendments and supplements thereto, if any, shall be given to Tenant.

Tenant agrees to comply with all such Rules and Regulations upon notice to Tenant from Landlord, provided that such Rules and Regulations shall apply uniformly to all Tenants of the Shopping Center.

In the event of a conflict between the terms of these Rules and Regulations and the terms of the Lease, the terms of the Lease shall control.

DocuSign Envelope ID: 380A9288-5086-44F9-B137-A5F5B01B5766

EXHIBIT G        EXCLUSIVES

<u>Aspen Dental</u>: Tenant shall have the exclusive right to a dental and orthodontics, including oral surgery and implants, office ("Tenant's Exclusive Use") at the Shopping Center and within a one (1) mile radius from the outside boundary of the Shopping Center (collectively, "Tenant's Exclusive Use Area") and Landlord and Landlord's Affiliates (as hereinafter defined) shall not lease, or cause to be leased, or grant its consent to any assignment or sublease of space or change of use in Tenant's Exclusive Use Area, and/or any building in Tenant's Exclusive Use Area where Landlord is permitted to withhold consent to such assignment or subletting and assignment, to any person or entity that engages in or conducts Tenant's Exclusive Use.

<u>Bed Bath & Beyond</u>: Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding (i) furniture, and major appliances or "white goods" such as a typical P. C. Richards as the same is operated on the Effective Date, (ii) mattresses and box springs and similar bedding as typically sold by a Rockaway Bedding as the same is operated on the Effective Date, and (iii) a furniture store such as "Huffman Koos" as the same is operated on the Effective Date); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the "Exclusive Items"). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of(x) five (5%) percent of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet. Existing tenants of the Shopping Center and any Related Land (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord (or Landlord's Affiliate) and any such tenant requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.

<u>Chipotle Mexican Grill</u>: Landlord shall not permit any other occupant of the Shopping Center to engage in the primary sale of burritos, Mexican wraps, fajitas, tacos or Mexican food. Other restaurants may sell burritos, Mexican wraps, fajitas, tacos or Mexican food on an incidental basis. "Incidental basis" shall mean not to exceed fifteen (15%) percent of gross sales.

<u>Citibank</u>: (1) Retail banking institution; industrial bank; consumer banking institution; savings and loan association; credit union; stock, option, bond or derivative brokerage company; or other financial planning company which, among other things, accepts deposits from customers, provides stock brokerage, mortgage brokerage and/or financial planning services. (2) Operation of ATM's. For purposes of this exclusive, "ATM" shall mean an automated teller machine offering electronic fund transfer services whose function, among other things, is to permit customers to withdraw cash from accounts or credit lines, deposit funds, and repay loans made to such customers or transfer funds between such customers' accounts, or any other automated or electronic machine which provides any of the services provided by tenant. The foregoing "Exclusive" shall not prohibit the operation of H&R Block, or its successors and/or assigns under its lease or

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5786

any renewal thereof, or H&R Block's operation of a check cashing machine on its premises to cash checks issued to its clients, and same shall not be considered an ATM for the purposes of this exclusive.

Five Below: Landlord shall rent no portion of the Shopping Center or permit in the Shopping Center the sale of single or limited price point variety and general merchandise at price points that are primarily ten dollars ($10.00) or less. Notwithstanding the foregoing to the contrary, the operation of a typical "Dollar Tree" store as such stores typically operate from time to time shall not be a violation of this provision.

GameStop: Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied by any tenant occupying less than Three Thousand (3,000) sq. ft. for the sale of entertainment software, video software or video games (the "Exclusive Items"). Notwithstanding the foregoing, any tenant or sub-tenant in the Shopping Center shall have the right to utilize its premises for the sale of the Exclusive Items within an aggregate area (which shall include allocable portion of the aisle space adjacent to such sale) not to exceed fifteen (15%) percent of the floor area of such tenant's premises. For example, if a tenant is occupying a premises containing 3,500 square feet, the tenant may sell the Exclusive Items. In the event a tenant is occupying 2,500 square feet, the tenant would only be permitted to sell Exclusive Items if the floor area used for sale of the Exclusive Items is less than 375 square feet. Notwithstanding anything to the contrary foregoing, this exclusive shall not apply to a "big box" tenant selling electronic products or having a similar product line and Bed Bath and Beyond and shall not prevent such tenant from selling any products. In addition, this restriction shall not apply to Blockbuster, Hollywood Video or any other similar type store. However, if any store of any size installs their gaming concept, (i.e. GameRush, GameCrazy, etc.) that will be considered a direct violation of Tenant's exclusive rights. This exclusive shall not exclude Radio Shack from selling video game accessories, such as joysticks, adapters, etc., on an incidental basis with incidental to be defined as not more than five (5%) percent of their merchandise display area. This exclusive shall also not exclude any telecommunication-type stores, such as Cingular, Sprint, etc.

Honey Beauty Lounge Inc.: Landlord shall rent no portion of the Shopping Center or permit in the Shopping Center for manicure and pedicure services.

H&R Block: Landlord shall not lease space in the Shopping Center to any other tenant who engages in income tax preparation, electronic filing of income tax returns or tax refund anticipation loans during the term, however, this shall not prohibit the operation at the Shopping Center of Citibank, its successors and/or assigns or any banking or lending institution, including mortgage lending.

Lane Bryant: There shall be no operation in the Shopping Center (as same may be expanded) of any retail store selling large size (14 and up) women's clothing and/or apparel. The provisions of this Section shall not apply to the operation in the Shopping Center of (1) any tenant occupying in excess of 15,000 square feet of contiguous space and operating under a single-trade name, (2) a high-end women's apparel retail store whose prices are comparable to those of Talbots, Ann Taylor or Ann Taylor Loft, or (3) the Incidental (as hereinafter defined) sale of Plus Clothing. For purposes hereof, "Incidental" shall mean the sale of such merchandise in not more than the lesser of (a) five hundred (500) square feet or (b) ten (10%) percent of the sales area of such tenant's store, including a fair allocation of aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other trade fixtures or equipment containing or used for the sale or display of merchandise.

Michaels: Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the Shopping Center or any property contiguous to the Shopping Center (including, without limitation, any property that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord, to any "craft store", store selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, wedding or party goods (except apparel),

DocuSign Envelope ID: 380A9286-5986-44F9-B137-A5F5B01B5766

scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies, accessories, and/or decorations or other papercrafting (e.g. making greeting cards, gift bags, tags, and other related or similar items) supplies, accessories and/or decorations associated with the foregoing, or providing instruction on any of the foregoing or any combination of the foregoing categories, or any store similar to Tenant in operation or merchandising. Notwithstanding the foregoing to the contrary, the operation in the Shopping Center of a typical "Pier I Imports" store as such stores typically operate from time to time shall not be a violation of this Section 16.4.1; provided, however, in no event shall such Pier I Imports store provide picture framing services or devote more than the lesser of (i) 1,500 Leasable Square Feet, or (ii) ten (10%) percent of its Leasable Square Feet in the Shopping Center, in the aggregate, to the sale of arts and crafts, frames, artificial flowers, artificial floral arrangements, wedding or party goods.

Pollo Tropical: Landlord shall not permit any tenant, assignee, subtenant, user or occupant of any portion of the Shopping Center to use any portion of the Shopping Center as a "Hispanic Theme" restaurant, meaning any restaurant or take-out food business, the cuisine of which is commonly associated with Hispanic origin (i.e. from Central America, South America, Spain or the Caribbean, but expressly excluding Mexican cuisine) and/or the primary sale of chicken, such as KFC, Popeye's; Chic-Fil-A; Boston Market; Pollo Supremo; Pollo Loco.

Rockaway Bedding (Mattress Firm): Landlord shall not lease premises in the Shopping Center to any tenant whose principal business is the sale of beds and mattresses, such as Mattress Giant, Boscov's, Mattress Depot, Resnick's, Walt's, Mattress Express, Sleepy's, Sleepy's Kids, Mattress Discounters, Mattress Warehouse, Mattress King, Mr. Mattress, Dial-A-Mattress, Macybed, Better Bedding and Bedding Barn.

Starbucks: Landlord shall not sell or allow any person or entity (other than Tenant) to sell in the Building, Shopping Center or Property (a) freshly ground or whole coffee beans, (b) espresso, espresso-based coffee drinks or coffee based drinks, (c) tea or tea-based drinks, (d) gourmet, brand-identified brewed coffee, and (c) blended beverages containing the following: ice, coffee, espresso and tea (but not including coffee ice cream or coffee ice cream blended beverages). The exclusive use restrictions herein shall also apply to kiosks and carts but shall not apply to (i) the incidental sale of brewed coffee, teas, or hot espresso or hot espresso drinks for on-premises consumption by Bensi, Pizzeria Uno, or such other full service, sit- down restaurant serving a complete dinner menu which may have a take-out service or such other quick, casual varied theme menu restaurant; and (ii) the incidental sale of brewed coffees and teas by Baja Fresh, Bensi, Pizzeria Uno and Panera Bread, and each of their respective replacement tenants, if any, wherever located. The incidental sale of the foregoing products by specifically branded Baja Fresh, Bensi, Pizzeria Uno and Panera-Bread merchandise or the specifically branded merchandise of each of their respective replacement tenants shall not be deemed a violation of the foregoing exclusive granted to Tenant.

Supercuts: Landlord shall not rent, lease, occupy or use, nor sublet or permit any other premises in the Shopping Center to be occupied by any tenant for use as a hair salon or barber shop for haircutting, hairstyling and haircoloring.

Verizon: Landlord or its affiliates will not lease or permit any lease of retail space to competitors of Verizon Wireless in the business of the sale of wireless phone services or wireless phone equipment, accessories or permit the occupation of retail space by companies selling Verizon Wireless services or selling, leasing, installing, servicing, maintaining and repairing personal, wireless, cellular and mobile telecommunications systems, equipment, service, and related products, accessories, peripherals, parts, and services, including long distance service.

Vitamin Shoppe: Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or adjacent land owned or controlled by Landlord or any of its affiliates during the Term for the sale, rental or distribution, either singly or in any combination of the following items: vitamins, minerals, supplements, nutritional products, herbs or health related supplements, with the exception of Harmon Stores, Inc. or a national pharmacy chain with a store of at least 8,000 square feet, or leases that permit the sale of these items as an

DocuSign Envelope ID: 380A9289-5988-44F9-B137-A5F5B01B5766

incidental use (whereby the term "incidental use" shall mean that the sale of such products shall not exceed ten (10%) percent of total gross sales and that such tenant's sales floor area being used for such sales shall not exceed ten (10%) percent of such tenant's total sales floor area.

DocuSign Envelope ID: 380A9286-5088-44F9-B137-A5F5B01B5766

EXHIBIT H-1        SIGN CRITERIA

1.      Signs are to be furnished and installed by Tenant and approved by Landlord's architect and shall be acceptable to local zoning ordinances at the time of submission to zoning officer for approval.

2.      Tenant's sign contractor or architect must submit a shop drawing including installation details of Tenant's sign prior to approval. Tenant's sign shall be located within the limits of the Tenant's Demised Premises.

Maximum Sign size:

| | |
|---|---|
| Up to 30" storefront | Capitals - 18" or as per City ordinances B |
| 30'1" to 55' storefront | Capitals - 24" or as per City ordinances |
| 55' 1" and above | Capitals - 36" or as per City ordinances |

3.      Length of Tenant's sign shall be limited to seventy-five (75%) percent of Tenant's storefront. Limits of sign placement on storefront shall be as designated by Landlord. Size shall be limited by City ordinance as to sign size.

4.      All conduit, wiring for, and connection to, the sign shall be furnished by Tenant. Attachment of sign to building to be provided by Tenant.

5.      No flashing, moving, or audible signs or exposed neon tubing or raceways permitted.

6.      All signs shall be composed of individual internally illuminated separate letters with stand-off brackets 6" maximum projection. No externally illuminated signs are permitted. No fluorescent lighting is permitted.

7.      Tenant shall paint its name on their rear service door in 3" Helvetica medium style letter. The color for this sign, shall be black.

8.      Signing shall be limited to trade name and logo only if approved by City.

a. One sign or other graphic, treatment is allowed per storefront elevation. Tenant may, with Landlord approval, at its own cost and option install a sign on the rear of the premises within the lease area if acceptable to City ordinances and submit drawing to Landlord's architect for approval.

b. Printed signs on storefront and show windows, permanent or temporary, are not permitted. No stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (i) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (ii) a sticker or decal which contains the phrase "no solicitation" or words of like import. Small signature identification signs lettered directly on the show window adjacent to the entry doors, or logos, not over three (3) inches in height, used in conjunction and as continuous banding with signatures on glass are permitted subject to Landlord's approval and acceptance by City of same. No backlighting of above is permitted. No paper or cardboard signs are permitted other than professionally prepared interior window signs advertising special sales within the Premises.

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

9.    Projecting signs, paper signs, stickers, banners, or flags are not permitted. When credit card identification stickers are to be used, they must be applied to a freestanding panel inside the store.

10.    No exposed box signs, ballast boxes, sign rear panels or colored backing to painted or otherwise shall be permitted. No exposed electrical transformers are permitted. Sign company names and union labels shall be concealed or located in an inconspicuous place. No exposed sign illumination, animated flood fighting of signs or storefronts, components, formed or injection molded plastic sign, nor flashing lights are permitted.

10. All Tenants are required to obtain local government approval  or permit when required by code. All signs must be insured underwriters' approved, and be securely fastened to structure. Tenants, upon vacating the premises, must patch all holes and repaint/coat entire sign fascia area lease line to lease line.

11.    Signage and/or logos applied to canopies (if applicable) shall be as specified and/or approved by Landlord and Landlord's architect and meet all City ordinances, codes and requirements.

12.    Signage and/or logos applied to canvas canopies (if applicable) shall be white or blue in color and centered horizontally and vertically in the 6" valance of the canopy, the letters shall be 2.5" high. The color of the canopies shall be Tenant's choice from those set forth in paragraph 15 below, and the fabric chosen by Tenant shall match the overall project and shall be from a national awning fabric supplier. Tenant shall install, maintain and repair/replace the canopy or awning in accordance with the provisions of paragraph 13(a) of this Lease.

13.    Window graphics/signage layouts for any window signage must be submitted to Landlord for approval prior to installation. Drawings must be site specific.

14.    Tenant's signage is allowed to be the following colors unless otherwise approved by Landlord/Landlord's architect:
a. Red
b. Blue
c. Black (backlighting also permitted w/Black)
d. White
e. As shown on Exhibit H-3

15.    Tenant's canopies shall be limited in color to the following unless specifically approved by Landlord/Landlord's architect and shall not be illuminated either from under or above:
a. Black
b. Red
c. Green
d. Beige
e. Blue
f. Striped combinations of above
g. As shown on Exhibit H-3

In the event of any conflict between the terms hereof and the terms of the base Lease, the terms hereof shall control.

DocuSign Envelope ID: 380A9288-5088-44F9-B137-A5F5B01B5786

EXHIBIT H-2        PERMITTED SIGNS



DocuSign Envelope ID: 380A9286-5066-44F9-B137-A5F5B01B5766



DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766

EXHIBIT I    INSURANCE

(a)    Commercial General Liability

Bodily Injured and
Property Damage
$1,000,000 per occurrence combined single limit ($1,000,000) and per policy aggregate
($10,000,000) and per occurrence umbrella liability ($10,000,000)

Personal Injury and Advertising Injury
$1,000,000    any one person or organization

Products/Completed Operations
$1,000,000    annual aggregate

Damages to Premises Rented to Insured
$1,000,000 any one casualty

(b)    Automobile Liability

Bodily Injured and Property Damage
$1,000,000    per accident

Hired and Non-Owned Automobiles
$1,000,000    per accident

(c)    Workers Compensation

Workers Compensation        STATUTORY, provided, however, there shall be no exclusion
exceptions to coverage by any of Tenant's members, owners or partners or any other applicable
party, regardless if permitted in the State of New Jersey.


Employers Liability
$1,000,000    per employee, Bodily injury by disease
$1,000,000    policy limit, Bodily injury by disease
$1,000,000    per employee, bodily injury by accident

Umbrella Liability (as provided above)
$10,000,000    any one occurrence
$10,000,000    annual aggregate

DocuSign Envelope ID: 380A8286-5086-44F9-B137-A5F5B01B5766

EXHIBIT J Five Below Waiver

[See Next Page]

DocuSign Envelope ID: 380A9286-5086-44F9-B137-A5F5B01B5766
DocuSign Envelope ID: 69954C97-C5CA-403A-A5E4-89AC7DD5BC02



701 market street, suite 200 philadelphia, pa 19106 | p 215-546-7909 f 215-971-8494 www.fivebelow.com

June 27, 2023

<u>Via email</u>: Susan Marra (smarra@nscllp.com)

MAD RIVER DEVELOPMENT, LLC
240 Paramus Road, Suite 1
Ridgewood, New Jersey 07450

> Re:  Five Below Store #309 at River Front Center, Clifton, New Jersey
>      Conditional Waiver of Exclusive Use Provision for Claire's Boutiques, Inc. dba
>      "Claire's"

Dear Landlord:

Reference is made to that certain Lease dated December 14, 2020 (the "Lease"), by and between Five Below, Inc. ("Five Below") and ("Landlord"), for certain premises at (the "Shopping Center") as more particularly described in the Lease. Unless otherwise defined herein, all capitalized terms shall have the same meanings ascribed to them in the Lease.

Pursuant to Section 10 of the Lease, Five Below has certain exclusive rights in the Shopping Center whereby Landlord shall not rent any portion of the Shopping Center or permit in the Shopping Center the sale of single or limited price point variety and general merchandise at price points primarily $10 or less (the "Five Below Exclusive").

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Five Below hereby consents to waive its exclusive rights as to the Five Below Exclusive and allow Claire's Boutiques, Inc. dba "Claire's" ("Claire's") to operate as a retail sales store in the Shopping Center, for the sale of fashion accessories, jewelry, hair goods, handbags and sunglasses; teen home and gift items; specialty apparel items, cosmetics, fragrances, and bath and body products; cell phone cases and related accessories; trend driven items; novelties and holiday promotional items; and to provide ear piercing, subject to the following conditions:

1.  Claire's shall be operating under the trade name "Claire's" or other name so long as any such other name shall not be similar or confusing with the Five Below trade name;

2.  Five Below's consent, subject to the terms and conditions set forth herein, to the operation of Claire's consisting of approximately 1,383 square feet but no more than 1,521 square feet as noted on the site plan attached hereto as Exhibit A and made a part hereof (the "Claire's Location") shall not be deemed an approval of the operation of Claire's at any other location at this Shopping Center or any other location;

3.  No more than 15% of the sales area of the Claire's Location (including one-half of the adjacent aisle space) shall be used for the retail sale of tech accessories, including but not limited to cell phone/wireless accessories, gaming accessories, charging cables and connectors; no more than 15% of the sales area of the Claire's Location (including one-

## LET GO & HAVE FUN!

DocuSign Envelope ID: 360A9286-5086-44F9-B137-A5F5B01B5766
DocuSign Envelope ID: 69954C97-C5CA-403A-A5E4-89AC7DD5BC02

# five BEL⁰W

701 market street, suite 200  philadelphia, pa 19106  |   p 215-546-7909  f 215-971-8494  www.fivebelow.com

half of the adjacent aisle space) shall be used for the retail sale of teen home items; and, no more than 12% of the sales area of the Claire's Location (including one-half of the adjacent aisle space) shall be used for the retail sale of trend driven items, which are items that surge in popularity through customer reaction for a limited duration of time;

4. Except as otherwise limited herein, Claire's shall operate the Claire's Location as a retail sales store in substantially the same manner and with substantially the same product and service mix as the majority of other locations operating under the trade name "Claire's" as of the date hereof;

5. This waiver shall benefit only Claire's and Landlord but only as it applies to Claire's;

6. Five Below shall have the right, ancillary to its Permitted Use, to provide ear piercing services in the Leased Premises; and

7. This consent expires upon the termination or expiration of Claire's lease or Claire's cessation of business at the Claire's Location.

Five Below's consent set forth herein shall be binding upon Five Below's successors, assignees and subtenants, by whatever name called. In the event of a violation of any of the conditions set forth herein, and the failure to cure such violation within thirty (30) days of receipt of notice of such violation, Five Below's consent shall be deemed immediately revoked.

The parties acknowledge and agree that this agreement shall not cause Five Below to waive, modify, or relinquish any of its rights under the Lease, including any other current or future use restrictions, except as expressly set forth herein and that in all other respects the Lease shall remain in full force and effect and unmodified hereby. The consent granted by Five Below herein shall not relieve Landlord from obtaining Five Below's consent to any subsequent proposed use(s) that may impact Five Below's rights under the Lease.

Sincerely,

Five Below, Inc.

By: _Patrick D Buckley_

Name: Patrick J Buckley

Title: Assistant General Counsel

## LET G● & HAVE FUN!

DocuSign Envelope ID: 360A9286-5086-44F9-B137-A5F5B01B5766
DocuSign Envelope ID: 69954C97-C5CA-403A-A5E4-89AC7DD5BC02

# five BEL°W

701 market street, suite 200 philadelphia, pa 19106  |  p 215-546-7909  f 215-971-8494  www.fivebelow.com

## EXHIBIT "A" SITE PLAN



## LET G● & HAVE FUN!

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies on this 13th day of October 2025, that a true and correct copy of the foregoing was caused to be served upon all parties required to receive notice pursuant to De. Bankr. LR 4001-1 via this Court's ECF filing system and/or by UPS Overnight Delivery, upon the following parties:

**BY ELECTRONIC MAIL**:

| | |
|---|---|
| Claire's Holdings LLC<br>2400 West Central Road<br>Hoffman Estates, Illinois 60192,<br>Attn.: Brendan McKeough, Executive Vice President, Chief Legal Officer, and Secretary<br>(brendan.mckeough@claires.com)<br><br>3 SW 129th Avenue<br>Pembroke Pines, Florida 33027<br>Attn: Michele Reilly, Assistant Secretary<br>(michele.reilly@claires.com) | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn.: Joshua A. Sussberg, P.C.<br>(joshua.sussberg@kirkland.com)<br>Allyson B. Smith<br>(allyson.smith@kirkland.com) |
| Kirkland & Ellis LLP<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Attn.: Alexandra F. Schwarzman<br>(alexandra.schwarzman@kirkland.com)<br>Robert A. Jacobson<br>(rob.jacobson@kirkland.com) | Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Attn.: Paul N. Heath (heath@rlf.com)<br>Zachary I. Shapiro (shapiro@rlf.com) |
| U.S. Trustee<br>844 King Street, Suite 2207<br>Lockbox 35,<br>Wilmington, Delaware 19801<br>Attn.:Benjamin A. Hackman<br>(Benjamin.A.Hackman@usdoj.gov) | Cahill Gordon & Reindell LLP<br>Attn.: Joel Moss<br>(JMoss@cahill.com)<br>Amit Trehan<br>(ATrehan@cahill.com)<br>Sean Tierney<br>(STierney@cahill.com) |
| Simpson Thacher & Bartlett LLP<br>Attn.: Elisha D. Graff<br>(egraff@stblaw.com)<br>Zachary J. Weiner<br>(zachary.weiner@stblaw.com)<br><br>Potter Anderson & Corroon LLP<br>Attn.: L. Katherine Good<br>(kgood@potteranderson.com)<br>Jeremy Ryan (jryan@potteranderson.com) | McDermott Will & Schulte LLP<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attn.: Darren Azman<br>(dazman@mwe.com)<br>Kristin K. Going<br>(kgoing@mwe.com)<br>Stacy A. Lutkus<br>(salutkus@mwe.com) |

| | |
|---|---|
| Cole Schotz P.C.<br>500 Delaware Avenue, Suite 600<br>Wilmington, DE 19801<br>Attn.: Justin R. Alberto<br>(jalberto@coleschotz.com)<br>Stacy L. Newman<br>(snewman@coleschotz.com)<br>Michael E. Fitzpatrick<br>(mfitzpatrick@coleschotz.com)<br>Melissa M. Hartlipp<br>(mhartlipp@coleschotz.com) | Cole Schotz P.C.<br>1325 Avenue of the Americas, 19th Floor<br>New York, New York 10019<br>Attn.: Seth Van Aalten<br>(svanaalten@coleschotz.com)<br>Sarah A. Carnes<br>(scarnes@coleschotz.com) |

**REGER RIZZO & DARNALL LLP**

*/s/ Louis J. Rizzo, Jr., Esquire*
Louis J. Rizzo, Jr., Esquire (#3374)
Brandywine Plaza West
1521 Concord Pike, Suite 305
Wilmington, DE 19803
(302) 477-7100
*Attorney for Creditor, Blue Mountain Industrial Park, LLC*