# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) ) | Case No. 25-11454 (BLS) |
| Debtors. | ) ) ) ) | (Jointly Administered) |
|  | ) | **Re: Docket No. 688** |

## DECLARATION OF WILLIAM C. KOSTUROS IN SUPPORT OF (I) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF CLAIRE'S HOLDINGS LLC AND ITS DEBTOR AFFILIATES (TECHNICAL MODIFICATIONS)

I, William C. Kosturos, hereby declare under penalty of perjury:[2]

1. I am a Managing Director with Alvarez & Marsal North America, LLC (together with its wholly-owned subsidiaries and independent contractors and employees of its professional service provider affiliates, all of which are wholly-owned by its parent company and employees, "A&M"), a restructuring advisory services firm with numerous offices throughout the country.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343). The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the *First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Technical Modifications)* [Docket No. 688] (the "Plan"), the O*rder (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving (A) the Solicitation and Voting Procedures and (B) the Forms of Ballots and Notices in Connection Therewith, (III) Scheduling a Combined Hearing and Setting Related Dates and Deadlines, and (IV) Granting Related Relief* [Docket No. 416] (the "Conditional Disclosure Statement Order"), or the *Debtors' Memorandum of Law in Support of an Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Technical Modifications)* (the "Confirmation Brief"), filed concurrently herewith, as applicable.

2.  In my capacity as Managing Director, I am familiar with the Debtors' operations and business affairs, as well as the Debtors' sale and wind-down efforts. Accordingly, I am familiar with the terms of the Plan as well as its negotiation and development.

3.  Except as otherwise indicated, all matters set forth in this declaration (the "<u>Declaration</u>") are based upon (a) my personal knowledge of the Debtors' business, (b) information learned from my review of relevant documents, (c) information I received from the team at A&M or the Debtors' management team and other advisors, and (d) my experience as a restructuring professional. I am not being specifically compensated for this testimony other than through payments that are proposed to be received by A&M as in accordance with A&M's retention order [Docket No. 499].

## Background and Qualifications

4.  A&M is a preeminent restructuring consulting firm with extensive experience and an excellent reputation for providing high-quality, specialized management and restructuring advisory services to debtors and distressed companies. A&M provides a wide range of turnaround advisory services targeted at stabilizing and improving a company's financial position, including: (a) developing or validating forecasts, business plans, and related assessments of strategic position; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring packages. A&M is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization.

5.  I have more than 30 years of distressed company advisory experience. I have been involved in all aspects of numerous restructurings and have acted as, among other roles, Chief

Restructuring Officer, interim Chief Executive Officer, and Chief Financial Officer. My experience includes developing and negotiating solutions to complex capital structure issues, formulating and evaluating strategic business plans, developing and implementing turnaround strategies, and preparing forecast models and short- and long-term cash plans. My notable engagements include: SVB Financial Group; AIG Financial Products Corp.; Ascena Retail Group; Bed, Bath & Beyond; Toys "R" Us; Washington Mutual; Movie Gallery; Pacific Gas & Electric; Levi Strauss; Sunshine Biscuits; Hexcel Corporation; Unisil Corp.; Clothestime; and Spreckels Industries. I graduated with a bachelor's degree in accounting from the University of San Francisco.

6. The Debtors engaged A&M on May 2, 2025, to serve as their financial advisor in connection with any potential restructuring transaction, sale transaction, or capital raising transaction, including the Debtors and their non-Debtor operations. I understand that the Debtors chose A&M for these roles because of our expertise on issues relating to financially distressed companies and our extensive experience acting as an advisor in both in-court and out-of-court restructurings of companies of all sizes across a wide array of industries. A&M and its professionals have considerable experience advising debtors in chapter 11 cases and have been employed as an estate compensated professional in various capacities in numerous chapter 11 cases in this and other districts. From the outset of A&M's retention, I have worked closely with the Debtors' management team and other advisors to evaluate the Debtors' liquidity and cash needs in the event of a chapter 11 filing.

**General Background and the Development of the Plan**

7. The Debtors commenced these Chapter 11 Cases with the support of their Prepetition Secured Lenders for the continued use of cash collateral on a path forward to maximize

3

the value of the Debtors' Estates. To that end, the Debtors launched a dual-track path: initiating stores closing sales while pursuing a going-concern transaction. On August 18, 2025, the Debtors and AWS Claire's LLC ("Purchaser"), entered into an Asset Purchase Agreement, pursuant to which Purchaser acquired certain assets as set forth in the Asset Purchase Agreement, including as many as 975 of the Debtors' North American stores (the "Sale Transaction"). The Bankruptcy Court entered an order approving the Sale Transaction on September 10, 2025 and the Sale Transaction closed on September 18, 2025.

8. The Plan is the product of extensive, good-faith, arms-length negotiations among the Debtors, the Prepetition Secured Lenders, and the Committee, with all parties working towards a value-maximizing outcome. The Plan includes the terms of a global settlement reached in connection with the Sale Transaction among these parties (the "Committee Settlement") and is designed to bring these Chapter 11 Cases to an orderly, efficient conclusion in accordance with the distribution priorities set forth in the Plan and consistent with the Bankruptcy Code. I believe that the Plan maximizes stakeholder recoveries and is in the best interest of the Estates.

9. On August 19, 2025, the Debtors filed the initial version of the Plan [Docket No. 185]. After discussions and negotiations with various stakeholders, on September 8, 2025, the Debtors filed an amended version of the Plan [Docket No. 408] and a corresponding *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates* [Docket No. 412] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"). On September 10, 2025, the Debtors filed an amended, solicitation version of the Plan [Docket No. 429] and an amended, solicitation version of the Disclosure Statement [Docket No. 430].

10. On September 9, 2025, the Bankruptcy Court entered the Conditional Disclosure Statement Order that (a) conditionally approved the Disclosure Statement on an interim basis and established a schedule for Confirmation, (b) approved, on an interim basis, procedures for (i) the solicitation and tabulation of votes on the Plan and (ii) Holders of Claims in Non-Voting Classes to opt in to the Plan's Third-Party Release, all as more fully set forth in the Conditional Disclosure Statement Motion.

11. The Debtors served the solicitation packages (the "Solicitation Packages") on Holders of Claims entitled to vote on the Plan (the "Voting Classes") by September 15, 2025 in accordance with the Solicitation Procedures. The Solicitation Packages included: (a) a cover letter describing the contents of the Solicitation Package, providing a link to solicitation versions of the Plan, Disclosure Statement, and Conditional Disclosure Statement Order (without exhibits, except the Solicitation and Voting Procedures), and urging the Holders of Claims in the Voting Classes to vote to accept the Plan; (b) the Combined Hearing Notice; and (c) the applicable Ballot. Additionally, the Debtors served Holders of Claims in Non-Voting Classes with the Non-Voting Status Notices, which included links to the Disclosure Statement, Plan, Conditional Disclosure Statement Order, Combined Hearing Notice, Plan Supplement, Opt-In Form, and other related documents. The Debtors also served Opt-In Forms on all landlords in accordance with the Conditional Disclosure Statement Order. The Debtors also published the Combined Hearing Notice in *The New York Times* on September 11, 2025 [Docket No. 438].

12. On October 7, 2025, the Debtors filed the initial Plan Supplement [Docket No. 618] and on October 13, 2025, the Debtors filed the Second Plan Supplement [Docket No. 629].

13. On October 21, 2025, the Debtors filed: (a) the *First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Technical Modifications)*

[Docket No. 688], which sets forth technical and clarifying modifications and addresses certain informal objections to the Plan, including those raised by the U.S. Trustee and various landlords; (b) the Third Plan Supplement [Docket No. 690]; and (c) the *Declaration of Jeriad R. Paul With Respect to the Tabulation of Votes on the First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Technical Modifications)* [Docket No. 691] (the "Voting Report"), reflecting that Class 3, Prepetition Priority Term Loan Claims, and Class 4, Prepetition Existing Term Loan Claims voted to accept the Plan.

14. Concurrently with the filing of this Declaration, the Debtors filed the *Declaration of William L. Transier in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Technical Modifications)* (the "Transier Declaration"), reflecting the Special Committee's conclusion that the Debtor Release is reasonable and should be approved.

15. As discussed herein, I believe prompt Confirmation and Consummation of the Plan is in the best interests of the Debtors, their creditors, and all other parties in interest. Accordingly, I believe that the Bankruptcy Court should approve the Disclosure Statement on a final basis and confirm the Plan.

## Relevant Provisions of the Plan

16. I believe that the Plan is the product of extensive, good-faith, arms-length negotiations among the Debtors, the Prepetition Secured Lenders, and the Committee, with all parties working towards a value-maximizing outcome. The Plan includes the terms of the Committee Settlement and is designed to bring these Chapter 11 Cases to an orderly, efficient conclusion in accordance with the distribution priorities set forth in the Plan and consistent with the Bankruptcy Code. I believe that the Plan maximizes stakeholder recoveries and is in the best

interest of the Estates. In support of the Confirmation Brief, below I highlight some critical components of the Plan.

### I. The Plan's Classification of Claims and Interests Is Appropriate.

17. The Plan's classification of Claims and Interests places Claims and Interests into nine separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class based on legal or factual criteria or other relevant criteria.

18. Article III.A of the Plan provides for the separate classification of Claims and Interests as follows:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Prepetition Priority Term Loan Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Existing Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Equity Interests in Claire's | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

19. I believe each Class is composed of substantially similar Claims or Interests, and each instance of separate classifications of similar Claims and Interests was based on valid factual and legal reasons. No classification has been made for purposes of gerrymandering votes.

20. Further, dissimilar Claims and Interests are not classified together under the Plan. Generally speaking, the classification scheme follows the Debtors' capital structure. Debt and equity are classified separately, and secured debt is classified separately from unsecured debt. I believe that other aspects of the classification scheme reasonably recognize the different legal or factual nature of Claims or Interests.

21. For example, the classification scheme distinguishes Holders of Prepetition Priority Term Loan Claims (Class 3) from Prepetition Existing Term Loan Claims (Class 4) because of the different priorities underlying the Claims in each Class. General Unsecured Claims (Class 5) are separately classified because they have differing legal rights than the Debtors' secured funded debt creditors. Other Secured Claims (Class 1) and Other Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code. In each case, I believe there are valid reasons for separately classifying the various Classes of Claims and Interests created under the Plan. I understand the Plan classifies Claims and Interests based upon their different rights and attributes. Additionally, I believe each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.

## II. The Plan Is Fair and Equitable.

22. I believe that the Plan is fair and equitable to Holders of Claims and Interests in Classes 5 through 9, which were deemed to reject the Plan. Under the Plan, no holder of any junior Claim or Interest will receive or retain any property under the Plan on account of such junior Claim or Interest. To the extent that Intercompany Interests and Intercompany Claims are Reinstated under the Plan, distributions on account of Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Claims on account of their Intercompany Interests or Intercompany Claims but for the purposes of administrative convenience, for the ultimate benefit of all parties in interest. I believe that any Reinstatement of Intercompany Interests or Intercompany Claims will thus have no economic substance. Thus, the Plan structure is fair and equitable.

## III. The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate.

23. I understand that the Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision. I believe these discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, are supported by the Debtors and their key creditor constituents, including Class 3 (Prepetition Priority Term Loan Claims) and Class 4 (Prepetition Existing Term Loan Claims) and, as I have been advised, are consistent with applicable precedent. Further, I understand that these provisions were fully and conspicuously disclosed to all parties in interest through the Combined Hearing Notice, the Ballots, and the applicable Notice of Non-Voting Status, which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.

### a. The Debtor Release in the Plan Is Appropriate.[3]

24. I understand that Article VIII.B of the Plan provides for releases by the Debtors and their Estates of various Claims and Causes of Action, including any derivative claims, that the Debtors or their Estates or affiliates could assert against each of the Released Parties (the "Debtor Release"). I understand that the scope of the Debtor Release is tailored to exclude any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct. I understand that the Debtor Release was negotiated as part of the Plan and is an indispensable component to achieve final resolution of potential disputes

---

[3] As described in the Transier Declaration, the Special Committee, with the assistance of Katten, as independent legal counsel, conducted an investigation (the "Independent Investigation") into whether the Debtors or their estates held any potentially viable claims or causes of action that were worthy of pursuit or maintenance in the context of the Chapter 11 Cases, against the current officers and current and former directors of the Debtors (the "D&O Release Parties"). As set forth in the Transier Declaration, the Special Committee concluded that the Debtors' estates do not have any viable and valuable Claims against the D&O Release Parties.

that would otherwise negatively affect the Debtors' Estates and the recoveries available to creditors under the Plan.

25.  I believe that each Released Party has made a substantial contribution to the Debtors' Estates. The Released Parties not only expended significant time and resources analyzing and negotiating the terms of the DIP Order, the Sale Transaction, and the Plan, but also gave up economic interests to facilitate the Debtors' Chapter 11 Cases. For example, I understand that the Prepetition Secured Lenders provided valuable consideration by consenting to the Debtors' use of cash collateral. Additionally, the Prepetition Secured Lenders agreed to the Committee Settlement, which provides the General Unsecured Creditors with a recovery that they may not receive outside of the Plan, and the funding of the Wind-Down Reserve with the proceeds from the Sale Transaction. The Debtors' directors, officers, employees, professionals, and other agents who served in such capacity on or after the Petition Date have been involved in negotiating, formulating, and implementing the Sale Transaction and the Plan. I believe these measures, among others, provided the Debtors with access to the liquidity necessary to commence, and operate during, these Chapter 11 Cases, enabled the Debtors to consummate a value-maximizing Sale Transaction, and have allowed the Debtors to chart a path toward an orderly and cost-efficient wind-down on the terms set forth in the Plan.

26.  I believe that the Debtor Release is essential to the success of the Debtors' Plan because it is an integral term of the Plan. Absent the Debtor Release, I believe that the Debtors may not have been able to build the level of consensus with respect to the Plan and the transactions contemplated thereby. I further believe that the Debtor Release is the product of arm's-length and good-faith negotiations between the Debtors and their key stakeholders and is limited in scope.

27.    For these reasons, I believe that the Debtor Release is justified, a sound exercise of the Debtors' business judgment, and in the best interests of creditors and other stakeholders, as it is an integral part of the Plan.

### b.    The Third-Party Release Is Consensual.

28.    I understand that the Plan also provides for mutual releases by certain Holders of Claims and Interests.  Specifically, I understand that Article VIII.C of the Plan provides that each Releasing Party shall release any and all Claims and Causes of Action such parties could assert against the Released Parties (the "Third-Party Release"), with certain limited exceptions.  I believe the Third-Party Release is consensual and integral to the Plan and should therefore be approved.

29.    I believe that the Third-Party Release is also a core component of the negotiated Committee Settlement reflected in the Plan, and it was and is necessary to secure support for the Plan among the Prepetition Secured Parties and the Committee. I understand that it also brought key stakeholders to the table for negotiations around the Sale Transaction and the Plan, each of which contributed to the Debtors' success in these Chapter 11 Cases.  Absent these parties' support, I do not believe the Debtors would be able to confirm the Plan or consummate the Wind-Down Transactions.  Importantly, I understand the Third-Party Release only applies to parties who have (a) actively participated in the chapter 11 or Plan process, including in the formulation and negotiation of the Third-Party Release or (b) manifested their affirmative consent to the Third-Party Release.

30.    For the foregoing reasons, I believe the Third-Party Release should be approved.

### B.    The Exculpation Provision Is Appropriate.

31.    I understand that Article VIII.D of the Plan provides for the exculpation of the Exculpated Parties (the "Exculpation Provision").  I believe the exculpation is fair and appropriate

under the facts and circumstances of these Chapter 11 Cases. I believe that the Plan's Exculpation Provision is the product of good-faith, arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' major stakeholders. I believe the Exculpation Provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.

32.     The Exculpated Parties participated in formulating and negotiating the Plan, and I believe that they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties. I believe that the Debtors and their officers, directors, and professionals actively negotiated in good faith with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases. Such negotiations were extensive, and the resulting agreements and compromises were implemented in good faith with a high degree of transparency. As a result, the Plan is supported by all Voting Classes and the Committee. Furthermore, I understand that the exculpation is limited to claims arising from acts during these Chapter 11 Cases and does not extend beyond such time period. Accordingly, I believe the Bankruptcy Court's findings of good faith vis-à-vis the Chapter 11 Cases should also extend to the Exculpated Parties.

33.     In addition, I believe that the promise of exculpation played a significant role in facilitating Plan negotiations. I believe that all of the Exculpated Parties played a key role in negotiating, formulating, and implementing the Sale Transaction, the Disclosure Statement, the Plan, and related documents in furtherance thereof, which paved the way for a remarkable value-maximizing resolution of these Chapter 11 Cases. I believe that the Exculpated Parties may not have been inclined to participate in the plan process without the promise of exculpation.

Accordingly, I believe it is appropriate for the Bankruptcy Court to approve the Exculpation Provision, and to find that the Exculpated Parties have acted in good faith and in compliance with the law.

        **C.     The Injunction Provision Is Appropriate.**

34.     I understand that the injunction provision set forth in Article VIII.E of the Plan (the "Plan Injunction") merely implements the Plan's release and exculpation provisions by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Liquidating Trust, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action that are released, discharged, settled, or subject to the exculpation pursuant to the Plan.  Thus, I understand that the injunction provision is a key provision of the Plan because it enforces the release and exculpation provisions that are centrally important to the Plan.  Moreover, I understand that the Plan Injunction is narrowly tailored to achieve its purpose and consensual as to any party that did not specifically object to it.  I believe that the Plan Injunction is appropriate.

**IV.     The Plan Is in the Best Interests of Creditors and Interest Holders.**

35.     It is my understanding that section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accepts the Plan or (b) receives or retains property having a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code under the Plan.  I understand that this requirement is known as the "best interests" test.  I understand that the best interests test applies to each non-consenting member of an impaired class and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical

chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's chapter 11 plan.

36. To determine whether the Plan satisfies the best interests test, the Debtors, with the assistance of A&M and their other advisors, prepared a liquidation analysis, which is attached to the Disclosure Statement as Exhibit B (the "Liquidation Analysis"). The Liquidation Analysis estimates (a) the projected cash proceeds that a chapter 7 trustee would generate if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code on or around September 19, 2025 (the "Conversion Date") and the assets of each Debtor's Estates were liquidated and (b) the distribution that each Class of Allowed Claims or Interests would receive from the liquidation proceeds under the priority scheme dictated by the Bankruptcy Code. Such recoveries are then compared with the estimated recoveries to Holders of Allowed Claims and Interests under the Plan.

37. I oversaw the preparation of the Liquidation Analysis and worked closely with a team of A&M professionals in its development. The Liquidation Analysis was completed following due diligence performed by the A&M team, which included a review of the Debtors' books and records and discussions with the Debtors' management. The Liquidation Analysis is based on the Debtors' projected cash balance and assets as of the Conversion Date and the net costs to execute the administration of the wind down of the Estates. In addition, the Liquidation Analysis incorporates various estimates and assumptions that I believe are reasonable under the circumstances and are customarily used in chapter 11 cases similar to this one, including the projected costs associated with the administration of the estate and the support required to wind down the Debtors' operations in a hypothetical conversion to a chapter 7 liquidation.

38. Based on the Liquidation Analysis and as outlined in the table below, the Plan will provide Holders of Claims and Interests with a recovery that is not less than what they would otherwise receive if the Debtors' Estates were liquidated under Chapter 7. In particular, Classes 3 and 5 will recover more under the Plan than they would under a hypothetical chapter 7 liquidation, while the other Classes will recover no less than they would under a hypothetical chapter 7 liquidation. As such, I believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

| Class | Designation | Treatment | Claim Amount | Estimated Plan Recovery | Estimated Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | $- | 100% | 100% |
| 2 | Other Priority Claims | Unimpaired | $- | 100% | 100% |
| 3 | Prepetition Priority Term Loan Claims | Impaired | $124[4] | 36% | 6-23% |
| 4 | Prepetition Existing Term Loan Claims | Impaired | $515[4] | 0% | 0% |
| 5 | General Unsecured Claims | Impaired | $817 | 1-3% | 0% |
| 6 | Intercompany Claims | Unimpaired/ Impaired | $9,208 | 0% | 0% |
| 7 | Intercompany Interests | Unimpaired / Impaired | N/A | N/A | N/A |
| 8 | Equity Interests | Impaired | N/A | N/A | N/A |
| 9 | Section 510(b) Claims | Impaired | N/A | N/A | N/A |

## V. The Plan Is Feasible.

39. I understand that section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or further reorganization of the debtor or any successor thereto unless such liquidation or reorganization is proposed in the plan. Simply put, section 1129(a)(11) of the Bankruptcy Code requires a plan to be "feasible." I believe the Plan is feasible. I understand that, through the Plan, there will be an orderly liquidation and wind down of the Debtor's Estates and timely distributions to Holders of Allowed Claims in accordance with the Plan, the Bankruptcy Code, and applicable law. Rather than unnecessarily

---

[4] Prepetition Priority Term Loan and Prepetition Existing Term Loan Claims reflect principal and accrued interest amounts as of the Conversion Date.

elongate these cases through a conversion to chapter 7, the Plan provides closure and assurance that the assets of the Debtors will be distributed in an efficient and value maximizing manner subject to the Debtors' obligations under the Plan and without the need for any additional liquidity. Based on my review of the Debtors' financial information and the Plan, I believe the sources of considerations identified in Article IV of the Plan and the Wind-Down Memorandum filed with the Plan Supplement are sufficient to satisfy all of the Debtors' obligation and potential distributions under the Plan, including on account of all Allowed Administrative Claims and Allowed Priority Tax Claims. The Debtors have analyzed the Debtors' ability to maintain adequate liquidity to effectively wind down the Debtors' Estates and determined that, following the consummation of the Sale Transaction, the Debtors have adequate funds to fund the Wind-Down Transactions and establish the Liquidating Trust to make all distributions contemplated under the Plan. Accordingly, I believe that the Plan is feasible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 21, 2025

Respectfully submitted,

*/s/ William C. Kosturos*
William C. Kosturos
Managing Director
Alvarez and Marsal North America, LLC