**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MEMORANDUM OF
## LAW IN SUPPORT OF AN ORDER (I) APPROVING
## THE DEBTORS' DISCLOSURE STATEMENT ON A FINAL BASIS AND
## (II) CONFIRMING THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF CLAIRE'S
## HOLDINGS LLC AND ITS DEBTOR AFFILIATES (TECHNICAL MODIFICATIONS)

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Clint M. Carlisle (No. 7313)
Colin A. Meehan (No. 7237)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:          defranceschi@rlf.com
                heath@rlf.com
                shapiro@rlf.com
                carlisle@rlf.com
                meehan@rlf.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                allyson.smith@kirkland.com

- and -

Alexandra F. Schwarzman, P.C. (admitted *pro hac vice*)
Robert A. Jacobson (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          alexandra.schwarzman@kirkland.com
                rob.jacobson@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*          *Co-Counsel for the Debtors and Debtors in Possession*

Dated:  October 21, 2025

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343).  The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

## TABLE OF CONTENTS

Page(s)

Preliminary Statement.................................................................................................2

Background ...................................................................................................................3

I.     Procedural History...............................................................................................3

II.    The Independent Investigation. ..........................................................................6

III.   The Plan Solicitation and Notification Process. ................................................8

IV.   Confirmation Objections......................................................................................11

Argument ......................................................................................................................11

I.     The Disclosure Statement Contains "Adequate Information" as Required by
Section 1125 and 1126 of the Bankruptcy Code and Satisfies Notice
Requirements.......................................................................................................11

    A.    The Disclosure Statement Contains Adequate Information. ...................11

    B.    The Debtors Complied with Applicable Notice Requirements........................15

          1.    The Debtors Complied with the Notice Requirements Set Forth
in the Conditional Disclosure Statement Order and the
Bankruptcy Rules.................................................................................16

          2.    The Ballots Used to Solicit Holders of Claims Entitled to Vote
on the Plan Complied with the Conditional Disclosure
Statement Order....................................................................................16

          3.    The Debtors' Solicitation Period Complied with the
Conditional Disclosure Statement Order.............................................17

          4.    The Debtors' Tabulation Procedures Complied with the
Conditional Disclosure Statement Order.............................................17

          5.    Solicitation of the Plan Complied with the Bankruptcy Code
and Was in Good Faith..........................................................................18

II.    The Plan Satisfies Each Requirement for Confirmation. .............................................18

    A.    The Plan Complies with the Applicable Provisions of the Bankruptcy
Code (§ 1129(a)(1))......................................................................................19

| | | | |
|---|---|---|---|
| | 1. | The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. | 19 |
| | 2. | The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code. | 22 |
| B. | | The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)). | 25 |
| | 1. | The Debtors Complied with Section 1125 of the Bankruptcy Code. | 26 |
| | 2. | The Debtors Complied with Section 1126 of the Bankruptcy Code. | 27 |
| C. | | The Plan Was Proposed in Good Faith (§ 1129(a)(3)). | 29 |
| D. | | The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)). | 30 |
| E. | | The Debtors Have Complied with the Governance Disclosure Requirement (§ 1129(a)(5)). | 31 |
| F. | | The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). | 32 |
| G. | | The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). | 32 |
| H. | | The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. | 34 |
| I. | | The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). | 35 |
| J. | | At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)). | 38 |
| K. | | The Plan Is Feasible (§ 1129(a)(11)). | 38 |
| L. | | The Plan Provides for the Payment of Certain Statutory Fees (§ 1129(a)(12)). | 39 |
| M. | | No Remaining Retiree Benefits Obligations (§ 1129(a)(13)). | 40 |
| N. | | Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. | 40 |

O.      The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code..........................................................................41

    1.      The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1))...........................................................................41

    2.      The Plan Is Fair and Equitable (§ 1129(b)(2))...................................43

P.      The Plan Complies with the Remaining Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).........................................44

III.      The Discretionary Contents of the Plan Are Appropriate Under Section 1123(b) of the Bankruptcy Code............................................................45

    A.      The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code................................................47

        1.      The Debtor Release in the Plan Is Appropriate....................................47

        2.      The Consensual Third-Party Release Is Appropriate............................54

        3.      The Exculpation Provisions Are Appropriate.......................................59

        4.      The Injunction Provision Is Appropriate..............................................61

    B.      The Plan Complies with Section 1123(d) of the Bankruptcy Code.................62

    C.      Modifications to the Plan..................................................................62

IV.      The Mad River Objection Should Be Overruled.............................................64

V.      Good Cause Exists to Waive the Stay of the Confirmation Order.........................64

Conclusion .........................................................................................................65

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abbotts Dairies of Pa., Inc.,*
  788 F.2d 143, 150 n.5 (3d Cir. 1986)....................................................29

 *In re Accuride Corp.,*
  No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) .....................................56, 58, 59

*In re AeroCision Parent, LLC,*
  No. 23-11032 (KBO) (Bankr. D. Del. Mar. 4, 2024) ............................................56

*In re Aleris Int'l, Inc.,*
  2010 WL 3492664 (Bankr. D. Del. May 13, 2010)......................................25, 42

*In re Am. Solar King,*
  90 B.R. 808 (Bankr. W.D. Tex 1988) ....................................................63

*In re Ambanc La Mesa L.P.,*
  115 F.3d 650 (9th Cir. 1997) ...................................................41, 42

*In re Armstrong World Indus., Inc.,*
  348 B.R. 111 (D. Del. 2006)..................................................18, 42

*In re Aztec Co.,*
  107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................42

*Bank of Am. Nat. Trust & Savs. Ass'n v. 203 N. LaSalle St. P'ship,*
  526 U.S. 434 (1999)...................................................33, 43

*In re Boy Scouts of Am. & Del. BSA, LLC,*
  650 B.R. 87 (D. Del. 2023) ....................................................63

*In re Boy Scouts of Am.,*
  137 F.4th 126 (3d Cir. 2025) ...................................................18

*In re Burns & Roe Enters., Inc.,*
  No. 08-4191, 2009 WL 438694 (D.N.J. Feb. 23, 2009) ........................................63

*In re Century Glove Inc.,*
  1993 WL 239489 (D. Del. Feb. 10, 1993)..............................................30

*Century Glove, Inc. v. First Am. Bank of N.Y.,*
  860 F.2d 94 (3d Cir. 1988)............................................... *passim*

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986) .................................................................................31

*In re Chateaugay Corp.*,
10 F.3d 944 (2d Cir. 1993) ..........................................................................................20, 21

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) .................................................................19, 42, 48, 55

*In re Drexel Burnham Lambert Grp., Inc.*,
960 F.2d 285 (2d Cir. 1992) ...............................................................................................61

*In re Emerge Energy Servs. LP*,
No. 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) .............................56

*In re Enron Corp.*,
326 B.R. 497 (S.D.N.Y. 2005) ...........................................................................................61

*In re Exaeris, Inc.*,
380 B.R. 741 (Bankr. D. Del. 2008) ...................................................................................48

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) .....................................................................................49

*In re EXP OldCo Winddown, Inc.*,
No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) ......................................48, 56, 58, 59

*In re FAH Liquidating Corp.*,
No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) ............................................................59

*First Am. Bank of N.Y. v. Century Glove, Inc.*,
81 B.R. 274 (D. Del. 1988) ................................................................................................13

*In re Flintkote Co.*,
486 B.R. 139 (Bankr. D. Del. 2012) ..............................................................................38, 39

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) .............................................................................42

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988) .................................................................................30

*In re Glob. Safety Textiles Holdings LLC*,
No. 09-12234, 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) .......................................63

*Harrington v. Purdue Pharma L. P.*,
603 U.S. 204 (2024) ..........................................................................................................56

**Page(s)**

*In re Indianapolis Downs. LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013) .................................................50, 61

*In re ION Media Networks, Inc.*,
   419 B.R. 585 (Bankr. S.D.N.Y. 2009) .......................................................44

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987).....................................................................20

*In re JOANN Inc.*,
   No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025)................................56, 58, 59

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993).................................................................20, 41

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636, 649 (2d Cir. 1988)..........................................................38, 39

*In re Lab'y Partners, Inc.*,
   No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) ...............................59

*In re Lapworth*,
   1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998).....................................25

*In re Lernout & Hauspie Speech Prods., N.V.*,
   301 B.R. 651 (Bankr. D. Del. 2003) ..........................................................42

*In re Lisanti Foods, Inc.*,
   329 B.R. 491 (D.N.J. 2005) .................................................................13, 30

*In re Lucky Bucks*,
   No. 23-10758 (KBO) (Bankr. D. Del. July 28, 2023) ...............................56

*In re Mallinckrodt PLC*,
   639 B.R. 837 (Bankr. D. Del. 2022), *abrogated on other grounds by
   Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) ......................44

*In re Master Mortg. Inv. Fund, Inc.*,
   168 B.R. 930 (Bankr. W.D. Mo. 1994)...................................................49, 53

*In re Mercy Hosp.*,
   No. 23-00623, 2024 WL 2890139 (Bankr. N.D. Iowa June 7, 2024).....................53

*In re Metrocraft Pub. Servs., Inc.*,
   39 B.R. 567 (Bankr. N.D. Ga. 1984) .........................................................14

*In re Momentum Mfg. Corp.*,
   25 F.3d 1132 (2d Cir. 1994).......................................................................26

**Page(s)**

*In re Monnier Bros.*,
755 F.2d 1336 (8th Cir. 1985) ...........................................................12

*In re NII Holdings, Inc.*,
288 B.R. 356, 362 (Bankr. D. Del. 2002) .............................................29

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ....................................................19

*In re Nuverra Env't Sols., Inc.*,
590 B.R. 75 (D. Del. 2018)..............................................19, 41, 44

*In re Oldco Tire Distribs., Inc.*,
No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025)...........48, 56, 58, 59

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
848 F.2d 414 (3d Cir. 1988)...............................................................13

*In re PC Liquidation Corp.*,
383 B.R. 856 (E.D.N.Y. 2008) ...........................................................13

*In re Phx. Petrol., Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) .......................................12, 13, 14

*In re Premier Int'l Holdings, Inc.*,
No. 09-12019, 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010).........59

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ..................................................39

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)......................................................29, 59, 61

*In re River Village Assoc.*,
181 B.R. 795 (E.D. Pa. 1995) .............................................................13

*In re S&W Enter.*,
37 B.R. 153 (Bankr. N.D. Ill. 1984) ...................................................19

*In re Scioto Valley Mortg. Co.*,
88 B.R. 168 (Bankr. S.D. Ohio 1988)..................................................14

*In re Smallhold, Inc.*,
665 B.R. 704 (Bankr. D. Del. 2024) ...................................................55

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010) ...................................................49

*In re Spansion, Inc.*,
    No. 09-10690, 2010 WL 2905001 (Bankr. D. Del. Apr. 16, 2010)........................................59

*In re Stone & Webster, Inc.*,
    286 B.R. 532 (Bankr. D. Del. 2002) ....................................................................................33

*In re Sun Country Dev., Inc.*,
    764 F.2d 406 (5th Cir. 1985) .......................................................................................29, 30

*In re SunPower Corp.*,
    No. 24-11649 (CTG) (Bankr. D. Del. Oct. 18, 2024)...........................................................48

*In re T-H New Orleans Ltd. P'ship*,
    116 F.3d 790 (5th Cir. 1997) .......................................................................................29, 30

*In re Tonopah Solar Energy, LLC*,
    657 B.R. 393 (D. Del. 2022)...............................................................................................39

*In re Tribune*,
    464 B.R. 126 (Bankr. D. Del. 2011) ..................................................................................53

*In re Tupperware Brands Corp.*,
    No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025) .................................................56, 58, 59

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) ...............................................................................14

*In re Unichem Corp.*,
    72 B.R. 95 (Bankr. N.D. Ill. 1987) ....................................................................................12

*In re Virgin Orbit*,
    No. 23-10405 (KBO) (Bankr. D. Del. July 31, 2023) ..........................................................56

*In re Vyaire Med., Inc.*,
    No. 24-11217 (BLS) (Bankr. D. Del. Nov. 14, 2024) ...........................................................48

*In re W. Coast Video Enters., Inc.*,
    174 B.R. 906 (Bankr. E.D. Pa. 1994) .................................................................................55

*In re W.R. Grace & Co.*,
    475 B.R. 34, 87 (D. Del. 2012)...............................................................................30, 38, 39

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) .............................................................................49, 50

*In re WCI Cable, Inc.*,
    282 B.R. 457 (Bankr. D. Or. 2002)....................................................................................49

Page(s)

*In re Wheel Pros, LLC,*
  No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) ............................................48

*In re World Health Alts., Inc.,*
  344 B.R. 291 (Bankr. D. Del. 2006) ....................................................................48

*In re Zenith Elecs. Corp.,*
  241 B.R. 92 (Bankr. D. Del. 1999) ...................................................49, 50, 54

**Statutes**

11 U.S.C. Ch. 7 ...........................................................................................13, 33, 34

11 U.S.C. Ch. 11 ..................................................................................... *passim*

11 U.S.C. § 101(51D)(B) ...............................................................................45

11 U.S.C. § 101-1532 ......................................................................................1

11 U.S.C. § 365(b)(1) ....................................................................................62

11 U.S.C. § 365(f) ..........................................................................................64

11 U.S.C. § 502 ..............................................................................................27

11 U.S.C. § 503(b) .........................................................................................35

11 U.S.C. § 507(a)(1) .....................................................................................35

11 U.S.C. § 507(a)(2) ...............................................................................35, 39

11 U.S.C. § 507(a)(4) .....................................................................................35

11 U.S.C. § 507(a)(5) .....................................................................................35

11 U.S.C. § 507(a)(6) .....................................................................................35

11 U.S.C. § 507(a)(7) .....................................................................................35

11 U.S.C. § 507(a)(8) .....................................................................................35

11 U.S.C. § 1107(a) .........................................................................................3

11 U.S.C. § 1108 .............................................................................................3

11 U.S.C. § 1114 ...........................................................................................40

11 U.S.C. § 1122 .................................................................................. *passim*

**Page(s)**

11 U.S.C. § 1122(a) ............................................................................................. 19

11 U.S.C. § 1123 ............................................................................. 18, 19, 42, 62

11 U.S.C. § 1123(a) ............................................................................................ 22

11 U.S.C. § 1123(a)(1) ....................................................................................... 22

11 U.S.C. § 1123(a)(2) ....................................................................................... 22

11 U.S.C. § 1123(a)(3) ....................................................................................... 23

11 U.S.C. § 1123(a)(4) ....................................................................................... 23

11 U.S.C. § 1123(a)(5) .................................................................................. 23, 24

11 U.S.C. § 1123(a)(6) ....................................................................................... 24

11 U.S.C. § 1123(a)(7) .................................................................................. 24, 25

11 U.S.C. § 1123(b) ................................................................... 45, 46, 47, 60

11 U.S.C. § 1123(b)(1) ....................................................................................... 46

11 U.S.C. § 1123(b)(2) ....................................................................................... 46

11 U.S.C. § 1123(b)(3) ....................................................................................... 46

11 U.S.C. § 1123(b)(3)(A) ................................................................................. 48

11 U.S.C. § 1123(b)(4) ....................................................................................... 46

11 U.S.C. § 1123(b)(5) ....................................................................................... 46

11 U.S.C. § 1123(b)(6) ....................................................................................... 46

11 U.S.C. § 1123(d) ............................................................................................ 62

11 U.S.C. § 1125 ...................................................................................... *passim*

11 U.S.C. § 1125(a) ....................................................................................... 15, 26

11 U.S.C. § 1125(a)(1) ................................................................................... 12, 26

11 U.S.C. § 1125(b) ............................................................................................ 26

11 U.S.C. § 1125(c) ............................................................................................ 27

11 U.S.C. § 1125(e) ............................................................................................ 18

**Page(s)**

11 U.S.C. § 1126 ................................................................................ *passim*

11 U.S.C. § 1126(a) .................................................................................27, 28

11 U.S.C. § 1126(b)(2) ...................................................................................15

11 U.S.C. § 1126(c) ..........................................................................17, 29, 34

11 U.S.C. § 1126(f) ....................................................................... 9, 27, 28

11 U.S.C. § 1126(g) ............................................................................. 9, 28

11 U.S.C. § 1127 .............................................................................................63

11 U.S.C. § 1127(a) .......................................................................................62

11 U.S.C. § 1129 ................................................................................ *passim*

11 U.S.C. § 1129(a) ..............................................................................18, 41

11 U.S.C. § 1129(a)(1) ...................................................................................19

11 U.S.C. § 1129(a)(2) ..........................................................................25, 29, 60

11 U.S.C. § 1129(a)(3) ..........................................................................29, 30, 60

11 U.S.C. § 1129(a)(4) ..............................................................................30, 31

11 U.S.C. § 1129(a)(5) ..............................................................................31, 32

11 U.S.C. § 1129(a)(5)(A)(ii) .........................................................................31

11 U.S.C. § 1129(a)(6) ...................................................................................32

11 U.S.C. § 1129(a)(7) ..........................................................................32, 33, 34

11 U.S.C. § 1129(a)(8) ..........................................................................34, 38, 41

11 U.S.C. § 1129(a)(9) ..........................................................................35, 36, 37

11 U.S.C. § 1129(a)(9)(A) ........................................................................35, 36

11 U.S.C. § 1129(a)(9)(B) ........................................................................35, 36

11 U.S.C. § 1129(a)(9)(C) ........................................................................35, 37

11 U.S.C. § 1129(a)(10) ............................................................................38, 41

11 U.S.C. § 1129(a)(11) ............................................................................38, 39

**Page(s)**

11 U.S.C. § 1129(a)(12) ..................................................................................39, 40

11 U.S.C. § 1129(a)(13) ........................................................................................40

11 U.S.C. § 1129(a)(14) ........................................................................................40

11 U.S.C. § 1129(a)(15) ........................................................................................40

11 U.S.C. § 1129(a)(16) ........................................................................................40

11 U.S.C. § 1129(b) ........................................................................................ *passim*

11 U.S.C. § 1129(b)(1) ....................................................................................41, 42

11 U.S.C. § 1129(b)(2) ....................................................................................43, 44

11 U.S.C. § 1129(c) ........................................................................................44, 45

11 U.S.C. § 1129(d) ........................................................................................44, 45

11 U.S.C. § 1129(e) ........................................................................................44, 45

11 U.S.C. § 3017 ...................................................................................................16

28 U.S.C. § 1930 ............................................................................................39, 40

Securities Act of 1933, Section 5 (15 U.S.C. § 77e) ...................................45

**Rules**

Bankruptcy Rule 1015(b) .........................................................................................3

Bankruptcy Rule 3020(e) ......................................................................................64

Fed. R. Bankr. P. 3017 ..........................................................................................26

Fed. R. Bankr. P. 3018 ..........................................................................................26

Fed. R. Bankr. P. 3018(c) ......................................................................................16

Fed. R. Bankr. P. 3019 ..........................................................................................63

Fed. R. Bankr. P. 3020 ..........................................................................................64

Fed. R. Bankr. P. 3020(e) ......................................................................................64

Fed. R. Bankr. P. 6004 ..........................................................................................64

Fed. R. Bankr. P. 6004(h) ......................................................................................64

**Page(s)**

Fed. R. Bankr. P. 6006 .................................................................................................64

Fed. R. Bankr. P. 6006(d) ...........................................................................................64

Fed. R. Bankr. P. Rule 9019 .......................................................................................48

Local Rule 1015-1 ..........................................................................................................3

Local Rule 3017-1 .......................................................................................................16

**Other Authorities**

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) .......................19

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) .......................................................19

S. Rep. No. 95-989, *as reprinted in* 1978 U.S.C. C.A.N. 5787 (1978) ..................13, 19

S. Rep. No. 989, 95th Cong., 2d Sess. (1978) ............................................................25

## RELIEF REQUESTED

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law in support of (a) final approval of the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Solicitation Version)* [Docket No. 430] (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and (b) confirmation of the *First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Technical Modifications)* [Docket No. 688] (as may be further amended, modified, or supplemented from time to time, the "Plan"),[2] pursuant to sections 1125, 1126, and 1129, respectively, of the Bankruptcy Code.

In support of confirmation of the Plan, the Debtors have also filed the following contemporaneously herewith:  (a) *Declaration of William C. Kosturos in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of the First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Technical Modifications)* (the "Kosturos Declaration"); (b) *Declaration of William L. Transier in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Technical Modifications)* (the "Transier Declaration"); and (c) the *Declaration of Jeriad R. Paul with Respect to the Tabulation of Votes on the First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Technical Modifications)* (the "Voting Report," and

---

[2]    A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of Chris Cramer, Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Claire's Holdings LLC and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 27] (the "First Day Declaration") and the Disclosure Statement.  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

1

together with the Kosturos Declaration and the Transier Declaration, collectively, the "Declarations"). In further support of confirmation of the Plan and final approval of the Disclosure Statement, and in response to objections thereto, the Debtors respectfully state as follows:

**Preliminary Statement**

1.     The Debtors commenced these Chapter 11 Cases following a months-long prepetition sale and marketing process that had, as of the Petition Date, not yet produced an actionable bid for a going-concern sale transaction. As a result, the Debtors obtained relief at the first day hearing to commence a full-chain liquidation of the Debtors' business. In parallel, the Debtors continued to market a going-concern transaction. As a result of these efforts, the Debtors and their advisors negotiated, executed, and consummated a going-concern sale with AWS Claire's, LLC that preserves thousands of jobs, provides continued business to many of the Debtors' vendors and landlords, and will allow Claire's to continue as an iconic brand for years to come. The Debtors now look to bring this remarkably successful chapter 11 process to conclusion via final approval of the Disclosure Statement and confirmation of the Plan.

2.     The Plan incorporates the comprehensive, good-faith settlement reached in connection with the Sale Transaction between the Debtors' major stakeholders, including the Prepetition Priority Term Lenders, the Prepetition Existing Term Lenders, and the Committee (the "Committee Settlement"). The Committee Settlement provides, among other things, for the funding and maintenance of a Stub Rent Reserve and Section 503(b)(9) Claim Reserve, and the establishment of the Liquidating Trust. Reflective of the consensus reached between the parties, the Plan has been overwhelmingly accepted by creditors in the Voting Classes.

3.     The Plan provides for the distribution of the Distributable Proceeds pursuant to the priority waterfall set forth in the Plan and consistent with the Bankruptcy Code. The Plan provides

for an orderly liquidation of the Debtors' remaining assets and brings finality to these Chapter 11 Cases.

4.      In anticipation of the hearing to consider final approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing"), the Debtors worked, and continue to work, closely with their key stakeholders—including, the United States Trustee for the District of Delaware (the "U.S. Trustee"), numerous landlords, the Debtors' sureties, and other governmental authorities—to resolve their concerns with agreed-upon revisions to the Plan and Confirmation Order.  The Debtors have been in discussion with Mad River (defined below), the only party that has filed an objection to the Plan.  The Debtors believe that the issues outstanding can be resolved consensually and will work with Mad River to do so in advance of the Combined Hearing.

5.      Timely confirmation and consummation of the Plan will allow the Debtors to bring these Chapter 11 Cases to an orderly, value-maximizing conclusion.  For the reasons stated herein and in light of the evidentiary support to be offered at the Combined Hearing, the Plan and the Disclosure Statement satisfy all applicable provisions of the Bankruptcy Code.  Therefore, and as set forth more fully in this memorandum, the Plan should be confirmed, and the Disclosure Statement should be approved on a final basis.

## Background

### I.      Procedural History.

6.      On August 6, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  During these Chapter 11 Cases, the Debtors have operated their business and managed their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On August 7, 2025, the Court entered an order [Docket No. 79] authorizing the procedural consolidation and the joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  On August 15,

2025, the U.S. Trustee appointed the Committee [Docket No. 154], as subsequently amended on August 21, 2025 [Docket No. 216].  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

7.      As set forth above, the Debtors marketed their assets in an effort to achieve a going-concern sale transaction.  The Debtors did not receive any actionable going-concern bids as of the Petition Date despite the Debtors' extensive marketing efforts.  As a result, the Debtors sought and obtained relief to immediately begin closing all of their brick-and-mortar stores at the outset of these Chapter 11 Cases.  Importantly, however, the Debtors maintained the flexibility to stop the store closings in their business judgment (with the consent of the ABL Agent).

8.      On August 18, 2025, the Debtors executed an Asset Purchase Agreement with AWS Claire's LLC and ceased store closings of over 800 stores.  The Debtors subsequently obtained authorization to enter into the DIP Facility, which provided the Debtors with $22.5 million of incremental liquidity to restart inventory shipments and bridge to the closing of the Sale Transaction.  The Court entered the Sale Order on September 10, 2025 and the Sale Transaction closed on September 18, 2025.  In connection with the Sale Transaction, the Debtors released the Prepetition Secured Parties from any and all claims, causes of action, or demands of any nature held by the Debtors, subject to certain exceptions pending the outcome of the Independent Investigation (as defined herein).

9.      On August 19, 2025, the Debtors filed the *Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates* [Docket No. 185].  After discussions and negotiations with the Debtors' various stakeholders, including the Committee, the Prepetition Secured Parties, and the U.S. Trustee, the Debtors filed the (a) *Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates* [Docket No. 408] on September 8, 2025 and (b) *Disclosure*

*Statement for the First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates* [Docket No. 412], on September 9, 2025, which resolved informal concerns raised by such parties and, together with the Sale Order and DIP Order, incorporated the terms of the Committee Settlement.[3]

10.     On September 9, 2025, the Bankruptcy Court entered an amended order approving the Disclosure Statement on an interim basis and establishing a schedule for Confirmation [Docket No. 416] (the "Conditional Disclosure Statement Order").  The Conditional Disclosure Statement Order also approved, on an interim basis, procedures for (a) the solicitation and tabulation of votes on the Plan and (b) Holders of Claims or Interests not entitled to vote on the Plan  (collectively, the "Non-Voting Holders") to opt in to the Plan's Third-Party Release (collectively, the "Solicitation Procedures").  On September 15, 2025, the Debtors commenced solicitation of votes on the Plan.[4]

11.     On October 7, 2025, the Debtors filed with this Court the initial plan supplement [Docket No. 618] (the "Plan Supplement"), which includes the (a) Schedule of Assumed Executory Contracts and Unexpired Leases,[5] (b) Schedule of Retained Causes of Action, (c) Wind-Down Transactions Memorandum, (d) Identity of Liquidating Trustee, and (e) the Liquidating Trust Agreement.

---

[3]     The Debtors subsequently filed the *Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Solicitation Version)* [Docket No. 429] and *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Solicitation Version)* [Docket No. 430] on September 10, 2025.

[4]     *See Affidavit of Service* [Docket No. 527] (the "Solicitation Affidavit").

[5]     As updated on October 13, 2025 [Docket No. 629].

12.     Contemporaneously herewith, the Debtors filed the *First Amended Joint Chapter 11 Plan of Claire's Holdings LLC and Its Debtor Affiliates (Technical Modifications)*, which sets forth technical and clarifying modifications and addresses certain informal objections to the Plan, including those raised by the U.S. Trustee and various landlords. The deadline (a) to file objections to the Plan and final approval of the Disclosure Statement and (b) for all Holders of Claims entitled to vote on the Plan to cast their ballots was October 14, 2025, at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline").[6]

### II.     The Independent Investigation.

13.     Prior to the Petition Date, the board of managers of Claire's Holdings LLC (the "Board") appointed David Barse and William L. Transier as independent and disinterested managers (collectively, the "Independent Managers") to assist the Board in exploring, negotiating, evaluating, and executing potential strategic value-maximizing transactions. Contemporaneously with the appointment of the Independent Managers, the Board[7] formed a special committee consisting solely of the Independent Managers (the "Special Committee"). The scope of the Special Committee's authority included, among other things, (a) the authority to, on behalf of the entire Board and as it deems appropriate or desirable in its direction, take any action with respect to conflicts matters and (b) without limiting the authority of the Board other than with respect to

---

[6]     The Debtors extended the objection deadline for certain parties to October 15, October 17, and October 20, 2025, as applicable, at 4:00 p.m. (prevailing Eastern Time) and October 21, 2025 at 2:00 p.m. (prevailing Eastern Time). All related issues concerning these extensions were resolved prior to the filing of this memorandum.

[7]     On June 1, 2025, the Independent Managers were appointed to the boards of the following Debtor entities and were appointed to special committees of such boards: (i) Claire's Stores, Inc.; (ii) Claire's Puerto Rico Corp.; (iii) CBI Distributing Corp.; (iv) Claire's Boutiques, Inc.; (v) Claire's Canada Corp.; (vi) BMS Distributing Corp.; (vii) CSI Canada LLC; (viii) CLSIP Holdings LLC; (ix) CLSIP LLC; (x) Claire's Swiss Holdings LLC; and (xi) Claire's Swiss Holdings II LLC. On August 5, 2025, the Independent Managers were appointed to the board of Claire's (Gibraltar) Holdings Limited and were appointed to a special committee of such board.

conflicts matters, the authority to review, discuss, consider, negotiate, approve, and authorize the Company's entry into and consummation of a transaction.

14.     On July 23, 2025, at the sole direction of the Independent Managers, the Company engaged Katten Muchin Rosenman LLP ("Katten") as independent counsel to the Independent Managers to assist the Special Committee in, among other things, conducting an investigation to determine whether the Debtors or their estates hold any potentially viable claims or causes of action that are worthy of pursuit or maintenance in the context of the Chapter 11 Cases, against the Debtors' current or former directors, officers, shareholders, insiders, affiliates, lenders, and any other parties (including third parties) (the "Independent Investigation").    At the Special Committee's direction, Katten submitted more than fifty categories of diligence requests to the Company, seeking a broad range of documents and information relevant to the Independent Investigation, including board materials and minutes, corporate formation and governance documents, transaction documents, debt documents, and financial information.  The Company responded to all document and information requests, and Katten received and reviewed more than 1,000 documents from the Company.  At the Special Committee's direction, Katten also interviewed seven parties including current and former directors, officers, and advisors of the Company.  The Independent Investigation was extensive, and the Special Committee concluded that the Debtors' estates do not have any viable and valuable claims or causes of action against the current officers and current and former directors of the Debtors (the "D&O Release Parties") that would warrant the time, expense, and uncertainty associated with the prosecution or maintenance of such claims or causes of action.[8]

---

[8]     *See* Transier Declaration, ¶ 26.  Claims and Causes of Action against the Debtors' Former Officers, if any, are preserved as agreed to pursuant to the Committee Settlement.

### III.    The Plan Solicitation and Notification Process.

15.    The Debtors served the Solicitation Packages on Holders of Claims entitled to vote on the Plan by September 15, 2025, in accordance with the Solicitation Procedures.[9] The Solicitation Packages included:  (a) the Ballots; (b) the Cover Letter, including instructions to obtain access, free of charge, to the Plan, Disclosure Statement, and Conditional Disclosure Statement Order, and urging the Holders of Claims in the Voting Classes to vote to accept the Plan; (c) the Combined Hearing Notice.  Holders in the Non-Voting Classes received an applicable Notice of Non-Voting Status and an Opt-In Form related to the Plan's Third-Party Release in lieu of the Solicitation Package.[10]  Each Notice of Non-Voting Status and/or Opt-In Form included, among other things:  (a) instructions as to how to view or obtain copies of the Disclosure Statement, Plan, and related documents from the Claims and Noticing Agent; (b) an Opt-In Form by which all Holders or potential Holders of Claims or Interests can elect to opt in to the Third-Party Release contained in Article VIII of the Plan; (c) a disclosure regarding the releases and the settlement, release, exculpation, and injunction language set forth in Article VIII of the Plan; (d) notice of the Voting Deadline; and (e) information related thereto.  The Debtors also published the Combined Hearing Notice in *The New York Times* (national edition) on September 11, 2025, as evidenced by the *Certificate of Publication* [Docket No. 428].

16.    The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein applies separately to each of the Debtors.  For purposes of administrative convenience, the Plan consolidates the process by which distributions will be made under the Plan, but the Plan does not contemplate substantive consolidation.

---

[9]     *See* Solicitation Affidavit.

[10]    *See* Voting Report, ¶ 5.

17.    In compliance with the Bankruptcy Code and the Conditional Disclosure Statement Order, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.[11]  Holders of Claims and Interests were not entitled to vote if their rights are (a) Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code) or (b) Impaired and such Holders are not entitled to receive any distribution under the Plan (in which case such Holders were conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Accordingly, the following Classes of Claims and Interests were *not* entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Equity Interests in Claire's | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

18.    The Debtors solicited votes on the Plan only from Holders of Claims in Class 3 (Prepetition Priority Term Loan Claims) and Class 4 (Prepetition Existing Term Loan Claims). The deadline for all Holders of Claims entitled to vote on the Plan to cast their Ballots[12] was

---

[11]    *See* 11 U.S.C. § 1126.

[12]    The forms of ballots used in solicitation were included as Exhibit 3 and Exhibit 4, attached to the Conditional Disclosure Statement Order (the "Ballots").  Ballots were provided to holders of Prepetition ABL Claims (Class 3), Prepetition Priority Term Loan Claims (Class 4) and Existing Term Loan Claims (Class 5).  Following entry of the Disclosure Statement Order, all Prepetition ABL Claims were satisfied in full and, accordingly, the Class of Prepetition ABL Claims was removed from the Plan.  As a result, the Prepetition Priority Term Loan Claims and Prepetition Existing Term Loan Claims are now Classes 3 and 4, respectively.

October 14, 2025, at 4:00 p.m. (prevailing Eastern Time), and the deadline to object to confirmation of the Plan was October 14, 2025, at 4:00 p.m. (prevailing Eastern Time) (the "Confirmation Objection Deadline"). The Voting Classes overwhelmingly voted in favor of accepting the Plan. As reflected in the Voting Report, (a) 100% in number and 100% in amount of Holders of Claims in Class 3 voted in favor of confirmation of the Plan and (b) 96.97% in number and 99.93% in amount of Holders of Claims in Class 4 voted in favor of confirmation of the Plan.[13] Accordingly, the voting requirements of section 1126 of the Bankruptcy Code are satisfied.

19.    All Holders of Claims and Interests, regardless of whether they were entitled to vote on the Plan, had the opportunity to "opt in" to the Third-Party Release through their Ballots or Opt-In Forms, as applicable. The Debtors received 43 affirmative opt-ins.

20.    The Plan represents a significant achievement for the Debtors and is the direct result of extensive, good-faith negotiations with the Debtors' key stakeholders. The Plan will maximize the value of the Estates and maximize recoveries to Holders of Claims, as demonstrated by the Voting Classes' acceptance of the Plan. Because the Plan meets the requirements of section 1129(b) as described below, the Court should confirm the Plan over the Classes that were deemed to reject the Plan.

21.    The Combined Hearing is currently scheduled to start on October 29, 2025, at 2:00 p.m. (prevailing Eastern Time). The Debtors filed a proposed Confirmation Order substantially contemporaneously with the filing of this memorandum.

---

[13]    *See* Voting Report, Exhibit A.

**IV.     Confirmation Objections.**

22.     The Debtors received one formal limited objection to confirmation from Mad River Development, LLC [Docket No. 628] (the "Mad River Objection" filed by "Mad River"). The Debtors also received several informal comments from certain parties, including the Committee, the U.S. Trustee, certain of the Debtors' landlords, the Debtors' sureties, and certain governmental parties.  The Debtors believe that all informal comments received have been resolved, either by agreement or with the inclusion of agreed-upon language in the most recently filed Plan or in the Confirmation Order.  The Debtors reserve their rights to address all objections, if any, at the Combined Hearing.

<u>**Argument**</u>

23.     This memorandum is organized as follows:  ***First***, the Debtors present their case for approval of the Disclosure Statement on a final basis.  ***Second***, the Debtors present their case-in-chief that the Plan satisfies the applicable requirements of section 1129 of the Bankruptcy Code by a preponderance of the evidence and should therefore be confirmed.  ***Third***, the Debtors request that the Bankruptcy Court overrule the Mad River Objection.  ***Finally***, the Debtors assert that good cause exists to waive the stay of the Confirmation Order.

24.     For the reasons stated herein, and in light of the evidentiary support to be offered at the Combined Hearing and by the Declarations, the Debtors respectfully request that the Bankruptcy Court approve the Disclosure Statement on a final basis and confirm the Plan.

**I.     The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 and 1126 of the Bankruptcy Code and Satisfies Notice Requirements.**

**A.     The Disclosure Statement Contains Adequate Information.**

25.     Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed chapter 11 plan must provide "adequate information" regarding that plan to holders of impaired

claims and interests entitled to vote on the plan.  Specifically, section 1125(a)(1) of the Bankruptcy

Code provides, in relevant part, as follows:

> "[A]dequate information" means information of a kind, and in
> sufficient detail, as far as is reasonably practicable in light of the
> nature and history of the debtor and the condition of the debtor's
> books and records, including a discussion of the potential material
> Federal tax consequences of the plan to the debtor, any successor to
> the debtor, and a hypothetical investor typical of the holders of
> claims or interests in the case, that would enable such a hypothetical
> investor of the relevant class to make an informed judgment about
> the plan.[14]

26.     The primary purpose of a disclosure statement is to provide all material

information, or "adequate information," that allows parties entitled to vote on a proposed plan to

make an informed decision about whether to vote to accept or reject the plan.[15]  Congress intended

that such informed judgments would be needed to both negotiate the terms of, and vote on, a

chapter 11 plan.[16]

27.     "Adequate information" is a flexible standard, based on the facts and circumstances

of each case.[17]  Courts within the Third Circuit and elsewhere acknowledge that determining what

---

[14]    11 U.S.C. § 1125(a)(1).

[15]    *See, e.g.*, *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks
to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Monnier Bros.*, 755
F.2d 1336, 1342 (8th Cir. 1985) ("The primary purpose of a disclosure statement is to give the creditors the
information they need to decide whether to accept the plan."); *In re Phx. Petrol., Co.*, 278 B.R. 385, 392 (Bankr.
E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable
'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and
determine whether to vote in favor of or against that plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D.
Ill. 1987) ("The primary purpose of a disclosure statement is to provide all material information which creditors
and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for
or against the plan.").

[16]    *See Century Glove, Inc.*, 860 F.2d at 100 ("The necessity of 'adequate information' was intended to help creditors
in their negotiations.").

[17]    *See* 11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as
far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's

constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[18]  Accordingly, the determination of whether a disclosure statement contains adequate information must be made on a case-by-case basis, focusing on the unique facts and circumstances of each case.[19]

      28.    In determining whether a disclosure statement contains adequate information as required by section 1125 of the Bankruptcy Code, courts typically look for disclosures related to topics such as:

    a.   the events that led to the filing of a bankruptcy petition;

    b.   the relationship of the debtor with its affiliates;

    c.   a description of the available assets and their value;

    d.   the debtor's anticipated future performance;

    e.   the source of information stated in the disclosure statement;

    f.   the debtor's condition while in chapter 11;

    g.   claims asserted against the debtor;

    h.   the estimated return to creditors under a chapter 7 liquidation of the debtor;

---

books and records."); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of [section] 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources); S. Rep. No. 95-989, at 121 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5907 (stating that "the information required will necessarily be governed by the circumstances of the case").

[18]    *See, e.g.*, *In re River Village Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement."); *In re Phx. Petrol.*, 278 B.R. at 393 (noting the Bankruptcy Court's discretion in determining adequacy of disclosure statements).

[19]    *See In re Phx. Petrol.*, 278 B.R. at 393 (stating that an adequacy determination depends on various case-dependent factors); *In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes 'adequate information' in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court." (citation omitted)); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005) (stating that "[t]he information required will necessarily be governed by the circumstances of the case").

      i.   the future management of the debtor;

      j.   the chapter 11 plan or a summary thereof;

      k.   financial information, valuations, and projections relevant to a creditor's decision to accept or reject the chapter 11 plan;

      l.   information relevant to the risks posed to creditors under the plan;

      m.   the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;

      n.   litigation likely to arise in a non-bankruptcy context; and

      o.   tax attributes of the debtor.[20]

29.    The Disclosure Statement contains a number of categories of information that courts consider "adequate information," including, without limitation:

- ***The Debtors' Corporate History, Structure, and Business Overview***.  An overview of the Debtors' corporate history, business operations, organizational structure, and capital structure is described in Article V of the Disclosure Statement;

- ***Events Leading to the Chapter 11 Filings***.  An overview of the Debtors' out-of-court restructuring efforts in response to liquidity constraints and the events leading to such liquidity constraints are described in Article VI of the Disclosure Statement;

- ***Material Developments and Anticipated Events of the Chapter 11 Cases***. A summary of the course of events in the Chapter 11 Cases, including the sale process, is described in Article VII of the Disclosure Statement;

- ***Risk Factors***.  Certain risks associated with forward-looking statements and an overall disclaimer as to the information provided by and set forth in the Disclosure Statement, are described in Article VIII of the Disclosure Statement;

---

[20]   *See In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996); *see also In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (listing the factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).  Disclosure regarding all topics is not necessary in every case.  *In re U.S. Brass Corp.*, 194 B.R. at 425 ("Disclosure of all factors is not necessary in every case."); *see also In re Phx. Petrol.*, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

- ***Solicitation and Voting Procedures***.  A description of the procedures for soliciting votes to accept or reject the Plan and voting on the Plan is provided in Article IX of the Disclosure Statement;

- ***Confirmation of the Plan***.  Confirmation procedures and statutory requirements for confirmation and consummation of the Plan are described in Article X of the Disclosure Statement;

- ***Certain United States Federal Income Tax Consequences***.  A description of certain U.S. federal income tax law consequences of the Plan is provided in Article XI of the Disclosure Statement;

- ***Releases and Retained Causes of Action.***  A description of the Plan's release provisions is contained in Article IV.E of the Disclosure Statement, and a description of the Plan's details regarding the Liquidating Trust's establishment for commencing and pursuing the Retained Causes of Action and managing and administering any proceeds thereof, as appropriate, is provided in Article III.H of the Disclosure Statement; and

- ***Recommendation***.  A recommendation by the Debtors that Holders of Claims in the Voting Classes should vote to accept the Plan is included in Article XII of the Disclosure Statement.

30.    In addition, prior to solicitation, the Disclosure Statement and the Plan were subject to review and comment by various parties, including the Prepetition Secured Lenders, the DIP Lender, the Committee, and the U.S. Trustee.  Since interim approval of the Disclosure Statement on September 9, 2025, no party in interest has disputed that the Disclosure Statement contains information sufficient for Impaired Holders in Voting Classes to be able to cast an informed vote on the Plan.  For the reasons set forth above, the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code in satisfaction of section 1126(b)(2) and should be approved on a final basis.

**B.    The Debtors Complied with Applicable Notice Requirements.**

31.    The Debtors complied with the solicitation and Confirmation-related procedures and timeline approved by the Conditional Disclosure Statement Order, including all applicable notice requirements.

1.      **The Debtors Complied with the Notice Requirements Set Forth in the Conditional Disclosure Statement Order and the Bankruptcy Rules.**

32.      The Debtors satisfied the notice requirements set forth in the Conditional Disclosure Statement Order, Bankruptcy Rule 3017, and Local Rule 3017-1.  *First*, on or about September 15, 2025, the Debtors distributed the Solicitation Packages to Holders of Claims entitled to vote on the Plan as of the Voting Record Date and distributed applicable Notices of Non-Voting Status and Opt-In Forms to the Non-Voting Classes and counterparties to the Debtors' leases.[21]  *Second*, the Debtors caused the Publication Notice to be published in *The New York Times* on September 11, 2025.[22]  *Third*, the Combined Hearing Notice included instructions on how to obtain the Plan and the Disclosure Statement free of charge through the Debtors' restructuring website or for a fee at the Bankruptcy Court's PACER website.[23]

2.      **The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Conditional Disclosure Statement Order.**

33.      The forms of Ballots used comply with the Bankruptcy Rules and were approved on an interim basis by the Bankruptcy Court pursuant to the Conditional Disclosure Statement Order.[24]  No party has objected to the sufficiency of the Ballots.  Accordingly, the Debtors submit that they complied with the Conditional Disclosure Statement Order and satisfied the requirements of Bankruptcy Rule 3018(c).

---

[21]      *See* Solicitation Affidavit.

[22]      *See* Publication Affidavit.

[23]      *See* Combined Hearing Notice [Docket No. 426].

[24]      *See* Conditional Disclosure Statement Order, ¶ 8.

### 3. The Debtors' Solicitation Period Complied with the Conditional Disclosure Statement Order.

34.     The Debtors' solicitation period complied with the Conditional Disclosure Statement Order, Bankruptcy Code, Bankruptcy Rules, and Local Rules.  *First*, the Solicitation Packages, including instructions for accessing electronic or hard-copy versions of the Plan and Disclosure Statement, were transmitted to all Holders of Claims entitled to vote on the Plan.[25] ***Second***, the solicitation period, which lasted from September 15, 2025 through October 14, 2025, complied with the Conditional Disclosure Statement Order and was adequate under the facts and circumstances of these Chapter 11 Cases.[26]  Accordingly, the Debtors submit that the solicitation period complied with the Conditional Disclosure Statement Order.

### 4. The Debtors' Tabulation Procedures Complied with the Conditional Disclosure Statement Order.

35.     The Debtors request that the Bankruptcy Court find that the Debtors' tabulation of votes complied with the Conditional Disclosure Statement Order.  The Claims and Noticing Agent reviewed all Ballots received in accordance with the Solicitation and Voting Procedures approved pursuant to the Conditional Disclosure Statement Order.[27]  Accordingly, the Debtors respectfully submit that the Bankruptcy Court should approve the Debtors' tabulation of votes, confirming that the requisite Claims voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.

---

[25]     *See* Solicitation Affidavit.

[26]     *See* Conditional Disclosure Statement Order, ¶ 7; Solicitation Affidavit.

[27]     *See* Voting Report, ¶ 10.

### 5.    Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.

36.    Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of [title 11] . . . is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan."[28] As set forth in the Disclosure Statement and Disclosure Statement Motion, and as demonstrated by the Debtors' compliance with the Conditional Disclosure Statement Order, the Debtors at all times engaged in arm's-length, good-faith negotiations and took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code. Therefore, the Debtors respectfully request that the Bankruptcy Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II.    The Plan Satisfies Each Requirement for Confirmation.

37.    To confirm the Plan, the Bankruptcy Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[29] As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.

---

[28]    11 U.S.C. § 1125(e).

[29]    *See In re Boy Scouts of Am.*, 137 F.4th 126, 158 n.18 (3d Cir. 2025) ("To confirm a consensual reorganization plan, on the other hand, the debtor must carry its burden of satisfying § 1129(a)'s sixteen statutory requirements by a preponderance of evidence.  And those requirements increase when a debtor seeks to "cram down" a plan over the objection of a nonconsenting impaired class." (citing *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006))); *In re Armstrong*, 348 B.R. at 120, n.15 (applying the preponderance of the evidence standard).

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).**

38.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a chapter 11 plan, respectively.[30]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

**1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

39.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[31]  For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[32]  Instead, claims or interests designated to a particular class must be substantially similar to each other.[33]  Courts in this jurisdiction and others have recognized that plan proponents

---

[30]    S. Rep. No. 95-989, at 126 (1978), *as reprinted in* 1978 U.S.C. C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), *as reprinted in* 1978 U.S.C. C.A.N. 5963, 6368; *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

[31]    11 U.S.C. § 1122(a).

[32]    *See In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 96 (D. Del. 2018) ("Section 1122 of the [Bankruptcy] Code provides that claims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes." (quoting *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004))).

[33]    *Id.*

have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[34]

40.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into ten separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class based on legal or factual criteria or other relevant criteria.[35]  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

  a.     <u>Class 1</u>:  Other Secured Claims;

  b.     <u>Class 2</u>:  Other Priority Claims;

  c.     <u>Class 3</u>:  Prepetition Priority Term Loan Claims;

  d.     <u>Class 4</u>:  Prepetition Existing Term Loan Claims;

  e.     <u>Class 5</u>:  General Unsecured Claims;

  f.     <u>Class 6</u>:  Intercompany Claims;

  g.     <u>Class 7</u>:  Intercompany Interests;

  h.     <u>Class 8</u>:  Equity Interests in Claire's; and

  i.     <u>Class 9</u>:  Section 510(b) Claims.[36]

---

[34]   *Id.*  Courts have identified grounds justifying separate classification, including (a) where members of a class possess different legal rights and (b) where there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *see also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *accord In re Chateaugay Corp.*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis on account of the bankruptcy court-approved settlement).

[35]   *See* Plan, Art. III.

[36]   *Id.*

41.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in each such Class.[37]  In addition, valid legal and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[38]  Namely, the Plan separately classifies the Claims because each Holder of such Claims or Interests may hold (or may have held) rights in the Estates legally dissimilar to the Claims or Interests in other Classes.[39]

42.     For example, the classification scheme distinguishes Holders of Prepetition Priority Term Loan Claims (Class 3) from Prepetition Existing Term Loan Claims (Class 4) because of the different priorities underlying the Claims in each Class.  General Unsecured Claims (Class 5) are separately classified because they have differing legal rights than the Debtors' secured funded debt creditors.[40]  Other Secured Claims (Class 1) and Other Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code.[41]

43.     Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class, and the separation of Classes is based on valid factual and legal distinctions.  The Debtors submit that the

---

[37] *See* Kosturos Declaration, ¶ 19.

[38] *See id.*

[39] *See id.* ¶ 20.

[40] *See* Plan, Art. III.

[41] *See id*; *see also* Kosturos Declaration, ¶ 21.

Plan fully complies with and satisfies section 1122 of the Bankruptcy Code. No party has asserted otherwise.

> **2.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

44.      The seven applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan. The Plan satisfies each of these requirements.

> *(1)      Designation of Classes of Claims and Equity Interests (§ 1123(a)(1))*

45.      Section 1123(a)(1) of the Bankruptcy Code requires that the Plan designate "classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interest."[42]  For the reasons set forth above, Article III of the Plan properly designates classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[43]  No party has asserted otherwise.

> *(2)      Specification of Unimpaired Classes (§ 1123(a)(2))*

46.      Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."[44]  The Plan meets this requirement by identifying each Class that is Unimpaired.[45]  No party has asserted otherwise.

---

[42]    11 U.S.C. §1123(a)(1).

[43]    *See* Plan, Art. III.A.

[44]    11 U.S.C. §1123(a)(2).

[45]    *See* Plan, Art. III.A.

*(1)     Treatment of Impaired Classes (§ 1123(a)(3))*

47.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."[46] The Plan meets this requirement by setting forth the treatment of each Class that is Impaired.[47]  No party has asserted otherwise.

*(2)     Equal Treatment within Classes (§ 1123(a)(4))*

48.     Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[48]  The Plan satisfies this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.[49]  No party has asserted otherwise.

*(3)     Means for Implementation (§ 1123(a)(5))*

49.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[50]  The Plan, together with the documents and forms of agreement included in the Plan Supplement, provides a detailed blueprint for the transactions underlying the Plan, which are focused on an orderly Wind-Down of the Estates.

---

[46]   11 U.S.C. §1123(a)(3).

[47]   *See* Plan, Art. III.B.

[48]   11 U.S.C. § 1123(a)(4).

[49]   *See* Plan, Art. III.B.

[50]   11 U.S.C. § 1123(a)(5).

50.    Article IV of the Plan, in particular, sets forth the means for implementation of the Plan, which include, *inter alia*:  (a)  the provision of certain transition services to the Purchaser in connection with the Sale Transaction; (b) the establishment of the Liquidating Trust pursuant to the Liquidating Trust Agreement; (c) the Wind-Down Transactions; (d) the sources of consideration for Plan distributions and Waterfall Recovery; and (e) appointment of the Liquidating Trustee and the vesting of assets in the Liquidating Trust.[51]

51.    The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement. Accordingly, the Debtors believe that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code. No party has asserted otherwise.

### *(4)    Issuance of Non-Voting Securities (§ 1123(a)(6))*

52.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate documents prohibit the issuance of nonvoting equity securities.  Because the Debtors are not issuing any new securities under the Plan, section 1123(a)(6) of the Bankruptcy Code does not apply to the Plan.

### *(5)    Directors and Officers (§ 1123(a)(7))*

53.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[52] The Plan satisfies this requirement by providing for the deemed resignation of the Debtors'

---

[51]    *See* Plan, Art. IV.

[52]    11 U.S.C. §1123(a)(7).

directors and officers from their duties following the Effective Date.[53]  The Plan also provides for

the appointment of the Liquidating Trustee as the trustee and administrator of the Liquidating

Trust, established pursuant to the Plan, and that the Liquidating Trustee shall act as the exclusive

representative of the Estates for all purposes and as the sole officer and director of each of the

post-Effective Date Debtors in accordance with the terms of the Plan, the Plan Supplement, the

Liquidating Trust Agreement, and any orders of the Bankruptcy Court (and all certificates of

formation, membership agreements, and related documents are deemed amended by the Plan to

permit and authorize the same).[54]  Accordingly, the Plan satisfies section 1123(a)(7) of the

Bankruptcy Code.  No party has asserted otherwise.

### B.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

54.      The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which

requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[55]

The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to

encompass the disclosure and solicitation requirements set forth in section 1125 and the plan

acceptance requirements set forth in section 1126 of the Bankruptcy Code.[56]  As set forth herein,

the Debtors have complied with these provisions, including sections 1125 and 1126 of the

---

[53]   *See* Plan, Art. IV.I.

[54]   *See* Plan, Art. IV.G.

[55]   *See* 11 U.S.C. § 1129(a)(2).

[56]   *In re Lapworth*, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("The legislative history of section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 and 1126 of the Bankruptcy Code."); S. Rep. No. 989, 95th Cong., 2d Sess., at 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977).

Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by soliciting votes on the Plan in accordance with the Conditional Disclosure Statement Order.

### 1.     The Debtors Complied with Section 1125 of the Bankruptcy Code.

55.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a chapter 11 plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[57]  Section 1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding a debtor's condition so that they may make an informed decision whether to approve or reject the plan.[58]

56.     Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Bankruptcy Court approved the Disclosure Statement on a conditional basis in accordance with section 1125(a)(1).[59]  The Bankruptcy Court also conditionally approved the Solicitation Procedures and related materials.[60]  As stated above, the Debtors, through their Claims and Noticing Agent, complied with the requirements of the Conditional Disclosure Statement Order in connection with the solicitation process, thereby satisfying sections 1125(a) and (b) of the

---

[57]     11 U.S.C. § 1125(b).

[58]     *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[59]     *See generally* Conditional Disclosure Statement Order.

[60]     *See generally* Conditional Disclosure Statement Order.

Bankruptcy Code.[61]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code by making

the same Disclosure Statement available to all Holders of Claims or Interests.[62]

57.     Based on the foregoing, the Debtors submit that they have complied in all respects

with the solicitation requirements of section 1125 of the Bankruptcy Code and the Conditional

Disclosure Statement Order.

### 2.     The Debtors Complied with Section 1126 of the Bankruptcy Code.

58.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

a chapter 11 plan.  Specifically, under section 1126 of the Bankruptcy Code, only holders of

allowed claims and equity interests in impaired classes of claims or interests that will receive or

retain property under a plan on account of such claims or interests may vote to accept or reject

such plan.  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

(a)     The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan . . . .

(f)     Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g)     Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive any property under the plan on account of such claims or interests.[63]

---

[61]   *See* Solicitation Affidavit.

[62]   *See* Solicitation Affidavit.

[63]   11 U.S.C. § 1126(a), (f), (g).

59.     As set forth above, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Allowed Claims in Class 3 (Prepetition Priority Term Loan Claims) and Class 4 (Prepetition Existing Term Loan Claims).[64]   The Debtors did not solicit votes from Holders of Claims and Interests in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) because Holders of Claims in these Classes are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.[65]   Depending on their ultimate treatment, Holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) will be either conclusively presumed to accept or deemed to reject the Plan, and in either scenario are not entitled to vote on the Plan.[66]   Holders of Claims and Interests in Class 8 (Equity Interests in Claire's) and Class 9 (Section 510(b) Claims) will receive no distribution on account of their Claims or Interests and, pursuant to section 1126(g) of the Bankruptcy Code, are deemed to reject the Plan.[67]   Further, the Debtors waived their right to solicit votes from Holders of Claims in Class 5 (General Unsecured Claims) and treated such Claims as deemed to reject the Plan.[68]   Thus, pursuant to section 1126(a) of the Bankruptcy Code, only Holders of Claims in Classes 3 and 4 were entitled to vote to accept or reject the Plan.

---

[64]   *See* Solicitation Affidavit.

[65]   *See* Plan, Art. III.A-B.

[66]   *See* Plan, Art. III.A-B.

[67]   *Id*.

[68]   *Id.*

60. With respect to the Voting Classes, section 1126(c) of the Bankruptcy Code provides that a class accepts a plan where holders of claims holding at least two-thirds in amount and more than one-half in number of allowed claims voting in such class vote to accept such plan. The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[69] As set forth in the Voting Report, Class 3 (Prepetition Priority Term Loan Claims) and Class 4 (Prepetition Existing Term Loan Claims) overwhelmingly voted to accept the Plan. Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.[70] No party has asserted otherwise.

### C. The Plan Was Proposed in Good Faith (§ 1129(a)(3)).

61. Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[71] Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[72] To determine whether a plan seeks

---

[69] *See generally* Voting Report.

[70] *See* Voting Report, <u>Exhibit A</u>.

[71] 11 U.S.C. § 1129(a)(3).

[72] *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) ("[F]or purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986))); *see also In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002) ("[T]he Plan has been proposed with the legitimate purpose of reorganizing the business affairs of each of the Debtors and maximizing the returns available to creditors of the Debtors. Accordingly, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code."); *accord In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997) ("Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." (quoting *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985))).

relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[73]

62.     The Debtors negotiated, developed, and proposed the Plan in good faith, and the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  Throughout these Chapter 11 Cases, the Debtors worked to build consensus among their various stakeholders, as evidenced by, among other things, the Committee Settlement incorporated into the Plan.  The Plan and the process leading up to its formulation are the result of extensive, arm's-length negotiations among the Debtors, the Prepetition Secured Lenders, the Committee, and other parties in interest.[74] Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code. No party has asserted otherwise.

### D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).

63.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court as reasonable.  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Bankruptcy Court as to their reasonableness.[75]

---

[73]    *E.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) ("[A] determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal." (citing *In re Sun Country Dev., Inc.*, 764 F. 2d at 408)); *In re Century Glove, Inc.*, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ("The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." (citing *In re Sun Country Dev., Inc.*, 764 F.2d at 408)); *T-H New Orleans*, 116 F.3d at 802 (same).

[74]    *See* Kosturos Declaration, ¶ 8.

[75]    *See In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) (holding that fees

64.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.[76]  Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than sixty days after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Court.[77]  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.  No party has asserted otherwise.

### E.     The Debtors Have Complied with the Governance Disclosure Requirement (§ 1129(a)(5)).

65.     Section 1129(a)(5)(A)(ii) of the Bankruptcy Code requires the plan proponent to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan and that the appointment or continuation of such officers and directors be consistent with the interests of creditors and equity security holders and public policy.[78]

66.     The Plan satisfies section 1129(a)(5).  Article IV.G of the Plan provides for a Liquidating Trustee.  On the Effective Date, the authority, power, and incumbency of the persons

---

and expenses related to the plan are subject to the approval by the bankruptcy court); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[76]    *See* Plan, Art. II.

[77]    Plan, Art. II.B.

[78]    *See* 11 U.S.C. § 1129(a)(5)(A)(ii).

acting as directors and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such.  At that time, the Liquidating Trustee will be appointed as the sole director and sole officer of the post-Effective Date Debtors.[79]  The Plan provides that the Liquidating Trustee will act for the Estates by preserving and liquidating the Liquidating Trust Assets, preparing and filing all monthly operating reports due after the Effective Date and all post-confirmation reports as required by the U.S. Trustee, filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases, winding down and liquidating the Debtors' Estates, paying or otherwise satisfying Allowed Claims in accordance with the Waterfall Recovery, and any other responsibilities set forth under the Plan, Liquidating Trust Agreement, or an order of the Bankruptcy Court.[80]  Accordingly, the Plan fully complies with and satisfies all of the requirements of section 1129(a)(5) of the Bankruptcy Code.  No party has asserted otherwise.

F.    **The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

67.    Section 1129(a)(6) of the Bankruptcy Code requires that any rate change provided for in a plan be approved by or subject to the approval of all governmental regulatory commissions with jurisdiction, if any.  The Plan does not provide for any rate changes, and the Debtors are not subject to any such regulation.  Thus, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

G.    **The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

68.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder

---

[79]    *See* Plan, Art. IV.G.

[80]    *See* Plan, Art. IV.G.

of a claim or interest has either accepted the plan or will receive or retain property having a value of not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  The best interests test applies to individual dissenting holders of impaired claims or interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's chapter 11 plan.[81]

69.     The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.  As set forth in the Disclosure Statement[82] and the Kosturos Declaration, the Debtors believe that the Plan satisfies the best interests test because, among other things, the recovery to be available to Holders of Allowed Claims or Interests under the Plan—if any—will be not less than the recoveries expected to be available in a chapter 7 liquidation—if any.  Importantly, because this is a liquidating plan, creditors are receiving all of the remaining assets in the Debtors' estates, subject to the priority under the Bankruptcy Code.  In light of the minimal remaining assets and incremental costs of a liquidation, no party would be better off in a chapter 7 liquidation.[83]  Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

70.     Moreover, the Plan provides for the establishment of the Liquidating Trust, wherein the Liquidating Trust Assets will be distributed to the Beneficiaries in accordance with the

---

[81]    *See Bank of Am. Nat. Trust & Savs. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *see also In re Stone & Webster, Inc.*, 286 B.R. 532, 544–45 (Bankr. D. Del. 2002) ("The application of the best interest test involves a hypothetical application of chapter 7 to a chapter 11 plan.  A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders would receive in a 'hypothetical Chapter 7 distribution' to those classes." (citation omitted)).

[82]    *See* Disclosure Statement, <u>Exhibit B</u>.

[83]    *See id.*

Liquidating Trust Agreement.  The Liquidating Trust construct reflected in the Plan provides Holders of General Unsecured Claims with a potential recovery opportunity that they otherwise would not have in a chapter 7 liquidation.[84]  Specifically, pursuant to the settlement embodied in the Plan and the Sale Order, the Prepetition Priority Term Lenders and the Prepetition Existing Term Lenders agreed to, among other things, the Debtors funding the Liquidating Trust with $1.0 million of proceeds from the Sale Transaction after the payment of all Prepetition ABL Claims and contributing the Retained Causes of Action to the Liquidating Trust for the benefit of Holders of General Unsecured Claims.[85]  In light of the foregoing, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  No party has asserted otherwise.

### H.    The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

71.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  If not, the plan must satisfy the "cram down" requirements of section 1129(b) of the Bankruptcy Code with respect to the claims or interests in that class.[86]  Pursuant to section 1126(c) of the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in amount and more than one-half in number of the allowed claims voting in that class vote to accept the plan.

72.    As set forth above, Classes 3 and 4 were each Impaired and each voted to accept the Plan.  As such, there is an Impaired consenting Class that affirmatively voted to accept the Plan.  Holders of Claims and Interests in Classes 6 and 7 are presumed to accept or deemed to

---

[84]    *Id.*

[85]    *See* Plan, Art. I.A.137, 146, 154; Plan, Art. III.B.6; Plan, Art. IV.F.

[86]    11 U.S.C. § 1129(b).

reject the Plan, as applicable.  Holders of Claims and Interests in Classes 5, 8, and 9 are Impaired, were not entitled to vote, and are deemed to reject the Plan.[87]  Notwithstanding such deemed rejections, the Debtors meet the requirements of section 1129(b) of the Bankruptcy Code to "cram down" these rejecting classes.

I.      **The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

73.      Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code— administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

---

[87]    *Id.*

74.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim will receive payment in an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim (or as soon as reasonably practicable thereafter), without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Liquidating Trustee, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that any Allowed Administrative Claim (other than a Professional Fee Claim) that is an Assumed Liability under the Transaction Documents shall be an obligation of the Purchaser and shall not be an obligation of the Debtors.[88]

75.     ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Allowed Claims specified by 1129(a)(9)(B) are Impaired under the

---

[88]     *See* Plan, Art. II.A.

Plan.[89]  More specifically, under Article III.B of the Plan, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on or as soon as reasonably practicable after the later to occur of (a) the Effective Date and (b) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.[90]

76.    ***Third***, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that to the extent that an Allowed Priority Tax Claim was not otherwise paid during the Chapter 11 Cases, assumed and paid as an Assumed Liability under the applicable Transaction Documents, or the Holder thereof agrees to a less favorable treatment, in full and final satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that any Allowed Priority Tax Claim that is not an Assumed Liability under any Transaction Documents shall be satisfied solely from the Wind-Down Reserve.[91]  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.  No party has asserted otherwise.

---

[89]    *See Id.*

[90]    *See* Plan, Art. III.C.

[91]    *See* Plan, Art. II.C.

**J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

77.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.   As detailed herein and in the Voting Report, Holders of Claims in the Voting Classes—which are each an Impaired Class under the Plan—voted to accept the Plan, independent of any insiders' votes.[92]   Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.     The Plan Is Feasible (§ 1129(a)(11)).**

78.     Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.   Specifically, the Bankruptcy Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[93] To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[94]

---

[92]     *See* Voting Report, Exhibit A.

[93]     11 U.S.C. § 1129(a)(11).

[94]     *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012) (stating that the bankruptcy court "need not require a guarantee of success" (citations omitted) (internal quotation marks omitted)); *In re W.R. Grace & Co.*, 475 B.R. at 115 (same); *accord Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.   Success need not be guaranteed.").

Rather, a debtor must provide only a reasonable assurance of success.[95]  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[96]

79.    Here, the Plan contemplates the implementation of the Wind-Down Transactions and orderly liquidation and monetization of Liquidating Trust Assets by the Liquidating Trustee, with proceeds being distributed pursuant to the Plan.  As set forth in the Kosturos Declaration, the Debtors have sufficient funds to implement and complete the Wind-Down Transactions and make all distributions contemplated by the Plan.[97]  Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(11) of the Bankruptcy Code. No party has asserted otherwise.

### L.    The Plan Provides for the Payment of Certain Statutory Fees (§ 1129(a)(12)).

80.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[98]  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.[99]

---

[95]    *Kane*, 843 F.2d at 649; *In re Flintkote Co.*, 486 B.R. at 139; *In re W.R. Grace & Co.*, 475 B.R. at 115.

[96]    *See, e.g.*, *In re Tonopah Solar Energy, LLC*, 657 B.R. 393, 410 (D. Del. 2022) ("As Debtor correctly notes, [plan feasibility] is a low threshold."); *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) ("The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." (internal citation omitted)).

[97]    *See* Kosturos Declaration, ¶ 39.

[98]    11 U.S.C. § 1129(a)(12).

[99]    11 U.S.C. § 507(a)(2).

81.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XII.C of the Plan provides that all Quarterly Fees due and payable pursuant to section 1930 of Title 28 of the Judicial Code before the Effective Date shall be paid by the Debtors.  After the Effective Date, to the extent applicable, the Liquidating Trustee shall be liable to pay any and all Quarterly Fees when due and payable and shall file with the Bankruptcy Court UST Form 11-PCR reports when they become due.[100]    Accordingly, the Plan complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.  No party has asserted otherwise.

**M.     No Remaining Retiree Benefits Obligations (§ 1129(a)(13)).**

82.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).    Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.

**N.     Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

83.     Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.    Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the Debtors are a moneyed, business, or commercial corporation and, therefore, section 1129(a)(16)

---

[100]    *See* Plan, Art. XII.C.

40

of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of non-bankruptcy law, is not applicable to these Chapter 11 Cases.

**O.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

84.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[101]  Notwithstanding the fact Classes 5, 8, and 9, and, potentially, Classes 6 and 7, are deemed to have rejected the Plan, the Plan is confirmable because it complies with sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

**1.     The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)).**

85.     The Plan does not unfairly discriminate with respect to Classes 5, 6, 7, 8, and 9. Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[102]  In general, courts have held that a plan unfairly discriminates in

---

[101]     *John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("[T]he Plan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the Plan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the Plan.").

[102]     *In re Nuverra Env't Sols.*, 590 B.R. 75, 93 (D. Del. 2018), *aff'd on equitable mootness grounds*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("As unfair discrimination is not defined in the Bankruptcy Code,

violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[103]  A threshold inquiry to assessing whether a proposed chapter 11 plan unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[104]

86.    Here, the Plan's treatment of the non-accepting Impaired Classes is proper because all similarly situated Holders of Claims and Interests at each applicable Debtor will receive substantially similar treatment, and the Plan's classification scheme rests on a legally acceptable rationale, including in relation to their priority within the Debtors' capital structure, their differing legal nature, and their respective rights against the Debtors.  Claims in each of the non-accepting Impaired Classes are not similarly situated to those of any other Classes, given their distinctly different legal character from all other Claims and Interests.  Accordingly, the Plan does not discriminate unfairly with respect to Classes 5, 6, 7, 8, or 9, who are deemed or are potentially

---

courts must examine the facts and circumstances of the particular case to determine whether unfair discrimination exists."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[103]    *See In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *accord In re Ambanc La Mesa*, 115 F.3d at 656–57 (same).

[104]    *See In re Aleris Int'l*, No. 09-10478, 2010 WL 3492664, at *31 (Bankr. D. Del. May 13, 2010) ("[S]ection 1129(b) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes." (citation omitted)); *In re Armstrong World Indus.*, 348 B.R. at 122 ("A finding that all classes of the same priority will receive the identical amount under the proposed Plan is not necessary to find that the Plan does not discriminate. . . . [T]he presumption of unfair discrimination only arises if the dissenting class would receive a 'materially lower' percentage recovery or will have a 'materially greater risk' in connection with the distribution." (citation omitted)).

deemed to reject the Plan, or for whom the Debtors waived their rights to solicit votes on the Plan, and, therefore, satisfies the requirements of section 1129(b).

### 2. The Plan Is Fair and Equitable (§ 1129(b)(2)).

87. A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[105] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[106]

88. Here, the Plan is "fair and equitable" to Holders of Claims and Interests in those Classes that were deemed to reject the Plan because the Plan satisfies the absolute priority rule with respect to each of these non-accepting Impaired Classes. Specifically, no holder of any junior Claim or Interest will receive or retain any property under the Plan on account of such junior Claim or Interest, except to the extent any Holder of a Claim or Interest has agreed to a different treatment or recovery under the terms of the Committee Settlement.[107] With respect to Class 5 (General Unsecured Claims), (a) its recovery from the Trust GUC Assets under the Plan is the result of a negotiated resolution with the Debtors' Prepetition Secured Lenders and (b) if the Class receives any Distributable Proceeds from the Waterfall Recovery, such recovery will only be after all senior Classes have been paid in full. Moreover, all Classes senior to Class 5 are Unimpaired or have

---

[105] *Bank of Am. Nat. Trust & Savs. Ass'n*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property[.]' That latter condition is the core of what is known as the 'absolute priority rule.'" (citations omitted)).

[106] *See id.*

[107] Kosturos Declaration, ¶ 22; *see generally* Plan, Art. III.

voted in favor of the Plan.[108]  In light of this, the Plan structure is fair and equitable and does not violate the absolute priority rule.

89.     In addition, to the extent that Intercompany Interests and Intercompany Claims are Reinstated under the Plan, distributions on account of Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Claims on account of their Intercompany Interests or Intercompany Claims but for the purposes of administrative convenience, for the ultimate benefit of all parties in interest.  Any Reinstatement of Intercompany Interests or Intercompany Claims will thus have no economic substance.[109] Accordingly, the Plan is "fair and equitable" with respect to all non-accepting Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

90.     For the foregoing reasons, and further supported by the lack of objections on any grounds related to Section 1129(b)(2), the Plan can be crammed down on the non-consenting Impaired Classes.

**P.     The Plan Complies with the Remaining Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).**

91.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  *First*, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple

---

[108]   Recoveries gifted to junior classes by senior classes, such as those provided by the Trust GUC Assets due to a resolution with Holders of Claims in Classes 3 and 4, have long been permitted in this District.  *See, e.g.*, *In re Mallinckrodt PLC*, 639 B.R. 837, 903 (Bankr. D. Del. 2022), *abrogated on other grounds by Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) (confirming a plan which provided for gifted recovery to structurally junior creditors); *In re Nuverra*, 590 B.R.at 94 (confirming a plan which provided for gifted recovery where no objecting more senior class was skipped over).

[109]   *See In re ION Media Networks, Inc.*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan. The Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure.").

plans, is not implicated because there is only one proposed plan. ***Second***, the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[110]   Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.  As provided in the Kosturos Declaration, the Plan was proposed in good faith and not by any means forbidden by law.[111]  ***Lastly***, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' Chapter 11 Cases are a "small business case."[112]  Accordingly, the Plan satisfies the requirements of section 1129(c), (d), and (e) of the Bankruptcy Code.  No party has asserted otherwise.

### III.   The Discretionary Contents of the Plan Are Appropriate Under Section 1123(b) of the Bankruptcy Code.

92.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the assumption or rejection of executory contracts and unexpired leases; (e) provide for the sale of all or substantially all of the property of the debtor's estates, and the distribution of

---

[110]   *See* 15 U.S.C. § 77e.

[111]   *See* Kosturos Declaration, ¶ 16.

[112]   *See* 11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $3,424,000 (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101(51D)(B).

the proceeds of such sale among holders of claims or interests; or (f) include any other appropriate provision not inconsistent with the Bankruptcy Code.[113]

93.     As set forth below, the Plan includes certain of these discretionary provisions, such as releases and general settlement of certain Claims and Interests.  The Debtors have determined, as fiduciaries of their Estates and in the exercise of their reasonable business judgment, that each of the discretionary provisions of the Plan is appropriate given the circumstances of these Chapter 11 Cases.

94.     Here, the Plan includes various discretionary provisions that are consistent with the discretionary authority vested under section 1123(b) of the Bankruptcy Code.  For example, the Plan impairs certain Classes of Claims and Interests and leaves others Unimpaired, proposes treatment for Executory Contracts and Unexpired Leases, provides a structure for Claim allowance and disallowance, establishes a distribution process for the satisfaction of Allowed Claims entitled to distributions under the Plan.  In addition, the Plan contains provisions implementing certain releases and exculpations, and permanently enjoining certain causes of action.

95.     Each of these provisions is appropriate because, among other things, each is the product of arm's-length negotiations and has been critical to obtaining the support of the various constituencies for the Plan.  Such provisions are discussed in turn below but, in summary, satisfy the requirements of section 1123(b).[114]

---

[113]   *See* 11 U.S.C. § 1123(b)(1)–(6).

[114]   *See* Kosturos Declaration, ¶ 16.

A. **The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

96. The Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision. These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, are supported by the Debtors and their key creditor constituents (including Class 3 (Prepetition Priority Term Loan Claims) and Class 4 (Prepetition Existing Term Loan Claims)), and are consistent with applicable precedent. Further, these provisions were fully and conspicuously disclosed to all parties in interest through the Combined Hearing Notice, the Ballots, and the applicable Notice of Non-Voting Status, which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.

1. **The Debtor Release in the Plan Is Appropriate.**

97. Article VIII.B of the Plan provides for releases by the Debtors and their Estates of various Claims and Causes of Action, including any derivative claims, that the Debtors or their Estates or affiliates could assert against each of the Released Parties (the "Debtor Release").[115] The scope of the Debtor Release is tailored to exclude any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful

---

[115] Article I.A.124 of the Plan defines "Released Parties" as, collectively, and in each case, solely in their respective capacities as such: (a) the Debtors; (b) the Liquidating Trustee; (c) the Prepetition ABL Lenders; (d) the Prepetition Priority Term Loan Lenders; (e) the Prepetition Existing Term Loan Lenders; (f) the Prepetition ABL Agent; (g) the Prepetition Priority Term Loan Agent (including any predecessor agent); (h) the Prepetition Existing Term Loan Agent (including any predecessor agent); (i) the Initial Term Loan Agent; (j) the Releasing Parties; (k) each current and former Affiliate of each Entity in clause (a) through (j); and (l) each Released Party of each Entity in clause (a) through (k); *provided* that, notwithstanding the foregoing, the Released Parties shall not include the Former Officers.

misconduct.[116]   The Debtor Release meets the applicable business judgment standard because it is fair, reasonable, and in the best interests of the Debtors' Estates, the product of extensive arm's-length negotiations, and was critical to obtaining support for the Plan.[117]   Indeed, the Debtor Release was negotiated as part of the Plan and is an indispensable component to achieve final resolution of potential disputes that would otherwise negatively affect the Debtors' Estates and the recoveries available to creditors under the Plan.   Further, the scope of the Debtor Release is consistent with those regularly approved in this district.[118]

98.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[119]   Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair,

---

[116]   *See* Plan, Art. VIII.B; *see also* Transier Declaration, ¶ 31.

[117]   *See* Kosturos Declaration, ¶¶ 24–27; *see also* Transier Declaration, ¶¶ 27–32.

[118]   *See In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (confirming a chapter 11 plan including a similar scope of debtor releases); *In re EXP OldCo Winddown, Inc.*, No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. Nov. 14, 2024) (same); *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Oct. 18, 2024) (same); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (same).

[119]   *See Coram*, 315 B.R. at 334–35 ("The standards for approval of a settlement under section 1123 [of the Bankruptcy Code] are generally the same as those under [Bankruptcy] Rule 9019.").   Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."   *Id.* at 334 (internal citations omitted); *e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746 (Bankr. D. Del. 2008); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be "within the reasonable range of litigation possibilities" (internal quotation marks omitted)).

reasonable, and in the best interests of the estate."[120]   In determining whether a debtor release is

proper, courts in this jurisdiction and elsewhere generally may consider the following five factors:

a.    whether the non-debtor has made a substantial contribution to the debtor's reorganization;

b.    whether the release is essential to the debtor's reorganization;

c.    whether there is an agreement by a substantial majority of creditors to support the release;

d.    whether there is an identity of interest between the debtor and the third party; and

e.    whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[121]

Not all of the above factors need to be satisfied for a court to approve a debtor release.[122]

99.    The Debtor Release should be approved because, among other things, the Special

Committee determined, following the Independent Investigation, that the Debtors' estates do not

have any viable and valuable Claims against the D&O Release Parties, and the Debtor Release

satisfies the *Zenith* factors.

100.    As described in the Transier Declaration, the Special Committee, with the

assistance of Katten, as independent legal counsel, conducted the Independent Investigation to

---

[120]    *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"); *accord In re WCI Cable, Inc.*, 282 B.R. 457, 469 (Bankr. D. Or. 2002) ("A debtor-in-possession has the burden of proof by a preponderance of the evidence to establish that a proposed settlement is reasonable, adequate, fair and equitable.").

[121]    *See, e.g., In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re Spansion, Inc.*, 426 B.R. at 143 n.47 (citing the *Zenith* factors).

[122]    *See, e.g., In re Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness.") (internal citation omitted); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

determine whether the Debtors or their estates hold any potentially viable claims or causes of action that are worthy of pursuit or maintenance in the context of the Chapter 11 Cases, against the Debtors' current or former directors, officers, shareholders, insiders, affiliates, lenders, and any other parties.[123]  At the Special Committee's direction, Katten submitted more than fifty categories of diligence requests to the Company, seeking documents and information relevant to the Independent Investigation.[124]  Katten also interviewed seven parties including current and former directors, officers, and advisors of the Company.[125]   After investigation, analysis, and due deliberation, the Special Committee concluded that the Debtors' estates do not have any viable and valuable Claims against the D&O Release Parties.[126]

101.    Additionally, the Debtor Release satisfies the *Zenith* factors.  **First**, each Released Party has made a substantial contribution to the Debtors' Estates.  Delaware bankruptcy courts have recognized that a wide variety of acts may illustrate a substantial contribution to a debtor's estate.[127]  The Released Parties not only expended significant time and resources analyzing and negotiating the terms of the DIP Order, the Sale Transaction, and the Plan, but also gave up economic interests to facilitate the Debtors' Chapter 11 Cases.  For example, the Prepetition

---

[123]    *See* Transier Declaration, ¶¶ 14–15.

[124]    *See id.* ¶ 23.

[125]    *See id.*

[126]    *See id.* ¶ 26.

[127]    *See In re Indianapolis Downs. LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *In re Wash. Mut., Inc.*, 442 B.R. at 348 (finding substantial contribution required the contribution of "cash or anything else of a tangible value to the [chapter 11 plan] or to creditors"); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (finding that directors' and officers' prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release).

Secured Lenders provided valuable consideration by consenting to the Debtors' use of cash collateral.[128]   Additionally, the Prepetition Secured Lenders agreed to the Committee Settlement, which provides the General Unsecured Creditors with a recovery that they may not receive outside of the Plan, and the funding of the Wind-Down Reserve with the proceeds from the Sale Transaction.[129]   The Debtors' directors, officers, employees, professionals, and other agents who served in such capacity on or after the Petition Date have been involved in negotiating, formulating, and implementing the Sale Transaction and the Plan.  These measures, among others, provided the Debtors with access to the liquidity necessary to commence, and operate during, these Chapter 11 Cases, enabled the Debtors to consummate a value-maximizing Sale Transaction, and have allowed the Debtors to chart a path toward an orderly and cost-efficient wind-down on the terms set forth in the Plan.

102.    Moreover, the Debtor Release is necessary for the finality contemplated by the Plan.  Without the Debtor Release contemplated in the Plan, stakeholders may continue to litigate over the Estates, which would cause related wind-down issues and additional expenses. The Debtor Release provides finality, facilitates the consummation of the Plan, and allows for an orderly wind-down and liquidation of the Debtors' Estates.  In the absence of the aforementioned parties' contributions, the Wind-Down Transactions contemplated by the Plan would be significantly more challenging to effectuate.  The Debtor Release, therefore, is key to the successful implementation of the Plan for the benefit of all stakeholders.

---

[128]    *See* Kosturos Declaration, ¶ 25.

[129]    *Id.*

103.    ***Second***, the Debtor Release is essential to the success of the Debtors' Plan because it constitutes an integral term of the Plan.[130]  Indeed, absent the Debtor Release, the Debtors may not have been able to build the level of consensus with respect to the Plan and the transactions contemplated thereby.   Importantly, the Debtor Release is the product of arm's-length and good-faith negotiations between the Debtors and their key stakeholders and is limited in scope.[131] The Debtor Release does not release any entity other than the Released Parties, their respective Affiliates, and each of their Related Parties (to the extent such Related Parties would be obligated to grant a release under principles of agency if they were so directed by the Releasing Parties to which they are related), as applicable, and does not release the Claims and Causes of Action expressly set forth and preserved by the Plan.[132]  In consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from potential Claims and Causes of Action of each of the Releasing Parties.[133]  The Debtors do not believe that they have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan.[134]  The Debtors believe the Debtor Release is appropriate in light of the risk, expense, and delay of pursuing any such Causes of Action with respect to the Released Parties as compared to

---

[130]    *See* Transier Declaration, ¶ 27.

[131]    *See id.* ¶¶ 31–32; *see also* Kosturos Declaration, ¶ 26.

[132]    *See* Plan, Art. IV.R.

[133]    *See* Plan, Art. VIII.C.

[134]    *See* Transier Declaration, ¶ 28.

the results and benefits achieved under the Plan.[135]  The Debtor Release provides finality and closure to the wind-down process and these Chapter 11 Cases and underpins the various compromises of issues achieved by the Plan.[136]  Therefore, the inclusion of the Debtor Release is integral to the Plan's success, is worthwhile, and inures to the benefit of the Debtors' stakeholders.

104.    *Third*, as evidenced by the Voting Report and noted herein, the Debtors' stakeholders overwhelmingly support the Plan, including the Debtor Release, and no stakeholder has objected to the Debtor Release contained in the Plan.  The Voting Classes each voted to accept the Plan.[137]  This degree of consensus evidences the Debtors' stakeholders' support for the Debtor Release and Plan.

105.    *Fourth*, an identity of interest exists between the Debtors and the Released Parties. Whether there is an identity of interest depends on whether the debtor and non-debtor are sufficiently interlinked such that a lawsuit against the non-debtor would effectively be a lawsuit against the debtor or would deplete the assets of the debtor's estate.[138]  Lawsuits against the Released Parties may implicate the Debtors, and each Released Party shares a common goal with the Debtors in seeing the Plan succeed and implementing the transactions contemplated thereunder.[139]  Moreover, with respect to certain of the releases—*e.g.*, those relating to the Debtors'

---

[135]  *See id.* ¶¶ 28–34.

[136]  *See id.* ¶ 33; *see also* Kostorus Declaration, ¶ 24.

[137]  *See* Voting Report, Exhibit A.

[138]  *In re Master Mortg*, 168 B.R. at 935 (Bankr. W.D. Mo. 1994).

[139]  *See In re Mercy Hosp.*, No. 23-00623, 2024 WL 2890139, at *4 (Bankr. N.D. Iowa June 7, 2024) ("Particularly persuasive [to finding that there exists an identity of interest] is the fact that these releases were integral to the consensual nature of the Plan and necessary to avoid the prospect of immense and complex litigation absent the releases."); *see also In re Tribune*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding that the debtors and released

current and former directors—there is a clear identity of interest supporting the Debtor Release because the Debtors will assume certain indemnification obligations under the Plan that will be honored by the Liquidation Trustee.  Thus, a lawsuit commenced by the Debtor (or derivatively on behalf of the Debtors) or the Liquidation Trustee, as applicable, against certain individuals would effectively be a lawsuit against the Debtors' own interest.

106.    ***Fifth***, the Plan maximizes the value of the Debtors' assets and the distribution of available proceeds to creditors.  The Plan provides for meaningful recoveries for creditors in exchange for, among other things, the Debtors' Release of potential claims, and the Plan has been carefully crafted to maximize value and provides meaningful recoveries for all stakeholders under the circumstances.

107.    For the reasons set forth above, and as supported by the Transier Declaration, the *Zenith* factors support approval of the Debtor Release, and the Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan.  Thus, the Bankruptcy Court should approve the Debtor Release in the Plan.

**2.      The Consensual Third-Party Release Is Appropriate.**

108.    The Plan also provides for mutual releases by certain Holders of Claims and Interests.  Specifically, Article VIII.C of the Plan provides that each Releasing Party shall release any and all Claims and Causes of Action such parties could assert against the Released Parties (the "<u>Third-Party Release</u>"), with certain limited exceptions.  The Releasing Parties include, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Liquidating Trustee; (c) the Prepetition ABL Lenders; (d) the Prepetition Priority Term Loan Lenders who affirmatively opt

---

parties "share the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest").

in to the releases provided in the Plan; (e) the Prepetition Existing Term Loan Lenders who affirmatively opt in to the releases provided by the Plan; (f) the Prepetition ABL Agent; (g) the Prepetition Priority Term Loan Agent (including any predecessor agent); (h) the Prepetition Existing Term Loan Agent (including any predecessor agent); (i) the Purchaser; (j) all Holders of Claims against the Debtors who affirmatively opt in to the releases provided by the Plan; (k) all Holders of Interests in the Debtors who affirmatively opt in to the releases provided by the Plan; (l) the Initial Term Loan Agent; (m) each current and former Affiliate of each Entity in clause (a) through (n) for which such Entity is legally entitled to bind such Affiliate to the releases contained in the Plan under applicable non-bankruptcy law; and (n) each Related Party of each Entity in clause (a) through (m) for which such Affiliate or Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law. The Third-Party Release is consensual, consistent with established Third Circuit law, and integral to the Plan. The Third-Party Release should therefore be approved.

109.    Courts in this jurisdiction routinely approve such release provisions if, as here, they are consensual and appropriately tailored. Consensual releases are permissible on the basis of general principles of contract law.[140] Courts have also held that an affirmative agreement from an affected creditor will render a release consensual.[141] The law is clear that a release is consensual where parties have received sufficient notice and have had an opportunity to object to and/or opt

---

[140]    *See In re Smallhold, Inc.*, 665 B.R. 704, 722–23 (Bankr. D. Del. 2024) (following the "contract model" of evaluating third-party releases); *In re Coram Healthcare Corp.*, 315 B.R. at 336 ("[A] [p]lan is a contract that may bind those who vote in favor of it.").

[141]    *See id.* ("[T]o the extent creditors or shareholders voted in favor of [a plan providing for the release of their claims] they are bound by that [plan]."); *In re W. Coast Video Enters., Inc.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("[E]ach creditor bound by the terms of the [non-debtor] release must individually affirm same, either with a vote in favor of a plan including such a provision, or otherwise.").

in to the releases.  In *Emerge*, this Court recognized that a release by a non-debtor third party is consensual where the releasing party indicates its consent by an affirmative act.[142]  Since *Emerge*, this Court and others have approved numerous third-party releases as consensual where the releasing third parties were required to indicate their consent by returning a form indicating the party's desire to participate in the third-party release.[143]

110.    Furthermore, the Supreme Court's decision in *Purdue* is not at odds with the release provisions commonly approved by this Court, and its holding is generally inapplicable to the release provisions contemplated by the Debtors.  In *Purdue*, the Supreme Court made clear the narrow scope of the decision by pointing out that "nothing in [this opinion] should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan."[144]  Therefore, *Purdue*'s applicability is limited to cases where a debtor or debtors seek non-consensual third-party releases.

111.    Approval of the Third-Party Release under the circumstances of these Chapter 11 Cases is appropriate because it is not binding on any non-consenting parties.  Here, all parties in interest were provided extensive notice of these Chapter 11 Cases, the Plan, and the deadline to

---

[142]  *Compare In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (declining to approve third-party release where holders of claims and interests were presumed to consent to participation in the third-party release if they did not return an opt-out form, regardless of whether such holder returned a ballot); *with*, *e.g.*, *In re AeroCision Parent, LLC*, No. 23-11032 (KBO) (Bankr. D. Del. Mar. 4, 2024) (approving a consensual third-party release that included, among others, all holders of claims who return a ballot voting to accept the plan, with no option to opt out); *In re Virgin Orbit*, No. 23-10405 (KBO) (Bankr. D. Del. July 31, 2023) (same); *In re Lucky Bucks,* No. 23-10758 (KBO) (Bankr. D. Del. July 28, 2023) (same, also including all holders of claims who return a ballot voting to reject plan who do not opt out).

[143]  *See In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025) (confirming a chapter 11 plan including opt-in third-party releases); *In re Tupperware Brands Corp.*, No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025) (same); *In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same).

[144]  *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 226 (2024) (emphasis added).

object to confirmation of the Plan.  Moreover, the Disclosure Statement, the Combined Hearing Notice, the Ballots, the Notices of Non-Voting Status, and the Opt-In Forms provided recipients with timely, sufficient, appropriate, and adequate notice of the Third-Party Release.  The Debtors required all Holders of Claims or Interests to affirmatively opt in to the Third-Party Release by either checking a box on the Ballot and returning the Ballot, or by completing and returning the applicable Opt-In Form, and provided each Holder of a Claim or Interest with ample notice and instructions on how to do so.  As of the Voting Deadline, 43 parties have affirmatively opted into the Third-Party Release by completing and returning a Ballot with the applicable box checked, or by completing and returning the applicable Opt-In Form.[145]

112.    For all these reasons, the inclusion of Holders of Claims against or Interests in the Debtors who affirmatively opt in to the releases provided by the Plan as "Releasing Parties" under the Plan and with respect to the Third-Party Release is appropriate and should be approved. Importantly, the Combined Hearing Notice, the Opt-In Forms, and the Ballots, as applicable, quoted the entirety of the Third-Party Release in bold, conspicuous font, and clearly provided such Holders with detailed instructions on how to opt-in to the Third-Party Release.  Thus, affected parties were on notice of the Third-Party Release, including the option to opt in to the Third-Party Release.  All Holders of Claims and Interests also had the opportunity to object to the Third-Party Release by timely filing an objection to the Plan.  The Third-Party Release is therefore consensual as to all creditors and interest holders who affirmatively opted in to the Third-Party Release.

113.    The Third-Party Release brought key stakeholders to the table for negotiations around the Sale Transaction and the Plan, each of which contributed to the Debtors' success in

---

[145]    Certain parties submitted Opt-In Forms after the Voting Deadline that were accepted by the Debtors based on a consensual extension of the applicable deadline for such parties.

these Chapter 11 Cases.  As noted in the Kosturos Declaration, the Third-Party Release was necessary to secure support for the Plan.[146]  And importantly, the Third-Party Release only applies to parties who have (a) actively participated in the chapter 11 or Plan process, including in the formulation and negotiation of the Third-Party Release or (b) manifested their affirmative consent to the Third-Party Release.  Thus, the Third-Party Release is wholly consensual.

114.    The Debtors submit that the inclusion of "Affiliates" and "Related Parties" as "Releasing Parties" is also appropriate, even though those parties have not necessarily manifested consent to the Third-Party Release.[147]  Courts in this district regularly approve such provisions, so long as the Plan specifies that such entities are "Releasing Parties" solely to the extent they can be bound under principles of applicable agency law by the "Releasing Party" to which they are related, so that a hypothetical future court may intelligibly interpret the Plan to determine if a party was released or not.[148]  Here, the Plan provides that "Affiliates" and "Related Parties" are "Releasing Parties" to the extent that such Entity "is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law."[149]  Therefore, the inclusion of "Affiliates" and "Related Parties" in the Third-Party Release should be approved.

---

[146]    *See* Kosturos Declaration, ¶ 29.

[147]    *See* Plan, Art. I.A.125.

[148]    *See In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025) (confirming a chapter 11 plan including opt-in third-party releases); *In re Tupperware Brands Corp.*, No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025) (same); *In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same).

[149]    Plan, Art. I.A.125.

115.    For the foregoing reasons, the Third-Party Release is consensual, permissible, and an integral and necessary part of the Plan.  Accordingly, the Third-Party Release should be approved.  No party has asserted otherwise.

### 3.    The Exculpation Provisions Are Appropriate.

116.    Exculpation provisions that apply only to estate fiduciaries and are limited to claims not involving actual fraud, willful misconduct, or gross negligence are customary and generally approved in this district under appropriate circumstances.[150]  Unlike third-party releases, exculpation provisions do not affect the liability of third parties per se, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for claims arising over the course of the Chapter 11 Cases.[151]

117.    Article VIII.D of the Plan provides for the exculpation of the Exculpated Parties.[152] The exculpation is fair and appropriate under both applicable law and the facts and circumstances of these Chapter 11 Cases.[153]  The Plan's exculpation provision is the product of good-faith,

---

[150]    *See In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025) (confirming a chapter 11 plan including an exculpation provision); *In re Tupperware Brands Corp.*, No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025) (same); *In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same).

[151]    *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019, 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion, Inc.*, No. 09-10690, 2010 WL 2905001, at *16 (Bankr. D. Del. Apr. 16, 2010) (same).

[152]    Article I.A.52 of the Plan defines "Exculpated Parties" as, collectively, (a) each of the Debtors; (b) each of their respective current officers and their respective current and former directors, managers, attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Effective Date and (c) the Committee, its Professionals, and its members.  For the avoidance of doubt, the Former Officers shall not be Exculpated Parties.

[153]    *See In re Lab'y Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*,

arm's-length negotiations, is critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' major stakeholders. The exculpation provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.

118. Moreover, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors. As discussed above, this Court must find, under section 1129(a)(2) of the Bankruptcy Code, that the Debtors have complied with the applicable provisions of the Bankruptcy Code. This Court must also find, under section 1129(a)(3) of the Bankruptcy Code, that the Plan has been proposed in good faith and not by any means forbidden by law. These findings apply to the Debtors and, by extension, to certain of the Debtors' officers, directors, employees, and professionals. Furthermore, these findings imply that the Plan was negotiated at arm's-length and in good faith. Where such findings are made, parties who have been actively involved in such negotiations should be protected from collateral attack.

119. Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases. Such negotiations were extensive, and the resulting agreements and compromises were implemented in good faith with a high degree of transparency.[154] As a

---

No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor purchaser was appropriate under section 1123(b)).

[154] *See* Kosturos Declaration, ¶ 32.

result, the Plan is supported by all Voting Classes and the Committee.[155]    Accordingly, the Court's

findings of good faith vis-à-vis the Chapter 11 Cases should also extend to the Exculpated Parties.

120.    In addition, the promise of exculpation played a significant role in facilitating Plan

negotiations.  All of the Exculpated Parties played a key role in negotiating, formulating, and

implementing the Sale Transaction, the Disclosure Statement, the Plan, and related documents in

furtherance thereof, which paved the way for a remarkable value-maximizing resolution of these

Chapter 11 Cases.  The Exculpated Parties may not have been inclined to participate in the plan

process without the promise of exculpation.  Exculpation for parties participating in the plan

process is appropriate where plan negotiations could not have occurred without protection from

liability.[156]  Accordingly, under the circumstances, it is appropriate for the Court to approve the

exculpation provision and to find that the Exculpated Parties have acted in good faith and in

compliance with the law.[157]

### 4.    The Injunction Provision Is Appropriate.

121.    The injunction provision set forth in Article VIII.E of the Plan (the "Plan

Injunction") merely implements the Plan's release and exculpation provisions by permanently

enjoining all entities from commencing or maintaining any action against the Debtors, the

Liquidating Trust, the Exculpated Parties, or the Released Parties on account of or in connection

with or with respect to any such Claims, Interests, or Causes of Action that are released,

discharged, settled, or subject to the exculpation pursuant to the Plan.  Thus, the injunction

---

[155]  *See, e.g.*, Voting Report, Exhibit A.

[156]  *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[157]  *See In re PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision exception for willful misconduct and gross negligence); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

provision is a key provision of the Plan because it enforces the release and exculpation provisions that are centrally important to the Plan. Moreover, the Plan Injunction is narrowly tailored to achieve its purpose and consensual as to any party that did not specifically object to it. As such, to the extent the Bankruptcy Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the Plan Injunction must also be appropriate. No party has asserted otherwise.

**B.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

122.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and non-bankruptcy law."[158]

123.    The Plan complies with section 1123(d) of the Bankruptcy Code. Article V.D of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code by payment of the Cure Claim in Cash on the Effective Date, subject to certain limitations set forth in the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.[159] Accordingly, the Debtors submit that the Plan fully complies with section 1123(d) of the Bankruptcy Code. No party has asserted otherwise.

**C.    Modifications to the Plan.**

124.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. Further, when the proponent of

---

[158]    11 U.S.C. § 1123(d).

[159]    Plan, Art. V.D.

a plan files the plan with modifications with the court, the plan as modified becomes the plan.

Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

accepted by all creditors and equity security holders who have previously accepted the plan if the

court finds that the proposed modifications do not adversely change the treatment of the claim of

any creditor or the interest of any equity security holder.   Interpreting Bankruptcy Rule 3019,

courts consistently have held that a proposed modification to a previously accepted plan will be

deemed accepted where the proposed modification is not material or does not adversely affect the

way creditors and stakeholders are treated.[160]  As courts have recognized, "a plan modification is

immaterial unless it will 'so affect a creditor or interest holder who accepted the plan that such

entity, if it knew of the modification, would be likely to reconsider its acceptance.' "[161]

125.    Contemporaneously herewith, the Debtors filed a modified version of the Plan,

which makes technical clarifications and resolves certain informal comments by various parties in

interest.   The modifications are immaterial or do not adversely affect the way creditors and

stakeholders who have previously accepted the Plan are treated and thus comply with section 1127

of the Bankruptcy Code and Bankruptcy Rule 3019.   Because none of the modifications to the Plan

are material or adversely affect Holder of Claims, the Debtors submit that no additional solicitation

or disclosure is required, and that such modifications should be deemed accepted by all creditors

that previously accepted the Plan.

---

[160]  *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234, 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191, 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[161]  *In re Boy Scouts of Am. & Del. BSA, LLC*, 650 B.R. 87, 168 (D. Del 2023) (quoting *In re Am. Solar King*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988)).

IV.    **The Mad River Objection Should Be Overruled.**

126.    The Mad River Objection does not present a basis to deny confirmation of the Plan. While Mad River purports to object to confirmation, the Mad River Objection is instead a reservation of rights to the extent the Debtors seek to assume the relevant lease under the Plan. For the avoidance of doubt, the Debtors have not sought, and will not seek, to assume this or any other lease of nonresidential real property pursuant to the Plan.  Instead, any nonresidential real property leases to be assumed will be assumed and assigned pursuant to the Sale Order. The Debtors will cease operations and winddown.  The only contracts to be assumed pursuant to the Plan are those essential to conducting a winddown and providing limited transition services. Accordingly, the Mad River Objection should be overruled as moot.

V.    **Good Cause Exists to Waive the Stay of the Confirmation Order.**

127.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."[162] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

128.    The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.  As noted above, these Chapter 11 Cases and the related transactions under the Plan are consensual and have been negotiated and implemented in good faith and with a high degree of transparency and public

---

[162]    Fed. R. Bankr. P. 3020(e).

dissemination of information.  The Debtors have undertaken great efforts to efficiently close the Sale Transaction, wind-down the remaining operations, and emerge from chapter 11 as soon as practicable.  Additionally, for each day the Debtors remain in chapter 11, they incur administrative and professional costs, which will be reduced if the Debtors emerge expeditiously.

129.    For these reasons, the Debtors, along with their advisors and other key constituents, are working to expedite the Debtors' entry into and consummation of the documents and transactions related to the Plan, ensuring that the Effective Date occurs as soon as possible after the Confirmation Date.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## Conclusion

130.    For all of the reasons set forth herein and in the Declarations, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Bankruptcy Court approve the Disclosure Statement on a final basis and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling all outstanding Objections, and granting such other and further relief as is just and proper.

Dated:  October 21, 2025
Wilmington, Delaware

/s/ Zachary I. Shapiro
**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Clint M. Carlisle (No. 7313)
Colin A. Meehan (No. 7237)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:       (302) 651-7700
Facsimile:       (302) 651-7701
Email:             defranceschi@rlf.com
                        heath@rlf.com
                        shapiro@rlf.com
                        carlisle@rlf.com
                        meehan@rlf.com

*Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:             joshua.sussberg@kirkland.com
                        allyson.smith@kirkland.com

- and -

Alexandra F. Schwarzman, P.C. (admitted *pro hac vice*)
Robert A. Jacobson (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:             alexandra.schwarzman@kirkland.com
                        rob.jacobson@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*